ORIGINAL

FILED
NOV 2 1 2005
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CLEARMEADOW INVESTMENTS, LLC, CLEARMEADOW CAPITAL CORP., Tax Matters Partner,

Plaintiff,

v.

UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE,

Defendant.

No. 05-1223T

**COMPLAINT FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER INTERNAL REVENUE CODE (IRC) § 6226**

**Nature of Action**

1. This is a federal income tax partnership proceeding brought under Appendix F of the Rules of the United States Court of Federal Claims and § 6226(a) of The Internal Revenue Code of 1986 (as amended) (26 U.S.C) (hereinafter referred to as "IRC") to contest the findings of the Internal Revenue Service in the Notice of Final Partnership Administrative Adjustment dated August 24, 2005 (hereinafter referred to as "FPAA").

**Statement of the Claim**

2. Clearmeadow Investments, LLC, through the Tax Matters Partner, hereby seeks -

(a) a refund (with interest provided by law) of the $175,870 in federal income taxes, including additions, paid to the Internal Revenue Service ("IRS") pursuant to the adjustments made to the FPAA, paid by Mark Hutton, (hereinafter referred to as "Hutton") the sole shareholder and president of Clearmeadow Capital Corp., (hereinafter referred to as "Capital Corp.") a Delaware corporation and the tax matter partner.

(b) a determination of partnership items and the related adjustments set forth in the FPAA, and

(c) a determination of the partnership level defenses relating to the penalties asserted in the FPAA.

3. That FPAA was issued by the Internal Revenue Service Director, Small Business/Self-Employed, St. Louis, Missouri 63166. The adjustments relate to the year ended December 31, 2001. The IRS issued a copy of the FPAA to Clearmeadow Investments, LLC, The Tax Matters Partner. It is attached as Exhibit A and incorporated herein by reference.

4. The FPAA asserts adjustments in partnership income, partnership expenses, contributions by partners and distributions to partners and asserts alternative forms of penalties under IRC § 6662. All of those assertions and explanations are disputed.

**The Parties**

5. Clearmeadow Investments, LLC (herein referred to as "Clearmeadow") is a limited liability company formed on October 10, 2001 under the laws of the State of Delaware. It is treated as a partnership for federal income tax purposes. The taxpayer identification number of Clearmeadow is 48-1251013, and its principal place of business is 2229 S. West Street, Wichita, KS 67213. Its United States Partnership Return (Form 1065) for 2001 was filed with the Internal Revenue Service Center.

6. Hutton is the president and secretary of Capital Corp. which is the managing member of Clearmeadow and is The Tax Matters Partner.

7. The tax matters partner is filing this complaint for readjustment of partnership items within the period specified in IRC § 6226(a).

8. The Defendant is the United States of America with respect to the claims and actions by its agent, the IRS, an executive agency within the Department of Treasury. Service of process may be made on Defendant through the Attorney General at the Tax Division of the Department of Justice and upon such other offices or individuals as may be required.

**Jurisdiction**

9. This Court has jurisdiction over this claim, pursuant to 28 U.S.C. § 1508 and 26 U.S.C. § 6226(b).

**Deposit**

10. On September 11, 2003, Hutton paid $175,870 in tax, including additions, to the IRS with respect to the adjustments made by the IRS with respect to the FPAA. In accordance with IRC § 6226(e), the payment represents the amount by which Hutton's tax liability, including additions, would be increased under the adjustments asserted in the FPAA issued by the Internal Revenue Service.[1]

**Assignments of Error**

11. The FPAA issued by the IRS erred in the following particulars:

a. In attempting to do indirectly what the IRS admits it cannot do directly;

b. In seeking to substitute pejoratives and self-serving labels (i.e. lack of economic substance, economic sham, etc.) for the results permitted by law, simply because those results and that law do not favor the IRS in this particular case;

[1] Pursuant to IRC Section 6226(e), the amount of the payment should be the amount by which the tax liability of Hutton would be increased if the treatment of the *partnership items* on that partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the FPAA. Clearmeadow's FPAA relates to 2001 and identifies the total partnership item adjustments. Hutton's share of that adjustment as reported by Capital Corp. would result in additional tax, including adjustments, of approximately $175,870 to Hutton.

