IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC,
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

The defendant, the United States, asks the Court to find the following facts, which are supported by citations to the complaint (Compl.), to the Declaration of Robert Stoddart (Stoddart Decl.) and its exhibits, and to the Declaration of Martha TenEyck (TenEyck Decl.) and its exhibits. The declarations are filed today as Appendix B (App. B) of the brief in support of the defendant's motion for summary judgment.

1. Mark Hutton (hereinafter Hutton), a resident of Wichita, Kansas (Stoddart Decl. Ex. 31 at 4, App. B at 149), has been a licensed general contractor since 1992; he received his license while doing business through Hutton Construction Corporation. (Stoddart Decl. Ex. 31 at 44, App. B at 175.) For the last 15 years he has been president of the Hutton Construction Corporation. (*Id*. at 45, App. B at 176.)

2. For the 2001 taxable year, Hutton Construction Corporation was an S-corporation; it issued a K-1 to Hutton that reported $921,885 of non-passive income. (Stoddart Decl. Ex. 29, App. B at 133.)

3. During 2001, Hutton noticed that his income was increasing over earlier years, though he did not consider the increase a "spike." (Stoddart Decl. Ex. 31 at 63, App. B at 180.)

4. Bryan Hanning (hereinafter Hanning) is employed with Massachusetts Mutual Life Insurance Company and is a member of AGH Wealth Advisors in Wichita, Kansas. (Stoddart Decl. Ex. 32 at 4, App. B at 194.)

5. In 2001, Hanning informed Hutton of an "investment strategy" (hereinafter the market-linked-deposit or MLD transaction) offered through the law firm of Cantley & Sedaca, LLP. The purported investment comprised certain foreign currency transactions. (Stoddart Decl. Ex. 32A, App. B at 217.)

6. Hanning had found Cantley & Sedacca listed under the caption "resources for investment opportunities and tax strategies" in a binder of information issued by the National Association for Family Wealth Counselors, an organization to which Hanning belongs. (Stoddart Decl. Ex. 32 at 5-6, App. B at 195-96.) Hanning called Cantley & Sedacca to learn about their investment choices and operations. (Stoddart Decl. Ex. 32 at 8, App. B at 198.)

7. Cantley & Sedacca was formed sometime in the second quarter of 2001. (Stoddart Decl. Ex. 35 at 4, App. B at 326.) The senior partner was Beckett Cantley, who was initially located in Atlanta, Georgia. (*Id*. at 11, App. B at 333.) Edward Sedacca was also a partner (*id.* at 4, App. B at 326); he was located in Dallas, Texas (*id*. at 11, App. B at 333).

8. Cantley & Sedacca had over 80 clients (Stoddart Decl. Ex. 35 at 12, App. B at 334), and a very high percentage of those clients entered into MLD transactions (*id*. at 12-14, App. B at 334-36). All of Cantley & Sedacca's MLD transactions relied upon a similar legal theory or analysis. (*Id*. at 8-9, App. B at 330-31.)

9. Edward Sedacca understood that market-linked deposits were a product of Deutsche Bank, and that the investments were executed through Dan Brooks, who had worked for Deutsche Bank. (Stoddart Decl. Ex. 35 at 19-20, App. B at 341-42.)

10. When a client contacted Cantley & Sedacca, the firm would arrange for the client to speak with one of their lawyers. The client was usually accompanied by his other advisors, including lawyers and tax advisors. At the meeting, the Cantley & Sedacca lawyer would explain the legal and technical issues raised by the MLD transaction. (Stoddart Decl. Ex. 35 at 17, App. B at 339.) The clients generally asked Cantley & Sedacca to create the entities used in the execution of the transaction; and Cantley & Sedacca gave the client a form requesting the information needed to create those entities. (Stoddart Decl. Ex. 35 at 18, App. B at 340.)

11. To gather necessary information about Hutton, Cantley & Sedacca sent Hanning a form captioned "Intake Summary," which Hanning helped Hutton to complete. Hanning then returned the form to Cantley & Sedacca. (Stoddart Decl. Ex. 32 at 14, App B at 203; Stoddart Decl. Ex. 32B, App. B at 218-20.)

12. Before 2001, Hanning had sold only one investment product to Hutton as an individual: a split-dollar variable life contract that contained mutual funds. (Stoddart Decl. Ex. 32 at 11, App. B at 200.) Hanning had also sold Hutton's business entities key-person life insurance policies and a 401(k) plan. (*Id*. at 12, App. B at 201.) Except for one life insurance

policy, all of the products Hanning had sold to Hutton and his entities were products of Massachusetts Mutual Life Insurance Company. (*Id*. at 12-13, App. B at 201-02.)

13. The MLD transaction is very different from all the other business Hanning has ever done with Hutton. (Stoddart Decl. Ex. 32 at 25-26, App. B at 208-09.)

14. So that Hutton could understand the nature of the MLD transaction, Hanning arranged conference calls among himself, Hutton, Cantley & Sedacca, Marc Kaplan, and Scott Hewitt. (Stoddart Decl. Ex. 32 at 27-29, App. B at 209A-210.) Edward Sedacca represented Cantley & Sedacca. (Stoddart Decl. Ex. 33 at 49, App. B at 252.) Marc Kaplan was a CPA employed by AGH Wealth Management Solutions. (Stoddart Decl. Ex. 32 at 33, App. B at 212.) Scott Hewitt (hereinafter Hewitt) is a CPA (Stoddart Decl. Ex. 33 at 45, App. B at 248) who performs accounting and tax services for Hutton and his entities (Stoddart Decl. Ex. 33 at 46-47, App. B at 249-50).

15. Because Hanning recommended Hutton as a purchaser of the MLD transaction, Cantley & Sedacca paid a referral fee to AGH Wealth Management Solutions, an entity in which Hanning had an ownership interest. (Stoddart Decl. Ex. 32 at 14-15, App. B at 203-04.)

16. Hanning disclosed to Hutton that Cantley & Sedacca had paid him a referral fee for recommending Hutton as a purchaser of the MLD transaction. (Stoddart Decl. Ex. 32 at 15, App. B at 204.)

17. On October 4, 2001, Cantley & Sedacca sent Hutton (through Hanning) a document captioned "Agreement for Your Legal Services." Hanning gave the document to Hutton. (Stoddart Decl. Ex. 32 at 15-16, App. B at 204-05; Stoddart Decl. Ex. 32C, App. B at 221-23.)

18. The October 4, 2001, Agreement required Hutton to represent: (1) that he had relied solely upon his (and his financial advisor's) independent investigation of all matters or concerns regarding the MLD transaction; and (2) that he (or his financial advisor) possessed knowledge and experience in financial and business matters sufficient to ensure his (or his financial advisor's) capability to evaluate the merits and risks of the MLD transaction. Cantley & Sedacca stated that they were not financial advisors themselves, and that they stressed that they had expressed no opinion about the MLD transaction. (Stoddart Decl. Ex. 32C at 1, App. B at 221.)

19. Hanning does not consider himself to be Hutton's investment advisor. (Stoddart Decl. Ex. 32 at 11, App. B at 200.)

20. When he discussed the MLD transaction with Hutton, Hanning did not have the knowledge and experience in financial and business matters needed to evaluate the merits of the transaction. (Stoddart Decl. Ex. 32 at 16, App. B at 205.)

21. Hanning did not represent to Hutton that he had the knowledge and experience in financial and business matters needed to evaluate the merits of the MLD transaction, and he never gave Hutton any reason to believe that he had such knowledge and experience. (Stoddart Decl. Ex. 32 at 16-17, App. B at 205-06.)

22. Hutton lacks the knowledge and experience in financial and business matters that would permit him to evaluate the merits and risks of trading options on foreign currencies. (Stoddart Decl. Ex. 31 at 15, App. B at 160.)

23. Hewitt has been Hutton's accountant since 1993. (Stoddart Decl. Ex. 33 at 5, App. B at 228.) Hutton considers Hewitt to be the financial advisor who had sufficient

knowledge and experience in financial and business matters to evaluate the MLD transaction. (*See* Stoddart Decl. Ex. 31 at 15, App. B at 160-61.)

24. Hewitt never gave Hutton any reason to think that he had the financial and business knowledge needed to evaluate the merits of trading options on foreign currencies. (*See* Stoddart Decl. Ex. 31 at 15-16, App. B at 160-61.)

25. Hutton never asked Hewitt whether the MLD transaction provided a reasonable opportunity of profit apart from tax considerations. (Stoddart Decl. Ex. 31 at 16-17, App. B at 161-62.) Hutton took Hewitt's silence on the subject as a statement that the MLD transaction actually did provide a reasonable opportunity for profit. (*Id*. at 17-18, App. B at 162-63; *see also id* at 23-24, App. B at 168-69.)

