No. 05-1223 T
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CLEARMEADOW INVESTMENTS, LLC,
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

RICHARD T. MORRISON
Acting Assistant Attorney General

DAVID GUSTAFSON
ROBERT STODDART
Attorneys
United States Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

## TABLE OF CONTENTS

*Page*

Questions Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*A.* *Summary.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*B.* *The transaction before the Court is one of many such deals devised and marketed by Cantley & Sedacca, Deutsche Bank, and other promoters.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*C.* *When Hutton entered the MLD he had no reasonable belief that he would earn a profit in excess of his costs apart from the promised tax benefits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*D.* *Through Clearmeadow, Hutton pretended to spend 27.5 million for long and short positions in the MLD transaction.* . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*E.* *Following Cantley & Sedacca's plan, Hutton contributed his MLD positions to a corporation, which joined Daniel Brooks in a purported partnership.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*F.* *Before the end of the taxable year, Hutton liquidated the Clearmeadow partnership and had Clearmeadow Capital sell a portion of a partnership asset to generate exactly the amount of tax loss Hutton needed for the year.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*G.* *The IRS offered Hutton the chance to settle his tax liabilities, but he refused; the IRS then adjusted Clearmeadow's partnership return, and Hutton brought suit here.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*H.* *Like other investors in this tax shelter, Hutton sued the promoters, claiming that the MLD transaction was a sham.* . . . . . . . . . . . . . . . . . . . . . . . . . 16

Jurisdiction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*A.* *Both the plaintiff's complaint and the FPAA are timely.* . . . . . . . . . . . . . . . . . . . . 17

*B.* *This Court has jurisdiction to determine the partnership items that will affect the plaintiff's basis in its partnership interest.* . . . . . . . . . . . . . . . . . . 19

[Table of Contents, continued]

*Page*

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*I.* *The partnership assumed Clearmeadow Capital's $2,769,200 liability in a transaction described in Notice 2000-44.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. *In this proceeding the Court can determine the character of Clearmeadow Capital's contribution, although the reduction in the basis of Clearmeadow Capital's partnership interest will occur later.* . . . . . . . . . . . . . . . . . . . . . . . . . 22

*B.* *The Secretary had the authority to apply Treas. Reg. § 1.752-6 to transactions that occurred before it was issued.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*C.* *Treas. Reg. § 1.752-6 governs Clearmeadow's transaction, which occurred after Notice 2000-44.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*II.* *The 40% gross valuation misstatement penalty applies to the transactions and tax reporting of Clearmeadow LLC.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*A.* *For purposes of this motion, the Court need not consider the other penalties in the FPAA.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*B.* *In this case, the gross valuation misstatement is "applicable" as a matter of mere arithmetic.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*C.* *The Clearmeadow partnership has no defense against the penalty; it could not reasonably have relied on Cantley & Sedacca's opinion.* . . . . . . . . . . . . . . . . . . 31

*D.* *Hutton must raise his personal defenses against the penalty in a partner-level proceeding after assessment and payment of the penalty.* . . . . . . . . . . . . . . . . . . 34

*III.* *Clearmeadow's transaction lacked business purpose and economic substance.*. . . . . . . . 38

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Appendix A:

Internal Revenue Code of 1986 (26 U.S.C.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Community Renewal Tax Relief Act of 2000 (part of the Consolidated Appropriations Act, 2001), Pub. L. No. 106-554, 114 Stat. 2763. . . . . . . . . . . . . . 50

[Table of Contents, Appendix A, continued]

*Page*

Treasury Regulations (26 C.F.R.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Miscellaneous:

Rev. Rul. 58-234, 1958-1 C.B. 279. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
Modifications and Additions to the Unified Partnership Audit Procedures, 64 Fed. Reg. 3886-01 (Jan. 26, 1999). . . . . . . . . . . . . . . . . . . . . . . . . 68
Notice 2000-44, 68 Fed. Reg. 37,434-01 (June 24, 2003).. . . . . . . . . . . . . . . . . . . 71
Assumption of Partner Liabilities, 68 Fed. Reg. 37,434-01 (June 24, 2003). . . . 74
T.D. 9062, 68 Fed. Reg. 37,414-01 (June 24, 2003). . . . . . . . . . . . . . . . . . . . . . . . 75
Chief Counsel Notice CC-2003-020, 2003 WL 24016805 (June 25, 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Appendix B (separately bound):

Declaration of Robert Stoddart. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

| Exhibit Number | Description |
|---|---|
| 1 | Letter from Cantley & Sedacca, LLP, to Mark Hutton (Oct. 5, 2001). . . . . . . . . . 5 |
| 2 | Certificate of Formation of Clearmeadow Investments, LLC. . . . . . . . . . . 8 |
| 3 | Operating Agreement of Clearmeadow Investments, LLC. . . . . . . . . . . . 10 |
| 4 | Certificate of Incorporation of Clearmeadow Capital Corp.. . . . . . . . . . . 19 |
| 5 | IRS Form 2553, Election by a Small Business Corporation. . . . . . . . . . . 21 |
| 6 | Certificate of Filing for Certificate of Incorporation of Clearmeadow Capital Corp... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
| 7 | Deutsche Bank Alex Brown Client Statement (Oct. 31, 2001). . . . . . . . . 24 |
| 8 | Deutsche Bank Alex Brown Client Statement (Nov. 30, 2001). . . . . . . . 30 |
| 9 | Deutsche Bank Alex Brown Client Statement (Dec. 31, 2001).. . . . . . . . 34 |

[Table of Contents, Appendix B, Declaration of Robert Stoddart, continued]


| Exhibit Number | Description | *Page* |
|---|---|---|
| 10 | Deutsche Bank Alex Brown Client Statement, Canadian Dollars (Dec. 31, 2001). | 39 |
| 11 | Deutsche Bank Alex Brown Confirmation Statement, US Dollars (Dec. 14, 2001). | 42 |
| 12 | Deutsche Bank Alex Brown Confirmation Statement, Canadian Dollars (Dec. 14, 2001). | 43 |
| 13 | Deutsche Bank Alex Brown Confirmation Statement, Canadian Dollars (Dec. 27, 2001). | 44 |
| 14 | Deutsche Bank Alex Brown Confirmation Statement, US Dollars (Dec. 27, 2001). | 45 |
| 15A | Cover letter from Clarion Capital, LLC, to Mark Hutton. | 46 |
| 15B | Clarion Capital Statement of Account for Clearmeadow Investments, LLC, as of 12/29/01. | 47 |
| 16 | Societe Generale, Confirmation for Currency Linked Deposit Swap, Clearmeadow Investments, LLC (Oct. 15, 2001). | 49 |
| 17 | Societe Generale, Confirmation for Currency Linked Deposit Swap, Clearmeadow Investments, LLC (Oct. 15, 2001). | 54 |
| 18 | Letter from Clearmeadow Investments, LLC, to Craig Brubaker (Oct. 15, 2001). | 58 |
| 19 | Letter from Clearmeadow Investments, LLC, to Craig Brubaker (Oct. 10, 2001). | 59 |
| 20 | Letter from Clearmeadow Investments, LLC, to Craig Brubaker (Dec. 18, 2001). | 60 |
| 21 | Assignment of Limited Liability Company Units and Joinder Agreement (Oct. 19, 2001). | 61 |

[Table of Contents, Appendix B, Declaration of Robert Stoddart, continued]


| Exhibit Number | Description | *Page* |
|---|---|---|
| 22 | Amended and Restated Operating Agreement of Clearmeadow Investments, LLC (Oct. 19, 2001). . . . . | 63 |
| 23 | Assignment of Limited Liability Company Units and Joinder Agreement (Dec. 18, 2001). . . . . | 88 |
| 24 | Letter from Clearmeadow Investments, LLC, to Craig Brubaker (Dec. 18, 2001). . . . . | 91 |
| 25A | Cover letter from Clearmeadow Investments, LLC, to Craig Brubaker, referencing a "Schedule A" (Oct. 10, 2001). . . . . | 92 |
| 25B | Schedule A. . . . . | 93 |
| 26 | Certificate of Assessments and Payments for Clearmeadow Investments, LLC. . . . . | 94 |
| 27 | Form 1065, 2001 U.S. Return of Partnership Income of Clearmeadow Investments, LLC. . . . . | 97 |
| 28 | Form 1120S, 2001 U.S. Income Tax Return for an S Corporation, Clearmeadow Capital Corp.. . . . . | 111 |
| 29 | Excerpts from Form 1040, 2001 U.S. Individual Income Tax Return of Mark E. Hutton and Mary S. Hutton. . . . . | 126 |
| 30 | Excerpts of a letter from Cantley & Sedacca, LLP, to Mark Hutton (Jan. 22, 2002). . . . . | 135 |
| 30A | Letter from Cantley & Sedacca to Mark Hutton (Jan. 23, 2002). . . . . | 146A |
| 31 | Excerpts from the transcript of the deposition of Mark Hutton (May 8, 2007).. . . . . | 147 |
| 31A | Hutton Deposition Exhibit 1: Investor representations.. . . . . | 187 |
| 31B | Huttton Deposition Exhibit 2: Letter from Clearmeadow Investments, LLC, to Craig Brubaker (Oct. 15, 2001).. . . . . | 191 |

[Table of Contents, Appendix B, Declaration of Robert Stoddart, continued]


| Exhibit Number | Description | *Page* |
|---|---|---|
| 32 | Excerpts from the transcript of the deposition of Bryan Hanning (May 8, 2007). | 192 |
| 32A | Hanning Deposition Exhibit 1: Affidavit (Sept. 19, 2006). | 217 |
| 32B | Hanning Deposition Exhibit 2: Intake Summary. | 218 |
| 32C | Hanning Deposition Exhibit 3: Letter from Cantley & Sedacca, LLP, to Mark Hutton (Oct. 4, 2001). | 221 |
| 32D | Hanning Deposition Exhibit 4: Printout of e-mails to and from Mark Hutton, Bryan Hanning, and Jeremy Nerenberg (Nov. 30-Dec. 6, 2001). | 224 |
| 33 | Excerpts from the transcript of the deposition of Scott Hewitt (May 8, 2007). | 225 |
| 33A | Hewitt Deposition Exhibit 2: Letter from Cantley & Sedacca, LLP, to Amy Klupny (March 1, 2002). | 253 |
| 33B | Excerpt from Hewitt Deposition Exhibit 3: Draft Form 1065, 2001 U.S. Return of Partnership Income. | 254 |
| 34 | Excerpts from the transcript of the deposition of Daniel Brooks taken in *NHB X, LLC, Norman H. Bevan, Tax Matters Partner v. Commissioner*, No 17453-05 (Tax Ct. Nov. 30, 2006). | 257 |
| 35 | Excerpts from the statement under oath of Edward Sedacca, taken in *NHB X, LLC, Norman H. Bevan, Tax Matters Partner v. Commissioner*, No 17453-05 (Tax Ct. Jan. 26, 2007). | 323 |
| 36 | Civil Docket for *Hutton et al. v. Deutsche Bank AG et al.*, No. 07-2041 (D. Kan.). | 353 |
| 37 | Excerpts from the complaint filed in *Hutton et al. v. Deutsche Bank AG et al.*, No. 07-2041 (D. Kan.). | 360 |
| 38 | Excerpts from an order and opinion filed in *Michael Ling et al. v. Deutsche Bank, AG, et al*, No. 04 CV 4566 (S.D.N.Y.). | 369A |

[Table of Contents, Appendix B, Declaration of Robert Stoddart, continued]

| Exhibit Number | Description | *Page* |
|---|---|---|
| 39 | Order approving proposed notice and proof of claim, *Michael Ling et al. v. Deutsche Bank, AG, et al*, No. 04 CV 4566 (S.D.N.Y.) (Feb. 2, 2007) | 369D |
| 40 | Representative Exchange Rates for Selected Currencies for December 2001 (data archived by the International Monetary Fund) | 369I |
| 41 | Final Partnership Administrative Adjustment Letter | 369K |

Declaration of Martha TenEyck. . . . . 370

| Exhibit Number | Description | |
|---|---|---|
| 1 | Letter from the IRS to Mark E. and Mary S. Hutton (May 20, 2004) | 374 |
| 2 | Form 15382, Notice of Election to Participate in Announcement 2004-46 Settlement Initiative | 375 |
| 3 | Letter from the IRS to Mark E. and Mary S. Hutton (July 21, 2004) | 378 |
| 3A | Extract from Form 9984, Examining Officer's Activity Record | 378A |
| 4 | Letter from the IRS to Anthony S. Gasaway (July 21, 2004) | 379 |
| 5 | Letter from the IRS to Mark E. and Mary S. Hutton (Dec. 22, 2004) | 380 |
| 6 | Letter from the IRS to Mark E. and Mary S. Hutton (Jan. 21, 2005) | 381 |
| 7 | Letter from the IRS to Mark E. and Mary S. Hutton (Feb. 7, 2005) | 384 |
| 8 | Letter from the IRS to Mark E. and Mary S. Hutton (March 24, 2005) | 385 |
| 9 | Letter from the IRS to Anthony S. Gasaway (March 24, 2005, 2005) | 388 |

[Table of Contents, Appendix B, Declaration of Martha TenEyck, continued]


| Exhibit Number | Description | *Page* |
|---|---|---|
| 10 | Letter from the IRS to Mark E. and Mary S. Hutton (March 29, 2005). | 389 |
| 11 | Letter from the IRS to Anthony S. Gasaway (March 24, 2005). | 390 |
| 12 | Letter faxed by Anthony S. Gasaway to Martie TenEyck, IRS (April 11, 2005). | 391 |
| 13 | Letter from the IRS to Anthony S. Gasaway (April 12, 2005). | 394 |
| 14 | Form 2848, Power of Attorney and Declaration of Representative. | 397 |
| 15 | Letter faxed by Anthony S. Gasaway to Martie TenEyck, IRS (June 8, 2005). | 399 |


## TABLE OF AUTHORITIES

Cases:


*Agro Science Co. v. Comm'r*, 934 F.2d 573, (5th Cir. 1991) . . . . . . . . . . 33
*Avon Products, Inc. v. United States*, 97 F.3d 1435 (Fed. Cir. 1996). . . . . . . . . . 36
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). . . . . . . . . . 39
*CEMCO Investors, LLC, v. United States*,
No. 04 C 8211, 2007 WL 951944 (N.D. Ill. March 27, 2007) . . . . . . . . . . 30
*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). . . . . . . 37
*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006). . . . . . . . . . 39
*Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367 (Fed. Cir. 2002). . . . . . . . . . 38-39
*Domulewicz v. Comm'r*, 129 T.C. No. 3, 2007 WL 2262884 (Aug. 8, 2007). . . . . . . . . . 19, 35
*Drobny v. Comm'r*, 86 T.C. 1326 (1986). . . . . . . . . . 33
*Gilman v. Comm'r*, 933 F.2d 143 (2d Cir. 1991). . . . . . . . . . 39
*Gindes v. United States*, 661 F.2d 194, (Ct. Cl. 1981).. . . . . . . . . . 19
*Heasley v. Comm'r*, 902 F.2d 380 (5th Cir. 1990). . . . . . . . . . 39
*Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975). . . . . . . . . . 24
*Hutton et al. v. Deutsche Bank AG et al.*, No. 07-2041 (D. Kan.). . . . . . . . . . 16
*Illes v. Comm'r*, 982 F.2d 163 (6th Cir. 1992). . . . . . . . . . 39
*Katz v. Commissioner*, 335 F.3d 1121 (10th Cir. 2003). . . . . . . . . . 21
*Keener v. United States*, 76 Fed. Cl. 455 (2007) . . . . . . . . . . 20, 37

[Table of Authorities, Cases, continued]

Page

*Klamath Strategic Investment Fund, LLC, v. United States*,
440 F. Supp. 2d 608 (E.D. Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
*Klamath Strategic Investment Fund, LLC, v. United States*,
472 F. Supp. 2d 885 (E.D. Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37, 38
*Ling et al. v. Deutsche Bank, AG, et al*, No. 04 CV 4566 (S.D.N.Y.). . . . . . . . . . . . . . . . . . . . . . 17
*Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007). . . . . . . . . . . . . . . . . . . . . . . . . 37
*Massengill v. Comm'r*, 876 F.2d 616 (8th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*Mayrath v. Comm'r*, 357 F.2d 209 (5th Cir.1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
*McKeever v. Comm'r*, T.C. Memo. 2000-288, 2000 WL 1297710 (2000). . . . . . . . . . . . . . . . 33-34
*Merino v. Comm'r*, 196 F.3d 147 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*Nussdorf v. Comm'r*, 129 T.C. No. 5, 2007 WL 2330800 (Aug. 16, 2007) . . . . . . . . . . . . . . . . . 23
*Santa Monica Pictures v. Commissioner*,
89 T.C.M. (CCH) 1157, 2005 WL 1111792 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38
*Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*Transpac Drilling Venture 1983-63 v. United States*,
16 F.3d 383 (Fed. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*United States v. Mead Corp*., 533 U.S. 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
*Zfass v. Comm'r*, 118 F.3d 184 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Statutes:

