# ASSIGNMENT OF LIMITED LIABILITY COMPANY UNITS AND JOINDER AGREEMENT

**THIS ASSIGNMENT OF LIMITED LIABILITY COMPANY UNITS AND JOINDER AGREEMENT** (the "**Assignment**"), entered into this 19 day of October, 2001, by and among **MARK E. HUTTON**, an individual residing in the State of Kansas ("**HUTTON**"), and **CLEARMEADOW CAPITAL CORP.**, a corporation organized under the laws of the State of Delaware ("**CLEARMEADOW**"),

## W I T N E S S E T H:

**WHEREAS**, CLEARMEADOW INVESTMENTS, LLC, a limited liability company organized under the laws of the State of Delaware (the "Company"), was formed on the 9 day of October, 2001;

**WHEREAS**, the business and affairs of the Company and its Members are governed by the terms of that certain operating agreement of the Company, made effective as of the 19 day of October, 2001, (the "Operating Agreement");

**WHEREAS**, HUTTON is the sole Member (as that term is defined in the Operating Agreement) in the Company (collectively, the "Membership Interest");

**WHEREAS**, HUTTON desires to transfer his entire membership interest (the "Membership Interest") to CLEARMEADOW as a contribution to the capital of CLEARMEADOW, and thereby withdraw and terminate his complete interest as a Member of the Company, and

**WHEREAS**, ~~HUTTON~~ CLEARMEADOW desires to receive the Membership Interest and assume all rights and obligations as a Member with respect to the Membership Interest;

**NOW, THEREFORE**, in consideration of the premises, and of the mutual promises, covenants, and conditions herein contained, and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto intending to be legally bound hereby agree as follows:

1. <u>**Sale and Assignment; Withdrawal.**</u> HUTTON hereby contributes to CLEARMEADOW, and CLEARMEADOW hereby accepts from HUTTON, the Membership Interest as a contribution to the capital of CLEARMEADOW. HUTTON hereby assigns all right, title, and interest in and to the Membership Interest to CLEARMEADOW, and HUTTON hereby withdraws from membership in the Company, surrendering to CLEARMEADOW any and all rights HUTTON may have as a Member with respect to the Membership Interest.

DEFENDANT'S EXHIBIT 21

PENGAD-Bayonne, N.J.



3

2. **Joinder**. CLEARMEADOW hereby agrees to take the Membership Interest subject to the terms and conditions of the Operating Agreement. The parties hereto agree to treat CLEARMEADOW as a Member with respect to the Membership Interest pursuant to the terms of the Operating Agreement.

3. **Consents.** The parties hereto consent to the transfer of the Units from HUTTON to CLEARMEADOW, to the admission of CLEARMEADOW as a Member with respect to the Membership Interest, and to the withdrawal of HUTTON as a Member.

4. **Further Action.** The parties hereto agree to take all such further action as may be necessary or appropriate to effectuate the purposes of this Assignment.

5. **Governing Law.** This Assignment shall be construed and enforced pursuant to the laws of the State of Delaware, notwithstanding its choice of law provisions.

**IN WITNESS WHEREOF**, the undersigned have executed this Assignment as of the day and year first above written.

Mark E. Hutton

**MARK E. HUTTON**

**CLEARMEADOW CAPITAL CORP.**

Mark E. Hutton

By: Mark E. Hutton
Its: President

*Amended and Restated Operating Agreement of*

# CLEARMEADOW INVESTMENTS, LLC

*A Limited Liability Company*
*Organized Under the Laws of*
*the State of Delaware*

**Dated Effective:** October 19, 2001

DEFENDANT'S EXHIBIT 22

PENGAD-Bayonne, N. J.

**38-P**

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# CLEARMEADOW INVESTMENTS, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT** is entered into effective as of the 19 day of October, 2001 (the "**Effective Date**"), by and among the Members, each of whom hereby agrees and certifies as set forth herein. All capitalized terms used herein not otherwise defined outside of Article II hereof shall have the definitions prescribed thereto pursuant to Article II of this Agreement.

