**CANTLEY & SEDACCA, LLP**

ATTORNEYS AT LAW
5220 SPRING VALLEY ROAD, SUITE 610
DALLAS, TEXAS 75254
TEL. (972) 361-0090
FAX. (972) 361-0644

EDWARD SEDACCA
PARTNER

MIAMI, FL
DALLAS, TX
SAN FRANCISCO, CA

January 22, 2002

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

Mr. Mark Hutton
7118 West Clearmeadow Court
Wichita, Kansas 67205

Re: **Investment Transactions**

Dear Mr. Hutton:

You (the "Investor") have requested our opinions regarding certain federal income tax consequences of the investment transactions ("Transactions") described below.

In rendering our opinions, we have reviewed and relied upon representations and advice, including financial information, from you and various other parties to the Transactions and made certain assumptions, which representations, advice and assumptions are referred to herein. We have also examined such documents, and we have made such other inquiries of officers, owners and other persons involved in the Transactions, as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, assumptions, documents, and responses to such inquiries. If any such item is inaccurate in any material respect, or any such documents prove not to be authentic, the opinions contained herein may not be relied upon. We have reviewed the applicable provisions of the Internal Revenue Code of 1986, as amended ("Code"), and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg.," "Treasury Regulations," or "Regulations") promulgated thereunder; relevant decisions of the federal courts; published Revenue Rulings ("Rev. Rul.") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue Service ("Service" or "IRS"); and such other materials as we have considered relevant. In certain instances, we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed. We must caution you, however, that our opinions are not binding upon the IRS or the courts and there can



PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT 30

be no assurance that the IRS or a court considering these matters would agree with our opinions set forth herein.

Based upon our understanding of the facts and assumptions as described herein, we believe that it is more likely than not that our opinions set forth herein would be upheld by a court if they were challenged by the IRS and fully litigated on the merits. Any conclusion set forth in this letter that an issue "should," "would," "will" or "likely" be resolved in a particular manner means only that it is our opinion it is more likely than not that a court would sustain that conclusion.

## I. THE TRANSACTIONS

We understand that the Investor is a United States citizen. We also understand that the Investor was introduced to Dan Brooks of Clarion Capital. Clarion Capital is in the business of structuring foreign currency based derivative products. We understand that Mr. Brooks has nearly 20 years of investment and trading experience. Most recently, Mr. Brooks was employed by Deutsche Bank in its Institutional Trading/Derivative Structuring group from 1996 until 2001. Prior to joining Deutsche Bank, Mr. Brooks was employed: (1) as a management trainee in Chemical Bank's Institutional Currency Trading group from 1982 through 1984, (2) then, as Chief Currency Trader for Bank of America's Institutional Currency Trading group from 1984 through 1989, (3) then, as Chief Currency Trader for Lehman Brothers from 1989 through 1991, and (4) then, as Head of Proprietary Currency Trading for Banque Nationale de Paris from 1991 through 1996. Mr. Brooks is currently principal owner of and is employed by Clarion Capital. Mr. Brooks has a B.A., and a Masters of Business Administration in finance/investment from Duke University.

We understand that the Investor had communicated his concerns to Mr. Brooks regarding the current status of the United States equities markets, as well as the lack of perceived opportunity for investment type yields in the bond markets. We further understand that the Investor communicated to Mr. Brooks that he believed interest rates were also well below his comfort level. With this in mind, Mr. Brooks introduced the Investor to a foreign currency based investment strategy comprised of certain foreign currency market linked deposit ("MLD") type investments and other structured foreign currency based derivative products. Mr. Brooks, with his vast experience, felt there was still tremendous opportunity in the foreign currency derivative products area and that he has represented to us that, if the Investor were to continue his investment in the Transactions and with Mr. Brooks (and his entity) for at least five (5) years, his investment strategy could yield the Investor an annual return of somewhere between 15% and 17% net of all of the Investor's fees and expenses from the Transactions. The Investor decided to invest with Mr. Brooks.

