said deemed distribution (reduced by the amount of any cash and fair market value of any "marketable securities", deemed received.

H. The sale of the foreign currency contracts by the LLC, as a disregarded entity for federal income tax purposes, would result in the Corporation's (and, thus, the Investor's) recognition of ordinary gain or loss, measured by the difference between the amount realized from such sale and the Corporation's adjusted tax basis in the sold contracts (as determined in G above).

I. Assuming that the Investments and assets of the LLC (other than those assets gain or loss from the sale of which would be subject to Section 988) are capital assets for federal income tax purposes, the LLC's sale of any of such Investments or assets would result in the Corporation's (and, thus, the Investor's) recognition of capital gain or loss, measured by the difference between the amount realized from such sale and the Corporation's adjusted tax basis in the sold Investment or asset (as determined in G above).

J. The tax treatment described herein for the Investor in respect of the Transactions would be upheld if challenged by the Service and would not subject the Investor to penalties under Section 6662(b)(2) or (3).

K. The Transactions would not constitute a tax shelter within the meaning of Section 6111 and, therefore, would not be required to be registered under Section 6111(a).

The opinions set forth above are subject to the following qualifications, limitations and exceptions: no opinion is expressed regarding the tax treatment of the described transaction for the purpose of any foreign, state or local income tax, or any tax other than the United States federal income tax. Any misstatement of a material fact or omission of any fact that may be material or any change in any of the facts referred to may require a modification of all or part of our opinions.

Our opinions are limited to matters expressly set forth herein, and no opinion may be applied or inferred beyond the matters so stated. The opinions expressed herein are based upon our interpretation of current law. The opinions expressed herein are not binding on the Service or the courts. Moreover, there is no assurance that the Service or a court considering this matter would agree with our opinions or conclusions expressed herein. We do not undertake to advise you of any changes in law which may occur after the date hereof. The Code, the Regulations promulgated thereunder, and the administrative position of the Service are subject to change either prospectively or retroactively. Such changes could render certain or all of the opinions expressed herein inapplicable.

The opinions expressed herein are furnished by us solely for the benefit of the Investor, and thus may not be relied upon or delivered to any person other than the Investor without our express, prior written approval.

Very truly yours,

Cantley & Sedacca, LLP

**CANTLEY & SEDACCA, LLP**

ATTORNEYS AT LAW
5220 SPRING VALLEY ROAD, SUITE 610
DALLAS, TEXAS 75254
TEL. (972) 361-0090
FAX. (972) 361-0644

EDWARD SEDACCA
PARTNER

MIAMI, FL
DALLAS, TX
SAN FRANCISCO, CA

January 23, 2002

VIA FEDEX

Mr. Mark Hutton
7118 West Clearmeadow Court
Wichita, Kansas 67205

Dear Mr. Hutton:

Enclosed please find our opinion letter pertaining to your market-linked deposit investment, as well as, two copies of the representations ("Investor Representations") that we will need from you, Clearmeadow Investments, LLC (the "LLC") and Clearmeadow Capital Corp. (the "Corp.") in connection with our issuance of the opinion letter. While we are furnishing you with the opinion letter, please be advised that the opinion letter may not be relied upon (and is not otherwise released) unless and until we have received the following items: (a) the Investor Representations fully executed by you, the LLC and the Corp.; (b) the fully executed additional representations that we require from Dan Brooks (and his entity, CF Advisors XXXVII, LLC); and (c) any remaining agreements and documents that we have not yet received but which are relevant to the opinion letter.

Please review the Investor Representations for accuracy and completeness and, if acceptable to you, kindly sign, date and have witnessed your signature in two places where indicated by the "Sign Here" tabs and return the signed Investor Representations (original signatures only) to my attention at the following address: Cantley & Sedacca, LLP, 5220 Spring Valley Road, Suite 610, Dallas, Texas 75254.

Sincerely,

Edward Sedacca

Enc.

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
30A



C&SLLP004872

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,
Plaintiff,
V.
THE UNITED STATES,
Defendant.

D E P O S I T I O N

The deposition of MARK HUTTON, taken on behalf of the Defendant pursuant to the Federal Code of Civil Procedure and Notice before:

DONNA M. LYTLE, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

a Certified Shorthand Reporter of Kansas, at the Epic Center, 301 N. Main Street, Suite 1200, Wichita, Kansas, on the 8th day of May, 2007, starting at the hour of 2:00 P.M.

**Stoddart Decl.**
**Exhibit 31**

A P P E A R A N C E S

The plaintiff appeared by its counsel, Mr. Tom Pliske, of the firm Gasaway & Stientjes, LLC, 1120 Olivette Executive Parkway, Suite 220, St. Louis, Missouri 63132.

The defendant appeared by its counsel, Mr. Robert Stoddart, of the U.S. Department of Justice, Tax Division, P.O. Box 26, Washington, DC 20044.

MARK HUTTON,
of lawful age, having been first duly sworn on his oath to state the truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. STODDART:
Q. Could you please give us your name?
A. Mark Edward Hutton.
Q. Could you please give us your address?
A. Home address, 7118 Clearmeadow Court, Wichita, Kansas.
Q. My name is Bob Stoddart, I represent the United States which you are suing. Have you ever been deposed before?
A. Yes.
Q. In what connection?
A. On a number of construction project litigations for a company that I worked for prior to starting my company.
Q. What company is that?
A. Martin K. Eby Construction.
Q. Then you know how it works.
A. A little bit.
Q. Everything has to be oral and there can't be any sign language, and it's best if only one

person talks at a time.
Is there any reason you can't give completely full and truthful testimony today?
A. No, sir.
Q. Okay. Let's start right in by asking you about the new suit that you filed in the U.S. District of Kansas against Deutsche Banc. You did file a suit?
A. Yes, I did.
Q. Did you have a chance to look at the complaint before it was filed?
A. No, I did not.
Q. Did you engage in an attorney to file this for you?
A. I engaged Rob Stientjes, with the Gasaway, Stientjes law firm, to investigate this issue and then he took it from there.
Q. By "he", you mean Stephen M. Gorny, G-O-R-N-Y?
A. I believe that Rob Stientjes worked with him. I do not and have never met with Mr. Gorny. My contact has been Rob Stientjes with my law firm, Gasaway, Stientjes?
Q. Do you know if Mr. Stientjes ever got a copy of the complaint before it was filed?

A. I don't know that he did. I assume that he did, I mean, that he actually prepared it.
Q. Did he prepare it from the information you'd given him?
A. Yes.
Q. Is there any representation made in this complaint -- have you looked at it since?
A. I've attempted to read it. I'm not big on legal stuff legalese. I've attempted to read through it and try to follow it.
Q. To the best of your knowledge, were there any representations made in this complaint that were false?
A. I don't recall any that I read.
Q. Let's just go through some of the ones that might concern me. I only have one copy I'm afraid so I may have to push it across the table for you to look at.
Looking at Paragraph 15 which says, and I'm breaking to the middle of the sentence here, quote, Deutsche Banc continued marketing, promoting and participating in this sham, Son of Boss tax shelters, including ML tax investments and others devised by them as part of the defendant's arrangement, closed quote.

Is this MLD transaction a sham Son of Boss tax shelter?

A. That's not for -- I don't have the background knowledge in law and tax to really understand what defines a sham tax shelter or what a shelter is, so I couldn't tell you. That was written by Rob Stientjes and those are his words, so you'd have to ask him on that.

Q. Okay. He is your attorney, and he represents you?

A. He does. Actually, Tom is my direct representation.

Q. And have you ever directed any of your attorneys to file an amended complaint removing that language?

A. No, no.

Q. Do you stand by it?

A. Do I stand by it?

Q. Yes. To the extent that you don't want to correct it?

A. Well, I don't -- I guess so. I'm not qualified to decide whether that's a relevant issue or not --

Q. Okay.

A. -- in the whole scheme of things. I'm a

contractor, I'm not a tax CPA or an attorney, so
when you start talking about, is this -- do I
agree that this is a sham or not, I couldn't tell
you.
Q. Okay.
A. I've never heard that word in that
context until, you know, this whole thing came up.
Q. As long as the attorney, who is
representing you, says it and you don't disavow
it, that would be fine by me.
I will look at Paragraph 22, quote, you
say that the ML deposit transactions were
structured in a way that Deutsche Banc decided
whether to control -- whether a profit was earned
and how much that profit would be, and B, Deutsche
Banc would exercise its discretion to ensure no
profit would be earned, closed quote. Is that
true?
A. I did not give that information to Rob
Stientjes. I think he obtained that information
from other avenues, but he did not get that from
me. I learned -- that's the first time I learned
of that, when I read this complaint.
Q. Did you tell him it was wrong?
A. I don't know that it's right or wrong.

Q. Do you disavow it?
A. I guess not because I don't know whether it's right or wrong.
Q. That's fine.
A. Again, I didn't -- that information I did not give Mr. Stientjes as it related to Deutsche Banc, he found that out through other investigations and you'd have to ask him whether that was something that he -- how he found that out, because that was new information for me.
Q. But he is your representative; correct?
A. Um-hum, yes.
Q. And you don't disavow it?
A. No, I guess not, no.
Q. Going to read from Paragraph 56, quote, There was not a reasonable chance of earning a profit on the ML deposit transaction and other Son of Boss like transactions, closed quote. Is that true?
A. Well, I think that's a question that we have today. It appears to me that there was some misrepresentations made to me back when this transaction and investment opportunity was put forward, and that's what this -- that's really the root of this lawsuit is how I was mislead by

taking their advice and their personal representations.

