IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,
Plaintiff,
V.
THE UNITED STATES,
Defendant.

D E P O S I T I O N

The deposition of SCOTT R. HEWITT, taken on behalf of the Defendant pursuant to the Federal Code of Civil Procedure and Notice before:

DONNA M. LYTLE, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

a Certified Shorthand Reporter of Kansas, at the Epic Center, 301 N. Main Street, Suite 1200, Wichita, Kansas, on the 8th day of May, 2007, starting at the hour of 9:30 a.m.

**Stoddart Decl.**
**Exhibit 33**

A P P E A R A N C E S

The plaintiff appeared by Mr. Mark Hutton and by its counsel, Mr. Tom Pliske, of the firm Gasaway & Stientjes, LLC, 1120 Olivette Executive Parkway, Suite 220, St. Louis, Missouri 63132.

The defendant appeared by its counsel, Mr. Robert Stoddart, of the U.S. Department of Justice, Tax Division, P.O. Box 26, Washington, DC 20044.

SCOTT R. HEWITT,

of lawful age, having been first duly sworn on his oath to state the truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. STODDART:

Q. Good morning. My name is Bob Stoddart, I represent the United States in this case, with the Justice Department.

Could you please give us your full name and your address?

A. Scott R. Hewitt, home address or business address?

Q. Either.

A. 205 West Second, Wichita, Kansas, 67202.

Q. May we have your phone number?

A. 316-269-4500.

Q. And have you ever been deposed before?

A. Yes.

Q. Oh, good. Then I don't have to stress that the transcript is only from our oral indications and that you can't nod your head or make gestures and expect to be understood.

Are you able to give full and complete answers today; is there any reason why you can't?

A. To my knowledge, no.
Q. So you're not on any debilitating drug or anything of that sort?
A. No.
Q. I may be, I'm on antihistamines. We might as well begin.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 1.)
Q. Do you know what Exhibit 1 is?
A. Yes.
Q. What is it?
A. It was an affidavit that I signed regarding this case.
Q. Paragraph 3, you say you've been Mark Hutton's personal accountant from 1993. In that capacity, what have you done for him?
A. I've done all his personal tax returns, his corporate tax returns, consulted on various business items with Mark.
Q. What sort of business items?
A. Tax matters regarding asset purchases, building purchases, any of the things that Mark does, business or personally wise, that would have a tax impact.

Q. Has your advice and your consultation been exclusively about the tax affect of these purchases?
A. I would say, yes, for the most part.
Q. Have you become familiar basically with Mr. Hutton's holdings and his assets?
A. Through preparation of the tax returns, I'm aware of his holdings and assets.
Q. Now, to get to what this case is about, in 2001, Mr. Hewitt (sic) entered a transaction or investment or tax shelter that is supposed to have generated certain tax losses that was claimed on the 2001 and 2003 amended return as a loss.
Do you know or are you familiar with that transaction which involved Deutsche Banc, among others?
A. Yes, I am.
Q. So to avoid a lot of difficulty prefaces, I'll just called it the market link deposit transaction, or the MLD transaction.
A. Okay.
Q. When did you first become familiar, first hear about the MLD transaction?
A. During Mark's discussions with, I believe it was the Cantley & Sedacca law firm. Mark gave

me a call and we had a meeting and a telephone conference with Mark and Bryan Hanning and myself on the phone with Ed Sedacca, I believe.

Q. When was that?

A. I don't remember the date. Prior to the time Mark invested in the transaction.

Q. So before October of 2001?

A. I would guess that'd be right.

Q. Did you have any other calls with Cantley & Sedacca, other than your first one?

A. We had a second brief call to clarify a few things after the first one, and then when we're preparing the 2001 return, we had a brief phone call with Mr. Sedacca to get a clarification on reporting.

Q. What was the clarification you got on reporting?

A. It's been a long time. Just assurance of the way I prepared the return, that it was reasonable. There wasn't anything real specific, just general questions. I don't, frankly, remember all the conversation.

Q. Had you given a copy of the return to Mr. Sedacca to look at?

A. No.

Q. Back to the first meeting, do you remember what the conversation was about?
A. It was mainly Mr. Sedacca explaining the investment opportunity and the risks, the reward scenario of what the transaction could produce. Then question and answers. Mark had questions, I had questions, Bryan Hanning asked questions, and then we left the -- got off the phone call with Mr. Sedacca and basically adjourned the meeting.
Q. What were your questions?
A. My questions involved the tax aspects, what happens if the MLD has profit, how is that going to be taxed, what happens if it has a loss and the tax aspects of that. That's pretty much my involvement in that.
Q. Do you remember what profit items you were considering?
A. The currency transactions?
Q. Um-hum.
A. I believe they were Euros, but those transactions, if they had profit, my questions were, were they long-term capital gains, were they ordinary income, those kind of things.
Q. Do you remember the second meeting you had?

A. It was just a more brief meeting, just to clarify -- I was asked to be there, it mainly didn't involve tax, it was Mark and Bryan Hanning and another gentleman named Marc Kaplan who worked for AGH, Allen, Gibbs & Houlik. It was more just clarifying -- a few clarifying questions that Mark had on the transaction.
Q. What were those few final questions?
A. I don't remember now.
Q. Did you ever do an independent examination of the financial aspect of this transaction?
A. Of the financial side, no. That's Mark and Bryan.
Q. So you never gave Mr. Hutton any assurance that he had a reasonable opportunity to make a profit independent of the tax benefits that he would get?
A. I did not. I have no expertise in that area.
Q. If you look at Paragraph 9 of Exhibit 1, you say you discussed the investment with Mr. Hutton and noted its possibility of a high return. Also the risk of a large loss.
When you noted the possibility of a high

return, did you yourself think that it had a possibility of a high return?

A. It's like any investment, I was -- my thinking was there was potential for a return.

Q. Why was there potential?

A. Just from the discussions that I was -- I mean, I was in the room during the discussions of the investment and I felt like there'd be a potential for -- even though risky, it had a possibility of having a return.

Q. Did you yourself independently from your knowledge of finance believe that it had a return or you believed that it had a potential of a return, or were you taking the possibility of return on faith, so to speak, from what Cantley & Sedacca was saying?

A. No real knowledge of that. Probably more on faith, I would say.

Q. In Paragraph 11, you say that you were unaware at the time of providing any advice to Mark Hutton regarding the MLD investment, that it had been determined to be a listed transaction.

Do you remember when it was determined to be a listed transaction?

A. I believe that was in 2004. I may be

wrong on that but that's when I -- I think it happened.
Q. Okay. And you say in Paragraph 13 that you reviewed the extensive legal opinion from the law firm of Cantley & Sedacca; is that true?
A. That's true.
Q. Did you get a copy of the legal opinion from Cantley & Sedacca?
A. I had acquired a copy of Mark's, yes, but I did not keep a copy of it. I gave it back to Mark.
Q. When did you give a copy back?
A. After I reviewed it.
Q. Did you review it before you did the tax return?
A. Yes.
Q. And did you return it before you produced the tax return?
A. Yes.
Q. I'll tell you that the return that I got from Mr. Hutton was printed on only the odd numbered pages, like one, three, five.
MR. PLISKE: Objection, you said the return.
MR. STODDART: I'm sorry, you're

right.
Q. The opinion letter from Cantley & Sedacca, do you remember if the opinion letter from Cantley & Sedacca that you got had the even numbered pages?
A. I have no idea. I would assume it would have but I don't know. Not anything I really looked at.
Q. You didn't look to see if it had all the pages?
A. It was bound, I assumed it would have had them. I just made an assumption.
Q. You reviewed the opinion, didn't you?
A. Um-hum.
Q. Did you notice anything missing?
A. Not to my knowledge.
Q. Okay.
A. No, I didn't notice anything missing.
Q. You remember if it had the even numbered pages?
A. I can't remember that. It didn't appear to be -- anything out of order in the document.
Q. Okay. You then eventually prepared tax returns for Mr. Hutton. For the year 2001, what tax returns did you prepare?

A. There would have been a Clearmeadow Capital Corp, which was an LLC, Clearmeadow Capital Company, I believe, is the name of it, an S corp, and then Mark Hutton's personal return and also Mark Hutton's business return.
Q. I'm going to get out another exhibit here.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 2.)
Q. Do you know what Exhibit 2 is?
A. Yeah.
Q. What is it?
A. It was a request to Mr. Sedacca to get an example return during the time we're preparing the return to make sure we knew how to report the -- report everything.
Q. Did you request a sample return from Mr. Sedacca?
A. No, my associate did.
Q. Did you ask this associate to?
A. Yeah.
Q. Who is the associate?
A. Amy Clupny.
Q. And her name is on the --

A. Her name is misspelled, C-L-U-P-N-Y.
Q. Thank you.
Did you ever receive this sample return?
A. Yes.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 3.)
Q. Do you know what Exhibit 3 is?
A. It appears to be the sample return.
Q. Is it?
A. Yes, it is.
Q. Do you remember -- oh, the sample return for which entity?
A. It'd been the Clearmeadow Investments, LLC return.
Q. The partnership?
A. Um-hum.
Q. Did you follow this sample return when you did your own return?
A. Actually, we had already prepared the return before we requested this and we were pretty much right on. We didn't agree with one number, I believe.
Q. So all of your return is basically the same as Cantley & Sedacca except for the change of

one number?
A. I believe that's correct.
Q. And is the one number on Page 3 of this exhibit?
A. Yeah, I believe so.
Q. And just to be sure, what line is that number on?
A. 14b(1).
Q. And the handwritten number, is that the number that you put in?
A. I believe it is. I'd have to look at the Clearmeadow return.
Q. I note on the front of this sample exhibit in Line H(1) that there's an X by cash, so the cash accounting method was chosen; is that correct?
A. That's what they suggested. I'm not sure how we reported it on Clearmeadow, I frankly don't remember.
Q. Would it refresh your memory if I were to show you a copy of the return --
A. Sure.
Q. -- you prepared.
A. Yeah, we looked at cash basis, also.
Q. Why did you elect cash basis?

A. Normally on an LLC investment, I almost always select cash, unless there's a reason to go accrual.

Q. Do you know the Internal Revenue Code prohibits the use of the cash method for tax shelters?

A. At this point in time, we didn't think this was a tax shelter.

Q. Do you know the definition of tax shelter that applies to the choice of accounting method provision?

A. Frankly, no.

Q. I believe it's a partnership, one of the many definitions, a partnership, a significant purpose of which is the avoidance of federal income tax.

Did you consider whether Clearmeadow was a partnership, a significant purpose of which was the avoidance of federal income tax?

A. Absolutely not, it was an investment partnership.

Q. And it's significant purpose was not --

A. Not in my mind, no.

MR. STODDART: Let's go off the record for a moment.

(WHEREUPON, an off the record
discussion was had, after which
the following:)

Q. I would like these exhibits back, because they're not exhibits to your deposition, but I'll tell you it is an exhibit that's captioned at the top Investor Representations.

Have you ever seen this document before?

A. I don't recall ever seeing this before.

Q. May I have those back, please?

A. (Complies with request).

(WHEREUPON, the reporter marked
for identification Deposition
Exhibit No. 4.)

Q. Have you ever seen Exhibit 4?

A. Yes, I have.

Q. And what is Exhibit 4?

A. Agreement for legal services from Mr. Hutton.

Q. If you'd look at Page 2, and look at the first sentence of the second paragraph of Page 2, states, I quote, as you are aware, investment in the investment in the manner contemplated by Bank is anticipated to provide you with substantial tax benefits; correct?

A. That's what it says.
Q. Wouldn't you think that an investment that provides substantial tax benefits has a significant purpose in the avoidance of federal income tax?
A. I didn't view it that way, I viewed it as an investment strategy.
Q. An investment -- about how much out of pocket did Mr. Hutton pay?
A. 150,000, I believe.
Q. It's a bit more than that, but how much in losses did you claim altogether?
A. I don't recall off the top of my head.
Q. Was it in excess of $2 million?
A. Don't know without looking.
Q. Let's look. Would it refresh your memory if you were to take a look at your 2001 partnership return?
A. Sure.
Q. You might try looking at Line 23. Line 23 is distributions of property other than money? What was that property?
A. Basis and open securities.
Q. And what were the securities?
A. Exact securities, I'm not sure.

Q. Were they Canadian dollars?
A. Whatever CAD currency stands for. I assume that's Canadian, yeah.
Q. And those dollars were later sold; correct?
A. I believe they were, yes.
Q. And they were sold for pretty much their face value, weren't they?
A. Don't know the answer to that, off the top of my head.
Q. You prepared the individual return, didn't you?
A. Yes.
Q. I can tell you as a fact that they were sold for pretty much their face value.
A. Okay.
Q. How much would the loss have been?
A. Depends on what the face value was.
Q. It was about a thousand dollars and the loss would have been over two million; correct?
A. Yep.
Q. Pretty good investment if you put in 150,000, 300,000, and you get a tax loss of over two million; correct?
A. That's your opinion.

Q. I understand it's not your opinion, so it's your opinion if you make an investment of 300,000 and get a tax loss of over two million, a significant purpose of that investment is not the avoidance of federal income tax?
A. In my opinion, that was not the reason we went into this investment.
Q. Your opinion is your opinion.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 5.)
Q. Do you know what Exhibit 5 is?
A. It was work papers used in preparation of tax returns.
Q. They're handwritten. Whose handwriting is it?
A. Amy Clupny.
Q. Did she actually prepare the return?
A. Yes.
Q. Did she prepare it under your supervision?
A. Yes.
Q. What does she mean, if you know, the bottom of the first page of this Exhibit, establish deduction in both year?

