14:16:13 firm.
14:16:14 Q And --
14:16:15 A Or --
14:16:16 Q -- the members of the firm at that
14:16:17 time, let's just be clear, were you, Jeremy
14:16:21 Nerenberg and Robert Bloink here in Dallas?
14:16:24 A And John Ivsan.
14:16:26 Q In North Carolina?
14:16:27 A In North Carolina. And Beckett
14:16:28 Cantley.
14:16:29 Q In Atlanta?
14:16:30 A In Atlanta or -- or Florida, wherever
14:16:33 he was.
14:16:36 Q Okay.
14:16:36 A We would receive a call, just like
14:16:37 any lawyer or law firm would receive a call
14:16:40 saying -- you know, the call could have gone to
14:16:44 Beckett or it could have gone to Robert Bloink or
14:16:48 John Ivsan or myself and saying: We have a client
14:16:51 that would like to meet with you.
14:16:55 (Mr. Leonard entered the
14:17:20 deposition proceedings.)
14:17:21 BY MR. SORENSEN:
14:17:21 Q You want to go on?
14:17:23 A Sure.

14:17:24 We obviously inquire into
14:17:28 what -- what the client was interested in speaking
14:17:32 with us about, and we would -- we would make
14:17:39 arrangements for that client to have an
14:17:40 opportunity to speak with one of the lawyers in
14:17:43 the firm. The client was in -- the client was
14:17:53 usually accompanied by his or her other
14:17:57 professional advisors, tax advisors, lawyers, and
14:18:01 they would basically ask -- and if it was about
14:18:08 the MLD, they would ask about the MLD, and we
14:18:12 would explain the -- the legal issues and
14:18:14 technical issues behind the MLD, and then we
14:18:24 would -- would leave.
14:18:24 Q Are you familiar with the term a
14:18:27 "LeMans sheet" that was used in your office?
14:18:34 A I -- the word "LeMans sheet" rings no
14:18:39 bell.
14:18:40 Q Exhibit B in the packet.
14:18:45 Do you recognize a document
14:18:48 like that?
14:18:55 A I believe I do recognize this, a
14:18:58 document like this.
14:18:59 Q What is this document?
14:19:04 A This document is if -- if somebody
14:19:06 said: Yes, I want to enter into a Market Linked

14:19:10 Deposition transaction, they would ask us to create
14:19:14 the entities that were involved in the execution.
14:19:20 And in order to create the entities, you have to
14:19:22 have the appropriate information to do so.
14:19:25 Q Can you tell me what the bottom entry
14:19:30 is, the last -- first page, bottom entry?
14:19:32 A It says: Deal size.
14:19:33 Q What does that mean?
14:19:39 A That would be the size of the
14:19:41 investment in the Market Linked Deposit, I -- I
14:19:43 believe, that they were -- that they were going to
14:19:47 be executing.
14:19:48 Q Would that also equate to the size
14:19:50 loss they would generate -- tax loss?
14:19:56 A The Market Linked Deposit itself did
14:20:02 not -- you know, it didn't -- it didn't -- it
14:20:04 didn't generate an absolute loss, if -- if as a
14:20:10 result of actions on behalf of the investor, that
14:20:14 could be the size of the loss that resulted from
14:20:16 that. It could be something other than that.
14:20:16 BY MR. ALETTA:
14:20:21 Q Excuse me. Did it correspond to the
14:20:23 amount of increase in outside partnership basis?
14:20:28 A Yes. Well, the -- the transaction --
14:20:30 if you purchased a million dollar Market Linked

