# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

**Mark Hutton, Clear Meadow Investment LLC**
**2233 S. West Street**
**Wichita, KS 67213**

Plaintiffs,

v.

Cause No. 07-2041 JTM

**Deutsche Bank AG**
**Serve: Registered Agent**
**CT Corporation System**
**111 Eighth Avenue**
**New York, New York, 10011**

**Deutsche Bank Securities Inc**
**doing business as**
**Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities Inc**
**Serve: Registered Agent**
**CT Corporation System**
**111 Eighth Avenue**
**New York, New York, 10011**

**Clarion Capital, LLC**
**Serve: P.O.B.**
**230 Park Avenue**
**New York, NY 10169**

**Clarion Capital Corporation**
**Serve: P.O.B.**
**230 Park Avenue**
**New York, NY 10169**

DEFENDANT'S EXHIBIT 37

PENGAD-Bayonne, N. J.

**Clarion Capital Holdings, LLC**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

**Clarion Capital Partners, LLC**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

**CF Advisors XXXVII, LLC**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

**Daniel Brooks, Jr.**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

Defendants.

## CLASS ACTION COMPLAINT

COME NOW plaintiffs, Mark Hutton and Clear Meadow Investment LLC, on behalf of himself and all others similarly situated (hereinafter sometimes referred to as "Plaintiffs" and "the Class"), and for their complaint against Deutsche Bank AG, Deutsche Bank Securities Inc doing business as Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities Inc., Clarion Capital, LLC, Clarion Capital Corporation, Clarion Capital Holdings, LLC, Clarion Capital Partners, LLC, CF Advisors XXXVII, LLC, and Daniel Brooks, Jr. (hereinafter "defendants") allege:

**Preliminary statement**

1. This is a civil class action brought on behalf of a Plaintiff Class consisting of all persons in the United States of America, who purchased from defendants sham tax shelters such as ML deposit, SON of BOSS, OPS, BOSS, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, COBRA, and other similar Son of Boss tax shelters during the years 1997, 1998, 1999, 2000, 2001, 2002, and 2003.

2. Plaintiffs bring this action, seeking compensatory damages, trebled under RICO and punitive damages, and related relief, against two investment firms, Deutsche Bank, and other related entities and individuals for their role in promoting over 19 tax strategies that the federal government has found to be unregistered tax shelters, including one dubbed market linked deposit, and inducing plaintiffs, including Mark Hutton, to utilize certain foreign currency market linked deposit ("ML deposit") strategy and file tax returns premised on the assumption that the strategy was lawful. ML deposits like other Son of Boss tax strategies has been rejected by federal and state tax agencies, as the Defendants knew or should have known it would be.

3. Plaintiffs allege claims under RICO, as well as claims for breach of fiduciary duty, inducing breach of fiduciary duty; fraud, negligent misrepresentations and professional malpractice, breach of contract constituting professional malpractice, declaratory relief, and seeking to recover unethical, excessive, and illegal fees.

4. Plaintiff seeks damages for the fees they paid to defendants; the amount that Plaintiffs have paid and/or will pay a new set of advisors to rectify Defendants' self-serving, bogus tax reducing strategies; the taxes Plaintiffs have paid and may be assessed in the future that Defendants promised would be eliminated, and Defendants

shall be liable to Plaintiffs for any additional amounts, including taxes, interest and penalties, that may be assessed against them by the Internal Revenue Service and state tax authorities or that Plaintiffs will pay in the future; damages resulting from hiring and paying substantial sums to additional tax and legal advisors to rectify Defendants' malfeasance and minimize the resulting harm injunctive relief under RICO and other claims; disgorgement of the fees charged by Defendants; plus compensation for other damages sustained; plus attorneys' fees and costs under RICO and other damages, including damages sustained from hiring attorneys to defend Plaintiffs from the I.R.S. and state tax authorities.

