BROOKS

The exhibits are marked Exhibit A through A-N and those exhibits are marked so that we have clarity in the record here about what we are talking about.

If you refer to Exhibit A --

A. Okay.

Q. -- you will see that that looks like a Powerpoint which, sort of, discusses Clarion Capital and also a bio of yourself and it looks like a resume attached. Do you see that?

THE WITNESS: I do.

MR. ALETTA: Can you give us a general description, Mr. Brooks, of your work experience in the foreign currency market area, the trading area?

THE WITNESS: Sure. Out of business school I went to work for Chemical Bank which no longer exists -- It's now JP Morgan, I guess -- in their management training program. I ended up on the foreign currency desk there as a spot trader.

Spot trading is currency that's trading for value right now. So it's a very hectic, very large, block trading-type of desk.

BROOKS

I was there for several years. I moved to Bank of America. After that to become the senior market trader there which at that point, on a currency desk, the larger the currencies are, generally, the better money, more responsibility, better position.

I did that for several years. I went to Lehman Brothers.

MR. ALETTA: Excuse me for a second. Could you give us time periods?

THE WITNESS: To Chemical Bank I went in '82. In 1982 I came to Chemical Bank and I traded there through '84. I went to Bank of America from '84 to early '89. I went to Lehman Brothers for several years. I went to Bank National Deperie where I stopped being a spot trader to come more of a proprietary-type trader. Spot trading is very hectic. It's like being in a boxing ring every day. Proprietary trading is more -- as you get more senior you can sit back and take positions and not have to have the day-to-day responsibility of quoting prices.

After that I went to Banker's Trust for

BROOKS

several years. Once again at a proprietary trading desk. Banker's Trust was bought by Deutsche Bank.

MR. ALETTA: Up to that point in time, did have you any experience determining the probabilities of currency options in finishing in the money?

THE WITNESS: I represented and advised customers who traded options and had options trade in the money. Yes. I would say on a big currency desk probably half the business you do, maybe more today, is derivative trading.

MR. ALETTA: What do you mean by "derivative trading"?

THE WITNESS: Options.

MR. ALETTA: Currency options?

THE WITNESS: Currency options.

MR. ALETTA: Again, my question is: Up until the point where you joined Deutsche Bank, did you have experience in determining the probabilities of currency options finishing in the money?

THE WITNESS: Yes, I did. I had customers who would come in who wanted to trade with the

bank, that had accounts with the bank and they would want to have specific probabilities on their trades.

Nobody is going to do a currency option trade unless they know exactly what the probability of what they are putting on is.

I had customers who would come in and say, I want a 10 percent chance to get a big slam or a 50 percent chance of something smaller.

MR. ALETTA: Would you then actually provide the analysis of what those probabilities are or would you have somebody else do that?

THE WITNESS: I would have a derivatives trader put that in -- model that in the Black Scholes model.

MR. ALETTA: Then, after that person provided the analysis to you, would you then provide that to the customer?

THE WITNESS: Yes, I would.

MR. ALETTA: How about while you were at Deutsche Bank, did you actually provide analyses of currency options finishing in the money? "Analyses" being the probability that

the currency option would expire in the money.

THE WITNESS: Anybody who does an option -- when somebody comes to you to price an option, you have to put the probability into the machine to get a price for the option. It's impossible to price an option and not know the exact parameters of what you are putting on.

MR. ALETTA: Would you determine that probability?

THE WITNESS: At Deutsche Bank? No. The trader on the desk would determine that probability. At Deutsche Bank I was in the sales function. Of course I had access to the trading model that the trader had. Deutsche Bank has an option pricer. So I would know exactly what the price should be but the responsibility for the price would be the trader's.

MR. ALETTA: When did you join Deutsche Bank?

THE WITNESS: In 1999 Deutsche Bank bought Banker's Trust and we were merged into that desk, summer of 1999.

BROOKS

MR. ALETTA: When did you leave Deutsche Bank?

THE WITNESS: In April of 2001.

MR. ALETTA: During that time you engaged in -- let me ask that question.

MR. GROSSBERG: I'm sorry, April --

THE WITNESS: -- 2001.

MR. ALETTA: During the time you were at Deutsche, who was the trader at Deutsche who determined the probabilities for the trades that you were involved with?

THE WITNESS: Perry Parker.

MR. ALETTA: Would you spell that for me?

THE WITNESS: P-E-R-R-Y, P-A-R-K-E-R. He was the head of the derivatives desk -- foreign currency derivatives desk at Deutsche Bank.

MR. ALETTA: Is Mr. Parker still there?

THE WITNESS: I don't believe so.

MR. ALETTA: Do you know where he is?

THE WITNESS: I don't know for sure and I don't know where he went, but I don't think he is at that desk anymore.

MR. ALETTA: Could you describe your duties at Deutsche during the time period that

BROOKS

you were there?

THE WITNESS: Half of my duties were my accounts. As a salesperson you have accounts, basically people who would call in to you to do currency business.

Half of my business was the handling of Alex Brown brokers who would come in to do currency business of all different types.

The other half was my handling large institutional investors who had long-term relationships with.

MR. ALETTA: What would you be doing for your clients at Deutsche?

THE WITNESS: Advising. Most times people who are trading from outside of a bank environment, I would say, sort of, 60 percent of your job is to let them know what's going on in the market, a feel for the market, where you think it's going.

You get good clients by being right in the market. People call up and say, what do you think dollar/yen is doing today and you say I think it's going up. When it goes up, they call you back the next day and say, where do

BROOKS

you think it's going now.

Basically, those are my two functions. With Alex Brown it could be any number of things, anything from spot trading in currencies, forward trading, all kinds of derivatives, anything the clients need to do on the currency desk. It's a very active desk.

MR. ALETTA: So you actually worked on a desk called the currency desk?

THE WITNESS: I was in foreign exchange sales.

MR. ALETTA: That's the department you worked in?

THE WITNESS: That's the department I was in.

MR. ALETTA: And your title at Deutsche was --

THE WITNESS: -- vice president.

MR. ALETTA: Was there anything after vice president? Was there any other designation to your title?

THE WITNESS: No.

MR. ALETTA: Again, at Deutsche Bank you were not determining the probabilities of

BROOKS

options?

THE WITNESS: No, I was not determining probabilities. My job was to work for the customer and make sure that the probabilities were correct, that the price they were getting was correct.

MR. ALETTA: Okay. How did you go about doing that?

THE WITNESS: There is a pricing model. I had the same pricing model the trader had.

MR. ALETTA: Did that pricing model have a name?

THE WITNESS: It's the Black Scholes pricing model. Deutsche Bank has an option pricing model that's available not only to the trading desk but, I think all up until the end of 2005, some big customers also had access to this model.

It's not rocket science to price derivatives. There really are just four or five basic variables to put in to get a price. On the vast majority of things that I worked on you were not going to be able to quote a customer price that was off market because they

BROOKS

knew where it was. They are using the same model you are using, the same model the trader is using to price the derivatives.

MR. ALETTA: Are you saying that by using this Black Scholes model you would determine the price of the options -- the currency options that were being sold by Deutsche?

THE WITNESS: Exactly.

MR. SORENSEN: One quick question: You said there are four or five variables. What are they?

THE WITNESS: Interest rates, how long are the options going to be. How much a variable known as volatility, which is how much the market has been moving. If the market hasn't been moving a lot.

MR. SORENSEN: Let's stop there. For volatility, do you use a historical analysis for volatility in the model which is used as Deutsche Bank?

THE WITNESS: The model is using -- once again, that's out of my realm, but I know they are using up-to-date volatilities.

MR. SORENSEN: Okay.

BROOKS

And then I handled any Alex Brown branch that would come in and need currency business. So I don't know how many branches they had but their San Francisco, Chicago, Dallas, Atlanta branches were fairly busy in currency so that kept my day moving.

MR. ALETTA: Were you handling currency options for Deutsche in 2000?

THE WITNESS: Sure.

MR. ALETTA: Did you handle any market link deposit transactions for Deutsche during 2000?

THE WITNESS: No, I did not.

MR. ALETTA: Did you handle --

MR. GREENE: Sorry. Dan, just let you know again, for the record, please wait until John is done with his question.

It is very difficult for the reporter to pick up both the question and the answer when are you going over each other.

MR. ALETTA: Thank you, Paul.

Did you handle any market link deposit transactions for Deutsche during 2001?

THE WITNESS: While at Deutsche Bank? No,

I did not.

MR. ALETTA: With regard to the currency options transactions that you handled for Deutsche, did those currency options transactions have any tax benefits associated with them that you know of?

THE WITNESS: Yes, I believe that Deutsche Bank was involved with several customers who were doing tax-related transactions.

MR. ALETTA: Could you explain for us what those tax benefits were?

THE WITNESS: I could not.

MR. ALETTA: Could you explain who at Deutsche Bank was involved with those transactions other than yourself?

MR. GREENE: John, just to clarify, I'm not sure what you mean by "who was involved in those transactions." You wanted the complete cast of characters?

MR. ALETTA: Yes.

MR. GREENE: Okay.

MR. ALETTA: Yes.

THE WITNESS: On the currency side, obviously -- well, I shouldn't say "obviously."

BROOKS

MR. ALETTA: Who else was involved at Deutsche Bank with these types of transactions that were discussed?

THE WITNESS: Well, the people bringing the transactions were all customers of Deutsche Bank Alex Brown. Craig Brubaker at Alex Brown in Dallas was a guy who brought a lot of customers. David Parse at Alex Brown in Chicago brought a lot of customers. There were some other -- Alex Flagg in San Francisco, I think, had some customers. I think there were other costumers coming out of Atlanta as well.

MR. ALETTA: Did these transactions that we're talking about, these currency option transactions, did they involve a combination of two currency options one being a long position and one being a short position?

THE WITNESS: Yes, they did.

MR. ALETTA: What is the technical term for that type of option?

THE WITNESS: Digital option.

MR. ALETTA: Digital option.

What was your understanding of how the digital option transaction worked, the ones

BROOKS

that were involved in Deutsche Bank at the time you were at Deutsche?

THE WITNESS: They were very typical digital options. The digital option is used by somebody that wants to put on a -- these were all European digital options. European means that when you put on a bet that it's going to be read at a certain time on a certain date. So you are making a bet that the currency is going to be above or below a certain price, at a certain time, on a certain date. So basically what -- if you want to think about it, if you are betting on a currency going up, what a digital option does is that you bought upside, today the currency is trading here, whatever the parameters are for the bet that you are putting, that's where the idea of somebody saying, hey, I want this to have a 28 percent chance of a 60 percent return is, that gives you the strike price to say, all right, if this strike price -- if this dollar/yen is 1.20 today and with all the volatilities and time and interest rates and things and you put in that you want this percent chance of winning

BROOKS

this bet, the model is going to spit back a price, a strike price saying that this strike price has those probabilities of occurring for that type of return.

Basically, you own that, the customer comes in on the long side where they own the upside to that price and on the other side they sold the rest of the upside. So they don't have unlimited upside on that transaction. That would be a lot more expensive to buy. What they've done is bought the upside until here and they sold the rest of the upside away.

That's the buying side of the option and the sales side.

MR. ALETTA: What's the advantage for the customer using the digital option?

Let me rephrase it. What's the advantage for the customer using a digital option method of investing in currency options?

THE WITNESS: Two advantages, the first one being they know exactly how much they are risking, they can't lose any more than the premium they are paying for the transaction. They are making it an all or nothing bet,

BROOKS

saying I'm giving you 20 grand today and that's going to either turn into 35 or that money is gone, if I win or I lose.

The other side is basically because it's not just the customers are coming in, they want to buy dollar/yen but they don't want to buy it with unlimited upside, it makes the premium cheaper. So it is a way to put on a specific trade for a cheaper premium. It's by far the most used derivative in currency.

MR. ALETTA: With regard to the digital options, are you familiar with the term "sweet spot"?

THE WITNESS: Are you talking about a two point variance in the middle?

MR. ALETTA: Yes. Could you explain for us what a sweet spot is in terms of the digital option?

THE WITNESS: Sure. A sweet spot is this long side that we are talking about, say the dollar/yen is 120 and you win the bet if it goes about 124, the sweet spot would be if the bank wanted to put something on that transaction that gives the customer a chance to

BROOKS

have, sort of, a lottery feature where if it lands in those one or two points you would win the long side of the bet, you wouldn't have to pay out the short side of the bet.

So the sweet spot is if you have -- if the dollar/yen today is 120 and the strike is 124, the customer wins the long side of the bet at 124 double 0, 124.01 and the short side doesn't start until 124.02. There is a little lot area there where the customer could win a lot of money.

MR. ALETTA: Okay.

MR. SORENSEN: The follow-up question then: In the typical vanilla digital option, is there a sweet spot?

THE WITNESS: No. That's not really true. What you are talking about is structured products where the bank will put little things like that in to make it look sexier to the client.

MR. SORENSEN: My follow-up question had to do with the fact that you said that the digital options are by far the most commonly traded --

BROOKS

THE WITNESS: Yes, I would say --

MR. SORENSEN: -- on the currency desk. On those that are the most commonly traded is there, in fact, a sweet spot or are the vast majority simply above a certain point you are in?

THE WITNESS: The vast majority do not have a sweet spot.

MR. ALETTA: Do you know a Jessica Walter?

THE WITNESS: Yes, I do.

MR. ALETTA: Was she an employee at Deutsche while you were?

THE WITNESS: Yes, she was.

MR. ALETTA: When you were at Deutsche, did you conduct any business with Jessica Walter?

THE WITNESS: Jessica inputted a lot of transactions. Jessica was back office help for the derivatives desk. So basically she was -- her job as I know it was to make sure that all the transactions that were done on the sales desk and on the trading desk, as far as options were concerned, were put in the systems correctly. She input a lot of deals.