c. In simultaneously honoring the existence of the partnership/LLC whenever it suits the IRS' interests and disregarding the existence of the partnership/LLC whenever its existence does not suit the IRS' interests;

d. In asserting that, under Treas. Reg. §1.701-2, Clearwater was a sham and was formed or availed of in connection with a transaction or transactions, a principal purpose of which was to reduce substantially the present value of the partner/members' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code, and, as a consequence, (i) the partnership should be disregarded and all transactions engaged in by the partnership/LLC should be treated as engaged in directly by the partners/members; and (ii) Euros purportedly acquired by the partnership/LLC should be treated as having been acquired directly by purported partner/members;

e. In asserting that, under Treas. Reg. §1.701-2, Euro currency contributed to or assumed by Clearmeadow should be treated as never having been contributed or assumed and gains or losses realized by the partnership/LLC on the transactions should be treated as having been realized by the partners/members directly;

f. In further asserting that, under Treas. Reg. §1.701-2, the partners should not be treated as partners;

g. In further asserting that, under Treas. Reg. §1.701-2, the contributions to the partnership/LLC "will be adjusted to reflect clearly" at some unspecified time and in some unspecified way the Commissioner's view of the partnership/LLC's or partner/members' income;

h. In further asserting that, even if the Euro currency were treated as contributed to Clearmeadow, the investment should be reduced, both in the hands of the contributing partner/members and the partnership/LLC, by any amount received by the partner/member from the contemporaneous sale of a substantially similar amount to the same party;

i. In further asserting that the 40% penalty attributable to a gross valuation misstatement applies under IRC §§ 6662(a), 6662(b)(1), 6662(c) and 6662(h);

j. In asserting alternatively that the 20% penalty attributable to negligence or disregard of rules and regulations applies as provided by IRC §§ 6662(a), 6662(b)(2), and 6662(c);

k. In asserting alternatively that the 20% penalty attributable to a substantial understatement of income tax applies under IRC §§ 6662(a), 6662(b)(2), and 6662(c) and that the 20% penalty for substantial understatement of income tax for tax shelter transactions applies;

l. In asserting alternatively that the 20% penalty for substantial valuation misstatement applies under IRC §§ 6662(a), 6662(b)(2), and 6662(c);

m. In applying certain broad, ambiguous, and unconstitutionally vague phrases in Treas. Reg. § 1.701-2 without regard to the principles embedded in Examples 1, 9, and 10 of that regulation — principles that confirm the correctness of Plaintiffs' returns; and

n. In effectively treating the sold Euro currency as liabilities under IRC § 752 and thereby, reducing basis.

**Facts**

12. The facts, and mixed matters of fact and law, on which Plaintiffs rely are as follows:

a. Hutton is a hard working successful business man who has always taken great care to follow the law. The IRS does not like the result of that law in this case and now wants to ignore the same principles the IRS successfully urged and applied to its financial advantage in other cases. That effort, along with the IRS effort to override the role of the judiciary and Congress, defies the precedent of this Court and this Circuit.

b. The IRS has at times, as here, unilaterally considered a business entity validly formed under state law a sham, but Hutton does not. Hutton had invested in the stock and bond market for over 20 years and weighed the risks and rewards of the investment of the current situation absent any potential tax benefits.

c. Hutton has always followed the advice of professionals (i.e. Lawyers, Certified Public Accountants, etc.) as to risk/reward and the suggested business structure with respect to any investment or business venture in which he has been involved.

d. Subsequent to the collapse of the stock market beginning in February 2000, Hutton recognized the importance of the financial diversifications of his business and investment assets.

e. In early 2001, Brian Hanning of Allen Gibbs, and Houlig, CPA, a personal friend and investment advisor to Hutton for many years, contacted Hutton and suggested investing in a foreign currency based investment strategy comprised of certain foreign currency market linked deposit (hereinafter referred to as "MLD") that is the subject of the FPAA.

f. Hutton, upon initially learning about the MLD investment that is the subject of the FPAA, was informed that it was an opportunity to make money on the investment and for which potential tax benefits existed.

g. Brian Hanning set up conference calls with a law firm known as Cantley & Sedacca, LLP who provided further information regarding the investment strategy, the name of a broker, the opportunity to make money on the investment, and the complicated, but potential tax benefits that might flow from the investment.

h. Hutton continued to have numerous meetings, (minimum of three) with the law firm of Cantley & Sedacca, LLP, in an attempt to understand and evaluate the investment prior to making any commitment with respect to the investment.

i. At the first meeting, Hutton had Brian Hanning of Allen Gibbs, and Houlig, CPA, a personal friend and investment advisor, present to provide him with an independent analysis of the investment .