26. Hutton can remember no occasion on which Hewitt ever gave him an implicit opinion that a transaction would be profitable by failing to state that it would be unprofitable. (Stoddart Decl. Ex. 31 at 20, App. B at 165.)

27. Hutton never asked Hewitt to check the Black/Scholes calculations that purported to show the MLD transaction's possibility of profit; and Hewitt had never mentioned to Hutton the Black/Scholes calculation or the valuation of options. (Stoddart Decl. Ex. 31 at 22, App. B at 167.)

28. Hewitt never gave Hutton any assurance that he had a reasonable opportunity to make a profit on the MLD transaction independent of the tax benefits claimed for the transaction. Hewitt has no expertise in that area. (Stoddart Decl. Ex. 33 at 9, App. B at 232.)

29. Though Hewitt "noted" the possibility of profit when he discussed the MLD transaction with Hutton, Hewitt himself accepted the possibility of profit "on faith." (Stoddart Decl. Ex. 33 at 9-10, App. B at 232-33.)

30. Hutton never asked anyone whether the MLD transaction had a reasonable possibility of producing an economic profit in excess of tax benefits and out-of-pocket costs. (Stoddart Decl. Ex. 31 at 26, App. B at 171.)

31. When Hutton was deciding whether to enter the MLD transaction, no one except Cantley & Sedacca led him to believe that it offered a reasonable opportunity to make a profit. (Stoddart Decl. Ex. 31 at 108, App. B at 180B.)

32. Hutton relied on the advice of no one other than Hewitt and Hanning when he considered whether the MLD transaction had a reasonable possibility of producing a profit. (Stoddart Decl. Ex. 31 at 26, App. B at 171.)

33. The October 4, 2001, Agreement informed Hutton that Cantley & Sedacca would charge a flat fee of $150,000 for their services. (Stoddart Decl. Ex. 32C at 1, App. B at 221.) The fee would cover neither an audit defense if the IRS challenged Hutton's tax return nor expenses of any consequent litigation; Hutton would have to pay an additional, nonrefundable $25,000 fee if he later informed Cantley & Sedacca that he required such services. (*Id*. at 2, App. B at 222.)

34. On October 5, 2001, Hutton signed a document dated October 5, 2001, and captioned "Agreement for your Legal Services." Except for the signature and the date, this document is identical to the Agreement dated October 4, 2001, discussed in the previous paragraph. (*See* Stoddart Decl. Ex. 1, App. B at 5-7.)

35. On October 9, 2001, Edward Sedacca signed a certificate of formation for Clearmeadow Investments, LLC, a Delaware limited liability company. (Stoddart Decl. Ex. 2, App. B at 9.) The Delaware Secretary of State filed the certificate on October 10, 2001. (*Id.*, App. B at 8.)

36. The initial operating agreement of Clearmeadow Investments, LLC, dated October 10, 2001, named Hutton as the sole Member and provided that the Member would have no liability for the debts of the company except to the extent of his capital contribution. (Stoddart Decl. Ex. 3, ¶¶ 2.2, 3.2, App. B at 12.) Hutton's capital contribution was $287,500. (*Id.*, Schedule A-1, App. B at 18.)

37. On October 15, 2001, Clearmeadow Investments, LLC, deposited $287,500 into an account with Deutsche Bank Alex Brown (hereinafter DB Alex Brown). (Stoddart Decl. Ex. 7 at 3, App. B at 26.) DB Alex Brown is a member of the New York Stock Exchange (Stoddart Decl. Ex. 37 at 6, App. B at 365) and is a brokerage (*see* Stoddart Decl. Ex. 34 at 87, App. B at 297).

38. On October 15, 2001, Clearmeadow Investments, LLC, and Societe Generale, New York Branch, entered an agreement captioned "Confirmation for Currency Linked Deposit Swap." The Agreement was sent to the attention of Mr. Jason Saffran, Cantley & Sedacca. (Stoddart Decl. Ex. 16 at 1, 5, App. B at 49, 53.) The Agreement named Clearmeadow as the Depositor and Societe Generale as the Deposit Recipient; the Deposit Amount and the Deposit Settlement Amount were both EUR (Euros) 27,472,520; and the Date of Deposit was October 16, 2001. (*Id.* at 2, App. B at 50.) The Agreement generally foresaw two transactions:

(1) On the Maturity Date, which was to be December 14, 2001 (*ibid*.), Societe General would pay Clearmeadow the Deposit Settlement Amount, EUR 27,472,520, converted into US Dollars (USD) at the current spot exchange rate. Societe Generale would also pay Clearmeadow the "Fixed Yield," which the agreement defined as interest on the Deposit Amount from the Date of Deposit to the Maturity Date, calculated at the Deposit Interest Rate of 3.6650%. (*Id.* at 2-3, App B at 50-51.)

(2) On December 18, 2001 (the Settlement Date), Societe Generale would also pay Clearmeadow an additional amount (the "Premium Yield") if on December 14, 2001 (the Expiration Date), the Reference Exchange Rate (the exchange rate of US Dollars (USD) to Japanese Yen (JPY)) was equal to or greater than the Threshold Rate (USD/JPY 124.65). (*Id.* at 3, App. B at 51.) The "Premium Yield" was to be EUR 4,395,604–the product of the Premium Deposit Rate (16%) and the Deposit Amount, EUR 27,472,520. (*Id*. at 2-3, App. B at 50-51.) As consideration for this option, Clearmeadow was to pay Societe Generale a Premium of EUR 2,747,252 (*see id*. at 2, App. B at 50); Societe Generale would retain the Premium if the Reference Exchange Rate was less than the Threshold Rate on December 14, 2001. (*See id*. at 3-4, App. B at 51-52.)

39. In a legal opinion issued on January 22, 2002, Cantley & Sedacca called the preceding transaction the "long MLD position," and it summarized the transaction as follows: Clearmeadow deposited EUR 27,427,520 with Societe Generale on October 15, 2001. On December 14, 2001, Societe Generale was to repay this amount, plus 3.67% annual interest. Societe Generale would also pay Clearmeadow an additional amount, the "Long Bonus Yield," if on December 14, 2001, the "JPY/USD [*sic*] spot market exchange rate is at least 124.65."[1] Clearmeadow paid a premium to Societe Generale of EUR 2,747,252 for the long MLD position. (Stoddart Decl. Ex. 30 at 3, App. B at 137.)

40. On October 15, 2001, Clearmeadow Investments, LLC, and Societe Generale, New York Branch, entered a second agreement captioned "Confirmation for Currency Linked

---

[1] The exchange rate 124.65 suggests that the parties meant to reference the number of yen per dollar. If that is so, Cantley & Sedacca's expression, JPY/USD, seems more accurate than Societe Generale's expression, USD/JPY.

Deposit Swap." The Agreement was also sent to the attention of Mr. Jason Saffran, Cantley & Sedacca. (Stoddart Decl. Ex. 17 at 1, 4, App. B at 54, 57.) In this agreement, however, the parties reversed their roles: The Agreement named Societe Generale as the Depositor and Clearmeadow as the Deposit Recipient; the Deposit Amount and the Deposit Settlement Amount were identical to the amounts in the "long MLD position" already described–EUR (Euros) 27,472,520; and the Date of Deposit was again October 16, 2001. (*Id*. at 2, App. B at 55.) The Agreement also foresaw two transactions, the first of which is the mirror image of the corresponding transaction in the "long MLD position" already described:

> (1) On the Maturity Date, which was to be December 14, 2001 (*ibid*.), Clearmeadow would pay Societe Generale the Deposit Settlement Amount, EUR 27,472,520, converted into US Dollars (USD) at the current spot exchange rate. Societe Generale would also pay Clearmeadow the "Fixed Yield," which the agreement defined as interest on the Deposit Amount from the Date of Deposit to the Maturity Date, calculated at the Deposit Interest Rate of 3.6650%. (*Id.* at 2-3, App B at 55-56.)
>
> (2) On December 18, 2001 (the Settlement Date), Clearmeadow would also pay Societe Generale an additional amount (the "Premium Yield") if on December 14, 2001 (the Expiration Date), the Reference Exchange Rate (the exchange rate of US Dollars (USD) to Japanese Yen (JPY)) was equal to or greater than the Threshold Rate (USD/JPY 124.67). (*Id.* at 3, App. B at 56.) The "Premium Yield" was to be EUR 4,347,352–the product of the Premium Deposit Rate (15.824%) and the Deposit Amount, EUR 27,472,520. (*Id.* at 2-3, App. B at 55-56.) As consideration for this option, Societe Generale was to pay Clearmeadow a Premium of EUR 2,717,033 (*see id*. at 2, App. B at 55); Clearmeadow would retain the Premium if the Reference Exchange Rate was less than the Threshold Rate on December 14, 2001. (*See id*. at 3, App. B at 56.)