Internal Revenue Code of 1986:

§ 162.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
§ 165.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
§ 212.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
§ 358.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27
§ 705.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 722.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 732.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
§ 733.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 752.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25, 26, 29
§ 754.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
§ 6226.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20, 30
§ 6229.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
§ 6231.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 37
§ 6659.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 6662.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31
§ 6663.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
§ 6664.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34
§ 7805.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

[Table of Authorities, Statutes, continued]

*Page*

Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324, *codified as* 26 U.S.C. §§ 6221-6233.. . . . . . . . . . . . . . . . . . . . . . . . 20
Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106. . . . 39
Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763. . . . 27

Treasury Regulations (26 C.F.R.):

§ 1.752-6T. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25, 27
§ 1.752-6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28
§ 1.183-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
§ 1.6031(a)-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
§ 1.6662-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
§ 1.6664-4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
§ 301.6221-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 35, 36
§ 301.6226(e)-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
§ 301.6231(a)(3)-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
§ 301.6231(a)(5)-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 30
§ 301.6231(a)(7)-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
§ 301.7701-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

Miscellaneous:

Rev. Rul. 58-234, 1958-1 C.B. 279. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Modifications and Additions to the Unified Partnership Audit Procedures, 64 Fed. Reg. 3886-01 (Jan. 26, 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Notice 2000-44, 2000-2 C.B. 255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
T.D. 8965, 66 Fed. Reg. 50,541 (Oct. 4, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Assumption of Partner Liabilities, 68 Fed. Reg. 37,434-01 (June 24, 2003). . . . . . . 25, 27
T.D. 9062, 68 Fed. Reg. 37,414-01 (June 24, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Announcement 2004-46.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
T.D. 9207, 70 Fed. Reg. 30334-01 (May 26, 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Chief Counsel Notice CC-2003-020, 2003 WL 24016805 (June 25, 2003). . . . . . . . . . . . 2
Rule 56, Rules of the U.S. Court of Federal Claims (RCFC). . . . . . . . . . . . . . . . . . . . . . 39

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC,
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The defendant, the United States, presents the following brief in support of its motion for summary judgment. All relevant statutes, regulations, and other non-case authorities are set out in Appendix A, *infra*.

## QUESTIONS PRESENTED

I. Did the Clearmeadow partnership assume a liability to pay $2,769,200 in a transaction described in Notice 2000-44 when the plaintiff contributed to the partnership an option under which the plaintiff may have had to pay $2,769,200 on the closing date?

II. Does the penalty for a gross valuation misstatement apply as a result of the Clearmeadow partnership's transactions and tax reporting?

III. Did the Clearmeadow partnership's transactions lack economic substance and business purpose?

STATEMENT OF THE CASE

A taxpayer, Mark Hutton, claims benefits arising from a tax shelter he bought from promoters whom he has sued elsewhere for promoting a sham. Here and for the moment, however, Hutton argues that the sham was a legitimate investment. The shelter at issue is a Son of Boss transaction, which the IRS has defined as follows (Chief Counsel Notice CC-2003-020, 2003 WL 24016805 (June 25, 2003)):

> The Son of Boss transaction involves the contribution of a purchased option to a partnership and the assumption by the partnership of a separate written option which the taxpayer incurred. A taxpayer engaged in a Son of Boss transaction claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call option but is not reduced under Internal Revenue Code § 752 for the assumption of the obligation under the written call option. Subsequently, taxpayer claims a loss on the disposition of the partnership interest even though taxpayer has incurred no corresponding economic loss.

The defendant will now describe how Hutton bought, exploited, and defended the tax shelter he is now willing–elsewhere–to recognize as a sham.

*A. Summary*

On October 15, 2001, through an entity called Clearmeadow Investments, LLC, Hutton pretended to deposit $25,000,000 with the New York branch of Societe Generale; and Societe Generale pretended to deposit $25,000,000 with Hutton; each party promised to pay to the other on December 14, 2001, both the nonexistent deposit and offsetting amounts of interest that each nonexistent deposit was supposed to earn at the rate of 3.6650% per annum. As part of the same transaction, Hutton pretended to pay Societe Generale $2,500,000 for a foreign-currency option under which Hutton could collect $2,800,000 from Societe Generale if certain conditions were met on the expiration date, December 14, 2001; and Societe Generale pretended to pay Hutton

$2,472,500 for a nearly identical option under which Societe Generale could collect $2,769,200 from Hutton if certain conditions were met on the expiration date, December 14, 2001. (*See* Defendant's Proposed Findings of Uncontroverted Fact (hereinafter DPF) 38-42, 44.) Actually, Hutton transferred to Societe Generale only the excess of his purported payment over his purported receipt–$27,500. Not another penny changed hands. Clearmeadow never had more than $287,500 in its account. (*See* DPF 45-46.)

As a result of these offsetting transfers, Hutton claims to have increased his basis in a partnership by $2,500,000 when he contributed to it the option he purported to buy from Societe Generale. When the partnership liquidated, he attached part of that inflated basis to a partnership asset that had a nominal value, sold the asset, and claimed a tax loss of $1,004,040. (*See* DPF 97, 98, 104, 105, 110.) But Hutton had also transferred to the partnership the option he sold to Societe Generale, and the partnership accordingly assumed Hutton's potential $2,769,200 liability. Nevertheless, Hutton did not reduce his basis in the partnership by the amount of the transferred liability. Hutton entered this tax shelter more than a year after the IRS announced that such transactions abuse the law. *See* Notice 2000-44, 2000-2 C.B. 255 (released on August 13, 2000).

Because the potential $2,769,200 liability Hutton transferred was just as real as the $2,500,000 he pretended to pay Societe Generale (and for other reasons), the IRS adjusted the partnership's return to reflect both sides of his bargain. (*See* DPF 129.) Hutton now challenges the adjustments: he wants this Court to give him the tax benefits he claimed for the $2,500,000 he is supposed to have paid for the contributed option; and he invites the Court to join him in

ignoring the $2,769,200 liability of which the partnership relieved him. The law, common sense, and elementary fairness all stand in his way.

### *B. The transaction before the Court is one of many such deals devised and marketed by Cantley & Sedacca, Deutsche Bank, and other promoters.*

Mark Hutton, a resident of Wichita, Kansas (DPF 1), is the sole shareholder of Clearmeadow Capital Corp. (DPF 104), the plaintiff and the tax-matters partner of Clearmeadow Investments, LLC, through which Hutton entered these transactions.

Hutton is a general contractor. During 2001, he noticed that his income was increasing over earlier years (DPF 1, 3); and when the year ended, he found that he had earned $921,885 of non-passive income through one of his S-corporations, Hutton Construction Corp. (DPF 2). A business acquaintance of Hutton, Bryan Hanning, approached him with an "investment" in foreign-currency transactions that was offered through the law firm of Cantley & Sedacca. (DPF 5.) Hanning had found Cantley & Sedacca listed in a binder of information under the caption "resources for investment opportunities and tax strategies." (DPF 6.) Hanning is employed with Massachusetts Mutual Life Insurance Company and is a member of AGH Wealth Advisors. (DPF 4.) Before 2001, Hanning had sold Hutton and his business entities only insurance-related products, and all but one of them were products of Massachusetts Mutual. (DPF 12.) Hanning was now proposing a transaction much different from any other business he had ever done with Hutton. (DPF 13.)

Beckett Cantley and Edward Sedacca formed Cantley & Sedacca some time during the second quarter of 2001. (DPF 7.) A very high proportion of the firm's clients entered market-linked deposit transactions (MLDs) like Hutton's, and all of the transactions relied upon a similar

legal theory. (DPF 8.) An MLD is a combination of (1) a deposit with a fixed yield, like a CD or a bank account; and (2) a variable component that is linked to some market–for example, currencies or equities. (DPF 63.) Edward Sedacca understood that MLDs were a product of Deutsche Bank, and Cantley & Sedacca's MLDs were executed by a former employee of Deutsche Bank, Daniel Brooks. (*See* DPF 9.)

After earning an MBA in investment and finance from Duke University's Fuqua School of Business, Brooks spent several years trading foreign currencies and currency options for various employers, including Bankers Trust. When Deutsche Bank bought Bankers Trust in 1999, Brooks joined Deutsche Bank Alex Brown (hereinafter DB Alex Brown), where he worked as a vice-president at the currency desk in foreign exchange sales. (DPF 60.) DB Alex Brown is a member of the New York Stock Exchange and is a brokerage. (DPF 37.) Brooks met Edward Sedacca through Craig Brubaker, who worked as a broker with DB Alex Brown. (DPF 62.)

In April of 2001 (the second quarter of the year, when Cantley & Sedacca was formed), Brooks left DB Alex Brown and founded an entity called Clarion Capital to do currency trading and advising. (DPF 61.) Brooks had not been involved with MLD transactions when he worked with DB Alex Brown; it was Cantley & Sedacca who introduced him to MLDs, because that was the structure they were planning to use. (DPF 63.) Brooks discussed with Cantley & Sedacca the "risk" he would put into the MLD transaction–that is, the options embedded in the MLD and the possibility that they would be profitable. (DPF 76.) His only role was to arrange the currency option; he had no role in the "deposit" portion. (DPF 65.)

The currency options in Brooks's MLDs were European digital options. A European option is exercisable only at a specific date and time. A digital option is a combination of a

purchased "long" position and a sold "short" position. In the long position, the investor purchases a potential profit–up to a certain point–and in the short position the investor sells away the remaining potential profit. Brooks sees two advantages to trading currencies using digital options: (1) the investor can lose no more than the price he paid for the long position; and (2) the premium is low because the short position limits the investor's potential profit. According to Brooks, digital options are the most commonly used derivatives in currency trading. (DPF 66.) Brooks arranged most of the options through Deutsche Bank, but for about 30 clients, including Hutton, he arranged the options through Societe Generale. (*See* DPF 78.)

Though Cantley & Sedacca had developed the structure of the MLDs, the investors all held accounts with DB Alex Brown before contacting Brooks, and Brooks received his instructions through DB Alex Brown. (DPF 67.) Between June and December of 2001, Brooks engaged in MLD transactions with 150 different customers. To carry out the transactions, he always joined an LLC with the customer. Cantley & Sedacca formed the LLCs, which were all basically the same. Through Clarion Capital, Brooks owned 1% of each LLC for the life of the MLD transaction, but he held no interest in any of the LLCs after December 31, 2001. (DPF 64.) By then, all of the investors had terminated his interest in their LLCs and his investment authority over their accounts with DB Alex Brown. (*See* DPF 90.)

*C. When Hutton entered the MLD he had no reasonable belief that he would earn a profit in excess of his costs apart from the promised tax benefits.*

Following their usual procedure (*see* DPF 10), Cantley & Sedacca held a conference call with Hutton and his advisors–Hanning, Mark Kaplan (a CPA with Hanning's firm), and Scott Hewitt. Hewitt is a CPA who performs accounting and tax services for Hutton and his entities.

(DPF 14.) To gather necessary information about Hutton, Cantley & Sedacca sent Hanning a form captioned "Intake Summary," which Hanning helped Hutton complete. He then returned it to Cantley & Sedacca. (DPF 11.) Hanning also forwarded to Hutton a document from Cantley & Sedacca captioned "Agreement for Your Legal Services." (DPF 17.) Cantley & Sedacca paid Hanning a referral fee, which Hanning disclosed to Hutton. (DPF 15-16.)

On October 5, 2001, Hutton signed a document identical to the agreement for legal services that Hanning had given him. (DPF 34.) The document informed Hutton that Cantley & Sedacca charged a flat fee of $150,000 (considered earned on the date of the document). It also put Hutton on notice that the IRS might challenge the tax benefits generated by the transaction he contemplated, and it warned him that the $150,000 fee would cover neither an audit defense nor the cost of any consequent litigation. (*See* DPF 33.)

By signing the October 5 agreement Hutton represented: (1) that he had relied solely upon his (and his financial advisor's) independent investigation of all matters or concerns regarding the MLD transaction; and (2) that he (or his financial advisor) possessed knowledge and experience in financial and business matters sufficient to ensure his (or his financial advisor's) capability to evaluate the merits and risks of the MLD transaction. (DPF 18.) Hutton's representation was false: neither he nor any of his advisors had independently investigated the MLD transaction, and neither he nor any of his advisors even claimed to have knowledge and experience in financial and business matters sufficient to ensure their capability to evaluate the merits and risks of the MLD transaction. (*See* DPF 20-32.) Despite his personal inability to evaluate the transaction (DPF 22), Hutton never asked anyone whether it had a reasonable possibility of producing an economic profit in excess of tax benefits and out-of-pocket costs

(DPF 30). According to Hutton, when he was deciding to enter the MLD transaction only Cantley & Sedacca led him to believe that it offered a reasonable opportunity to make a profit. (DPF 31.) But in the agreement Hutton signed on October 5, Cantley & Sedacca stated that they were not financial advisors themselves, and that they stressed that they had expressed no opinion about the MLD transaction. (DPF 18.)

*D. Through Clearmeadow, Hutton pretended to spend 27.5 million for long and short positions in the MLD transaction.*

On October 9, 2001, Edward Sedacca signed a certificate of formation for Clearmeadow Investments, LLC, a Delaware limited liability company. The Delaware Secretary of State filed the certificate on October 10, 2001. (DPF 35.) The initial operating agreement of Clearmeadow Investments, LLC, dated October 10, 2001, named Hutton as the sole Member and provided that the Member would have no liability for the debts of the company except to the extent of his capital contribution, which was $287,500. (DPF 36.) Because Clearmeadow had only a single owner and was not a corporation, it was to be "[d]isregarded as an entity separate from its owner" for federal tax purposes. *See* Treas. Reg. § 301.7701-3(b)(1)(ii).

On October 15, 2001, Clearmeadow deposited $287,500 into an account with DB Alex Brown. (DPF 37.) On the same day, Clearmeadow executed two agreements with Societe Generale, New York Branch, captioned "Confirmation for Currency Linked Deposit Swap." Both agreements were sent to the attention of Mr. Jason Saffran, Cantley & Sedacca. (DPF 38, 40.)

With one agreement, Clearmeadow purported to purchase what Cantley & Sedacca later called the "long MLD position," which it summarized as follows: Clearmeadow deposited EUR

(euros) 27,427,520 with Societe Generale on October 15, 2001. On December 14, 2001, Societe Generale was to repay this amount, plus 3.67% annual interest. Societe Generale would also pay Clearmeadow an additional amount, the "Long Bonus Yield," if on December 14, 2001, the "JPY [Japanese yen]/USD [US dollar] spot market exchange rate is at least 124.65." Clearmeadow paid a premium of EUR 2,747,252 for the long MLD position. (DPF 39.) The Court will find the details of the agreement at DPF 38.

With the other document, Clearmeadow purported to sell what Cantley & Sedacca later the "short MLD position," which it summarized as follows: Societe Generale deposited EUR 27,427,520 with Clearmeadow on October 15, 2001. On December 14, 2001, Clearmeadow was to repay this amount, plus 3.67% annual interest. Clearmeadow would also pay Societe Generale an additional amount, the "Short Bonus Yield," if on December 14, 2001, the "spot market JPY/USD exchange rate is at least equal to 124.67." Societe Generale paid a premium of EUR 2,717,033 for the short MLD position. (DPF 41.) The Court will find the details of the agreement at DPF 40.