## ARTICLE I

## ORGANIZATION

1.1 **Formation.** The Members, by and through their Authorized Representative, caused there to be filed a Certificate of Formation with the Delaware Secretary of State on the Organization Date, creating the Company, organized and to be operated in compliance with the provisions of the Act. The rights and liabilities of the Members are as provided in the Act except as provided in this Operating Agreement.

1.2 **Name**. The name of the Company is "**CLEARMEADOW INVESTMENTS, LLC.**"

1.3 **Principal Office; Statutory Agent**. The location of the principal office and place of business of the Company is 2233 S. West Street, Wichita, Kansas 67213. At this principal office, the Company shall maintain its records as required by Section 18-104 of the Act. National Registered Agents, Inc. is the statutory agent of the Company in Delaware, and its address is 9 East Loockerman Street, Dover, Delaware, 19901.

1.4 **Term**. This Agreement is effective as of the Effective Date and will continue in perpetuity unless and until the Company is dissolved and liquidated in accordance with the provisions of this Operating Agreement.

1.5 **Purpose**. The purposes of the Company are:

(a) To engage in the acquisition, maintenance, and disposition of foreign currency investments and foreign currency derivates;

(b) To acquire, invest in, and sell other investments for the mutual benefit of the Members;

(c) To enable the Class B Member to consolidate and manage various foreign currency and foreign currency derivative investments of the Members within the ownership and management structure of the Company consistent with the investment strategy which the Class B Member deems in its sole discretion to provide the greatest yield for the Members in light of the risks of such investments; and

(d) To conduct any other business or joint enterprise which shall be legal for a limited liability company to conduct under the Act.

## ARTICLE II

## DEFINED TERMS

The terms defined in this Article, whenever used in this Agreement and capitalized, have the following meanings unless the context or use requires another meaning:

"**Act**" means the Delaware Limited Liability Company Act, as codified in Chapter 18 of Title 6 of the Delaware Code, as now enacted or hereafter amended.

"**Adjusted Capital Account Deficit**" means the deficit balance, if any, in a Member's capital account (i) increased by (a) to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(c), the amount of any unconditional obligation of such Member imposed by state or local law to make contributions to the Company, and (b) the amount the Member is deemed obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) decreased by the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

"**Agreement**" means this amended and restated operating agreement of the Company, as amended from time to time.

"**Capital Account**" means the capital account of a Member maintained in accordance with Section 4.1 of this Agreement.

"**Class A Member**" means that Member listed on **Exhibit A** as holding one or more Class A Units, and any other Person who is admitted as a Class A Member in accordance with this Agreement and the Act, so long as such Class A Member holds at least one Class A Unit.

"**Class A Unit**" means a Unit of Class A interest.

"**Class B Member**" means that Member listed on **Exhibit A** as holding one or more Class B Units, and any other Person who is admitted as a Class B Member in accordance with this Agreement and the Act, so long as such Class B Member holds at least one Class B Unit.

"**Class B Unit**" means a Unit of Class B interest.

"**Code**" means the Internal Revenue Code of 1986, as amended. All references to particular sections of the Internal Revenue Code shall be deemed to include reference to corresponding provisions of subsequent internal revenue law of the United States of America.

"**Company**" means CLEARMEADOW INVESTMENTS, LLC, a limited liability company organized under the laws of the State of Delaware.

"**Company Unit**" or "**Unit**" means an interest of a Member or an assignee in the Company representing such fractional part of the interests of all the Members and assignees pursuant to this Agreement as is equal to the quotient of one divided by the number of Outstanding Units.

"**Effective Date**" has the meaning set forth in the recitals to this Agreement.

"**Excess Cash**" means the amount of cash (from whatever source) of the Company on hand from time to time that is in excess of the required equity of the Company as determined by the Members pursuant to a Required Vote.

"**Fiscal Year**" means the fiscal year of the Company as determined by the Members from time to time and in compliance with Code Section 706, and, initially, means a fiscal year ending on December 31.

"**Indemnitee**" has the meaning set forth in Section 9.1 of this Agreement.

"**Member**" or "**Members**" means those Persons listed on **Exhibit A**, attached hereto, and any other Person who is admitted as a Member pursuant to the terms of this Agreement, so long as such Member holds at least one Company Unit.

"**Organization Date**" means the 9 day of October, 2001.