Mr. Brooks initially introduced the Investor to certain foreign currency market linked deposit type investments or MLDs. It was with the initial intent of investing in foreign currency type derivative products that on October 10, 2001 the Investor formed Clearmeadow Investments, LLC (the "LLC"), a Delaware limited liability company, and

contributed $287,500 in cash to the LLC. At this time, the Investor was the sole member and beneficial owner of the LLC. Then, the Investor, through the LLC, opened an account with Deutsche Bank on October 12, 2001 and deposited into the account the $287,500 that the Investor had contributed to it in order to purchase long and short MLD positions amongst other investments. The long and short MLDs are separate instruments that can be bought or sold separately. The maturity date on an MLD is usually less than one year (typically 10, 15, 30, 45 or 90 days). An MLD, like a money market or certificate of deposit, is a cash deposit. In addition, an MLD contains two interest components, a fixed rate of return component which is paid in all events at the maturity of the cash deposit and a variable rate of return component which is tied to the performance of a market item (such as a foreign currency). The obligation of the counterparty to pay the variable interest component of an MLD at maturity is determined by reference to a specific financial market measure, such as the value or price of an equity index or a commodity, or to a change in foreign exchange rates. Further, the determination of whether a depositor would be entitled to receive the variable interest component of his/her deposit would not be determined (or determinable) until the maturity date set for the deposit. The cost of purchasing an MLD position is generally determined by the overall rate of return that a depositor is seeking.

The long MLD position that the LLC entered into constituted a deposit of EUR[1] 27,472,520 (the "Long Deposit Amount") made by the LLC on October 15, 2001 ("Long Deposit Date") with Societe General ("SB"). Under the terms of this long MLD position, on December 14, 2001 (the "Long Maturity Date"), SG would be required to pay to the LLC an amount equal to the sum of: (i) the Long Deposit Amount, plus (ii) the "Long Fixed Yield" (as defined below), plus (iii) the "Long Bonus Yield" (as defined below), except that the Long Bonus Yield is only payable if at 10 a.m. New York time on the Long Maturity Date, the JPY/USD spot market exchange rate is at least 124.65. For purposes of the foregoing, the "Long Fixed Yield" means interest on the Long Deposit Amount determined from the Long Deposit Date to the Long Maturity Date calculated at an annual rate of 3.67% on the basis of a 30 day month/360 day year. The "Long Bonus Yield" means an amount equal to the product of: (a) 16%, and (b) the Long Deposit Amount. On the Long Deposit Date, the spot market JPY/USD exchange rate was 121.05. The premium paid by the LLC for the long MLD position was EUR 2,747,252.

The short MLD position entered into by the LLC constituted a deposit of EUR 27,472,520 (the "Short Deposit Date") made by SG with the LLC on October 15, 2001 (the "Short Deposit Date"). Under the terms of this short MLD position, on December 14, 2001 (the "Short Maturity Date"), the LLC would be required to pay to SG, an amount equal to the sum of: (i) the Short Deposit Amount, plus (ii) the "Short Fixed Yield" (as defined below), plus (iii) the "Short Bonus Yield" (as defined below), except that the Short Bonus Yield is only payable if at 10 a.m. New York time on the Short Maturity Date, the spot market JPY/USD exchange rate is at least equal to 124.67. For purposes of the foregoing, the "Short Fixed Yield" means interest on the Short Deposit Amount determined from the Short Deposit Date to the Short Maturity Date calculated at

[1] For purposes of this opinion, "EUR" refers to Eurodollars, "JPY" refers to Japanese Yen and "USD" or "$" refers to United States dollars.

an annual rate of 3.67% on the basis of a 30 day month/360 day year. The "Short Bonus Yield", means an amount equal to the product of: (a) 15.82%, and (b) the Short Deposit Amount. On the Short Deposit Date, the JPY/USD spot market exchange rate was 121.05. The premium received by the LLC from SG was EUR 2,717,033. We understand, and have assumed for purposes of our opinions herein, that the LLC's receipt of this premium did not constitute an income recognition event for federal income tax purposes for either the LLC or the Investor at the time of receipt and that no income recognition event in respect of this premium will arise until the Short Maturity Date.