Q. Do you disavow that statement?

A. I guess not, no.

Q. Going to read from Paragraph 28. Quote, Defendants knew that the various law firms that they worked with were using, quote, canned, closed quote, opinion letters concerning the ML deposit transactions and other Son of Boss like transactions and needed only to fill in several blanks for each of the many clients to which they rendered such, quote, opinion letters, closed quote. The fact that the, quote, opinion letters, closed quote, were, quote, canned, closed quote, was not disclosed to plaintiffs or class, closed quote. Is that true?

A. I believe that to be true, yeah. We didn't know at the time it was a canned opinion.

Q. If you would have known it was a canned opinion, would you have continued with the transaction?

A. I can't say whether I would have or not. I think it would have -- we would have maybe investigated, but the word canned is somewhat erroneous because, I mean, there's all sorts of

legal documents that are used on a repetitious basis and put forward for various other -- all sorts of entities to use, that are consistent.

For instance, an LLC. If I want to form an LLC, I call up my attorney and he doesn't start from scratch in generating the document that creates that LLC, he pulls it from other things that he's done, and so the fact that it's canned, quote, quote, is -- I don't know that that's, in itself, a reason that I would have rejected it.

Q. If you'd known it was canned, would you have investigated further?

A. I think I would have -- I would have expected Scott Hewitt, that's who I relied upon to take a look at the opinion letter. That is so far above me as it relates to understanding or even attempting to understand the sophistication of the tax code and those transactions and everything, that was well above anything that I understood from a legality standpoint, and that's why I relied on Scott Hewitt for it.

Q. If you'd known this was a canned opinion letter, would you have asked Mr. Hewitt to investigate?

A. I suspect I would have. I mean, I would

have asked him to make sure that it was really no different than anything else, though. I handed it to him and I said, I need your opinion on this.

Q. Going to read from Paragraph 83, Defendants breached their duties to plaintiffs by promoting the ML deposit transaction, and other Son of Boss like transactions, by making false representations by failing to disclose material or significant facts of the effects of those facts and misrepresentations; by advising plaintiffs to engage in and complete the ML deposit transactions; by advising plaintiffs that the cost of the currency long option purchased by them in the ML deposit transaction could properly be included in their tax basis for computing capital loss for 2001; that the amounts received for selling the currency short option could be ignored, closed quote. Is all of that true?

A. There's a lot there.

Q. Is anything in it false?

A. That's easier. As we see it today, I think that's a correct statement. I think we were mislead by Deutsche Banc.

Q. As a factual matter, that's true, what I just read?

A. I'm sorry, I didn't catch the question.
Q. Is what I just --
A. I thought you were talking to yourself.
Q. Is what I just read true from this paragraph?
A. Our assertion is true, we believe our assertion is true, that Deutsche Banc mislead us in what the tax ramifications and what the opportunities were in the whole investment, we were mislead.
Q. Do you wish to disavow this representation made to the U.S. District Court?
A. I don't know any reason why I would.
Q. I'm going to read from Paragraph 105, closed quote, The defendants acted with full knowledge and awareness that the transaction was disclosed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint when, in fact, they lacked those features, paren, which was necessary for successful tax strategy, close paren, close quote. Is that true?
A. We believe that's an accurate representation of what -- yeah.

Q. And you don't disavow that?
A. No.
Q. I have something that was an exhibit in previous depositions but I don't have anymore copies, so it won't be an exhibit here. I will just give you a copy to look at.
A. Okay.
Q. And if Mr. Pliske wants to look at it, it is a letter captioned agreement for your legal services from Cantley & Sedacca. Showing that to Mr. Hutton now. I'd like to look at Paragraph 3. Do you have that?
MR. PLISKE: I have the October 4th letter.
Q. Paragraph 3, third sentence of Paragraph 3, quote, In making the investment that will be required as part of the investment, you have relied solely upon your, paren, and your financial advisor's, paren, independent investigation of all matters or concerns regarding the investment and the investment. You, paren, or your financial advisor, close paren, possess the knowledge and experience in financial and business matters that ensures your, paren, and your financial advisor's, paren, capability to evaluate

the merits and risks of the investment, and you are, therefore, making an informed decision as to the investment, closed quote.

Do you have knowledge and experience in financial and business matters that would ensure your capability to evaluate the merits and risks of option trading in foreign currencies?

A. Absolutely not, that's why I hire guys like Scott Hewitt.

Q. And whom did you hire -- who was your financial advisor who did possess knowledge and experience in financial and business matters?

A. I would look at that as Scott Hewitt.

Q. But he says he didn't have that knowledge.

A. Well, he may have said that, but I looked to him. I felt like he did when I -- when we analyzed this particular opportunity, that's who my primary person that I looked to, was Scott Hewitt, in discussion of this.

Q. Did Mr. Hewitt ever give you any reason to think that he had financial and business knowledge so as to evaluate the merits of trading options in foreign currencies?

A. Well, I'd answer that by saying he sure

didn't tell me he didn't, and I've had a lot of faith and trust in Scott over the years. He's helped our company, he's been instrumental in helping our company grow and with his expertise in other areas and the like, he's proven to be a valuable consultant for me, and so I didn't really question in depth whether he was specifically comfortable with this, but he never indicated to me that he wasn't.

Q. Did you ever ask Mr. Hewitt for an opinion on whether the option trading transaction would, apart from tax contributions, provide a reasonable opportunity for profit, apart from tax considerations?

A. You know, I don't specifically recall asking him that, but in the course of our conversations, I had a comfort level that he was okay with it, but I really don't recall that I specifically phrased a question to him like that.

Q. In his affidavit he said that he gave you the opinion that if it was not profitable, there would be down side protection because of tax attributes.

MR. PLISKE: Objection.

A. That wasn't really what the question was.

MR. PLISKE: I don't think he said
that in his affidavit.
MR. STODDART: Let's get his
affidavit.
Q. And while we continue, I'd like to ask
you, when exactly did Mr. Hewitt tell you that
this transaction had a reasonable possibility of
producing a profit?
A. I don't believe that I said that he said
that.
Q. So he didn't say that?
A. No, what I said was that in the course of
our discussions, that I had a comfort level that
he believed that, but I don't believe that he ever
specifically said what you're asking me the
question is.
Q. What exactly gave you the comfort level?
A. Scott and I've worked together on a
number of things, and Scott's always been very
open and honest with me as to issues that I've
brought to him, and I felt like if he would have
had a concern about that or a comment, he was
always very open in making those, and he didn't.
So I guess I took his silence as a
acquiescence, if you will, that yeah, it's an okay

deal, but I did not ask him specifically as it relates to that. That would have been out of character for me, quite frankly, for me to have drilled in that deep to a transaction like this.
Q. Did Mr. Hewitt ever before then given you his opinion that any transaction you entered had a reasonable possibility of making an economic profit regardless of the tax consequences?
A. No, no. Only thing I would qualify again is I suppose there's been times I've thrown out an idea of maybe a direction I was going to take my company, and we'd talk about the profitability aspect of that, and the investment in a piece of real estate.
Kind of good example would be building an office building for my company and how that was -- the ownership structure was going to be set up so that it had its -- it was profitable and benefitted me the best for tax purposes.
Q. Would he give an opinion on the business merits of your transaction?
A. If I asked him specifically to do that, he would be more than open to do that.
Q. Did he ever?
A. On this transaction or on others?

Q. On others before this, let's say.
A. Yeah, yeah.
Q. Such as?
A. Well, he brought me the idea of starting the company EquipLease, as an equipment rental company that's outside of Hutton Construction, and we discussed the benefits of that.
Q. Did he tell you that it was reasonably likely or did he give you the impression, or did he say, did he say this was likely to give you a profit?
A. Well, I think -- in that particular case, we knew it would be a profitable deal, how the profits were handled, and its impact on me long-term financially is really what the discussion of that particular deal was.
Q. I'm interested in the occasions before you entered this MLD transaction on which -- in which you specifically went to Mr. Hewitt for business advice, apart from tax advice.
A. Gosh, I mean, it was all so intermixed. I can't say that I ever went to him for business advice that we didn't discuss in context with that the tax ramifications of it, that I recall anything specific to that, but we've had a lot of

conversations about various business things that we do and how that affects things.
Q. And when you have conversations about business things, does he actually implicitly talk about the business things?
A. I don't really understand what you're...
Q. You're saying you got a comfort level because Mr. Hewitt didn't speak up and say, this is unlikely to produce a profit --
A. Yeah.
Q. -- apart from tax?
Were there other occasions in which he gave you this kind of implicit business advice that something is going to be profitable just because he failed to say it would not be profitable?
A. Well, I think I know what you're getting at. I'm not sure that I could say explicitly that there's any one thing like that, that you're asking me.
Q. If there's not any one thing, does that mean there is no thing?
A. No.
Q. What does it mean?
A. Well, I think it means that in the

context of literally thousands of conversations that I've had with Scott as my accounting partner and that I can't say yes or no that he's ever sat down and that we've had that context, just to talk about the profitability of something and not have tax implications intermixed. It's just not generic to our conversations.

Q. So your testimony is that he gave you the advice -- that you had a reasonable opportunity to earn a significant profit from the transactions in excess of all fees and transaction costs and without regard to tax benefits because he never told you that you did not have a reasonable opportunity?

A. Yeah, I mean, he never brought it up and said, Mark, this doesn't feel right, doesn't smell right. I mean, he never said anything like that, and that would be something that would be in his character to do.