A. I'm not sure.
Q. As I understand this transaction, Mr. Hutton's supposed to have paid a premium for a long position equaled to two and a half million U.S. dollars and on the same day, he's supposed to have received a premium for a short position equaled to slightly less. Do you recall about the same way?
A. Frankly, I don't, I don't remember that.
Q. To save time, I will just assure you that that is the case and you can just assume it's hypothetical, if you like.
A. Okay.
Q. But here we have a transaction buying basically operations; correct, buying and selling?
A. Correct.
Q. So Mr. Hutton purchased an option, let's say for two and a half million, and he wrote an option for slightly less. He did all of this in October of 2001, the transaction closed on December 14th of 2001, and what are the tax effects of doing that?
A. Off the top of my head, I don't know the answer to your question.
Q. Well, he paid money, he received money.

Is the money he received taxable income?
A. Potentially.
Q. And when options close, do you recognize taxable income?
A. I would say normally you would.
Q. Did he recognize taxable income in this case for the short premium he received in the amount of nearly two and a half million dollars?
A. I don't know that he ever received two and a half million dollars.
Q. True, he did not. Did he pay two and a half million dollars?
A. Not that I'm aware of.
Q. Okay.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 6.)
Q. Do you know what Exhibit 6 is?
A. It's a money transfer request.
Q. This was produced from your files?
A. I remember seeing it, I'm not sure of the significance of it, honestly.
Q. Well, let's look at what it says on its face. Mr. Hutton is asking a bank to transfer 25 million U.S. dollars and to pay premiums of two

and a half million dollars. You said before you were more or less familiar with Mr. Hutton's assets. To your knowledge, did he have 27 and a half million dollars to invest in this transaction?
A. Not aware that he did.
Q. Here's another Exhibit from your files that you produced.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 7.)
Q. Do you know what this Exhibit is?
A. It's a Deutsche Banc account statement.
Q. Did you look at this exhibit before you prepared the 2001 return?
A. I assume I did, yes.
Q. Exhibit 6 -- we know that on October 15th, 2001, Mr. Hutton told the bank to transfer out 27 and a half million dollars from his account, and I can tell you that he's also supposed to have received about the same amount at the same time. Do you notice any such transfers on the bank statement?
A. Not on this statement, no.
Q. It is the same bank; correct?

A. I may have told Mr. Hutton, yes, but no one else.
Q. You may have. Did you?
A. I don't remember.
Q. What did you tell Mr. Hutton about your efforts to make sure that the Cantley & Sedacca opinion letter was correct?
Did you ever assure him that you had independently tested those conclusions?
A. Probably not.
Q. Yes or no, please.
A. No.
Q. Did you ever expressly assure Mr. Hutton that if the IRS challenged any of the opinions taken on that return, there was a greater than 50 percent chance that the positions would be upheld?
A. Greater than 50 percent chance it'd be upheld?
Q. Um-hum, expressly say that.
A. No, not to my knowledge.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 8.)
Q. You'll see from the SH number at the

public accountant?
A. Yes.
Q. Approximately when did you receive your CPA license?
A. 1984.
Q. And have you been practicing in public accounting since 1984?
A. Yes.
Q. Do you practice primarily in the tax area?
A. Yes.
Q. Do you conduct audits?
A. A few, yes.
Q. What percent of your work is done in the tax area?
A. Approximately 70 percent.
Q. And in the tax area, does that consist of tax planning?
A. Occasionally, yes.
Q. Do you do tax compliance work on a regular basis, the preparation of tax returns?
A. Yes, um-hum.
Q. Work experience, history, since graduating and getting your CPA license, where have you worked?

A. I worked for -- from '77 to 1984, I worked for Haney, Riffel and Company, local firm. In '85, I started a firm called Hewitt -- Hanneman & Hewitt.
Q. That was 1985?
A. Uh-huh.
Q. Were you a partner?
A. I was a partner with Dale Hanneman, and then in 2004, I split off from him and opened Hewitt and Company.
Q. And you're a partner in Hewitt and Company?
A. Yes, I'm the only partner, only owner.
Q. How many employees do you have?
A. Three full time and two part time.
Q. And earlier when I asked about the type of work that you do, is that the type of work the firm does, also?
A. Yes.
Q. Your background with Mr. Hutton, earlier you stated you've been working with Mr. Hutton since 1993; is that correct?
A. '93 or '94, in that time frame.
Q. And do you prepare audits on his business?

A. I have prepared an audit on his records. Normally, we do reviews for his bonding requirements.
Q. And you prepare the tax returns?
A. Correct.
Q. Earlier you stated corporate tax returns, individual tax returns, Clearmeadow Capital?
A. We prepared that, yes.
Q. Do you prepare any other tax returns on behalf of Mr. Hutton or his business?
A. There's another partnership return.
Q. Which is that?
A. EquipLease.
Q. Do you prepare payroll tax returns?
A. No.
Q. Do you prepare all these returns or are they prepared under your supervision?
A. Prepared under my supervision.
Q. Does Mark ever direct you how to prepare a return?
A. No.
Q. Has he -- would you ever prepare a return as directed by any client?
A. No. We have arguments about which way to report it, but if push comes to shove, I win.

Q. And you're talking with respect to Mr.
Hutton?
A. Correct.
Q. Do you take continuing education classes?
A. Yes.
Q. Are they mandatory in this state?
A. Yes, 80 hours every two years.
Q. And do you take continuing education
classes in tax matters?
A. Yes.
Q. And periodically or recently or always?
A. Well, I mix it probably 60, 70 percent
tax and the rest financial or that kind of thing.
Q. You know Mr. Hutton on a business level.
Do you know him on a social level?
A. Very occasionally.
Q. Would you be in here testifying on his
behalf for any reason other than it being a true
statement?
A. No.
Q. You stated you were involved in the early
discussions with respect to the MLD transaction
for 2001; is that correct?
A. That's correct.
Q. And you were on a phone conference with

Cantley & Sedacca?
A. Yes.
Q. Who was on that phone conference with you?
A. I believe Ed Sedacca at the other end, and Mark and Bryan Hanning and myself.
Q. Why were you on the conference?
A. Mark just asked me to come and listen and give him an opinion on my thoughts about this transaction.
Q. Did you just listen?
A. Mostly.
Q. Did you ask questions?
A. I think we all asked questions as I recall but mine were -- I don't recall what questions I would have asked but I'm fairly sure I did.
Q. You were not prohibited from asking questions?
A. No, no, no, huh-uh.
Q. After that phone conference, do you recall -- I don't know what you did, but did you follow-up in any way after that phone conference?
A. Once Mr. Hutton received the opinion letter, I read through it and evidently didn't do a good job of analyzing it, and then we had another meeting later.

CANTLEY & SEDACCA, LLP
ATTORNEYS AT LAW
5220 SPRING VALLEY ROAD, SUITE 610
DALLAS, TEXAS 75254
TEL. (972) 233-6175
FAX. (972) 361-0644

JEREMY I. NERENBERG
ASSOCIATE

MIAMI, FL
DALLAS, TX
SAN FRANCISCO, CA

March 1, 2002

**VIA FEDEX**

Amy Klupny
229 E. Williams, #310
Wichita, KS 67202

**Re: Sample Tax Return**

Amy:

Enclosed please find a sample tax return as it relates to the market linked deposit investment strategy. If you have any questions regarding this matter, please feel free to call Ed Sedacca or me. Thank you.

Very Truly Yours,

CANTLEY & SEDACCA, LLP

Jeremy I. Nerenberg

DEPOSITION EXHIBIT
2- Hewitt

Enclosures

SH 00106

DEFENDANT'S EXHIBIT
33A
PENGAD-Bayonne, N. J.

CASE # 05-1223

Form **1065** Department of the Treasury Internal Revenue Service
**U.S. Return of Partnership Income**
► See separate instructions.
**2001**

IRS use only — Do not write or staple in this space.
OMB No.1545-0099

For calendar year 2001, or tax year beginning , 2001, and ending , 20

A Principal Business Activity: INVESTMENT
B Principal Product or Service: INVESTMENTS
C Business Code Number: 523900

Use the IRS label. Otherwise, print or type.
LLC NAME

DRAFT

D Employer Identification Number
E Date Business Started: 9/01/2001
F Total Assets (see instrs): $

G Check applicable boxes: (1) [X] Initial return (2) [X] Final return (3) [ ] Name change (4) [ ] Address change (5) [ ] Amended return
H Check accounting method: (1) [X] Cash (2) [ ] Accrual (3) [ ] Other (specify) ►
I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ► 2

**Caution:** *Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.*

**INCOME**

| | | | | |
|---|---|---|---|---|
| 1 a | Gross receipts or sales | 1a | | |
| b | Less returns and allowances | 1b | | 1c |
| 2 | Cost of goods sold (Schedule A, line 8) | | | 2 |
| 3 | Gross profit. Subtract line 2 from line 1c | | | 3 |
| 4 | Ordinary income (loss) from other partnerships, estates, and trusts *(attach schedule)* | | | 4 |
| 5 | Net farm profit (loss) *(attach Schedule F (Form 1040))* | | | 5 |
| 6 | Net gain (loss) from Form 4797, Part II, line 18 | | | 6 |
| 7 | Other income (loss) *(attach schedule)* | | | 7 |
| 8 | **Total income (loss).** Combine lines 3 through 7 | | | 8 |

**DEDUCTIONS** (SEE INSTRUCTIONS FOR LIMITATIONS)

| | | | | |
|---|---|---|---|---|
| 9 | Salaries and wages (other than to partners) (less employment credits) | | | 9 |
| 10 | Guaranteed payments to partners | | | 10 |
| 11 | Repairs and maintenance | | | 11 |
| 12 | Bad debts | | | 12 |
| 13 | Rent | | | 13 |
| 14 | Taxes and licenses | | | 14 |
| 15 | Interest | | | 15 |
| 16 a | Depreciation (if required, attach Form 4562) | 16a | | |
| b | Less depreciation reported on Schedule A and elsewhere on return | 16b | | 16c |
| 17 | Depletion **(Do not deduct oil and gas depletion.)** | | | 17 |
| 18 | Retirement plans, etc | | | 18 |
| 19 | Employee benefit programs | | | 19 |
| 20 | Other deductions *(attach schedule)* | | | 20 |
| 21 | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | | 21 |
| 22 | **Ordinary income (loss)** from trade or business activities. Subtract line 21 from line 8 | | | 22 |

DEPOSITION EXHIBIT
3-Hewitt

**Sign Here**
Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member) is based on all information of which preparer has any knowledge.

► Signature of General Partner or Limited Liability Company Member ►

May the IRS discuss this return with the preparer shown below (see instrs)? [X] Yes [ ] No

**Paid Preparer's Use Only**
Preparer's Signature
Firm's Name (or yours if self-employed), Address, and ZIP Code ►

SH 00131

DEFENDANT'S EXHIBIT 33B
PENGAD-Bayonne, N.J.

BAA For Paperwork Reduction Act Notice, see separate instructions.
CASE #05-1223

DRAFT 1065

Form **1065** (2001) LLC NAME Page **2**

**Schedule A** **Cost of Goods Sold** (see instructions)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases less cost of items withdrawn for personal use | 2 | |
| 3 | Cost of labor | 3 | |
| 4 | Additional Section 263A costs *(attach schedule)* | 4 | |
| 5 | Other costs *(attach schedule)* | 5 | |
| 6 | **Total.** Add lines 1 through 5 | 6 | |
| 7 | Inventory at end of year | 7 | |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | |

9a Check all methods used for valuing closing inventory:

- (i) ☐ Cost as described in Regulations Section 1.471-3
- (ii) ☐ Lower of cost or market as described in Regulations Section 1.471-4
- (iii) ☐ Other (specify method used and attach explanation) ►

b Check this box if there was a writedown of 'subnormal' goods as described in Regulations Section 1.471-2(c) ► ☐

c Check this box if the LIFO inventory method was adopted this tax year for any goods *(if checked, attach Form 970)* ► ☐

d Do the rules of Section 263A (for property produced or acquired for resale) apply to the partnership? ☐ Yes ☐ No

e Was there any change in determining quantities, cost, or valuations between opening and closing inventory? ☐ Yes ☐ No
If 'Yes', attach explanation.