14:20:34 Deposit -- and you're -- you're familiar with
14:20:35 Section 752. Under Section 752 is if your outside
14:20:42 basis would be increased by the amount of the --
14:20:49 the investment in the Market Linked Deposit, that
14:20:53 was contributed as property to the partnership
14:20:53 itself.
14:20:57 So if the -- if the -- if the
14:21:01 client invested -- in fact, invested a million
14:21:04 dollars in it, then the partnership basis would be
14:21:08 increased by that million dollars. If they
14:21:10 invested something other than a million dollars,
14:21:12 then that's what their -- that's what their
14:21:14 increase in the outside basis would be, and that's
14:21:17 my understanding of the -- of the interpretation
14:21:20 of Section 752.
14:21:21 Q In a typical situation, who would
14:21:24 convey to you the deal size that was involved for
14:21:27 each investor? Who would be that person? Would
14:21:29 it be the investor or would it be somebody else
14:21:31 that would convey to you that amount?
14:21:32 A Well, each investor would -- would --
14:21:35 would decide how much they want to invest in any
14:21:37 particular -- in the Market Linked Deposit. And
14:21:42 the actual execution of those investments, as I
14:21:44 stated earlier, would -- I was not involved or

14:21:48 included in that.
14:21:49 Q Who was?
14:21:51 A Well, it -- my -- my understanding
14:21:53 is, is that was all done with Dan Brooks.
14:21:56 Now, could they have gone to
14:21:58 other investment advisors? The -- the ones that I
14:22:02 was aware of were done with Dan Brooks.
14:22:04 Q Did -- did your firm, Cantley &
14:22:09 Sedacca, refer the investors to Dan Brooks with
14:22:13 executing the Market Linked Deposit transactions?
14:22:16 A I don't recall how that relationship
14:22:19 was fostered.
14:22:30 Q But they -- did all the investors use
14:22:32 Dan Brooks' assistance in engaging the Market
14:22:35 Linked Deposit transactions?
14:22:36 A The ones that I'm aware of, I
14:22:37 believe, did.
14:22:38 MR. WELTY: And Market Linked
14:22:40 Deposit was a Deutsche Bank product essentially
14:22:42 and Dan Brooks worked for Deutsche Bank.
14:22:45 THE WITNESS: Yes.
14:22:45 MR. WELTY: Isn't that the
14:22:45 connection?
14:22:45 THE WITNESS: Yes.
14:22:47 BY MR. SORENSEN:

14:22:47 Q Well, that raises the question. You
14:22:48 don't recall whether the clients came from Dan
14:22:53 Brooks or you referred --
14:22:54 A Well, no, no, no. If Dan Brooks got
14:22:55 a call, he would say: I got a call from somebody
14:22:58 who's interested in talking about the Market
14:22:59 Linked Deposit. And he would call one of the
14:23:01 lawyers in the firm. So yeah, he probably did --
14:23:06 I don't -- I mean, you've got to remember John
14:23:08 Ivsan was in North Carolina, and Beckett was here
14:23:12 and I was here. And so I didn't always know what
14:23:15 necessarily Robert or Beckett or John were doing.
14:23:18 Q But here in the Dallas office. Let's
14:23:20 limit it to that.
14:23:21 A What's that?
14:23:22 Q Limit it here to in the Dallas
14:23:24 office. Do you recall here the clients you had in
14:23:26 Dallas, whether they were referred to you by
14:23:29 Brooks or from you to Brooks?
14:23:33 A I don't -- I don't recall how that
14:23:37 transpired. I mean, I -- I truly don't.
14:23:37 BY MR. ALETTA:
14:23:40 Q Did it just simply vary from investor
14:23:43 to investor on how you became involved with these
14:23:43 investors?

14:23:46 A Yes.
14:23:47 Q It came from different sources,
14:23:47 right?
14:23:50 A Yes.
14:23:52 BY MR. SORENSEN:
14:23:52 Q Well, just --
14:23:52 A I don't mean to -- I don't -- I don't
14:23:53 want to frustrate you.
14:23:53 MR. ALETTA: Do you want to
14:23:55 talk about Mr. Bevan, maybe?
14:23:56 MR. SORENSEN: In a minute.
14:23:57 BY MR. SORENSEN:
14:23:58 Q It's just interesting that all of
14:23:59 your clients had Mr. Brooks for a financial
14:24:04 advisor, how that's a coincidence or if that was a
14:24:07 referral process that you --
14:24:07 A Well --
14:24:08 Q -- only referred them to Mr. Brooks
14:24:10 or he only referred them to you?
14:24:12 A -- somebody came in -- okay. If a
14:24:14 client came in and asked about the Market Linked
14:24:17 Deposit or the specific legal issues that are
14:24:22 attached to the Market Linked Deposit, we made it
14:24:27 very, very clear that they were not walking into
14:24:30 the room on any confidential basis, nor did we