5. On information and belief, in 1997 or 1998, the Defendants entered into an arrangement to market and promote at least 19 tax strategies, one of which was dubbed ML deposits, in order to generate huge fees. The Defendants arranged for Deutsche Bank, among others, to identify and then solicit potential participants, like Mark Hutton, who were induced to engage in ML deposits and other transactions and pay the Defendants large fees by misrepresentations, financial advice, and legal advice that the Defendants knew or should have known was improper and incompetent.

6. Among other things, the Defendants induced Mark Hutton and others to engage in the ML deposits and other transactions by representing that the ML deposits tax strategies had been vetted by law firms, were lawful and conservative, and by promising that the law firms would provide legal opinions attesting to that characterization and providing protection against penalties that the tax authorities could assess in the unlikely event they challenged the legitimacy of tax reductions from the ML deposits strategy.

7. Defendants either knew or should have known from the outset that the ML deposits strategy is a tax shelter that would not pass muster with the IRS or state tax authorities.

8. Defendants abused their position of trust by collecting fees for putting into effect a scheme to reduce the Plaintiffs' income taxes that all the Defendants knew or should have known would be regarded as a sham by the tax authorities. Indeed, defendants used law firms such as Cantley & Sedeca, White & Case, Jenkens & Gilchrist and Brown & Wood to provide lengthy and detailed legal opinion letters confirming the propriety of the ML deposits scheme, in exchange for a large fee, calculated as a percentage of the paper losses created. The Opinion Letters were issued after, and failed to seriously address, a 1999 IRS Notice ("1999 Notice") that rejected transactions substantially the same as that the Defendants were foisting on Mark Hutton, as well as a 1998 tax decision by the Third Circuit, ACM Partnership v. Commissioner, that rejected the reasoning of the Defendants in their canned opinion letters.

**PARTIES**

9. Plaintiff Mark Hutton is an individual and citizen of the state of Kansas. He resided in Kansas during the relevant time periods and at the time of the filing of this Complaint.

10. On information and belief, Defendant Deutsche Bank AG is a leading international financial services conglomerate, with 13 million customers and 71,000 employees in 76 countries, including offices in New York. On information and belief, Defendant Deutsche Bank AG is a foreign corporation organized and existing under the

laws of Germany, with principal place of business in Germany, and with offices in New York, New York.

11. On information and belief, Defendant Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown (together with Deutsche Bank AG, "Deutsche Bank") is a Delaware corporation with its principal place of business in New York, New York, and is a member of the New York Stock Exchange.

12. Each of these tax strategies (OPS, BOSS, Son-of Boss, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, ML deposits and COBRA) was the same as or substantially similar to "listed transactions," transactions that are subject to the list maintenance requirements of Internal Revenue Code § 6111 because they have the potential for tax avoidance or evasion, listed in I.R.S. regulations or notices. Each should have been registered as tax shelters pursuant to Internal Revenue Code § 6111(c), but the Defendants and the other members of Defendant's alliance did not register them.

13. On information and belief, as the I.R.S. listed a specific transaction or a type of transaction being marketed by the Defendants or other members of Defendant's alliance, the members of the alliance, including the defendants, would modify the shelter being marketed by them. The modifications did not render the revised tax shelters lawful or substantially different from the listed transactions.

14. On information and belief, under the Defendants' arrangement, the role of Deutsche Bank included providing financing to enable some persons to participate in tax shelters. Deutsche Bank's role also included providing a financial facade of economic substance for the financial transactions taxpayers would engage in to generate tax losses. Deutsche Bank's role was to structure the transactions so that they had a semblance of

economic substance but, as Deutsche Bank knew, in reality would only generate losses. Deutsche Bank served as the counter party on the numerous transactions engaged in to implement those shelters. On information and belief, Deutsche Bank was to solicit potential participants in the shelters.