BROOKS

MR. ALETTA: When did you form Clarion Capital?

THE WITNESS: Right after leaving Deutsche Bank. I believe it was formed in May of 2001.

MR. ALETTA: Who is the owner of Clarion Capital?

THE WITNESS: I am the owner of Clarion Capital.

MR. ALETTA: Is Clarion Capital still in existence?

THE WITNESS: It is.

MR. ALETTA: Why did you form Clarion Capital?

THE WITNESS: It was my company. I went out on my own and that was the company I was using. It was formed to do currency advising and trading.

MR. ALETTA: What were Clarion Capital's assets in 2001? Describe it.

THE WITNESS: My revenue from trading and customers was roughly $1.4 million.

MR. ALETTA: Did it have any other assets?

THE WITNESS: Me. No.

MR. ALETTA: Where was its place of

BROOKS

told you?

THE WITNESS: I don't.

MR. SORENSEN: A few questions: How did you meet Ed Sedacca?

THE WITNESS: Ed Sedacca was introduced to me by Craig Brubaker.

MR. ALETTA: Craig Brubaker was with --

THE WITNESS: -- Deutsche Bank Alex Brown in Dallas.

MR. ALETTA: I had contact with --

THE WITNESS: -- Ed Sedacca came and did business on the currency desk at Deutsche Bank when he was in a position with Beal Bank, in -- I'm not sure if it's Dallas or Houston. He worked directly for Andy Beal and they were customers of Deutsche Bank and did some business with Deutsche Bank.

MR. SORENSEN: You had testified or stated earlier that while you were at Deutsche Bank you didn't do any of these MLDs or market link deposit transactions.

When was the first time that you did a market link deposit transaction?

THE WITNESS: I believe the first time I

BROOKS

executed a market link deposit was in late June of 2001.

MR. SORENSEN: Who introduced you to the market link deposit concept?

THE WITNESS: Cantley & Sedacca brought that to my attention, that this was a structure that they were looking to use.

Market link deposit is a generic term. It was not something that was very common but not something that was uncommon either. It was probably used more in Europe, used by corporations.

Basically, a market link deposit is a CD that has some sort of a fixed rate to it. So you are going to get paid whatever percent -- you put money into a deposit. You are going to get a certain amount that's paid just like any other CD or bank deposit. And then it has a variable component that is based on linked to some market and these things are done with currencies, they are done with equities, they are done with fixed income, whatever you want.

MR. SORENSEN: Looking specifically at the transaction that you were engaged in with Mr.

BROOKS

Bevan, that type of market link deposit -- you state that the first one was in, approximately, June of 2001?

THE WITNESS: Yes.

MR. SORENSEN: Approximately how many did you engage in?

THE WITNESS: I traded for 150 different customers.

MR. SORENSEN: These were all executed during what time period?

THE WITNESS: June to December 2001.

MR. SORENSEN: Have you done any since December --

THE WITNESS: No, I have not.

MR. SORENSEN: -- of 2001?

THE WITNESS: No, I have not.

MR. SORENSEN: In each of these transactions that you engaged in was an LLC formed between you and the investor?

THE WITNESS: Yes, it was.

MR. SORENSEN: Again, wait for my question before you answer.

On your non-market link deposits -- do you have any?

BROOKS

THE WITNESS: Yes, I do.

MR. SORENSEN: How many of those have formed LLCs where you are a one percent owner with the LLC, with the investor owning the 99 percent remainder?

THE WITNESS: None.

MR. SORENSEN: So it was only in the market link deposits that it was done?

THE WITNESS: Yes.

MR. SORENSEN: Do you know who advised the investor to form the LLC?

THE WITNESS: I don't know directly who did that, no.

MR. SORENSEN: Do you have a belief as to who did?

THE WITNESS: I believe Cantley & Sedacca advised them to do that.

MR. SORENSEN: Do you know why the LLC was formed?

THE WITNESS: I was told that it was for a trading account.

MR. SORENSEN: Do you need to be an LLC to trade an account?

THE WITNESS: No, you do not.

BROOKS

MR. SORENSEN: Did that explanation make sense to you at the time?

THE WITNESS: It was not unusual that somebody wanted you to have a piece of skin in the game. I should go back to your previous question about trading for other people.

Generally people when they come to you, they may not have you form your own LLC or come in on an LLC but they will want you to put some money up.

MR. SORENSEN: They want you to expose?

THE WITNESS: They don't want you saying if you are going to be trading my money, I want you to have some money involved with that.

MR. SORENSEN: But if I understand right, nobody outside the LLC -- I mean outside of the market link deposit cases has formed an LLC with you as a member.

THE WITNESS: No, they have not.

MR. SORENSEN: But you are exposed in some way in many of your client's investments?

THE WITNESS: Yes, I am.

MR. SORENSEN: But the fact that the LLCs were formed for the market link deposits, did

BROOKS

you ever ask why that was? Did you ever ask Craig Brubaker?

THE WITNESS: No, I did not. That was presented to me in that form. I gave it my counsel to look at and said, is there something wrong, is this unusual. And the answer I got was no, that's fine.

MR. SORENSEN: Who was your counsel at the time?

THE WITNESS: Karen Steffans, K-A-R-E-N, S-T-E-F-F-A-N-S at Schumaker, S-C-H-U-M-A-K-E-R, Loop, L-O-O-P, & Kenrick, K-E-N-R-I-C-K. They were a Charlotte firm.

MR. SORENSEN: So going back to my questions, all of the investors who invested in market link deposits of this type formed LLCs?

THE WITNESS: Yes, they did.

MR. SORENSEN: Do you know who formed those LLCs?

THE WITNESS: Cantley & Sedacca.

MR. SORENSEN: They formed all of them?

THE WITNESS: I believe so.

MR. SORENSEN: You were a one percent owner? When I say "you," I mean Clarion

BROOKS

Capital?

THE WITNESS: Clarion was a one percent owner in every one of them.

MR. SORENSEN: And in every one of them did Clarion remain a partner through the life of the MLD?

THE WITNESS: Yes, I did.

MR. SORENSEN: Was Clarion a member of any of the LLC after December 31st of 2000 --

THE WITNESS: No, I was not.

MR. SORENSEN: You were, in fact, out of each and every one of them --

THE WITNESS: Every single one of them.

MR. SORENSEN: Do you know why?

THE WITNESS: That was at the -- that was the customer's prerogative.

MR. SORENSEN: To your knowledge, were market link deposits ever marketed to investors as tax law schemes?

THE WITNESS: I was never directly involved or indirectly involved in any marketing of any tax scheme.

MR. SORENSEN: Of all the market link deposits that you engaged in in 2001, were all

BROOKS

MR. SORENSEN: When you say "someone," you would assume someone within Deutsche Bank who had access to the model?

THE WITNESS: Yes.

MR. GREENE: Objection to the form.

MR. SORENSEN: But your answer is yes?

THE WITNESS: I would assume that.

MR. SORENSEN: When you were discussing these market link deposits, were you advise your clients that they had a 2 percent chance of hitting the sweet spot?

THE WITNESS: I told them that they had roughly a 1 percent chance modeled Black-Scholes of winning the sweet spot. But also, it was my feeling as well that it was my responsibility to say that that should not really be -- that that is a long shot. That's obviously a long shot.

MR. SORENSEN: Comparable to hitting the lottery?

THE WITNESS: Comparable to hitting the lot.

MR. SORENSEN: In fact, isn't it called the lottery in some documents?

BROOKS

THE WITNESS: I believe it is.

When I talked to the people about possible gains it was basically saying, that was out there, it was a real risk, it was on the book. The bank had that risk but you really should be -- when you are looking at return -- more interested in what you can make having a 28 or 30 percent chance of returning 60 percent.

MR. SORENSEN: How many of your clients returned 60 percent in these market link deposits?

THE WITNESS: Well, I traded. I actively traded so a certain percentage of people, I took off early because I took profit. But I think roughly 60 percent of my group made money on the MLDs.

MR. SORENSEN: But I believe your statement was 28 percent of the group would make a 60 percent return.

THE WITNESS: If held to maturity.

MR. SORENSEN: How many of your clients received a 60 percent return on these --

THE WITNESS: I'm not sure but I think it was in excess of 40 percent.

BROOKS

compensated. My lawyer looked at the LLC formation and saw that there was nothing that I should be afraid of in doing.

MR. ALETTA: With regard to your conversation with Mr. Sedacca, was it just one conversation?

THE WITNESS: To the best -- that's as I recall. I think I only had one conversation with him on that subject and the rest were between Karen Steffans and Cantley & Sedacca as they were formed.

MR. ALETTA: With regard to that conversation, were you discussing generally the formation of LLCs for all the investors that were involved in the market link deposits or were you discussing any particular investor?

THE WITNESS: I think that the conversation I had was probably on the first transaction that I did and by the time -- once again, I'm speculating here. I don't really remember the call that clearly -- but basically it was my understanding that my trading for any account would take basically the same form and use the same form LLC so there really would

BROOKS

have been -- it was portrayed to me by my attorney, it would be redundant to keep going over it with every account that was opened, going over the LLCs because they were all basically the same.

MR. ALETTA: Okay. Did you have any objections to forming LLCs with these investors?

MR. GREENE: Hold on one second. To the extent that your answer to the question would reveal any discussions between you and your attorney regarding the formation of the LLC or any other kind of legal advice, I instruct the witness not to answer.

If you can answer the question without divulging any such communications you may answer.

MR. GROSSBERG: I object to the form of the question.

THE WITNESS: Without the conversations that I directly had with my attorney, it was portrayed to me that it was an LLC form that I should have no problem being in.

MR. ALETTA: Who portrayed that to you?

BROOKS

agreement other than the fact that if they brought people to me and I invested for them that I would be paid in a certain manner.

MR. ALETTA: Was that agreement in writing or oral?

MR. GREENE: I object to the form.

THE WITNESS: I don't recall having a written agreement with them. My agreement was -- everything was done, as far as I was concerned, facing Deutsche Bank. By the time they came to me, all the clients had basically been made customers of Deutsche Bank and then I was approached by Deutsche Bank to do the trading.

MR. GROSSBERG: Excuse me, just a point of clarification. When you say "Deutsche Bank," do you mean Deutsche Bank Alex Brown?

THE WITNESS: Yes, I mean the brokers.

MR. GROSSBERG: That's fine.

MR. ALETTA: You had an agreement -- didn't you have an agreement with Cantley that you would be setting up LLCs with the investors? Let me backup.

Didn't you have an agreement with Cantley

BROOKS

26,000?

THE WITNESS: -- 16,000 --

MR. SORENSEN: Approximately 20,000 --

THE WITNESS: -- 600. And if he would have won he would have gotten --

MR. SORENSEN: 60 percent of that 20,000?

THE WITNESS: 60 percent on top of that 20,000, right.

MR. SORENSEN: So when you say "60 percent," you are talking about a return here of getting your fee from Deutsche Bank back plus 60 percent of that fee?

THE WITNESS: Yes. 110 percent is what we had to pay to put the options on at Deutsche Bank.

MR. SORENSEN: Don't say 110 percent, let's say 110 basis points.

THE WITNESS: Right.

MR. SORENSEN: 1.1 percent?

THE WITNESS: 1.1 percent.

MR. SORENSEN: So you are advising that they had a 28 percent chance of getting 60 percent of 1.1 percent of that back?

THE WITNESS: Exactly.

BROOKS

MR. ALETTA: How were the premiums for the market link deposits determined and by "market link deposits" I am referring to the market link deposits involving Mr. Bevan?

THE WITNESS: Deutsche Bank modeled that and would say what our premiums were.

It was agreed that Deutsche Bank would be putting these options on at those variables for 1.1 percent of the size of the digital option.

MR. ALETTA: What do you mean by "size of the digital option"?

THE WITNESS: In Mr. Bevan's case the size of digital option was a million and-a-half dollars.

MR. ALETTA: Weren't there two digital options involved with Mr. Bevan or was it just one?

THE WITNESS: There are two options, I am talking about the long side of the option. There was a one and-a-half million dollar option minus whatever the premium was on the other side.

MR. ALETTA: You mentioned Deutsche Bank determined the premiums. Who at Deutsche Bank?

BROOKS

other 25 percent being credited to the LLC that was created.

MR. GREENE: There is no question pending here.

MR. ALETTA: Let's move on.

MR. SORENSEN: It's not a significant point. I'm trying to get clarification.

MR. ALETTA: Did NHB X acquire Canadian currency at some point?

THE WITNESS: Yes, they did.

MR. ALETTA: What was the purpose of NHB X acquiring --

THE WITNESS: I'm not sure what the purpose was. I was advised that they wanted to purchase $1,000 in Canadian currency.

MR. ALETTA: Who advised you?

THE WITNESS: Craig Brubaker.

MR. ALETTA: When did that occur?

THE WITNESS: Late in the year.

MR. ALETTA: Did Mr. Brubaker indicate any reason why the Canadian currency should be obtained by NHB X?

THE WITNESS: He did not.

MR. ALETTA: Do you have any notes

BROOKS

regarding that conversation with Craig Brubaker?

THE WITNESS: I do not.

MR. ALETTA: Do you have any correspondence regarding that decision?

THE WITNESS: I believe so.

MR. ALETTA: What happened to the Canadian currency?

THE WITNESS: I'm not sure. I believe it was credited to Mr. Bevan's account.

MR. ALETTA: Was it eventually sold?

THE WITNESS: I have no idea.

MR. ALETTA: Do you know of any tax reason for NHB X acquiring the Canadian currency?

MR. GROSSBERG: Objection to form.