j. In the second meeting with Cantley & Sedacca, LLP, Hutton had his personal accountant (Scott Hewitt, CPA) since 1993 present again for assurance and to provide an independent view as to the merits of the investment and to provide him an opinion as to the potential tax benefits, if any, that is now the subject to the FPAA.

k. Hutton and Hewitt discussed the risk of the investment and the possibility of a high return versus the risk of losing big on the investment.

l. Hewitt, independent of all other parties involved in the suggestion of the MLD investment to Hutton, provided an opinion that the MLD investment made logical sense and that the potential tax benefits were in compliant with the law.

m. Hewitt's thoughts, opinion, and conclusion were the deciding factors for Hutton in making the MLD investment.

n. Hutton spent significant amount of time and energy in understanding the MLD investment and the transaction involved, but ultimately relied on all the experts (i.e. CPAs, Attorneys, brokers, etc.) and their opinion and expertise in making the MLD investment.

o. Hutton also received advice from Dan Brooks of Clarion Capital. Mr. Brooks has a B.A. and Masters of Business Administration in finance/investments from Duke University and had over 20 years of investment experience.

p. Mr. Brooks also suggested to Hutton that he consider certain foreign currency market linked deposits type investments (MLD).

q. On October 10, 2001 Hutton formed Clearmeadow Investment LLC in order to provide efficiency of investment and limited liability with respect to his MLD investment.

r. Hutton initially invested $287,500 in Clearmeadow by opening an account with Deutsche Bank and depositing money in the account.

s. Upon formation of Clearmeadow, Hutton was the sole member & beneficial owner of Clearmeadow.

t. Hutton was advised that the tax laws provided some downside protection if he would ultimately lose money on his investment. He was also told by competent tax advisors that the tax laws and the courts recognized that taxpayers may arrange their affairs so as to minimize their tax liabilities.

u. Hutton, as a businessman, knew that he needed to rely upon capable people (qualified and experienced) to handle the intricacies of the tax laws and that business transactions could and should be structured with tax consequences in mind.

v. On October 15, 2001, Clearmeadow (purchased) entered into a long position with Societe Generale (hereinafter referred to as "SG"), an international banking and finance group based in France, with the purchase of 27,472,520 Eurodollars. This investment matured on December 14, 2001 at which time SG would be required to pay Clearmeadow the principal amount plus fixed and variable interest amounts.

w. Clearmeadow paid a premium to acquire this long position equal to 2,747,252 Eurodollars.

x. SG is, and was at all times, an unrelated third-party with respect to Hutton and Clearmeadow.

y. On October 15, 2001, Clearmeadow (sold) entered into a short position with SG with the sale of 27,472,520 Eurodollars, when SG deposited this amount with Clearmeadow. This investment matured on December 14, 2001 at which time Clearmeadow would be required to pay SG the principal amount plus fixed and variable interest amounts.

z. Although the long and short term position in the MLD investment by Clearmeadow appear to be similar, the strike price on the long term position (Japanese Yen/U.S. Dollar exchange rate) must be at least 124.65, while the strike price on the short term position (Japanese Yen/U.S. Dollar exchange rate) must be at least 124.167.

aa. Hutton, in making his decision to make this MLD investment, was informed the long term and short term position had a 28% statistical probability of both

being satisfied such that Clearwater would recognize a 60% return on the net investment, a 1.3 % statistical probability of the long position (but not the short position) being satisfied, such that the return on the net investment would be 14,466%, but that there was a 70% statistical probability that neither would be satisfied such that the entire investment would be lost.

bb. On October 17, 2001, Hutton transferred his entire membership interest in Clearmeadow to Capital Corp., a Delaware corporation and withdrew as a member of Clearmeadow.

cc. At this time, Capital Corp. was admitted as a member along with CF Advisors XXXCII, LLC ("CF Advisors") a domestic limited liability company unrelated to Hutton, Clearmeadow or Capital Corp.

dd. When CF Advisors was admitted as a member of Clearmeadow, Clearmeadow is deemed converted from a disregarded entity to a partnership for federal income tax purposes. As such, the Corporation is treated as having contributed the MLD positions and the other assets of Clearmeadow (as a disregarded entity) to a newly formed Clearmeadow (as a partnership). The Corporation's basis in its ownership interests in Clearmeadow at such time is equal to the gross premium paid by Clearmeadow for its ML Deposit position plus the amount of Clearmeadow's cash and basis in other assets.