41. In a legal opinion issued on January 22, 2002, Cantley & Sedacca called the preceding transaction the "short MLD position," and it summarized the transaction as follows: Societe Generale deposited EUR 27,427,520 with Clearmeadow on October 15, 2001. On December 14, 2001, Clearmeadow was to repay this amount, plus 3.67% annual interest.

Clearmeadow would also pay Clearmeadow an additional amount, the "Short Bonus Yield," if on December 14, 2001, the "spot market JPY/USD [*sic*] exchange rate is at least equal to 124.67." Societe Generale paid a premium of EUR 2,717,033 for the short MLD position. (Stoddart Decl. Ex. 30 at 3-4, App. B at 137-38.) Cantley & Sedacca added, "We understand, and have assumed for purposes of our opinions herein, that the LLC's receipt of this premium did not constitute an income recognition event for federal income tax purposes for either the LLC or the investor [Hutton] at the time of receipt and that no income recognition event in respect of this premium will arise until the Short Maturity Date." (*Id.* at 4, App. B at 138.)

42. On a statement of account for Clearmeadow Investments, LLC, an entity called Clarion Capital, LLC, made an entry dated October 15, 2001, for a "Long Market Linked Deposit (MLD)." (Clarion Capital's role will be explained later.) The entry reads as follows (Stoddart Decl. Ex. 15B, App. B at 47):

| | | |
|---|---|---|
| Fixed Interest (3.665% annualized actual/360) | | USD 150,163 |
| Deposit Amount | EUR 27,472,520 | USD 25,000,000 |
| Premium Paid | EUR 2,747,252 | USD 2,500,000 |
| Bonus Coupon (Variable Interest Income) | | USD 2,800,000 |

The same statement also contains an entry dated October 15, 2001, for a "Short Market Linked Deposit (MLD)." It reads as follows (*ibid.*):

| | | |
|---|---|---|
| Fixed Interest (3.665% annualized actual/360) | | USD 150,163 |
| Deposit Amount | EUR 27,472,520 | USD 25,000,000 |
| Premium Received | EUR 2,717,033 | USD 2,472,500 |
| Bonus Coupon (Variable Interest Expense) | | USD 2,769,200 |

43. Hutton did not report the $2,472,500 "premium received" on his personal federal income tax return for 2001. (*See* Stoddart Decl. Ex. 29, App. B at 126-34.)

44. On October 15, 2001, Hutton sent a letter on Clearmeadow's stationery to Craig Brubaker at DB Alex Brown concerning Clearmeadow's account. The letter states, in part (Stoddart Decl. Ex. 18, App. B at 58):

> This letter constitutes your authorization to transfer the necessary funds to complete the purchase of the market linked deposits in the notional amount of US $25,000,000 and also to pay premiums totaling US $2,500,000 associated therewith from the above-referenced account to Societe Generale, New York ABA.

45. During the month of October, 2001, Clearmeadow's account with DB Alex Brown, contained no more than $287,500. (Stoddart Decl. Ex. 7 at 3-4, App. B at 26-27.)

46. Throughout the year 2001, Clearmeadow's account with DB Alex Brown never contained more than $287,500. (Stoddart Decl. Ex. 7 at 3-4, App. B at 26-27; Stoddart Decl. Ex. 8 at 3-4, App. B at 32-33; Stoddart Decl. Ex. 9 at 3-4, App. B at 36-37.)

47. Hewitt, Hutton's long-time accountant, is generally familiar with Hutton's holdings and assets. (Stoddart Decl. Ex. 33 at 6, App. B at 229.) Hewitt is not aware that Hutton had $27.5 million to invest in the MLD transaction. (*Id*. at 23, App. B at 246.)

48. Though Hutton claims to have believed that Deutsche Bank was lending him $27.5 million, he cannot recall signing a promissory note. (Stoddart Decl. Ex. 31 at 30-31, App. B at 172-73.) The defendant's trial attorney asked Hutton to send him a copy of any documents he might have that reference a loan from Deutsche Bank, but Hutton has sent no such documents. (*Id*. at 31, App, B at 172; Stoddart Decl. ¶ 1.) Hutton considers it unlikely that he would have lost such documents had they existed. (*Id*. at 107-08, App. B at 180A-180B.)

49. On October 15, 2001, DB Alex Brown did not transfer the sums of $25,000,000 and $2,500,000 from Clearmeadow's account to Societe Generale. (*See* Stoddart Decl. Ex. 7 at 3, App. B at 26.)

50. On October 16, 2001, DB Alex Brown wired $27,500 from Clearmeadow's account to Societe Generale in New York. (Stoddart Decl. Ex. 7 at 4, App. B at 27.) That amount is the net of the premium purportedly paid by Clearmeadow for the long MLD position, $2,500,000, and the premium purportedly received on the short MLD position, $2,472,500. (*See* Stoddart Decl. Ex. 15B, App. B at 47; *see also* Stoddart Decl. Ex. 34 at 142, App. B at 302.) This amount–$27,500–is also 1.1% (110 basis points) of $2,500,000, the premium for the long MLD position; it is also the amount the bank charged to set up the option. (*See* Stoddart Decl. Ex. 34 at 114-15, App. B at 298-99 (discussing an MLD transaction arranged by Clarion Capital and Daniel Brooks for a Mr. Bevan); *see also id.* at 143, App. B at 303 (the basic terms were the same for all the MLD transactions).)

51. On October 12, 2001, Robert S. Bloink, Esq., signed a certificate of incorporation for Clearmeadow Capital Corporation. (Stoddart Decl. Ex. 4, App. B at 20.) Mr. Bloink was an attorney with the firm of Cantley & Sedacca. (Stoddart Decl. Ex. 35 at 11, App. B at 333.)

52. On October 10, 2001–two days before Clearmeadow Capital Corporation was formed–Hutton signed an election to have it treated as an S-Corporation under the Internal Revenue Code. At the time, Clearmeadow Capital Corporation already had an Employer Identification Number. Hutton listed John V. Ivsan, Attorney at Law, as the legal representative the IRS should call if it required more information. (Stoddart Decl. Ex. 5, App. B at 21.) Mr.

Ivsan was an attorney with the firm of Cantley & Sedacca. (Stoddart Decl. Ex. 35 at 11, App. B at 333.)

53. The Delaware Secretary of State did not file the certificate of incorporation for Clearmeadow Capital Corporation until November 28, 2001. (*See* Stoddart Decl. Ex. 6, App. B at 23.)

54. On October 19, 2001, Hutton transferred his entire membership interest in Clearmeadow Investments, LLC, to Clearmeadow Capital Corporation as a contribution to its capital. (Stoddart Decl. Ex. 21, App. B at 61-62.) He accepted the transfer as president of Clearmeadow Capital Corporation. (*Id*., App. B at 62.)

55. On October 19, 2001, Mark E. Hutton, president of Clearmeadow Capital Corporation, and Daniel J. Brooks, president of CF Advisors XXXVII, LLC, executed an amended and restated operating agreement for Clearmeadow Investments, LLC. (Stoddart Decl. Ex. 22 at 1, 22, App B at 63, 84.) Clearmeadow Capital Corporation contributed $287,500 in exchange for 99,000 Class A Units (*id.* at 24, 23, App. B at 86, 85) and became the Class A Member (*id*. at 3, App. B at 65). CF Advisors contributed $2,500 "out of its service fees" for 1,000 Class B Units (*id*. at 25, 23, App. B at 87, 85) and became the Class B Member (*id*. at 4, App. B at 66). The agreement limited the members' liability to the amount of their contributions. (*Id*. at 15, 5, App. B at 77, 67.)

56. According to the restated operating agreement of Clearmeadow Investments, LLC, the Class A Member (Hutton's S-corporation) had solicited the Class B Member (Brooks and his LLC) to obtain the Class B Member's services as an investment advisor and specialist in foreign currency and foreign currency derivative investments. The parties agreed to pay the Class B

Member a front-end fee of $10,000 for his services, payable immediately, plus 2% of the company's net asset value as of the end of the fiscal year and 20% of all income and gains realized during the fiscal year. (Stoddart Decl. Ex. 22 at 14, App. B at 76.)

57. The Class A Member reserved the right to terminate the services of the Class B Member at any time after December 16, 2001, and–upon delivery of notice–to require the Class B Member to sell all of its Class B units to the Class A member for book value. The Class B Member had no similar rights against the Class A Member. (*See* Stoddart Decl. Ex. 22 at 18-19, App. B at 80-81.) In general, the Class A member had the continuing power of management. (*See id*. at 10, ¶ 5.1 & 15, ¶ 6.2(c); App. B at 72, 77.)