These agreements denominate the parties' obligations in euros, but Hutton made his purported payment and claimed his tax benefits in dollars. Accordingly, the defendant will refer to the amounts in dollars, using the information that Daniel Brooks and Clarion Capital reported to Clearmeadow on a statement of account. One entry on that statement, dated October 15, 2001, is captioned "Long Market Linked Deposit (MLD)" and reads as follows (DPF 42):

| | | |
|---|---|---|
| Fixed Interest (3.665% annualized actual/360) | | USD 150,163 |
| Deposit Amount | EUR 27,472,520 | USD 25,000,000 |
| Premium Paid | EUR 2,747,252 | USD 2,500,000 |
| Bonus Coupon (Variable Interest Income) | | USD 2,800,000 |

The same statement also contains an entry dated October 15, 2001, for a "Short Market Linked Deposit (MLD)," which reads as follows (DPF 42):

| | | |
|---|---|---|
| Fixed Interest (3.665% annualized actual/360) | | USD 150,163 |
| Deposit Amount | EUR 27,472,520 | USD 25,000,000 |
| Premium Received | EUR 2,717,033 | USD 2,472,500 |
| Bonus Coupon (Variable Interest Expense) | | USD 2,769,200. |

On October 15, 2001, in order to appear to buy the "long MLD position," Hutton sent a letter on Clearmeadow's stationery to Craig Brubaker at DB Alex Brown concerning Clearmeadow's account. The letter states, in part (DPF 44):

> This letter constitutes your authorization to transfer the necessary funds to complete the purchase of the market linked deposits in the notional amount of US $25,000,000 and also to pay premiums totaling US $2,500,000 associated therewith from the above-referenced account to Societe Generale, New York ABA.

At the time, however, Clearmeadow's account contained no more than $287,500 (DPF 45) and throughout 2001 it never contained more than $287,500 (DPF 46). Hutton's longtime accountant, Scott Hewitt, is generally familiar with Hutton's holdings and assets; Hewitt was not aware that Hutton had $27.5 million to invest. (DPF 47.) Hutton did not borrow the $27.5 million from Deutsche Bank, and he had no reason to imagine that Deutsche Bank was lending it to him. (*See* DPF 48.) Simply put, on October 15, 2001, DB Alex Brown did not transfer the sums of $25,000,000 and $2,500,000 from Clearmeadow to Societe Generale. (DPF 49.)

Instead, on October 16, 2001, DB Alex Brown wired $27,500 from Clearmeadow's account to Societe Generale in New York. That amount is the excess of the premium Clearmeadow purported to pay for the long MLD position, $2,500,000, over the premium it purported to receive on the short MLD position, $2,472,500. It is also 1.1% (110 basis points) of

$2,500,000, the premium for the long MLD position, which is the amount the bank charged to set up the option. (DPF 50.)

*E. Following Cantley & Sedacca's plan, Hutton contributed his MLD positions to a corporation, which joined Daniel Brooks in a purported partnership.*

On October 12, 2001, a Cantley & Sedacca attorney signed a certificate of incorporation for Clearmeadow Capital Corporation, which Hutton had already elected to treat as an S-corporation with the help of another Cantley & Sedacca attorney. (*See* DPF 51, 52.) On October 19, 2001, Hutton transferred his entire membership interest in Clearmeadow Investments, LLC, to Clearmeadow Capital Corporation as a contribution to its capital. He accepted the transfer as president of Clearmeadow Capital Corporation. (DPF 54.) In the rest of this brief the defendant will generally refer to the corporation as "Clearmeadow Capital" and to the LLC as "the Clearmeadow partnership," "Clearmeadow LLC," or "the LLC."

On October 19, 2001, Mark E. Hutton, president of Clearmeadow Capital, and Daniel J. Brooks, president of CF Advisors XXXVII, LLC, executed an amended and restated operating agreement for Clearmeadow Investments, LLC. Clearmeadow Capital contributed $287,500 to the LLC in exchange for 99,000 Class A Units and became the Class A Member. CF Advisors contributed $2,500 "out of its service fees" for 1,000 Class B Units and became the Class B Member. The amended and restated operating agreement limited the members' liability to the amount of their contributions. (DPF 55.) (The defendant will refer to CF Advisors/Brooks as "Brooks" unless more description seems needed.) When Brooks joined Clearmeadow LLC, it at least appeared to become a partnership for federal tax purposes. *See* Treas. Reg. § 301.7701-3(b)(1)(i).

According to the new operating agreement of Clearmeadow LLC, Clearmeadow Capital had solicited Brooks to obtain his services as an investment advisor and specialist in foreign currency and foreign currency derivative investments. The parties agreed to pay Brooks an immediate front-end fee of $10,000 for his services, plus 2% of the company's net asset value as of the end of the fiscal year and 20% of all income and gains realized during the fiscal year. (DPF 56.) Even before signing this agreement, Hutton had asked DB Alex Brown to transfer $10,000 from Clearmeadow's account to two accounts held by CF Advisors in Baltimore Maryland. On October 23, 2001, DB Alex Brown transferred the money–$7,500 to an account with DB Alex Brown and $2,500 to an account with "Bankers Trust Company Deutsche Bk London/F." (DPF 58-59).

Clearmeadow Capital reserved the right to terminate Brooks's services at any time after December 16, 2001, and–upon delivery of notice–to require him to sell all of his Class B units to Clearmeadow Capital for book value. Brooks had no similar rights against Clearmeadow Capital. (DPF 57.)

While Brooks managed Clearmeadow, it made several small option trades; Brooks arranged three to five such currency-option trades for each of the LLCs that entered such MLD transactions. (*See* DPF 100.) And on December 13, 2001, Clearmeadow Investments paid $1,000 in US funds for $1,487.51 of Canadian currency. The settlement date was December 14, 2001. (DPF 86.) Other persons who bought MLDs through Cantley & Sedacca also purchased Canadian currency. Daniel Brooks bought the currency at the investors' instructions, but he does not know the reason for the purchases or what became of the currency. In particular, he does not know if there was any tax reason for the purchases. (DPF 87.)

*F. Before the end of the taxable year, Hutton liquidated the Clearmeadow partnership and had Clearmeadow Capital sell a portion of a partnership asset to generate exactly the amount of tax loss Hutton needed for the year.*

Soon after Brooks bought the Canadian currency, Hutton ended the partnership. On December 18, 2001, Clearmeadow Capital bought Brooks's partnership interest (DPF 88) and ended Brooks's investment authority over the DB Alex Brown account maintained by Clearmeadow Investments, LLC (DPF 89). The former partnership then distributed its assets to Clearmeadow Capital; those assets were $284,315 in cash and 1,487.51 units of Canadian currency. (*See* DPF 97.) Generally (ignoring adjustments for distributed cash), when a partnership liquidates and distributes property other than money, a partner's basis in the property is the partner's basis in the partnership. *See* Code § 732(a)(1). Clearmeadow Capital asserts that the 1,487.51 Canadian dollars had a "cost basis" of $2,501,000 (*see* DPF 97), which is the $2,500,000 cost of the long MLD position Clearmeadow Capital had contributed to Clearmeadow LLC plus $1,000. The partnership had served Hutton's purpose: it had transformed a net investment of $27,500 into a potential loss of over $2,000,000.

Hutton betrayed his intentions on November 30, 2001, when he sent the following e-mail to Hanning and to Jeremy Nerenberg, an attorney with Cantley & Sedacca (DPF 84):

> Scott [Hewitt] and I met today and figured this out. We would like to take down $1,005,000 of the loss for year 2001. I would think the balance for next year but if possible I would like to wait until later in 2002 to decide on this. Is that possible?

With the phrase "loss for the year 2001," Hutton was referring to the tax loss that would be generated by the MLD transaction. (*Ibid.*) Nerenberg replied, in part, as follows (DPF 85):

> I spoke too soon in my prior e-mail. Apparently, the entire remaining balance would have to be triggered next year (e.g., no amount can be carried over into

> 2003). Please contact Ed Sedacca at 972-361-0090 should you have any questions regarding this matter. I will assume that you would still like to take down $1,005,000 of the loss for year 2001, and thus take the entire remaining balance for year 2002 – is this correct?

The promoters delivered the tax loss Hutton ordered, almost to the dollar. On December 24, 2001, on Hutton's instructions, DB Alex Brown sold $597.98 of Clearmeadow Capital's Canadian currency (40.2% of the total amount) for $323.08 in US funds. (DPF 91, 92.) Clearmeadow Capital reported the results of this sale as a "portfolio loss" on its 2001 federal income tax return, and it computed the loss as follows (DPF 104):

| | Date Acquired | Date Sold | Cost | Proceeds | Net Gain (Loss) |
|---|---|---|---|---|---|
| CAD Currency | 12/14/2001 | 12/24/2001 | $1,005,402 | $323 | ($1,005,079) |

The $1,005,402 "cost" was 40.2% of the $2,501,000 tax basis that Clearmeadow Capital claimed in the Clearmeadow LLC partnership. (*See* DPF 105.) Clearmeadow Capital passed this loss (reduced by $1,039 of profits) and other tax attributes to its sole shareholder, Mark Hutton, who reported them on his 2001 income tax return. (DPF 109, 110.) The net Clearmeadow loss of $1,004,040 neatly offset the $921,885 of income Hutton received from Hutton Construction Corporation. (DPF 110.) Hutton kept the rest of the potential loss for another day: Clearmeadow Capital listed its remaining partnership "basis," $1,495,598, as a current asset on the balance sheet of its 2001 return. (DPF 106.) At DPF 97-110 the Court will find all of Clearmeadow LLC's tax attributes tracked from the partnership return through Clearmeadow Capital's S-corporation return to Mark Hutton's individual return.

*G. The IRS offered Hutton the chance to settle his tax liabilities, but he refused; the IRS then adjusted Clearmeadow's partnership return, and Hutton brought suit here.*

On August 29, 2002, Clearmeadow LLC filed its 2001 federal partnership return (DPF 94), and Clearmeadow Capital filed its 2001 federal S-corporation income-tax return (DPF 103). Hutton and his wife filed a joint federal income-tax return on August 28, 2002. (DPF 110.) In a letter dated May 20, 2004, the IRS informed Hutton that it had issued Announcement 2004-46, which grants taxpayers an opportunity to resolve tax liabilities associated with transactions described in Notice 2000-44 (Son of Boss transactions); the letter enclosed a Notice of Election to participate in the settlement initiative. (*See* DPF 111.) Hutton signed the Notice of Election and returned it to the IRS (DPF 113), but he and his representative failed to provide the information the IRS requested within the time allowed (*see* DPF 114-122). Finally, the IRS served summonses upon Hutton and his wife, requiring them to appear and produce requested documents. (DPF 123.) Hutton refused to produce more documents (DPF 124), and neither the Huttons nor their representative appeared in response to the summonses (DPF 125).

Using the information in its possession (DPF 126), the IRS mailed a Notice of Final Partnership Administrative Adjustment (FPAA) to Clearmeadow Capital Corp., the tax matters partner of Clearmeadow Investments, LLC, on August 24, 2005 (DPF 128). The FPAA reverses all the items that Clearmeadow Investments, LLC, reported to its partners on forms K-1 and corrects them to zero. The FPAA finds, among other things, that (1) the obligations assumed by the partnership when it received the MLD short position constitute liabilities for purposes of Treas. Reg. § 1.752-6T, and the partnership's assumption of the liabilities should reduce the partners' basis in their partnership interests; (2) the purchase and contribution of the MLD

positions, the formation of the partnership, and its liquidation had neither business purpose nor economic substance, and as a consequence the transactions should be disregarded and all claimed losses and increases in basis should be denied; and (3) understatements of tax resulting from the partnership items are attributable to substantial understatement of income tax, gross valuation misstatements, and negligence or disregard of rules and regulations. The FPAA also proposes penalties. (DPF 129.)

Through Clearmeadow Capital, Hutton filed a complaint with this Court on November 21, 2005, demanding a determination of the partnership items set forth in the FPAA and a determination of partnership-level defenses to the proposed penalties. (*See* Compl. ¶ 2.) Among other allegations, the complaint asserts that "Clearmeadow engaged in business activity." (*Id.* ¶ 12ii.)

*H. Like other investors in this tax shelter, Hutton sued the promoters, claiming that the MLD transaction was a sham.*

On January 23, 2007, Hutton and the Clearmeadow entities filed a class-action RICO suit against the promoters of the MLD transaction; it is captioned *Hutton et al. v. Deutsche Bank AG et al.*, No. 07-2041 (D. Kan.). (DPF 131.) In his RICO suit, Hutton demands from the promoters some of the relief he demands from the defendant here. (*See* DPF 132.) Hutton's RICO complaint asserts that the promoters marketed and implemented a "fraudulent and illegal" Son of Boss tax shelter designed to give the false impression that a complex series of financial transactions were legitimate business transactions with economic substance, though they were not. (DPF 133.) In his deposition in the present case, Hutton reaffirmed that assertion to be an "accurate representation." (DPF 134.) Hutton's RICO complaint also admits that his MLD

transaction fell within the scope of Notice 2000-44.[1] (DPF 135.) In fact, Hutton's RICO complaint makes many of the arguments the defendant will raise in this brief (*see* DPF 139) and it generally demonstrates that his suit here is untenable (*see* DPF 131-44).

Hutton is not the only investor in this MLD Son of Boss shelter who realized that it was a fraud. The promoters recently settled another class-action suit for $4,599,000.00; the case is captioned *Ling et al. v. Deutsche Bank, AG, et al*, No. 04 CV 4566 (S.D.N.Y.). The district court approved the *Ling* settlement on February 2, 2007. By its terms, the settlement applies to the Clearmeadow entities and to Hutton. (DPF 145.)

Hutton cannot prove his case here without contradicting himself and disproving his case against the promoters of the shelter.

## JURISDICTION

Before discussing the substance of the case, the defendant must address jurisdictional issues raised in Hutton's complaint.

*A. Both the plaintiff's complaint and the FPAA are timely.*

The plaintiff asks this Court to redetermine Clearmeadow's partnership items under Code § 6226(a), which permits a tax matters partner to file a petition in this Court within 90 days after

[1] As the defendant explains at page 26, *infra*, when a partnership assumes a liability in a transaction like those described in Notice 2000-44, the assumption results in a reduction of the partner's basis in his partnership interest even if the partnership also assumes substantially all of the assets with which the liability is associated. Accordingly the defendant will ask the Court to determine that Clearmeadow's transaction is similar to ones described in Notice 2000-44.

the FPAA is mailed. Because Clearmeadow Capital had continuing exclusive authority to make necessary management decisions for the LLC (DPF 57), Clearmeadow Capital is the tax matters partner. *See* Treas. Reg. § 301.6231(a)(7)-2. The FPAA was mailed on August 24, 2005, and Clearmeadow Capital filed its complaint on November 21, 2005, within the time allowed. As Code § 6226(e) requires, Clearmeadow Capital deposited with the IRS the amount by which Hutton's tax liability would be increased if he adjusted his personal return to reflect the changes the FPAA made to the return of Clearmeadow LLC.[2] (*See* Compl. ¶ 10.) The Court has jurisdiction of Hutton's petition.

Despite Hutton's assertions to the contrary, however, the Court also has jurisdiction to uphold the FPAA. In paragraph 20 of his complaint, he insists: "The 2001 tax return of Clearmeadow was due March 15, 2002 for [*sic*] which the defendant had three years to perform an examination and make adjustments. The FPAA was issued on August 25, 2001 [*sic*] and hence the statute of limitations prevents any adjustments to be made."

These assertions lack any merit. First, Hutton has misstated the facts: the FPAA was mailed on August 24, 2005. (DPF 128.) Second, Hutton has misstated the date on which Clearmeadow's return was due: under Treas. Reg. § 1.6031(a)-1(e)(2), "The return of a partnership must be filed on or before the fifteenth day of the fourth month following the close of the taxable year of the partnership"–in this case April 15, not March 15. Third, Hutton has

---

[2] As an S corporation, Clearmeadow Capital is a "pass-thru partner." *See* Code § 6231(a)(9). Hutton was an "indirect partner" in Clearmeadow LLC because he held an interest in the partnership "through 1 or more pass-thru partners." § 6231(a)(10). When a pass-thru partner files a complaint, as Clearmeadow Capital did in this cases, § 6226(e)(1) requires a deposit equal to the increase in the tax liability of "each indirect partner holding an interest through the pass-thru partner." Treas. Reg. § 301.6226(e)-1(a)(1).

ignored the applicable statute, Code § 6229(a)(1), under which the IRS may assess tax attributable to partnership items within 3 years of the date the partnership return was filed. Clearmeadow LLC filed its 2001 partnership return on August 29, 2002. (DPF 94.) The IRS had until August 29, 2005, to issue the FPAA. The FPAA is valid.

*B. This Court has jurisdiction to determine the partnership items that will affect the plaintiff's basis in its partnership interest.*

As the defendant will explain, it is entitled to judgment as a matter of law that Hutton's S-corporation contributed a $2,769,200 liability to the Clearmeadow partnership in a transaction similar to ones described in Notice 2000-44. When applied to the partner, this partnership-level determination will eliminate the portfolio loss Hutton claimed on his return and will also make him liable for a penalty. These results, however, will occur on the *partner* level after this TEFRA partnership case has ended. *See Domulewicz v. Comm'r*, 129 T.C. No. 3, 2007 WL 2262884 at *7-*8 (Aug. 8, 2007). Hutton misunderstands the distinction between the TEFRA proceedings and a subsequent assessment, apparently reasoning that this Court's decision cannot affect his basis in the partnership (his "outside basis"[3]) because the Court can consider only "partnership items." According to him, however, the FPAA purports to adjust "non-partnership items"–in particular, the basis of Clearmeadow Capital's partnership interest in the LLC. (*See* Compl. ¶ 15.)