"**Person**" means and includes any natural person and any corporation, firm, partnership, trust, estate, limited liability company, or other entity resulting from any form of association, or as otherwise defined under Section 34-101 of the Act.

"**Required Vote**" has the meaning set forth in Section 6.2(c) of this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Transfer**" means any sale, assignment, pledge, hypothecation, encumbrance, disposition, transfer (including, without limitation, a transfer by will, intestate distribution, or decree

of divorce or separation), gift, or attempt to create or grant a security interest in any Unit or portion thereof, whether voluntary or involuntary, by operation of law or otherwise.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1 **Initial Capital Contributions**. The Members hereby contribute that cash, foreign currency, foreign currency derivatives, and other property further described in **Exhibit A**, attached hereto, in exchange for their initial interests in the Company as described in Section 3.2 of this Agreement.

3.2 **Initial Interest in the Company**. Each Member has subscribed for the number of Units as further described in **Exhibit A**, attached hereto, and shall have an interest in the profits and capital of the Company proportionate to such Units as provided in this Agreement.

3.3 **No Interest on Capital.** No interest shall be paid by the Company on the contributions to the capital of the Company by the Members.

3.4 **Loans from the Members**. If any Member advances any funds to the Company in excess of his, her, or its required contributions to the capital of the Company, the amount of any such advance shall not be deemed a capital contribution but shall be an obligation of the Company to such Member and shall be repaid by the Company on such terms as the Members by a Required Vote determine as of the date of the advance.

3.5 **No Additional Capital Contributions.** Following their initial contributions, Members are not required to contribute any additional amounts to the capital of the Company.

## ARTICLE IV

## ALLOCATION OF PROFITS, GAINS, AND LOSSES; DISTRIBUTIONS TO MEMBERS

The Members agree that the income, profits, gains, and losses of the Company shall be allocated, and cash distributions of the Company shall be made, as follows:

4.1 **Capital Accounts.** Each Member shall have a Capital Account maintained as set forth in Treasury Regulations Section 1.704-1(b)(2)(iv).

4.2 **Allocation of Income, Profits, Gains, and Losses.** After the special allocations contained in Sections 4.3 and 4.4 have been made, all items of income, profits, gains, and losses of the Company for each Fiscal Year, determined using such methods of accounting

for depreciation and other items as the Members select, shall be allocated among the Members in the following order of priority:

(a) Net Loss. Any net loss shall be allocated to and among the Members in the following order of priority:

(i) First, except as provided in Section 4.2(a)(iii) with respect to allocations that would cause a Member to have an Adjusted Capital Account Deficit, all losses shall be allocated in an amount equal to the excess, if any, of the Residual Net Profits allocated to the Members pursuant to Section 4.2(b)(iii) over all prior allocations of losses to the Members pursuant to this Section 4.2(a)(i). Allocations of losses pursuant to this Section 4.2(a)(i) are intended to offset prior allocations, if any, of Residual Net Profits and shall, in each case, be made to and among the Members in proportion to their respective Units.

(ii) Second, except as provided in Section 4.2(a)(iii) with respect to allocations that would cause a Class A Member to have an Adjusted Capital Account Deficit, all other losses shall be allocated to and among the Class A Members in proportion to their respective Class A Units.

(iii) Notwithstanding the provisions of Sections 4.2(a)(i) and (ii), losses shall not first be allocated to a Member to the extent such allocation would cause such Member to have (or increase) an Adjusted Capital Account Deficit; rather, such losses shall first be allocated to the other Members (even if such Members holding a different class of Units) in proportion to their respective Units until no Member may receive an allocation without causing such Member to have (or increase) an Adjusted Capital Account Deficit, at which point such losses shall be allocated to all the Members (with regard to any effect such allocation has on an Adjusted Capital Account Deficit) in proportion to their respective Units.