All amounts payable under a long MLD position or short MLD position are payable in U.S. dollars at the then spot JPY/USD exchange rate. It has also been represented to us that, as of the Short Deposit Date or Long Deposit Date, there was an approximate 28% statistical probability (based on Black/Scholes) of the contingencies of both the short and long MLD positions being satisfied and of the LLC (and, thus, the Investor) thus realizing a 60% return (net of direct transaction costs associated with the MLD positions) on its net investment in its MLD investments and an approximate 1.3% statistical probability (based on Black/Scholes) of the contingency of the long MLD position (but not the short MLD position) being satisfied and of the LLC thus realizing an approximate 14,446% return (net of direct transaction costs associated with the MLD positions) on its MLD investment. It has been further represented to us that the LLC (and, thus, the Investor) has a statistical probability (based on Black/Scholes) of approximately 70% of neither contingency being satisfied and of, thus, losing its entire MLD investment.

We have been advised that the MLD positions entered into by the LLC were private contractual arrangements with SG and for which there was (i) no market on a national securities exchange that is registered under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); (ii) no market on an interdealer quotation system sponsored by a national securities association registered under section 15A of the Securities Exchange Act of 1934; (iii) no market on a domestic board of trade designated as a contract market by the Commodities Futures Trading Commission; (iv) no market on a foreign securities exchange or board of trade that satisfies analogous regulatory requirements under the law of the jurisdiction in which it is organized (such as the London International Financial Futures Exchange, the Marche a Terme International de France, the International Stock Exchange of the United Kingdom and the Republic of Ireland, Limited, the Frankfurt Stock Exchange, and the Tokyo Stock Exchange); (v) no interdealer market[2]; and (vi) solely with respect to a debt instrument, no debt market for such instrument.[3] We understand from Mr. Brooks, however, that while an MLD position

---

[2] For this purpose, an interdealer market refers to a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields, or other pricing information) of one or more identified brokers, dealers, or traders or actual prices (including rates, yields, or other pricing information) of recent transactions; except that it does not refer to a directory or listing of brokers, dealers, or traders for specific contracts (such as yellow sheets) that provides neither price quotations nor actual prices of recent transactions.

[3] For this purpose, a debt market exists with respect to a debt instrument if price quotations for the instrument are readily available from brokers, dealers, or traders, although no debt market exists with

is an exotic derivative structure, any number of sophisticated options desks could and would make a price on said position.

In general, the long and short MLD positions could be transferred independently of each other, although under the International Swap Dealers Association Master Agreement ("ISDA Agreement") entered into by the LLC, together with the Confirmation For Currency Linked Deposit Swap for the LLC's long MLD position (the "Confirmation"), other than transfers of the long MLD position to majority-owned and controlled entities, any transfer by the LLC of its MLD position requires SG's prior written consent. It is our understanding that this consent requirement is intended merely to serve as a protection to SG against the situation of SG having an obligation to pay on the long MLD position without the ability to offset its obligation with any amount that it would be entitled to receive under the short MLD position (*e.g.*, because the short MLD position is owned by a different person). It is also our understanding that SG would not be adverse to granting its consent to the assignment by the LLC of its short MLD position (without the long MLD position) if SG was satisfied with the creditworthiness of the assignee. Moreover, we understand that SG does, in fact, enter into only MLD positions where it is the depositor (without entering into any offsetting positions) where it is satisfied as to the creditworthiness of the counterparty.

On October 17, 2001, the Investor transferred his entire membership interest in the LLC to Clearmeadow Capital Corp., a Delaware corporation (the "Corporation") and, pursuant to that Assignment of Membership Units and Joinder Agreement, dated October 17, 2001, by and among the Investor and the Corporation (the "Assignment Agreement"), the Investor withdrew from the LLC and the Corporation was admitted as a member of the LLC. Simultaneously with the Investor's transfer, CF Advisors XXXVII, LLC, a domestic limited liability company that is wholly-owned and controlled by Mr. Brooks ("CC"), was admitted as a member of the LLC, and CC and the Corporation entered into the Amended & Restated Operating Agreement of Clearmeadow Investments, LLC, dated October 19, 2001 (the "Operating Agreement"). CC is also the investment advisor to the LLC. In exchange for 1,000 Class B Units in the LLC, CC contributed $2,500 in cash to the LLC out of its Additional Consideration (as defined below). At this time, the Corporation had 99,000 Class A Units in the LLC.