Q. And when you went to him and asked for his opinion, what opinion did you ask for?

A. I asked him what he thought of the deal, and that would be a direct quote, what do you think of this, and he -- go ahead.

Q. Did you give him the Black/Scholes

analysis that you were supposed to have discussed with Mr. Brooks?
A. I would not have a clue as to what the Black/Scholes analysis was if you put it in front of me today.
Q. Did you ask Mr. Hewitt to look into Daniel Brooks' Black/Scholes analysis?
A. No. I wouldn't have known what that is or anything to be able to ask him. Why I would have asked him?
Q. Do you have any reason to think that Mr. Hewitt would know about the Black/Scholes analysis?
A. I couldn't answer that.
Q. Had he ever mentioned it to you before?
A. No.
Q. Had he ever talked to you about valuing option trades?
A. None.
Q. Did you know from other transactions that he, in fact, did value option trades?
A. No.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 1.)

Q. Do you know what this Exhibit 1 is. It's captioned at the Top Investor Representations?
A. Yeah, um-hum.
Q. And you signed this?
A. Yes, I did, looks like on the back.
Q. On March 11th, 2002?
A. Um-hum.
Q. In Paragraph 5 that, quote, Based on the advice of CC and Brooks as to the probability of the investments reaching certain price levels at which they would be profitable, and on the advice of my own investment advisors, I believe and continue to believe that I have and continue to have a reasonable opportunity to earn a significant economic profit from the transactions in excess of all fees and transaction costs, and without regard for tax benefits, closed quote.
Ask you again, what was the, quote, advice of my own investment advisors, closed quote, on which you believed that you had a reasonable opportunity to earn a significant economic profit from the transactions?
A. I based my opinion of that on the fact that Scott Hewitt had no objections to it.
Q. And his lack of objections was his

advice?
A. That's how I saw it, yeah, I was comfortable with that. I asked him to look at it and he came back and said he thought it was okay.
Q. Let's look at another sentence from this paragraph, quote, in fact, my decision to invest in the transactions with CC and Brooks was based in large part on CC's and Brooks' representations that A, there was an approximately 28 percent statistical probability, paren, based on Black/Scholes, paren, of realizing a 60 percent return on my net investment in the MLD positions, net of all my direct transactions costs associated with the positions, and an approximate 1.3 percent statistical probability, paren, based on Black/Scholes, paren, of realizing a 14,446 percent return on my net investment in the MLD positions net of all my direct transaction costs associated with the positions, closed quote.
It is your testimony that Mr. Hewitt -- that Mr. Hewitt advised you that there was a 28 percent statistical probability based on Black/Scholes, et cetera, because he did not tell you the opposite?
A. We didn't discuss that segment of it, so

you can draw the conclusion how you want to. I go back to my -- what I said originally, I had him look at the whole deal, I asked him what he thought of it, he said he thought it'd be okay.
Q. Did you give him the information from Mr. Brooks that determined that there was a 28 percent statistical probability of realizing a 60 percent return, et cetera, et cetera? I can tell you he didn't provide any documents like that to me.
A. I don't believe I received all that information directly. I was kinda depending upon Scott to get information that he needed to be comfortable with this from Bryan Hanning and, in fact, I think they had some conversation about that, as well as Cantley & Sedacca.
Q. Did you believe that Bryan Hanning had the ability to determine that there was a 28 percent statistical probability based on Black/Scholes?
A. I don't believe that he had that ability to actually determine that statistically. I did believe Bryan to understand the basics of this transaction and the viability of it as it related to its ability to yield a profit.
Q. Did you ask him whether in his opinion

the transaction had a reasonable probability of producing an economic profit in excess of taxes and out-of-pocket costs?
A. No, I didn't ask him that specifically.
Q. Did you ask anybody that?
A. No, I don't believe I asked that specific question.
Q. Did you ask the general question of anyone whether this would produce an economic profit net of taxes?
A. We certainly discussed that as the reason of this investment was the fact that it had a probability, although it be a high risk, of yielding a significant return on the investment, yeah, we discussed that.
Q. And what did you do to determine that such a probability existed?
A. Well, I guess, again, I relied on Scott Hewitt and his understanding of financial things and somewhat Bryan Hanning as well, believing that Bryan Hanning would not have brought this to me if it didn't have at least some reasonable opportunity to make some money.
Q. Did you rely on anything other than that?
A. I don't recall that I did, no.

(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 2.)

Q. This is Exhibit 2. Do you know what Exhibit 2 is?

A. Looks like a letter.

Q. Have you signed it?

A. I did.

Q. And the letter authorizes somebody at Deutsche Banc to pay out an amount that adds up to 27 and a half million dollars from a certain account.

Did you have 27 and a half million dollars in that account when you authorized the transfer of funds?

A. Well, this was a part of a --

Q. First the answer, then the explanation. Did you have 27 and a half million dollars?

A. Not that I'm aware of.

Q. Did you?

A. Not that I'm aware of.

Q. Had you put 27 and a half million dollars into that account?

A. No, but my understanding of the transaction was that Deutsche Banc was actually

going to be loaning that.
Q. Did you ever sign a promissory note for 27 and a half million dollars?
A. Not that I recall.
Q. If you do find such documents referencing a loan from Deutsche Banc, will you please make sure that I get a copy?
A. Of course, of course.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 3.)
Q. Do you know what Exhibit 3 is?
A. This is a statement of account from Deutsche Banc.
Q. And for what period is it?
A. Oh, gosh, let me find it here. Net value as of December 31st of 2000, October -- statement of account, October 1st to October 31st, 2001. Confusing.
Q. Go to the second page, under activity, do you see anything that would indicate that there was 27 and a half million dollars in this account --
A. No, sir.
Q. -- in October?

Scott Hewitt suggested that I talk to Tony.

Q. What did he say you should talk to Mr. Gasaway about?

A. When I got the notification from the IRS that they were looking at this transaction, I called up Scott, Scott called up a friend of his at Stinson, Morrison and Hecker, guy named John Better, I believe is his name, I think it's John, and John knew of Tony Gasaway who was employed by the St. Louis office of Stinson, Morrison and Hecker at the time, and that's kinda how it all came to be. That's when I started talking to Tony.

Q. Going to leap ahead because this gets very tedious after a while.

Did you complete high school?

A. Yes, sir.

Q. Do you have an undergraduate degree from a college or university?

A. Yes, sir.

Q. What's the name of the school?

A. Kansas State University.

Q. What were your years of enrollment?

A. I was at Kansas State from 1974 through 1977.

A. No.
Q. Did you receive any training or education in the areas of accounting, finance and income taxes?
A. Absolutely not. That would have been cruel and unusual punishment.
Q. Have you attended any investment related classes or investment seminars?
A. No, not seminars, no.
Q. Any investment related classes?
A. No. I've gone to deals that a bank puts on on kinda economic outlooks and stuff like that, and generally you don't get out of one of those that they don't pitch something to you, so, that's it.
Q. Do you have any professional or business certifications or licenses?
A. I'm a licensed general contractor.
Q. What was the date you received your license?
A. As Hutton Construction, 1992. Would have been about March of 1992.
Q. Was the certification or license ever involuntarily revoked or suspended?
A. No, sir.

Q. What was your work history for the last 15 years?
A. All 15 years, as the president of Hutton Construction Corporation.
Q. Would you identify all business entities in which -- in the last 15 years you had an ownership interest and also served as an employee?
A. Yeah, you want me to go through those?
Q. Yes.
A. I'll try to hit them all. There's EquipLease, LLC, which is a limited liability corporation that the sole purpose is to rent equipment to Hutton Construction. I'm partners in an LLC called Insight Medical Partners. We build and lease real estate to medical tenants such as medical office buildings and surgery centers. There's another entity, Cyprus Medical Partners that did one building in the same context, just a different group -- one extra investor, so we created a separate LLC. I think that's pretty well it, that I can remember.
Q. Do any of those entities or does any of those entities have an in-house accountant?
A. EquipLease and Hutton Construction, of course, uses Scott Hewitt but not in-house. When

Deutsche Banc?
A. I'm assuming it is because that's what they say it is on their statement. They usually aren't in the habit of increasing that.
Q. So all in all, about how much would you say you paid out of pocket?
A. I think it was around $225,000, that I recall.
Q. I'm going to show you something I'm not going to make an exhibit, because I don't have any more copies, but it's been an exhibit in other depositions. It is that e-mail from Bryan Hanning at the top, I will wait for Mr. Pliske to get his copy out.
MR. PLISKE: Okay, go ahead.
Q. You'll see here at the top of the e-mail that has Bryan S. Hanning at the top of the printout, the subject is Leman's strategy. Do you happen to know what Leman's strategy is?
A. No, sir.
Q. Now, look at the bottom here. This is an e-mail apparently from you because your name is on the "from" line. Is that your e-mail address, which is Mhutton@huttonconstruction.com?
A. That's changed now, but that was it at

that time, uh-huh.
Q. Did you send that e-mail that's at the bottom there?
A. I would say yes, yeah. It sounds like me and certainly looks like it's from me, um-hum.
Q. I'll read this into the record then. It says Bryan slash Jeremy. Scott and I met today and figured this out. We would like to take down $1,005,000 of loss for year 2001. I would think the balance for next year, but if possible, I would like to wait until later in 2002 to decide on this. Is that possible?
First, could you identify Bryan and Jeremy?
A. Well, I don't know Jeremy, I'm assuming that he was Jeremy Nerenberg, but Bryan Hanning would be who I was referring to there.
Q. And what loss were you talking about taking down?
A. Well, it was my understanding that in the failure of this opportunity to yield a profit, that there was some tax benefits, and that would have been that loss.
Q. So this is from the MLD transaction?
A. I believe so, yes, sir.