**Schedule B** **Other Information**

| | | Yes | No |
|---|---|---|---|
| 1 | What type of entity is filing this return? Check the applicable box:<br>a ☐ Domestic general partnership b ☐ Domestic limited partnership<br>c ☒ Domestic limited liability company d ☐ Domestic limited liability partnership<br>e ☐ Foreign partnership f ☐ Other ► | | |
| 2 | Are any partners in this partnership also partnerships? | X | |
| 3 | During the partnership's tax year, did the partnership own any interest in another partnership or in any foreign entity that was disregarded as an entity separate from its owner under Regulations Sections 301.7701-2 and 301.7701-3? If yes, see instructions for required attachment | | X |
| 4 | Is this partnership subject to the consolidated audit procedures of Sections 6221 through 6233? If 'Yes,' see **Designation of Tax Matters Partner** below | | X |
| 5 | Does this partnership meet **all three** of the following requirements?<br>a The partnership's total receipts for the tax year were less than $250,000;<br>b The partnership's total assets at the end of the tax year were less than $600,000; **and**<br>c Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return.<br>If 'Yes,' the partnership is not required to complete Schedules L, M-1, and M-2; item F on page 1 of Form 1065; or item J on Schedule K-1 | | X |
| 6 | Does this partnership have any foreign partners? If 'Yes,' the partnership may have to file Forms 8804, 8805 and 8813. See instructions | | X |
| 7 | Is this partnership a publicly traded partnership as defined in Section 469(k)(2)? | | X |
| 8 | Has this partnership filed, or is it required to file, **Form 8264,** Application for Registration of a Tax Shelter? | | X |
| 9 | At any time during calendar year 2001, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See the instructions for exceptions and filing requirements for Form TD F 90-22.1. If 'Yes,' enter the name of the foreign country. ► | | X |
| 10 | During the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If 'Yes,' the partnership may have to file Form 3520. See instructions | | X |
| 11 | Was there a distribution of property or a transfer (e.g., by sale or death) of a partnership interest during the tax year? If 'Yes,' you may elect to adjust the basis of the partnership's assets under Section 754 by attaching the statement described in the instructions under **Elections Made by the Partnership** | X | |
| 12 | Enter the number of Forms 8865 attached to this return ► 0 | | |

**Designation of Tax Matters Partner** (see instructions)

SH 00132

Enter below the general partner designated as the tax matters partner (TMP) for the tax year of this return:

Name of Designated TMP ► S CORP
Identifying Number of TMP ► APPLIED FOR

Address of Designated TMP ►

CASE # 05-1223 PTPA0112L 12/03/01 Form **1065** (2001)

Form 1065 (2001) LLC NAME Page 3

**Schedule K — Partners' Shares of Income, Credits, Deductions, etc**

| | (a) Distributive share items | | (b) Total amount |
|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities (page 1, line 22) | 1 | |
| | 2 Net income (loss) from rental real estate activities *(attach Form 8825)* | 2 | |
| | 3a Gross income from other rental activities — 3a | | |
| | b Expenses from other rental activities *(attach sch)* — 3b | | |
| | c Net income (loss) from other rental activities. Subtract line 3b from line 3a | 3c | |
| | 4 Portfolio income (loss): a Interest income | 4a | 40,120. |
| | b Ordinary dividends | 4b | 404. |
| | c Royalty income | 4c | |
| | d Net short-term capital gain (loss) *(attach Schedule D (Form 1065))* | 4d | |
| | e (1) Net long-term capital gain (loss) *(attach Schedule D (Form 1065))* | 4e (1) | |
| | (2) 28% rate gain (loss) ► (3) Qualified 5-year gain ► | | |
| | f Other portfolio income (loss) *(attach schedule)* SEE STATEMENT 1 | 4f | 450. |
| | 5 Guaranteed payments to partners | 5 | 7,200. |
| | 6 Net Section 1231 gain (loss) (other than due to casualty or theft) *(attach Form 4797)* | 6 | |
| | 7 Other income (loss) | 7 | |
| Deductions | 8 Charitable contributions *(attach schedule)* | 8 | |
| | 9 Section 179 expense deduction *(attach Form 4562)* | 9 | |
| | 10 Deductions related to portfolio income (itemize) SEE STATEMENT 2 | 10 | 7,250. |
| | 11 Other deductions | 11 | |
| Credits | 12a Low-income housing credit: | | |
| | (1) From partnerships to which Section 42(j)(5) applies | 12a (1) | |
| | (2) Other than on line 12a(1) | 12a (2) | |
| | b Qualified rehabilitation expenditures related to rental real estate activities *(attach Form 3468)* | 12b | |
| | c Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | |
| | d Credits related to other rental activities | 12d | |
| | 13 Other credits | 13 | |
| Investment Interest | 14a Interest expense on investment debts | 14a | 38,920. |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4f above | 14b (1) | 40524 ~~40,974.~~ |
| | (2) Investment expenses included on line 10 above | 14b (2) | 7,250. |
| Self-Employment | 15a Net earnings (loss) from self-employment | 15a | 7,200. |
| | b Gross farming or fishing income | 15b | |
| | c Gross nonfarm income | 15c | |
| Adjustments and Tax Preference Items | 16a Depreciation adjustment on property placed in service after 1986 | 16a | |
| | b Adjusted gain or loss | 16b | |
| | c Depletion (other than oil and gas) | 16c | |
| | d (1) Gross income from oil, gas, and geothermal properties | 16d (1) | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | 16d (2) | |
| | e Other adjmnts & tax pref items | 16e | |
| Foreign Taxes | 17a Name of foreign country or U.S. possession ► | | |
| | b Gross income from all sources | 17b | |
| | c Gross income sourced at partner level | 17c | |
| | d Foreign gross income sourced at partnership level: | | |
| | (1) Passive ► (2) Listed categories *(attach sch)* ► (3) General limitation ► | 17d (3) | |
| | e Deductions allocated and apportioned at partner level: | | |
| | (1) Interest expense ► (2) Other | 17e (2) | |
| | f Deductions allocated and apportioned at partnership level to foreign source income: | | |
| | (1) Passive ► (2) Listed categories *(attach sch)* ► (3) General limitation ► | 17f (3) | |
| | g Total foreign taxes (check one): ► ☐ Paid ☐ Accrued | 17g | |
| | h Reduction in taxes available for credit *(attach schedule)* | 17h | |
| Other | 18 Section 59(e)(2) expenditures: a Type ► b Amount ► | 18b | |
| | 19 Tax-exempt interest income | 19 | |
| | 20 Other tax-exempt income | 20 | |
| | 21 Nondeductible expenses | 21 | |
| | 22 Distributions of money (cash and marketable securities) | 22 | 175,604. |
| | 23 Distributions of property other than money | 23 | 1,801,000. |
| | 24 Other items and amounts required to be reported separately to partners *(attach schedule)* | | |

BAA Form 1065 (2001)

CASE # 05-1223 PTPA0134L 01/01/02 SH 00133

UNITED STATES TAX COURT

-----------------------------------------X

NHB X, LLC, NORMAN H. BEVAN, TAX MATTERS PARTNER,

Petitioners,

Docket No. 17453-05

-against-

COMMISSIONER OF INTERNAL REVENUE,

Respondent.

-----------------------------------------X

Deposition of Daniel Brooks

November 30, 2006

New York, New York

**Stoddart Decl.**
**Exhibit 34**

REPORTED BY:

Helen Mendlowich

November 30, 2006
10:14 a.m.

Deposition of Daniel Brooks, taken by Respondent, pursuant to Notice and Subpoena, at the offices of the Internal Revenue Service, 33 Maiden Lane, 12th Floor, New York, New York, before Helen Mendlowich, a Shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

THOMPSON & KNIGHT, LLP
Attorneys for Petitioners
333 Clay Street, Suite 3300
Houston, TX 77002

BY: MARC E. GROSSBERG, ESQ.

INTERNAL REVENUE SERVICE
Attorneys for Respondent
333 East River Drive, Suite 200
East Hartford, CT 06108

BY: JOHN ALETTA, ESQ.
DAVID SORENSEN, ESQ.

ALSTON & BIRD, LLP
Attorneys for Non-Party Witness
90 Park Avenue
New York, NY 10016

BY: FRANCIS PAUL GREENE, ESQ.

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto, that the filing, sealing, and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before this court.

BROOKS

D A N I E L B R O O K S, stating his business address as 10 Bay Street, Westport, Connecticut 06880, after having first been duly sworn by a Notary Public for the State of New York, was examined and testified as follows:

EXAMINATION BY MR. ALETTA AND MR. SORENSEN:

MR. ALETTA: This is a deposition of Daniel Brooks pursuant to tax court rule 74 in connection with the tax court case entitled NHB X, LLC, et al. versus Commissioner of Internal Revenue, docket number 17453-05.

Present at this deposition are myself, John Aletta, Respondent's counsel and David Sorensen, also Respondent's counsel, counsel for Petitioner, Marc Grossberg, the witness, Daniel Brooks and counsel for Daniel Brooks, Attorney Paul Greene.

Mr. Brooks, before we get started -- I just want to clarify a few matters before we actually get into the substantive discussion.

Did you receive the notice of deposition that the government issued in this case?

THE WITNESS: I did.

MR. ALETTA: Did you receive a letter

BROOKS

MR. ALETTA: What was the nature of those discussions?

THE WITNESS: It was a telephone call initiated by Marc. He asked me basic questions about the trading from Mr. Bevan's account.

MR. ALETTA: What was the general nature of your responses?

THE WITNESS: Just understanding the risk of the transactions.

MR. ALETTA: Okay. What was that?

THE WITNESS: Basically, that there was, in fact, a -- that the derivatives that were imbedded in market link deposits had a 28 percent chance of getting a 60-percent return if held to maturity, and the trades, in fact, did work.

MR. ALETTA: By "market link deposits" are you referring to those market link deposits that were entered into by Norman H. Bevan during 2001?

THE WITNESS: I am talking about the one market link deposit that Mr. Bevan hired me to put the risk into.

MR. ALETTA: On what did you base your

analysis of the 28 percent profitability?

THE WITNESS: That's pretty clear cut. Derivatives are traded on a model called the Black Scholes model where, in our case, we were trading currencies but basically, you can input the type of risk that you want, the return you are looking for, the current spot price of whatever currency it is that you want to bet on in the market that you are taking the risk on and it will give you the price where you could put that trade on with those exact risk parameters and the exact expected return.

MR. ALETTA: How did you know that the amount was 28 percent when you talked to Mr. Grossberg?

THE WITNESS: Because that was -- when I'm hired by somebody to trade for them, that came down from Cantley & Sedacca who were advising Mr. Bevan, from Deutsche Bank and that was the parameters that they gave me to put on these transactions, that was the risk they were looking for.

MR. ALETTA: Who at Cantley & Sedacca provided that to you?

BROOKS

THE WITNESS: I'm not sure exactly who -- I talked directly to Craig Brubaker. He is with Alex Brown Deutsche Bank in Dallas.

He was the one -- Mr. Bevan was a customer of Alex Brown Deutsche Bank. So basically, I got the information for whatever risk Mr. Bevan wanted to put on from there.

My job was to pick a currency with that risk profile that I felt -- and, of course, the direction of that currency that I felt would best allow the customer to be able to be comfortable in that transaction.

MR. ALETTA: What was the risk amount again?

THE WITNESS: 28 percent probability of winning.

MR. ALETTA: Winning what?

THE WITNESS: Winning a 60-percent return on the money being invested.

MR. ALETTA: Again, somebody told you that they wanted the MLD transaction Mr. Bevan entered into to have a 28 percent chance of obtaining a 60 percent profit?

THE WITNESS: Right, exactly.

BROOKS

MR. ALETTA: Okay.

THE WITNESS: That's how I work, I have to have the parameter the customer is looking for.

MR. ALETTA: Who told you that the desired result was a 28 percent probability?

THE WITNESS: Now, the desired profit was coming from Cantley & Sedacca through Deutsche Bank.

MR. ALETTA: Again, Mr. Brooks, I'm looking for a name.

THE WITNESS: Craig Brubaker.

MR. ALETTA: Craig Brubaker told you that?

THE WITNESS: Yes.

MR. ALETTA: Where did he learn that from?

THE WITNESS: I don't know that directly. I assume that it was coming from -- I don't want to assume.

I think that probably that came from Cantley & Sedacca.

MR. ALETTA: Who at Cantley & Sedacca?

THE WITNESS: Probably Ed Sedacca.

MR. ALETTA: Probably Ed Sedacca?

THE WITNESS: Yes.

MR. ALETTA: We'll probably come back to

BROOKS

this subject but for now let's go back to some more general subjects.

The first thing I want to talk about is your education. Can you just give us briefly your educational background?

THE WITNESS: College, I went to Duke University, after which I worked for one year and then went to Fuqua School of Business. It's an MBA program at Duke.

MR. ALETTA: Do have have any tax courses in your background?

THE WITNESS: None.

MR. ALETTA: Do have you any specialized knowledge in the tax field?

THE WITNESS: No, none.

MR. ALETTA: How about accounting courses?

THE WITNESS: None.

MR. ALETTA: What was your MBA in?

THE WITNESS: Investment and finance.

MR. ALETTA: Let's discuss your work experience and before we get there I'm going to hand you a group of exhibits which you already have. Most of these exhibits have been provided to you through my letter.

The exhibits are marked Exhibit A through A-N and those exhibits are marked so that we have clarity in the record here about what we are talking about.

If you refer to Exhibit A --

A. Okay.

Q. -- you will see that that looks like a Powerpoint which, sort of, discusses Clarion Capital and also a bio of yourself and it looks like a resume attached. Do you see that?

THE WITNESS: I do.

MR. ALETTA: Can you give us a general description, Mr. Brooks, of your work experience in the foreign currency market area, the trading area?

THE WITNESS: Sure. Out of business school I went to work for Chemical Bank which no longer exists -- It's now JP Morgan, I guess -- in their management training program. I ended up on the foreign currency desk there as a spot trader.

Spot trading is currency that's trading for value right now. So it's a very hectic, very large, block trading-type of desk.

BROOKS

I was there for several years. I moved to Bank of America. After that to become the senior market trader there which at that point, on a currency desk, the larger the currencies are, generally, the better money, more responsibility, better position.

I did that for several years. I went to Lehman Brothers.

MR. ALETTA: Excuse me for a second. Could you give us time periods?