14:24:39 have anything proprietary in regard to this Market
14:24:39 Linked Deposit.
14:24:40 So if they walked out of the
14:24:41 office and they wanted to use somebody else, then
14:24:44 by golly -- or if they -- you could go on Deutsche
14:24:48 Bank's website and -- and go look on their
14:24:50 website. It says Market Linked Deposit. I mean,
14:24:53 there's nothing --
14:24:53 So what I'm trying to say is
14:24:55 that all I know is about the transactions that I
14:24:57 know about. I don't know about any transactions
14:25:00 that I don't know about. And -- and I'm not
14:25:03 trying to be crass or anything.
14:25:06 Q Well, we're not --
14:25:07 A I'm just --
14:25:08 Q We're not either. We're not trying
14:25:08 to --
14:25:08 A Yeah.
14:25:10 Q -- hide anything. But of the 150
14:25:13 Market Linked Deposits that we've identified, 150
14:25:15 of them had Cantley & Sedacca as the law firm and
14:25:18 150 of them had Dan Brooks as the advisor.
14:25:21 A Correct.
14:25:21 MR. WELTY: Are you -- you're
14:25:22 saying that's an absolute? You're -- are you

saying that --

MR. SORENSEN: Well, to my knowledge --

MR. WELTY: -- other people didn't do the Market Linked Deposit transaction?

MR. SORENSEN: No. I'm saying the ones that we're looking at on the abusive Market Linked Deposit scheme -- I know you love that word -- all of them had Cantley & Sedacca as the law firm and all of them had Daniel Brooks as the --

MR. WELTY: I just want to make sure --

MR. SORENSEN: -- financial advisor.

MR. WELTY: I just want to make sure: Are you saying that there are no Market Linked Deposit transactions not executed by Dan Brooks or not involved in Cantley & Sedacca?

MR. SORENSEN: No. I'm saying --

MR. WELTY: Okay.

MR. SORENSEN: -- the ones that we have identified as being within the parameters of -- of what we've identified as this

14:25:58 tax shelter --
14:25:59 MR. WELTY: What you've been
14:26:00 assigned to.
14:26:01 MR. SORENSEN: No. What we've
14:26:02 identified as being the Market Linked Deposits
14:26:05 related to this transaction, this shelter, this
14:26:07 transaction, have all been identified through
14:26:09 Deutsche Bank and Societe Generale as having
14:26:11 Cantley & Sedacca as the law firm and Daniel
14:26:14 Brooks as the financial advisor. That's what I'm
14:26:18 saying.
14:26:18 MR. WELTY: If that's your
14:26:19 knowledge basis.
14:26:19 A Yeah. I can't confirm or deny that.
14:26:21 BY MR. SORENSEN:
14:26:21 Q Okay. Tell me how you were paid --
14:26:25 well, no. Let's back up for a minute.
14:26:27 How would someone know to call
14:26:29 your law firm --
14:26:29 MR. ALETTA: Excuse me, Dave,
14:26:30 a second. I'm sorry. Can I take that exhibit
14:26:32 back, my pile here?
14:26:33 THE WITNESS: Yeah.
14:26:34 MR. ALETTA: I don't want
14:26:34 to --

15:50:25 for that. We can talk about that later, Todd.
15:50:25 BY MR. ALETTA:
15:50:28 Q Are you in contact with Mr. Cantley
15:50:31 presently?
15:50:31 A Only -- only as it pertains to any
15:50:34 ongoing activities from the -- my tenure at
15:50:42 Cantley & Sedacca.
15:50:42 Q Okay. But you don't know where he is
15:50:44 right now?
15:50:44 A I do not.
15:50:45 Q Or where he's located?
15:50:46 A I do not.
15:50:47 Q Do you know if he's traveling
15:50:50 presently?
15:50:50 A (Witness shakes head.)
15:50:50 Q Is that a no?
15:50:51 A I don't know anything about
15:50:53 Mr. Cantley other than what communications have
15:50:57 transpired in regard to our resolving any --
15:50:59 Q Okay.
15:51:00 A -- outstanding issues in 2001.
15:51:02 Q Okay.
15:51:02 A And that answer would be consistent
15:51:04 with any other lawyer in the firm.
15:51:04 Q Okay.