15. After the Internal Revenue Service issued IRS Notice 1999-59 and Notice 2000-44 and after the Third Circuit issued its ruling in ACM Partnership, Deutsche Bank continued marketing, promoting and participating in these sham, Son-of-Boss tax shelters including ML deposit tax shelter and others that were devised by them as part of the Defendants' arrangement, that fell within the scope of those notices and rulings. On information and belief, Deutsche Bank used the interstate mail and wire facilities to promote and market these tax shelters, to conduct the transactions called for by the shelters, and to collect fees.

16. The Defendants' actions described herein pose the threat of continuing criminal activity, as they have continued their promotion of listed tax shelters even after IRS Notices and court rulings questioning the shelters' legitimacy.

17. On information and belief, the Defendants' arrangement involved billions of dollars in tax losses, hundred, if not thousands of clients and taxpayers, causing those clients and taxpayers substantial losses and depriving the United States of billions of dollars in tax revenues.

18. The Defendants intentionally masked their arrangement and activities under the cloak of attorney-client privilege. They and their fellow participants corresponded and communicated with clients individually so that clients would not know

who else was participating in the shelters and could not know the scope of the Defendants' arrangement.

19. On information and belief, Deutsche Bank officials and employees took steps to make sure that their involvement in marketing and promoting the tax shelters was cloaked under attorney-client privilege. Deutsche Bank also changed its normal operational procedures to avoid creating an audit trail.

20. While each of these steps in Defendants' sham tax shelters like the ML deposit strategy was planned by the Defendants in advance as a single transaction designed to reduce the taxpayer's tax liability, the Defendants agreed neither to disclose this to Plaintiffs and class nor to explain the consequences of this fact to Plaintiffs and class.

21. The Defendants agreed that taxpayers/clients would be advised that because the basis of a taxpayer/client's interest in a partnership would be increased for tax purposes by the purchase cost of long options, but not decreased by the premium earned on the sale of the short options, upon the contribution of the partnership interests to an S corporation and the sale by the S corporation of its capital assets, the S corporation would realize a large loss that could be applied to substantially reduce or eliminate the substantial gain realized by the taxpayer/client on another event and, thus, substantially reduce or eliminate the taxpayer/client's tax liability for that gain. The Defendants further agreed that taxpayer/clients were to be advised that the amount of loss to be generated by the ML deposit transaction could be pre-determined by the Defendants.

22. The Defendants agreed that taxpayer/clients would be told that while the most expected result of a ML deposit transaction was that the loss or gain on the long options would be almost completely offset by the gain or loss on the short options, and vice versa, there was a reasonable chance that the taxpayer would earn a significant profit on the ML deposit transaction. In fact, Deutsche Bank, as well as the other Defendants, knew (a) that the ML deposit transactions were structured in a way that vested in Deutsche Bank the ability to control whether a profit was earned and how much that profit would be and (b) that Deutsche Bank would exercise its discretion to ensure no profit would be earned.

23. On information and belief, the Defendants further agreed that prospective participants in the ML deposit transactions and other Son of Boss-like tax shelters would be told that (a) these were a legitimate and lawful tax strategy, (b) ML deposit transactions and other Son of Boss-like tax shelters had been developed for a "select audience" of individual who had generated significant gains or income, and (c) these individuals could take advantage of a legal "loophole" in the tax laws to shield all or most of their income from taxation.

24. On information and belief, the Defendants further agreed (a) that the lawyers' opinion would be presented in an abbreviated format that did not disclose fully the risks associated with ML deposit transactions and other Son of Boss-like transactions so that prospective participants would be lulled into engaging in ML deposit transactions and other Son of Boss-like transactions, and (b) that the prospective participants would be told that law firms would issue opinion letters attesting to the legitimacy of ML deposit transactions and other Son of Boss-like transactions and that the opinion letters would

37. At the time of contribution, the Clearmeadow Capital Corp. and CF Advisors XXXVII, LLC amended the Clearmeadow Investments, LLC agreement to include a provision, which allows the Corporation to cause CF Advisors to purchase the ownership interests of the Corporation in Clearmeadow Investments, LLC at fair market value or to cause CF Advisors to sell its ownership interests to the Corporation. The Clearmeadow Capital Corp. exercised this right prior to December 14, 2001, and caused CF Advisors to acquire the Clearmeadow Capital Corp. ownership interests in Clearmeadow Investments, LLC.