THE WITNESS: I do not. I have no knowledge of these tax matters.

MR. ALETTA: Any tax reason for NHB X selling the Canadian currency?

MR. GROSSBERG: Objection to form.

THE WITNESS: I have no knowledge of that.

MR. ALETTA: Did the other investors' LCS with regard to the market link deposit transactions, did those other investors' LLCs

BROOKS

acquire Canadian currencies?

MR. GROSSBERG: Objection to form.

THE WITNESS: Some did, not all.

MR. ALETTA: Why was there Canadian currency in those cases acquired for those LLCs of the other investors?

THE WITNESS: I don't know.

MR. ALETTA: Who recommended that those -- that the LLCs acquire the Canadian currency?

THE WITNESS: In all cases it was either Craig Brubaker or David Parse.

MR. ALETTA: Did NHB X have any agreements with Craig Brubaker or David Parse?

MR. GROSSBERG: Objection to form.

MR. GREENE: Objection to form. David Parse and Craig Brubaker?

THE WITNESS: I have no idea.

MR. SORENSEN: -- too many names.

MR. ALETTA: Why did you follow their instructions with regard to acquiring the Canadian currency on behalf of NHB X, and "their instructions" being Mr. Brubaker's and Mr. Parse's.

THE WITNESS: In all cases it was shown to

BROOKS

me that the customer himself wanted to do it.

MR. ALETTA: How was it shown to you?

THE WITNESS: Mr. Parse or Mr. Brubaker said to me that this is what the customer wants to do.

MR. ALETTA: Do you recall a specific conversation in the Bevan case regarding Mr. Bevan with regard to that Canadian currency?

THE WITNESS: I do not.

MR. ALETTA: The Canadian currency that was acquired, that was the currency itself?

THE WITNESS: They acquired Canadian currency, Canadian dollars.

MR. ALETTA: You had mentioned that -- I don't know if we went over this, I don't think we went over this -- but you had mentioned before that NHB X had entered into foreign currency trades, currency option trades?

THE WITNESS: Yes.

MR. ALETTA: Did the other investors' LLCs also enter into currency option trades?

MR. GROSSBERG: Objection to form.

THE WITNESS: Yes, they did.

MR. ALETTA: How many currency option

BROOKS

trades did those other investors engage in and other investors' LLCs engage in?

MR. GREENE: Just to clarify, are you asking on aggregate or do you want the numbers per investor?

MR. ALETTA: I just guess to clarify, I would like a range how many currency options, each --

MR. SORENSEN: -- per investor?

MR. ALETTA: -- each investor engaged in?

THE WITNESS: Three to five.

MR. ALETTA: Three to five currency option trades.

THE WITNESS: Three to five individual currency option trades.

MR. SORENSEN: Following up on that, was there a more typical number?

MR. GREENE: I object to the form.

MR. GROSSBERG: Join.

MR. SORENSEN: Do you recall how many investors engaged in four transactions?

THE WITNESS: I would say that it really mattered on what time the MLD -- what time I started trading for the customer. Obviously,

million four eighty three five hundred for the short side of the option.

The net of that is what his actual cost was. That was the total premium and that was what I looked at.

MR. ALETTA: So the cost of Mr. Bevan in terms of actual dollars paid was the difference between the long premium and the short premium under the part of the deposits, correct?

THE WITNESS: Yes.

MR. ALETTA: With regard to these market link deposits, were any deposits made for the deposit portion of the transaction?

THE WITNESS: I don't know. My job was -- my world was strictly in this little premium and the risk on the trade. So in this whole thing, my world was that variable interest rate. My world was putting the risk in that market link area.

MR. ALETTA: Do you understand any other portions of the transaction as referenced in this confirmation other than the currency options transactions involving the Japanese yen?

MR. GREENE: I object. Could I get the question read back, please?

(Testimony was read back.)

MR. ALETTA: Do you understand any of the transactions referenced by confirmations in Exhibit T and Exhibit U other than the currency options portion of the transaction?

MR. GROSSBERG: Objection to form.

MR. GREENE: Join.

THE WITNESS: I understand that it's a long and short deposit. I have no knowledge of whether the deposits were made or not.

MR. GREENE: Can I take a five-minute break? I need to make a call about my replacement later whenever it's good for you guys.

MR. ALETTA: Let me just finish this document.

If you look down at the document under paragraph 2, Mr. Brooks, where it says, "Deposit." I'm looking at Exhibit T.

There is a "deposit, Norman H. Bevan. A deposit taken with Deutsche Bank. Deposit amount Euro 16,375,546 Euro."

BROOKS

MR. ALETTA: Did Deutsche Bank require any margin or security for entering into these market link deposit transactions referenced in Exhibit T and Exhibit U?

MR. GREENE: I object to the form.

THE WITNESS: I don't know about on the deposits, I know just from the risk side, they did. Obviously, the options had to be paid for upfront and that premiums we were talking about, the premiums needed to be paid.

MR. ALETTA: The net premiums?

THE WITNESS: Well, the difference between the long and the short.

MR. ALETTA: Okay. Outside of the premiums did Deutsche Bank require any other security or margin --

THE WITNESS: I have no idea.

MR. ALETTA: -- for these transactions referenced in Exhibits T and U?

THE WITNESS: I have no idea. Mr. Bevan was a customer of the bank but I don't know what his relationship was with the bank.

MR. GREENE: I need a break to make a call to my office. I'll be right back.

BROOKS

(A short break was taken.)

MR. GROSSBERG: I wish to make a standing objection to any leading questions.

MR. ALETTA: We're ready?

THE WITNESS: Yes.

MR. ALETTA: We're back on the record.

With regard to these market link deposit transactions referenced as Exhibit U and T entered into by Mr. Bevan, did the other investors enter into similar market link deposit transactions with Deutsche?

THE WITNESS: Yes, they did.

MR. ALETTA: Were the basic terms similar to the market link deposits referenced in Exhibits U and T?

THE WITNESS: Yes, they were.

MR. ALETTA: Did they all use long and short positions on these market link deposit transactions?

THE WITNESS: Yes, they did.

MR. ALETTA: Was there any particular reason why a long and a short position was used?

THE WITNESS: I really don't know. Once

again, my place was in the digital options so I don't know why they came up with the structure they came up with.

MR. ALETTA: Who told you to enter into a long and a short position for each of the investors with regard to market link deposit transactions?

THE WITNESS: I was approached by -- all Deutsche Bank customers who looked to do a digital option that had a long and short position.

MR. ALETTA: You were approached by all of the investors to do this type of transaction?

THE WITNESS: I was approached by Deutsche Bank Alex Brown.

MR. ALETTA: Answer the question, please.

MR. GROSSBERG: Can you repeat the question?

MR. GREENE: I'd like to hear it as well.

(Testimony was read back.)

THE WITNESS: I guess the most direct answer to that is that this was a structure that I was presented with to put risk into. The structure came from Cantley & Sedacca

BROOKS -

through Deutsche Bank.

MR. ALETTA: Through Mr. Brubaker?

THE WITNESS: Through Mr. Brubaker and Mr. Parse.

MR. ALETTA: Did Deutsche have any ability to determine the spot price with regard to the currency options in regard to the market link deposit transactions?

THE WITNESS: What do you mean by "determine"? Fix it, say in two months it's going to be here?

MR. ALETTA: No, I'm not talking about fixing it. I'm talking about picking the spot price. Were they the calculating agent?

THE WITNESS: Yes, they are definitely the calculating agent.

MR. ALETTA: Could you explain what that means?

THE WITNESS: Any large options desk in the big bank is going to make sure that they are the calculating agent for when options come to term to determine exactly where the market is.

Now, any big bank cannot randomly do that

BROOKS

Mr. Bevan's MLD transactions, if they both finished in the money, how much money would he have received?

THE WITNESS: He would have received an additional $6,000 some or more.

MR. SORENSEN: $6,400?

THE WITNESS: Yes.

MR. ALETTA: Did you consider whether taking 19,800 would be cause to forego having both options finishing in the money?

THE WITNESS: Yes, I did. But in this situation what your options are to make money or not to make any money at all that's really what Mr. Bevan was hiring me to do, that is to trade the market.

MR. ALETTA: Whom did you discuss the termination with at Deutsche?

THE WITNESS: I put the order in with Craig Brubaker to sell.

MR. ALETTA: Was there any discussion back and forth between yourself and Mr. Brubaker regarding this termination?

THE WITNESS: Mr. Brubaker was a broker.

MR. ALETTA: Did you have any discussions

Alex Brown.

MR. ALETTA: Okay. Take a look at page 2 for a moment here. Do you see the statement there? There is a chart that talks about deposit, premium received, fixed interest, variable interest.

Do you see what I'm referring to?

THE WITNESS: Yes, I do.

MR. ALETTA: Take a look at the variable interest column. Do you see the payment of 19,800?

THE WITNESS: I see it.

MR. ALETTA: Can you explain to us, first of all, what does that refer to and secondly, why is that referred to as variable interest? Do you have any knowledge of that?

THE WITNESS: My responsibility in the MLD transaction was with variable interest. Variable interest is the currency option that's traded in the structure. It's variable because you could win or you could lose.

Fixed interest is you put your money in the bank and somebody pays you 4 percent. Variable interest is the derivative that says,

BROOKS

if we put you on the right way you could win money, if we don't you can lose the premium.

MR. GREENE: Is this a good time to call?

MR. ALETTA: Yes.

(A short break was taken.)

MR. ALETTA: Mr. Brooks, let's take a look at Exhibit W and X again which is the termination agreement for Mr. Bevan and the market deposit transactions, the confirmations of those terminations.

THE WITNESS: I have them.

MR. ALETTA: I noticed on page 2 that Mr. Bevan executed that termination confirmation. Do you see that what I'm referring to?

MR. GROSSBERG: Are you back at X?

MR. ALETTA: W and X.

Mr. Bevan executed that, right? Do you see what I'm referring to, page 2 of Exhibits W and X?

THE WITNESS: Yes, it looks like he signed the confirm.

MR. ALETTA: And Jessica Walters also signed that?

THE WITNESS: Yes.

BROOKS

the top of Exhibit W, the very top, above the words Deutsche Bank, there is a phone number and there is also a circle. We missed the area code, it looks like the area code begins with 2 and then there is a 469-3240.

Do you see the number I'm referring to at the very top of Exhibit W?

THE WITNESS: Once again, I'm not sure. But I believe 469 is the Deutsche Bank exchange.

MR. ALETTA: Could you turn to Exhibit Z? This is the document entitled "Assignment of Limited Liability and Joinder Agreement."

Do you see Exhibit Z?

THE WITNESS: I do see it.

MR. ALETTA: Are you familiar with this document?

THE WITNESS: This is a document that Mr. Bevan terminated me from the LLC, I believe.

MR. ALETTA: Okay. Who drafted this document?

THE WITNESS: I'm not sure but I believe it was Cantley & Sedacca.

MR. ALETTA: When did Mr. Bevan execute

BROOKS

this document?

THE WITNESS: According to the document it says "the 26th day of December."

MR. ALETTA: But do you have knowledge about when Mr. Bevan actually executed this document?

THE WITNESS: I do not.

MR. ALETTA: Do you have any knowledge of when Mr. Bevan first received this document?

THE WITNESS: I do not.

MR. ALETTA: Do you know when you first received this document?

THE WITNESS: I would have to check to see if I did, in fact, receive this document. I don't know.

MR. ALETTA: Turn to page 2. Is that your signature at the bottom?

THE WITNESS: Yes, it is. I am assuming that it's the 26th day of December but I don't know for sure.

MR. ALETTA: What was the purpose of this document?

THE WITNESS: It's my understanding that Mr. Bevan no longer wanted me to be authorized

BROOKS

to trade in the account and he wanted me to be -- he wanted to buy out my interest in the LLC.

MR. ALETTA: Did the other investors in the market link deposit transactions use a similar document to terminate your interest in the LLCs?

THE WITNESS: Yes, they did.

MR. ALETTA: Did you execute those documents for those other investors' LLCs?

THE WITNESS: Yes, I did.

MR. ALETTA: Were there any tax reasons for executing these documents?

THE WITNESS: I have no idea.

MR. ALETTA: Turn to Exhibit A-A. This is a letter from Norman H. Bevan to Craig Brubaker dated December 26. The letter says, "This letter is to inform you that Clarion Four X Advisors LX, LLC assigned all of its interest in NHB X, LLC to Norman H. Bevan and is no longer a member of NHB X."

Are you familiar with this letter?

THE WITNESS: Yes.

MR. ALETTA: Was this letter provided to you at any point?

BROOKS

THE WITNESS: I can't remember if I got this particular letter. I would have to check and see but it was what would be provided to Deutsche Bank when someone was taking someone's trading authority off an account.

MR. ALETTA: Do you know when Mr. Bevan executed this letter?

THE WITNESS: I do not.

MR. ALETTA: Did the other investors execute similar letters, other investors in the market link deposit transactions?

THE WITNESS: Yes, they did.

MR. ALETTA: Could you turn to Exhibit A-D? Exhibit A-D is a fairly thick exhibit, it is a legal opinion from Cantley & Sedacca.

THE WITNESS: I have it, yes.

MR. ALETTA: Are you familiar with this document?

THE WITNESS: No, I am not.

MR. ALETTA: Were you aware that Cantley & Sedacca were providing legal opinions to the investors in the market link deposit transactions?

THE WITNESS: Yes, I was.

BROOKS

MR. ALETTA: How did you become aware of that?

THE WITNESS: I was told that when I was approached to do the investing that it was -- they did have tax ramifications and it became clear as we actually went through the process of vetting this particular transaction through not only Deutsche Bank but also SOCGEN.