ee. Capital Corp. was and remains a validly formed and validly existing corporation under Delaware law and shortly after its formation, timely filed a Form 2553 (Election by a Small Business Corporation under section 1362 of the Internal Revenue Code) with the IRS.

ff. Capital Corp. was formed so that Hutton could isolate his investment with CF Advisors XXXCII, LLC in one entity, Clearmeadow, while utilizing another entity, Capital Corp., for multiple types of investments which would continue to provide him limited liability.

gg. Clearmeadow was formed to limit liability for Hutton, and later transferred by Hutton to Capital Corp. so as to limit his joint investment with CF Advisors XXXCII, LLC to this one entity.

hh. At all relevant times, Clearmeadow has been a legally recognized entity under Delaware law.

ii. Following its formation in 2001, Clearmeadow engaged in business activity in its name and on its own behalf as a limited liability company.

jj. Investing through a limited liability company such as Clearmeadow served the important business purposes that normally cause people to form limited liability companies and partnerships (e.g., increasing returns through centralized control and investment decisions, leverage, collateral, administrative efficiency, consolidated cost reduction), but here it was also essential considering that Clearmeadow's philosophy was consistent with that of a hedge fund. As a matter of industry practice, hedge funds are organized as partnerships or limited liability companies.

kk. Contrary to the assertion in the FPAA, the tax consequences to each member of the Clearmeadow's operations and of transactions between the members and the limited liability company accurately reflected such member's economic arrangement and clearly reflected such member's income (individually and collectively) under the law.

ll. The limited liability company was formed for the express purpose of making money and Hutton would not have participated but for the opportunity to make money and diversify his investment position.

mm. The limited liability company was not formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partner/members' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K.

nn. During 2001, Clearmeadow (i) entered into enforceable binding MLD investment contracts in its own name as a party; (ii) maintained accounts in its own name; (iii) acquired foreign currency positions in its own name; (iv) bought foreign currency positions in its own name; (v) sold foreign currency positions in its own name; (vi) acquired equities in its own name; and (vii) conducted business as a functioning, existing limited liability company.

oo. Clearmeadow made all filings required by law. It had a separate bank account in its name. It traded and otherwise did business with unrelated parties in its name. In all respects, it conducted itself as a business entity, distinct from its members.

pp. In the Spring of 2002, Hutton as president of Capital Corp. received a Form K-1 from Clearmeadow reporting the results of his earnings/losses, as well as distributions of currency and stock. The Clearmeadow partnership return and Forms K-1 were prepared by a qualified CPA with knowledge of the facts. Clearmeadow and its partner/members relied on the expertise of the partnership return preparer and other advisors in preparing their returns.

qq. Clearmeadow and its members also engaged well qualified advisors to evaluate the financial merits of the investment and the proper tax treatment of the transactions in issue.

rr. Clearmeadow and its partner/members did not attempt to limit the scope of the advisors' research or investigation. The members secured tax opinions from their respected tax advisors, who informed them that the tax treatment of the losses from and transactions with Clearmeadow, as reported on the respective returns, were more likely than not correct.

ss. Clearmeadow filed its 2001 return in good faith with due diligence and reasonable regard for the income tax rules and regulations, and in reliance on qualified tax professionals who were in possession of all pertinent facts when the return was filed and whom Clearmeadow and its members believed when the experts opined that the position taken was more likely than not the correct position. The actions undertaken by Clearmeadow and its partner/members meet and exceed the ordinary care protected by IRC §§ 6662 and 6664 in complying with the income tax rules and regulations. Neither Clearmeadow nor its partner/members were negligent; nor did either act with intentional disregard of the rules or regulations under IRC § 6662.

tt. Neither the value nor the adjusted basis of any property claimed on Clearmeadow 2001 federal income tax return was 400% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any transaction between persons described in IRC § 482, 400% or more (or 25% or less) of the amount determined under IRC § 482 to be the correct amount of such price. All transactions reflected on the returns were reported at

amounts based on transactions with unrelated parties. No amounts on the returns were determined by valuation. Thus, the 40% valuation misstatement penalty is not applicable to Clearmeadow or its partner/members.

uu. Neither the value nor the adjusted basis of any property claimed on Clearmeadow 2001 federal income tax return was 200% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any transaction between persons described in IRC § 482, 200% or more (or 50% or less) of the amount determined under IRC § 482 to be the correct amount of such price. Thus, the 20% valuation misstatement penalty is not applicable to Clearmeadow or its partner/members.