58. On October 10, 2001, nine days before CF Advisors became a member, Clearmeadow Investments, LLC, authorized DB Alex Brown to wire $7,500 to CF Advisors' account with DB Alex Brown in Baltimore, Maryland. (Stoddart Decl. Ex. 19, App. B at 59.) On October 23, 2001, DB Alex Brown transferred $7,500 to CF Advisors. It charged no wire fee for the transfer. (Stoddart Decl. Ex. 7 at 4, App. B at 27.)

59. On October 18, 2001, one day before CF Advisors became a member, Clearmeadow Investments, LLC, authorized DB Alex Brown to wire $2,500 to CF Advisors' account with DB Alex Brown in Baltimore, Maryland. (Stoddart Decl. Ex. 20, App. B at 60.) On October 23, 2001, DB Alex Brown wired $2,500 to "Bankers Trust Company Deutsche Bk London/F." It charged a wire fee of $10. (Stoddart Decl. Ex. 7 at 4, App. B at 27.) Deutsche Bank had purchased Bankers Trust in 1999. (Stoddart Decl. Ex. 34 at 20, App. B at 271.)

60. Daniel Brooks attended Duke University and its Fuqua School of Business, where he earned an MBA degree in investment and finance. (Stoddart Decl. Ex. 34 at 15, App. B at

266.) After leaving school he spent several years trading foreign currencies and currency options for various employers, including Bankers Trust. (*Id.* at 16-18, App. B at 267-69.) When Deutsche Bank bought Bankers Trust in 1999, Brooks joined DB Alex Brown (*id* at 20, App. B at 271), where he worked as a vice president at the currency desk in foreign exchange sales (*id*. at 23, App. B at 274.)

61. In April of 2001, Brooks left DB Alex Brown and formed Clarion Capital to do currency trading and advising. Brooks is the owner of Clarion Capital. (Stoddart Decl. Ex. 34 at 46, App. B at 285.)

62. Brooks met Edward Sedacca through Craig Brubaker, who worked at DB Alex Brown in Dallas (Stoddart Decl. Ex. 34 at 52, App. B at 286) as a broker (*id*. at 160, App. B at 306).

63. Brooks was not involved in MLD transactions when he worked with DB Alex Brown. (Stoddart Decl. Ex. 34 at 29, App. B at 277.) It was Cantley & Sedacca who introduced him to the MLD concept, because that was a structure that they were planning to use. (*Id*. at 53, App. B at 287.) According to Brooks, a market-linked deposit (MLD) is a combination of (1) a deposit with a fixed yield, like a CD or bank account; with (2) a variable component that is linked to some market–for example, currencies or equities. (*Ibid*.)

64. Between June and December of 2001, Brooks engaged in MLD transactions with 150 different customers; after 2001 he engaged in none. To carry out these transactions, he always joined an LLC with the customer. (Stoddart Decl. Ex. 34 at 54, 57 App. B at 288, 291.) It was Cantley & Sedacca who formed the LLCs (*id*. at 57, App. B at 291), and all of them were basically the same (*id*. at 71, App. B at 296). Brooks (through Clarion Capital) owned 1% of

every such LLC and remained an owner through the life of the entity's MLD transaction (*id*. at 58, App. B at 292), but he held no interest in any of the LLC's after December 31, 2001 (*ibid*.).

65. Brooks had no role in the "deposit" portion of the MLD; his only role was to arrange the "variable interest" portion. (Stoddart Decl. Ex. 34 at 136, App. B at 300.) "Variable interest" means the currency option that was traded in the MLD structure; it is called "variable" because the investor could win or lose on the trade. (*Id*. at 166-67, App. B at 307-08.)

66. The currency options in Brooks's MLD's were European digital options. (Stoddart Decl. Ex. 34 at 34-35, App. B at 279-80.) A European option is exercisable only at a specific date and time. (*Id*. at 35, App. B at 280.) A digital option is a combination of a purchased "long" position and a sold "short" position. In the long position, the investor purchases a potential profit–up to a certain point–and in the short position the investor sells away the remaining potential profit. (*Id*. at 35-36, App. B at 280-81.) Brooks sees two advantages to trading currencies using digital options: (1) the investor can lose no more than the price he paid for the long position; and (2) the premium is low because the short position limits the investor's potential profit. (*Id*. at 36-37, App. B at 281-82.) Digital options are the most commonly used derivatives in currency trading. (*Id*. at 37, App. B at 282.) (By "derivative," Brooks means "option." (*Id*. at 18, App. B at 269.))

67. Cantley & Sedacca developed the structure of the MLD transactions, but Brooks received his instructions through DB Alex Brown. (Stoddart Decl. Ex. 34 at 144-45, App. B at 304-05.) All of his investors were clients of DB Alex Brown before coming to Brooks for advice about MLDs. (*Id*. at 216, App. B at 320.)

68. On March 11, 2002, Hutton signed a document captioned "Investor Representations" on behalf of himself, Clearmeadow Investments, LLC, and Clearmeadow Capital Corporation. (Stoddart Decl. Ex. 31A at 1, 4, App. B at 187, 190.) Dan Brooks signed the document on behalf of CF Advisors XXXVII, LLC, as "sole member." His signature is undated. (*Id*. at 4, App. B at 190.)

69. In the Investor Representations, Hutton states that he (through Clearmeadow Capital Corporation) formed Clearmeadow Investments, LLC, along with CF Advisors, XXXVII, LLC. He refers to CF Advisors as "CC." (Stoddart Decl. Ex. 31A at 1, App. B at 187.) Paragraph 5 of the Investor Representations provides, in part (*id*. at 1-2, App. B at 187-88):

> Based on the advice of CC and Brooks as to the probability of the Investments reaching certain price levels at which they would be profitable, and on the advice of my own investment advisors, I believed, and continue to believe, that I have, and continue to have, a reasonable opportunity to earn a significant economic profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits. In fact, my decision to invest in the Transactions and with CC and Brooks was based, in large part, on CC's and Brooks' representations that (a) there was an approximate 28% statistical probability (based on Black/Scholes) of realizing a 60% return on my net investment in the MLD positions, net of all my direct transaction costs associated with the positions, and an approximate 1.3% statistical probability (based on Black/Scholes) of realizing a 14,446% return on my net investment in the MLD positions, net of all my direct transaction costs associated with the positions, and (b) if I were to continue my investment in the transactions and with CC and him for at least five (5) years, I could reasonably expect that his investment strategy would yield for me an annual return on my total investment in the Transactions of somewhere between 15% and 17%, net of all my fees and expenses from the Transactions and without regard to tax benefits. It is my current intention to hold the Corporation's (and, thus, my) investment in the Transactions and with CC and Brooks for such period of time as to be able to achieve a reasonable economic return on my investment, without regard to tax benefits and net of all my fees and expenses from the Transactions.

70. Brooks believed that an investor would have to stay invested for at least five years to have a reasonable opportunity to make a 15% profit; but of the 150 investors for whom he

arranged MLD's, only half held their investments for more than three months, and not one of them held his investment beyond the end of 2001. (Stoddart Decl. Ex. 34 at 202-04, App. B at 315-17.)

71. The term "Black/Scholes" refers to a mathematical model that calculates an option's value from four of five variables, including interest rates, the length of the option, and market volatility. (*See* Stoddart Decl. Ex. 34 at 12, 24-25, App. B at 263, 275-76.)

72. On March 11, 2002, Hutton acknowledged that Cantley & Sedacca would rely upon his "Investor Representations" of that date in issuing its tax opinion letter. (Stoddart Decl. Ex. 31A at 1, App. B at 187.) Cantley & Sedacca had mailed the unsigned Investor Representations to Hutton on January 23, 2002, along with their tax opinion letter and stated, "the opinion letter may not be relied upon (and is not otherwise released) unless and until we have received . . . the Investor Representations fully executed by you, the LLC, and the Corp. . . . ." (Stoddart Decl. Ex. 30A, App. B at 146A.) The opinion letter stressed that Cantley & Sedacca had not independently verified Hutton's representations, and it warned, "If any such item is inaccurate in any material respect, . . . the opinions contained herein may not be relied upon." (Stoddart Decl. Ex. 30 at 1, App. B at 135.) Like the Investor Representations, the tax opinion letter refers to CF Advisors XXXVII, LLC, as "CC." (*Id*. at 5, App. B at 139.) Brooks has explained that the letters "CC" in Cantley & Sedacca's tax opinion letter refer to Clarion Capital. (Stoddart Decl. Ex. 34 at 189-90, App. B at 313-14 (quoting a paragraph also found on page 7 of Stoddart Decl. Ex. 30, App B at 141).)