Hutton is partially correct about this Court's jurisdiction. After receiving the FPAA, Clearmeadow Capital filed a "petition for a readjustment of the partnership items of

---

[3] The partnership's basis in its assets is sometimes called the "inside basis," and the partners' basis in their partnership interests is the "outside basis." *See generally, e.g., Gindes v. United States*, 661 F.2d 194, 197 n.9 (Ct. Cl. 1981) (discussing the distinction).

[Clearmeadow LLC] for [the 2001] taxable year" under Code § 6226(a), which is part of the Tax Treatment of Partnership Items Act of 1982. Congress enacted these provisions as Title IV of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324, *codified as* 26 U.S.C. §§ 6221-6233. The Act sets out ways to determine the tax treatment of partnership items on the partnership level and to obtain a single judicial review of adjustments. *See generally Transpac Drilling Venture 1983-63 v. United States*, 16 F.3d 383, 387 (Fed. Cir. 1994); *Keener v. United States*, 76 Fed. Cl. 455, 457-59 (2007) (discussing the history, purpose, and application of the TEFRA partnership provisions). Section 6226(f) describes the jurisdiction this Court can exercise in a TEFRA proceeding as follows:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

Under TEFRA, the Court determines "partnership items," which Code § 6231(a)(3) defines as items "required to be taken into account for the partnership's taxable year under any provision of Subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level." The Court may not determine any "nonpartnership item," that is, "an item which is (or is treated as) not a partnership item" (§ 6231(a)(4)); and the Court may not determine any "affected item," which § 6231(a)(5) defines as "any item to the extent such item is affected by a partnership item."

A partner's basis in a partnership is an affected item (*see* Treas. Reg. § 301.6231(a)(5)-1(b)), which a court cannot consider in a TEFRA partnership-level proceeding unless the partnership has elected to use the partners' outside basis as the basis of partnership assets under Code § 754 (*see* § 301.6231(a)(3)-1(a)(3)). The Clearmeadow partnership made no such election. (DPF 99.) Accordingly, this Court cannot determine Clearmeadow Capital's basis in Clearmeadow LLC; it is an affected item, and "'affected items' are items that require adjustment *after and as a consequence of* a determination that is necessarily made in a partnership-level proceeding." *Katz v. Comm'r*, 335 F.3d 1121, 1130 n.1 (10th Cir. 2003) (emphasis added). This Court, however, must determine all the partnership items that enter the calculation of Clearmeadow Capital's basis in the LLC as well as the FPAA's adjustments of the partnership's items of income and loss.

ARGUMENT

The defendant will show that there is no genuine issue of material fact as to three items in the FPAA: (1) the amount and character of the assumed liability; (2) the applicability of the 40% penalty for a gross valuation misstatement; and (3) the lack of economic substance and business purpose in the MLD transaction. The defendant is entitled to judgment as a matter of law.

*I. The partnership assumed Clearmeadow Capital's $2,769,200 liability in a transaction described in Notice 2000-44.*

The partnership (the re-formed Clearmeadow LLC) assumed the assets of the old LLC, which included (1) a long MLD position purchased for $2,500,000, which might generate $2,800,000 when the option closed (DPF 42); (2) a short MLD position sold for $2,472,500,

which might require the optionor to pay $2,769,200 when the option closed (DPF 42); and (3) $287,500 in cash (DPF 55).

Clearmeadow Capital acquired its partnership interest in the LLC in exchange for a contribution. Accordingly, Code § 705 requires Clearmeadow Capital to begin calculating its basis in the LLC under Code § 722, which provides, in pertinent part: "The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution . . . ." Clearmeadow's basis in the long MLD position was $2,500,000. That amount plus the cash contribution of $287,500 result in a basis of $2,787,500. Under § 752(b), however (emphasis added), "any decrease in a partner's individual liabilities *by reason of the assumption by the partnership* of such individual liabilities shall be considered as a distribution of money to the partner by the partnership." If the LLC assumed Clearmeadow Capital's liability under the short MLD position to pay $2,769,200 to Societe General, then the LLC effectively distributed $2,769,200 to Clearmeadow Capital. Under § 733, after a distribution to a partner that is not a distribution in liquidation, "the adjusted basis to such partner of his interest in the partnership shall be reduced (but not below zero) by . . . the amount of any money distributed to such partner . . . ." The distribution would reduce Clearmeadow Capital's basis to $18,300.

A. *In this proceeding the Court can determine the character of Clearmeadow Capital's contribution, although the reduction in the basis of Clearmeadow Capital's partnership interest will occur later.*

Before the IRS can determine Clearmeadow Capital's outside basis in a future partner-level proceeding, this Court must determine at the partnership level (among other things) whether

the LLC assumed Clearmeadow Capital's liability under the short MLD position. The Court can and must make that determination, because "partnership items" include partnership liabilities. *See* Treas. Reg. § 301.6231(a)(3)-1(a)(1)(v); *cf., e.g., Nussdorf v. Comm'r*, 129 T.C. No. 5, 2007 WL 2330800 at *10 n.16 (Aug. 16, 2007) (in a partnership-level proceeding, court had to determine whether the short position in contributed euro options constituted a liability, even though the IRS based its partner-level notice of deficiency on the *pre*-contribution basis of the asset). Partnership items also include information the partnership must have about contributions to the partnership (§ 301.6231(a)(3)-1(a)(4)(i)) "[f]or purposes of its books and records, or for purposes of furnishing information to a partner" (§ 301.6231(a)(3)-1(c)(2)). Such information includes "[t]he character of the amount received from a partner." § 301.6231(a)(3)-1(c)(2)(i). Furthermore, "[t]he term 'partnership item' includes the accounting practices and the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Treas. Reg. § 301.6231(a)(3)-1(b).

When the Clearmeadow partnership determined the amount of income and loss from its MLD positions, it treated the $2,769,200 paid to Societe Generale on the short MLD option as an "interest expense on investment debts," which it netted against the $2,472,500 option premium that Hutton had received from Societe Generale on October 15, 2001–while Clearmeadow LLC was still disregarded as an entity separate from Hutton. (*See* DPF 102, 42, 55.) Hutton did not include the $2,472,500 on his individual 2001 federal income-tax return (DPF 43), and Cantley & Sedacca opined that "the LLC's receipt of this premium did not constitute an income recognition event for federal income tax purposes for either the LLC or the investor [Hutton] at the time of receipt and that no income recognition event in respect of this premium will arise

until the Short Maturity Date." (DPF 41.) Hutton treated his receipt of the option premium as an "open transaction" of the sort described in Rev. Rul. 58-234, 1958-1 C.B. 279, 283:

> Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. . . . Hence, no income, gain, profits, or earnings are derived from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium.

When the short MLD option closed, the Clearmeadow partnership recognized the option premium as partnership income and it recognized the amount paid to Societe Generale as a partnership loss. This is incontrovertible proof that the partnership assumed Hutton's liability under the short-position MLD option.

Before 2000, Clearmeadow Capital might have raised at least a specious argument (at the partner-level) that its liability on the option sold to Societe Generale did not constitute a liability within the meaning of Code § 752, and that it accordingly received no distribution of money when the LLC assumed the liability. For example, in *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), the Tax Court held that for purposes of § 752, an optionor had no liability on a written option until the option was exercised because the liability would not be fixed until then.

On August 13, 2000, however, the IRS issued Notice 2000-44, 2000-2 C.B. 255, which describes a transaction similar to Hutton's MLD transaction and sets out its legal consequences as follows:

> In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The Notice holds that losses resulting from these transactions do not reflect actual economic consequences and are not deductible under Code § 165. Furthermore, the Notice warns (emphasis added): "[T]he transactions *may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules*. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2)."

To implement the position announced in Notice 2000-44, the Treasury Department issued temporary regulation § 1.752-6T in T.D. 9062, 68 Fed. Reg. 37,414-01 (June 24, 2003),[4] the entire text of which is set out in Appendix A, *infra*. The regulation generally defines the word

---

[4] On the same day, the Treasury Department announced that the temporary regulation, § 1.752-6T, would serve as the text of a proposed regulation, § 1.752-6. *See* Assumption of Partner Liabilities, 68 Fed. Reg. 37,434-01 (June 24, 2003). The Secretary adopted the regulation in final form as § 1.752-6 in T.D. 9207, 70 Fed. Reg. 30,334-01 (May 26, 2005). The defendant will generally cite the final version of the regulation.

"liability" in Code § 752 to include the definition of liability found in § 358(h)(3), which provides: "For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." This definition of "liability" covers Clearmeadow Capital's obligation to pay $2,769,200 to Societe Generale. Accordingly, under Treas. Reg. § 1.752-6(a), Clearmeadow Capital's "basis in the partnership is reduced . . . by the amount (determined as of the date of the exchange) of the liability." This reduction will occur in a later partner-level proceeding.

Under Code § 358(h)(2)(B), the reduction in basis required by § 358(h)(1) does not apply to transactions in which the person assuming the liability also receives substantially all of the assets with which the liability is associated; and Treas. Reg. § 1.752-6(b)(1) generally adopts § 358(h)(2)(B). The Clearmeadow partnership received the entire MLD position that gave rise to the liability, but "[t]he exception contained in section 358(h)(2)(B) does not apply to an assumption of a liability (defined in section 358(h)(3)) by a partnership as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000-44." § 1.752-6(b)(2). The exception cannot benefit Clearmeadow because its MLD transaction is similar to the transactions described in Notice 2000-44.

*B. The Secretary had the authority to apply Treas. Reg. § 1.752-6 to transactions that occurred before it was issued.*

Though the temporary regulation was issued on June 24, 2003, it applies to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003. *See* Treas. Reg. § 1.752-6(d)(1). Clearmeadow LLC assumed Clearmeadow Capital's MLD liability on October

19, 2001, when it became a partnership rather than a disregarded entity. (*See* DPF 54, 55.) Under the regulation, the IRS will be able to reduce Clearmeadow Capital's basis by the amount of the liability because by its terms the regulation can be applied retroactively.

Congress authorized the IRS to make the regulation retroactive in the Community Renewal Tax Relief Act of 2000 (part of the Consolidated Appropriations Act, 2001), Pub. L. No. 106-554, § 309, 114 Stat. 2763, 2763A-638. Section 309(a) of the Act added § 358(h) to the Code. Section 309(c) of the Act provides:

> (c) Application of comparable rules to partnerships and S corporations.– The Secretary of the Treasury or his delegate–
>
> > (1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration of duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships . . . .

Under Section 309(d)(2), "[t]he rules prescribed under subsection (c) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed by such rules."

When the Secretary issued Temp. Treas. Reg. § 1.752-6T, he invoked the Community Renewal Tax Act and stated (68 Fed. Reg. 37,414-01, 37,416):

> In accordance with the directive in section 309(c) and (d)(2) of the Act, these temporary regulations apply to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003. Under [Code] section 7805(b)(6), the Secretary may provide that any regulation may take effect in accordance with a legislative grant from Congress authorizing the Secretary to prescribe the effective date for such regulation. In addition, under section 7805(b)(3), the Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse. The Secretary has determined that a later effective date is inappropriate. Therefore, these regulations are being applied retroactively in accordance with the directive from Congress in section 309(d)(2) of the Act and to prevent abuse.

The Internal Revenue Code authorizes the Secretary to issue retroactive regulations to prevent abuse (Code § 7805(b)(3)); and it declares that a specific grant of legislative authority to issue retroactive regulations supersedes the general rule against retroactivity (§ 7805(b)(6)).

The defendant asks the Court to consider the character of Clearmeadow Capital's contributed short MLD position and to find that the contribution included a liability of $2,769,200. The defendant also asks the Court to determine that the partnership assumed the liability as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000-44. The requested findings involve partnership items because they concern the character of a contribution and because the partnership needed this information to calculate its income and loss and to furnish the resulting data to its partner. The defendant repeats, however, that the reduction of Clearmeadow Capital's basis in the partnership by the amount of the transferred liability is outside the Court's TEFRA jurisdiction. The IRS must adjust the outside basis in a separate deficiency proceeding.

*C. Treas. Reg. § 1.752-6 governs Clearmeadow's transaction, which occurred after Notice 2000-44.*

In *Klamath Strategic Investment Fund, LLC, v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006) (*Klamath I*), a district court decreed that the Secretary abused his discretion when he made Treas. Reg. § 1.752-6 retroactive to October 18, 1999. In the district court's view, the partners were entitled to rely on *Helmer* at least until the IRS issued Notice 2000-44. *See* 440 F. Supp. 2d at 625.

The defendant disagrees with the district court, but even if *Klamath I* were good law, Clearmeadow could not rely upon it. As the district court conceded, Notice 2000-44 warned

taxpayers at least as early as August 13, 2000, that the IRS would apply Code § 752 to attack the described transactions. The transactions in *Klamath I* preceded Notice 2000-44, and the holding of *Klamath I* is this: "[T]axpayers–like the Plaintiffs in this case–that engaged in the conduct before issuance of any notice could justifiably rely on *Helmer* and its progeny. Thus the retroactivity of the Regulation is ineffective *as to these Plaintiffs*." *Klamath I*, 440 F. Supp. 2d at 626 (emphasis added). By contrast, the Clearmeadow partnership assumed Clearmeadow Capital's liability on October 19, 2001, more than a year after Notice 2000-44 appeared.

*II. The 40% gross valuation misstatement penalty applies to the transactions and tax reporting of Clearmeadow LLC.*

In the FPAA, the IRS proposed four alternative penalties under Code § 6662 as a consequence of Clearmeadow's participation in the MLD tax shelter: a 40% penalty on any portion of the underpayment of tax attributable to a gross valuation misstatement; a 20% penalty on any portion of the underpayment attributable to negligence or disregard of rules and regulations; a 20% penalty on any portion of the underpayment attributable to the substantial understatement of income tax; and a 20% penalty on any portion of the underpayment attributable to a substantial valuation misstatement. (DPF 129.)

*A. For purposes of this motion, the Court need not consider the other penalties in the FPAA.*

The accuracy-related penalties are not cumulative; for example, if the 40% penalty applies as well as all three 20% penalties, the maximum accuracy-related penalty is 40%. *See* Treas. Reg. § 1.6662-2(c). Accordingly, for purposes of this summary judgment motion, the defendant asks the Court to uphold only application of the 40% penalty. The defendant does not waive the other penalties and will assert them if further partnership-level proceedings occur.

*B. In this case, the gross valuation misstatement is "applicable" as a matter of mere arithmetic.*

Code § 6662(a), (b)(3), (e), and (h) together impose a penalty equal to 40% of any portion of an understatement of tax required to be shown on a return if the understatement is attributable to a gross valuation misstatement. A gross valuation misstatement occurs if "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by Chapter 1 is [400] percent or more of the amount determined to be the correct amount of such valuation (or adjusted basis) as the case may be . . . ." § 6662(e), as modified by § 6662(h)(2)(A)(i).[5] In particular, a gross valuation misstatement can occur if a taxpayer inflates the adjusted basis of a partnership interest in a Son of Boss transaction. *See CEMCO Investors, LLC, v. United States*, No. 04 C 8211, 2007 WL 951944 at *9 (N.D. Ill. March 27, 2007), *appeal pending*, No. 07-2220 (7th Cir.). The IRS may not assess the penalty for a "substantial valuation misstatement" against an individual unless the portion of the underpayment attributable to the misstatement exceeds $5,000. § 6662(e)(2). The same rule applies to the penalty for a gross valuation misstatement. *See* § 6662(h)(2)(A).

In this proceeding, the Court can determine only the "applicability" of the 40% penalty. Code § 6226(f). It cannot calculate or impose the penalty on an individual partner because the penalty is an "affected item."[6] The Court will essentially determine the applicability of the

---

[5] Code § 6662(b)(3) defines "substantial valuation misstatement." In the version of the Code effective when Clearmeadow and its owners filed their returns, a substantial valuation misstatement was a valuation that was 200% or more of the correct amount. Section 6662(h) generally defined "gross valuation misstatement" as a "substantial valuation misstatement" described in subsection (e) with "400%" substituted for "200%."