(b) Net Profit. Any net profit shall be allocated to and among the Members in the following order of priority:

(i) First, to the Members, until cumulative profits allocated pursuant to this Section 4.2(b)(i) equal cumulative losses allocated to the Members pursuant to Section 4.2(a)(iii);

(ii) Second, to and among the Class A Members to the extent of the excess, if any, of (A) the aggregate net losses resulting from all prior allocations under Section 4.2(a)(ii) over (B) all prior allocations of profits pursuant to this Section 4.2(b)(ii); and

(iii) Third, the balance of the net profits ("**Residual Net Profits**") to and among the Members as follows:

(A) Residual Net Profits shall be allocated to the Class A Members in proportion to their Class A Units until cumulative allocations of Residual Net Profits under this clause (A) equal ten percent (10%) of the fair market value of the assets originally contributed by the Class A Members (unreduced by any liabilities assumed by the Company from the Class A Members) in exchange for their Class A Units; and

(B) The balance of any Residual Net Profits shall be allocated among the Members in proportion to their respective Units.

4.3 **Special Allocations.**

(a) **Nonrecourse Deductions.** Nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(c)) shall be separately allocated to and among the Members in proportion to their respective Membership Units.

(b) **Minimum Gain Chargeback.** Notwithstanding anything to the contrary contained in this Article IV, if, during any Fiscal Year, there is a net decrease in Company "minimum gain," as defined in Treasury Regulations Section 1.704-2(c), each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company minimum gain for the year, as determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).

(c) **Member Minimum Gain Chargeback.** Notwithstanding anything to the contrary contained in this Article IV, except Section 4.3(b) hereof, if there is a net decrease during any Fiscal Year in the "partner minimum gain" attributable to a "partner nonrecourse

debt," as defined in Treasury Regulations Section 1.704-2(j)(2), and as determined in accordance with Treasury Regulations Section 1.704-2(i)(3), then each Member with a share of the minimum gain attributable to such debt must be specifically allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in partner minimum gain attributable to such partner nonrecourse debt that is allocable to the disposition of Company property subject to such partner nonrecourse debt.

(d) **Qualified Income Offset.** Except as provided in Section 4.3(b), in the event a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) that has not otherwise been taken into account in determining such Member's Adjusted Capital Account Deficit, if any, such Member shall be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by Treasury Regulations and Code Section 704(b), the Adjusted Capital Account Deficit of such Member as quickly as possible.

(e) **Member's Interest in Company Profits.** For purposes of determining each Member's share of "excess nonrecourse liabilities" of the Company, as such term is defined by Treasury Regulations Section 1.752-3(a)(3), and solely for such purpose, the Member's interests in Company profits shall be determined in proportion to their respective Membership Units.

(f) **Management Fees.** All deductions, losses, and other items related to expenses incurred by the Company pursuant to Section 5.5 of this Agreement shall be allocated entirely to the Class A Members.

4.4 **Discretionary Allocations.**

(a) **Allocation Savings Provision.** The allocation method set forth in this Article IV is intended to comply with the requirements of Code Section 704(b). If, in the opinion of the Members by a Required Vote, the allocation of profits or losses pursuant to the preceding provisions of this Article IV do not (i) satisfy the requirements of Code Section 704(b), (ii) comply with any other provisions of the Code or Treasury Regulations enacted thereunder, or (iii) properly take into account any expenditure made by the Company or transfer of a Membership Unit, then,

notwithstanding anything to the contrary contained in the preceding provisions of Article IV, profits and losses shall be allocated in such a manner as the Members by a Required Vote determine to be required so as to reflect properly the foregoing requirements.

(b) **Members' Varying Interests.** If any interest in the Company is transferred or assigned during any Fiscal Year in accordance with Article VIII hereof, all items of income, gain, loss, deduction, and credit, and all other items of the Company with respect to each interest so transferred shall be prorated between the transferor and the transferee(s) in accordance with the number of days during such year each held such interest or in such other manner as the Members may determine to be necessary to comply with the requirements of Code Section 706(d) at the time of such transfer.

(c) **Code Section 704(c).** In accordance with Code Section 704(c) and applicable Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and the value ascribed to it under this Agreement. In addition, in the event the value of any Company asset is required to be adjusted pursuant to the provisions of Code Section 704(b) and the Treasury Regulations thereunder, subsequent allocations of income, gain, loss, and deduction for tax purposes with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its adjusted value in the same manner as under Code Section 704(c) and the applicable Treasury Regulations. Any elections or other decisions relating to such allocations shall be made by the Members in any manner that reasonably reflects the purpose and intentions of this Agreement. Allocations pursuant to this Section 4.4(c) are solely for purposes of federal, state, and local taxes, as appropriate, and shall not affect, or in any way be taken into account in computing, any Members' Capital Account or share of profits, losses, other items, or distributions pursuant to any provision of this Agreement.