It was represented to us that the Corporation was and remains a validly formed and validly existing corporation under Delaware law. It was further represented to us that a Department of the Treasury/Internal Revenue Service Form 2553 (Election by a Small Business Corporation under section 1362 of the Internal Revenue Code) for the

---

respect to a debt instrument if (A) no other outstanding debt instrument of the issuer (or of any person who guarantees the debt instrument) is traded on an established financial market described in clauses (i), (ii), (iii), (iv), (v), or (vi) above; (B) the original stated principal amount of the issue that includes the debt instrument does not exceed $25 million; (C) the conditions and covenants relating to the issuer's performance with respect to the debt instrument are materially less restrictive than the conditions and covenants included in all of the issuer's other traded debt (e.g., the debt instrument is subject to an economically significant subordination provision whereas the issuer's other traded debt is senior); or (D) the maturity date of the debt instrument is more than 3 years after the latest maturity date of the issuer's other traded debt.

Corporation was timely filed to be effective beginning with the Corporation's first taxable year, and that such election remains effective. It has been further represented to us that such election will not be terminated (either voluntarily or involuntarily) at any time during the Corporation's existence.

It was represented to us that the Investor's purpose in investing in the MLD investments through the LLC was to utilize an entity that would enable the Investor to minimize personal liability on his MLD investment (and, in particular, the short MLD position) and which was a flow-through (or disregarded) entity for tax purposes. Moreover, the use of the LLC to acquire and hold the MLD positions and other Investments allowed for the direct participation of, and direct loss exposure for, CC (and Mr. Brooks) in the Transactions. It was further represented to us that the Investor's purpose for contributing his LLC membership interest to the Corporation was to isolate his investment with CC and Mr. Brooks in a separate investment vehicle through which the Investor could make other investments without the participation or involvement of Mr. Brooks.

In general, the Operating Agreement provides that LLC net profits are first allocated to the members to offset previous allocations of LLC net losses, and then to the Corporation (and, thus, the Investor), until the Corporation has been allocated an amount of net profits equal to 10% of the fair market value of its contributed assets[4] (unreduced by any liabilities assumed by the LLC), and then to the Corporation and CC in proportion to their respective Units. *See* Section 4.2(b) of the Operating Agreement. In general, LLC net losses are first allocated to the members to offset previous allocations of LLC net profits, and then to the Corporation (and, thus, the Investor) until the Corporation's capital account[5] has been reduced to zero, and then to CC. *See* Section 4.2(a) of the Operating Agreement. The Corporation (and, thus, the Investor) is also specially allocated all deductions, losses and other items related to the Additional Consideration payable to CC for its investment advisory services to the LLC. *See* Section 4.3(f) of the Operating Agreement.

The sole member of CC is Mr. Brooks who, as better described above, has nearly 20 years of experience trading, managing and advising clients with respect to foreign currency contracts, MLD positions and other similar investments.

In general, management and control of the LLC is reserved exclusively to the members of the LLC, although those members acting pursuant to a "Required Vote" have the power and authority to manage, and direct the management of, the business and affairs of the LLC. *See* Sections 5.1 and 6.2(c) of the Operating Agreement. As the owner of 99% of the total Units in the LLC, the Corporation (and, thus, the Investor) is essentially vested with management and control of the business and affairs of the LLC.

---

[4] For purposes of our opinions, we have assumed that this is intended to mean and refer to the Investor's capital contribution to the LLC.

[5] The Corporation's capital account balance would be deemed to equal the amount of cash and the fair market value of the assets held by the LLC at the time of CC's admission as a member of the LLC and CC's contribution of $2,500 to the LLC. *See* Rev. Rul. 99-5, 1999-1 CB 434.