Q. And there was more of a loss that you were going to take in some other period?
A. Yes. I mean, it's...
Q. How much was the remaining loss that you were going to take?
A. I don't recall.
Q. You remember what period you took the loss in?
A. Well, this would have been in 2001.
Q. I mean, the remaining loss?
A. Never took it. I believe it was shortly after this that we determined that this was a red flag, you know, that the IRS had ruled that this was not a viable deal, and so we commenced to unravel it.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 4.)
Q. Do you know what Exhibit 4 is?
A. It's an amended tax return for 2003.
Q. Did you sign it?
A. Yes, sir.
Q. Did you file it?
A. Yes, sir.
Q. It says in the second page under part 2

him prior to 2001?
A. Yes.
Q. Did you approach him or did he approach you with respect to this 2001 transaction?
A. He approached me.
Q. Was your 2001 taxable year as it was developing in 2001, was it unusual in any way?
A. No. I mean, it was showing kind of the same systematic growth in profit that we'd had over prior years. It was a profitable year.
Q. It was --
A. Not significantly so.
Q. Not a spike in income?
A. No, not what I would consider a spike. There was an increase, but not a spike.
Q. Did you find it unusual that Bryan Hanning would approach you with an investment opportunity?
A. No. I mean, over the times that we got together on a fairly regular basis going to lunch and visit, I mean, we threw all sorts of ideas around from investment opportunities and structuring various deferred compensation plans and continuity, what I called continuity insurance, which is kind of life insurance, stuff

A. Yes, sir.
Q. You mentioned that you're familiar a bit with margins but you don't use that.
A. I know what they are.
Q. Do you know what a margin call is?
A. I do.
Q. Did you receive the equivalent of a margin call from the MLD transaction?
A. No, not that I recall.
Q. Were you ever told that you might receive a margin call?
A. I don't remember receiving that or being told that, no.
Q. Do you have any disclosure at all that you might be called upon to actually pay the 27 and a half million dollars that you purported to have transferred?
A. I don't recall any.
Q. Would you please look for any document you might have that would reflect at all on this?
A. I believe -- I've given absolutely everything that's related to this has been transferred to my law firm so if they have it, I mean, if it's in there, that's what I have.
Q. If you'd had it -- is there a possibility

you would have lost it?
A. I suppose there's always that possibility. I've seen my office at home.
Q. You think it's likely you would have lost it?
A. Probably not.
Q. You say that Cantley & Sedacca led you to believe that there was a reasonable opportunity to make a profit; true?
A. I believe that's true, yes.
Q. And you said primarily Cantley & Sedacca led you to believe there was a reasonable opportunity for profit; true?
A. True.
Q. Did anybody else lead you to believe there was a reasonable opportunity to make a profit?
A. Not when I made the decision to pursue the transaction, no.
Q. So there was no one else?
A. No one else.
Q. You say that Mr. Hewitt told you that he wanted to check some things out about the Cantley & Sedacca opinion letter?
A. Um-hum.

Q. What did he do to check it out?
A. I don't know.
Q. So when you said that you assumed he did some research, were you only speculating that he did research?
A. I think that's what assume means, yeah, I assumed he did research.
Q. You don't know that he did?
A. I don't know that he did.
Q. Did he tell you that he did?
A. Don't recall that he specifically said that I researched this or that.
Q. Okay.
MR. STODDART: That's enough for redirect.

RECROSS EXAMINATION

BY MR. PLISKE:
Q. Just a follow-up question. You just testified that you reasonably believed you could make a profit based on Cantley & Sedacca's representation; is that correct?
A. Um-hum, yes, sir.
Q. And you were asked the question did anyone else tell you you could reasonably make a profit?

MR. STODDART: Objection, that wasn't the question I asked, did anyone else lead you to believe that you could make a profit.

Q. The fact that Bryan Hanning was involved and was a trusted professional and did not tell you to stay away from this investment, did that reasonably give you some assurance as to making a profit in this?

MR. STODDART: In your opinion, may I ask.

MR. PLISKE: Yeah.

A. In my opinion, I can tell you -- if it hadn't been Bryan Hanning that brought me this opportunity, I probably would not have considered it because of its sophistication and the like, but I trusted Bryan that he would bring me a viable and profitable opportunity, and so the answer to that is, yes, I did trust Bryan.

Q. So are you saying because of the negative implication --

A. No, positive implication. I trusted Bryan very much, still do, in what he brings me, and his advice on various matters.

Q. You're not relying on me with respect that this was a reasonable opportunity to make an

investment, are you?
A. No.
Q. Are you relying on Mr. Stoddart?
A. No, I think it's pretty clear, he doesn't think it's a very good deal.
Q. But you're relying on Mr. Hanning, even though he didn't say, use any words to tell you that this was a reasonable opportunity to make a profit; is that correct?
A. I think that's correct. I mean, I relied, like I did with Scott Hewitt, on, at that time, 12 years of relationship, of business relationships, and multiple monetary transactions that we had done together, so it was -- I was relying upon that trust and faith that we had developed over that 12 years, and continue to have today.
MR. PLISKE: I don't have any further questions.
MR. STODDART: Just one.
REDIRECT EXAMINATION
BY MR. STODDART:
Q. Did you have any reason to believe that Mr. Hanning had experience in evaluating options trades?

A. You know, I really believed that Bryan was sophisticated enough and knowledgeable enough that he understood this transaction.

Q. What did he do, if anything, to let you think that he had experience in valuing options?

A. Well, not specific to options, but in past deals, Bryan always appeared to have a good handle on the tax code and investment opportunities and the complexities of, like, split dollar life insurance issues and things like that, and proved to be good at guiding me, if not personally through that, but recommending people in various things, like Dan Peare at Hinkle Elkouri, as related, developing a trust and everything like that. He was a trusted advisor on that kind of stuff, and I believed because of his level of communication to me on other sophisticated issues, that he brought this to me, and understood it, and was, therefore, by its nature, kind of put his stamp of approval on it. I would have expected Bryan not to bring me something that he didn't feel was out of my best interest to do.

Q. If he'd brought you any investment of any sort promising heaven knows what, you would have

signed it?
A. Absolutely not. I mean, he has brought me some insurance policies that we've regrouped on, and I said, that isn't really what I want to do and we've backed up, but I've stayed with Bryan Hanning on them. It's no different than any other financial -- I don't throw Bryan out because I don't like the deal he brought me. We work together to put a deal together that meets my needs.
Q. And what were your personal efforts to see whether your reliance on Mr. Hanning in an options trading deal promising 14,000 percent return, what were your personal efforts to see if he had the capacity to evaluate it?
A. Again, I felt like the 12 plus years of direct business relationship with him gave me an opportunity that I was reasonable in relying on him, that that was not outside our normal business relationship, and that we have, you know, that we had done numerous deals together that I had not drilled down into the very minute details on. They were based on him bringing it to me and my trust in him and that we moved forward on them.
Q. You said that there were some that you

looked into and you decided not to do as he proposed?

A. As we discussed it, we made changes to it.

Q. Why didn't you look into this one?

A. I was comfortable with it.

Q. Why?

A. Because he brought it to me.

Q. Only because he brought it to you?

A. Primarily, yeah, and Scott Hewitt said it was okay, too. It wasn't just Bryan Hanning, it was a combination of Bryan Hanning and Scott Hewitt that brought me this deal, and by Bryan bringing it to me, and by Scott saying I think it's okay, gave me the impression and the comfort that I would be able -- that this was an okay deal to do.

Q. Even though you paid $225,000 down for more than a million dollars in tax loss, didn't that strike you as different from the sort of transaction that you'd relied on those two gentlemen for in the past?

A. Certainly was different, yes.

MR. STODDART: All right, I have no more questions.

MARK HUTTON

STATE OF KANSAS )
) ss:
COUNTY OF )

Subscribed and sworn to before me, the undersigned authority, this, the 29th day of May, 2007.

NOTARY PUBLIC

PEGGY M. WEST
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 7/11/09

My appointment
Expires: July 11, 2009

C E R T I F I C A T E

STATE OF KANSAS )
) ss:
SALINE COUNTY )

I, Donna M. Lytle, Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition by him given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office, this 22nd day of May, 2007.

Donna M. Lytle

DONNA M. LYTLE STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Donna M. Lytle, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

Plaintiff,

V.

THE UNITED STATES,

Defendant.

2007 JUN -8 PM 3:04

**A F F I D A V I T**

I, Donna M. Lytle, a Certified Shorthand Reporter for the State of Kansas, do hereby certify that the original deposition of Mark Hutton taken on the 8th day of May, 2007, has been filed with Robert Stoddart for his keeping.

No corrections were made by the witness.