THE WITNESS: To Chemical Bank I went in '82. In 1982 I came to Chemical Bank and I traded there through '84. I went to Bank of America from '84 to early '89. I went to Lehman Brothers for several years. I went to Bank National Deperie where I stopped being a spot trader to come more of a proprietary-type trader. Spot trading is very hectic. It's like being in a boxing ring every day. Proprietary trading is more -- as you get more senior you can sit back and take positions and not have to have the day-to-day responsibility of quoting prices.

After that I went to Banker's Trust for

BROOKS

several years. Once again at a proprietary trading desk. Banker's Trust was bought by Deutsche Bank.

MR. ALETTA: Up to that point in time, did have you any experience determining the probabilities of currency options in finishing in the money?

THE WITNESS: I represented and advised customers who traded options and had options trade in the money. Yes. I would say on a big currency desk probably half the business you do, maybe more today, is derivative trading.

MR. ALETTA: What do you mean by "derivative trading"?

THE WITNESS: Options.

MR. ALETTA: Currency options?

THE WITNESS: Currency options.

MR. ALETTA: Again, my question is: Up until the point where you joined Deutsche Bank, did you have experience in determining the probabilities of currency options finishing in the money?

THE WITNESS: Yes, I did. I had customers who would come in who wanted to trade with the

bank, that had accounts with the bank and they would want to have specific probabilities on their trades.

Nobody is going to do a currency option trade unless they know exactly what the probability of what they are putting on is.

I had customers who would come in and say, I want a 10 percent chance to get a big slam or a 50 percent chance of something smaller.

MR. ALETTA: Would you then actually provide the analysis of what those probabilities are or would you have somebody else do that?

THE WITNESS: I would have a derivatives trader put that in -- model that in the Black Scholes model.

MR. ALETTA: Then, after that person provided the analysis to you, would you then provide that to the customer?

THE WITNESS: Yes, I would.

MR. ALETTA: How about while you were at Deutsche Bank, did you actually provide analyses of currency options finishing in the money? "Analyses" being the probability that

the currency option would expire in the money.

THE WITNESS: Anybody who does an option -- when somebody comes to you to price an option, you have to put the probability into the machine to get a price for the option. It's impossible to price an option and not know the exact parameters of what you are putting on.

MR. ALETTA: Would you determine that probability?

THE WITNESS: At Deutsche Bank? No. The trader on the desk would determine that probability. At Deutsche Bank I was in the sales function. Of course I had access to the trading model that the trader had. Deutsche Bank has an option pricer. So I would know exactly what the price should be but the responsibility for the price would be the trader's.

MR. ALETTA: When did you join Deutsche Bank?

THE WITNESS: In 1999 Deutsche Bank bought Banker's Trust and we were merged into that desk, summer of 1999.

MR. ALETTA: When did you leave Deutsche Bank?

THE WITNESS: In April of 2001.

MR. ALETTA: During that time you engaged in -- let me ask that question.

MR. GROSSBERG: I'm sorry, April --

THE WITNESS: -- 2001.

MR. ALETTA: During the time you were at Deutsche, who was the trader at Deutsche who determined the probabilities for the trades that you were involved with?

THE WITNESS: Perry Parker.

MR. ALETTA: Would you spell that for me?

THE WITNESS: P-E-R-R-Y, P-A-R-K-E-R. He was the head of the derivatives desk -- foreign currency derivatives desk at Deutsche Bank.

MR. ALETTA: Is Mr. Parker still there?

THE WITNESS: I don't believe so.

MR. ALETTA: Do you know where he is?

THE WITNESS: I don't know for sure and I don't know where he went, but I don't think he is at that desk anymore.

MR. ALETTA: Could you describe your duties at Deutsche during the time period that

you were there?

THE WITNESS: Half of my duties were my accounts. As a salesperson you have accounts, basically people who would call in to you to do currency business.

Half of my business was the handling of Alex Brown brokers who would come in to do currency business of all different types.

The other half was my handling large institutional investors who had long-term relationships with.

MR. ALETTA: What would you be doing for your clients at Deutsche?

THE WITNESS: Advising. Most times people who are trading from outside of a bank environment, I would say, sort of, 60 percent of your job is to let them know what's going on in the market, a feel for the market, where you think it's going.

You get good clients by being right in the market. People call up and say, what do you think dollar/yen is doing today and you say I think it's going up. When it goes up, they call you back the next day and say, where do

BROOKS

you think it's going now.

Basically, those are my two functions. With Alex Brown it could be any number of things, anything from spot trading in currencies, forward trading, all kinds of derivatives, anything the clients need to do on the currency desk. It's a very active desk.

MR. ALETTA: So you actually worked on a desk called the currency desk?

THE WITNESS: I was in foreign exchange sales.

MR. ALETTA: That's the department you worked in?

THE WITNESS: That's the department I was in.

MR. ALETTA: And your title at Deutsche was --

THE WITNESS: -- vice president.

MR. ALETTA: Was there anything after vice president? Was there any other designation to your title?

THE WITNESS: No.

MR. ALETTA: Again, at Deutsche Bank you were not determining the probabilities of

BROOKS

options?

THE WITNESS: No, I was not determining probabilities. My job was to work for the customer and make sure that the probabilities were correct, that the price they were getting was correct.

MR. ALETTA: Okay. How did you go about doing that?

THE WITNESS: There is a pricing model. I had the same pricing model the trader had.

MR. ALETTA: Did that pricing model have a name?

THE WITNESS: It's the Black Scholes pricing model. Deutsche Bank has an option pricing model that's available not only to the trading desk but, I think all up until the end of 2005, some big customers also had access to this model.

It's not rocket science to price derivatives. There really are just four or five basic variables to put in to get a price. On the vast majority of things that I worked on you were not going to be able to quote a customer price that was off market because they

BROOKS

knew where it was. They are using the same model you are using, the same model the trader is using to price the derivatives.

MR. ALETTA: Are you saying that by using this Black Scholes model you would determine the price of the options -- the currency options that were being sold by Deutsche?

THE WITNESS: Exactly.

MR. SORENSEN: One quick question: You said there are four or five variables. What are they?

THE WITNESS: Interest rates, how long are the options going to be. How much a variable known as volatility, which is how much the market has been moving. If the market hasn't been moving a lot.

MR. SORENSEN: Let's stop there. For volatility, do you use a historical analysis for volatility in the model which is used as Deutsche Bank?

THE WITNESS: The model is using -- once again, that's out of my realm, but I know they are using up-to-date volatilities.

MR. SORENSEN: Okay.

BROOKS

And then I handled any Alex Brown branch that would come in and need currency business. So I don't know how many branches they had but their San Francisco, Chicago, Dallas, Atlanta branches were fairly busy in currency so that kept my day moving.

MR. ALETTA: Were you handling currency options for Deutsche in 2000?

THE WITNESS: Sure.

MR. ALETTA: Did you handle any market link deposit transactions for Deutsche during 2000?

THE WITNESS: No, I did not.

MR. ALETTA: Did you handle --

MR. GREENE: Sorry. Dan, just let you know again, for the record, please wait until John is done with his question.

It is very difficult for the reporter to pick up both the question and the answer when are you going over each other.

MR. ALETTA: Thank you, Paul.

Did you handle any market link deposit transactions for Deutsche during 2001?

THE WITNESS: While at Deutsche Bank? No,

I did not.

MR. ALETTA: With regard to the currency options transactions that you handled for Deutsche, did those currency options transactions have any tax benefits associated with them that you know of?

THE WITNESS: Yes, I believe that Deutsche Bank was involved with several customers who were doing tax-related transactions.

MR. ALETTA: Could you explain for us what those tax benefits were?

THE WITNESS: I could not.

MR. ALETTA: Could you explain who at Deutsche Bank was involved with those transactions other than yourself?

MR. GREENE: John, just to clarify, I'm not sure what you mean by "who was involved in those transactions." You wanted the complete cast of characters?

MR. ALETTA: Yes.

MR. GREENE: Okay.

MR. ALETTA: Yes.

THE WITNESS: On the currency side, obviously -- well, I shouldn't say "obviously."

BROOKS

MR. ALETTA: Who else was involved at Deutsche Bank with these types of transactions that were discussed?

THE WITNESS: Well, the people bringing the transactions were all customers of Deutsche Bank Alex Brown. Craig Brubaker at Alex Brown in Dallas was a guy who brought a lot of customers. David Parse at Alex Brown in Chicago brought a lot of customers. There were some other -- Alex Flagg in San Francisco, I think, had some customers. I think there were other costumers coming out of Atlanta as well.

MR. ALETTA: Did these transactions that we're talking about, these currency option transactions, did they involve a combination of two currency options one being a long position and one being a short position?

THE WITNESS: Yes, they did.

MR. ALETTA: What is the technical term for that type of option?

THE WITNESS: Digital option.

MR. ALETTA: Digital option.

What was your understanding of how the digital option transaction worked, the ones

BROOKS

that were involved in Deutsche Bank at the time you were at Deutsche?

THE WITNESS: They were very typical digital options. The digital option is used by somebody that wants to put on a -- these were all European digital options. European means that when you put on a bet that it's going to be read at a certain time on a certain date. So you are making a bet that the currency is going to be above or below a certain price, at a certain time, on a certain date. So basically what -- if you want to think about it, if you are betting on a currency going up, what a digital option does is that you bought upside, today the currency is trading here, whatever the parameters are for the bet that you are putting, that's where the idea of somebody saying, hey, I want this to have a 28 percent chance of a 60 percent return is, that gives you the strike price to say, all right, if this strike price -- if this dollar/yen is 1.20 today and with all the volatilities and time and interest rates and things and you put in that you want this percent chance of winning

BROOKS

this bet, the model is going to spit back a price, a strike price saying that this strike price has those probabilities of occurring for that type of return.

Basically, you own that, the customer comes in on the long side where they own the upside to that price and on the other side they sold the rest of the upside. So they don't have unlimited upside on that transaction. That would be a lot more expensive to buy. What they've done is bought the upside until here and they sold the rest of the upside away.

That's the buying side of the option and the sales side.

MR. ALETTA: What's the advantage for the customer using the digital option?

Let me rephrase it. What's the advantage for the customer using a digital option method of investing in currency options?

THE WITNESS: Two advantages, the first one being they know exactly how much they are risking, they can't lose any more than the premium they are paying for the transaction. They are making it an all or nothing bet,

BROOKS

saying I'm giving you 20 grand today and that's going to either turn into 35 or that money is gone, if I win or I lose.

The other side is basically because it's not just the customers are coming in, they want to buy dollar/yen but they don't want to buy it with unlimited upside, it makes the premium cheaper. So it is a way to put on a specific trade for a cheaper premium. It's by far the most used derivative in currency.

MR. ALETTA: With regard to the digital options, are you familiar with the term "sweet spot"?

THE WITNESS: Are you talking about a two point variance in the middle?

MR. ALETTA: Yes. Could you explain for us what a sweet spot is in terms of the digital option?

THE WITNESS: Sure. A sweet spot is this long side that we are talking about, say the dollar/yen is 120 and you win the bet if it goes about 124, the sweet spot would be if the bank wanted to put something on that transaction that gives the customer a chance to

BROOKS

have, sort of, a lottery feature where if it lands in those one or two points you would win the long side of the bet, you wouldn't have to pay out the short side of the bet.

So the sweet spot is if you have -- if the dollar/yen today is 120 and the strike is 124, the customer wins the long side of the bet at 124 double 0, 124.01 and the short side doesn't start until 124.02. There is a little lot area there where the customer could win a lot of money.

MR. ALETTA: Okay.

MR. SORENSEN: The follow-up question then: In the typical vanilla digital option, is there a sweet spot?

THE WITNESS: No. That's not really true. What you are talking about is structured products where the bank will put little things like that in to make it look sexier to the client.

MR. SORENSEN: My follow-up question had to do with the fact that you said that the digital options are by far the most commonly traded --

BROOKS

THE WITNESS: Yes, I would say --

MR. SORENSEN: -- on the currency desk. On those that are the most commonly traded is there, in fact, a sweet spot or are the vast majority simply above a certain point you are in?

THE WITNESS: The vast majority do not have a sweet spot.

MR. ALETTA: Do you know a Jessica Walter?

THE WITNESS: Yes, I do.

MR. ALETTA: Was she an employee at Deutsche while you were?

THE WITNESS: Yes, she was.

MR. ALETTA: When you were at Deutsche, did you conduct any business with Jessica Walter?

THE WITNESS: Jessica inputted a lot of transactions. Jessica was back office help for the derivatives desk. So basically she was -- her job as I know it was to make sure that all the transactions that were done on the sales desk and on the trading desk, as far as options were concerned, were put in the systems correctly. She input a lot of deals.

BROOKS

MR. ALETTA: When did you form Clarion Capital?

THE WITNESS: Right after leaving Deutsche Bank. I believe it was formed in May of 2001.

MR. ALETTA: Who is the owner of Clarion Capital?

THE WITNESS: I am the owner of Clarion Capital.

MR. ALETTA: Is Clarion Capital still in existence?

THE WITNESS: It is.

MR. ALETTA: Why did you form Clarion Capital?

THE WITNESS: It was my company. I went out on my own and that was the company I was using. It was formed to do currency advising and trading.

MR. ALETTA: What were Clarion Capital's assets in 2001? Describe it.

THE WITNESS: My revenue from trading and customers was roughly $1.4 million.

MR. ALETTA: Did it have any other assets?

THE WITNESS: Me. No.

MR. ALETTA: Where was its place of

BROOKS

told you?

THE WITNESS: I don't.

MR. SORENSEN: A few questions: How did you meet Ed Sedacca?