15:51:10 BY MR. SORENSEN:
15:51:10 Q I want to go back to one area we
15:51:12 skipped over too fast, and that was the fees.
15:51:14 Did the firm pay referral fees
15:51:17 for clients who were referred to it?
15:51:24 A There were -- the firm paid
15:51:25 consulting fees.
15:51:26 Q Consulting fees to whom?
15:51:28 A If you -- if -- it wasn't unusual for
15:51:32 an engagement letter to specify that we would --
15:51:38 part of their fee was being paid to a -- to a
15:51:40 third party.
15:51:41 Q And that third party would have been
15:51:46 someone who brought the client to you?
15:51:49 A They were involved in the client
15:51:53 representation, yes.
15:51:53 Q Okay. I was just wanting to know if
15:51:53 you knew that the firm paid Mr. Bevan money for
15:51:58 referrals.
15:51:58 MS. McNULTY: I object to that
15:51:59 question.
15:51:59 MR. SORENSEN: That's okay.
15:52:00 A I didn't write any of those checks,
15:52:00 so --
15:52:00 BY MR. SORENSEN:

15:52:07 Q So you're not aware that the firm
15:52:09 paid Mr. Bevan $167,000?
15:52:12 MS. McNULTY: That's a fact
15:52:13 that has not been established. You're assuming a
15:52:16 fact that hasn't been established.
15:52:16 BY MR. SORENSEN:
15:52:18 Q Well, you're not aware that the
15:52:20 records for Cantley & Sedacca show payment of
15:52:22 referral fees to Mr. Bevan?
15:52:25 MR. WELTY: Do you know?
15:52:26 A I don't know.
15:52:26 BY MR. SORENSEN:
15:52:27 Q Okay. That's all I wanted to know.
15:52:27 A I don't know. I --
15:52:31 Q And just following up -- and this is
15:52:33 from -- again, we don't know how this happened.
15:52:36 Are you aware how Mr. Brooks would obtain signed
15:52:39 but undated documents from Mr. Bevan?
15:52:44 MS. McNULTY: What are you
15:52:45 looking at?
15:52:46 MR. SORENSEN: I'm afraid I
15:52:46 don't have multiple copies of this, but these are
15:52:49 the documents in Mr. Bevan's case, the tabs that
15:52:53 we went through earlier --
15:52:54 MR. WELTY: From?

16:00:34 have.

16:00:35 THE WITNESS: That's it? I

16:00:36 thought you guys were going to, like, chew -- you

16:00:38 know, like, beat me.

16:00:43 MR. SORENSEN: Well, we're

16:00:43 trying to be --

16:00:43 THE WITNESS: Well, I'm trying

16:00:43 to be --

16:00:43 MR. WELTY: I guess we're off

16:00:44 the record.

(Off the record at 4:00 p.m.)

- - - - -

THE STATE OF TEXAS X

COUNTY OF DALLAS X

This is to certify that I, Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter and Certified LiveNote Reporter, reported in shorthand the proceedings had at the time and place set forth, and that the above and foregoing pages contain a full, true, and accurate transcript of the said proceedings.

GIVEN UNDER MY HAND on this the 31 day of January, 2007.

Jamie K. Israelow
Jamie K. Israelow, CSR, RPR, CRR, CLR
Texas CSR 3801
Expiration Date: 12/31/08
MillerParker, Inc.
CRCB Registration No. 85
100 Premier Place
5910 North Central Expressway
Dallas, Texas 75206
214.369.3376

Job Sheet No. 070126JKI
File No. 06617