38. On December 14, 2001, the Japanese yen/US exchange rate was equal to 120.05.

39. Plaintiffs were informed by Defendants that the above stated transaction created a loss that Mark Hutton could recognize on his personal income tax return for the year ending December 31, 2001.

40. Mark Hutton received an opinion letter from Cantley & Sedeca that falsely advised him that the ML deposit transaction would properly and legally reduce his income tax liability.

41. None of the Defendants disclosed to Plaintiffs the consequences of the fact that each of the steps in the ML deposit transaction was fully planned as a single transaction designed to reduce the tax liability of Plaintiffs in 2001.

42. In 2001, Mark Hutton filed a tax return where he claimed a loss in excess of $1,000,000 generated from the ML deposit transaction.

continuously and systematically engaged in business in the state of Kansas and have agents in Kansas doing business in Kansas.

53. Venue is proper in this District pursuant to (a) 18 U.S.C. § 1965(a) because the Defendants all are found, reside and/or transact business in this District; (b) 18 U.S.C. § 1965(b) because the ends of justice require that the parties residing in any other district be brought before this Court; (c) 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District; and (d) 28 U.S.C. § 1391(a)-(b) because one or more Defendants is found in and subject to personal jurisdiction in this district.

**COUNT I**
**(violations of state Deceptive Trade Practices Act)**

54. Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

55. At all relevant times, by virtue of its misrepresentations, concealment, and deceptive trade practices, Defendants represented to Plaintiffs and class that the ML deposit transactions and other Son of Boss-like transactions were lawful and legitimate tax planning strategies.

56. At all relevant times, Defendants either knew or should have known from the outset that the ML deposit strategy and other Son of Boss-like transactions would not pass muster with the IRS and were entirely sham tax shelters.

57. Defendants, through employees, agents and representatives, committed acts or practices which were actionable under the Deceptive Trade Practices Acts of Kansas, Colorado, New York, Connecticut and/or the other states for one or more of the following reasons:

365E

88. Deutsche Bank knew or should have known that the other Defendants were acting as unregistered promoters of tax shelters and concealed that fact and its implications from Mark Hutton and other customers in order to obtain large fees from them.

89. Deutsche Bank induced and participated in these fiduciary breaches by providing the facilities for and acting as the counterparty in the currency options transactions, by providing substantial assistance to and playing a substantial role in the Defendants' arrangement, and by remaining silent and failing to inform Plaintiffs that the ML deposit transaction would not provide Plaintiffs with legitimate tax losses, or with any reasonable prospect of profits, which Deutsche Bank knew was an expectation that Plaintiffs had.

90. As a proximate cause of the foregoing, Plaintiffs have been injured in an amount to be proved, and should be awarded punitive damage.

**COUNT V**
**(Fraud - Against All Defendants)**

91. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

92. Each Defendant is liable for the misrepresentations and omissions made by each of the other Defendants as a principal and co-conspirator.