MR. ALETTA: Mr. Brooks, who made you aware of this legal opinion?

MR. GREENE: I object to the form.

THE WITNESS: I have never seen this legal opinion.

MR. ALETTA: Who made you aware that Cantley & Sedacca were going to be issuing legal opinions for the investors in the market link deposit transactions?

MR. GROSSBERG: Objection to form.

THE WITNESS: I would have to say Cantley & Sedacca themselves.

MR. ALETTA: Are you referring to both Beckette Cantley and Edward Sedacca?

THE WITNESS: Yes.

MR. ALETTA: When did they make you aware

BROOKS

of that?

THE WITNESS: When they asked me to put the risk in the transaction. This was nothing that was hidden.

MR. ALETTA: Okay. Again, can you give us a date when this occurred, when this conversation happened?

THE WITNESS: I would say May or June of 2001. I'm not sure.

MR. ALETTA: Do you know why the legal opinions were being provided to the investors?

THE WITNESS: I don't know specifically why.

MR. ALETTA: What did Beckette Cantley or Edward Sedacca tell you about the use for the providing of these legal opinions to the investors?

THE WITNESS: Nothing specific. I would say that in the vetting process of taking of the bank looking at the entire program that I was CC'd on some e-mails that would have had some mention of what can be construed as other trades like work or whatever, but no one ever sat down with me and went through the legal

BROOKS

opinion as to what they were doing with it.

MR. ALETTA: Did you provide information with Cantley & Sedacca in connection with the drafting of these legal opinions that they provided to the investors?

THE WITNESS: The only thing that I provided was my reps about what I was doing with the trades.

MR. ALETTA: The investor representations?

THE WITNESS: Exactly.

MR. ALETTA: The ones that we were talking about earlier?

THE WITNESS: Yes.

MR. ALETTA: You never had any other discussions with members of the firm of Cantley & Sedacca regarding the market link deposit transactions or your role in the market link deposit transactions?

THE WITNESS: Nothing outside of what parameters risk-wise are going to be put on the transactions. No.

MR. ALETTA: Did you provide any documents to Cantley & Sedacca for the preparation of any legal opinions other than your investor

BROOKS

representations?

THE WITNESS: Just risks.

MR. ALETTA: Excuse me?

THE WITNESS: Just the investor reps of the risk. I am talking about currency risk.

MR. ALETTA: I think we have to clarify that.

What documents were provided to Cantley & Sedacca by you in connection with any legal opinions that were provided to the investors?

THE WITNESS: I was presented with a structure that they wanted me to put risk into, they wanted me -- I should be more clear -- that they wanted me to imbed an option in. And I put as part of my representations the probability of the trade winning, what we would do when the trade won, what we had been discussing, a 28 percent chance of getting a 60 percent return.

MR. ALETTA: How did you transmit that information to Cantley & Sedacca?

THE WITNESS: That was all basically done with and through Deutsche Bank, Craig Brubaker.

MR. ALETTA: Did you provide any written

documents to Cantley & Sedacca in connection with the legal opinions?

THE WITNESS: No, nothing in connection with the legal opinions. I would have had conversations with Craig Brubaker and Dave Parse about what it was going to cost the customer to put a transaction on, like we talked before about 110 percent basis points and what my fee was. Outside of that I would not have had direct conversations.

MR. ALETTA: Take a look at page 5 of Exhibit A-D. I'm referring to the first paragraph of page 5, the first sentence. The sentence reads, "We understand that the investor had communicated his concerns to Mr. Brooks regarding the current status of the United States equity markets as well as the lack of perceived opportunity for investment type yields in the bond markets."

Did you provide information to Cantley & Sedacca regarding the statement I just read that's contained in the legal opinion?

THE WITNESS: No, I did not.

MR. ALETTA: Do you know where Cantley &

Exhibit A-D which is, again, a legal opinion from Cantley & Sedacca.

THE WITNESS: I'm there.

MR. ALETTA: If you look at the second full paragraph which is about two-thirds of the way down, "It has been represented" -- do you see where I'm reading? The second full paragraph.

THE WITNESS: I do, I see it.

MR. ALETTA: The paragraph says, "It has been represented to us that based on the investment information provided by CC as to the probability of the investments reaching certain price levels at which they would be profitable and on the advice of the investor's own investment advisors, the investor believes and continues to believe that he has and will continue to have a reasonable opportunity to earn a significant economic profit from the transactions in excess of all the fees and transactions costs without regard to tax benefits."

Now, the reference to CC, does that refer to an entity formed by Clarion Capital that's

BROOKS

controlled by you?

MR. GREENE: I object to the form.

THE WITNESS: I believe it's Clarion Capital.

MR. ALETTA: Clarion Capital itself, okay.

Did you provide any information to Cantley & Sedacca regarding that statement that I read in this legal opinion?

THE WITNESS: I believe that I said to Cantley & Sedacca that there was a reasonable chance of making a good, significant economic profit.

MR. ALETTA: And how would you have communicated that to Cantley?

THE WITNESS: I think it would probably be on my representations to them.

MR. ALETTA: Outside of the representations was any other information provided that's referenced in this statement I just read from this opinion in Exhibit A-D?

THE WITNESS: I don't believe so other than the fact of what I thought reasonable returns to be over a period of time.

MR. ALETTA: The next sentence in that

BROOKS

I think I talked in general of what was expected from currency traders. If you weren't somebody who could produce at that time 15 to 20, 25 percent return, you weren't going to be able to keep people's money.

MR. SORENSEN: Did you advise any of the individuals that they needed to stay invested approximately five years to realize a return?

THE WITNESS: No, I did not.

MR. SORENSEN: This is Exhibit 2 again. Looking at the second full paragraph, is there an indication of the time line you expected the investors to stay invested?

MR. GREENE: I object to the form. I'm sorry, are you referring him to page 2?

MR. SORENSEN: Page 2, the first paragraph.

THE WITNESS: I'm looking at it. I think that that would refer to the fact that to get a steady return between 15 and 17 percent that a reasonable time to have money invested was five years.

MR. SORENSEN: So at least in this case you were advising this individual that to

achieve those type of results they would need
to stay in at least five years?

MR. GREENE: Object to the form.

THE WITNESS: I think I was telling the
customer he would have a reasonable opportunity
to realize that if he stays in for that amount
of time.

MR. SORENSEN: Do you believe that you
gave similar advice to the majority of the
individuals in this transaction?

MR. GREENE: I object to the form.

THE WITNESS: I think over time, to have
that type of return, on average, you need a
decent period of time.

MR. SORENSEN: Of the approximately 150
people who had invested with the MLDs, how many
of those stayed invested with you longer than
three months?

THE WITNESS: I'd have to go back and check
but probably half.

MR. SORENSEN: How many of them stayed
invested after the end of the year?

THE WITNESS: None of them did.

MR. SORENSEN: None of them did?

BROOKS

THE WITNESS: Not even one.

MR. SORENSEN: I believe that during the earlier questioning you indicated that to your knowledge when an individual entered into this transaction, Cantley & Sedacca sent out a package of documents; is that correct?

THE WITNESS: I have no knowledge of what they sent.

MR. GREENE: Objection to form. I think it mischaracterizes the witness's prior testimony.

MR. SORENSEN: To your knowledge, did Cantley & Sedacca send out a package of documents?

MR. GREENE: Objection to form, asked and answered. You can answer again.

THE WITNESS: I don't know what and when they sent out to the customer.

MR. SORENSEN: After a typical individual invested in or agreed to invest in these transactions, did Cantley & Sedacca -- what, if anything, did Cantley & Sedacca send to you?

THE WITNESS: Cantley & Sedacca -- actually, I don't recall them saying to me

BROOKS

MR. GREENE: Is their a reference to Palm Canyon here? I haven't seen it yet.

MR. SORENSEN: I believe Mr. Hamel's or Mr. Lamb's name is at the top.

MR. GREENE: Thank you.

MR. SORENSEN: How much does it say they stand to make if all options end in the money?

MR. GREENE: I object to the form.

THE WITNESS: It says $8 million gain.

MR. SORENSEN: If they both end in the money not the sweet spot?

MR. GREENE: I object to the form.

THE WITNESS: $88,000.

MR. SORENSEN: That's the 60 percent of the amount of risk; is that right?

THE WITNESS: It is.

MR. SORENSEN: And what is the $8 million called by you?

THE WITNESS: Remote lottery feature.

MR. SORENSEN: That would be what you referred to as the sweet spot, correct?

THE WITNESS: Yes, it would.

MR. SORENSEN: Do you assign a percentage likelihood of achieving that result?

BROOKS

MR. GREENE: I object to the form.

THE WITNESS: It was usually a little over 1 percent.

MR. SORENSEN: 1.3 percent?

THE WITNESS: That's sounds correct.

MR. SORENSEN: What was the percentage of the option that they would not make any money? Is there a simple math?

THE WITNESS: 70 percent.

MR. SORENSEN: Roughly 71 percent?

THE WITNESS: Right. If I remember correctly, though, I believe this did make money.

MR. SORENSEN: We're going to talk about that now.

MR. GREENE: We have still have a few minutes left.

MR. SORENSEN: In that form you indicated that they had a 28 percent chance of making 60 percent, $55,000 or 88,000, correct?

THE WITNESS: Right.

MR. SORENSEN: I actually have two copies of the next document.

MR. GROSSBERG: I'm going to raise another

BROOKS

THE WITNESS: They just said I wanted to buy $1,000 worth of Canadian.

MR. SORENSEN: They identified the currency?

THE WITNESS: They did.

MR. SORENSEN: They identified the amount?

THE WITNESS: They did.

MR. SORENSEN: As I understand your statements earlier, these investors were clients of the bank before they came to you, correct?

THE WITNESS: They were, all of them.

MR. SORENSEN: They were all clients of the bank. They came to you for advice on making transactions with the bank?

THE WITNESS: Right.

MR. SORENSEN: Were all transactions made with Deutsche Bank?

THE WITNESS: No.

MR. SORENSEN: What other banks did you use?

THE WITNESS: SOCGEN.

MR. SORENSEN: Any others besides those two?

BROOKS

THE WITNESS: No.

MR. SORENSEN: Who determined which of those banks were used?

THE WITNESS: I did.

MR. SORENSEN: Approximately how many of those transactions were made by SOCGEN.

THE WITNESS: I can't be certain but I think around 30.

MR. SORENSEN: 30 of the 150?

THE WITNESS: Yes.

MR. SORENSEN: Did you know somebody at SOCGEN?

THE WITNESS: I knew a fellow from my town that has been in foreign exchange for a long time. Yes, I knew somebody there.

MR. SORENSEN: I didn't mean that as a sinister-type question. It's not unusual for people to go to traders they know.

THE WITNESS: No, it's not and also, I find anyway, you need more than one bank to deal with.

MR. SORENSEN: Of the LLCs or all the investors, how many of them had accounts with Deutsche Bank?

C E R T I F I C A T E

STATE OF NEW YORK )
SS:)
COUNTY OF NEW YORK)

I, Helen Mendlowich, a Notary Public within and for the State of New York, do hereby certify:

THAT Daniel Brooks, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand of this 30th day of November 2006.

Helen Mendlowich
HELEN MENDLOWICH

IN THE MATTER OF:

EXAMINATION UNDER OATH OF EDWARD SEDACCA

RE: UNITED STATES TAX COURT
DOCKET NO. 17453-05

IN THE MATTER OF:
NHB X, LLC, NORMAN H. BEVAN, TAX MATTERS PARTNER,
Petitioners,

VS

COMMISSIONER OF THE INTERNAL REVENUE,
Respondent.

PRESENT AT TAKING OF STATEMENT:
EDWARD SEDACCA, WITNESS
DAVID SORENSEN, INTERROGATOR
JOHN ALETTA
MARY A. McNULTY
M. TODD WELTY
ERNEST W. LEONARD
JAMIE K. ISRAELOW,
CERTIFIED SHORTHAND REPORTER

EXAMINATION UNDER OATH in question-and-answer form of EDWARD SEDACCA, taken before Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter and Certified Shorthand Reporter, at the offices of Equity Group, 5220 Spring Valley Road, Suite 410, Dallas, Dallas County, Texas, on the 26th day of January, 2007, from 2:01 p.m. to 4:00 p.m., at which time the following proceedings were had:

DEFENDANT'S EXHIBIT 35

P R O C E E D I N G S

(On the record at 2:01 p.m.)

EDWARD SEDACCA,

the witness hereinbefore named, being of lawful age and being first duly cautioned and sworn in the above cause, testified on his oath as follows:

EXAMINATION

14:01:26 BY MR. SORENSEN:

14:01:27 Q Why don't you state your name and
14:01:28 spell it for her.

14:01:29 A Edward Sedacca, S as in Sam,
14:01:36 e-d-a-c-c-a.

14:01:36 Q Could you give us a brief background
14:01:38 of your education?

14:01:40 A I have a -- a bachelor's of science
14:01:44 from San Diego State University. I have a law
14:01:47 degree from the University of Iowa College of Law,
14:01:49 and I have a master's of taxation from New York
14:01:53 University School of Law.

14:01:55 Q Approximately when did you get your
14:01:56 JD?

14:01:57 A '92, I believe.

14:01:58 Q And your LLM?

14:01:59 A I'm sorry. '89 for the JD and '92
14:02:05 for the LLM.