vv. Clearmeadow had no substantial understatement of its income tax. Moreover, Clearmeadow and any transactions at issue are not tax shelters as defined by IRC § 6662(d)(2)(C) or (D). Even if a substantial understatement of income tax were ultimately determined to be due, there was substantial authority for the treatment of all items on the 2001 return of Clearmeadow and each partner/member had a reasonable basis for believing that the tax treatment of such item was more likely than not the proper treatment.

ww. In all events, no penalty can or should be applied against Clearmeadow, as an entity or against its partner/members since all concerned proceeded in good faith based upon reasonable cause within the meaning of IRC § 6664(c).

13. Accuracy related penalties under IRC § 6662 apply only to an underpayment of tax required to be shown on a return. No tax was required to be shown on the partnership return for Clearmeadow. Accordingly, no penalties are determinable in this proceeding. Even if an

underpayment were determined to be due, there was reasonable cause for such underpayment and Clearmeadow, through its partner/members, acted in good faith, in reliance on their qualified tax advisors. Hence, no penalty is due with respect to such underpayment pursuant to IRC § 6664(c). Furthermore, the FPAA is deficient with respect to the asserted penalties for failure to describe any factual basis for asserting them.

14. Defendant bears the burden of proof as to the penalties, as well as the substantive partnership items.

15. The FPAA (upon which this partnership proceeding is statutorily based under IRC § 6226) improperly adjusts "non-partnership items":

a. By statute, Clearmeadow and its members were required to contest the Final Partnership Administrative Adjustment, if at all, under IRC § 6226 "JUDICIAL REVIEW OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENTS."

b. Plaintiffs contested the FPAA by filing the Complaint sub judice under that statutory authorization.

c. Under, inter alia, IRC §§ 6221 and 6226, partnership proceedings such as this may only address "partnership items."

d. Pursuant to IRC § 6231(a)(3), a "partnership item" is an item prescribed by regulation as more appropriately determined at the partnership level than at the partner level.

e. The basis in their respective partnership interests was determined accordingly. That basis is commonly referred to as "outside basis."

f. The outside basis of a given partner is not required to be reported on the US. Partnership Return drafted by Defendant for the taxable year 2001 or any other year.

g. That item was not reported anywhere on the U.S. Partnership Return drafted by Defendant and filed by Clearmeadow for the taxable year 2001 or any other year.

h. While Defendant's regulations address the partnership basis of assets contributed to or distributed by the partnership (known as "inside basis"), Defendant's regulations do not treat 'outside basis" as a partnership item and certainly do not treat pre-partnership activities as a partnership item.

i. The inside basis of the partnership assets is not disputed in this case.

j. Hence, Defendant's attempt to effectively treat the contingent obligation by Hutton under the sold short investment in the MLD as an offsetting fixed liability is not a partnership item and must be addressed, if at all, in the individual proceedings relating to the isolated company and their respective owners.

16. Defendant relied in the FPAA and now relies in this litigation upon language in Treas. Reg. § 1.701-2(a) and (b) that:

(i) contradicts, inter alia, the accurate analysis and conclusions codified in Treas. Reg. § 1.701-2(d), Examples 1,9, and 10;

(ii) creates internal inconsistencies, ambiguities, and unconstitutional vagueness;

(iii) seeks to circumvent, ignore, limit, restrict, and/or repeal various statutes enacted by Congress and thereby violates the legislative element of the Separation of Powers doctrine; and

(iv) seeks to unilaterally reverse precedent adopted by the judiciary and thereby violates the Separation of Powers doctrine confirmed in, inter alia, Bankers Trust

of New York v. United States, 225 F.3d 1368, 1376 (Fed. Cii. 2000) (citing Marbuy v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803).