73. Hanning gave Hutton no opinion on whether the tax benefits claimed for the MLD transaction would be upheld if the IRS challenged them. (Stoddart Decl. Ex. 32 at 17-18, App. B at 206-07.)

74. Hewitt never assured Hutton that he had independently tested Cantley & Sedacca's conclusions about the alleged tax benefits of the MLD transaction. (Stoddart Decl. Ex. 33 at 33, App. B at 247.)

75. The MLD transaction was different from any of the other transactions as to which Hutton had relied upon the advice of Hewitt and Hanning. (Stoddart Decl. Ex. 31 at 114, App. B at 184.)

76. Cantley & Sedacca informed Brooks that they would be issuing legal opinions to the investors in the MLD transactions, and Brooks was told that the transactions had tax ramifications (Stoddart Decl. Ex. 34 at 179, App. B at 312A), but he does not know specifically why Cantley & Sedacca were providing legal opinions (*id*. at 180, App. B at 312B). No one ever went through the opinions with him or told him their purpose. (*See id*. at 180-181, App. B at 312B-312C.) His only discussions with Cantley & Sedacca about the MLD transactions concerned the "risk" he would put into them–that is, the options he embedded in the MLDs and the probability that they would be profitable. (*See id*. at 181-182, App. B at 312C-312D.)

77. Brooks has explained that the investors had a 28% chance of making a 60% profit on the 1.1% of the premium supposedly paid for the "long" MLD position. (Stoddart Decl. Ex. 34 at 13, App. B at 264 (investor had a 28% possibility of "[w]inning a 60-percent return on the money being invested").) That is, the successful investor would recover the 1.1% fee he paid to the bank plus 60% of that fee. (*Id*. at 114, App. B at 298.)

78. For most of his 150 MLD clients Brooks purchased the options through Deutsche Bank, but he arranged options for 30 clients through "SOCGEN." These were the only banks through which he arranged options (Stoddart Decl. Ex. 34 at 216-17, App. B at 320-21.)

79. Clearmeadow paid Societe Generale a fee of $27,500 (*i.e.*, 1.1 % of $2,500,000, the long option premium) as a "Net Market Linked Deposit (Premium)." (Stoddart Decl. Ex. 15B, App. B at 47.) When the investment closed, Clearmeadow received the difference between the "Variable Interest Income" from the long position, $2,800,000, and the "Variable Interest Expense" on the short position, $2,769,200. That amount is $30,800, which Clarion Capital reported to Clearmeadow as the Net Market Linked Deposit Variable Interest.[2] (*Ibid.*) That amount less Societe Generale's $25,700 fee gave Clearmeadow a net profit on the MLD transaction of $4,339, which was swallowed up by Clarion Capital's $10,000 fee. (*Ibid.*) Under Clarion Capital's management, Clearmeadow's initial deposit of $287,500 had dwindled to $282,100.26 in less than three months. (*See id.* at 2, App. B at 48.)

80. Hutton and Clearmeadow could have made what the documents call a "14,446% profit" on their net investment of $27,500 only if the exchange rate of Japanese Yen to US Dollars was between 124.65 and 124.67 on December 14, 2001. In that case, Societe Generale

---

[2] Clearmeadow's $30,800 profit is neither 60% nor 160% of the $27,500 it paid Societe Generale to set up the options. Denominating the amounts in Euros does not make the transaction any more comprehensible. Clearmeadow is supposed to have paid EUR 30,219 to Societe Generale. That amount is the excess of the "premium paid," EUR 2,747,252, over the "premium received," EUR 2,717,033. (*See* Stoddart Decl. Ex. 15B, App. B at 47.) It is also 1.1% of the premium paid. The USD/EUR exchange rate was .9016 on December 14, 2001. (Stoddart Decl. Ex. 40, App. B at 369I.) If Clearmeadow had received 160% of its Euro "investment" paid in dollars, it would have received $43,592 (EUR 30,219 x 160% = EUR 48,350 x $.9016/EUR 1 = $43,592). If Clearmeadow had received 60% of its Euro investment paid in dollars, it would have received $16,347 (EUR 30,219 x 60% = EUR 18,131 x $.9016/EUR 1 = $16,347).

would owe Clearmeadow a "Premium Yield" of EUR 4,395,604 (Stoddart Decl. Ex. 16 at 3, 2, App. B at 51, 50), and Clearmeadow would not owe Societe Generale the offsetting Premium Yield of EUR 4,347,352 on the short position (Stoddart Decl. Ex. 17 at 3, 2, App. B at 56, 55). (Clarion Capital reported these amounts to Clearmeadow as $2,800,000 and $2,769,200 respectively.[3] *See* Stoddart Decl. Ex. 15B, App. B at 47.) As it turned out, however, each party to the option behaved as if the exchange rate had exceeded 124.67 at the proper date and time; they appeared to carry out the offsetting exchanges, though only the net amount changed hands. (*See ibid.* ).

81. Societe Generale was supposed to have determined the yen/dollar exchange rate "at the Expiration Time on the Expiration Date" and then to have closed the options by paying or withholding the "Premium Yield" accordingly. (Stoddart Decl. Ex. 16 at 3, App. B at 51; Stoddart Decl. Ex. 17 at 3, App. B at 56.) The Expiration Time was 10:00 A.M., New York time; and the Expiration Date was December 14, 2001. (Stoddart Decl. Ex. 16 at 2, App. B at 50; Stoddart Decl. Ex. 17 at 2, App. B at 55.) Despite the option agreements, however, Societe Generale deposited the $30,800 of "Net Market Linked Deposit Variable Interest" to

---

[3] The EUR/USD exchange rate may explain the difference between 14,446% of the dollar-denominated net investment of $27,500 (which is $3,972,650) and the dollar-denominated bonus yield of $2,800,000 that Clarion Capital noted on its account statement. The calculation works better in Euros: Hutton's net investment would have been the excess of the "paid" long premium, EUR 2,747,252 (Stoddart Decl. Ex. 16 at 3, App. B at 51) over the "received" short premium, EUR 2,717,033 (Stoddart Decl. Ex. 17 at 2, App. B at 55)–*i.e.*, EUR 30,219 (which is also 1.1% of the long premium). The long premium yield would have been EUR 4,395,604 (Stoddart Decl. Ex. 16 at 3, App. B at 51), which is close to 14,446% of EUR 30,219, *i.e.*, EUR 4,365,437. The person who calculated the number 14,446% seems to have believed that the long premium yield would have been increased by the return of the net investment. The sum of the Euro-denominated net investment and the long premium yield is EUR 4,425,823–exactly 14,446% of EUR 30,219.

Clearmeadow's account on December 12, 2001–a full two days before it could have known the exchange rate that should have determined the outcome of the options. (Stoddart Decl. Ex. 9 at 4, App. B at 37.)

82. On December 14, 2001, Japanese yen/US dollar exchange rate was 127.35. (Stoddart Decl. Ex. 40, App. B at 369I.)

83. Brooks referred to the space between the long Threshold Amount, 124.65, and the short Threshold Amount, 124.67, as the "sweet spot." (*See* Stoddart Decl. Ex. 34 at 37-38, 210, App. B at 282-83, 318.) Although Brooks represented Hutton's odds of hitting the sweet spot at about 1.3% (*see, e.g.,* Stoddart Decl. Ex. 31A at 1-2, App. B at 187-88), he has admitted that the investor's chances were "comparable to hitting the lottery" (Stoddart Decl. Ex. 34 at 64, App. B at 293). He also referred to the sweet spot as a "lottery feature" (*id*. at 38, App. B at 283) and a "remote lottery feature" (*id*. at 210, App. B at 318). Even certain documents refer to the sweet spot as a "lottery." (*Id*. at 64-65, App. B at 293-94.) Such a feature is rare in commercial MLDs (*id.* at 38-39, App. B at 283-84); in Brooks's words, a sweet spot is found in "structured products where the bank will put little things like that in to make it look sexier to the client" (*id*. at 38, App. B at 283).

84. On November 30, 2001, Hutton sent an e-mail to Hanning and to Jeremy Nerenberg. (Stoddart Decl. Ex. 31 at 52-53, App. B at 177-78.) Nerenberg was an attorney with Cantley & Sedacca. (Stoddart Decl. Ex. 35 at 11, App. B at 333.) In his e-mail, Hutton stated (Stoddart Decl. Ex. 32D, App B at 224; Stoddart Decl. Ex. 31 at 53, App. B at 178):

> Scott [Hewitt] and I met today and figured this out. We would like to take down $1,005,000 of the loss for year 2001. I would think the balance for next year but

> if possible I would like to wait until later in 2002 to decide on this. Is that possible?

With the phrase "loss for the year 2001," Hutton was referring to the tax loss that would be generated by the MLD transaction. (Stoddart Decl. Ex. 31 at 53, App. B at 178.)