[6] A penalty is an affected item to the extent provided in the regulations. Treas. Reg. § 301.6231(a)(5)-1(e). Here the penalty is an affected item because Hutton's return will show no underpayment until a partnership item is adjusted. (*See* DPF 110.) *See* § 301.6231(a)(5)-1(e)(3).

penalty when it determines the amount and character of Clearmeadow Capital's contributions to the partnership.[7] If the Court determines that the partnership assumed Clearmeadow Capital's $2,769,200 liability on the short MLD position in a transaction similar to one described in Notice 2000-44, the IRS will have the necessary predicate to reduce Clearmeadow Capital's basis in its partnership interest. The reduction will demonstrate that Clearmeadow Capital's reported basis in its partnership interest exceeded its actual basis by much more than 400%; the reduction in basis will also eliminate or nearly eliminate the $1,004,040 loss Hutton claimed on his 2001 individual return and will result in an underpayment of tax that exceeds $5,000. The IRS will then assess the penalty.

*C. The Clearmeadow partnership has no defense against the penalty; it could not reasonably have relied on Cantley & Sedacca's opinion.*

There is only one other item the Court can consider with respect to the penalty: whether the *partnership* has a defense under Code § 6664(c)(1), which provides, "No penalty shall be assessed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." The Clearmeadow partnership has no such defense. The partnership received only one piece of professional advice–and it could not reasonably rely upon it as a matter of law.[8]

---

[7] *See* Treas. Reg. § 301.6221-1(c): "Assessment of any penalty . . . shall be made based upon partnership-level determinations. Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty . . . ."

[8] We show here that the proffered advice cannot support a "reasonable cause" defense, but the defense may also be unavailable because the advice does not concern partnership-level tax reporting. The IRS will calculate the penalty on an underpayment that arises from Hutton's inflated basis in his partnership interest, but the partnership itself could not report Hutton's outside basis.

Hutton and his entities, along with Brooks and his entities, solicited tax advice from Cantley & Sedacca. On January 23, 2002, Cantley & Sedacca mailed unsigned "Investor Representations" to Hutton along with their tax opinion letter and they stated, "the opinion letter may not be relied upon (and is not otherwise released) unless and until we have received . . . the Investor Representations fully executed by you, the LLC, and the Corp. . . . ." The opinion letter stressed that Cantley & Sedacca had not independently verified Hutton's representations and it warned, "If any such item is inaccurate in any material respect, . . . *the opinions contained herein may not be relied upon*." (DPF 72, emphasis added.)

Hutton's representations were not merely inaccurate; they defied reality. On March 11, 2002, Hutton signed the representations on behalf of himself, Clearmeadow Investments, LLC, and Clearmeadow Capital Corporation. Daniel Brooks signed the document on behalf of CF Advisors XXXVII, LLC. (DPF 68.) In Paragraph 5 of the Investor Representations, Hutton states (DPF 69): "It is my current intention to hold the Corporation's (and, thus, my) investment in the Transactions and with CC [Clarion Capital] and Brooks for such period of time as to be able to achieve a reasonable economic return on my investment, without regard to tax benefits and net of all my fees and expenses from the Transactions."

Nearly four months earlier, however, on November 30, 2001, Hutton had revealed that he planned to take a 2001 tax loss of $1,005,000 from the MLD transaction, which he could do only if he liquidated the partnership in 2001. (*See* DPF 84.) Nearly three months earlier, on December 18, 2001, Hutton had liquidated the Clearmeadow partnership and had barred Brooks from managing his "investment."[9] (DPF 88, 89.) Yet he represented on March 11, 2002, that his

---

[9] Hutton was not the only one of Cantley & Sedacca's MLD clients to liquidate his investment before it could produce a profit net of fees and without regard to the promised tax

"current intention" was to hold his investment with Brooks until he had earned a reasonable economic return net of all fees and without regard to tax benefits.

Hutton's misrepresentation was material because he could deduct his losses from the transaction only if the partnership had a profit motive,[10] and there was only one way Hutton could "reasonably expect that his investment strategy would yield . . . an annual return on [his] total investment in the Transactions . . . net of all [the] fees and expenses from the Transactions and without regard to tax benefits." (DPF 69.) He would have had to hold his investment for five years to make such an economic profit (*ibid.*), but he knew he would not hold his investment for five years when he represented that he would.

The transaction offered two other possibilities of profit (*see* DPF 69; Compl. ¶ 12.aa), but no reasonable investor would expect to profit from a "1.3% statistical probability . . . of realizing a 14,446% return on [the] net investment in the MLD positions." The promoters knew that an investor's odds of winning the so-called 14,446% return were "comparable to hitting the lottery." (*See* DPF 83.) This is not an activity in which an investor would engage with a genuine profit motive. *See, e.g., McKeever v. Comm'r*, T.C. Memo. 2000-288, 2000 WL 1297710 at *19

---

benefits. Brooks believed that an investor would have to stay invested for at least five years to have a reasonable opportunity to make such a profit; but of the 150 investors for whom he arranged MLDs, not one held his investment beyond the end of 2001, and only half held their investments for more than three months. (DPF 70.)

[10] "Congress allows deductions under 26 U.S.C. § 162 for expenses of carrying on activities that constitute a taxpayer's trade or business, . . . and under 26 U.S.C. § 212 for expenses incurred in connection with activities undertaken to produce or collect income. Expenditures may only be deducted under sections 162 . . . and 212 if the facts and circumstances indicate that the taxpayer made them primarily in furtherance of a bona fide profit objective independent of tax consequences." *Agro Science Co. v. Comm'r*, 934 F.2d 573, 576 (5th Cir. 1991) (*citing* Treas. Reg. § 1.183-2(a); *Mayrath v. Comm'r*, 357 F.2d 209, 214 (5th Cir.1966); *Drobny v. Comm'r*, 86 T.C. 1326, 1340 (1986)).

(2000) (Horse breeders had no profit motive even though "the activity, in theory, could have turned a profit had petitioners hit the lottery with a million-dollar horse"). Furthermore, Hutton now believes that the promoters were able to control whether a profit would be earned and that they made certain no profit would be earned. (*See* DPF 137.) For example, Societe Generale closed Clearmeadow's MLD options two days prematurely, when it knew it would not have to pay the 14,446% return. (*See* DPF 81.)

The MLD promoters also promised a 28% chance of earning a 60% profit on the net investment, but that profit would be only "net of all . . . *direct* transaction costs associated with the positions," not net of all investment expenses. (*See* DPF 69, emphasis added.) Hutton seems to have realized the "60% profit"–which his expenses predictably wiped out. (*See* DPF 77, 79.)

Surely both members of the Clearmeadow partnership suspected that Hutton's representation was inaccurate and that the partnership should not rely on Cantley & Sedacca's opinion letter; but even if they relied on it in good faith, it cannot constitute "reasonable cause" under Code § 6664(c)(1). Taxpayers may not rely upon advice "based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction . . . ." Treas. Reg. § 1.6664-4(c)(1)(ii). Hutton himself now insists that the opinion letter made false representations and cannot be relied upon. (DPF 139.)

*D. Hutton must raise his personal defenses against the penalty in a partner-level proceeding after assessment and payment of the penalty.*

Hutton may or may not be able to raise a defense under Code § 6664(c)(1) at the partner level by asserting that he reasonably relied on his personal relationship with his accountant and business advisors. *See* Compl. ¶ 12.a-u. *But see* DPF 18-32. This Court, however, cannot

consider Hutton's asserted reasonable cause and good faith. Although "[a]ny penalty . . . that relates to an adjustment to a partnership item shall be determined at the partnership level[, p]artner-level defenses to such items can only be asserted through refund actions following assessment and payment." Treas. Reg. § 301.6221-1(c); *see also* § 301.6221-1(d) ("Partner-level defenses to any penalty . . . may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment"); *Domulewicz*, 2007 WL 2262884 at *8.

Despite these regulations, the district court that partially invalidated a regulation governing outside basis at the partnership level in *Klamath I* also applied the partner-level reasonable-cause defense in a partnership-level proceeding: *Klamath Strategic Investment Fund, LLC, v. United States*, 472 F. Supp. 2d 885, 902-05 (E.D. Tex. 2007) (*Klamath II*). If Hutton asks this Court to consider his asserted reasonable cause and personal good faith in this proceeding in reliance upon *Klamath II*, this Court should avoid the district court's errors.

The district court gave two reasons for violating the TEFRA scheme in *Klamath II*. First, the court announced a legal proposition for which there is no support: "In the circumstances of a given case, the reasonable cause exception may be considered at the partnership-level if it involves actions by the managing member partner." *Id.*, 472 F. Supp. 2d at 903. The district court cited, as its only authority, *Santa Monica Pictures v. Commissioner*, 89 T.C.M. (CCH) 1157, 2005 WL 1111792 at *94-*112 (2005); but the Tax Court did not expressly decide that a partner-level defense could be asserted in a partnership-level proceeding.[11] A case is no authority

---

[11] In fact, elsewhere in its opinion the Tax Court stated: "Partner-level defenses [to penalties], however, must be asserted in a separate refund action following assessment and payment." *Santa Monica Pictures*, 2005 WL 1111792 at *94 n.187.

on a point that "does not appear to have been raised as an issue." *See Avon Products, Inc. v. United States*, 97 F.3d 1435, 1441 (Fed. Cir. 1996).

After announcing that it could consider "actions by the managing member partner" to establish a partner-level defense in a TEFRA proceeding, the district court ignored the actions of Presidio Growth, LLC, an independent investment advisor that the court had earlier found to be the "managing member" of both partnerships to which the contested FPAAs had been issued. *See Klamath II*, 472 F. Supp. 2d at 888. Instead, the court analyzed the actions of St. Croix Ventures, LLC, and Rogue Ventures, LLC–disregarded entities wholly owned by the individual investors who purchased the tax shelter, Cary Patterson and Harold Nix. Both Patterson and Nix had entered partnerships (Klamath and Kinabalu, respectively) with Presidio Growth. *See id*. at 887-88. At page 904 of 472 F. Supp. 2d, the court noted that the IRS had–

> delved into these taxpayers' defenses to penalties during the administrative process preceding these adjustments. . . . As a result, no administrative benefit would be gained by requiring additional proceedings. The court, therefore, determines that the reasonable cause defenses involving St. Croix and Rogue may be considered in connection with "the applicability of any penalty, addition to tax, or additional amount which relates to a partnership item." 26 U.S.C. § 6226(f).

A federal court cannot take jurisdiction simply because it sees no "administrative benefit" in complying with statutes and regulations that place jurisdiction elsewhere. Partner-level defenses to penalties "can *only* be asserted through refund actions following assessment and payment." Treas. Reg. § 301.6221-1(c) (emphasis added). Such defenses "*may not* be asserted in the partnership-level proceeding." § 301.6221-1(d) (emphasis added).

When the Secretary proposed these regulations, he solicited comments from the public (*see* Modifications and Additions to the Unified Partnership Audit Procedures, 64 Fed. Reg. 3886-01 (Jan. 26, 1999), App. A, *infra*), and he adopted the regulations as final over two years

later (*see* T.D. 8965, 66 Fed. Reg. 50,541 (Oct. 4, 2001)). Code § 6231(a)(3) gives the Secretary authority to issue regulations defining "partnership item" after considering whether "such item is more appropriately determined at the partnership level than at the partner level." The Secretary determined that a partner-level defense to penalties is not a partnership item, is more appropriately determined at the partner level, and may be determined only at the partner level. The defendant submits that this determination is reasonable and is within the statutory grant of authority. Finally, Congress enacted the TEFRA partnership provisions to treat partnership items with uniformity while still permitting individual partners to raise questions unique to themselves in later proceedings. *See generally Keener*, 76 Fed. Cl. at 457-58 (purpose of TEFRA partnership provisions).

As the Supreme Court recently said, "Where an agency rule sets forth important individual rights and duties, where the agency focuses fully and directly upon the issue, where the agency uses full notice-and-comment procedures to promulgate a rule, where the resulting rule falls within the statutory grant of authority, and where the rule itself is reasonable, then a court ordinarily assumes that Congress intended it to defer to the agency's determination." *Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2350-51 (2007). Such a regulation is "legally binding." *Id*. at 2346 (*citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984); *United States v. Mead Corp*., 533 U.S. 218, 227 (2001)). The district court had no jurisdiction to consider a partner-level defense in *Klamath II*, and Hutton cannot raise his own reasonable-cause defense here.

Furthermore, even if the district court properly considered a partner-level defense under the facts of *Klamath II*, the present case lacks the most important of those facts. The district

court stressed that the IRS had already considered the partners' reasonable-cause defense in administrative proceedings (472 F. Supp. 2d at 904); and the partners "promptly responded to the IRS when the IRS requested information from them concerning the transactions" (*id*. at 902). Hutton never presented a reasonable-cause defense to the IRS during earlier administrative proceedings. (DPF 127.) And he refused to provide all the information the IRS requested; he even refused to appear when served with a summons. (*See* DPF 111-125.)

*III. Clearmeadow's transaction lacked business purpose and economic substance.*

The FPAA reduced all of the Clearmeadow partnership's reported tax attributes to zero because the purchase and contribution of the MLD positions, the formation of the partnership, and its liquidation had neither business purpose nor economic substance; as a consequence the FPAA disregarded the transactions. (*See* DPF 129.) In many cases, a court must decide disputed factual issues to determine if transactions had business purpose and economic substance–but not in this case. The plaintiff must bear the burden of producing evidence that the FPAA is incorrect. *See, e.g., Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 385-86 (5th Cir. 1995); *Santa Monica Pictures*, 2005 WL 1111792 at *40. That is a burden Hutton cannot bear. Hutton brought a RICO suit against the promoters on the ground that the Clearmeadow transactions lacked economic substance, could not yield an economic profit, were designed to produce tax benefits, and were essentially a sham. (*See* DPF 133, 136, 137, 138.) Even in the present proceedings Hutton has conceded under oath that the transactions lacked economic substance. (*See* DPF 134.)

Hutton cannot avoid summary judgment merely by insisting that his RICO complaint proves nothing. Hutton, "the non-moving party[,] must affirmatively demonstrate *by specific*

*factual allegations* that a genuine issue of material fact exists for trial." *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); emphasis added); *accord* RCFC 56(e). He cannot rest upon "an assumption and [his] own assertions." *See Crown Operations*, 289 F.3d at 1378. He must show that the FPAA is incorrect–that is, he must produce evidence to show that the allegations in his RICO complaint are false and that his deposition testimony in the present case is false.

The Court should find that the purchase and contribution of the MLD positions, the formation of the Clearmeadow partnership, and its liquidation had neither business purpose nor economic substance. As a consequence, the Court should ignore those transactions and hold that the FPAA correctly reduced all of the partnership's items of income and loss to zero. *See, e.g., Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006).[12]

CONCLUSION

For the reasons given, the defendant asks the Court to make the following determinations: (1) a determination of what the partners contributed to the Clearmeadow partnership in exchange for their partnership interests, and in particular, a determination that the partnership assumed a

---

[12] Earlier in this brief the defendant asked the Court to apply a 40% penalty for a gross valuation misstatement. The Court of Appeals for the Fifth Circuit has held that the IRS cannot assess a penalty for a valuation misstatement when it totally ignores the transaction for lack of economic substance. *See, e.g., Heasley v. Comm'r*, 902 F.2d 380, 383 (5th Cir. 1990). The Fifth Circuit is alone in this view. Every other court of appeals to decide the issue has applied the penalty to transactions that were disregarded for lack of economic substance. *See Massengill v. Comm'r*, 876 F.2d 616, 619 (8th Cir. 1989); *Gilman v. Comm'r*, 933 F.2d 143, 151-52 (2d Cir. 1991); *Illes v. Comm'r*, 982 F.2d 163, 167 (6th Cir. 1992); *Zfass v. Comm'r*, 118 F.3d 184, 190 (4th Cir. 1997); *Merino v. Comm'r*, 196 F.3d 147, 158-59 (3d Cir. 1999).

In all these cases, former Code § 6659 imposed the valuation-misstatement penalty. Section 6659 was repealed by the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 7721, 103 Stat. 2106, 2399 (effective for tax returns due after 1989). The valuation-misstatement penalties now appear in Code § 6662(b) as accuracy-related penalties.

liability in the amount of $2,769,200 when it accepted Clearmeadow Capital's contribution of the short MLD position in a transaction similar to the transactions described in Notice 2000-44; and (2) a determination that a 40% penalty is applicable and may be assessed in later proceedings if the facts at the partner-level warrant the assessment. The defendant also asks the Court to hold that the purchase and contribution of the MLD positions, the formation of the Clearmeadow partnership, and its liquidation had neither business purpose nor economic substance, and that the FPAA properly reduced all of the reported items of income and loss to zero. The defendant believes that these determinations resolve the case completely.