4.5 **Tax Allocations.** Except as otherwise provided in Sections 4.3 or 4.4 of this Agreement, all items of income, gain, loss, and deduction are to be allocated for federal income tax purposes in the same manner as the corresponding allocation is made for book purposes pursuant to Section 4.2 of this Agreement.

4.6 **Distributions to Members.** Excess Cash shall be distributed to the Members in proportion to their respective Units, at such times and in such amounts as the Members may determine pursuant to a Required Vote.

4.7 **Entity Classification.** Neither the Company nor any Member shall file or cause to be filed any election the effect of which would be to cause the Company to be classified as other than a partnership for Federal income tax purposes without the prior written consent of all the Members.

## ARTICLE V

## MANAGEMENT AND OPERATIONS

5.1 **Member Management.** The management and control of the Company is reserved exclusively to the Members. Those Members acting pursuant to a Required Vote have all power and authority to manage, and direct the management of, the business and affairs of the Company, both ordinary and extraordinary, but only in accordance with the terms of this Agreement and the Act. Approval by or action taken by a Member pursuant to a Required Vote and in accordance with this Agreement is the approval or action of the Company.

5.2 **Investment Powers of Class B Member.** The Members hereby request that the Class B Member direct the investment activity of the Company and manage the Company's assets for the benefit of the Members in the manner deemed best by the Class B Member to grow the value of the Company's assets and provide the greatest investment return to all the Members. The following provisions shall apply in governing the Class B Member's ability to direct and manage the Company's investment activities:

(a) Subject to the limitations imposed by the Act and this Agreement, including paragraph (b) of this Section 5.2, the authority of the Class B Member includes the power to:

(i) approve the annual operating and capital budgets and strategic plans of the Company;

(ii) authorize any commitment for a capital expenditure;

(iii) authorize any sale, lease, transfer, or other disposition of any asset of the Company or any group of assets (other than a disposition of any real property);

(iv) open, conduct, and close checking, savings, custodial, and other accounts on behalf of the Company in such banks or other financial institutions as the Members may select from time to time;

employee of the Company, and any other Person acting on behalf of the Company;

(v) commence, defend, or settle litigation pertaining to the Company and its business or assets, provided that the Company shall not bear the expenses of any litigation brought against any Member acting in that capacity, any employee of the Company, or any other Person acting on behalf of the Company except as otherwise provided in this Agreement;

(vi) change the Fiscal Year of the Company or make or modify any tax election;

(vii) employ accountants, attorneys, contractors, brokers, investment managers, engineers, consultants, or other Persons on such terms, and for such compensation, as it considers appropriate, including, without limitation, Persons who may be Members, or who perform services for, or have business, financial, family, or other relationships with, any Member, manager, officer, or employee;

(viii) approve any purchase or lease of real property;

(ix) enter into any contract, agreement, undertaking, or transaction with any Member or with any other person, firm, or corporation which performs services for or has any business, financial, family, or other relationship with any Member;

(x) authorize any distribution to a Member;

(xi) approve any change of the location of the principal office of the Company;

(xii) determine the fair market value of all Company property upon a Revaluation Event or otherwise;

(xiii) authorize the filing of a Bankruptcy petition by or on behalf of the Company.

employee of the Company, and any other Person acting on behalf of the Company;

(v) commence, defend, or settle litigation pertaining to the Company and its business or assets, provided that the Company shall not bear the expenses of any litigation brought against any Member acting in that capacity, any employee of the Company, or any other Person acting on behalf of the Company except as otherwise provided in this Agreement;

(vi) change the Fiscal Year of the Company or make or modify any tax election;

(vii) employ accountants, attorneys, contractors, brokers, investment managers, engineers, consultants, or other Persons on such terms, and for such compensation, as it considers appropriate, including, without limitation, Persons who may be Members, or who perform services for, or have business, financial, family, or other relationships with, any Member, manager, officer, or employee;

(viii) approve any purchase or lease of real property;

(ix) enter into any contract, agreement, undertaking, or transaction with any Member or with any other person, firm, or corporation which performs services for or has any business, financial, family, or other relationship with any Member;

(x) authorize any distribution to a Member;

(xi) approve any change of the location of the principal office of the Company;

(xii) determine the fair market value of all Company property upon a Revaluation Event or otherwise;

(xiii) authorize the filing of a Bankruptcy petition by or on behalf of the Company.