However, CC is vested with the power and authority to direct the LLC's investment activity, and to manage the LLC's portfolio in the manner deemed best by CC to grow its value and provide the greatest investment return to all of the members. *See* Section 5.2 of the Operating Agreement. As compensation for its investment advisory services, CC receives quarterly services fees, payable no later than the last day of each quarter, of an amount that, when annualized, equals (a) 2% of the net asset value of the LLC as of the last day of the fiscal year (unreduced by LLC distributions for such fiscal year), and (b) 20% of the LLC's income and gains during such fiscal year, except that for the first quarter of the first fiscal year, a front-end loaded service fee of $10,000 for such quarter is due and payable as of the effective date of the Operating Agreement (the "Additional Consideration"). *See* Section 5.5 of the Operating Agreement.

The purposes of the LLC are to: (i) engage in the acquisition, maintenance, and disposition of foreign currency investments and foreign currency derivatives; (ii) acquire, invest in, and sell other investments for the mutual benefit of the members; (iii) enable CC to consolidate and manage various foreign currency and foreign currency derivative investments of the members within the ownership and management structure of the LLC consistent with the investment strategy which CC deems in its sole discretion to provide the greatest yield for the members in light of the risks of such investments; and (iv) conduct any other business or joint enterprise which shall be legal for a limited liability company to conduct under the Limited Liability Company Act of the State of Delaware. *See* Section 1.5 of the Operating Agreement. Representations consistent therewith were also made to us by the LLC. For purposes herein, the investments made and held by the LLC shall be referred to, individually, as an "Investment" and, collectively, as the "Investments".

It has been represented to us that based on the investment information provided by CC as to the probability of the Investments reaching certain price levels at which they would be profitable, and on the advice of the Investor's own investment advisors, the Investor believed, and continues to believe, that he has, and will continue to have, a reasonable opportunity to earn a significant economic profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits. It has been further represented to us that Investor intends to continue his Investment for a period of time to enable Investor to earn a reasonable profit from the Transactions, in excess of all fees and transactions and without regard to tax benefits.

Subject to certain conditions, the Operating Agreement also permits the holders of the Class A Units (here, the Corporation) to transfer any or all of their Class A Units in the LLC at any time and without the need for any advance written notice to any other member. *See* Section 8.1 of the Operating Agreement. Also, to entice the Investor to enter into the LLC, CC agreed to incorporate a provision into the Operating Agreement which provides, *inter alia,* that, at any time after the expiration of the period ending fifteen (15) days prior to the end of the first complete quarter after the effective date of the Operating Agreement, a Class A Member may, at its option, either require that CC purchase all of its Class A LLC Units for a purchase price equal to the "book value" for such units as determined in accordance with Treasury Regulations Section 1.704-

1(b)(2)(iv) or the Class A Members, by a Required Vote, may require that CC sell all of its Class B LLC Units to the Class A Members for a purchase price equal to the "book value" for such units as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). *See* Section 8.4 of the Operating Agreement. Whether, when and how a Class A Member exercises this option is within its sole discretion and control. It has been represented to us that the Operating Agreement's reference to "book value" in connection with this option was intended by the parties to mean the "fair market value" of said units, after booking up or down the members' capital accounts to reflect any and all unrealized gain and loss from the Investments and the other assets then held by the LLC, and that the Operating Agreement shall be interpreted and applied consistently with such interpretation. The purpose of the option is to provide the Investor with an incentive to invest with CC and to allow for either CC's removal or a liquidation of the Class A LLC Units in the event CC's investment strategies do not meet the Investor's expectations. This option provides the Investor with an evaluation period of CC's investment activities to ascertain whether he believes CC's investment strategy will be able to produce the intended or expected returns set forth at the beginning of the investment period.

It has been represented to us that the U.S. dollar has been, and will continue to be, the functional currency of the Investor, the Corporation and the LLC and, also, that each of them are calendar year taxpayers.

## II. ANALYSIS

### A. Status of LLC prior to admission of CC as member

Prior to the admission of CC as a member of the LLC, we believe that it is more likely than not that the LLC, at the time that the Investor was its sole member and beneficial owner, was a disregarded entity for federal income tax purposes. *See* Treas. Reg. § 301.7701-3(b)(1)(ii). We further believe that it is more likely than not that, for federal income tax purposes, the Investor himself would be treated as the person having entered into the MLD positions and that, for federal income tax purposes (including, without limitation, for purposes of Sections 351, 358, 721, 722 and 752), the Investor's contribution of his LLC membership interest to the Corporation constituted a direct contribution by the Investor of the short and long MLD positions, cash and other assets then held by the LLC.