Filed: June 6, 2007

Donna M. Lytle, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North Seventh, Suite E
Salina, KS 67401

DONNA M. LYTLE STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

cc: Tom Pliske

mk

## Investor Representations

In connection with the opinion to be delivered by Cantley & Sedacca LLP ("Cantley & Sedacca") to me regarding certain investment transactions (the "Transactions"), and recognizing that (1) Cantley & Sedacca will rely upon the following representations in issuing its tax opinion letter (the "Tax Opinion") to me, and (2) the tax opinions set forth therein may not be accurate if any of the following representations are not accurate in all respects, I hereby certify that the following representations are true, correct and complete:

1. I am a United States citizen.

2. I, through my wholly owned corporation, Clearmeadow Capital Corp., a Delaware corporation (the "Corporation") have joined together with CF Advisors XXXVII, LLC ("CC") in the formation of Clearmeadow Investments, LLC, a Delaware limited liability company ("LLC"), in good faith with a common investment purpose. In connection therewith, I had contributed $287,500 in cash to the LLC in order that the LLC acquire investments in long and short market linked deposit ("MLD") positions and other foreign currency investments and, thereafter, contributed my membership interest in the LLC to the Corporation and caused the LLC to admit CC as a member of the LLC for such business reasons including, among other things, diversification of our portfolio and the professional management to be provided by CC and its sole member, Dan Brooks ("Brooks").

3. Prior to entering into the Transactions, I was aware of Brooks' extensive background and experience in MLD and other foreign currency transactions, including his nearly 20 years of experience trading in, managing and advising clients with respect to MLD investments, foreign currency contracts and similar types of investments. Prior to entering into the Transactions, I discussed with Brooks the Transactions and his investment strategy.

4. No portion of my investment in the Transaction was, is or will be guaranteed (directly or indirectly) by any person, nor am I otherwise protected (either directly or indirectly) against loss through a stop loss agreement or other arrangement.

5. I entered into the Transactions for business reasons, with the intent to produce a significant economic profit from price movements of foreign currency contracts, MLD positions and other similar investments (collectively, the "Investments"). Based on advice of CC and Brooks as to the probability of the Investments reaching certain price levels at which they would be profitable, and on the advice of my own investment advisors, I believed, and continue to believe, that I have, and continue to have, a reasonable opportunity to earn a significant economic profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits. In fact, my decision to invest in the Transactions and with CC and Brooks was based, in large part, on CC's and Brooks' representations that (a) there was an approximate 28% statistical probability (based on Black/Scholes) of realizing a 60% return on my net investment in the MLD positions, net of all of my direct transaction costs associated with the positions, and an approximate 1.3% statistical probability (based on

DEFENDANT'S EXHIBIT 31A

DEPOSITION EXHIBIT
1- Hutton





C&SLLP004994

Black/Scholes) of realizing a 14,446% return on my net investment in the MLD positions, net of all of my direct transaction costs associated with the positions, and (b) if I were to continue my investment in the Transactions and with CC and him for at least five (5) years, I could reasonably expect that his investment strategy would yield for me an annual return on my total investment in the Transactions of somewhere between 15% and 17%, net of all of my fees and expenses from the Transactions and without regard to tax benefits. It is my current intention to continue the Corporation's (and, thus, my) investment in the Transactions and with CC and Brooks for such period of time so as to be able to achieve a reasonable economic return on my investment, without regard to tax benefits and net of all of my fees and expenses from the Transactions.

6. I am not entering into the Transactions in reliance upon the Tax Opinion and would have entered into the Transactions even without the Tax Opinion being issued to me.

7. LLC was and is a validly formed and validly existing limited liability company under Delaware law.

8. The Corporation was and is a validly formed and validly existing corporation under Delaware law. A Department of the Treasury/Internal Revenue Service Form 2553 (Election by a Small Business Corporation under section 1362 of the Internal Revenue Code) was timely filed to be effective beginning with the Corporation's first taxable year. Such election remains, and will remain, effective and has not been and will not be terminated (either voluntarily or involuntarily) at any time during the Corporation's existence.

9. My purpose in holding my investment in the Transactons through the Corporation was to have a vehicle for holding my investment in the Transactions while retaining the flexibility to be able to make other investments in which Brooks or CC would not participate.

10. Cantley & Sedacca has been furnished with the current version of the operating agreement of the LLC (the "Operating Agreement") and the certificate of incorporation, bylaws and other organizational documents of the Corporation.

11. At the time that I contributed my Class A LLC Units to the Corporation, and immediately following such contribution, neither the LLC nor the Corporation had any liabilities or obligations (other than the LLC's contractual obligations to Societe General ("Bank") in respect of the short MLD position) and none of the assets then held by the LLC or the Corporation were subject to any liability or obligation. At no time did I receive, nor am I entitled to receive, any money or other property in connection with my investment in the Transactions from CC, Brooks or any other person.

12. The short and long MLD positions (deposit amount: 27,472,520 Eurodollars) that the LLC invested in was an investment made by the LLC on its own behalf and independently of, and not as agent for, any other person.

13. I have not (either directly or indirectly) hedged, nor will I hedge, my exposure from my net investment in the Transactions, nor have or will I identify any aspect of the Transactions as being part of a hedging transaction under Treasury Regulations Section 1.446-4.

14. The U.S. dollar has been, and will remain, the functional currency for myself, the Corporation and the LLC.

15. At any time after the expiration of the period ending fifteen (15) days prior to end of the first calendar quarter after the effective date of the Operating Agreement, I have the option to require that CC either purchase all of my Class A LLC Units or sell to me all of its Class B LLC Units, in either case, for a purchase price equal to the book value of the units being sold as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Whether, when and how I exercise either of these options is within my sole discretion and control. It is my understanding that "book value" for these purposes means the fair market value of the units being sold, after booking up or down the LLC members' capital accounts to reflect any and all realized gain and loss from the Investments and other assets of the LLC based upon their then fair market values.

16. The LLC has not elected, and will not elect, under Treasury Regulations Section 301.7701-3 to be classified as a corporation for federal tax purposes.

17. The Operating Agreement, and no other agreement (whether oral or written), covers the rights and obligations of the members of the LLC. The LLC has filed (and will file) its own income tax returns and has maintained (and will maintain) its own separate books and records. The Corporation has filed (and will file) its own income tax returns and has maintained (and will maintain) its own separate books and records.

18. Prior to my entering into the Transactions, I was not related to CC, Brooks, Bank or any other person having any involvement with the Transactions.

19. There does not exist, nor will there exist, any understanding, agreement, obligation, or arrangement pursuant to which either I am, or the Corporation, LLC, CC, Brooks, Bank or any other party involved in the Transactions is, committed to undertake all or any of the transactions comprising the Transactions upon the happening of any other transaction, except to the extent that any person is contractually obligated to perform under the MLD positions in accordance with their stated terms.

20. LLC has not elected, and will not elect, under Treasury Regulations Section 1.988-3(b), to treat exchange gain or loss on any forward contracts, future contract or option contracts as capital gain or loss.

21. I, along with the LLC and the Corporation, are all calendar year taxpayers.

22. I have reviewed the description of the Transactions as set forth in the Tax Opinion and such description is accurate and materially complete, and there are no pertinent facts relating to any aspect of the Transactions that have not been disclosed to Cantley & Sedacca.



C&SLLP004996

IN WITNESS WHEREOF, I have signed this Representation Certificate this 11th day of March, 2002.

Witness

Witness

MARK HUTTON

SIGN HERE

IN WITNESS WHEREOF, the Corporation and LLC have each reviewed this Representation Certificate and, by its signature below, acknowledges and verifies the accuracy of each of the representations hereinabove made.

CLEARMEADOW INVESTMENTS, LLC

By: Clearmeadow Capital Corp., its member

By:
Name: MARK HUTTON
Title:
Date: 11-MARCH-2002

SIGN HERE

Witness

Witness

By: CF ADVISORS XXXVII, LLC its member

By:
Name: Dan Brooks, sole member
Date:

Witness

Witness

CLEARMEADOW CAPITAL CORP.

By:
Name: MARK HUTTON
Title:
Date: 11-MARCH-2002

SIGN HERE

Witness

Witness



C&SLLP004997

**CLEARMEADOW INVESTMENTS, LLC**
2233 S. West Street
Wichita, Kansas 67213

10/15, 2001

**VIA TELECOPY (214) 740-7780**

Mr. Craig Brubaker
Deutsche Banc Alex Brown
200 Crescent Court
Suite 500
Dallas, Texas 75201

Re: CLEARMEADOW INVESTMENTS, LLC
Acct # [redacted]

Dear Mr. Brubaker:

This letter constitutes your authorization to transfer the necessary funds to complete the purchase of the market linked deposits in the notional amount of US $25,000,000 and to also pay the premiums totaling US $2,500,000 associated therewith from the above-referenced account to Societe Generale, New York ABA.

Please contact me if you have any questions regarding this matter.

Very truly yours,

DEFENDANT'S EXHIBIT 31B

DEPOSITION EXHIBIT
2- Hutton

Mark E. Hutton, Manager

SH 00116



CASE # 05-1223

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,
Plaintiff,
V.
THE UNITED STATES,
Defendant.

D E P O S I T I O N

The deposition of BRYAN HANNING, taken on behalf of the Defendant pursuant to the Federal Code of Civil Procedure and Notice before:

DONNA M. LYTLE, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

a Certified Shorthand Reporter of Kansas, at the Epic Center, 301 N. Main Street, Suite 1200, Wichita, Kansas, on the 8th day of May, 2007, starting at the hour of 11:35 a.m.

**Stoddart Decl.**
**Exhibit 32**

A P P E A R A N C E S

The plaintiff appeared by Mr. Mark Hutton and by its counsel, Mr. Tom Pliske, of the firm Gasaway & Stientjes, LLC, 1120 Olivette Executive Parkway, Suite 220, St. Louis, Missouri 63132.

The defendant appeared by its counsel, Mr. Robert Stoddart, of the U.S. Department of Justice, Tax Division, P.O. Box 26, Washington, DC 20044.