THE WITNESS: Ed Sedacca was introduced to me by Craig Brubaker.

MR. ALETTA: Craig Brubaker was with --

THE WITNESS: -- Deutsche Bank Alex Brown in Dallas.

MR. ALETTA: I had contact with --

THE WITNESS: -- Ed Sedacca came and did business on the currency desk at Deutsche Bank when he was in a position with Beal Bank, in -- I'm not sure if it's Dallas or Houston. He worked directly for Andy Beal and they were customers of Deutsche Bank and did some business with Deutsche Bank.

MR. SORENSEN: You had testified or stated earlier that while you were at Deutsche Bank you didn't do any of these MLDs or market link deposit transactions.

When was the first time that you did a market link deposit transaction?

THE WITNESS: I believe the first time I

executed a market link deposit was in late June of 2001.

MR. SORENSEN: Who introduced you to the market link deposit concept?

THE WITNESS: Cantley & Sedacca brought that to my attention, that this was a structure that they were looking to use.

Market link deposit is a generic term. It was not something that was very common but not something that was uncommon either. It was probably used more in Europe, used by corporations.

Basically, a market link deposit is a CD that has some sort of a fixed rate to it. So you are going to get paid whatever percent -- you put money into a deposit. You are going to get a certain amount that's paid just like any other CD or bank deposit. And then it has a variable component that is based on linked to some market and these things are done with currencies, they are done with equities, they are done with fixed income, whatever you want.

MR. SORENSEN: Looking specifically at the transaction that you were engaged in with Mr.

BROOKS

Bevan, that type of market link deposit -- you state that the first one was in, approximately, June of 2001?

THE WITNESS: Yes.

MR. SORENSEN: Approximately how many did you engage in?

THE WITNESS: I traded for 150 different customers.

MR. SORENSEN: These were all executed during what time period?

THE WITNESS: June to December 2001.

MR. SORENSEN: Have you done any since December --

THE WITNESS: No, I have not.

MR. SORENSEN: -- of 2001?

THE WITNESS: No, I have not.

MR. SORENSEN: In each of these transactions that you engaged in was an LLC formed between you and the investor?

THE WITNESS: Yes, it was.

MR. SORENSEN: Again, wait for my question before you answer.

On your non-market link deposits -- do you have any?

BROOKS

THE WITNESS: Yes, I do.

MR. SORENSEN: How many of those have formed LLCs where you are a one percent owner with the LLC, with the investor owning the 99 percent remainder?

THE WITNESS: None.

MR. SORENSEN: So it was only in the market link deposits that it was done?

THE WITNESS: Yes.

MR. SORENSEN: Do you know who advised the investor to form the LLC?

THE WITNESS: I don't know directly who did that, no.

MR. SORENSEN: Do you have a belief as to who did?

THE WITNESS: I believe Cantley & Sedacca advised them to do that.

MR. SORENSEN: Do you know why the LLC was formed?

THE WITNESS: I was told that it was for a trading account.

MR. SORENSEN: Do you need to be an LLC to trade an account?

THE WITNESS: No, you do not.

BROOKS

MR. SORENSEN: Did that explanation make sense to you at the time?

THE WITNESS: It was not unusual that somebody wanted you to have a piece of skin in the game. I should go back to your previous question about trading for other people.

Generally people when they come to you, they may not have you form your own LLC or come in on an LLC but they will want you to put some money up.

MR. SORENSEN: They want you to expose?

THE WITNESS: They don't want you saying if you are going to be trading my money, I want you to have some money involved with that.

MR. SORENSEN: But if I understand right, nobody outside the LLC -- I mean outside of the market link deposit cases has formed an LLC with you as a member.

THE WITNESS: No, they have not.

MR. SORENSEN: But you are exposed in some way in many of your client's investments?

THE WITNESS: Yes, I am.

MR. SORENSEN: But the fact that the LLCs were formed for the market link deposits, did

BROOKS

you ever ask why that was? Did you ever ask Craig Brubaker?

THE WITNESS: No, I did not. That was presented to me in that form. I gave it my counsel to look at and said, is there something wrong, is this unusual. And the answer I got was no, that's fine.

MR. SORENSEN: Who was your counsel at the time?

THE WITNESS: Karen Steffans, K-A-R-E-N, S-T-E-F-F-A-N-S at Schumaker, S-C-H-U-M-A-K-E-R, Loop, L-O-O-P, & Kenrick, K-E-N-R-I-C-K. They were a Charlotte firm.

MR. SORENSEN: So going back to my questions, all of the investors who invested in market link deposits of this type formed LLCs?

THE WITNESS: Yes, they did.

MR. SORENSEN: Do you know who formed those LLCs?

THE WITNESS: Cantley & Sedacca.

MR. SORENSEN: They formed all of them?

THE WITNESS: I believe so.

MR. SORENSEN: You were a one percent owner? When I say "you," I mean Clarion

Capital?

THE WITNESS: Clarion was a one percent owner in every one of them.

MR. SORENSEN: And in every one of them did Clarion remain a partner through the life of the MLD?

THE WITNESS: Yes, I did.

MR. SORENSEN: Was Clarion a member of any of the LLC after December 31st of 2000 --

THE WITNESS: No, I was not.

MR. SORENSEN: You were, in fact, out of each and every one of them --

THE WITNESS: Every single one of them.

MR. SORENSEN: Do you know why?

THE WITNESS: That was at the -- that was the customer's prerogative.

MR. SORENSEN: To your knowledge, were market link deposits ever marketed to investors as tax law schemes?

THE WITNESS: I was never directly involved or indirectly involved in any marketing of any tax scheme.

MR. SORENSEN: Of all the market link deposits that you engaged in in 2001, were all

BROOKS

MR. SORENSEN: When you say "someone," you would assume someone within Deutsche Bank who had access to the model?

THE WITNESS: Yes.

MR. GREENE: Objection to the form.

MR. SORENSEN: But your answer is yes?

THE WITNESS: I would assume that.

MR. SORENSEN: When you were discussing these market link deposits, were you advise your clients that they had a 2 percent chance of hitting the sweet spot?

THE WITNESS: I told them that they had roughly a 1 percent chance modeled Black-Scholes of winning the sweet spot. But also, it was my feeling as well that it was my responsibility to say that that should not really be -- that that is a long shot. That's obviously a long shot.

MR. SORENSEN: Comparable to hitting the lottery?

THE WITNESS: Comparable to hitting the lot.

MR. SORENSEN: In fact, isn't it called the lottery in some documents?

BROOKS

THE WITNESS: I believe it is.

When I talked to the people about possible gains it was basically saying, that was out there, it was a real risk, it was on the book. The bank had that risk but you really should be -- when you are looking at return -- more interested in what you can make having a 28 or 30 percent chance of returning 60 percent.

MR. SORENSEN: How many of your clients returned 60 percent in these market link deposits?

THE WITNESS: Well, I traded. I actively traded so a certain percentage of people, I took off early because I took profit. But I think roughly 60 percent of my group made money on the MLDs.

MR. SORENSEN: But I believe your statement was 28 percent of the group would make a 60 percent return.

THE WITNESS: If held to maturity.

MR. SORENSEN: How many of your clients received a 60 percent return on these --

THE WITNESS: I'm not sure but I think it was in excess of 40 percent.

BROOKS

compensated. My lawyer looked at the LLC formation and saw that there was nothing that I should be afraid of in doing.

MR. ALETTA: With regard to your conversation with Mr. Sedacca, was it just one conversation?

THE WITNESS: To the best -- that's as I recall. I think I only had one conversation with him on that subject and the rest were between Karen Steffans and Cantley & Sedacca as they were formed.

MR. ALETTA: With regard to that conversation, were you discussing generally the formation of LLCs for all the investors that were involved in the market link deposits or were you discussing any particular investor?

THE WITNESS: I think that the conversation I had was probably on the first transaction that I did and by the time -- once again, I'm speculating here. I don't really remember the call that clearly -- but basically it was my understanding that my trading for any account would take basically the same form and use the same form LLC so there really would

BROOKS

have been -- it was portrayed to me by my attorney, it would be redundant to keep going over it with every account that was opened, going over the LLCs because they were all basically the same.

MR. ALETTA: Okay. Did you have any objections to forming LLCs with these investors?

MR. GREENE: Hold on one second. To the extent that your answer to the question would reveal any discussions between you and your attorney regarding the formation of the LLC or any other kind of legal advice, I instruct the witness not to answer.

If you can answer the question without divulging any such communications you may answer.

MR. GROSSBERG: I object to the form of the question.

THE WITNESS: Without the conversations that I directly had with my attorney, it was portrayed to me that it was an LLC form that I should have no problem being in.

MR. ALETTA: Who portrayed that to you?

BROOKS

agreement other than the fact that if they brought people to me and I invested for them that I would be paid in a certain manner.

MR. ALETTA: Was that agreement in writing or oral?

MR. GREENE: I object to the form.

THE WITNESS: I don't recall having a written agreement with them. My agreement was -- everything was done, as far as I was concerned, facing Deutsche Bank. By the time they came to me, all the clients had basically been made customers of Deutsche Bank and then I was approached by Deutsche Bank to do the trading.

MR. GROSSBERG: Excuse me, just a point of clarification. When you say "Deutsche Bank," do you mean Deutsche Bank Alex Brown?

THE WITNESS: Yes, I mean the brokers.

MR. GROSSBERG: That's fine.

MR. ALETTA: You had an agreement -- didn't you have an agreement with Cantley that you would be setting up LLCs with the investors? Let me backup.

Didn't you have an agreement with Cantley

BROOKS

26,000?

THE WITNESS: -- 16,000 --

MR. SORENSEN: Approximately 20,000 --

THE WITNESS: -- 600. And if he would have won he would have gotten --

MR. SORENSEN: 60 percent of that 20,000?

THE WITNESS: 60 percent on top of that 20,000, right.

MR. SORENSEN: So when you say "60 percent," you are talking about a return here of getting your fee from Deutsche Bank back plus 60 percent of that fee?

THE WITNESS: Yes. 110 percent is what we had to pay to put the options on at Deutsche Bank.

MR. SORENSEN: Don't say 110 percent, let's say 110 basis points.

THE WITNESS: Right.

MR. SORENSEN: 1.1 percent?

THE WITNESS: 1.1 percent.

MR. SORENSEN: So you are advising that they had a 28 percent chance of getting 60 percent of 1.1 percent of that back?

THE WITNESS: Exactly.

BROOKS

MR. ALETTA: How were the premiums for the market link deposits determined and by "market link deposits" I am referring to the market link deposits involving Mr. Bevan?

THE WITNESS: Deutsche Bank modeled that and would say what our premiums were.

It was agreed that Deutsche Bank would be putting these options on at those variables for 1.1 percent of the size of the digital option.

MR. ALETTA: What do you mean by "size of the digital option"?

THE WITNESS: In Mr. Bevan's case the size of digital option was a million and-a-half dollars.

MR. ALETTA: Weren't there two digital options involved with Mr. Bevan or was it just one?

THE WITNESS: There are two options, I am talking about the long side of the option. There was a one and-a-half million dollar option minus whatever the premium was on the other side.

MR. ALETTA: You mentioned Deutsche Bank determined the premiums. Who at Deutsche Bank?

BROOKS

other 25 percent being credited to the LLC that was created.

MR. GREENE: There is no question pending here.

MR. ALETTA: Let's move on.

MR. SORENSEN: It's not a significant point. I'm trying to get clarification.

MR. ALETTA: Did NHB X acquire Canadian currency at some point?

THE WITNESS: Yes, they did.

MR. ALETTA: What was the purpose of NHB X acquiring --

THE WITNESS: I'm not sure what the purpose was. I was advised that they wanted to purchase $1,000 in Canadian currency.

MR. ALETTA: Who advised you?

THE WITNESS: Craig Brubaker.

MR. ALETTA: When did that occur?

THE WITNESS: Late in the year.

MR. ALETTA: Did Mr. Brubaker indicate any reason why the Canadian currency should be obtained by NHB X?

THE WITNESS: He did not.

MR. ALETTA: Do you have any notes

regarding that conversation with Craig Brubaker?

THE WITNESS: I do not.

MR. ALETTA: Do you have any correspondence regarding that decision?

THE WITNESS: I believe so.

MR. ALETTA: What happened to the Canadian currency?

THE WITNESS: I'm not sure. I believe it was credited to Mr. Bevan's account.

MR. ALETTA: Was it eventually sold?

THE WITNESS: I have no idea.

MR. ALETTA: Do you know of any tax reason for NHB X acquiring the Canadian currency?

MR. GROSSBERG: Objection to form.

THE WITNESS: I do not. I have no knowledge of these tax matters.

MR. ALETTA: Any tax reason for NHB X selling the Canadian currency?

MR. GROSSBERG: Objection to form.

THE WITNESS: I have no knowledge of that.

MR. ALETTA: Did the other investors' LCS with regard to the market link deposit transactions, did those other investors' LLCs

acquire Canadian currencies?
MR. GROSSBERG: Objection to form.
THE WITNESS: Some did, not all.
MR. ALETTA: Why was there Canadian currency in those cases acquired for those LLCs of the other investors?
THE WITNESS: I don't know.
MR. ALETTA: Who recommended that those -- that the LLCs acquire the Canadian currency?
THE WITNESS: In all cases it was either Craig Brubaker or David Parse.
MR. ALETTA: Did NHB X have any agreements with Craig Brubaker or David Parse?
MR. GROSSBERG: Objection to form.
MR. GREENE: Objection to form. David Parse and Craig Brubaker?
THE WITNESS: I have no idea.
MR. SORENSEN: -- too many names.
MR. ALETTA: Why did you follow their instructions with regard to acquiring the Canadian currency on behalf of NHB X, and "their instructions" being Mr. Brubaker's and Mr. Parse's.
THE WITNESS: In all cases it was shown to

me that the customer himself wanted to do it.