93. In order to induce Mark Hutton to pay them in excess of $250,000 in fees, Defendants made numerous knowingly and false affirmative representations and intentional omissions of material fact to Mark Hutton, as set forth, supra, and including (1) stating that the so-called ML deposit transaction, under which a taxpayer/client simultaneously purchases and sells ML deposits, contributes them to a partnership, and takes various other steps as set forth above, entitles the taxpayer/client to include the cost

365F

of the long options purchased in his basis for calculating capital losses while ignoring the premiums received for the short options, thus offsetting capital gains realized in unrelated transactions; (2) failing to disclose that the ML deposit transaction was not legitimate and that existing published authority, including Notices published by the IRS and court decisions, meant that purported losses arising from such transactions as the ML deposit transaction and other Son of Boss-like transactions were not properly allowable for tax purposes; (3) failing to disclose that if Mark Hutton filed tax returns claiming losses based on the ML deposit transaction, he would be liable for penalties and interest and that the "Opinion Letters" provided by the Defendants would not protect Mark Hutton from penalties, (4) failing to promptly advise Mark Hutton to amend his returns, (5) making and endorsing the statements contained m the Opinion Letters signed by Cantley & Sedaca, Jenkens & Gilchrist and Brown & Wood; (6) making and endorsing the statements contained in their oral advice and the 2001 tax returns prepared in accordance with their Opinion Letters; (8) Defendants' statements that there was a reasonable prospect that Mark Hutton would earn a profit on the ML deposit transaction; and/or (9) failing to disclose that Deutsche Bank controlled whether a profit would be earned and the amount of any profit.

94. The above affirmative representations and omissions made by each Defendant were false, misleading, and material when made or omitted and said Defendants knew these representations and omissions to be false, misleading, and material when made or omitted with the intention that Mark Hutton would rely upon them in entering into the ML deposit transaction and pay them in excess of $250,000 in fees.

365G

promptly amend said returns, and failed to avail themselves of legitimate tax savings opportunities and deductions.

103. As a proximate cause of the foregoing, Mark Hutton has been injured in an amount to be proved but believed to be at least $750,000, and should be awarded punitive damages of $100 million.

**COUNT VII**
**(Civil Conspiracy**
**-Against All Defendants)**

104. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

105. As described more fully herein, the defendants knowingly acted in concert to market and implement the fraudulent and illegal ML deposit transaction and other Son of Boss tax shelter transaction. In doing so, the defendants acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint when in fact they lacked those features (which was necessary for successful tax strategy).

106. The defendants acted in their respective roles as described above according to a predetermined and commonly understood accepted plan of action (i.e. the Defendants' arrangement), all for the purposes of obtaining professional fees from plaintiffs and class members.

107. The acts of defendants were contrary to numerous provisions of law, as stated above.

123. Further, since the Defendants and Cantely & Sedeca did not disclose information that they were required to disclose, such as that they were promoting the ML deposit transaction and other Son of Boss-like transactions, they had a significant pecuniary interest in the ML deposit transaction and other Son of Boss-like transactions, that there was a significant risk that their role in promoting the ML deposit transaction and other Son of Boss-like transactions would extinguish any attorney-client privilege, and that their representation of Mark Hutton and their arrangement with the other Defendants violated the applicable rules of professional conduct and standard of care, the fee agreement with Mark Hutton is not enforceable.

124. The Defendants have been unjustly enriched by the collection of fees from Mark Hutton in that they benefited, at Plaintiffs' expense, by collecting fees that were excessive, unreasonable and improper. Equity and good conscience demand the return of those fees.

125. Accordingly, Plaintiffs are entitled to rescind the agreement to pay fees and are entitled to restitution or recoupment of that amount from the Defendants who must disgorge those fees to Mark Hutton.

126. Deutsche Bank never disclosed that it and the other Defendants were promoting the ML deposit transaction and other Son of Boss-like transactions, that the fees it would earn were charged on transactions that were structured in a way to provide Deutsche Bank with discretion as to whether a profit would be earned, that Deutsche Bank had a conflict of interest in exercising that discretion and that it would and did exercise that discretion so that a profit was not earned. Irrespective of the services

Deutsch Bank rendered, the fees it received were excessive since any chance for profit was controlled by the bank which acted to prevent any profit from being earned.

127. The fees charged by Deutsche Bank were invalid and unreasonable and Mark Hutton is entitled to rescission of their agreement to pay those fees.