14:02:06 Q And could you briefly describe your
14:02:08 work experience since law school?
14:02:10 A While in law school -- since law
14:02:13 school, I apologize, I worked for Feingold &
14:02:21 Napoli in New York City, which is a tax boutique
14:02:24 firm in New York that focuses just on tax law.
14:02:29 Q From when to when?
14:02:30 A From graduation until July of '95. I
14:02:38 met my wife in New York City. You're going to ask
14:02:41 why I came to Texas. I might as well put that in
14:02:44 there.
14:02:44 My wife did her residency at
14:02:47 Mount Sinai Hospital in New York, and we got
14:02:50 engaged and decided to leave New York City and
14:02:51 come to Dallas where she's from. I initially took
14:02:57 a position with Ginsberg & Brusilow in Dallas and
14:03:04 quickly recognized that probably wasn't a good
14:03:07 fit. And then I went to work for --
14:03:10 Q Time frames again, roughly?
14:03:11 A I was there probably 90 days.
14:03:15 Q Okay.
14:03:15 A In November of '95, I began working
14:03:19 for Cline & Associates. I worked at Cline &
14:03:25 Associates until approximately February of '98,
14:03:31 where I took a job with working for companies

14:03:38 owned and controlled by Andrew Beal. I resigned
14:03:47 in the second quarter of 2001 from Mr. Beal, and I
14:03:54 took -- and then that's when I became a partner at
14:03:57 Cantley & Sedacca. I was with Cantley & Sedacca
14:04:02 for the entire year of 2001 and decided to sever
14:04:07 my relationship the first quarter of 2002.
14:04:11 Eventually, I started the
14:04:13 Equity Group, which is where basically I have
14:04:16 been -- remained employed since -- since then.
14:04:21 Q Okay. Let's be a little more
14:04:22 specific. You said the second quarter of 2001.
14:04:24 Do you remember when Cantley &
14:04:27 Sedacca was formed?
14:04:31 A Specific dates, no. Second quarter,
14:04:34 in generality. I mean, second quarter 2001 would
14:04:38 be my best recollection.
14:04:39 Q Would it help if it was sometime in
14:04:41 April of 2001?
14:04:45 A That would be in the second quarter,
14:04:48 yes.
14:04:49 Q Okay. Well, I was curious. You said
14:04:50 you were then employed by Cantley & Sedacca for
14:04:55 the full year of 2001. Do you mean --
14:04:57 A The remainder.
14:04:59 (Interruption.)

14:05:01 THE WITNESS: 10 minutes.
14:05:03 BY MR. SORENSEN:
14:05:03 Q And what do you do in the Equity Group?
14:05:07 A I am presently the managing -- the chairman of the Equity Group. The Equity -- and my primary responsibility is to oversee the business activities that the Equity Group has become involved with.
14:05:18 Q As a practicing attorney?
14:05:21 A No.
14:05:21 Q Are you still licensed as an attorney?
14:05:23 A No, I'm not.
14:05:25 Q Were you disbarred?
14:05:27 A No.
14:05:29 Q Just gave up your license?
14:05:30 A I -- I was licensed in New York and Texas. I officially resigned in -- from New York and I just let my license lapse in Texas.
14:05:41 Q Were there any disciplinary actions pending at the time?
14:05:44 A I didn't finish my continuing education, so I -- I'm not sure what you call it, but they sent me a letter saying: You didn't

14:05:52 complete your continuing education and you're
14:05:54 suspended from practicing law.
14:05:56 Q That's in Texas?
14:05:57 A In Texas.
14:05:58 Q Were there any adversary complaints
14:06:01 against you, either bars?
14:06:05 A Not that I'm aware of.
14:06:06 Q Were you -- as a result of your
14:06:09 activities with Cantley & Sedacca, were you sued
14:06:13 for malpractice?
14:06:15 A No. I was sued, and I believe
14:06:23 malpractice might -- was one of the multiple
14:06:28 complaints that was contained in there, yes.
14:06:30 Q Right. And what -- what lawsuit was
14:06:32 that? What's the name of the lawsuit?
14:06:37 A Well --
14:06:37 Q Or the lawsuits?
14:06:38 A I mean, the law -- the -- the --
14:06:44 MR. WELTY: Can you tell him
14:06:44 who the lawyer that basically brought them? Maybe
14:06:47 that would --
14:06:47 THE WITNESS: What's his name
14:06:47 in Dallas.
14:06:50 MR. WELTY: Deary?
14:06:50 THE WITNESS: Deary, yes.

14:06:53 THE REPORTER: Deary.

14:06:54 THE WITNESS: David Deary.

14:06:55 BY MR. SORENSEN:

14:06:56 Q Was there only one lawsuit?

14:06:58 A No. Well -- well, what happened was
14:06:59 originally -- initially there was a lawsuit filed
14:07:02 against Jenkins & Gilchrist and I was named in
14:07:05 that suit.

14:07:06 Subsequent to that, there was
14:07:08 another lawsuit filed in the Southern District of
14:07:10 New York. It was filed as a class action.
14:07:13 Subsequent to that, there was a lawsuit in --
14:07:16 Michael Link. That's the --

14:07:18 Q Is that the lawsuit?

14:07:20 A Yes.

14:07:21 Q Was that the only lawsuit that you
14:07:22 know of?

14:07:23 A No.

14:07:23 Q What were the others?

14:07:24 A There was a lawsuit filed in
14:07:29 San Diego. I don't know if anyone was ever served
14:07:32 on it, but my understanding is all of those
14:07:36 lawsuits -- any potential lawsuit or pending
14:07:39 lawsuit was consolidated into the Link settlement.

14:07:44 Q The Link class action lawsuit?

14:07:45 A Class action lawsuit.
14:07:47 Q And the class action lawsuit alleged,
14:07:50 among other things, malpractice and fraud?
14:07:54 A Yes.
14:07:54 Q Was it in relation to a particular
14:08:00 activity that your law firm was engaged in?
14:08:03 A Yes.
14:08:03 Q And what was that activity?
14:08:06 A It was for -- I'm trying to -- I'm
14:08:12 not trying to sideswipe the question. I'm trying
14:08:15 to figure out how to answer the question.
14:08:17 Q That's fine.
14:08:18 A It was because certain former clients
14:08:23 of Cantley & Sedacca entered into certain
14:08:26 transactions, and as a result of those
14:08:28 transactions, they're now being challenged by the
14:08:33 Internal Revenue Service, and they're bringing --
14:08:34 they're bringing the causes of actions as a result
14:08:37 of that.
14:08:38 Q Can you describe these transactions
14:08:42 or a generic transaction?
14:08:44 A A -- I mean --
14:08:45 Q Were they all the same?
14:08:46 A Were they all the same transaction?
14:08:49 I think the reason they tried to bring a class

action is because there's a single -- a similar legal analysis that attached to the transactions.

Was the facts of each transaction the same? No. Was there a -- was there a similar threat or legal analysis? I believe the answer to that would be yes.

Q And did those involve the Market Linked Deposits?

A Yes.

Q Yes. Can you briefly describe a Market Linked Deposit, what it is?

A I'm not sure what you're asking.

MR. WELTY: Are you talking about the actual market link investment?

MR. SORENSEN: The scheme -- the tax scheme.

MR. WELTY: The scheme? Well --

MR. SORENSEN: My word for it, the tax scheme.

MR. WELTY: Can you describe what the investment -- are you wanting to know what the market link investment is? Are you wanting to know what the legal issue was?

MR. SORENSEN: I want him -- I

14:09:47 want to see if he can describe the actual
14:09:50 investments that his clients entered into.
14:09:54 A The actual investments?
14:09:56 BY MR. SORENSEN:
14:09:56 Q Yes.
14:09:57 MR. WELTY: Each one?
14:09:57 A The answer -- from the investments
14:09:59 themselves, I was -- I never acted as investment
14:10:03 advisor to any of the clients. I never assisted
14:10:06 in the purchase or sale of the investments
14:10:09 themselves, that I can recall.
14:10:11 BY MR. SORENSEN:
14:10:12 Q Okay. Well, let's back up. How did
14:10:14 you -- how did you meet these clients?
14:10:29 A The clients were introduced to the
14:10:32 firm.
14:10:33 Q By whom?
14:10:38 A I mean --
14:10:39 MR. WELTY: If you know, or --
14:10:40 if you know specifically, tell him.
14:10:43 A I mean, I don't -- I don't -- I mean,
14:10:46 I can't give -- I mean, I have -- the clients were
14:10:51 introduced to the firm and --
14:10:52 BY MR. SORENSEN:
14:10:53 Q Well, let me ask another question.

14:10:54 You know Daniel Brooks?
14:10:56 A I do know who Daniel Brooks is, yes.
14:10:58 Q Did Daniel Brooks refer clients to
14:11:04 you?
14:11:05 A Daniel Brooks would introduce --
14:11:06 would -- on specific times would have likely
14:11:09 introduced clients to the firm, yes. I don't know
14:11:11 that I know -- I can name any specific client,
14:11:15 because there was several lawyers and --
14:11:18 Q Well, let's talk about the office
14:11:21 makeup. Where was the office located -- Cantley &
14:11:25 Sedacca's office here in Dallas?
14:11:26 A The senior partner was Beckett
14:11:28 Cantley, and he was located initially in Atlanta,
14:11:33 Georgia, and relocated to Miami. I, myself, was
14:11:37 located in Dallas. Still am located in Dallas.
14:11:40 Q And --
14:11:40 A John Ivsan was located in wherever he
14:11:46 lives, Charlotte.
14:11:46 Q North Carolina.
14:11:48 A And then Robert Bloink was hired, and
14:11:53 he would -- he would frequently be in Dallas. And
14:11:58 eventually, Jeremy Nerenberg was hired, and he
14:12:02 officed full-time in Dallas.
14:12:03 Q Were there other office members in

14:12:05 Dallas?
14:12:06 A Lawyers?
14:12:06 Q Staff.
14:12:07 A Yes.
14:12:07 Q And who were they?
14:12:09 A They were Jason Saffran, and then we
14:12:11 had a secretary, Karen --
14:12:17 MR. ALETTA: Davidson?
14:12:18 THE WITNESS: Davidson.
14:12:21 BY MR. SORENSEN:
14:12:21 Q And physically your offices were
14:12:21 located in this building?
14:12:25 A Correct.
14:12:25 Q Two floors up?
14:12:28 A Correct.
14:12:28 Q Approximately how many clients did
14:12:30 Cantley & Sedacca have?
14:12:34 A My belief is we had approximately 80
14:12:38 to 90 clients.
14:12:40 Q And of the number of clients you
14:12:42 remember, how many of them entered into this
14:12:47 typical Market Linked Deposit transaction that
14:12:49 we're talking about?
14:12:57 A That -- the -- the majority of them.
14:12:58 Q Would it surprise you to learn there

14:13:00 was actually about 180 of them?

14:13:02 A Well, I've learned through the
14:13:03 litigation, 180. But again -- again, I don't want
14:13:06 to split hairs. And just for clarification, a
14:13:10 husband -- is a husband and a wife two different
14:13:13 clients or is that --

14:13:14 Q Not from our perspective.

14:13:17 A Because my understanding is 180
14:13:18 included husband and wife, children, whatever.
14:13:19 But I've -- I've heard the number 180 before, yes.
14:13:22 My understanding was it was in the 80 to 90 range.

14:13:25 Q And you would estimate
14:13:28 what percentage of them were involved in the
14:13:32 Market Linked Deposit transactions?

14:13:33 A You mean versus doing other legal
14:13:35 work or other transactions?

14:13:40 Q Let's start with other transactions.

14:13:42 A I can -- I didn't -- I wasn't
14:13:45 involved in any other transactions.

14:13:47 Q Okay. So what percentage of the 90
14:13:53 that you recall were involved in the Market Linked
14:13:56 Deposit transactions?

14:13:58 A Well, that's -- that's my thought. I
14:13:58 mean, I thought that was -- that's --

14:14:00 Q What I'm trying to get at, it's our

14:14:02 impression 100 percent of them is. Is that a fair statement?

14:14:04 A Well, I mean, I -- I didn't ask -- I didn't know if you were asking did I do wills for somebody or had I done this or had I done that? Okay. So you're asking that? Yes. Okay. I think it's safe to say it's a very high percentage, but I can't give you specific.

14:14:19 Q Very high?

14:14:20 A Yes.

14:14:20 Q Have you ever seen this document before?

14:14:25 MR. WELTY: What is this document?

14:14:31 MS. McNULTY: You don't have another copy?

14:14:34 MR. SORENSEN: I'm afraid those are the two copies I have.

14:14:39 MR. ALETTA: Why don't you identify it for the record.

14:14:41 MR. SORENSEN: I will.

14:14:57 A I do not recognize this document.

14:14:57 BY MR. SORENSEN:

14:14:57 Q You don't? Okay.

14:14:59 MR. SORENSEN: And just for

the record, this document appears to be a document that is a flow through -- a flow chart analysis of a law scheme. In fact, it's called --

MR. WELTY: Of what?

MR. SORENSEN: A law scheme. It's entitled: Example of $500,000 Loss Generated.

MR. WELTY: Okay. So the document is entitled: Proprietary and confidential. Do not copy or distribute. Example of $500,000 Loss Generated. And it's one, two, three -- four pages long; is that right?

MR. SORENSEN: Yeah. But since the witness hasn't -- doesn't recognize it, we won't go any further on that.

BY MR. SORENSEN:

Q Can you describe how a client with the firm was introduced to this transaction?

A Some -- a partner in the firm or somebody in the firm would receive a call --

Q Okay.

A -- saying: So and so would like to meet with you.

Q When you say "you," who do you mean?