17. To the extent any part of Treas. Reg. § 1.701-2 is valid or relevant, Defendant's regulation confirms by way of examples in subsection (d) that Clearmeadow must be recognized as a valid partnership for federal tax purposes:

a. In Example 1, the parties chose a partnership format (there a limited partnership, here a limited liability company) as a means of providing one of the partners with limited liability.

b. Defendant confirms in Example 1 that Congress intended Subchapter K to "permit taxpayers [such as the members of Clearmeadow] to conduct joint business activity through a flexible economic arrangement without incurring an entity level tax."

c. In Example 1 Treas. Reg. § 1.701-2(d), Defendant confirms that even though one partner alone "retained, indirectly, substantially all of the benefits and burdens of ownership of the property [that 99% partner contributed], the decision to organize and conduct business through [a partnership] under these circumstances is consistent with this intent [under Subchapter K]."

d. Further, Defendant confirms in Example 1 of its regulation that "on these facts [i.e., formation of a limited liability entity as a means of limiting liability for the 99% partner], the requirements of [Treas. Reg. § 1 .701-2] (a)(1), (2), and (3) are satisfied."

e. Defendant's regulation then concludes in mandatory terms that "[t]he Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction."

18. Examples 9 and 10 of Defendant's Treas. Reg. § 1.701-2(d) also require recognition of Clearmeadow.

a. In Example 9, A, one of the partners in partnership PRS decided to withdraw as did Hutton as a member of Clearmeadow.

b. The partnership agreement in the example permits A to receive cash or securities upon withdrawal — a determination that is retained by the managing member under the Clearmeadow Operating Agreement.

c. As here, A's outside basis in his partnership interest ($100x in the example) is significantly greater than the partnership's inside basis ($20x) in the securities the partnership chose to distribute.

d. Defendant's Example 9 recognizes that, as here, IRC § 732(b) attributes A's basis in his partnership interest ($1,000) to the securities distributed to him. As here, A may then sell those securities and recognize a substantial loss.

e. Defendant confirms in Example 9 that the tax consequences flow from the "electivity" Congress injected into IRC § 754, that the transaction is deemed to clearly reflect income, and that the Commissioner cannot recast the transaction, even though Example 9 specifies the principal purpose of the A and PRS as follows:

> In selecting the assets to be distributed, A and P had a principal purpose to take advantage of the facts that (i) A's basis in the Securities shall be determined by reference to A's basis in its partnership interest under section 732(b), and (ii) because PRS will not make an election under Section 754, the remaining partners of PRS will likely enjoy a federal tax timing advantage (i.e., from the $80x of additional basis in its assets that would have been eliminated in the Section 754 election had been made) that is inconsistent with proper reflection of income under paragraph (a)(3) of this section.

f. Having said that, Defendant then confirms that the tax treatment is proper there and therefore, here.

g. Defendant's Example 10 confirms that exact same conclusion that the same tax treatment flows by operation of law under IRC § 732(b) even where the principal purpose is to shift basis, that various aspects of Subchapter K (specifically including § 732) necessarily distort income, and that:

> Thus, the application of section 732 to this transaction will be treated as satisfying the proper reflection of income standard under paragraph (a)(3) of this section. The Commissioner therefore cannot invoke paragraph (b) of this Section to recast the transaction.

19. The positions urged by Defendant in this case also contradict the Defendant's historic construction and application of the word liability for purposes of IRC Section 752 and other determinations of basis.

a. That contradiction converts the historic clarity into inconsistencies, ambiguities, and unconstitutional vagueness.

b. Specifically, Defendant offsets the investment (Eurodollars) sold, against the Eurodollar they purchased. As a result, Defendant reduces the basis of Clearmeadow.

c. Historically, Defendant established and publicized that every liability is an obligation but not every obligation is a liability, and that an obligation does not rise to the level of a liability unless it is fixed (i.e., not contingent upon some future event).

d. Hutton and his advisors specifically relied upon Defendant's historic construction to their (potential) detriment.

20. The 2001 tax return of Clearmeadow was due March 15, 2002 for which the defendant had three years to perform an examination and make adjustments. The FPAA was

issued on August 25, 2001 and hence the statute of limitations prevents any adjustments to be made.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

(i) for a redetermination of the FPAA to remove all adjustments to income, losses, distributions, contributions by partners/basis, and penalties;

(ii) for recovery of the $175,870 in taxes, including additions paid by Hutton, as president and sole shareholder of Capital Corp., the tax matters partner;

(iii) to determine that the statute of limitations is applicable and any adjustments by the respondent are untimely; and

(iv) for such further relief to which Plaintiff may be justly entitled.

Date: Nov. 18, 2005

ROBERT J. STIENTJES
Missouri Bar No. 48922
Gasaway & Stientjes LLP
41 S. Old Orchard Ave., Ste. B
Saint Louis, Missouri 63119
314.961.3812 telephone
314.918.7120 facsimile
rjstientjes@gasawaytaxlaw.com