85. Nerenberg replied, in part, as follows (Stoddart Decl. Ex. 32D, App. B at 224):

> I spoke too soon in my prior e-mail. Apparently, the entire remaining balance would have to be triggered next year (e.g., no amount can be carried over into 2003). Please contact Ed Sedacca at 972-361-0090 should you have any questions regarding this matter. I will assume that you would still like to take down $1,005,000 of the loss for year 2001, and thus take the entire remaining balance for year 2002 – is this correct?

86. On December 13, 2001, Clearmeadow Investments paid $1,000 in US funds for $1,487.51 of Canadian currency. The settlement date was December 14, 2001. (*Compare* Stoddart Decl. Ex. 11, App. B at 42, *with* Stoddart Decl. Ex. 12, App. B at 43; *see also* Stoddart Decl. Ex. 10 at 3, App. B at 41.)

87. Other persons who bought MLDs through Cantley & Sedacca also purchased Canadian currency. Daniel Brooks bought the currency at the investors' instructions, but he does not know the reason for the purchases or what became of the currency. In particular, he does not know if there was any tax reason for the purchases. (Stoddart Decl. Ex. 34 at 126-29, App. B at 299A-299D.)

88. On December 18, 2001, Clearmeadow Capital Corporation and CF Advisors XXXVII, LLC, executed a document captioned "Assignment of Limited Liability Company Units and Joinder Agreement." The document refers to CF Advisors as "Clarion," and to CF Advisors's ownership units of Clearmeadow Investments, LLC, as "Clarion Units." (Stoddart Decl. Ex. 23 at 1, App. B at 88.) By executing the document, CF Advisors agreed to sell its

1,000 Class B units of ownership in Clearmeadow Investments, LLC, to Clearmeadow Capital Corporation for $2,500. (*Id*. at 1-3, App. B at 88-90.)

89. On December 18, 2001, Hutton, as president of Clearmeadow Capital Corporation, notified Craig Brubaker of DB Alex Brown that Dan Brooks and CF Advisors XXXVII, LLC, had no more investment authority over the DB Alex Brown account maintained by Clearmeadow Investments, LLC. (Stoddart Decl. Ex. 24, App. B at 91.)

90. Other investors in Brooks's MLD transactions used documents similar to Stoddart Decl. Exhibits 23 and 24 to terminate his interest in their LLC's and to end his authority over their accounts with DB Alex Brown. (Stoddart Decl. Ex. 34 at 175-78, App. B at 309-12.)

91. On December 24, 2001, Hutton authorized Craig Brubaker of DB Alex Brown to sell 40% of the positions held in the account maintained by Clearmeadow Investments, LLC. (Stoddart Decl. Ex. 25A, 25B, App. B at 92, 93.)

92. On December 24, 2001, Clearmeadow Investments, LLC, exchanged $597.98 of its Canadian currency for $323.08 in US currency. The settlement date was December 27, 2001. (*Compare* Stoddart Decl. 13, App. B at 44, *with* Stoddart Decl. Ex. 14, App. B at 45; *see also* Stoddart Decl. Ex. 10 at 3, App. B at 41.) That amount constitutes 40.2% of the Canadian currency held in Clearmeadow's account (*i.e.*, $597.98/$1,487.51).

93. The firm of Hewitt, Hutton's accountant, prepared the 2001 federal income-tax returns for Clearmeadow Investments, LLC, Clearmeadow Capital Corporation, and Hutton. (Stoddart Decl. Ex. 33 at 12-13, App. B at 235-36.)

94. On August 29, 2002, Clearmeadow Investments, LLC, filed a Form 1065, U.S. Partnership Return of Income, for the taxable period that ended in December of 2001.

Clearmeadow had received extensions of time to October 15, 2002, within which to file the return. (Stoddart Decl. Ex. 26, App. B at 95.)

95. Amy Clupny, an associate of Hewitt, prepared the 2001 return for Clearmeadow Investments, LLC, under Hewitt's supervision. (Stoddart Decl. Ex. 33 at 20, App. B at 243.) After Clupny drafted the return, Hewitt asked her to obtain a sample partnership return from Edward Sedacca. (*Id.* at 13, App. B at 236.)

96. On March 1, 2002, Cantley & Sedacca sent Amy Clupny "a sample tax return as it relates to the market linked deposit investment strategy." (Stoddart Decl. Ex. 33A, App. B at 253.) Cantley & Sedacca's sample return is identical to the return Hewitt prepared for Clearmeadow investments, LLC, except for a single number (page 3, line 14(b) of the sample return), on which Hewitt crossed out the number 40,974 and wrote in the number 40524. (Stoddart Decl. Ex. 33 at 14-15, App. B at 237-38; Stoddart Decl. Ex. 33B at 3, App. B at 256.)

97. The 2001 partnership return of Clearmeadow Investments, LLC, reported distributions of $284,315 in cash and $2,501,000 of property. (Stoddart Decl. Ex. 27 at 3, lines 22, 23, App. B at 99.) The return defined the distributed property as 1,487.51 units of Canadian currency, with a fair market value of $1,000 and a cost basis of $2,501,000. (*Id.*, App. B at 103.)

98. Clearmeadow Investments, LLC, attached two forms K-1 to its partnership return. One form reported a $10,000 guaranteed payment made to CF Advisors, XXXVII, LLC. (Stoddart Decl. Ex. 27, App. B at 107.) The other reported, among other things, a distribution to Clearmeadow Capital Corporation of $281,815 as distributions of money and $2,501,000 as distributions of property other than money (*id.*, App. B at 110.); it also reported $10,040 of

deductions related to portfolio income (*id*., App. B at 109), which comprised $10,000 of investment fees and a $40 wire fee (*id*., App. B at 110); and (2) .

99. With its 2001 partnership return, Clearmeadow filed elections to amortize start-up expenditures under Code § 195(b) and organizational expenditures under § 709, but the election form lists no amount to be amortized and fails to describe the expenditures (Stoddart Decl. Ex. 27, App. B at 104). The partnership return lists no amortized amounts and the K-1s allocate no amortized amounts to the partners. The partnership made no election under § 754. (*See id*., App. B at 97-108.)

100. Clearmeadow's 2001 partnership return also lists investment income of $446,863, comprising $450,163 of interest income, $1,016 of ordinary dividends; and $1,039 of § 988 gain from trading small puts and calls. (*See* Stoddart Decl. Ex. 27, App. B at 99, 102, 103.) Brooks had arranged from three to five such currency-option trades for each of the LLCs that entered the MLD transactions. (Stoddart Decl. Ex. 34 at 129-30, App. B at 299D-299E.) The partnership return also reported $446,863 of interest expense on investment debts. (Stoddart Decl. Ex. 27, App. B at 99.) Clearmeadow allocated all of these items to Clearmeadow Capital Corporation. (*Id*., App. B at 109-110.)

101. Clearmeadow's $450,163 of "interest income" comprises the following items that Clarion Capital reported to it under the caption"Long Market Linked Deposit" (Stoddart Decl. Ex. 15B, App. B at 47):

| | |
|---|---|
| The "fixed interest" Clearmeadow claims to have received. . . . . . . . . . . | $150,163 |
| The excess of the "variable interest income"–$2,800,000–over the "premium paid"–$2,500,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $300,000 |
| TOTAL | $450,163 |

102. Clearmeadow's $446,863 of "interest expense on investment debts" comprises the following items that Clarion Capital reported to it under the caption "Short Market Linked Deposit" (Stoddart Decl. Ex. 15B, App. B at 47):

| | |
|---|---|
| The "fixed interest" Clearmeadow claims to have paid.. . . . . . . . . . . . . . . | $150,163 |
| The excess of the "variable interest expense"–$2,769,200–over the "premium received"–$2,472,500. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $296,700 |
| TOTAL | $446,863 |

103. On August 29, 2002, Clearmeadow Capital Corporation filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for the taxable period that ended in December of 2001. (Stoddart Decl. Ex. 28, App. B at 111.)

104. The 2001 income-tax return of Clearmeadow Capital Corporation reported a portfolio loss of $1,004,040 (Stoddart Decl. Ex. 28 at 2, Schedule K, line 4f, App. B at 112), which it passed to its sole shareholder, Hutton, on a Schedule K-1 (*id.*, App. B at 123). The corporation's return explained the calculation of the portfolio loss on Schedule 1A as follows (*id.*, App B at 120):

| | Date Acquired | Date Sold | Cost | Proceeds | Net Gain (Loss) |
|---|---|---|---|---|---|
| CAD Currency | 12/14/2001 | 12/24/2001 | $1,005,402 | $323 | ($1,005,079) |
| IRS Section 988 Gain (Loss) | | | 1,005,402 | 323 | (1,005,079) |
| LLC K-1 Flow Through IRC Section 988 Gain (Loss) | | | | | 1,039 |
| Total Line 4f | | | | | $1,004,040 |

105. The purported "cost" of the Canadian currency claimed by Clearmeadow Capital Corporation, $1,005,402, was 40.2% of the purported $2,501,000 distribution of property made

by Clearmeadow Investments, LLC–*i.e.*, $1,005,402/$2,501,000. (*Compare* Stoddart Decl. Ex. 28, App. B at 120, *with* Stoddart Decl. Ex. 27, App. B at 103.)