Respectfully submitted,

s/ Robert Stoddart
ROBERT STODDART
U.S. Justice Department, Tax Division
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445; FAX: (202) 514-9440

RICHARD T. MORRISON
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

s/ David Gustafson
Of Counsel

August 22, 2007

**APPENDIX A**

Internal Revenue Code of 1986 (26 U.S.C.):

§ 162. Trade or business expenses

(a) In General.–There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . .

. . . .

. . . .

§ 165. Losses

(a) General rule.–There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) Amount of deduction.–For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) Limitation on losses of individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to–

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; . . .

. . . .

. . . .

§ 212. Expenses for production of income

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year–

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; or

(3) in connection with the determination, collection, or refund of any tax.

[26 U.S.C., continued]

§ 358. Basis to distributees

. . . .

(h) Special rules for assumption of liabilities to which subsection (d) does not apply–

(1) In general.–If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability–

(A) which is assumed by another person as part of the exchange, and

(B) with respect to which subsection (d)(1) does not apply to the assumption.

(2) Exceptions.–Except as provided by the Secretary, paragraph (1) shall not apply to any liability if–

(A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or

(B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

(3) Liability.--For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title.

. . . .

§ 705. Determination of basis of partner's interest

(a) General rule.–The adjusted basis of a partner's interest in a partnership shall, except as provided in subsection (b), be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)–

. . . .

§ 721. Nonrecognition of gain or loss on contribution

(a) General rule.–No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.

[26 U.S.C., continued]

§ 722. Basis of contributing partner's interest

The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

. . . .

§ 732. Basis of distributed property other than money

(a) Distributions other than in liquidation of a partner's interest.–

(1) General rule.-The basis of property (other than money) distributed by a partnership to a partner other than in liquidation of the partner's interest shall, except as provided in paragraph (2), be its adjusted basis to the partnership immediately before such distribution.

(2) Limitation.--The basis to the distributee partner of property to which paragraph (1) is applicable shall not exceed the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction.

. . . .

. . . .

§ 733. Basis of distributee partner's interest

In the case of a distribution by a partnership to a partner other than in liquidation of a partner's interest, the adjusted basis to such partner of his interest in the partnership shall be reduced (but not below zero) by–

(1) the amount of any money distributed to such partner, and

(2) the amount of the basis to such partner of distributed property other than money, as determined under section 732.

. . . .

[26 U.S.C., continued]

§ 752. Treatment of certain liabilities

. . . .

(b) Decrease in partner's liabilities.–Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

. . . .

. . . .

§ 754. Manner of electing optional adjustment to basis of partnership property

If a partnership files an election, in accordance with regulations prescribed by the Secretary, the basis of partnership property shall be adjusted, in the case of a distribution of property, in the manner provided in section 734 and, in the case of a transfer of a partnership interest, in the manner provided in section 743. Such an election shall apply with respect to all distributions of property by the partnership and to all transfers of interests in the partnership during the taxable year with respect to which such election was filed and all subsequent taxable years. Such election may be revoked by the partnership, subject to such limitations as may be provided by regulations prescribed by the Secretary.

. . . .

§ 6226. Judicial review of final partnership administrative adjustments

(a) Petition by tax matters partner.–Within 90 days after the day on which a notice of a final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a petition for a readjustment of the partnership items for such taxable year with–

(1) the Tax Court,

(2) the district court of the United States for the district in which the partnership's principal place of business is located, or

(3) the Court of Federal Claims.

. . . .

[26 U.S.C. § 6226, continued]

(e) Jurisdictional requirement for bringing action in district court or Court of Federal Claims.–

(1) In general.–A readjustment petition under this section may be filed in a district court of the United States or the Court of Federal Claims only if the partner filing the petition deposits with the Secretary, on or before the day the petition is filed, the amount by which the tax liability of the partner would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the final partnership administrative adjustment. . . .

. . . .

(f) Scope of judicial review.–A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

. . . .

. . . .

§ 6229. Period of limitations for making assessments

(a) General rule.–Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of–

(1) the date on which the partnership return for such taxable year was filed, or

(2) the last day for filing such return for such year (determined without regard to extensions).

. . . .

. . . .

[26 U.S.C., continued]

§ 6231. Definitions and special rules

(a) Definitions.--For purposes of this subchapter–

. . . .

(3) Partnership item.–The term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

(4) Nonpartnership item.–The term "nonpartnership item" means an item which is (or is treated as) not a partnership item.

(5) Affected item.–The term "affected item" means any item to the extent such item is affected by a partnership item.

. . . .

(9) Pass-thru partner.–The term "pass-thru partner" means a partnership, estate, trust, S corporation, nominee, or other similar person through whom other persons hold an interest in the partnership with respect to which proceedings under this subchapter are conducted.

(10) Indirect partner.–The term "indirect partner" means a person holding an interest in a partnership through 1 or more pass-thru partners.

. . . .

. . . .

. . . .

§ 6662. Imposition of accuracy-related penalty on underpayments

(a) Imposition of penalty.–If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

(b) Portion of underpayment to which section applies.–This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

[26 U.S.C. § 6662(b), continued]

(1) Negligence or disregard of rules or regulations.

(2) Any substantial understatement of income tax.

(3) Any substantial valuation misstatement under chapter 1.

(4) Any substantial overstatement of pension liabilities.

(5) Any substantial estate or gift tax valuation understatement.

. . . .

(e) Substantial valuation misstatement under chapter 1.–

(1) In general.–For purposes of this section, there is a substantial valuation misstatement under chapter 1 if–

(A) the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be), or

. . . .

(2) Limitation.–No penalty shall be imposed by reason of subsection (b)(3) unless the portion of the underpayment for the taxable year attributable to substantial valuation misstatements under chapter 1 exceeds $5,000 ($10,000 in the case of a corporation other than an S corporation or a personal holding company (as defined in section 542)).

. . . .

(h) Increase in penalty in case of gross valuation misstatements.–

(1) In general.–To the extent that a portion of the underpayment to which this section applies is attributable to one or more gross valuation misstatements, subsection (a) shall be applied with respect to such portion by substituting "40 percent" for "20 percent".

(2) Gross valuation misstatements.–The term "gross valuation misstatements" means–

[26 U.S.C. § 6662(h)(2), continued]

(A) any substantial valuation misstatement under chapter 1 as determined under subsection (e) by substituting–

(i) "400 percent" for "200 percent" each place it appears.

. . . .

. . . .

[The Pension Protection Act of 2006, Pub. L. No. 109-280, § 1219(a)(1) & (2), 120 Stat. 780, 1083, made the following amendments to Code § 6662: In subsection (e)(1) it struck out "200 percent" and substituted "150 percent." And it rewrote subsection (h)(2)(A)(i)as follows: "in paragraph (1)(A), "200 percent" for "150 percent". The amendments apply to returns filed after the date of enactment, August 17, 2006. *See id.*, § 1219(e)(1), 120 Stat. at 1085.]

. . . .

§ 6664. Definitions and special rules

. . . .

(c) Reasonable cause exception for underpayments.–

(1) In general.–No penalty shall be assessed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

. . . .

. . . .

. . . .

§ 7805. Rules and regulations

. . . .

(b) Retroactivity of regulations.–

(1) In general.–Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:

[26 U.S.C. § 7508(b)(1), continued]

(A) The date on which such regulation is filed with the Federal Register.

(B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.

(C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

. . . .

(3) Prevention of abuse.--The Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse.

. . . .

(6) Congressional authorization.--The limitation of paragraph (1) may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation.

. . . .

. . . .

Treasury Regulations (26 C.F.R.):

§ 1.752-6 Partnership assumption of partner's section 358(h)(3) liability after October 18, 1999, and before June 24, 2003

(a) In general. If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section 752(a) and (b) apply), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of this section, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under Sec. Sec. 1.752-1 through 1.752-5.

(b) Exceptions–

(1) In general. Except as provided in paragraph (b)(2) of this section, the exceptions contained in section 358(h)(2)(A) and (B) apply to this section.

(2) Transactions described in Notice 2000-44. The exception contained in section 358(h)(2)(B) does not apply to an assumption of a liability (defined in section 358(h)(3)) by a partnership as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000-44 (2000-2 C.B. 255). See Sec. 601.601(d)(2) of this chapter.

. . . .

(d) Effective dates–

(1) In general. This section applies to assumptions of liabilities occurring after October 18, 1999 and before June 24, 2003.

. . . .

Sec. 1.183-2 Activity not engaged in for profit defined.

(a) In general. For purposes of section 183 and the regulations thereunder, the term activity not engaged in for profit means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Deductions are allowable under section 162 for expenses of carrying on activities which constitute a trade or business of the taxpayer and under section 212 for expenses incurred in connection with activities engaged in for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. Except as provided in section 183 and Sec. 1.183-1, no

[26 C.F.R. § 1.183-2(a), continued]

deductions are allowable for expenses incurred in connection with activities which are not engaged in for profit. Thus, for example, deductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation. The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. Thus it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent.

. . . .

. . . .

Sec. 1.6031(a)-1 Return of Partnership Income.

. . . .

(e) Procedural requirements–

(2) Time for filing. The return of a partnership must be filed on or before the fifteenth day of the fourth month following the close of the taxable year of the partnership.

. . . .

. . . .

Sec. 1.6664-4 Reasonable cause and good faith exception to section 6662 penalties.

. . . .

(c) Reliance on opinion or advice–

(1) Facts and circumstances; minimum requirements. All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice (including the opinion of a professional tax advisor)

[26 C.F.R. § 1.6664-4(c), continued]

as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law. For example, the taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith. In no event will a taxpayer be considered to have reasonably relied in good faith on advice (including an opinion) unless the requirements of this paragraph (c)(1) are satisfied. The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (including the opinion of a tax advisor) in good faith. For example, reliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.

(i) All facts and circumstances considered. The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item.

(ii) No unreasonable assumptions. The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.

Sec. 1.6662-2 Accuracy-related penalty.

. . . .

(c) No stacking of accuracy-related penalty components. The maximum accuracy-related penalty imposed on a portion of an underpayment may not exceed 20 percent of such portion (40 percent of the portion attributable to a gross valuation misstatement), notwithstanding that such portion is attributable to more than one of the types of misconduct described in paragraph (a) of this section. For example, if a portion of an underpayment of tax required to be shown on a return is attributable both to negligence and a substantial understatement of income tax, the maximum accuracy-related penalty is

[26 C.F.R. § 1.6662-2(c), continued]

20 percent of such portion. Similarly, the maximum accuracy-related penalty imposed on any portion of an underpayment that is attributable both to negligence and a gross valuation misstatement is 40 percent of such portion.

. . . .

. . . .

Sec. Substantial and gross valuation misstatements under chapter 1.

. . . .

(e) Definitions–

. . . .

(3) Property. For purposes of this section, the term "property" refers to both tangible and intangible property. Tangible property includes property such as land, buildings, fixtures and inventory. Intangible property includes property such as goodwill, covenants not to compete, leaseholds, patents, contract rights, debts and choses in action.

. . . .

(h) Pass-through entities–

(1) In general. The determination of whether there is a substantial or gross valuation misstatement in the case of a return of a pass-through entity (as defined in Sec. 1.6662-4(f)(5)) is made at the entity level. However, the dollar limitation ($5,000 or $10,000, as the case may be) is applied at the taxpayer level (i.e., with respect to the return of the shareholder, partner, beneficiary, or holder of a residual interest in a REMIC).

(2) Example. The rules of paragraph (h)(1) of this section may be illustrated by the following example.

Example. Partnership P has two partners, individuals A and B. P claims a $40,000 basis in a depreciable asset which, in fact, has a basis of $15,000. The determination that there is a substantial valuation misstatement is made solely with reference to P by comparing the $40,000 basis claimed by P with P's correct basis of $15,000. However, the determination of whether the $5,000 threshold for application of the penalty has been reached is made separately for each partner.

[26 C.F.R. § 1.6662-5(h)(2), continued]

> With respect to partner A, the penalty will apply if the portion of A's underpayment attributable to the passthrough of the depreciation deduction, when aggregated with any other portions of A's underpayment also attributable to substantial or gross valuation misstatements, exceeds $5,000 (assuming there is not reasonable cause for the misstatements (see Sec. 1.6664-4(c)).
>
> . . . .

. . . .

Sec. 301.6221-1 Tax treatment determined at partnership level.

> (c) Penalties determined at partnership level. Any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be determined at the partnership level. Partner-level defenses to such items can only be asserted through refund actions following assessment and payment. Assessment of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be made based on partnership-level determinations. Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty, addition to tax, or additional amount, other than partner-level defenses specified in paragraph (d) of this section.
>
> (d) Partner-level defenses. Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment. See section 6230(c)(4). Partner-level defenses are limited to those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level. Examples of these determinations are whether any applicable threshold underpayment of tax has been met with respect to the partner or whether the partner has met the criteria of section 6664(b) (penalties applicable only where return is filed), or section 6664(c)(1) (reasonable cause exception) subject to partnership-level determinations as to the applicability of section 6664(c)(2).
>
> . . . .

. . . .

[26 C.F.R., continued]

Sec. 301.6226(e)-1 Jurisdictional requirement for bringing an action in District Court or United States Court of Federal Claims.

(a) Amount to be deposited–

(1) In general. The jurisdictional amount that the filing partner (or, in the case of a petition filed by a 5-percent group, each member of the group, or, for civil actions beginning on or after April 2, 2002, in the case of a petition filed by a pass-thru partner, each indirect partner holding an interest through the pass-thru partner) shall deposit is the amount by which the tax liability of the partner would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the notice of final partnership administrative adjustment. The partner is not required to pay other outstanding liabilities in order to deposit a jurisdictional amount.

. . . .

. . . .

. . . .

Sec. 301.6231(a)(3)-1 Partnership items.

(a) In general. For purposes of subtitle F of the Internal Revenue Code of 1954, the following items which are required to be taken into account for the taxable year of a partnership under subtitle A of the Code are more appropriately determined at the partnership level than at the partner level and, therefore, are partnership items:

(1) The partnership aggregate and each partner's share of each of the following:

(i) Items of income, gain loss, deduction, or credit of the partnership;

. . . .

(v) Partnership liabilities (including determinations with respect to the amount of the liabilities, whether the liabilities are nonrecourse, and changes from the preceding taxable year); and

. . . .

. . . .

[26 C.F.R. § 301.6231(a)(3)-1(a), continued]

(3) Optional adjustments to the basis of partnership property pursuant to an election under section 754 (including necessary preliminary determinations, such as the determination of a transferee partner's basis in a partnership interest); and

(4) Items relating to the following transactions, to the extent that a determination of such items can be made from determinations that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partnership, for purposes of the partnership books and records or for purposes of furnishing information to a partner:

(i) Contributions to the partnership;

(ii) Distributions from the partnership; and

(iii) Transactions to which section 707(a) applies (including the application of section 707(b)).

(b) Factors that affect the determination of partnership items. The term "partnership item" includes the accounting practices and the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc. Examples of these determinations are: The partnership's method of accounting, taxable year, and inventory method; whether an election was made by the partnership; whether partnership property is a capital asset, section 1231 property, or inventory; whether an item is currently deductible or must be capitalized; whether partnership activities have been engaged in with the intent to make a profit for purposes of section 183; and whether the partnership qualifies for the research and development credit under section 30.

(c) Illustrations–

(1) In general. This paragraph (c) illustrates the provisions of paragraph (a)(4) of this section. The determinations illustrated in this paragraph (c) that the partnership is required to make are not exhaustive; there may be additional determinations that the partnership is required to make which relate to a transaction listed in paragraph (a)(4) of this section. The critical element is that the partnership needs to make a determination with respect to a matter for the purposes stated; failure by the partnership actually to make a determination (for example, because it does not maintain proper books and records) does not prevent an item from being a partnership item.

[26 C.F.R. § 301.6231(a)(3)-1(c), continued]

(2) Contributions. For purposes of its books and records, or for purposes of furnishing information to a partner, the partnership needs to determine:

(i) The character of the amount received from a partner (for example, whether it is a contribution, a loan, or a repayment of a loan);

(ii) The amount of money contributed by a partner;

(iii) The applicability of the investment company rules of section 721(b) with respect to a contribution; and

(iv) The basis to the partnership of contributed property (including necessary preliminary determinations, such as the partner's basis in the contributed property).