5.3 Standard of Care.

(a) Any Member, in the performance of his, her, or its duties, is entitled to rely in good faith on information, opinions, reports, and other statements, including financial statements, books of account, and other financial data, if prepared or presented by (i) one or more employees of the Company or (ii) legal counsel, public accountants, or other Persons as to matters within the Person's professional or expert competence.

(b) A Member is to perform his, her, or its duties as a Member in good faith, in a manner he, she, or it reasonably believes to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances.

(c) A Member cannot be found to have violated Section 5.3(b) herein unless it is proved, by clear and convincing evidence, in an action brought against the Member, that he, she, or it has not met the standard of Section 5.3(b) herein.

(d) A Member is to be liable in damages for any action that he, she, or it takes or fails to take as a Member only if it is proved, by clear and convincing evidence, that his, her, or its action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company.

5.4 **Tax Matters Partner**. The Members by a Required Vote may designate the "Tax Matters Partner" (the "**TMP**") pursuant to Code Section 6231(a)(7) for the Company. The TMP shall have the power to (i) enter into a settlement agreement with the Internal Revenue Service (the "Service") with respect to determinations of Company tax items that shall bind each Member who is not entitled to receive notice of the proceedings from the Service, who is not a member of a notice group defined in Code Section 6223(b)(2), and who has not timely filed a statement with the United States Secretary of Treasury (or his delegate) providing that the TMP shall not have authority to bind the Member, which settlement may be on such terms as the TMP shall determine in his sole discretion to be in the best interests of the Members as a class; (ii) in his sole discretion, decide whether or not to commence judicial action for review of Company items included in a notice of final Company administrative adjustment, with the selection of the appropriate court and the Company items to be contested; (iii) in his sole discretion, determine whether to appeal from an adverse decision in an action commenced pursuant to clause (ii) of this Section 5.4 and prosecute any appeal; (iv) in his sole discretion, intervene on behalf of the Company in any judicial action commenced by any other Member or notice group defined in Code Section 6223(b)(2) as to Company tax items; (v) file a request with the Service for an administrative adjustment as a substituted Company return, or otherwise, and to request judicial review on behalf of the Company as to any part of a request for administrative adjustment not

allowed by the Service, with the selection of the appropriate court, the Company items to be contested, and the decision whether to appeal from an adverse decision in any such action to be determined in the sole discretion of the TMP; (vi) in his sole discretion, enter into an agreement with respect to all present or former Members to extend the period for assessing any tax that is attributable to any Company item (and no other person shall be authorized to enter into any such agreement); (vii) upon receipt of a notice of the commencement of administrative proceedings by the Service, furnish to the Service the name, address, profits interest, and taxpayer identification number of each person who is or was a Member at any time during the applicable Company taxable year and such revised or additional information as may be required by law; and (viii) conform to any tax administrative requirements as may be placed on Tax Matters Partners generally by Treasury Regulations adopted after the date hereof as to income tax or any other federal tax applicable to the Company. The designation of the TMP may be modified at any time, and any vacancy in the TMP may be filled, by the Members pursuant to a Required Vote.

**5.5 Investment Advisory Fees for Class B Member**. The Class A Members have solicited the Class B Member to join the Company as a Class B Member for the specific purpose of obtaining the services of the Class B Member as a investment advisor and specialist with regard to foreign currency and foreign currency derivative investments. The Class B Member shall be compensated by the Company for services rendered in the capacity as an investment manager for the Company. The Class B Member shall also be reimbursed for any and all expenses incurred on behalf of, and properly chargeable to, the Company. The Members hereby agree that the Class B Member shall receive for every quarter of each Fiscal Year, as compensation for its services as the investment manager for the Company, payable no later than the last day of each quarter of each Fiscal Year, quarterly services fees in an amount that, when annualized, equal:

**(a)** Two percent (2%) of the net asset value of the Company as of the last day of such Fiscal Year (unreduced by Member distributions for such Fiscal Year); and

**(b)** Twenty percent (20%) of all income and gains realized by the Company during such Fiscal Year.

Solely for the first quarter of the first Fiscal Year, the parties hereto agree that a front-end loaded service fee of Ten Thousand and NO/100 Dollars ($10,000) for such quarter shall be due and payable as of the Effective Date to the Class B Member by the Company, and this expense and all other management fees under this Section 5.5 shall be allocated in the manner provided in Section 4.3(f) of this Agreement.