### B. Admission of CC as member of LLC – Formation of LLC as partnership for federal income tax purposes

A single member entity disregarded as an entity separate from its owner is classified as a partnership when the entity has more than one member. Treas. Reg. § 301.7701-3(f)(2). Guidance on the federal tax consequences of such changes is provided in Rev. Rul. 99-5, 1999-1 C.B. 434, and Rev. Rul. 99-6, 1999-1 C.B. 432. *See* TD 8844 (November 29, 1999).

the time of the Corporation's deemed contribution of the short MLD position to the LLC.[42]

Also, for the same reason that we believe that Section 358(h) would not apply to the Investor's contribution of his LLC membership interest to the Corporation, *see* II.L.2 *supra*, we also believe that it is more likely than not that Section 358(h) would not apply to the Corporation's deemed contribution to the LLC (as a partnership).

**M. <u>Nonapplication of Notice 2000-44</u>.**

In Notice 2000-44, 2000-36 I.R.B. 255 (the "Notice"), the Service addressed several fact patterns, including the following:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any

---

[42] Furthermore, the amount of the liability is not the amount that the obligor might have to pay the obligee currently to free himself of the obligation. *Accord*, Rev. Rul. 95-45, *supra*, the Service ruled that the assumed obligation was a "liability" in the amount of $1000x even though the obligee would have had to pay only $800 to free himself from the obligation. Similarly, except in the case of the original issue discount rules (which are an overlay on the common tax law of debt obligations and in any event apply only after a *de minimis* threshold), the amount of a debt obligation for tax purposes is set when the obligation is issued: it does not change with fluctuations in interest rates or the issuer's credit rating, even though these changes would affect the value of the debt obligation and therefore the amount that an economically rational issuer would pay the holder to discharge the debt. Also, while discharge of indebtedness income is measured by the original issue price and not by the face amount, for numerous other tax purposes the amount of a debt obligation is its face amount, <u>i.e.</u>, the amount that the holder would receive at maturity. *See, e.g.*, IRC §§ 144(a)(1), 148(f)(4)(D), 453A(c)(4), 691(a)(5)(B). We believe that it is more likely than not that the Short Bonus Yield has no "face amount" *per se*, but particularly when there is no payment obligation in respect thereof and, otherwise, the amount of such payment obligation, if any, is unascertainable and cannot be determined with reasonable accuracy.

> income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.
>
> The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of Section 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). *See Fox v. Commissioner*, 82 T.C. 1001 (1984). *Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.*
>
> Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

(Emphasis added).

Even assuming, *arguendo,* that (i) the Service and Treasury had the requisite statutory authority to issue the Notice, and (ii) the Notice is somehow binding on taxpayers, *see discussion infra,* we believe that it is more likely than not that the Notice was intended by the Service to address the purchase and sale of options and, therefore,

would not apply to the MLD positions which more likely than not constitute debt instruments for federal income tax purposes.

As for the Investor's contribution of his LLC membership interest to the Corporation in what is more likely than not a Section 351 exchange, the Notice noted that "tax losses *from similar transactions* designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes." The Notice addressed a transaction involving a Section 721 exchange of options for a partnership interest. A Section 351 exchange would, *arguably,* be viewed as similar to a Section 721 exchange. However, we believe that it is more likely than not that the Investor's Section 351 exchange would not be "similar" to the Section 721 options transaction addressed in the Notice. For one thing, unlike the options transaction in the Notice, the Investor's net economic outlay to acquire the Corporation stock -- i.e., approximately $674,187.50 in MLD positions, cash and other foreign currency investments-- would more likely than not not be considered "nominal or zero".

As for the Corporation's deemed contribution of the MLD positions to the LLC, the Notice provides little, if any, technical analysis regarding the possible application of Section 752 or other provisions of the Code or Regulations to even the fact pattern set forth therein and, that, it is impossible to determine how Section 752 should (if at all) apply to said MLD positions.