The witness appeared by his counsel, Mr. Terry L. Malone, of the firm Martin, Pringle, Oliver, Wallace & Bauer, LLP, 100 North Broadway, Suite 500, Wichita, Kansas 67202.

Also appearing, Mr. Don Glenn.

BRYAN HANNING,
of lawful age, having been first duly sworn on his oath to state the truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. STODDART:
Q. My name is Bob Stoddart, I represent the United States and I'm with the Department of Justice.
Could you please give us your full name and address?
A. My name is Bryan Scott Hanning. I live at 1 Sandpiper, Wichita, Kansas.
Q. Are you employed?
A. I am employed.
Q. How are you employed?
A. I am employed with Mass Mutual, Massachusetts Mutual Life.
Q. Do you have any other employment?
A. Actually, I do work with AGH Wealth Advisors, here in Wichita.
Q. In what capacity?
A. I'm as a representative member and agent for selling life insurance products and investments.

Q. What sort of investments?
A. Primarily mutual funds, variable annuities, variable life insurance products.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 1.)
Q. Do you know what Exhibit 1 is?
A. I do.
Q. What is it?
A. It's an affidavit.
Q. And you gave it in this case; correct?
A. Correct.
Q. I'd like to look at Paragraph 2. You say you approached Mark Hutton and informed him of an investment strategy offered through the law firm of Cantley & Sedacca.
How did you find out about the strategy offered through the law firm of Cantley & Sedacca?
A. I was a part of an association called National Association For Family Wealth Counselors and they had resource material that was offered, and I found Cantley & Sedacca listed under resources for investment opportunities and tax planning strategies and that's how I became aware of them.

Q. What sort of research or resource material?

A. Well, the only thing that was offered was the name of the firm and a contact name and phone number.

Q. I mean, where did you find this? Was there a flier or what?

A. As I recall, there was a binder that was provided that had information in it.

Q. Along with other information?

A. Yes, lots of other information about the association and the services it provided.

Q. And were there other investment opportunities listed?

A. I'm sure there were, and I don't recall what they were.

Q. What did you do when you found the name of Cantley & Sedacca in that book?

A. The question was what did I do when I found the name?

Q. Yeah, what'd you do next?

A. Basically, I just held it in reference, you know, for any opportunities that I would run across with certain clients and held the name, that it was available to me on recall.

Q. When did you find out what the investment strategy was?
A. I don't remember exactly.
Q. Did you ever contact Cantley & Sedacca?
A. Only -- I only contacted Cantley & Sedacca after I had a potential prospect or somebody interested in something of that nature.
Q. Of what nature? I'm trying to get to how you knew what the strategy was before you contacted Cantley & Sedacca.
A. I understand the question. As I recall, this was an alternative investment, so this is something outside of the traditional investment opportunity, and at the time, I had clients that were interested in those types of investment opportunities that would be beyond a mutual fund or something along those lines. I have clients that ask me what are opportunities out there that would be beyond traditional investments, and that's how you became aware of that.
Q. What do you mean beyond traditional investments?
A. Beyond mutual funds, stocks and bonds, variable products of any sort like that.
Q. Do you understand by that term, beyond

usual investments, investments that have tax advantages?
A. Well, I understand a lot of investments, even traditional, have tax advantages.
Q. When did you approach Mr. Hutton?
A. When did I approach him?
Q. Um-hum.
A. I don't recall exactly. I've talked to him frequently as a client and I don't remember the date of when I contacted him.
Q. Was it before or after you contacted Cantley & Sedacca?
A. I believe it was after.
Q. And why did you contact Cantley & Sedacca?
A. To -- well, at the time to find out about their investment choices and what they were doing.
Q. Before you contacted Cantley & Sedacca did you have anybody in mind, someone who might be interested in this?
A. Yes.
Q. And who was that -- who were those?
MR. MALONE: Counsel, before we get any further, certainly, we've had an issue with the protective order that we haven't talked about

Q. Why did you approach Mr. Hutton, that is, why did you think it would be a potential investment opportunity for him?
A. As I stated earlier, Mr. Hutton was interested in opportunities and ideas that would help him increase his wealth opportunities as well as which would include investments of different sort.
At the time, the market environment for traditional investments was not exceptionally good, and this was an investment option that I thought and we discussed as being a possible opportunity for him to pursue.
Q. When did you arrange conference calls for Mr. Hutton and the law firm of Cantley & Sedacca?
A. I don't recall exactly when, but for the initial meeting, to understand what the concept might involve, I arranged for that conference call to occur.
Q. Who was in the conference call?
A. Well, I'm not sure on the Cantley & Sedacca end of things, I want to say it was Beckett Cantley, but it could have been Mr. Sedacca at that time. And that's who was on that end.

Q. Who was on your end?
A. Myself, Mr. Hutton, I believe Scott Hewitt was there, and Marc Kaplan.
Q. Who is Marc Kaplan?
A. Marc Kaplan is a CPA with the firm of AGH, and he was there to comment on the partnership rules and help with the understanding of that.
Q. Would you consider yourself Mr. Hutton's investment advisor?
A. I would not.
Q. Had you ever sold investments to Mr. Hutton before this transaction?
A. I've sold him -- actually, Mr. Hutton directly? We had one variable life contract that was actually split between himself and the company. That would be the only investment.
Q. Is that a kind of life insurance with self directed investments in it?
A. Yes, it is a life insurance policy with mutual funds, self directing funds in it.
Q. Do you remember what sort of investments were in this variable annuity contract?
A. There was a large cap stock, there was mid cap stock, small cap stock, and international,

as well as guaranteed.
Q. Are these mutual funds?
A. They are mutual funds.
Q. So it's a small cap mutual fund?
A. Yes.
Q. And large cap, et cetera?
A. Correct, separate investment accounts.
Q. And before and up until you contacted Mr. Hutton about this particular transaction, what sort of things had you sold to him?
A. As I mentioned, the variable life contract. As far as Mr. Hutton directly, that would be exactly -- that'd be the only thing that I'd sold him.
Q. You sold things to him for his entities or to his entities?
A. I did.
Q. And what were they?
A. Variable life contracts on key people, and we had a 401(k) plan before then. Those would be the only two things.
Q. Was the 401(k) through Massachusetts Mutual?
A. It was.
Q. Were all these other mutual funds, et

cetera, in variable annuities, were they through Massachusetts Mutual?
A. They were.
Q. Before introducing Mr. Hutton to this particular transaction, had you ever sold him anything that was not a product of Massachusetts Mutual?
A. To him personally or to his entity?
Q. To either?
A. To his entity, there was, I believe, a Jackson National Life Policy that was sold on one of his key people for the company.
Q. A life insurance policy?
A. Correct.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 2.)
Q. Do you know what Exhibit 2 is?
A. I do.
Q. What is it?
A. It is an intake summary.
Q. What's an intake summary?
A. I believe it's for general information of the client.
Q. Where did you get this?

A. This came from the Cantley & Sedacca firm.
Q. And why did they send you this?
A. They sent this to me to forward to Mr. Hutton for general information.
Q. So Mr. Hutton filled it out?
A. I believe I assisted Mr. Hutton in filling it out.
Q. And did you send it back to Cantley & Sedacca?
A. As I recall, I believe I did.
Q. And what is Line 6?
A. I don't think I know.
Q. Oh, okay. Did Cantley & Sedacca pay you or AGH a referral fee for referring Mr. Hutton to them?
A. I'm sorry, ask the question again.
Q. Did Cantley & Sedacca pay either you or AGH a referral fee for referring Mr. Hutton to them?
A. Cantley & Sedacca paid a referral fee to AGH Wealth Managements Solutions.
Q. Are you a partner of AGH Wealth Management Solutions?
A. I was a, yes, an officer and owner of AGH

Wealth Management Solutions.
Q. I expect an objection, but I have to ask anyway, how much was the referral fee?
MR. MALONE: Counsel, as you anticipate, we object to the amount of the referral fee. Again, as we talked about earlier, this is an issue we believe ought to be properly covered by a protective order and we've been unable to get one reached thus far. We're certainly willing to let Mr. Hanning say that we got a referral fee, but the amount at this point we object to, and I'm instructing him not to answer without the protective order.
Q. Was the referral fee de minimis?
A. Define de minimis.
Q. Very small?
A. I don't recall.
Q. Did you disclose to Mr. Hutton that Cantley & Sedacca had paid AGH a referral fee because you referred him to them?
A. Yes.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 3.)
Q. This is Exhibit 3. Do you know what

Exhibit 3 is?
A. Yes, I do.
Q. What is it?
A. It is an agreement for legal services.
Q. Have you seen it before?
A. I have.
Q. When did you see it?
A. I remember seeing it back in October 4th of 2001.
Q. Did you give this to Mr. Hutton?
A. I believe I did.
Q. I'd like to look at the first paragraph on the first page which lists representations that Mr. Hutton is making. He represents that he or his financial advisor possesses the knowledge and experience in financial and business matters that ensures his or his advisors capability to evaluate the merits and risks of the investment.
Did you possess the knowledge and experience in financial business matters to evaluate the merits and risks of the MLD transaction?
A. I did not.
Q. Did you represent to Mr. Hutton that you had the knowledge and experience to evaluate the

merits and risks of the investment?
A. I did not.
Q. Did he ever ask you to evaluate the merits and risks of the investment?
A. I don't recall.
Q. Did you ever give him an opinion about the merits and risks of the investment?
A. I don't recall.
Q. To your knowledge, did Mr. Hutton have reason to believe that you had knowledge and experience in financial and business matters so as to evaluate the merits and risks of the MLD investment?
MR. MALONE: Object to the form of the question as calling for speculation, but you can answer it, if you can.
A. Could you ask the question again?
Q. Well, I don't think it's speculation.
Have you ever given Mr. Hutton reason to believe, had you given him reason to believe that you had the knowledge and experience in financial and business matters to evaluate the merits and risks of a market linked deposit transaction?
A. No, I don't believe I did.
Q. Did you ever give Mr. Hutton an opinion

about whether the tax benefits generated by the transaction would be upheld if the IRS challenged them?