MR. ALETTA: How was it shown to you?

THE WITNESS: Mr. Parse or Mr. Brubaker said to me that this is what the customer wants to do.

MR. ALETTA: Do you recall a specific conversation in the Bevan case regarding Mr. Bevan with regard to that Canadian currency?

THE WITNESS: I do not.

MR. ALETTA: The Canadian currency that was acquired, that was the currency itself?

THE WITNESS: They acquired Canadian currency, Canadian dollars.

MR. ALETTA: You had mentioned that -- I don't know if we went over this, I don't think we went over this -- but you had mentioned before that NHB X had entered into foreign currency trades, currency option trades?

THE WITNESS: Yes.

MR. ALETTA: Did the other investors' LLCs also enter into currency option trades?

MR. GROSSBERG: Objection to form.

THE WITNESS: Yes, they did.

MR. ALETTA: How many currency option

trades did those other investors engage in and other investors' LLCs engage in?

MR. GREENE: Just to clarify, are you asking on aggregate or do you want the numbers per investor?

MR. ALETTA: I just guess to clarify, I would like a range how many currency options, each --

MR. SORENSEN: -- per investor?

MR. ALETTA: -- each investor engaged in?

THE WITNESS: Three to five.

MR. ALETTA: Three to five currency option trades.

THE WITNESS: Three to five individual currency option trades.

MR. SORENSEN: Following up on that, was there a more typical number?

MR. GREENE: I object to the form.

MR. GROSSBERG: Join.

MR. SORENSEN: Do you recall how many investors engaged in four transactions?

THE WITNESS: I would say that it really mattered on what time the MLD -- what time I started trading for the customer. Obviously,

million four eighty three five hundred for the short side of the option.

The net of that is what his actual cost was. That was the total premium and that was what I looked at.

MR. ALETTA: So the cost of Mr. Bevan in terms of actual dollars paid was the difference between the long premium and the short premium under the part of the deposits, correct?

THE WITNESS: Yes.

MR. ALETTA: With regard to these market link deposits, were any deposits made for the deposit portion of the transaction?

THE WITNESS: I don't know. My job was -- my world was strictly in this little premium and the risk on the trade. So in this whole thing, my world was that variable interest rate. My world was putting the risk in that market link area.

MR. ALETTA: Do you understand any other portions of the transaction as referenced in this confirmation other than the currency options transactions involving the Japanese yen?

BROOKS

MR. GREENE: I object. Could I get the question read back, please?

(Testimony was read back.)

MR. ALETTA: Do you understand any of the transactions referenced by confirmations in Exhibit T and Exhibit U other than the currency options portion of the transaction?

MR. GROSSBERG: Objection to form.

MR. GREENE: Join.

THE WITNESS: I understand that it's a long and short deposit. I have no knowledge of whether the deposits were made or not.

MR. GREENE: Can I take a five-minute break? I need to make a call about my replacement later whenever it's good for you guys.

MR. ALETTA: Let me just finish this document.

If you look down at the document under paragraph 2, Mr. Brooks, where it says, "Deposit." I'm looking at Exhibit T.

There is a "deposit, Norman H. Bevan. A deposit taken with Deutsche Bank. Deposit amount Euro 16,375,546 Euro."

BROOKS

MR. ALETTA: Did Deutsche Bank require any margin or security for entering into these market link deposit transactions referenced in Exhibit T and Exhibit U?

MR. GREENE: I object to the form.

THE WITNESS: I don't know about on the deposits, I know just from the risk side, they did. Obviously, the options had to be paid for upfront and that premiums we were talking about, the premiums needed to be paid.

MR. ALETTA: The net premiums?

THE WITNESS: Well, the difference between the long and the short.

MR. ALETTA: Okay. Outside of the premiums did Deutsche Bank require any other security or margin --

THE WITNESS: I have no idea.

MR. ALETTA: -- for these transactions referenced in Exhibits T and U?

THE WITNESS: I have no idea. Mr. Bevan was a customer of the bank but I don't know what his relationship was with the bank.

MR. GREENE: I need a break to make a call to my office. I'll be right back.

(A short break was taken.)

MR. GROSSBERG: I wish to make a standing objection to any leading questions.

MR. ALETTA: We're ready?

THE WITNESS: Yes.

MR. ALETTA: We're back on the record.

With regard to these market link deposit transactions referenced as Exhibit U and T entered into by Mr. Bevan, did the other investors enter into similar market link deposit transactions with Deutsche?

THE WITNESS: Yes, they did.

MR. ALETTA: Were the basic terms similar to the market link deposits referenced in Exhibits U and T?

THE WITNESS: Yes, they were.

MR. ALETTA: Did they all use long and short positions on these market link deposit transactions?

THE WITNESS: Yes, they did.

MR. ALETTA: Was there any particular reason why a long and a short position was used?

THE WITNESS: I really don't know. Once

again, my place was in the digital options so I don't know why they came up with the structure they came up with.

MR. ALETTA: Who told you to enter into a long and a short position for each of the investors with regard to market link deposit transactions?

THE WITNESS: I was approached by -- all Deutsche Bank customers who looked to do a digital option that had a long and short position.

MR. ALETTA: You were approached by all of the investors to do this type of transaction?

THE WITNESS: I was approached by Deutsche Bank Alex Brown.

MR. ALETTA: Answer the question, please.

MR. GROSSBERG: Can you repeat the question?

MR. GREENE: I'd like to hear it as well.

(Testimony was read back.)

THE WITNESS: I guess the most direct answer to that is that this was a structure that I was presented with to put risk into. The structure came from Cantley & Sedacca

BROOKS

through Deutsche Bank.

MR. ALETTA: Through Mr. Brubaker?

THE WITNESS: Through Mr. Brubaker and Mr. Parse.

MR. ALETTA: Did Deutsche have any ability to determine the spot price with regard to the currency options in regard to the market link deposit transactions?

THE WITNESS: What do you mean by "determine"? Fix it, say in two months it's going to be here?

MR. ALETTA: No, I'm not talking about fixing it. I'm talking about picking the spot price. Were they the calculating agent?

THE WITNESS: Yes, they are definitely the calculating agent.

MR. ALETTA: Could you explain what that means?

THE WITNESS: Any large options desk in the big bank is going to make sure that they are the calculating agent for when options come to term to determine exactly where the market is.

Now, any big bank cannot randomly do that

Mr. Bevan's MLD transactions, if they both finished in the money, how much money would he have received?

THE WITNESS: He would have received an additional $6,000 some or more.

MR. SORENSEN: $6,400?

THE WITNESS: Yes.

MR. ALETTA: Did you consider whether taking 19,800 would be cause to forego having both options finishing in the money?

THE WITNESS: Yes, I did. But in this situation what your options are to make money or not to make any money at all that's really what Mr. Bevan was hiring me to do, that is to trade the market.

MR. ALETTA: Whom did you discuss the termination with at Deutsche?

THE WITNESS: I put the order in with Craig Brubaker to sell.

MR. ALETTA: Was there any discussion back and forth between yourself and Mr. Brubaker regarding this termination?

THE WITNESS: Mr. Brubaker was a broker.

MR. ALETTA: Did you have any discussions

Alex Brown.

MR. ALETTA: Okay. Take a look at page 2 for a moment here. Do you see the statement there? There is a chart that talks about deposit, premium received, fixed interest, variable interest.

Do you see what I'm referring to?

THE WITNESS: Yes, I do.

MR. ALETTA: Take a look at the variable interest column. Do you see the payment of 19,800?

THE WITNESS: I see it.

MR. ALETTA: Can you explain to us, first of all, what does that refer to and secondly, why is that referred to as variable interest? Do you have any knowledge of that?

THE WITNESS: My responsibility in the MLD transaction was with variable interest. Variable interest is the currency option that's traded in the structure. It's variable because you could win or you could lose.

Fixed interest is you put your money in the bank and somebody pays you 4 percent. Variable interest is the derivative that says,

if we put you on the right way you could win money, if we don't you can lose the premium.

MR. GREENE: Is this a good time to call?

MR. ALETTA: Yes.

(A short break was taken.)

MR. ALETTA: Mr. Brooks, let's take a look at Exhibit W and X again which is the termination agreement for Mr. Bevan and the market deposit transactions, the confirmations of those terminations.

THE WITNESS: I have them.

MR. ALETTA: I noticed on page 2 that Mr. Bevan executed that termination confirmation. Do you see that what I'm referring to?

MR. GROSSBERG: Are you back at X?

MR. ALETTA: W and X.

Mr. Bevan executed that, right? Do you see what I'm referring to, page 2 of Exhibits W and X?

THE WITNESS: Yes, it looks like he signed the confirm.

MR. ALETTA: And Jessica Walters also signed that?

THE WITNESS: Yes.

the top of Exhibit W, the very top, above the words Deutsche Bank, there is a phone number and there is also a circle. We missed the area code, it looks like the area code begins with 2 and then there is a 469-3240.

Do you see the number I'm referring to at the very top of Exhibit W?

THE WITNESS: Once again, I'm not sure. But I believe 469 is the Deutsche Bank exchange.

MR. ALETTA: Could you turn to Exhibit Z? This is the document entitled "Assignment of Limited Liability and Joinder Agreement."

Do you see Exhibit Z?

THE WITNESS: I do see it.

MR. ALETTA: Are you familiar with this document?

THE WITNESS: This is a document that Mr. Bevan terminated me from the LLC, I believe.

MR. ALETTA: Okay. Who drafted this document?

THE WITNESS: I'm not sure but I believe it was Cantley & Sedacca.

MR. ALETTA: When did Mr. Bevan execute

this document?

THE WITNESS: According to the document it says "the 26th day of December."

MR. ALETTA: But do you have knowledge about when Mr. Bevan actually executed this document?

THE WITNESS: I do not.

MR. ALETTA: Do you have any knowledge of when Mr. Bevan first received this document?

THE WITNESS: I do not.

MR. ALETTA: Do you know when you first received this document?

THE WITNESS: I would have to check to see if I did, in fact, receive this document. I don't know.

MR. ALETTA: Turn to page 2. Is that your signature at the bottom?

THE WITNESS: Yes, it is. I am assuming that it's the 26th day of December but I don't know for sure.

MR. ALETTA: What was the purpose of this document?

THE WITNESS: It's my understanding that Mr. Bevan no longer wanted me to be authorized

BROOKS

to trade in the account and he wanted me to be -- he wanted to buy out my interest in the LLC.

MR. ALETTA: Did the other investors in the market link deposit transactions use a similar document to terminate your interest in the LLCs?

THE WITNESS: Yes, they did.

MR. ALETTA: Did you execute those documents for those other investors' LLCs?

THE WITNESS: Yes, I did.

MR. ALETTA: Were there any tax reasons for executing these documents?

THE WITNESS: I have no idea.

MR. ALETTA: Turn to Exhibit A-A. This is a letter from Norman H. Bevan to Craig Brubaker dated December 26. The letter says, "This letter is to inform you that Clarion Four X Advisors LX, LLC assigned all of its interest in NHB X, LLC to Norman H. Bevan and is no longer a member of NHB X."

Are you familiar with this letter?

THE WITNESS: Yes.

MR. ALETTA: Was this letter provided to you at any point?

THE WITNESS: I can't remember if I got this particular letter. I would have to check and see but it was what would be provided to Deutsche Bank when someone was taking someone's trading authority off an account.

MR. ALETTA: Do you know when Mr. Bevan executed this letter?

THE WITNESS: I do not.

MR. ALETTA: Did the other investors execute similar letters, other investors in the market link deposit transactions?

THE WITNESS: Yes, they did.

MR. ALETTA: Could you turn to Exhibit A-D? Exhibit A-D is a fairly thick exhibit, it is a legal opinion from Cantley & Sedacca.

THE WITNESS: I have it, yes.

MR. ALETTA: Are you familiar with this document?

THE WITNESS: No, I am not.

MR. ALETTA: Were you aware that Cantley & Sedacca were providing legal opinions to the investors in the market link deposit transactions?

THE WITNESS: Yes, I was.

BROOKS

MR. ALETTA: How did you become aware of that?

THE WITNESS: I was told that when I was approached to do the investing that it was -- they did have tax ramifications and it became clear as we actually went through the process of vetting this particular transaction through not only Deutsche Bank but also SOCGEN.

MR. ALETTA: Mr. Brooks, who made you aware of this legal opinion?

MR. GREENE: I object to the form.

THE WITNESS: I have never seen this legal opinion.

MR. ALETTA: Who made you aware that Cantley & Sedacca were going to be issuing legal opinions for the investors in the market link deposit transactions?

MR. GROSSBERG: Objection to form.

THE WITNESS: I would have to say Cantley & Sedacca themselves.

MR. ALETTA: Are you referring to both Beckette Cantley and Edward Sedacca?

THE WITNESS: Yes.

MR. ALETTA: When did they make you aware

of that?

THE WITNESS: When they asked me to put the risk in the transaction. This was nothing that was hidden.

MR. ALETTA: Okay. Again, can you give us a date when this occurred, when this conversation happened?