128. Deutsche Bank was unjustly enriched by their receipt of the fees paid by Mark Hutton.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class state that they have been damaged, for which damage they demand judgment in their favor and against Defendants and pray for an Order of the Court ordering the action be maintained as a class action under Fed.R.Civ.P. 23, and the following class be certified:

> "All persons in the United States, who purchased from defendants sham tax shelters such as ML deposit, Son of Boss, OPS, BOSS, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, COBRA, and other similar Son of Boss tax shelters during the years 1997, 1998, 1999, 2000, 2001, 2002, and 2003.

Plaintiffs and the Class demand judgment awarding Plaintiffs and the Class:

A. On the first claim (violations of state Deceptive Trade Practices Act), damages in an amount to be proved, but believed to be at least $750,000, plus other such damages recognizable under the state Deceptive Trade Practices Act;

B. On the Second Claim (RICO), damages in an amount to be proved, but believed to be at least $750,000, trebled to at least $2,250,000 plus attorneys' fees and costs; an injunction enjoining Defendants from (1) engaging in the same types of conduct or endeavor alleged herein; (2) devising, offering, and soliciting clients for, or promoting,

tax shelters; (3) preparing tax returns involving tax shelters, (4) providing legal advice regarding tax shelters, (5) soliciting clients for, referring clients to, or engaging in marketing or business development programs, with each other; (6) sharing fees or income with each other; (7) committing any acts of mail fraud or wire fraud; and (8) violating the RICO laws; and an order (a) requiring Defendants to divest themselves of any interest, direct or indirect, in the Enterprise, and (b) dissolving the Enterprise.

C. On the Third Claim (Breach of Fiduciary Duty), damages in an amount to be proved, but believed to be at least $750,000, plus punitive damages in the amount of $100,000,000.

C. On the Fourth Claim (Inducing Breach of Fiduciary Duty), damages in an amount to be proved, but believed to be at least $750,000 plus punitive damages equal to $100,000,000.

D. On the Fifth Claim (Fraud), damages in an amount to be proved, but believed to be at least $750,000, plus punitive damages in the amount of $100,000,000.

E. On the Sixth Claim (Negligent Misrepresentation), damages in an amount to be proved, but believed to be at least $750,000.

F. On the Seventh Claim (Conspiracy), damages in an amount to be proved, but believed to be at least $750,000.

G. On the Eighth Claim (Declaratory Judgment), a declaration that (1) Defendants are liable to Plaintiffs for any and all taxes, interest, and penalties assessed in the past or future against them by the IRS and/or state tax authorities resulting from Plaintiffs' participation in the ML deposit transactions, for the money that Plaintiffs lost on the actual ML deposit transactions, for all professional fees incurred by Plaintiffs in

the past or the future to rectify Defendants' wrongdoing, such amounts to be trebled under RICO.

H. On the Ninth Claim (Unethical, Excessive and Illegal Fees), disgorgement by the Defendants of their fees in the amount of $250,000, plus attorneys' fees, costs, disbursements, interest, and such other and further relief as the Court may deem just and proper.

I. Such additional relief as the Court finds just and proper in the premises.

**JURY DEMAND**

~~Plaintiffs, through counsel, hereby demand trial by jury.~~

**DESIGNATION OF PLACE OF TRIAL**

The trial of this matter will take place in Kansas City, Kansas.

Respectfully submitted,

BY: ______________________

STEPHEN M. GORNY KS #16984
Bartimus, Frickleton, Robertson & Gorny, P.C.
11150 Overbrook Road, Suite 200
Leawood, KS 66211
(913) 266-2300 (tel)
(913) 266-2366 (fax)

and

Jeffrey J. Lowe
Francis J. "Casey" Flynn
JEFFREY J. LOWE, PC
8235 Forsyth, Suite 1100
St. Louis, Missouri 63105
(314) 678-3400
Fax: (314) 678-3401

ATTORNEYS FOR PLAINTIFF