A "You" being just a member of the

14:16:13 firm.
14:16:14 Q And --
14:16:15 A Or --
14:16:16 Q -- the members of the firm at that
14:16:17 time, let's just be clear, were you, Jeremy
14:16:21 Nerenberg and Robert Bloink here in Dallas?
14:16:24 A And John Ivsan.
14:16:26 Q In North Carolina?
14:16:27 A In North Carolina. And Beckett
14:16:28 Cantley.
14:16:29 Q In Atlanta?
14:16:30 A In Atlanta or -- or Florida, wherever
14:16:33 he was.
14:16:36 Q Okay.
14:16:36 A We would receive a call, just like
14:16:37 any lawyer or law firm would receive a call
14:16:40 saying -- you know, the call could have gone to
14:16:44 Beckett or it could have gone to Robert Bloink or
14:16:48 John Ivsan or myself and saying: We have a client
14:16:51 that would like to meet with you.
14:16:55 (Mr. Leonard entered the
14:17:20 deposition proceedings.)
14:17:21 BY MR. SORENSEN:
14:17:21 Q You want to go on?
14:17:23 A Sure.

14:17:24 We obviously inquire into
14:17:28 what -- what the client was interested in speaking
14:17:32 with us about, and we would -- we would make
14:17:39 arrangements for that client to have an
14:17:40 opportunity to speak with one of the lawyers in
14:17:43 the firm. The client was in -- the client was
14:17:53 usually accompanied by his or her other
14:17:57 professional advisors, tax advisors, lawyers, and
14:18:01 they would basically ask -- and if it was about
14:18:08 the MLD, they would ask about the MLD, and we
14:18:12 would explain the -- the legal issues and
14:18:14 technical issues behind the MLD, and then we
14:18:24 would -- would leave.
14:18:24 Q Are you familiar with the term a
14:18:27 "LeMans sheet" that was used in your office?
14:18:34 A I -- the word "LeMans sheet" rings no
14:18:39 bell.
14:18:40 Q Exhibit B in the packet.
14:18:45 Do you recognize a document
14:18:48 like that?
14:18:55 A I believe I do recognize this, a
14:18:58 document like this.
14:18:59 Q What is this document?
14:19:04 A This document is if -- if somebody
14:19:06 said: Yes, I want to enter into a Market Linked

14:19:10 Deposit transaction, they would ask us to create
14:19:14 the entities that were involved in the execution.
14:19:20 And in order to create the entities, you have to
14:19:22 have the appropriate information to do so.
14:19:25 Q Can you tell me what the bottom entry
14:19:30 is, the last -- first page, bottom entry?
14:19:32 A It says: Deal size.
14:19:33 Q What does that mean?
14:19:39 A That would be the size of the
14:19:41 investment in the Market Linked Deposit, I -- I
14:19:43 believe, that they were -- that they were going to
14:19:47 be executing.
14:19:48 Q Would that also equate to the size
14:19:50 loss they would generate -- tax loss?
14:19:56 A The Market Linked Deposit itself did
14:20:02 not -- you know, it didn't -- it didn't -- it
14:20:04 didn't generate an absolute loss, if -- if as a
14:20:10 result of actions on behalf of the investor, that
14:20:14 could be the size of the loss that resulted from
14:20:16 that. It could be something other than that.
14:20:16 BY MR. ALETTA:
14:20:21 Q Excuse me. Did it correspond to the
14:20:23 amount of increase in outside partnership basis?
14:20:28 A Yes. Well, the -- the transaction --
14:20:30 if you purchased a million dollar Market Linked

14:20:34 Deposit -- and you're -- you're familiar with
14:20:35 Section 752. Under Section 752 is if your outside
14:20:42 basis would be increased by the amount of the --
14:20:49 the investment in the Market Linked Deposit, that
14:20:53 was contributed as property to the partnership
14:20:53 itself.
14:20:57 So if the -- if the -- if the
14:21:01 client invested -- in fact, invested a million
14:21:04 dollars in it, then the partnership basis would be
14:21:08 increased by that million dollars. If they
14:21:10 invested something other than a million dollars,
14:21:12 then that's what their -- that's what their
14:21:14 increase in the outside basis would be, and that's
14:21:17 my understanding of the -- of the interpretation
14:21:20 of Section 752.
14:21:21 Q In a typical situation, who would
14:21:24 convey to you the deal size that was involved for
14:21:27 each investor? Who would be that person? Would
14:21:29 it be the investor or would it be somebody else
14:21:31 that would convey to you that amount?
14:21:32 A Well, each investor would -- would --
14:21:35 would decide how much they want to invest in any
14:21:37 particular -- in the Market Linked Deposit. And
14:21:42 the actual execution of those investments, as I
14:21:44 stated earlier, would -- I was not involved or

14:21:48 included in that.

14:21:49 Q Who was?

14:21:51 A Well, it -- my -- my understanding
14:21:53 is, is that was all done with Dan Brooks.

14:21:56 Now, could they have gone to
14:21:58 other investment advisors? The -- the ones that I
14:22:02 was aware of were done with Dan Brooks.

14:22:04 Q Did -- did your firm, Cantley &
14:22:09 Sedacca, refer the investors to Dan Brooks with
14:22:13 executing the Market Linked Deposit transactions?

14:22:16 A I don't recall how that relationship
14:22:19 was fostered.

14:22:30 Q But they -- did all the investors use
14:22:32 Dan Brooks' assistance in engaging the Market
14:22:35 Linked Deposit transactions?

14:22:36 A The ones that I'm aware of, I
14:22:37 believe, did.

14:22:38 MR. WELTY: And Market Linked
14:22:40 Deposit was a Deutsche Bank product essentially
14:22:42 and Dan Brooks worked for Deutsche Bank.

14:22:45 THE WITNESS: Yes.

14:22:45 MR. WELTY: Isn't that the
14:22:45 connection?

14:22:45 THE WITNESS: Yes.

14:22:47 BY MR. SORENSEN:

14:22:47 Q Well, that raises the question. You don't recall whether the clients came from Dan Brooks or you referred --

14:22:54 A Well, no, no, no. If Dan Brooks got a call, he would say: I got a call from somebody who's interested in talking about the Market Linked Deposit. And he would call one of the lawyers in the firm. So yeah, he probably did -- I don't -- I mean, you've got to remember John Ivsan was in North Carolina, and Beckett was here and I was here. And so I didn't always know what necessarily Robert or Beckett or John were doing.

14:23:18 Q But here in the Dallas office. Let's limit it to that.

14:23:21 A What's that?

14:23:22 Q Limit it here to in the Dallas office. Do you recall here the clients you had in Dallas, whether they were referred to you by Brooks or from you to Brooks?

14:23:33 A I don't -- I don't recall how that transpired. I mean, I -- I truly don't.

14:23:37 BY MR. ALETTA:

14:23:40 Q Did it just simply vary from investor to investor on how you became involved with these investors?

14:23:46 A Yes.

14:23:47 Q It came from different sources, right?

14:23:50 A Yes.

14:23:52 BY MR. SORENSEN:

14:23:52 Q Well, just --

14:23:52 A I don't mean to -- I don't -- I don't want to frustrate you.

14:23:53 MR. ALETTA: Do you want to talk about Mr. Bevan, maybe?

14:23:56 MR. SORENSEN: In a minute.

14:23:57 BY MR. SORENSEN:

14:23:58 Q It's just interesting that all of your clients had Mr. Brooks for a financial advisor, how that's a coincidence or if that was a referral process that you --

14:24:07 A Well --

14:24:08 Q -- only referred them to Mr. Brooks or he only referred them to you?

14:24:12 A -- somebody came in -- okay. If a client came in and asked about the Market Linked Deposit or the specific legal issues that are attached to the Market Linked Deposit, we made it very, very clear that they were not walking into the room on any confidential basis, nor did we

have anything proprietary in regard to this Market Linked Deposit.

So if they walked out of the office and they wanted to use somebody else, then by golly -- or if they -- you could go on Deutsche Bank's website and -- and go look on their website. It says Market Linked Deposit. I mean, there's nothing --

So what I'm trying to say is that all I know is about the transactions that I know about. I don't know about any transactions that I don't know about. And -- and I'm not trying to be crass or anything.

Q Well, we're not --

A I'm just --

Q We're not either. We're not trying to --

A Yeah.

Q -- hide anything. But of the 150 Market Linked Deposits that we've identified, 150 of them had Cantley & Sedacca as the law firm and 150 of them had Dan Brooks as the advisor.

A Correct.

MR. WELTY: Are you -- you're saying that's an absolute? You're -- are you

saying that --

MR. SORENSEN: Well, to my knowledge --

MR. WELTY: -- other people didn't do the Market Linked Deposit transaction?

MR. SORENSEN: No. I'm saying the ones that we're looking at on the abusive Market Linked Deposit scheme -- I know you love that word -- all of them had Cantley & Sedacca as the law firm and all of them had Daniel Brooks as the --

MR. WELTY: I just want to make sure --

MR. SORENSEN: -- financial advisor.

MR. WELTY: I just want to make sure: Are you saying that there are no Market Linked Deposit transactions not executed by Dan Brooks or not involved in Cantley & Sedacca?

MR. SORENSEN: No. I'm saying --

MR. WELTY: Okay.

MR. SORENSEN: -- the ones that we have identified as being within the parameters of -- of what we've identified as this

14:25:58 tax shelter --
14:25:59 MR. WELTY: What you've been
14:26:00 assigned to.
14:26:01 MR. SORENSEN: No. What we've
14:26:02 identified as being the Market Linked Deposits
14:26:05 related to this transaction, this shelter, this
14:26:07 transaction, have all been identified through
14:26:09 Deutsche Bank and Societe Generale as having
14:26:11 Cantley & Sedacca as the law firm and Daniel
14:26:14 Brooks as the financial advisor. That's what I'm
14:26:18 saying.
14:26:18 MR. WELTY: If that's your
14:26:19 knowledge basis.
14:26:19 A Yeah. I can't confirm or deny that.
14:26:21 BY MR. SORENSEN:
14:26:21 Q Okay. Tell me how you were paid --
14:26:25 well, no. Let's back up for a minute.
14:26:27 How would someone know to call
14:26:29 your law firm --
14:26:29 MR. ALETTA: Excuse me, Dave,
14:26:30 a second. I'm sorry. Can I take that exhibit
14:26:32 back, my pile here?
14:26:33 THE WITNESS: Yeah.
14:26:34 MR. ALETTA: I don't want
14:26:34 to --

for that. We can talk about that later, Todd.
BY MR. ALETTA:
Q Are you in contact with Mr. Cantley presently?
A Only -- only as it pertains to any ongoing activities from the -- my tenure at Cantley & Sedacca.
Q Okay. But you don't know where he is right now?
A I do not.
Q Or where he's located?
A I do not.
Q Do you know if he's traveling presently?
A (Witness shakes head.)
Q Is that a no?
A I don't know anything about Mr. Cantley other than what communications have transpired in regard to our resolving any --
Q Okay.
A -- outstanding issues in 2001.
Q Okay.
A And that answer would be consistent with any other lawyer in the firm.
Q Okay.

15:51:10 BY MR. SORENSEN:

15:51:10 Q I want to go back to one area we skipped over too fast, and that was the fees.

15:51:14 Did the firm pay referral fees for clients who were referred to it?

15:51:24 A There were -- the firm paid consulting fees.

15:51:26 Q Consulting fees to whom?

15:51:28 A If you -- if -- it wasn't unusual for an engagement letter to specify that we would -- part of their fee was being paid to a -- to a third party.

15:51:41 Q And that third party would have been someone who brought the client to you?

15:51:49 A They were involved in the client representation, yes.

15:51:53 Q Okay. I was just wanting to know if you knew that the firm paid Mr. Bevan money for referrals.

15:51:58 MS. McNULTY: I object to that question.

15:51:59 MR. SORENSEN: That's okay.

15:52:00 A I didn't write any of those checks, so --

15:52:00 BY MR. SORENSEN:

15:52:07 Q So you're not aware that the firm paid Mr. Bevan $167,000?

15:52:12 MS. McNULTY: That's a fact that has not been established. You're assuming a fact that hasn't been established.

15:52:16 BY MR. SORENSEN:

15:52:18 Q Well, you're not aware that the records for Cantley & Sedacca show payment of referral fees to Mr. Bevan?

15:52:25 MR. WELTY: Do you know?

15:52:26 A I don't know.

15:52:26 BY MR. SORENSEN:

15:52:27 Q Okay. That's all I wanted to know.

15:52:27 A I don't know. I --

15:52:31 Q And just following up -- and this is from -- again, we don't know how this happened. Are you aware how Mr. Brooks would obtain signed but undated documents from Mr. Bevan?

15:52:44 MS. McNULTY: What are you looking at?

15:52:46 MR. SORENSEN: I'm afraid I don't have multiple copies of this, but these are the documents in Mr. Bevan's case, the tabs that we went through earlier --

15:52:54 MR. WELTY: From?

have.

THE WITNESS: That's it? I thought you guys were going to, like, chew -- you know, like, beat me.

MR. SORENSEN: Well, we're trying to be --

THE WITNESS: Well, I'm trying to be --

MR. WELTY: I guess we're off the record.

(Off the record at 4:00 p.m.)

- - - - -

THE STATE OF TEXAS X
COUNTY OF DALLAS X

This is to certify that I, Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter and Certified LiveNote Reporter, reported in shorthand the proceedings had at the time and place set forth, and that the above and foregoing pages contain a full, true, and accurate transcript of the said proceedings.

GIVEN UNDER MY HAND on this the 31 day of January, 2007.