106. The balance sheet in Clearmeadow Capital Corporation's 2001 income-tax return shows $1,495,598 of "Other Current Assets" (Stoddart Decl. Ex. 28 at 4, line 6, App. B at 114), which Statement 4 describes as "MLD Investment" (*id*., App. B at 117). That $1,495,598 is the difference between the purported $2,501,000 distribution of property from Clearmeadow Investments, LLC, and the purported $1,005,402 cost of the Canadian currency that Clearmeadow Capital Corporation sold on December 24, 2001–*i.e.*, $2,501,000 - $1,005,402 = $1,495,598. (*Compare* Stoddart Decl. Ex. 27, App. B at 110, *with* Stoddart Decl. Ex. 28, App. B at 120.)

107. On its 2001 income-tax form, Clearmeadow Capital Corp. elected under Code § 195(b) to amortize over 60 months a legal fee of $100,000 purportedly incurred on October 12, 2001, as a start-up expenditure of its trade or business, which it claimed to have begun on October 12, 2001. On its balance sheet, Clearmeadow Capital Corp. also listed the $100,000 legal expense as an amortizable asset, which it reduced by $4,384 of current amortization. (Stoddart Decl. Ex. 28 at 119, 120, 114.) Clearmeadow Capital Corp. allocated the $4,384 of amortized start-up expenditures to Hutton, its sole shareholder. (*Id*., App. B at 123.)

108. On the balance sheet of its 2001 income-tax form, Clearmeadow Capital Corp. listed a $50,000 intangible asset (not amortizable), which it described as a "legal position." (Stoddart Decl. Ex. 28, App. B at 114.)

109. All of the items that Clearmeadow LLC passed to Clearmeadow Capital Corp. (*see* Stoddart Decl. Ex. 28 at 116) Clearmeadow Capital Corp. allocated to Hutton (*id*. at 123).

110. On his 2001 Form 1040, U.S. Individual Income Tax Return, which he filed jointly with his wife on August 28, 2002 (Stoddart Decl. Ex. 29, App. B at 126), Hutton included the $1,004,040 loss from Clearmeadow Capital Corporation in the losses from partnerships and S corporations reported in Part II of Schedule E; that loss offset the $921,885 gain he received from Hutton Construction Corporation. (*See id*., App. B at 131, 133.) He also deducted the $4,384 of amortized start-up expenses and $10,040 if investment expense that Clearmeadow Capital Corp. allocated to him. (*Id*., App. B at 132, 129A, 127.) So far, the IRS has determined no underpayment of tax as to Hutton's individual 2001 income-tax return. (*See* Stoddart Decl. ¶ 5.)

111. The IRS files for this case contain a letter dated May 20, 2004, addressed to Mark E. and Mary S. Hutton. (TenEyck Decl. ¶ 2 and Ex. 1, App. B at 370, 374.) It advised them that the IRS had issued Announcement 2004-46, which provides taxpayers an opportunity to resolve tax liabilities associated with transactions described in Notice 2000-46 ("Son of Boss" transactions), and it enclosed a Notice of Election to participate in the settlement. If they elected to participate and if the IRS notified them they were eligible to participate, the letter warned them that they would have to provide "additional information and documentation relating to the Son of Boss transaction" within 60 days of the date the IRS mailed them a notice of eligibility. (TenEyck Decl. Ex 1, App. B at 374.)

112. When Hutton received a notification that the IRS was considering his MLD transaction, he hired an attorney named Tony Gasaway to represent him. (Stoddart Decl. Ex. 31 at 42, App. B at 174.)

113. On June 21, 2004, Hutton signed and mailed a Form 13582, Notice of Election to Participate in Announcement 2004-46 Settlement Initiative, which the IRS received on June 22,

2004. (TenEyck Decl. ¶ 4 & Ex. 2, App. B at 371, 375.) At the time, neither Hutton nor Clearmeadow Investments, LLC, was under examination. (TenEyck Decl. Ex. 2 at 1, App. B at 375.) Hutton stated in the Notice that he had a representative; and the Notice specified that a representative's Power of Attorney must contain the following language: "The acts authorized by this Power of Attorney include representation for the purposes of Subchapter C of Chapter 83 of the Internal Revenue Code [the TEFRA provisions]." (*Ibid.*)

114. On July 21, 2004, the IRS mailed the Huttons and their representative, Anthony S. Gasaway, a letter acknowledging receipt of the Huttons' Notice to Participate in Announcement 2004-46 Settlement Initiative. (TenEyck Decl. ¶ 3, Exs. 3 & 4, App. B at 370, 378, 379.) The letter stated, "[Y]ou are required to provide the IRS with all the in formation and documentation requested below ***within 60 days from the date of this letter***." (TenEyck Decl. Ex. 3, App. B at 378 (original emphasis).)

115. On December 22, 2004, the IRS sent the Huttons a letter and Information Document Requests asking for information about their case "within 14 days from the date of this letter." (TenEyck Decl. ¶ 5 & Ex. 5, App. B at 371, 380.)

116. On January 21, 2005, the IRS mailed a letter to the Huttons and their representative, Anthony S. Gasaway, asking them to execute a Form 872-I to extend the statute of limitations within which to assess deficiencies for their taxable years 2001 and 2002. The letter stated, "[S]hould you decline to execute the Form 872-I and/or we do not receive the executed consent within 7 days of the date of this letter, we will not be bound by the terms of the Announcement 2004-46 settlement initiative and will proceed with issuance of a statutory notice of deficiency." (TenEyck Decl. ¶ 6 & Ex. 6, App. B at 371, 381.)

117. On February 7, 2005, the IRS sent the Huttons and their representative, Anthony S. Gasaway, a letter stating that they were not eligible to participate in the settlement initiative under Announcement 2004-46 because they had failed to comply with the required procedures. (TenEyck Dec. ¶ 7 & ex. 7, App. B at 371, 384.)

118. On March 24, 2005, the IRS sent the Huttons and their representative, Anthony S. Gasaway, a letter attempting to arrange a meeting so that the IRS could gather enough information about the Huttons' transaction to permit issuance of an audit report. The letter contains an accurate summary of the IRS's communications and attempted communications with the Huttons and Mr. Gasaway. (TenEyck Decl. ¶ 8 and Exs. 8 & 9, App. B at 371, 385, 388.)

119. On March 29, 2005, the IRS sent the Huttons and their representative, Anthony S. Gasaway, a letter setting a new date and time for an appointment. The letter once again asked the Huttons to send the information demanded in earlier document requests. (TenEyck Decl. ¶ 9 & Exs. 10 & 11, App. B at 371-72, 389, 390.)

120. On April 11, 2005, Anthony S. Gasaway faxed the IRS a letter acknowledging its letters of March 24 and 29, 2005. Mr. Gasaway also asked the IRS to stop contacting the Huttons directly to complain of his "allegedly infrequent communications." He included a Form 872-I to extend the statute of limitations for assessing additional tax for the Huttons' 2001 taxable year. (TenEyck Decl. ¶ 10 & Ex. 12, App. B at 372, 391.)

121. On April 12, 2005, the IRS sent Anthony S. Gasaway a letter explaining that it could not accept the Form 872-I he had sent because his power of attorney did not authorize him to represent the Huttons with respect to a TEFRA partnership examination. The IRS included a

draft power of attorney that contained the language necessary to grant Mr. Gasaway the authority he needed. (TenEyck Decl. ¶ 13 & Ex.13, App. B at 372, 394-95.)

122. On May 11, 2005, the IRS received a new power of attorney for Mr. Gasaway. The power of attorney did *not* include language empowering Mr. Gasaway to represent the Huttons in a TEFRA partnership examination. (TenEyck Decl. ¶ 12 & Ex. 14, App. B at 372, 397.)

123. On May 31, 2005, the IRS served summonses on Mark E. and Mary S. Hutton requiring them to appear on June 13, 2005, with the documents and information listed on attachments to the summonses. (TenEyck Decl. ¶ 13, App. B at 372.)

124. On June 8, 2005, the IRS received a letter faxed by Anthony Gasaway refusing to produce more documents by June 13, 2005. (TenEyck Decl. ¶ 13 & Ex. 15, App. B at 372, 399-401.)