To the extent that a determination of an item relating to a contribution can be made from these and similar determinations that the partnership is required to make, therefore, that item is a partnership item. To the extent that that determination requires other information, however, that item is not a partnership item. For example, it may be necessary to determine whether contribution of the property causes recapture by the contributing partner of the investment credit under section 47 in certain circumstances in which that determination is irrelevant to the partnership.

. . . .

Sec. 301.6231(a)(5)-1 Definition of affected item.

(a) In general. The term affected item means any item to the extent such item is affected by a partnership item. It includes items unrelated to the items reflected on the partnership return (for example, an item, such as the threshold for the medical expense deduction under section 213, that varies if there is a change in an individual partner's adjusted gross income).

(b) Basis in a partner's partnership interest. The basis of a partner's partnership interest is an affected item to the extent it is not a partnership item.

(c) At-risk limitation. The application of the at-risk limitation under section 465 to a partner with respect to a loss incurred by a partnership is an affected item to the extent it is not a partnership item.

[26 C.F.R. § 301.6231(a)(5)-1, continued]

. . . .

(e) Penalty, addition to tax, or additional amount–

(1) In general. The term affected item includes any penalty, addition to tax, or additional amount provided by subchapter A of chapter 68 of the Internal Revenue Code of 1986 to the extent provided in this paragraph (e).

. . . .

(3) Penalty, addition to tax, or additional amount containing floor–

(i) Floor exceeded prior to adjustment. If a partner would have been subject to a penalty, addition to tax, or additional amount that contains a floor in the absence of an adjustment to a partnership item (that is, the partner's understatement or underpayment exceeded the floor even without an adjustment to a partnership item) the term affected item shall include only the portion of the penalty, addition to tax, or additional amount computed with reference to the partnership item (or affected item) adjustments.

(ii) Floor not exceeded prior to adjustment. In the case of a penalty, addition to tax, or additional amount that contains a floor, if the taxpayer's understatement or underpayment does not exceed the floor prior to an adjustment to a partnership item but does so after such adjustment, the term affected item shall include the penalty, addition to tax, or additional amount computed with reference to the entire underpayment or understatement to which the penalty, addition to tax, or additional amount applies.

. . . .

(f) Effective date. This section is applicable to partnership taxable years beginning on or after October 4, 2001. For years beginning prior to October 4, 2001, see Sec. 301.6231(a)(5)-1T contained in 26 CFR part 1, revised April 1, 2001.

. . . .

[26 C.F.R. continued]

Sec. 301.6231(a)(7)-2 Designation or selection of tax matters partner for a limited liability company (LLC).

(a) In general. Solely for purposes of applying section 6231(a)(7) and Sec. 301.6231(a)(7)-1 to an LLC, only a member-manager of an LLC is treated as a general partner, and a member of an LLC who is not a member-manager is treated as a partner other than a general partner.

(b) Definitions–

. . . .

(3) Member-manager. Solely for purposes of this section, member-manager means a member of an LLC who, alone or together with others, is vested with the continuing exclusive authority to make the management decisions necessary to conduct the business for which the organization was formed. Generally, an LLC statute may permit the LLC to choose management by one or more managers (whether or not members) or by all of the members. If there are no elected or designated member-managers (as so defined in this paragraph (b)(3)) of the LLC, each member will be treated as a member-manager for purposes of this section.

. . . .

Sec. 301.7701-2 Business entities; definitions.

. . . .

(c) Other business entities. For federal tax purposes–

(1) The term partnership means a business entity that is not a corporation under paragraph (b) of this section and that has at least two members.

(2) Wholly owned entities–

(i) In general. A business entity that has a single owner and is not a corporation under paragraph (b) of this section is disregarded as an entity separate from its owner.

. . . .

[26 C.F.R., continued]

Sec. 301.7701-3 Classification of certain business entities.

(a) In general. A business entity that is not classified as a corporation under Sec. 301.7701-2(b) (1), (3), (4), (5), (6), (7), or (8) (an eligible entity) can elect its classification for federal tax purposes as provided in this section. . . .

(b) Classification of eligible entities that do not file an election–

(1) Domestic eligible entities. Except as provided in paragraph (b)(3) of this section, unless the entity elects otherwise, a domestic eligible entity is–

(i) A partnership if it has two or more members; or

(ii) Disregarded as an entity separate from its owner if it has a single owner.

. . . .

. . . .

. . . .

Miscellaneous:

Rev. Rul. 58-234, 1958-1 C.B. 279, 1958 WL 10737 (IRS RRU)

Internal Revenue Service (I.R.S.)

Revenue Ruling

Published: 1958

SECTION 1234.-OPTIONS TO BUY OR SELL, 26 CFR 1.1234-1: Options to buy or sell.
(Also Section 61.)
(Also Part II, Section 117(g)(2); Regulations 118, Section 39.117(g)-1.)

The amount (premium) received by the writer (issuer or optionor) for granting a 'put' or 'call' option, which is not exercised, constitutes ordinary income, for Federal income tax purposes, under section 61 of the Internal Revenue Code of 1954, to be included in his gross income only for the taxable year in which the failure to exercise the option becomes final.

Where a 'put' option is exercised, the amount (premium) re-received by the writer (issuer or optionor) for granting it constitutes an offset against the option price, which he paid for the securities involved upon its exercise, in determining the (net) cost basis to him of the securities that he purchased pursuant thereto, for subsequent gain or loss purposes.

Where a 'call' option is exercised, the amount (premium) received by the writer (issuer or optionor) for granting it is includible by him, with the option price which he received for the securities involved upon its exercise, in the (total) amount realized by him for the securities that he sold pursuant thereto, for the purpose of determining his gain or loss on their sale. For such purpose, if the amount (premium) received for granting a 'call' option is, under its terms, applicable, upon its exercise, on, to, or against the option price specified therein, such price thus adjusted (reduced) is considered the real option price.

On the sale by the option holder (optionee) of the stock involved in a 'put' option, upon its exercise, the cost (premium) of the option to him should be offset against the option price, thereupon received or accrued, in computing the (net) amount realized by him for the stock that he sold pursuant thereto, for the purpose of determining his gain or loss on its sale.

The above holdings do not apply to amounts (sales proceeds) received by an option dealer from sales of 'put' and 'call' options which were written (issued or granted) by others and held by him for sale to his customers in the ordinary course of his business as such dealer, nor to amounts (commissions or fees) received by an option broker for selling 'put' and 'call' options for his principals as such broker.

[Rev. Rul. 58-234, continued]

. . . .

An optionor, by the mere granting of an option to sell (‘put’), or buy (‘call’), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optionor become obligated to accept, or deliver, such property at that price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a ‘call’) was recognized, for Federal income tax purposes, in *A. E. Hollingsworth v. Commissioner*, 27 B.T.A. 621, acquiescence, C.B. XII-1, 6 (1933). It is manifest, from the nature and consequences of ‘put’ or ‘call’ option premiums and obligations, that there is no Federal income tax incidence on account of either the receipt or the payment of such option premiums, *i.e.*, from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss. The optionor, seeking to minimize or conclude the eventual burden of his option obligation, might pay the optionee, as consideration for cancellation of the option, an amount equal to or greater than the premium. Hence, no income, gain, profits, or earnings are derived from the receipt of either a ‘put’ or ‘call’ option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium. Therefore, it is considered that the principle of the decision in *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417, Ct. D. 499, C.B. XI-1, 293 (1932), which involved the receipt of ‘earnings,’ is not applicable to receipts of premiums on outstanding options.

. . . .

64 FR 3886-01, 1999-1 C.B. 714, 1999-10 I.R.B. 53, 1999 WL 26370 (F.R.)

PROPOSED RULES

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 301

[REG-106564-98]

RIN 1545-AW86

Modifications and Additions to the Unified Partnership Audit Procedures

Tuesday, January 26, 1999

*3886 AGENCY: Internal Revenue Service, Treasury.

ACTION: Notice of proposed rulemaking, notice of proposed rulemaking by cross-reference to temporary regulations, and notice of public hearing.

SUMMARY: In the Rules and Regulations of this issue of the Federal Register, the Internal Revenue Service (Service) is issuing temporary regulations relating to the unified partnership audit procedures added to the Internal Revenue Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). The text of those temporary regulations also generally serves as the text of these proposed regulations. This document also provides a notice of public hearing on these proposed regulations.

DATES: Written and electronic comments must be received by April 26, 1999. Outlines of topics to be discussed at the public hearing scheduled for April 14, 1999, at 10 a.m. must be received by March 24, 1999.

ADDRESSES: Send submissions to: CC:DOM:CORP:R (REG-106564-98), room 5226, Internal Revenue Service, POB 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand delivered Monday through Friday between the hours of 8 a.m. and 5 p.m. to: CC:DOM:CORP:R (REG-106564-98), Courier's desk, Internal Revenue Service, 1111 Constitution Avenue, NW, Washington, DC. Alternatively, taxpayers may submit comments electronically via the Internet by selecting the "Tax Regs" option on the IRS Home Page, or by submitting comments directly to the IRS Internet site at http://www.irs.ustreas.gov/prod/tax_regs/comments.html. The public hearing will be held in Room 2615, Internal Revenue Building, 1111 Constitution Avenue, NW., Washington, DC.

FOR FURTHER INFORMATION CONTACT: Concerning the proposed and temporary regulations, Robert G. Honigman, (202) 622-3050; concerning submissions of comments, the hearing, and/or to be placed on the building access list to attend the hearing Michael L. Slaughter, *3887 Jr., (202) 622-7180 (not toll-free numbers).

[64 FR 3886-01, continued]

SUPPLEMENTARY INFORMATION:

Background

Temporary and final regulations in the Rules and Regulations section of this issue of the Federal Register amend the Procedure and Administration Regulations (26 CFR part 301) relating to the unified partnership audit procedures found in sections 6221 through 6233 of the Internal Revenue Code (Code).

The text of those temporary regulations also generally serves as the text of these proposed regulations. The preamble to the temporary regulations explains the temporary and proposed regulations. Temporary regulations previously were published on December 13, 1984 49 FR 48536), and March 5, 1987 (52 FR 6779) (the existing regulations). The Service intends to finalize such regulations simultaneously with finalizing these regulations. Comments previously received in connection with the existing regulations will be considered as well as new or additional comments with respect to such regulations.

. . . .

Comments and Public Hearing

Before these proposed regulations are adopted as final regulations, consideration will be given to any electronic and written comments (a signed original and eight (8) copies) that are submitted timely to the Service. All comments will be available for public inspection and copying. The Service and Treasury Department specifically request comments on the clarity of the proposed regulations and how they may be made easier to understand.

A public hearing has been scheduled for April 14, 1999, at 10 a.m. in Room 2615, Internal Revenue Building, 1111 Constitution Avenue, NW., Washington, DC. Due to building security procedures, visitors must enter at the 10th Street entrance, located between Constitution and Pennsylvania Avenues, NW. In addition, all visitors must present photo identification to enter the building. Because of access restrictions, visitors will not be admitted beyond the immediate entrance area more than 15 minutes before the hearing starts. For information about having your name placed on the building access list to attend the hearing, see the FOR FURTHER INFORMATION CONTACT section of this preamble.

The rules of 26 CFR 601.601(a)(3) apply to the hearing.

Persons who wish to present oral comments at the hearing must submit electronic or written comments by April 26, 1999 and an outline of the topics to be discussed and the time devoted to each topic (a signed original and eight (8) copies) by March 24, 1999. A period of 10 minutes will be allotted to each person for making comments. An agenda showing the scheduling of the

[64 FR 3886-01, continued]

speakers will be prepared after the deadline for receiving outlines has passed. Copies of the agenda will be available free of charge at the hearing.

Drafting Information. The principal authors of these proposed regulations are Robert G. Honigman, Office of the Assistant Chief Counsel (Passthroughs & Special Industries), and William A. Heard, Office of the Assistant Chief Counsel (Field Service). However, other personnel from the Service and Treasury Department participated in their development.

List of Subjects in 26 CFR Part 301

Employment taxes, Estate taxes, Excise taxes, Gift taxes, Income taxes, Penalties, Reporting and recordkeeping requirements.

Proposed Amendments to the Regulations

Accordingly, 26 CFR part 301 is proposed to be amended as follows:

PART 301--PROCEDURE AND ADMINISTRATION

Paragraph 1. The authority citation for part 301 continues to read in part as follows:

Authority: 26 U.S.C. 7805 * * *

26 CFR § 301.6221-1

Par. 2. Section 301.6221-1 as proposed to be added at 1 FR 13235, April 18, 1986, is amended by: 1. Redesignating paragraph (c) as paragraph (e); 2. Adding paragraphs (c) and (d). The additions read as follows:

26 CFR § 301.6221-1

§301.6221-1 Tax treatment determined at partnership level.

* * * * *

(c) and (d) [The text of proposed paragraphs (c) and (d) are the same as the text of §301.6221-1T(c) and (d) published elsewhere in this issue of the Federal Register].

* * * * *

Notice 2000-44, 2000-36 I.R.B. 255, 2000-2 C.B. 255, 2000 WL 1138430 (IRS NOT)

TAX AVOIDANCE USING ARTIFICIALLY HIGH BASIS

Released: August 13, 2000
Published: September 5, 2000

**Tax avoidance using artificially high basis.** Taxpayers and their representatives are alerted that the purported losses arising from certain types of transactions are not properly allowable for federal income tax purposes. Also, the Service may impose penalties on participants in these transactions or, as applicable, on persons who participate in promoting or reporting these transactions.

In Notice 99-59, 1999-52 I.R.B. 761, the Internal Revenue Service and the Treasury Department described certain transactions that were being marketed to taxpayers for the purpose of generating artificial tax losses. This notice concerns other similar transactions that purport to generate tax losses for taxpayers.

As stated in Notice 99-59, a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. *See ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999) ("Tax losses such as these … which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations."); *Scully v. United States*, 840 F.2d 478, 486 (7th Cir. 1988) (to be deductible, a loss must be a "genuine economic loss"); *Shoenberg v. Commissioner*, 77 F.2d 446, 448 (8th Cir. 1935) (to be deductible, a loss must be "actual and real"); § 1.165-1(b) of the Income Tax Regulations ("Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.").

Notice 99-59 describes an arrangement that purported to give rise to deductible losses on disposition of stock by applying the rules relating to distributions of encumbered property to shareholders in order to create artificially high basis in the stock. The Service and the Treasury have become aware of similar arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests.

One variation involves a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness. As an example of this variation, a taxpayer may receive $3,000X in cash from a lender under a loan agreement that provides for an inflated stated rate of interest and a stated principal amount of only $2,000X. The taxpayer contributes the $3,000X to a partnership, and the partnership assumes the indebtedness. The partnership thereafter engages in investment activities. At a later time, the taxpayer sells the partnership interest.

[Notice 2000-44, continued]

Under the position advanced by the promoters of this arrangement, the taxpayer claims that only the stated principal amount of the indebtedness, $2,000X in this example, is considered a liability assumed by the partnership that is treated as a distribution of money to the taxpayer that reduces the basis of the taxpayer's partnership interest under § 752 of the Internal Revenue Code. Therefore, disregarding any additional amounts the taxpayer may contribute to the partnership, transaction costs, and any income realized or expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the excess of the cash contributed over the stated principal amount of the indebtedness, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. In this example, the taxpayer purports to have a basis in the partnership interest of $1,000X (the excess of the cash contributed ($3,000X) over the stated principal amount of the indebtedness ($2,000X)). On disposition of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss.

In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to

[Notice 2000-44, continued]

challenge under § 165(c)(2). *See Fox v. Commissioner*, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

Transactions that are the same as or substantially similar to the transactions described in this Notice 2000-44 are identified as “listed transactions” for the purposes of § 1.6011-4T(b)(2) of the Temporary Income Tax Regulations and § 301.6111- 2T(b)(2) of the Temporary Procedure and Administration Regulations. See also § 301.6112-1T, A-4. It should be noted that, independent of their classification as “listed transactions” for purposes of §§ 1.6011-4T(b)(2) and 301.6111-2T(b)(2), the transactions described in this Notice 2000-44 may already be subject to the tax shelter registration and list maintenance requirements of §§ 6111 and 6112 under the regulations issued in February 2000 §§ 301.6111-2T and 301.6112-1T, A-4), as well as the regulations issued in 1984 and amended in 1986 (§§ 301.6111-1T and 301.6112-1T, A-3). Persons required to register these tax shelters who have failed to register the shelters may be subject to the penalty under § 6707(a) and to the penalty under § 6708(a) if the requirements of § 6112 are not satisfied.