## ARTICLE VI

## VOTING; RIGHTS AND OBLIGATIONS OF THE MEMBERS

6.1 **Meetings of Members.** Meetings of Members may be called by those Members holding a majority of the Outstanding Units held among all Members.

6.2 **Voting by Members.**

(a) **Voting Power.** Except to the extent that the voting rights of any Units are increased, limited, or denied by the terms of this Agreement, Members vote their Units on each matter submitted to the Members for their vote, consent, waiver, release, or other action. Except as otherwise specifically provided in this Agreement, a Member votes such Member's entire Units even though the capital commitment has not been fully paid, but Units on which a capital contribution is overdue for payment or in default cannot be voted.

(b) **Quorum.** Those Members holding more than fifty per cent (50%) of the Outstanding Units held among all Members constitute a quorum for the transaction of business at a meeting of the Members. The holders of a majority of the Outstanding Units present at a meeting of the Members may adjourn the meeting from time to time.

(c) **Required Vote.** Except to the extent that the Operating Agreement otherwise provides, the vote of Members holding more than fifty per cent (50%) of the Outstanding Units present at the meeting is approval by the Members and shall constitute a "**Required Vote.**"

6.3 **Written Consent or Action.** Any action that the Members may authorize or take at a meeting may be authorized or taken without a meeting with the affirmative vote or approval of, and in a writing or writings signed by, those Members sufficient to constitute a Required Vote.

6.4 **Limitations on the Rights of Members.** Subject to any mandatory requirements of applicable law, no Member (in his, her, or its capacity as a Member) has the right to take any part whatsoever in the management and control of the ordinary business of the Company, sign for or bind the Company, compel a sale or appraisal of Company assets, or Transfer his, her, or its Units in the Company, except as provided in this Agreement.

6.5 **Limited Liability of Members.** Notwithstanding anything in this Agreement to the contrary, the liability of the Members arising out of or in any manner relating to the Company or its business shall not exceed the amount of their agreed upon contributions and obligations specified in Article III of this Agreement. After such contributions and obligations, the Members shall have no further liability to contribute money or otherwise to, or in respect of, the liabilities or obligations of the Company except as otherwise provided under the Act.

## ARTICLE VII

## DISSOLUTION AND LIQUIDATION

7.1 **Events of Dissolution.** Notwithstanding anything in the Act to the contrary, the Company shall be dissolved upon the consent of the Members pursuant to a Required Vote.

7.2 **Liquidation.**

(a) Upon an event of dissolution described in Section 7.1 of this Agreement, the Members shall (i) deliver to the Secretary of State of Delaware for filing a certificate of dissolution in accordance with the Act, and (ii) diligently proceed to wind up the affairs of the Company, liquidate its assets, and distribute the assets in accordance with this Agreement. During the time prior to liquidation, the Company shall continue as a limited liability company bound by the terms of this Agreement, succeed to all Company assets and liabilities, the business of the Company shall be continued, and the Members shall have the right to do all acts authorized by law for the purpose of winding up the affairs of the Company.

(b) In the event of liquidation of the Company, the Members shall take the following steps and in the following order of priority:

(i) Determine which Company properties and assets should be distributed in kind, and dispose of all other Company properties and assets at the best cash price obtainable therefore;.

(ii) Apply Company property to the payment of the debts and liabilities of the Company (other than liabilities for distributions to Members), the expenses of liquidation, and the establishment of any reserves deemed necessary by the Members pursuant to a Required Vote;

(iii) Repay any loans and advances (other than capital contributions) by Members, including liabilities for distributions to Members, and all accrued interest thereon; and