In Rev. Rul. 95-26, 1995-1 C.B. 131, the Service addressed whether a partnership's short sale of securities created a liability within the meaning of Section 752. In that ruling, a partnership entered into a short sale of securities on a national securities exchange and the partnership's broker-dealer took securities on hand and sold them on behalf of the partnership. The partnership left the cash proceeds from the sale with the broker-dealer as collateral and deposited additional cash with the broker dealer as further collateral. The partnership was obligated to deliver identical securities to the broker-dealer to close out the short sale. On these facts, the Service concluded that the short sale created a partnership liability within the meaning of Section 752, and relied upon Rev. Rul. 88-77, *supra*, for the proposition that a liability under Section 752 includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets. The Service concluded that a short sale creates such a liability because (a) a short sale created an obligation to return the borrowed securities, and (b) the partnership basis in its assets was increased by the amount of the cash received on the sale of borrowed securities. *See also Salina Partnership, supra.*

As quoted above, the Notice provides that the "transactions may be subject to challenge under § 752," but it does not provide any critical analysis on how Section 752 should apply. The Notice concludes that the taxpayer would be incorrect in increasing its basis in its partnership interest by the cost of the call option while not reducing the basis as a result of the partnership's assumption of the taxpayer's obligation with respect to the offsetting call option. Yet, the Notice fails to articulate how Section 752 would reduce

the basis since any decrease in a partner's individual liabilities by reason of assumption by the partnership of such liabilities (under Section 752(b)) would be offset by an increase in its basis provided under Section 752(a). *See* Treas. Reg. § 1.752-1(f).

Moreover, when it issued the Notice, the Service did not revoke its long-standing position regarding the definition of liability espoused in Rev. Rul. 88-77. The Notice is also inconsistent with the Tax Court's view that granting an option does not create a liability under Section 752, as expressed in the *Helmer* case discussed above. Accordingly, we believe that it is more likely than not that the Short Bonus Yield does not rise to the level of a liability for either Section 358 or 752 purposes and, thus, no reduction in basis in respect thereof would be warranted.

Even assuming, *arguendo,* that the Notice was intended to apply to transactions involving MLD positions, we believe that it would be more likely than not that the Transactions would be sufficiently distinguishable from the option transaction described in the Notice. For one thing, as noted above, the Corporation's (and, thus, the Investor's) "net economic outlay" for its interest in the LLC (i.e., EUR 27,472,520 in MLD positions, cash and other foreign currency investments) would more likely than not not be considered "nominal or zero".

**N. Negative basis adjustments under Section 705(a)(2)(B) or 752(b) upon maturity of short MLD position where no Short Payment Amount required to be made.**

Other than the basis adjustment for any net income, gain or loss in respect of the MLDs at maturity, we believe that it is more likely than not that if, upon the Short Maturity Date, no payment is required to be made in respect of the Short Bonus Yield, the Corporation would have no negative basis adjustment in its Class A LLC Units under either Section 705(a)(2)(B) or 752(b). Section 705(a)(2)(B) provides, in part, that the adjusted basis of a partner's interest in a partnership is decreased by "expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account." This language should be viewed as applying to expenditures which deplete partnership assets but which do not give rise to a deduction or basis. *See* McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners*, ¶ 6.02[3][c] (3d ed. 1997). Although the Regulations do not elaborate on the kinds of expenditures included in this category, typical examples of such expenditures are disallowed losses under Sections 267(a)(1) or 707(b), life insurance premiums not deductible under Section 264, and interest on debts incurred or continued in order to purchase tax-exempt notes not deductible under Section 265. *See id*; Willis, Pennell and Postlewaite, *Partnership Taxation*, ¶ 5.02[4] (6th ed. 1999).

If, on the Short Maturity Date, the contingency that triggers the obligation to pay the Short Bonus Yield (i.e., if the spot market JPY/USD rate reaches 124.67) is not satisfied, then no obligation or liability would arise in respect of the Short Bonus Yield, and the Short Bonus Yield component of the short MLD position would be worthless. In such event, we believe that it is more likely than not that the Corporation would not be

> tax liability is affected by the transaction even if it is not a direct party to the transaction (e.g., it participates through a partnership or through a controlled entity). A separate disclosure statement is required for each reportable transaction. The fact that a taxpayer files a disclosure statement for a reportable transaction shall not affect the legal determination whether the tax benefits claimed with respect to the transaction are allowable.