A. I did not.

(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 4.)

Q. Do you know what this Exhibit is, Exhibit 4?

A. I know it's an e-mail.

Q. Was it an e-mail that you received?

A. It indicates that I did receive it.

Q. First of all, do you know what the subject is, re: Leman's strategy. Do you know what Leman's strategy is?

A. I don't know what it is. I know it's a term that is used for a strategy that Cantley & Sedacca was producing.

Q. What, to your knowledge, was that strategy?

A. I really don't know what it was.

Q. Do you know if it had anything to do with the year 2001?

A. I suppose it would, because of the date.

Q. Do you know?

investments that he's remained with.
Q. Did you present him an opportunity or were you involved in an investment opportunity in 2002 similar to the 2001 transaction?
A. Ask the question again.
Q. Did you present him with an investment opportunity in 2002 similar to the 2001 transaction?
A. I don't recall.
Q. Did you approach Mr. Hutton with respect to the 2001 transaction or did he approach you?
A. Well, Mark and I talked frequently and so I suppose I would have approached him in conversation.
Q. Does he ever approach you and ask for investment opportunities?
A. Occasionally.
Q. Is the transaction he engaged in in 2001 any different than any other opportunities throughout the years that you may have approached him with?
A. Well -- ask the question again, I'm sorry.
Q. Is this 2001 transaction, the MLD transaction, is it similar or quite a bit

different than other opportunities you may have approached him with?
A. Well, it's very different from the things I work with Mark on.
Q. Is he a conservative investor, typically, versus a high risk investor?
A. I don't know. I believe Mark -- I think Mark takes calculated risks.
Q. Do you consider the MLD transaction a calculated risk?
A. I don't know if I have enough knowledge to say that it was, but I think so.
Q. Is it a high risk investment?
A. Yes.
Q. Could he make a lot of return if it was successful?
A. It was my understanding he could.
Q. Does Mark Hutton always go with what you advise him to invest in?
A. No, he doesn't.
Q. Has he asked you questions about the investment?
A. He does.
Q. Is it typical for Mark to get other professionals involved if he doesn't understand?

A. Yes, it is.
Q. And did he get other professionals involved in the MLD transaction?
A. Yes, he did.
Q. And who was that other professional that you're aware of?
A. Scott Hewitt.
Q. And did Scott participate in a phone conference with you and Mark and Cantley & Sedacca?
A. He did.
Q. Did you ask questions of Cantley & Sedacca on that phone conference, do you recall?
A. I don't recall.
Q. Do you recall if Scott asked questions during that phone conference?
A. Yes, he did.
Q. Did Mark ask questions?
A. Yes, he did.
Q. Why do you think Mark asked questions with respect -- prior to investing?
A. I'm sorry?
Q. Why do you think Mark may have asked questions?
A. To understand the nature of the product

and transaction.
    Q. Have you worked with Mark on deferred compensation arrangements?
    A. Yes.
    Q. And you testified you work with him on split dollar policies?
    A. Yes.
    Q. Are there tax benefits on either of those arrangements with respect to the company?
    A. Yes.
    Q. Are you involved in a lot of transactions involving deferred compensation or split dollars with other companies?
    A. I am.
    Q. Are your other clients concerned with the tax benefits that they may get --
    A. Yes.
    Q. -- with respect to those investment strategies?
    A. Absolutely.
    Q. Is it unusual for a client not to be concerned with tax consequences when they invest?
    A. Yes, it is.
    Q. Can you explain to Mark Hutton the advantages or disadvantages of investing in a

split dollar policy?
A. Yes, I can.
Q. And can you explain the tax consequences -- you don't have to, but could you explain the tax consequences to Mr. Hutton?
A. I could.
Q. Can you explain the tax consequences to Mr. Hutton of investing in a deferred compensation?
A. I can, and I might add that I refer to his tax advisor for clarification as well.
Q. In general?
A. In general.
Q. Okay. You did not advise him as to tax advice with respect to the MLD transaction; is that correct?
A. That's correct.
Q. You testified there was another individual on the phone conference. Who was that; a CPA?
A. Marc Kaplan.
Q. And did Marc Kaplan provide clarification as to partnership rules?
A. He did.
Q. And was that for Mark's benefit and

understanding?
A. On whatever the investment component was to the transaction.
Q. Did you run any calculations under the Black/Scholes formula?
A. I don't even know what the Black/Scholes formula is.
Q. As I understand it, there's options involved in the MLD transaction?
A. And that very well could be, I don't know.
Q. On what did you base your understanding that the option trade could be profitable?
A. From Cantley & Sedacca.
Q. From anything else?
A. None.
Q. You said that you were able to explain the tax consequences of deferred compensation arrangements and split dollar insurance. Are those both basically insurance products?
A. Split dollar is an insurance technique. Deferred compensation is not necessarily a life insurance product.
Q. What company did you use for the deferred compensation agreements -- arrangements that you

did for Mr. Hutton?
A. Well, two different things. Deferred compensation agreements are written by attorneys, and products themselves, if there is an informal funding, would have been Massachusetts Mutual Life for the variable life component.
Q. To Massachusetts Mutual for the deferred comp arrangements you did with Mr. Hutton; correct?
A. Correct.
Q. Could you explain the consequences of the MLD transaction?
A. I could not.
Q. Was Marc Kaplan a member of AGH?
A. The question was, was he or is he?
Q. Was he in 2001?
A. He was.
Q. Was he a partner?
A. No.
Q. What was he?
A. He was a CPA, that's all I know.
Q. An employee?
A. Correct.
MR. STODDART: That's about all I have.

Bryan Hanning
______________________________
BRYAN HANNING

STATE OF KANSAS )
) ss:
COUNTY OF )

Subscribed and sworn to before me, the undersigned authority, this, the 13th day of June, 2007.

KAY A. WHITE
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp 3/19/2008

~~IMPORTANT~~
~~INFORMATION ENCLOSED~~

Kay A. White
______________________________
NOTARY PUBLIC

My appointment
Expires: 3/19/2008

IN RE: Clearmeadow Investments V USA

Case No. 05-1223 T

CORRECTION SHEET FOR DEPOSITION OF

BRYAN HANNING

Page 17 Line 8 reads as follows: I don't recall

Should read: I did not.

Reason for change: ____

Page ____ Line ____ reads as follows: ____

Should read: ____

Reason for change: ____

Page ____ Line ____ reads as follows: ____

Should read: ____

Reason for change: ____

Page ____ Line ____ reads as follows: ____

Should read: ____

Reason for change: ____

Page____Line____reads as follows:___________________

_________________________________________________________

Should read:_____________________________________________

_________________________________________________________

Reason for change:_______________________________________

Page____Line____reads as follows:___________________

_________________________________________________________

Should read:_____________________________________________

_________________________________________________________

Reason for change:_______________________________________

I certify that I have read my deposition in the above case and request that the above changes be made.

6-13-07

(date)

Signature of Witness

# C E R T I F I C A T E

STATE OF KANSAS )
) ss:
SALINE COUNTY )

I, Donna M. Lytle, Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition by him given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office, this 22nd day of May, 2007.

DONNA M. LYTLE STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Donna M. Lytle

Donna M. Lytle, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

AFFIDAVIT

I, Bryan Hanning, being first dully sworn, hereby state the following under penalty of perjury:

1. I have been a personal friend and investment and insurance advisor to Mark E. Hutton for a number of years. I am also a registered representative of MML Investor Services, Inc. and officer/owner of AGH Trusted Advisors, LLC (formerly known as AGH Wealth Management Solutions, LLC).

2. In 2001, I approached Mark E. Hutton and informed him of an investment strategy offered through the law firm of Cantley & Sedacca, LLP that I thought would be a potential investment opportunity for him.

3. I arranged for conference calls with Mark E. Hutton and the law firm of Cantley & Sedacca, LLP, so that Mark could obtain additional information regarding the investment strategy.

4. The investment strategy was comprised of certain foreign currency transactions.

5. I participated in the first conference call with Cantley & Sedacca, LLP, so that I could assist Mark in understanding the investment.

6. It is my understanding that Mark E. Hutton also sought out the advice of his personal accountant, Scott Hewitt, CPA, with respect to the investment strategy proposed by Cantley & Sedacca, LLP.

7. I continue to be Mark E. Hutton's personal investment and insurance advisor through today.

Further the affiant saith not.

[signature]
Bryan Hanning

DEFENDANT'S EXHIBIT 32 A
PENGAD-Bayonne, N. J.

Subscribed and sworn to before me, this 19th day of September, 2006.

[Notary Seal:]

JACQUELINE A. FARMER
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 3/25/09

Jacqueline A. Farmer
Notary Signature

NOTARY PUBLIC
My commission expires: 3/25/09.