THE WITNESS: I would say May or June of 2001. I'm not sure.

MR. ALETTA: Do you know why the legal opinions were being provided to the investors?

THE WITNESS: I don't know specifically why.

MR. ALETTA: What did Beckette Cantley or Edward Sedacca tell you about the use for the providing of these legal opinions to the investors?

THE WITNESS: Nothing specific. I would say that in the vetting process of taking of the bank looking at the entire program that I was CC'd on some e-mails that would have had some mention of what can be construed as other trades like work or whatever, but no one ever sat down with me and went through the legal

opinion as to what they were doing with it.

MR. ALETTA: Did you provide information with Cantley & Sedacca in connection with the drafting of these legal opinions that they provided to the investors?

THE WITNESS: The only thing that I provided was my reps about what I was doing with the trades.

MR. ALETTA: The investor representations?

THE WITNESS: Exactly.

MR. ALETTA: The ones that we were talking about earlier?

THE WITNESS: Yes.

MR. ALETTA: You never had any other discussions with members of the firm of Cantley & Sedacca regarding the market link deposit transactions or your role in the market link deposit transactions?

THE WITNESS: Nothing outside of what parameters risk-wise are going to be put on the transactions. No.

MR. ALETTA: Did you provide any documents to Cantley & Sedacca for the preparation of any legal opinions other than your investor

representations?

THE WITNESS: Just risks.

MR. ALETTA: Excuse me?

THE WITNESS: Just the investor reps of the risk. I am talking about currency risk.

MR. ALETTA: I think we have to clarify that.

What documents were provided to Cantley & Sedacca by you in connection with any legal opinions that were provided to the investors?

THE WITNESS: I was presented with a structure that they wanted me to put risk into, they wanted me -- I should be more clear -- that they wanted me to imbed an option in. And I put as part of my representations the probability of the trade winning, what we would do when the trade won, what we had been discussing, a 28 percent chance of getting a 60 percent return.

MR. ALETTA: How did you transmit that information to Cantley & Sedacca?

THE WITNESS: That was all basically done with and through Deutsche Bank, Craig Brubaker.

MR. ALETTA: Did you provide any written

BROOKS

documents to Cantley & Sedacca in connection with the legal opinions?

THE WITNESS: No, nothing in connection with the legal opinions. I would have had conversations with Craig Brubaker and Dave Parse about what it was going to cost the customer to put a transaction on, like we talked before about 110 percent basis points and what my fee was. Outside of that I would not have had direct conversations.

MR. ALETTA: Take a look at page 5 of Exhibit A-D. I'm referring to the first paragraph of page 5, the first sentence. The sentence reads, "We understand that the investor had communicated his concerns to Mr. Brooks regarding the current status of the United States equity markets as well as the lack of perceived opportunity for investment type yields in the bond markets."

Did you provide information to Cantley & Sedacca regarding the statement I just read that's contained in the legal opinion?

THE WITNESS: No, I did not.

MR. ALETTA: Do you know where Cantley &

BROOKS

Exhibit A-D which is, again, a legal opinion from Cantley & Sedacca.

THE WITNESS: I'm there.

MR. ALETTA: If you look at the second full paragraph which is about two-thirds of the way down, "It has been represented" -- do you see where I'm reading? The second full paragraph.

THE WITNESS: I do, I see it.

MR. ALETTA: The paragraph says, "It has been represented to us that based on the investment information provided by CC as to the probability of the investments reaching certain price levels at which they would be profitable and on the advice of the investor's own investment advisors, the investor believes and continues to believe that he has and will continue to have a reasonable opportunity to earn a significant economic profit from the transactions in excess of all the fees and transactions costs without regard to tax benefits."

Now, the reference to CC, does that refer to an entity formed by Clarion Capital that's

controlled by you?

MR. GREENE: I object to the form.

THE WITNESS: I believe it's Clarion Capital.

MR. ALETTA: Clarion Capital itself, okay.

Did you provide any information to Cantley & Sedacca regarding that statement that I read in this legal opinion?

THE WITNESS: I believe that I said to Cantley & Sedacca that there was a reasonable chance of making a good, significant economic profit.

MR. ALETTA: And how would you have communicated that to Cantley?

THE WITNESS: I think it would probably be on my representations to them.

MR. ALETTA: Outside of the representations was any other information provided that's referenced in this statement I just read from this opinion in Exhibit A-D?

THE WITNESS: I don't believe so other than the fact of what I thought reasonable returns to be over a period of time.

MR. ALETTA: The next sentence in that

BROOKS

I think I talked in general of what was expected from currency traders. If you weren't somebody who could produce at that time 15 to 20, 25 percent return, you weren't going to be able to keep people's money.

MR. SORENSEN: Did you advise any of the individuals that they needed to stay invested approximately five years to realize a return?

THE WITNESS: No, I did not.

MR. SORENSEN: This is Exhibit 2 again. Looking at the second full paragraph, is there an indication of the time line you expected the investors to stay invested?

MR. GREENE: I object to the form. I'm sorry, are you referring him to page 2?

MR. SORENSEN: Page 2, the first paragraph.

THE WITNESS: I'm looking at it. I think that that would refer to the fact that to get a steady return between 15 and 17 percent that a reasonable time to have money invested was five years.

MR. SORENSEN: So at least in this case you were advising this individual that to

achieve those type of results they would need
to stay in at least five years?
MR. GREENE: Object to the form.
THE WITNESS: I think I was telling the
customer he would have a reasonable opportunity
to realize that if he stays in for that amount
of time.
MR. SORENSEN: Do you believe that you
gave similar advice to the majority of the
individuals in this transaction?
MR. GREENE: I object to the form.
THE WITNESS: I think over time, to have
that type of return, on average, you need a
decent period of time.
MR. SORENSEN: Of the approximately 150
people who had invested with the MLDs, how many
of those stayed invested with you longer than
three months?
THE WITNESS: I'd have to go back and check
but probably half.
MR. SORENSEN: How many of them stayed
invested after the end of the year?
THE WITNESS: None of them did.
MR. SORENSEN: None of them did?

THE WITNESS: Not even one.

MR. SORENSEN: I believe that during the earlier questioning you indicated that to your knowledge when an individual entered into this transaction, Cantley & Sedacca sent out a package of documents; is that correct?

THE WITNESS: I have no knowledge of what they sent.

MR. GREENE: Objection to form. I think it mischaracterizes the witness's prior testimony.

MR. SORENSEN: To your knowledge, did Cantley & Sedacca send out a package of documents?

MR. GREENE: Objection to form, asked and answered. You can answer again.

THE WITNESS: I don't know what and when they sent out to the customer.

MR. SORENSEN: After a typical individual invested in or agreed to invest in these transactions, did Cantley & Sedacca -- what, if anything, did Cantley & Sedacca send to you?

THE WITNESS: Cantley & Sedacca -- actually, I don't recall them saying to me

MR. GREENE: Is their a reference to Palm Canyon here? I haven't seen it yet.

MR. SORENSEN: I believe Mr. Hamel's or Mr. Lamb's name is at the top.

MR. GREENE: Thank you.

MR. SORENSEN: How much does it say they stand to make if all options end in the money?

MR. GREENE: I object to the form.

THE WITNESS: It says $8 million gain.

MR. SORENSEN: If they both end in the money not the sweet spot?

MR. GREENE: I object to the form.

THE WITNESS: $88,000.

MR. SORENSEN: That's the 60 percent of the amount of risk; is that right?

THE WITNESS: It is.

MR. SORENSEN: And what is the $8 million called by you?

THE WITNESS: Remote lottery feature.

MR. SORENSEN: That would be what you referred to as the sweet spot, correct?

THE WITNESS: Yes, it would.

MR. SORENSEN: Do you assign a percentage likelihood of achieving that result?

MR. GREENE: I object to the form.
THE WITNESS: It was usually a little over 1 percent.
MR. SORENSEN: 1.3 percent?
THE WITNESS: That's sounds correct.
MR. SORENSEN: What was the percentage of the option that they would not make any money? Is there a simple math?
THE WITNESS: 70 percent.
MR. SORENSEN: Roughly 71 percent?
THE WITNESS: Right. If I remember correctly, though, I believe this did make money.
MR. SORENSEN: We're going to talk about that now.
MR. GREENE: We have still have a few minutes left.
MR. SORENSEN: In that form you indicated that they had a 28 percent chance of making 60 percent, $55,000 or 88,000, correct?
THE WITNESS: Right.
MR. SORENSEN: I actually have two copies of the next document.
MR. GROSSBERG: I'm going to raise another

THE WITNESS: They just said I wanted to buy $1,000 worth of Canadian.

MR. SORENSEN: They identified the currency?

THE WITNESS: They did.

MR. SORENSEN: They identified the amount?

THE WITNESS: They did.

MR. SORENSEN: As I understand your statements earlier, these investors were clients of the bank before they came to you, correct?

THE WITNESS: They were, all of them.

MR. SORENSEN: They were all clients of the bank. They came to you for advice on making transactions with the bank?

THE WITNESS: Right.

MR. SORENSEN: Were all transactions made with Deutsche Bank?

THE WITNESS: No.

MR. SORENSEN: What other banks did you use?

THE WITNESS: SOCGEN.

MR. SORENSEN: Any others besides those two?

BROOKS

THE WITNESS: No.

MR. SORENSEN: Who determined which of those banks were used?

THE WITNESS: I did.

MR. SORENSEN: Approximately how many of those transactions were made by SOCGEN.

THE WITNESS: I can't be certain but I think around 30.

MR. SORENSEN: 30 of the 150?

THE WITNESS: Yes.

MR. SORENSEN: Did you know somebody at SOCGEN?

THE WITNESS: I knew a fellow from my town that has been in foreign exchange for a long time. Yes, I knew somebody there.

MR. SORENSEN: I didn't mean that as a sinister-type question. It's not unusual for people to go to traders they know.

THE WITNESS: No, it's not and also, I find anyway, you need more than one bank to deal with.

MR. SORENSEN: Of the LLCs or all the investors, how many of them had accounts with Deutsche Bank?

C E R T I F I C A T E

STATE OF NEW YORK )
SS:)
COUNTY OF NEW YORK)

I, Helen Mendlowich, a Notary Public within and for the State of New York, do hereby certify:

THAT Daniel Brooks, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand of this 30th day of November 2006.

Helen Mendlowich

HELEN MENDLOWICH

IN THE MATTER OF:

EXAMINATION UNDER OATH OF EDWARD SEDACCA

RE: UNITED STATES TAX COURT
DOCKET NO. 17453-05

IN THE MATTER OF:
NHB X, LLC, NORMAN H. BEVAN, TAX MATTERS PARTNER,
Petitioners,

VS

COMMISSIONER OF THE INTERNAL REVENUE,
Respondent.

PRESENT AT TAKING OF STATEMENT:
EDWARD SEDACCA, WITNESS
DAVID SORENSEN, INTERROGATOR
JOHN ALETTA
MARY A. McNULTY
M. TODD WELTY
ERNEST W. LEONARD
JAMIE K. ISRAELOW,
CERTIFIED SHORTHAND REPORTER

EXAMINATION UNDER OATH in question-and-answer form of EDWARD SEDACCA, taken before Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter and Certified Shorthand Reporter, at the offices of Equity Group, 5220 Spring Valley Road, Suite 410, Dallas, Dallas County, Texas, on the 26th day of January, 2007, from 2:01 p.m. to 4:00 p.m., at which time the following proceedings were had:

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
35

P R O C E E D I N G S

(On the record at 2:01 p.m.)

EDWARD SEDACCA,

the witness hereinbefore named, being of lawful age and being first duly cautioned and sworn in the above cause, testified on his oath as follows:

EXAMINATION

14:01:26 BY MR. SORENSEN:

14:01:27 Q Why don't you state your name and
14:01:28 spell it for her.

14:01:29 A Edward Sedacca, S as in Sam,
14:01:36 e-d-a-c-c-a.

14:01:36 Q Could you give us a brief background
14:01:38 of your education?

14:01:40 A I have a -- a bachelor's of science
14:01:44 from San Diego State University. I have a law
14:01:47 degree from the University of Iowa College of Law,
14:01:49 and I have a master's of taxation from New York
14:01:53 University School of Law.

14:01:55 Q Approximately when did you get your
14:01:56 JD?

14:01:57 A '92, I believe.

14:01:58 Q And your LLM?

14:01:59 A I'm sorry. '89 for the JD and '92
14:02:05 for the LLM.