Jamie K. Israelow
Jamie K. Israelow, CSR, RPR, CRR, CLR
Texas CSR 3801
Expiration Date: 12/31/08
MillerParker, Inc.
CRCB Registration No. 85
100 Premier Place
5910 North Central Expressway
Dallas, Texas 75206
214.369.3376

Job Sheet No. 070126JK1
File No. 06617

# U.S. District Court
# District of Kansas (Kansas City)
# CIVIL DOCKET FOR CASE #: 2:07-cv-02041-JTM-KMH

Hutton et al v. Deutsche Bank AG et al
Assigned to: District Judge J. Thomas Marten
Referred to: Magistrate Judge Karen M. Humphreys
Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 01/23/2007
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt Organization
Jurisdiction: Federal Question

**Plaintiff**

**Mark Hutton** represented by **Francis J. Casey Flynn**
Jeffrey J. Lowe, PC
8235 Forsyth, Suite 1100
St. Louis, MO 63105
314-678-3400
Fax: 314-678-3401
Email: casey@jefflowepc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey J. Lowe**
Jeffrey J. Lowe, PC
8235 Forsyth, Suite 1100
St. Louis, MO 63105
314-878-3400
Fax: 314-678-3401
Email: jeff@jefflowepc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Gorny**
Bartimus, Frickleton, Robertson, & Gorny, P.C. - Leawood
11150 Overbrook Drive, Suite 200
Leawood, KS 66211
913-266-2300
Fax: 913-266-2366
Email: steve@bflawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Clear Meadow Investment LLC** represented by **Francis J. Casey Flynn**
(See above for address)

DEFENDANT'S EXHIBIT 36

353

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey J. Lowe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Gorny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Deutsche Bank AG** represented by **Benjamin Sokoly**
Dewey Ballantine
1301 Avenue of the Americas
New York, NY 10019-6092
212-259-6926
Fax: 212-259-6333
Email: bsokoly@deweyballantine.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Aikin**
Shook, Hardy & Bacon L.L.P. --
Kansas City/Grand
2555 Grand Boulevard
Kansas City, MO 64108-2616
816-474-6550
Fax: 816-421-5547
Email: caikin@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M. Hill**
Dewey Ballantine
1301 Avenue of the Americas
New York, NY 10019-6092
212-259-8330
Fax: 212-259-6333
Email: lhill@deweyballantine.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth C. Farber**
Dewey Ballantine
1301 Avenue of the Americas
New York, NY 10019-6092
212-259-7227
Fax: 212-259-6333
Email: sfarber@deweyballantine.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley D. Davis**
Shook, Hardy & Bacon L.L.P. --
Kansas City/Grand
2555 Grand Boulevard
Kansas City, MO 64108-2616
816-474-6550
Fax: 816-421-5547
Email: sddavis@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Deutsche Bank Securities Inc**
*doing business as*
Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities Inc

represented by **Benjamin Sokoly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Aikin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M. Hill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth C. Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley D. Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Clarion Capital, LLC**

**Defendant**

**Clarion Capital Corporation**

**Defendant**

**Clarion Capital Holdings, LLC**

**Defendant**

**Clarion Capital Partners, LLC** represented by **Michael A. Williams**
Lathrop & Gage, LC - KC
2345 Grand Boulevard, Suite 2800
Kansas City, MO 64108
816-292-2000
Fax: 816-292-2001
Email: mwilliams@lathropgage.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CF Advisors XXXVII, LLC**

**Defendant**

**Daniel Brooks, Jr**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/23/2007 | 1 | COMPLAINT with trial location of Kansas City, filed by Mark Hutton, Clear Meadow Investment LLC.(jb) (Entered: 01/23/2007) |
| 01/23/2007 | | FILING FEE PAID: in the amount of $350.00, receipt number 6587 (jb) (Entered: 01/23/2007) |
| 01/23/2007 | | Summons Issued as to Clarion Capital Corporation, Clarion Capital Holdings, LLC, Clarion Capital Partners, LLC, CF Advisors XXXVII, LLC, Daniel Brooks, Jr, Deutsche Bank AG, Deutsche Bank Securities Inc, Clarion Capital, LLC. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry) (jb) (Entered: 01/23/2007) |
| 03/12/2007 | 2 | Unopposed MOTION for Extension of Time to File Answer *to Plaintiffs' Class Action Complaint* by Defendants Deutsche Bank AG, Deutsche Bank Securities Inc (Aikin, Christopher) (Entered: 03/12/2007) |
| 03/13/2007 | 3 | ORDER granting 2 Unopposed Motion for Extension of Time to Answer: Deutsche Bank AG and Deutsche Bank Securities Inc. answer due 4/11/2007. Signed by Magistrate Judge Karen M. Humphreys on 3/12/07. (vs) (Entered: 03/13/2007) |

| | | |
|---|---|---|
| 04/06/2007 | 4 | MOTION for attorney Seth C. Farber to appear pro hac vice by Defendants Deutsche Bank AG, Deutsche Bank Securities Inc (Attachments: # 1 Affidavit In Support of Motion For Leave to Appear Pro Hac Vice) (Aikin, Christopher) (Entered: 04/06/2007) |
| 04/06/2007 | 5 | MOTION for attorney Lawrence M. Hill to appear pro hac vice by Defendants Deutsche Bank AG, Deutsche Bank Securities Inc (Attachments: # 1 Affidavit In Support of Motion for Leave to Appear Pro Hac Vice) (Aikin, Christopher) (Entered: 04/06/2007) |
| 04/06/2007 | 6 | MOTION for attorney Benjamin Sokoly to appear pro hac vice by Defendants Deutsche Bank AG, Deutsche Bank Securities Inc (Attachments: # 1 Affidavit In Support of Motion For Leave to Appear Pro Hac Vice) (Aikin, Christopher) (Entered: 04/06/2007) |
| 04/09/2007 | | PRO HAC VICE FEE PAID: on 4/9/07 re: 5 MOTION for attorney Lawrence M. Hill to appear pro hac vice, 6 MOTION for attorney Benjamin Sokoly to appear pro hac vice, 4 MOTION for attorney Seth C. Farber to appear pro hac vice in the amount of $150.00 Receipt Number 1007652 (THIS IS A TEXT ONLY ENTRY-NO DOCUMENT IS ASSOCIATED WITH THIS TRANSACTION) (jb) (Entered: 04/09/2007) |
| 04/10/2007 | 7 | ORDER granting 4 Motion to Appear Pro Hac Vice Seth C. Farber for Deutsche Bank AG and Deutsche Bank Securities Inc. If pro hac vice counsel has not already done so, counsel is directed to immediately register for electronic notification pursuant to the court's Administrative Procedures by completing a CM/ECF Electronic Filing Registration Form at http://www.ksd.uscourts.gov/forms/index.php. Signed by Magistrate Judge Karen M. Humphreys on 4/10/07. (vs) (Entered: 04/10/2007) |
| 04/10/2007 | 8 | ORDER granting 5 Motion to Appear Pro Hac Vice Lawrence M. Hill for Deutsche Bank AG and Deutsche Bank Securities Inc. If pro hac vice counsel has not already done so, counsel is directed to immediately register for electronic notification pursuant to the court's Administrative Procedures by completing a CM/ECF Electronic Filing Registration Form at http://www.ksd.uscourts.gov/forms/index.php. Signed by Magistrate Judge Karen M. Humphreys on 4/10/07. (vs) (Entered: 04/10/2007) |
| 04/10/2007 | 9 | ORDER granting 6 Motion to Appear Pro Hac Vice Benjamin Sokoly for Deutsche Bank AG and Deutsche Bank Securities Inc. If pro hac vice counsel has not already done so, counsel is directed to immediately register for electronic notification pursuant to the court's Administrative Procedures by completing a CM/ECF Electronic Filing Registration Form at http://www.ksd.uscourts.gov/forms/index.php. Signed by Magistrate Judge Karen M. Humphreys on 4/10/07. (vs) (Entered: 04/10/2007) |

| | | |
|---|---|---|
| 04/11/2007 | 10 | MOTION to Dismiss *Plaintiffs' Class Action Complaint* by Defendants Deutsche Bank AG, Deutsche Bank Securities Inc (Aikin, Christopher) (Entered: 04/11/2007) |
| 04/11/2007 | 11 | MEMORANDUM IN SUPPORT of 10 MOTION to Dismiss *Plaintiffs' Class Action Complaint* by Defendants Deutsche Bank AG, Deutsche Bank Securities Inc (Attachments: # 1 Attachment 1/Index of Exhibits# 2 Exhibit 1# 3 Exhibit 2# 4 Exhibit 3# 5 Exhibit 4# 6 Exhibit 5# 7 Exhibit 6# 8 Exhibit 7)(Aikin, Christopher) (Entered: 04/11/2007) |
| 05/10/2007 | 12 | MOTION for Extension of Time to File Memorandum in Opposition as to 10 MOTION to Dismiss *Plaintiffs' Class Action Complaint* by Plaintiff Mark Hutton (Gorny, Stephen) (Entered: 05/10/2007) |
| 05/11/2007 | 13 | RESPONSE by Defendants Deutsche Bank AG, Deutsche Bank Securities Inc re 12 MOTION for Extension of Time to File Memorandum in Opposition as to 10 MOTION to Dismiss *Plaintiffs' Class Action Complaint* (Aikin, Christopher) (Entered: 05/11/2007) |
| 05/14/2007 | 14 | MOTION for Extension of Time to File Answer re 1 Complaint by Defendant Clarion Capital Partners, LLC (Williams, Michael) (Entered: 05/14/2007) |
| 05/15/2007 | 15 | ORDER granting 14 Unopposed Motion for Extension of Time to Answer: Clarion Capital Partners, LLC answer due 6/5/2007. Signed by Magistrate Judge Karen M. Humphreys on 5/15/07. (vs) (Entered: 05/15/2007) |
| 05/19/2007 | 16 | ORDER granting 12 plaintiff Hutton's Motion for Extension of Time to File memorandum in Opposition to 10 MOTION to Dismiss Plaintiffs' Class Action Complaint. Plaintiff Hutton's response is due on or before June 10, 2007. Entered by Judge J. Thomas Marten on 5-19-07.(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Marten, J. Thomas) (Entered: 05/19/2007) |
| 06/04/2007 | 17 | MOTION to Dismiss *(Motion to Dismiss Plaintiffs' Class Action Complaint, or in the Alternative, for a More Definite Statement)* by Defendant Clarion Capital Partners, LLC (Williams, Michael) (Entered: 06/04/2007) |
| 06/04/2007 | 18 | MEMORANDUM IN SUPPORT of 17 MOTION to Dismiss *(Motion to Dismiss Plaintiffs' Class Action Complaint, or in the Alternative, for a More Definite Statement)* by Defendant Clarion Capital Partners, LLC(Williams, Michael) (Entered: 06/04/2007) |
| 06/11/2007 | 19 | MOTION for attorney Jeffrey Lowe to appear pro hac vice ( Pro hac vice fee $50, Credit Card Receipt Number 974569.) by Plaintiff Mark Hutton (Gorny, Stephen) (Entered: 06/11/2007) |
| 06/11/2007 | 20 | MOTION for attorney Francis Flynn to appear pro hac vice ( Pro hac vice fee $50, Credit Card Receipt Number 974580.) by Plaintiff Mark Hutton (Gorny, Stephen) (Entered: 06/11/2007) |

| | | |
|---|---|---|
| 06/11/2007 | 21 | MOTION to Amend Complaint re 1 Complaint by Plaintiff Mark Hutton (Gorny, Stephen) (Entered: 06/11/2007) |
| 06/11/2007 | 22 | AMENDED MOTION to Amend Complaint re 1 Complaint by Plaintiff Mark Hutton (Attachments: # 1 Exhibit Amended Complaint) (Gorny, Stephen) Modified on 6/12/2007 (rm, ). (Entered: 06/11/2007) |
| 06/12/2007 | 23 | ORDER granting 19 Plaintiffs' Motion to Appear Pro Hac Vice. Attorney Jeffrey J. Lowe added as counsel for Plaintiffs Mark Hutton and Clear Meadow Investment LLC. If pro hac vice counsel has not already done so, counsel is directed to immediately register for electronic notification pursuant to the court's Administrative Procedures by completing a CM/ECF Electronic Filing Registration Form at http://www.ksd.uscourts.gov/forms/index.php. Signed by Magistrate Judge Karen M. Humphreys on 6/12/07. (sj) (Entered: 06/12/2007) |
| 06/12/2007 | 24 | ORDER granting 20 Plaintiffs' Motion to Appear Pro Hac Vice. Attorney Francis J. (Casey) Flynn added as counsel for plaintiffs Mark Hutton and Clear Meadow Investment LLC. If pro hac vice counsel has not already done so, counsel is directed to immediately register for electronic notification pursuant to the court's Administrative Procedures by completing a CM/ECF Electronic Filing Registration Form at http://www.ksd.uscourts.gov/forms/index.php. Signed by Magistrate Judge Karen M. Humphreys on 6/12/07. (sj) (Entered: 06/12/2007) |
| 06/15/2007 | 25 | Electronic Filing Registration Form of Francis "Casey" Flynn re motion for leave to appear pro hac vice 20 by Plaintiff Mark Hutton(Gorny, Stephen) (Entered: 06/15/2007) |
| 06/15/2007 | 26 | Electronic Filing Registration Form of Jeff Lowe re motion for leave to appear pro hac vice 19 by Plaintiff Mark Hutton(Gorny, Stephen) (Entered: 06/15/2007) |
| 07/03/2007 | 27 | ORDER granting 22 Plaintiffs' uncontested Motion to Amend Complaint. Plaintiffs shall file their amended complaint on or before 7/13/2007 and take the necessary steps to promptly serve defendants, including Societe Generale, with the amended complaint. Signed by Magistrate Judge Karen M. Humphreys on 7/3/07. (sj) (Entered: 07/03/2007) |

---

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/09/2007 11:20:54 | | | |
| PACER Login: | dj0038 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 2:07-cv-02041-JTM-KMH |

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

**Mark Hutton, Clear Meadow Investment LLC**
**2233 S. West Street**
**Wichita, KS 67213**

**Plaintiffs,**

**v.**

Cause No. 07-2041 JTM

**Deutsche Bank AG**
**Serve: Registered Agent**
**CT Corporation System**
**111 Eighth Avenue**
**New York, New York, 10011**

**Deutsche Bank Securities Inc**
**doing business as**
**Deutsche Bank Alex Brown, a Division of**
**Deutsche Bank Securities Inc**
**Serve: Registered Agent**
**CT Corporation System**
**111 Eighth Avenue**
**New York, New York, 10011**

**Clarion Capital, LLC**
**Serve: P.O.B.**
**230 Park Avenue**
**New York, NY 10169**

**Clarion Capital Corporation**
**Serve: P.O.B.**
**230 Park Avenue**
**New York, NY 10169**

360

DEFENDANT'S EXHIBIT 37

**Clarion Capital Holdings, LLC**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

**Clarion Capital Partners, LLC**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

**CF Advisors XXXVII, LLC**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

**Daniel Brooks, Jr.**
**Serve: P.O.B.**
**110 East 59th street**
**Suite 2100**
**New York, New York, 10022**

Defendants.