125. On June 13, 2005, neither the Huttons nor their representative appeared in response to the IRS's summons; and they produced no more documents. (TenEyck Decl ¶ 14, App. B at 372.)

126. Because the Huttons failed to appear or to produce sufficient information, the IRS produced a report using the information in its possession. (TenEyck Decl. ¶ 15, App. B at 373.)

127. During the IRS's consideration of the Huttons' application to participate in the settlement initiative for their MLD transaction, neither they nor their representatives argued that the Huttons should be excused from paying penalties on the ground that they had a reasonable cause for any underpayment or that they had acted in good faith. (TenEyck Decl. ¶ 16, App. B at 373.)

128. On August 24, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustment (FPAA) to Clearmeadow Capital Corp., the tax matters partner of Clearmeadow Investments, LLC. (*See* Compl. ¶ 1; Stoddart Decl. Ex. 41, App. B at 369K.)

129. The FPAA reverses all of the items that Clearmeadow Investments, LLC, reported to its partners on forms K-1 and corrects them all to zero. (*See* Stoddart Decl. Ex. 41, App. B at 369Q-369S.) The FPAA finds, among other things, that (1) the obligations arising from the MLD short position constitute liabilities for purposes of Treas. Reg. § 1.752-6T, and the partnership's assumption of the liabilities should reduce the partners' basis in their partnership interests (*id*. at 369U); (2) the purchase and contribution of the MLD positions, the formation of the partnership, and its liquidation had neither business purpose nor economic substance, and as a consequence the transactions should be disregarded and all claimed losses and increases in basis should be denied (*id*. at 369T); and (3) understatements of tax resulting from partnership items are attributable to substantial understatement of income tax, gross valuation misstatements, and negligence or disregard of rules and regulations (*id*. at 369V). The FPAA accordingly proposes the following penalties (*ibid*.):

A. a penalty as provided by Code §§ 6662(a), 6662(b)(3), 6662(e), and 6662(h) equal to 40% of any portion of the underpayment attributable to a gross valuation misstatement;

B. a penalty as provided by Code §§ 6662(a), 6662(b)(2), and 6662(d) equal to 20% of any portion of the underpayment attributable to negligence or disregard of rules and regulations;

C. a penalty as provided by Code §§ 6662(a), 6662(b)(2), and 6662(d) equal to 20% of any portion of the underpayment attributable to the substantial understatement of income tax; and

D. a penalty as provided by Code §§ 6662(a), 6662(b)(3), and 6662(e) equal to 20% of any portion of the underpayment attributable to a substantial valuation misstatement.

130. Hutton deposited with the IRS $175,870 in tax with respect to adjustments made by the FPAA (Compl. ¶ 10) and on November 21, 2005, he filed a complaint in this Court as the sole shareholder and president of Clearmeadow Capital Corp, the tax matters partner (*see* Compl. ¶ 2(a)).

131. On January 23, 2007, Hutton and Clearmeadow Investments, LLC, filed a class-action RICO suit in the U.S. District Court for the District of Kansas against Deutsche Bank, AG; Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown; Clarion Capital and various Clarion entities, including CF Advisors XXXVII, LLC; and Daniel Brooks, Jr. The suit is captioned *Hutton et al. v. Deutsche Bank AG et al.*, No. 07-2041 (D. Kan.) (hereinafter the RICO suit). (Stoddart Decl. Ex. 36, App. B at 353, 356.)

132. In the RICO Suit, Hutton demands, among other things, "a declaration that Defendants are liable to Plaintiffs for any and all taxes, interest, and penalties assessed in the part or future against them by the IRS and/or state tax authorities resulting from Plaintiffs' participation in the ML deposit transactions, for the money that Plaintiffs lost on the actual ML deposit transactions, for all professional fees incurred by Plaintiffs in the past or the future to rectify Defendants' wrongdoing, such amounts to be trebled under RICO." (Stoddart Decl. Ex. 37 at 36-37, App. B at 368-69.) Furthermore, Hutton demands that the Defendants disgorge all fees that Hutton paid them. (*Id*. at 34, App. B at 366A; *id*. at 37, App. B at 369.)

133. In the RICO Suit, Hutton makes the following assertion (Stoddart Decl. Ex. 37, ¶ 105, App. B at 366):

> As described more fully herein, the defendants knowingly acted in concert to market and implement the fraudulent and illegal ML deposit transaction and of the Son of Boss tax shelter transaction. In doing so, the defendants acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint when in fact they lacked those features (which was necessary for successful tax strategy).

134. In a deposition taken in the present case, the defendant's trial attorney read paragraph 105 of the RICO Suit's complaint into the record and then asked Hutton, "Is that true?" Mr. Hutton answered, "We believe that's an accurate representation of what – yeah." (Stoddart Decl. Ex. 31 at 13, App. B at 158.) The defendant's attorney then asked Hutton if he wished to disavow the assertions made in paragraph 105 of the RICO Suit; Mr. Hutton answered, "No." (*Id*. at 14, App. B at 159.)

135. In his RICO suit, Hutton alleges that the MLD transaction fell within the scope of IRS rulings, including Notice 2000-44. (Stoddart Decl. Ex. 37 at 7, App. B at 365A.)

136. In his RICO suit, Hutton alleges that the MLD transaction was planned in advance as a single transaction designed to reduce his tax liability, and he admits he was advised that the loss to be generated by the MLD transaction could be predetermined by the RICO defendants. (Stoddart Decl. Ex. 37 at 8, App. B at 365B.)

137. In his RICO suit, Hutton alleges that Deutsche Bank and the other defendants knew (a) that the structure of the MLD transaction vested in Deutsche Bank the ability to control whether a profit would be earned and how great the profit would be; and (2) that Deutsche Bank would exercise its control to ensure that no profit would be earned. (Stoddart Decl. Ex. 37 at 9, App. B at 365C.)

138. In his RICO suit, Hutton alleges that the MLD transaction was an entirely sham tax shelter. (Stoddart Decl. Ex. 37 at 18, App. B at 365E.)

139. In his RICO suit, Hutton alleges that Deutsche Bank and the other defendants (1) falsely represented that the purchaser of the MLD could include the cost of the long option in his basis while ignoring the premium received for the short option; (2) failed to disclose that existing published authority meant that losses claimed from the MLD transaction were not properly allowable; (3) failed to disclose that Hutton would be liable for penalties and interest if he reported the MLD losses on his tax returns and that the "Opinion Letters" the defendants provided would not protect him from the penalties. (Stoddart Decl. Ex. 37 at 26-27, App. B at 365F-365G.)

140. The MLD transaction was not a legitimate business transaction. (*See* Stoddart Decl. Ex. Ex. 37, ¶ 105, App. B at 366; Stoddart Decl. Ex. 31 at 13, App. B at 158.)

141. The MLD transaction lacked economic substance. (*See* Stoddart Decl. Ex. Ex. 37, ¶ 105, App. B at 366; Stoddart Decl. Ex. 31 at 13, App. B at 158.)

142. The MLD transaction was planned in advance as a single transaction designed to reduce Hutton's tax liability, and Hutton was advised that the loss to be generated by the MLD transaction could be predetermined by the RICO defendants. (Stoddart Decl. Ex. 37 at 8, App. B at 365B.)

143. Deutsche Bank and the other defendants in Hutton's RICO suit knew (a) that the structure of the MLD transaction vested in Deutsche Bank the ability to control whether a profit would be earned and how great the profit would be; and (2) that Deutsche Bank would exercise

its control to ensure that no profit would be earned. (Stoddart Decl. Ex. 37 at 9, App. B at 365C.)

144. The MLD transaction was an entirely sham tax shelter. (Stoddart Decl. Ex. 37 at 18, App. B at 365E.)

145. Another group of investors in this MLD Son of Boss tax shelter sued the promoters in the U.S. District Court for the Southern District of New York. The case is captioned *Michael Ling et al. v. Deutsche Bank, AG, et al*, No. 04 CV 4566 (S.D.N.Y.). (*See* Stoddart Decl. Ex. 38 at 1-3, App. B at 369A-369C (an order that summarizes the allegations).) The promoters settled the *Ling* suit for $4,599,000.00. (*See* Stoddart Decl. Ex. 39, App. B at 369F.) By its terms, the settlement applies to the Clearmeadow entities and to Hutton. (*See id.*, App. B at 369E.) The Court approved the *Ling* settlement on February 2, 2007. (*Id*. at 369D.)

WHEREFORE the defendant asks the Court to dismiss the complaint with prejudice.

Respectfully submitted,

s/ Robert Stoddart
ROBERT STODDART
U.S. Justice Department, Tax Division
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445; FAX: (202) 514-9440

RICHARD T. MORRISON
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

s/ David Gustafson
Of Counsel

August 22, 2007