In addition, the Service and the Treasury have learned that certain persons who have promoted participation in transactions described in this notice have encouraged individual taxpayers to participate in such transactions in a manner designed to avoid the reporting of large capital gains from unrelated transactions on their individual income tax returns (Form 1040). Certain promoters have recommended that taxpayers participate in these transactions through grantor trusts and use the same grantor trusts as vehicles to realize the capital gains. Further, although each separate capital gain and loss attributable to a portion of a trust that is treated as owned by a grantor under the grantor trust provisions of the Code (§ 671 and following) is properly reported as a separate item on the grantor's individual income tax return (see § 1.671-2(c) and the Instructions to Form 1041, U.S. Income Tax Return for Estates and Trusts), the Service and the Treasury understand that these promoters have advised that the capital gains and losses from these transactions may be netted, so that only a small net capital gain or loss is reported on the taxpayer's individual income tax return. In addition to other penalties, any person who willfully conceals the amount of capital gains and losses in this manner, or who willfully counsels or advises such concealment, may be guilty of a criminal offense under §§ 7201, 7203, 7206, or 7212(a) or other provisions of federal law.

68 FR 37434-01, 2003-2 C.B. 60, 2003-28 I.R.B. 60, 2003 WL 21438920 (F.R.)

PROPOSED RULES

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 1

[REG-106736-00]

RIN 1545-AX93

Assumption of Partner Liabilities

Tuesday, June 24, 2003

*37434 AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Notice of proposed rulemaking; notice of proposed rulemaking by cross-reference to temporary regulations; and notice of public hearing.

SUMMARY: This document contains proposed regulations relating to the definition of liabilities under section 752 of the Internal Revenue Code. These regulations provide rules regarding a partnership's assumption of certain fixed and contingent obligations in exchange for a partnership interest and provide conforming changes to certain regulations. These regulations also provide rules under section 358(h) for assumptions of liabilities by corporations from partners and partnerships. In addition, this document provides notice that the IRS and Treasury intend to issue supplemental guidance that may apply certain of the rules outlined in these proposed regulations to transactions involving corporations. This document also provides notice of public hearing on the proposed regulations.

. . . .

*37438

. . . .

Effective Date

The regulations described above are proposed to apply to assumptions of § 1.752-7 liabilities occurring on or after June 24, 2003. In the Rules and Regulations section of this issue of the Federal Register, the IRS is issuing temporary regulations (§ 1.752-6T) that apply to liabilities assumed by a partnership after October 18, 1999, and before June 24, 2003. The text of those temporary regulations published in the Rules and Regulation section of this issue of the Federal

[68 FR 37434-01, continued]

Register serves as the text of § 1.752-6 of these regulations. In lieu of applying § 1.752-6T of the temporary Income Tax Regulations, partnerships may elect to be subject to the proposed rules of § 1.358-7 and 1.752-7 and the proposed revisions of § 1.704- 1(b)(2)(iv)(b), 1.704-2(b)(3), 1.705-1(a)(7), and 1.752-1, published as part of this Notice of Proposed Rulemaking, with respect to all liabilities (including § 1.752-7 liabilities) assumed by the partnership after October 18, 1999 and before June 24, 2003. The election must be filed with the first Federal income tax return filed by the partnership on or after September 22, 2003. The election will be valid only if the partnership and its partners promptly amend any returns for open taxable years that would be affected by the election.

. . . .

---

68 FR 37414-01, 2003-2 C.B. 46, 2003-28 I.R.B. 46, 2003 WL 21438978 (F.R.)

RULES and REGULATIONS

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 1

[TD 9062]

RIN 1545-BB83

Assumption of Partner Liabilities

Tuesday, June 24, 2003

*37414 AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Temporary regulations.

SUMMARY: This document contains temporary regulations regarding a partnership's assumption of a partner's liabilities in a transaction occurring after October 18, 1999, and before June 24, 2003. These temporary regulations affect partners and partnerships and clarify the tax treatment of an assumption by a partnership of a partner's liability. The text of these *37415 temporary regulations also serves as the text of the proposed regulations set forth in a notice of proposed rulemaking on this subject in the Proposed Rules section of this issue of the Federal Register.

[TD 9062, continued]

DATES: Effective Date: These regulations are effective June 24, 2003.

Applicability Date: For date of applicability, see § 1.752-6T(d).

FOR FURTHER INFORMATION CONTACT: Horace Howells (202) 622-3050 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

Background

With certain exceptions, no gain or loss is recognized if property is transferred to a corporation solely in exchange for stock of the corporation, and, immediately after the exchange, the transferors control the corporation. If, however, the transferee corporation assumes a liability of the transferor, then, under section 358(d), the transferor's basis in the stock received in the exchange is reduced by the amount of that liability. If the amount of the liability exceeds the transferor's basis in the property transferred to the corporation, then the transferor recognizes gain under section 357(c)(1). Under section 357(c)(3), a liability the payment of which would give rise to a deduction or that would be described in section 736(a) (regarding payments to a retiring partner) is not taken into account in applying section 357(c)(1), unless the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.
Under section 752(a) and (b), similar rules apply where a partnership assumes a liability from a partner or a partner contributes property to a partnership subject to a liability. The difference between the amount of the liability and the partner's share of that liability after the partnership's assumption is treated as a distribution of money, which reduces the partner's basis in the partnership interest and may cause the partner to recognize gain. There is no statutory or regulatory definition of liabilities for purposes of section 752. Case law and revenue rulings, however, have established that, as under section 357(c)(3), the term liabilities for this purpose does not include liabilities the payment of which would give rise to a deduction, unless the incurrence of the liability resulted in the creation of, or an increase in, the basis of property. Rev. Rul. 88-77 (1988-2 C.B. 128); *Salina Partnership LP, FPL Group, Inc. v. Commissioner*, T.C. Memo 2000-352.

On December 21, 2000, as part of the Community Renewal Tax Relief Act of 2000 (Appendix G of H.R. 4577, Consolidated Appropriations Act, 2001) Public Law 106-554, 114 Stat. 2763, 2763A-638 (2001) (the Act), Congress enacted section 358(h) to address certain situations where property was transferred to a corporation in exchange for both stock and the corporation's assumption of certain obligations of the transferor. In these situations, transferors took the position that the obligations were not liabilities within the meaning of section 357(c) or that they were described in section 357(c)(3), and, therefore, the obligations did not reduce the basis of the transferor's stock. These assumed obligations, however, did reduce the value of the stock. The transferors then sold the stock and claimed a loss. In this way, taxpayers attempted to duplicate a

[TD 9062, continued]

loss in corporate stock and to accelerate deductions that typically are allowed only on the economic performance of these types of obligations.

Section 358(h) addresses these transactions by requiring that, after application of section 358(d), the basis in stock received in an exchange to which section 351, 354, 355, 356, or 361 applies be reduced (but not below the fair market value of the stock) by the amount of any liability assumed in the exchange. Exceptions to section 358(h) are provided where: (1) The trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange; or (2) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange. The term liability for purposes of section 358(h) includes any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code (Code).

Congress recognized that taxpayers were attempting to use partnerships to carry out the same types of abuses that section 358(h) was designed to deter. Therefore, in section 309(c) and (d)(2) of the Act, Congress directed the Secretary to prescribe rules to provide "appropriate adjustments under subchapter K of chapter 1 of the Code to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) * * * in transactions involving partnerships." This statutory provision does not specify whether the exceptions in section 358(h)(2) should apply. The only cross-reference to section 358(h) in this statutory provision is to section 358(h)(3), which defines the term liability. Under the statute, these rules are to "apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules."

In response to this directive, these temporary regulations provide rules to prevent the duplication and acceleration of loss through the assumption by a partnership of a liability of a partner in a nonrecognition transaction. Section 1.752-6T adopts the approach of section 358(h), with some modifications, for transactions involving partnership assumptions of partners' liabilities occurring after October 18, 1999, and before June 24, 2003. The modifications made to the approach of section 358(h) were to provide rules to conform the application of section 358(h) to partnerships and, as discussed below, to prevent abuse.

Prior to the enactment of Code section 358(h) and section 309(c) and (d)(2) of the Act, the lack of specific rules addressing the treatment of liabilities upon the transfer of property to a corporation or a partnership led to interpretations of then existing law that failed to reflect the true economics of certain transactions. In some cases, taxpayers continued to assert these interpretations even after the enactment of these statutory provisions. For example, in a transaction addressed in Notice 2000-44 (2000-2 C.B. 255), a taxpayer purchases and writes economically offsetting options and then purports to create substantial positive basis by

[TD 9062, continued]

transferring those option positions to a partnership. On the disposition of the partnership interest, the liquidation of the partner's interest in the partnership, or the taxpayer's sale or depreciation of distributed partnership assets, the taxpayer claims a tax loss, even though the taxpayer has incurred no corresponding economic loss.

Treasury and the IRS believe that it is appropriate to prohibit partners and partnerships engaging in transactions described in, or transactions that are substantially similar to the transactions described in, Notice 2000-44 from relying on the exception in section 358(h)(2)(B). The exceptions to section 358(h) were intended to exclude from the application of section 358(h) ordinary business transactions. They were not intended to allow taxpayers to engage in transactions that create noneconomic tax losses.

The text of the temporary regulations also serves as the text of the proposed regulations set forth in the notice of proposed rulemaking on this subject in *37416 the Proposed Rules section of this issue of the Federal Register (§ 1.752-6 of the proposed Income Tax Regulations). As part of that notice of proposed rulemaking, § 1.752-7 of the proposed Income Tax Regulations is being issued to carry out the directive of section 309(c) of the Act with respect to assumptions of liabilities occurring on or after June 24, 2003. The proposed regulations conform the application of section 358(h) to partnerships by providing a basis reduction upon an event that separates the partner from the liability rather than on assumption of the liability by the partnership and by adopting certain exceptions. Section 1.752-7(j) of the proposed Income Tax Regulations allows a partnership to elect to apply § 1.752-7 of the proposed Income Tax Regulations and related proposed provisions to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003 in lieu of applying § 1.752-6T of the temporary Income Tax Regulations to this period.

Explanation of Provisions

Under these temporary regulations, if a partnership assumes a liability of a partner (other than a liability to which section 752(a) and (b) apply) in a transaction described in section 721(a), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For this purpose, the term liability includes any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for Federal tax purposes. The adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under §§ 1.752-1 through 1.752-5.

The exceptions under section 358(h) applicable to corporate assumptions of shareholder liabilities generally apply for purposes of these temporary regulations. Therefore, a reduction in a partner's basis generally is not required, under these regulations, after an assumption of a liability by a partnership from that partner if: (1) The trade or business with which the liability is associated is transferred to the partnership assuming the liability as part of the transaction, or (2)

[TD 9062, continued]

substantially all of the assets with which the liability is associated are contributed to the partnership assuming the liability.

However, in the case of a partnership transaction described in, or a partnership transaction that is substantially similar to the transactions described in, Notice 2000-44, the exception for contributions of "substantially all of the assets with which the liability is associated" does not apply.

Effective Date

In accordance with the directive in section 309(c) and (d)(2) of the Act, these temporary regulations apply to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003. Under section 7805(b)(6), the Secretary may provide that any regulation may take effect in accordance with a legislative grant from Congress authorizing the Secretary to prescribe the effective date for such regulation. In addition, under section 7805(b)(3), the Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse. The Secretary has determined that a later effective date is inappropriate. Therefore, these regulations are being applied retroactively in accordance with the directive from Congress in section 309(d)(2) of the Act and to prevent abuse.

Special Analyses

These temporary regulations are necessary to prevent abusive transactions of the type described in the Notice 2000-44. Accordingly, good cause is found for dispensing with notice and public procedure pursuant to 5 U.S.C. 553(b)(B) and for dispensing with a delayed effective date pursuant to 5 U.S.C. 553(d)(1) and (3).

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. For the applicability of the Regulatory Flexibility Act (5 U.S.C. chapter 6), refer to the Special Analyses section of the preamble to the notice of proposed rulemaking on this subject published in the Proposed Rules section of this issue of the Federal Register. Pursuant to section 7805(f) of the Code, these temporary regulations will be submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

Drafting Information

The principal author of these temporary regulations is Horace Howells, Office of the Associate Chief Counsel (Passthroughs and Special Industries), IRS. However, other personnel from the IRS and Treasury Department participated in their development.

[TD 9062, continued]

List of Subjects in 26 CFR Part 1
Income taxes, Reporting and recordkeeping requirements.
Adoption of Amendments to the Regulations

Accordingly, 26 CFR part 1 is amended as follows:

PART 1--INCOME TAXES

1. The authority citation for part 1 continues to read in part as follows:

Authority: 26 U.S.C. 7805 * * *

Section 1.752-6T also issued under Pub. L. 106-554, 114 Stat. 2763, 2763A-638 (2001) * * *

26 CFR § 1.752-6T

2. Section 1.752-6T is added to read as follows:

26 CFR § 1.752-6T

§ 1.752-6T Partnership assumption of partner's section 358(h)(3) liability after October 18, 1999, and before June 24, 2003 (temporary).

(a) In general. If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section 752(a) and (b) apply), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of this section, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under §§ 1.752-1 through 1.752-5.
(b) Exceptions--(1) In general. Except as provided in paragraph (b)(2) of this section, the exceptions contained in section 358(h)(2)(A) and (B) apply to this section.
(2) Transactions described in Notice 2000-44. The exception contained in section 358(h)(2)(B) does not apply to an assumption of a liability (defined in section 358(h)(3)) by a partnership as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000-44 (2000-2 C.B. 255). See § 601.601(d)(2) of this chapter.
(c) Example. The following example illustrates the principles of paragraph (a) of this section:
Example. In 1999, A and B form partnership PRS. A contributes property with a value and basis of $200, subject to a nonrecourse debt obligation of $50 and a fixed or contingent obligation of

[TD 9062, continued]

$100 that is not a liability to which section 752(a) and (b) applies, in exchange for a 50% interest in PRS. Assume that, after the contribution, A's share of partnership liabilities under §§ 1.752-1 through 1.752-5 is $25. Also assume that the $100 liability is not *37417 associated with a trade or business contributed by A to PRS or with assets contributed by A to PRS. After the contribution, A's basis in PRS is $175 (A's basis in the contributed land ($200) reduced by the nonrecourse debt assumed by PRS ($50), increased by A's share of partnership liabilities under §§ 1.752-1 through 1.752-5 ($25)). Because A's basis in the PRS interest is greater than the adjusted value of A's interest, $75 (the fair market value of A's interest ($50) increased by A's share of partnership liabilities ($25)), paragraph (a) of this section operates to reduce A's basis in the PRS interest (but not below the adjusted value of that interest) by the amount of liabilities described in section 358(h)(3) (other than liabilities to which section 752(a) and (b) apply) assumed by PRS. Therefore, A's basis in PRS is reduced to $75.
(d) Effective dates--(1) In general. This section applies to assumptions of liabilities occurring after October 18, 1999 and before June 24, 2003.
(2) Election to apply § 1.752-7. The partnership may elect, under provisions of REG-106736-00 in 2003-28 I.R.B. (see § 601.601(d)(2) of this chapter) to apply those provisions and related Income Tax Regulations to all assumptions of liabilities by the partnership occurring after October 18, 1999, and before June 24, 2003. Provisions of REG-106736-00 in 2003-28 I.R.B. (see § 601.601(d)(2) of this chapter) describe the manner in which the election is made.
Approved: May 7, 2003.

David A. Mader,

Assistant Deputy Commissioner of Internal Revenue.

Gregory Jenner,

Deputy Assistant Secretary of the Treasury.

[FR Doc. 03-15281 Filed 6-23-03; 8:45 am]

END OF DOCUMENT

IRS CCN CC-2003-020, 2003 WL 24016805 (IRS CCN)

Chief Counsel Notice CC-2003-020

June 25, 2003

Cancellation Date: Upon Incorporation Into CCDM

**SUBJECT: NOTICE 2000-44 SON OF BOSS TAX SHELTER**

Purpose

The purpose of this Notice is to assist Chief Counsel attorneys in advising field personnel in the development of cases involving the type of transaction described in the second fact pattern of Notice 2000-44, 2000-2 C.B. 255, and substantially similar transactions (referred to herein as Son of Boss transactions).

Summary

The Son of Boss transaction involves the contribution of a purchased option to a partnership and the assumption by the partnership of a separate written option which the taxpayer incurred. A taxpayer engaged in a Son of Boss transaction claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call option but is not reduced under Internal Revenue Code § 752 for the assumption of the obligation under the written call option. Subsequently, taxpayer claims a loss on the disposition of the partnership interest even though taxpayer has incurred no corresponding economic loss. . . .

. . . .