(Emphasis added).

As relevant, under these rules, a taxpayer that is required to file a return for a taxable year with respect to the income tax imposed on a C corporation (i.e., the tax imposed under Section 11) must attach to its return a statement of any "reportable transaction" in which the taxpayer directly or indirectly participated. In defining those transactions that constitute "reportable transactions", the Regulations make reference to certain aspects and criteria used in Sections 6111 and 6112 to determine whether a transaction constitutes a "tax shelter", Corporate Tax Shelter and "potentially abusive tax shelter". *See* Temp. Reg. § 1.6011-4T(b). Since an S corporation is not a taxpayer that is subject to the tax imposed under Section 11, the Corporation, which is an S corporation, would more likely than not not be subject to these disclosure rules.

As none of the other direct or indirect participants that could derive potential federal income tax benefits from the Transactions were corporations (or entities treated as corporations for federal income tax purposes) – i.e., the Investor is an individual and CC is a single member limited liability company the sole member of which is Mr. Brooks, also an individual — we believe that it is more likely than not that the Transactions would not constitute a Corporate Tax Shelter.

Moreover, even assuming, *arguendo*, that the Transactions could be viewed as structured for the avoidance or evasion of Federal income tax for a direct or indirect participant which is a corporation, it has been represented to us that no aspect of the Transactions was offered to the Investor, the LLC, the Corporation or any other person under "conditions of confidentiality" (within the meaning of Section 6111(d)(2)).

Accordingly, we believe that it is more likely than not that the Transactions would not constitute a "tax shelter" under Section 6111 and, therefore, would not be required to be registered under Section 6111(a).

## III. <u>OPINIONS</u>

Based on the above discussion and analysis, and subject to the qualifications, representations, limitations and assumptions set forth herein, we are of the opinion that under current federal income tax law, it is more likely than not that:

A. The Investor's contribution of his LLC membership interest to the Corporation (at a time when the Investor was the sole member and beneficial owner of the LLC) was not a taxable transaction.

B. The MLD positions would be treated as debt instruments for federal income tax purposes with a contingent interest component that would not be includable as income under Section 1275 unless and until the contingency is satisfied.

C. The Short Bonus Yield portion of the short MLD position would not be treated as a liability for purposes of Section 752.

D. The Investor's tax basis in his Corporation stock immediately following his contribution of his LLC membership interest to the Corporation was equal to the amount of the gross premium paid by the LLC for its long MLD position plus the amount of cash then held by the LLC and the LLC's basis in its other assets, without any downward adjustment in respect of the Short Bonus Yield.

E. Other than the basis adjustment for any net income, gain or loss in respect of the MLD positions at maturity, if, upon the Short Maturity Date, no payment is required to be made in respect of the Short Bonus Yield, the Corporation would have no negative basis adjustment under either Section 705(a)(2)(B) or 752(b).

F. The Corporation's sale of all of its Class A LLC Units to CC pursuant to its option under the Operating Agreement would result in a capital gain or loss to the Corporation (except to the extent subject to recharacterization under Section 751) and, thus, to the Investor, measured by the difference between the Corporation's amount realized from such sale and the Corporation's then current adjusted tax basis in its Class A LLC Units.

G. The Corporation's purchase of all of CC's Class B LLC Units pursuant to its option under the Operating Agreement would result in the LLC being treated as having liquidated under Section 708(b)(1)(A) for federal income tax purposes, and that the Corporation would take an adjusted tax basis in the LLC's then remaining assets (other than cash and "marketable securities"[76]) deemed received in the deemed liquidation of LLC (i.e., the remaining Investments) equal to the Corporation's adjusted tax basis in its LLC interest immediately before

[76] In general, subject to the exceptions of Section 731(c)(3), the term "marketable securities" means financial instruments and foreign currencies which are, as of the date of the distribution, actively traded (within the meaning of Section 1092(d)(1)), IRC § 731(c)(2)(A), as well as those additional items identified in Section 731(c)(2)(B).