DEPOSITION EXHIBIT
1 - Hanning

# INTAKE SUMMARY

**Please Email Back to bgcantley@msn.com**

**Questions 1 – 13 for Deal Documents**
**Questions 14 – 20 for Deutsche Banc Documents**

| | |
|---|---|
| Cantley & Sedacca Primary Contact | **BGC** |

| | |
|---|---|
| 1. Referred by: | Bryan Hanning |
| 2. Name of Client (s) | Mark E. Hutton<br>7118 W. Clearmeadow Ct.<br>Wichita, KS 67205<br>316-721-1571<br>316-942-8881 |
| 3. Client's Residential Address, Phone, Fax | See above. |
| 4. Client Social Security # or Fed I.D. # | 509-58-~~1564~~ 1624 |

DEFENDANT'S EXHIBIT 32B

DEPOSITION EXHIBIT
2-Hanning

| | |
|---|---|
| 5. Individual's Breakdown of Shares / Percentages of Company (if more than One participant) | n/a |
| 6. Amount to be Invested Into Investment Strategy | $250 (10% x 1m) + $37,500 (DB 1.5%) = 287.5k total |
| 7. Name of Client LLC to be used with Dan Brooks. (Entity #1) | New |
| 8. LLC Entity #1 Business Address (if same as # 3 write "SAME") | Same |
| 9. State of Organization of Newly Formed LLC (Entity #1) | De |
| 10. If forming a Corp. or LLC in cases where loss is in S Corp. or Partnership, or if we have more than one client – <br><br> What is the Name and Type of this Entity? (Entity #2) | n/a |
| 11. If the answer to #10 is "yes" – <br><br> What is the Business Address for this New Corp. or LLC (Entity #2) | n/a |
| 12. If the answer to #10 is "yes" – <br><br> What is the State of Organization of Corp. or LLC (Entity #2) | n/a |

| | |
|---|---|
| 13. What is the County of the Client's Principle Business (Entity #1 & #2) | Sedgwick |
| 14. Bank Reference (Bank Name, Branch, Address, Contact Name) | Commerce Bank<br>150 N. Main<br>Wichita, KS 67202<br>John Frazee |
| 15. Who is the Client's Employer | Self |
| 16. Employer Address | Self |
| 17. Job Title | Self |
| 18. Occupation | Self |
| 19. Dependents | 2 (age 17, 20) |
| 20. Birth Date | 8-5-1954 |

**CANTLEY & SEDACCA, LLP**
ATTORNEYS AT LAW
3414 PEACHTREE ROAD, NE, SUITE 105
ATLANTA, GEORGIA 30326
TEL. (404) 442-2108
FAX (770) 234-6686

BECKETT G. CANTLEY
PARTNER

ATLANTA, GA
DALLAS, TX
SAN FRANCISCO, CA

DEFENDANT'S EXHIBIT 32 C

DEPOSITION EXHIBIT 3 - Hanning

October 4, 2001

Mr. Mark E. Hutton
2233 S. West Street
Wichita, KS 67213

**Re: Agreement for Your Legal Services**

Dear Mark:

Our law firm appreciates having the opportunity to provide legal services to you regarding your tax planning. As part of our service to you, it is important that we both understand the scope of our representation and our agreement regarding fees. You have engaged us to review the tax ramifications of a **market link deposit** investment strategy (the "Investment") and to research and review the law supporting the issuance of a legal opinion letter for this Investment (the "Opinion") and to issue an Opinion. Also, we have not been engaged to provide any type of advice regarding investment matters. The Opinion will be based on the relevant facts provided to us by you and by **Deutsche Bank** ("Bank"), certain representations made to us by you and by Bank, and on the state of the law at the time it is rendered. It will express our best professional judgment, applying a "more likely than not" standard, and will not be a guarantee.

The total flat fee for this service is **$150,000** (the "Flat Fee"). We request that you now forward the Flat Fee to our client escrow account. The Flat Fee will be considered earned as of **October 4, 2001** and you agree that we may bill you for the service immediately and place the Flat Fee into our general funds. However, we agree to continue our review of the Investment until the Opinion is issued. If you have paid us the Flat Fee and we have not issued an Opinion by April 15, 2002, we will refund the Flat Fee. Your execution of this Agreement indicates your approval of this arrangement.

The Investment involves a substantial investment of your assets. You have agreed that you shall bear all the economic risk of the Investment. In making the Investment that will be required as a part of the Investment, you have relied solely upon your (and your financial advisor's) independent investigation of all matters or concerns regarding the Investment and the Investment. You (or your financial advisor) possess the knowledge and experience in financial and business matters that ensures your (and your financial advisor's) capability to evaluate the merits and risks of the Investment and you are therefore making an informed decision as to the Investment. To assist us in explaining the Investment to you, we have engaged one or more financial advisors whom we will pay a fee for their assistance to us. We are not financial advisors and have expressed no opinion as to the investment suitability of the Investment. Likewise, any financial advisor engaged by us has not expressed an opinion on the Investment on our behalf. You acknowledge that we have made no guarantee regarding the successful determination of this matter and that all expressions relative thereto are matters of our preliminary opinion based upon our current knowledge of the subject matter.

We emphasize that any information that you provide us during this representation must be complete and accurate to the best of your knowledge as we will be relying on such information in providing your legal services. We also emphasize that all advice and/or planning is based on the current status of the Internal Revenue Code of 1986, as amended, and related tax laws (the "Tax Law"). We cannot predict with any accuracy any future change in the Tax Law and do not represent that the Tax Law will not result in a need for a change to your planning. This agreement when signed represents the entire agreement of the parties and all of the prior discussions concerning the entire subject matter hereof are merged herein and shall be considered to be a part of this agreement and shall not survive the execution hereof. This agreement cannot be changed verbally and can only be changed by another written agreement that must be signed by an authorized representative of this firm. Please indicate your approval of each of the terms of this engagement and fee agreement by signing below. A copy of this agreement is also enclosed for your files.

As you are aware, investment in the Investment in the manner contemplated by Bank is anticipated to provide you with substantial tax benefits. Because of these benefits, there is a possibility that if your return is reviewed, the IRS will audit your tax return, and that your tax return will be scrutinized. Except as provided in the next paragraph, issuance of the Opinion to you ends our responsibility with regard to your investment and our engagement in this matter. We will have no obligation or responsibility thereafter for advising you of tax law developments. You should understand that your reliance on the Opinion will not absolve you of the need to demonstrate that, in addition to potential tax benefits, you invested in the Investment because you believed, based on your own independent evaluation, that you had a realistic possibility of realizing a reasonable economic profit from your investment without regard to any tax benefits.

We also agree to provide you an audit defense in the event that you alert us that your require our representation in connection with an examination by the Internal Revenue Service of the Investment as reported on your federal income tax return. Such audit defense shall be provided to you at both the audit stage and at the IRS Appeals Office stage (if necessary). Such audit defense shall not include representation at the U.S. Tax Court, U.S. District Court or Court of Claims, although we would be happy to discuss such a defense with you should the need arise. A second nonrefundable flat fee of **$25,000** ("Second Fee") will be due upon your alerting us that you require our representation. The Second Fee is limited to representation in connection with the Investment and does not apply to any other items or transactions on your return that may be questioned by the Internal Revenue Service.

Our engagement is to represent you and only you. Our representation does not extend to any affiliate of yours, and you should be aware that we will not be considered to have established an attorney-client relationship with any such affiliate for any purpose.

Sincerely,

CANTLEY & SEDACCA, LLP

Beckett G. Cantley

APPROVED, AGREED TO AND ACCEPTED:

By: ______________________________ Date: ____________
**Mark E. Hutton**

**Bryan S. Hanning**

**From:** Jeremy Nerenberg [jnerenberg@att.net]
**Sent:** Thursday, December 06, 2001 9:14 AM
**To:** Mark Hutton
**Cc:** Bryan S. Hanning
**Subject:** Re: Lemans strategy

Gentlemen:

I spoke too soon in my prior email. Apparently, the entire remaining balance would have to be triggered next year (e.g., no amount can be carried over into 2003). Please contact Ed Sedacca at 972-361-0090 should you have any questions regarding this matter. I will assume that you would still like to take down $1,005,000 of the loss for year 2001, and thus take down the entire remaining balance for year 2002 -- is this correct?

Best Regards:

Jeremy Nerenberg
Cantley & Sedacca, LLP
Attorneys At Law
5220 Spring Valley Rd., Suite 610
Dallas, TX 75254
214-264-1825 (cell)
972-233-6175 (office)
972-361-0644(fax)
jnerenberg@att.net

Other Offices:
Atlanta, GA
San Francisco, CA

Unless otherwise stated herein, the information contained within this message is not intended to be legal advice and is not to be relied upon as such. Furthermore, the information is confidential and privileged, intended only for the named addressee. If the recipient is other than the intended addressee, any dissemination, distribution or copying of this material is strictly prohibited; please destroy this email and contact the sender at the above address. Your cooperation would be greatly appreciated.

----- Original Message -----
From: "Mark Hutton" <Mhutton@huttonconstruction.com>
To: <BSHanning@aghlc.com>; <jnerenberg@att.net>
Sent: Friday, November 30, 2001 5:07 PM
Subject: RE: Lemans strategy

Brian / Jeremy

Scott and I met today and figured this out. We would like to take down $1,005,000 of loss for year 2001. I would think the balance for next year but if possible I would like to wait until later in 2002 to decide on this. Is that possible?

DEFENDANT'S EXHIBIT 32D
PENGAD-Bayonne, N.J.

DEPOSITION EXHIBIT 4-Hanning