14:02:06 Q And could you briefly describe your
14:02:08 work experience since law school?
14:02:10 A While in law school -- since law
14:02:13 school, I apologize, I worked for Feingold &
14:02:21 Napoli in New York City, which is a tax boutique
14:02:24 firm in New York that focuses just on tax law.
14:02:29 Q From when to when?
14:02:30 A From graduation until July of '95. I
14:02:38 met my wife in New York City. You're going to ask
14:02:41 why I came to Texas. I might as well put that in
14:02:44 there.
14:02:44 My wife did her residency at
14:02:47 Mount Sinai Hospital in New York, and we got
14:02:50 engaged and decided to leave New York City and
14:02:51 come to Dallas where she's from. I initially took
14:02:57 a position with Ginsberg & Brusilow in Dallas and
14:03:04 quickly recognized that probably wasn't a good
14:03:07 fit. And then I went to work for --
14:03:10 Q Time frames again, roughly?
14:03:11 A I was there probably 90 days.
14:03:15 Q Okay.
14:03:15 A In November of '95, I began working
14:03:19 for Cline & Associates. I worked at Cline &
14:03:25 Associates until approximately February of '98,
14:03:31 where I took a job with working for companies

14:03:38 owned and controlled by Andrew Beal. I resigned
14:03:47 in the second quarter of 2001 from Mr. Beal, and I
14:03:54 took -- and then that's when I became a partner at
14:03:57 Cantley & Sedacca. I was with Cantley & Sedacca
14:04:02 for the entire year of 2001 and decided to sever
14:04:07 my relationship the first quarter of 2002.
14:04:11 Eventually, I started the
14:04:13 Equity Group, which is where basically I have
14:04:16 been -- remained employed since -- since then.
14:04:21 Q Okay. Let's be a little more
14:04:22 specific. You said the second quarter of 2001.
14:04:24 Do you remember when Cantley &
14:04:27 Sedacca was formed?
14:04:31 A Specific dates, no. Second quarter,
14:04:34 in generality. I mean, second quarter 2001 would
14:04:38 be my best recollection.
14:04:39 Q Would it help if it was sometime in
14:04:41 April of 2001?
14:04:45 A That would be in the second quarter,
14:04:48 yes.
14:04:49 Q Okay. Well, I was curious. You said
14:04:50 you were then employed by Cantley & Sedacca for
14:04:55 the full year of 2001. Do you mean --
14:04:57 A The remainder.
14:04:59 (Interruption.)

14:05:01 THE WITNESS: 10 minutes.
14:05:03 BY MR. SORENSEN:
14:05:03 Q And what do you do in the Equity
14:05:07 Group?
14:05:07 A I am presently the managing -- the
14:05:09 chairman of the Equity Group. The Equity -- and
14:05:10 my primary responsibility is to oversee the
14:05:13 business activities that the Equity Group has
14:05:17 become involved with.
14:05:18 Q As a practicing attorney?
14:05:21 A No.
14:05:21 Q Are you still licensed as an
14:05:23 attorney?
14:05:23 A No, I'm not.
14:05:25 Q Were you disbarred?
14:05:27 A No.
14:05:29 Q Just gave up your license?
14:05:30 A I -- I was licensed in New York and
14:05:33 Texas. I officially resigned in -- from New York
14:05:39 and I just let my license lapse in Texas.
14:05:41 Q Were there any disciplinary actions
14:05:43 pending at the time?
14:05:44 A I didn't finish my continuing
14:05:46 education, so I -- I'm not sure what you call it,
14:05:49 but they sent me a letter saying: You didn't

14:05:52 complete your continuing education and you're
14:05:54 suspended from practicing law.
14:05:56 Q That's in Texas?
14:05:57 A In Texas.
14:05:58 Q Were there any adversary complaints
14:06:01 against you, either bars?
14:06:05 A Not that I'm aware of.
14:06:06 Q Were you -- as a result of your
14:06:09 activities with Cantley & Sedacca, were you sued
14:06:13 for malpractice?
14:06:15 A No. I was sued, and I believe
14:06:23 malpractice might -- was one of the multiple
14:06:28 complaints that was contained in there, yes.
14:06:30 Q Right. And what -- what lawsuit was
14:06:32 that? What's the name of the lawsuit?
14:06:37 A Well --
14:06:37 Q Or the lawsuits?
14:06:38 A I mean, the law -- the -- the --
14:06:44 MR. WELTY: Can you tell him
14:06:44 who the lawyer that basically brought them? Maybe
14:06:47 that would --
14:06:47 THE WITNESS: What's his name
14:06:47 in Dallas.
14:06:50 MR. WELTY: Deary?
14:06:50 THE WITNESS: Deary, yes.

14:06:53 THE REPORTER: Deary.
14:06:54 THE WITNESS: David Deary.
14:06:55 BY MR. SORENSEN:
14:06:56 Q Was there only one lawsuit?
14:06:58 A No. Well -- well, what happened was
14:06:59 originally -- initially there was a lawsuit filed
14:07:02 against Jenkins & Gilchrist and I was named in
14:07:05 that suit.
14:07:06 Subsequent to that, there was
14:07:08 another lawsuit filed in the Southern District of
14:07:10 New York. It was filed as a class action.
14:07:13 Subsequent to that, there was a lawsuit in --
14:07:16 Michael Link. That's the --
14:07:18 Q Is that the lawsuit?
14:07:20 A Yes.
14:07:21 Q Was that the only lawsuit that you
14:07:22 know of?
14:07:23 A No.
14:07:23 Q What were the others?
14:07:24 A There was a lawsuit filed in
14:07:29 San Diego. I don't know if anyone was ever served
14:07:32 on it, but my understanding is all of those
14:07:36 lawsuits -- any potential lawsuit or pending
14:07:39 lawsuit was consolidated into the Link settlement.
14:07:44 Q The Link class action lawsuit?

14:07:46 A Class action lawsuit.
14:07:47 Q And the class action lawsuit alleged,
14:07:50 among other things, malpractice and fraud?
14:07:54 A Yes.
14:07:54 Q Was it in relation to a particular
14:08:00 activity that your law firm was engaged in?
14:08:03 A Yes.
14:08:03 Q And what was that activity?
14:08:06 A It was for -- I'm trying to -- I'm
14:08:12 not trying to sideswipe the question. I'm trying
14:08:15 to figure out how to answer the question.
14:08:17 Q That's fine.
14:08:18 A It was because certain former clients
14:08:23 of Cantley & Sedacca entered into certain
14:08:26 transactions, and as a result of those
14:08:28 transactions, they're now being challenged by the
14:08:33 Internal Revenue Service, and they're bringing --
14:08:34 they're bringing the causes of actions as a result
14:08:37 of that.
14:08:38 Q Can you describe these transactions
14:08:42 or a generic transaction?
14:08:44 A A -- I mean --
14:08:45 Q Were they all the same?
14:08:46 A Were they all the same transaction?
14:08:49 I think the reason they tried to bring a class

14:08:52 action is because there's a single -- a similar
14:08:55 legal analysis that attached to the transactions.
14:08:59 Was the facts of each
14:09:02 transaction the same? No. Was there a -- was
14:09:05 there a similar threat or legal analysis? I
14:09:07 believe the answer to that would be yes.
14:09:10 Q And did those involve the Market
14:09:14 Linked Deposits?
14:09:14 A Yes.
14:09:14 Q Yes. Can you briefly describe a
14:09:20 Market Linked Deposit, what it is?
14:09:26 A I'm not sure what you're asking.
14:09:29 MR. WELTY: Are you talking
14:09:30 about the actual market link investment?
14:09:34 MR. SORENSEN: The scheme --
14:09:34 the tax scheme.
14:09:35 MR. WELTY: The scheme?
14:09:36 Well --
14:09:38 MR. SORENSEN: My word for it,
14:09:38 the tax scheme.
14:09:40 MR. WELTY: Can you describe
14:09:40 what the investment -- are you wanting to know
14:09:42 what the market link investment is? Are you
14:09:44 wanting to know what the legal issue was?
14:09:47 MR. SORENSEN: I want him -- I

14:09:47 want to see if he can describe the actual
14:09:50 investments that his clients entered into.
14:09:54 A The actual investments?
14:09:56 BY MR. SORENSEN:
14:09:56 Q Yes.
14:09:57 MR. WELTY: Each one?
14:09:57 A The answer -- from the investments
14:09:59 themselves, I was -- I never acted as investment
14:10:03 advisor to any of the clients. I never assisted
14:10:06 in the purchase or sale of the investments
14:10:09 themselves, that I can recall.
14:10:11 BY MR. SORENSEN:
14:10:12 Q Okay. Well, let's back up. How did
14:10:14 you -- how did you meet these clients?
14:10:29 A The clients were introduced to the
14:10:32 firm.
14:10:33 Q By whom?
14:10:38 A I mean --
14:10:39 MR. WELTY: If you know, or --
14:10:40 if you know specifically, tell him.
14:10:43 A I mean, I don't -- I don't -- I mean,
14:10:46 I can't give -- I mean, I have -- the clients were
14:10:51 introduced to the firm and --
14:10:52 BY MR. SORENSEN:
14:10:53 Q Well, let me ask another question.

14:10:54 You know Daniel Brooks?
14:10:56 A I do know who Daniel Brooks is, yes.
14:10:58 Q Did Daniel Brooks refer clients to
14:11:04 you?
14:11:05 A Daniel Brooks would introduce --
14:11:06 would -- on specific times would have likely
14:11:09 introduced clients to the firm, yes. I don't know
14:11:11 that I know -- I can name any specific client,
14:11:15 because there was several lawyers and --
14:11:18 Q Well, let's talk about the office
14:11:21 makeup. Where was the office located -- Cantley &
14:11:25 Sedacca's office here in Dallas?
14:11:26 A The senior partner was Beckett
14:11:28 Cantley, and he was located initially in Atlanta,
14:11:33 Georgia, and relocated to Miami. I, myself, was
14:11:37 located in Dallas. Still am located in Dallas.
14:11:40 Q And --
14:11:40 A John Ivsan was located in wherever he
14:11:46 lives, Charlotte.
14:11:46 Q North Carolina.
14:11:48 A And then Robert Bloink was hired, and
14:11:53 he would -- he would frequently be in Dallas. And
14:11:58 eventually, Jeremy Nerenberg was hired, and he
14:12:02 officed full-time in Dallas.
14:12:03 Q Were there other office members in

Dallas?

A Lawyers?

Q Staff.

A Yes.

Q And who were they?

A They were Jason Saffran, and then we had a secretary, Karen --

MR. ALETTA: Davidson?

THE WITNESS: Davidson.

BY MR. SORENSEN:

Q And physically your offices were located in this building?

A Correct.

Q Two floors up?

A Correct.

Q Approximately how many clients did Cantley & Sedacca have?

A My belief is we had approximately 80 to 90 clients.

Q And of the number of clients you remember, how many of them entered into this typical Market Linked Deposit transaction that we're talking about?

A That -- the -- the majority of them.

Q Would it surprise you to learn there

14:13:00 was actually about 180 of them?
14:13:02 A Well, I've learned through the
14:13:03 litigation, 180. But again -- again, I don't want
14:13:06 to split hairs. And just for clarification, a
14:13:10 husband -- is a husband and a wife two different
14:13:13 clients or is that --
14:13:14 Q Not from our perspective.
14:13:17 A Because my understanding is 180
14:13:18 included husband and wife, children, whatever.
14:13:19 But I've -- I've heard the number 180 before, yes.
14:13:22 My understanding was it was in the 80 to 90 range.
14:13:25 Q And you would estimate
14:13:28 what percentage of them were involved in the
14:13:32 Market Linked Deposit transactions?
14:13:33 A You mean versus doing other legal
14:13:35 work or other transactions?
14:13:40 Q Let's start with other transactions.
14:13:42 A I can -- I didn't -- I wasn't
14:13:45 involved in any other transactions.
14:13:47 Q Okay. So what percentage of the 90
14:13:53 that you recall were involved in the Market Linked
14:13:56 Deposit transactions?
14:13:58 A Well, that's -- that's my thought. I
14:13:58 mean, I thought that was -- that's --
14:14:00 Q What I'm trying to get at, it's our

14:14:02 impression 100 percent of them is. Is that a fair
14:14:04 statement?
14:14:04 A Well, I mean, I -- I didn't ask -- I
14:14:05 didn't know if you were asking did I do wills for
14:14:07 somebody or had I done this or had I done that?
14:14:09 Okay. So you're asking that? Yes. Okay. I
14:14:13 think it's safe to say it's a very
14:14:17 high percentage, but I can't give you specific.
14:14:19 Q Very high?
14:14:20 A Yes.
14:14:20 Q Have you ever seen this document
14:14:25 before?
14:14:25 MR. WELTY: What is this
14:14:27 document?
14:14:31 MS. McNULTY: You don't have
14:14:32 another copy?
14:14:34 MR. SORENSEN: I'm afraid
14:14:34 those are the two copies I have.
14:14:39 MR. ALETTA: Why don't you
14:14:40 identify it for the record.
14:14:41 MR. SORENSEN: I will.
14:14:57 A I do not recognize this document.
14:14:57 BY MR. SORENSEN:
14:14:57 Q You don't? Okay.
14:14:59 MR. SORENSEN: And just for

14:15:00 the record, this document appears to be a document
14:15:03 that is a flow through -- a flow chart analysis of
14:15:08 a law scheme. In fact, it's called --
14:15:11 MR. WELTY: Of what?
14:15:12 MR. SORENSEN: A law scheme.
14:15:14 It's entitled: Example of $500,000 Loss
14:15:18 Generated.
14:15:18 MR. WELTY: Okay. So the
14:15:19 document is entitled: Proprietary and
14:15:22 confidential. Do not copy or distribute. Example
14:15:24 of $500,000 Loss Generated. And it's one, two,
14:15:32 three -- four pages long; is that right?
14:15:34 MR. SORENSEN: Yeah. But
14:15:35 since the witness hasn't -- doesn't recognize it,
14:15:37 we won't go any further on that.
14:15:44 BY MR. SORENSEN:
14:15:44 Q Can you describe how a client with
14:15:47 the firm was introduced to this transaction?
14:16:00 A Some -- a partner in the firm or
14:16:02 somebody in the firm would receive a call --
14:16:04 Q Okay.
14:16:04 A -- saying: So and so would like to
14:16:06 meet with you.
14:16:09 Q When you say "you," who do you mean?
14:16:12 A "You" being just a member of the