**CLASS ACTION COMPLAINT**

COME NOW plaintiffs, Mark Hutton and Clear Meadow Investment LLC, on behalf of himself and all others similarly situated (hereinafter sometimes referred to as "Plaintiffs" and "the Class"), and for their complaint against Deutsche Bank AG, Deutsche Bank Securities Inc doing business as Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities Inc., Clarion Capital, LLC, Clarion Capital Corporation, Clarion Capital Holdings, LLC, Clarion Capital Partners, LLC, CF Advisors XXXVII, LLC, and Daniel Brooks, Jr. (hereinafter "defendants") allege:

**Preliminary statement**

1. This is a civil class action brought on behalf of a Plaintiff Class consisting of all persons in the United States of America, who purchased from defendants sham tax shelters such as ML deposit, SON of BOSS, OPS, BOSS, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, COBRA, and other similar Son of Boss tax shelters during the years 1997, 1998, 1999, 2000, 2001, 2002, and 2003.

2. Plaintiffs bring this action, seeking compensatory damages, trebled under RICO and punitive damages, and related relief, against two investment firms, Deutsche Bank, and other related entities and individuals for their role in promoting over 19 tax strategies that the federal government has found to be unregistered tax shelters, including one dubbed market linked deposit, and inducing plaintiffs, including Mark Hutton, to utilize certain foreign currency market linked deposit ("ML deposit") strategy and file tax returns premised on the assumption that the strategy was lawful. ML deposits like other Son of Boss tax strategies has been rejected by federal and state tax agencies, as the Defendants knew or should have known it would be.

3. Plaintiffs allege claims under RICO, as well as claims for breach of fiduciary duty, inducing breach of fiduciary duty; fraud, negligent misrepresentations and professional malpractice, breach of contract constituting professional malpractice, declaratory relief, and seeking to recover unethical, excessive, and illegal fees.

4. Plaintiff seeks damages for the fees they paid to defendants; the amount that Plaintiffs have paid and/or will pay a new set of advisors to rectify Defendants' self-serving, bogus tax reducing strategies; the taxes Plaintiffs have paid and may be assessed in the future that Defendants promised would be eliminated, and Defendants

shall be liable to Plaintiffs for any additional amounts, including taxes, interest and penalties, that may be assessed against them by the Internal Revenue Service and state tax authorities or that Plaintiffs will pay in the future; damages resulting from hiring and paying substantial sums to additional tax and legal advisors to rectify Defendants' malfeasance and minimize the resulting harm injunctive relief under RICO and other claims; disgorgement of the fees charged by Defendants; plus compensation for other damages sustained; plus attorneys' fees and costs under RICO and other damages, including damages sustained from hiring attorneys to defend Plaintiffs from the I.R.S. and state tax authorities.

5. On information and belief, in 1997 or 1998, the Defendants entered into an arrangement to market and promote at least 19 tax strategies, one of which was dubbed ML deposits, in order to generate huge fees. The Defendants arranged for Deutsche Bank, among others, to identify and then solicit potential participants, like Mark Hutton, who were induced to engage in ML deposits and other transactions and pay the Defendants large fees by misrepresentations, financial advice, and legal advice that the Defendants knew or should have known was improper and incompetent.

6. Among other things, the Defendants induced Mark Hutton and others to engage in the ML deposits and other transactions by representing that the ML deposits tax strategies had been vetted by law firms, were lawful and conservative, and by promising that the law firms would provide legal opinions attesting to that characterization and providing protection against penalties that the tax authorities could assess in the unlikely event they challenged the legitimacy of tax reductions from the ML deposits strategy.

7. Defendants either knew or should have known from the outset that the ML deposits strategy is a tax shelter that would not pass muster with the IRS or state tax authorities.

8. Defendants abused their position of trust by collecting fees for putting into effect a scheme to reduce the Plaintiffs' income taxes that all the Defendants knew or should have known would be regarded as a sham by the tax authorities. Indeed, defendants used law firms such as Cantley & Sedeca, White & Case, Jenkens & Gilchrist and Brown & Wood to provide lengthy and detailed legal opinion letters confirming the propriety of the ML deposits scheme, in exchange for a large fee, calculated as a percentage of the paper losses created. The Opinion Letters were issued after, and failed to seriously address, a 1999 IRS Notice ("1999 Notice") that rejected transactions substantially the same as that the Defendants were foisting on Mark Hutton, as well as a 1998 tax decision by the Third Circuit, ACM Partnership v. Commissioner, that rejected the reasoning of the Defendants in their canned opinion letters.

## PARTIES

9. Plaintiff Mark Hutton is an individual and citizen of the state of Kansas. He resided in Kansas during the relevant time periods and at the time of the filing of this Complaint.

10. On information and belief, Defendant Deutsche Bank AG is a leading international financial services conglomerate, with 13 million customers and 71,000 employees in 76 countries, including offices in New York. On information and belief, Defendant Deutsche Bank AG is a foreign corporation organized and existing under the

laws of Germany, with principal place of business in Germany, and with offices in New York, New York.

11. On information and belief, Defendant Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown (together with Deutsche Bank AG, "Deutsche Bank") is a Delaware corporation with its principal place of business in New York, New York, and is a member of the New York Stock Exchange.

12. Each of these tax strategies (OPS, BOSS, Son-of Boss, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, ML deposits and COBRA) was the same as or substantially similar to "listed transactions," transactions that are subject to the list maintenance requirements of Internal Revenue Code § 6111 because they have the potential for tax avoidance or evasion, listed in I.R.S. regulations or notices. Each should have been registered as tax shelters pursuant to Internal Revenue Code § 6111(c), but the Defendants and the other members of Defendant's alliance did not register them.

13. On information and belief, as the I.R.S. listed a specific transaction or a type of transaction being marketed by the Defendants or other members of Defendant's alliance, the members of the alliance, including the defendants, would modify the shelter being marketed by them. The modifications did not render the revised tax shelters lawful or substantially different from the listed transactions.

14. On information and belief, under the Defendants' arrangement, the role of Deutsche Bank included providing financing to enable some persons to participate in tax shelters. Deutsche Bank's role also included providing a financial facade of economic substance for the financial transactions taxpayers would engage in to generate tax losses. Deutsche Bank's role was to structure the transactions so that they had a semblance of

economic substance but, as Deutsche Bank knew, in reality would only generate losses. Deutsche Bank served as the counter party on the numerous transactions engaged in to implement those shelters. On information and belief, Deutsche Bank was to solicit potential participants in the shelters.

15: After the Internal Revenue Service issued IRS Notice 1999-59 and Notice 2000-44 and after the Third Circuit issued its ruling in ACM Partnership, Deutsche Bank continued marketing, promoting and participating in these sham, Son-of-Boss tax shelters including ML deposit tax shelter and others that were devised by them as part of the Defendants' arrangement, that fell within the scope of those notices and rulings. On information and belief, Deutsche Bank used the interstate mail and wire facilities to promote and market these tax shelters, to conduct the transactions called for by the shelters, and to collect fees.

16. The Defendants' actions described herein pose the threat of continuing criminal activity, as they have continued their promotion of listed tax shelters even after IRS Notices and court rulings questioning the shelters' legitimacy.

17. On information and belief, the Defendants' arrangement involved billions of dollars in tax losses, hundred, if not thousands of clients and taxpayers, causing those clients and taxpayers substantial losses and depriving the United States of billions of dollars in tax revenues.

18. The Defendants intentionally masked their arrangement and activities under the cloak of attorney-client privilege. They and their fellow participants corresponded and communicated with clients individually so that clients would not know

who else was participating in the shelters and could not know the scope of the Defendants' arrangement.

19. On information and belief, Deutsche Bank officials and employees took steps to make sure that their involvement in marketing and promoting the tax shelters was cloaked under attorney-client privilege. Deutsche Bank also changed its normal operational procedures to avoid creating an audit trail.

20. While each of these steps in Defendants' sham tax shelters like the ML deposit strategy was planned by the Defendants in advance as a single transaction designed to reduce the taxpayer's tax liability, the Defendants agreed neither to disclose this to Plaintiffs and class nor to explain the consequences of this fact to Plaintiffs and class.

21. The Defendants agreed that taxpayers/clients would be advised that because the basis of a taxpayer/client's interest in a partnership would be increased for tax purposes by the purchase cost of long options, but not decreased by the premium earned on the sale of the short options, upon the contribution of the partnership interests to an S corporation and the sale by the S corporation of its capital assets, the S corporation would realize a large loss that could be applied to substantially reduce or eliminate the substantial gain realized by the taxpayer/client on another event and, thus, substantially reduce or eliminate the taxpayer/client's tax liability for that gain. The Defendants further agreed that taxpayer/clients were to be advised that the amount of loss to be generated by the ML deposit transaction could be pre-determined by the Defendants.

22. The Defendants agreed that taxpayer/clients would be told that while the most expected result of a ML deposit transaction was that the loss or gain on the long options would be almost completely offset by the gain or loss on the short options, and vice versa, there was a reasonable chance that the taxpayer would earn a significant profit on the ML deposit transaction. In fact, Deutsche Bank, as well as the other Defendants, knew (a) that the ML deposit transactions were structured in a way that vested in Deutsche Bank the ability to control whether a profit was earned and how much that profit would be and (b) that Deutsche Bank would exercise its discretion to ensure no profit would be earned.

23. On information and belief, the Defendants further agreed that prospective participants in the ML deposit transactions and other Son of Boss-like tax shelters would be told that (a) these were a legitimate and lawful tax strategy, (b) ML deposit transactions and other Son of Boss-like tax shelters had been developed for a "select audience" of individual who had generated significant gains or income, and (c) these individuals could take advantage of a legal "loophole" in the tax laws to shield all or most of their income from taxation.

24. On information and belief, the Defendants further agreed (a) that the lawyers' opinion would be presented in an abbreviated format that did not disclose fully the risks associated with ML deposit transactions and other Son of Boss-like transactions so that prospective participants would be lulled into engaging in ML deposit transactions and other Son of Boss-like transactions, and (b) that the prospective participants would be told that law firms would issue opinion letters attesting to the legitimacy of ML deposit transactions and other Son of Boss-like transactions and that the opinion letters would

365C

37. At the time of contribution, the Clearmeadow Capital Corp. and CF Advisors XXXVII, LLC amended the Clearmeadow Investments, LLC agreement to include a provision, which allows the Corporation to cause CF Advisors to purchase the ownership interests of the Corporation in Clearmeadow Investments, LLC at fair market value or to cause CF Advisors to sell its ownership interests to the Corporation. The Clearmeadow Capital Corp. exercised this right prior to December 14, 2001, and caused CF Advisors to acquire the Clearmeadow Capital Corp. ownership interests in Clearmeadow Investments, LLC.

38. On December 14, 2001, the Japanese yen/US exchange rate was equal to 120.05.

39. Plaintiffs were informed by Defendants that the above stated transaction created a loss that Mark Hutton could recognize on his personal income tax return for the year ending December 31, 2001.

40. Mark Hutton received an opinion letter from Cantley & Sedeca that falsely advised him that the ML deposit transaction would properly and legally reduce his income tax liability.

41. None of the Defendants disclosed to Plaintiffs the consequences of the fact that each of the steps in the ML deposit transaction was fully planned as a single transaction designed to reduce the tax liability of Plaintiffs in 2001.

42. In 2001, Mark Hutton filed a tax return where he claimed a loss in excess of $1,000,000 generated from the ML deposit transaction.

continuously and systematically engaged in business in the state of Kansas and have agents in Kansas doing business in Kansas.

53. Venue is proper in this District pursuant to (a) 18 U.S.C. § 1965(a) because the Defendants all are found, reside and/or transact business in this District; (b) 18 U.S.C. § 1965(b) because the ends of justice require that the parties residing in any other district be brought before this Court; (c) 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District; and (d) 28 U.S.C. § 1391(a)-(b) because one or more Defendants is found in and subject to personal jurisdiction in this district.

**COUNT I**
**(violations of state Deceptive Trade Practices Act)**

54. Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

55. At all relevant times, by virtue of its misrepresentations, concealment, and deceptive trade practices, Defendants represented to Plaintiffs and class that the ML deposit transactions and other Son of Boss-like transactions were lawful and legitimate tax planning strategies.

56. At all relevant times, Defendants either knew or should have known from the outset that the ML deposit strategy and other Son of Boss-like transactions would not pass muster with the IRS and were entirely sham tax shelters.

57. Defendants, through employees, agents and representatives, committed acts or practices which were actionable under the Deceptive Trade Practices Acts of Kansas, Colorado, New York, Connecticut and/or the other states for one or more of the following reasons:

365E