No. 05-1223 T
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CLEARMEADOW INVESTMENTS, LLC,
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

APPENDIX B TO THE BRIEF IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

---

THOMAS C. PLISKE
Stientjes & Pliske, LLC
1120 Olivette Executive Parkway
Suite 220
St. Louis, MO 63132
Tel: (314) 872 -3988
Fax: (314) 872-7374

Attorney for Plaintiff

# TABLE OF CONTENTS

Page

Appendix B Vol. 1 (Separately Bound):

Declaration of Thomas C. Pliske in Support of Plaintiff's Cross Motion for Summary Judgment ........ 1

Exhibit 1: Complete Condensed Deposition Transcript and Exhibits of Mark E. Hutton taken on May 8, 2007. ........ 3

Exhibit 2: Complete Condensed Deposition Transcript and Exhibits of Bryan S. Hanning taken on May 8, 2007. ........ 54

Exhibit 3: Complete Condensed Deposition Transcript and Exhibits of Scott R. Hewitt taken on May 8, 2007. ........ 73

Exhibit 4: Notice of Final Partnership Administrative Adjustment for Clearmeadow LLC. ........ 128

Exhibit 5: January 22, 2002 Opinion Letter from Cantley & Sedacca ........ 141

**IN THE UNITED STATES COURT OF FEDERAL CLAIM**

**No. 05-1223 T**
**(Judge Allegra)**

**CLEARMEADOW INVESTMENTS, LLC,**
**CLEARMEADOW CAPITAL CORP.,**
**Tax Matters Partner,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

DECLARATION OF THOMAS C. PLISKE IN SUPPORT OF PLAINTIFF' CROSS MOTION FOR SUMMARY JUDGMENT

I, Thomas C. Pliske, am an attorney employed at Stientjes & Pliske LLC, and represent Plaintiff, Clearmeadow Investments, LLC, Clearmeadow Capital Corp., Tax Matters Partner. I make this declaration of my personal knowledge.

1. The attached Exhibit 1 is a complete copy of the condensed transcript and exhibits of the deposition of Mark E. Hutton taken by Defendants and in which I defended Mark E. Hutton on May 8, 2007, in Wichita, Kansas. It accurately reproduces the questions asked and the answers given.

2. The attached Exhibit 2 is a complete copy of the condensed transcript and exhibits of the deposition of Bryan Scott Hanning taken by Defendants and in which I defended Mark E. Hutton on May 8, 2007, in Wichita, Kansas. It accurately reproduces the questions asked and the answers given.

3. The attached Exhibit 3 is a complete copy of the condensed transcript and exhibits of the deposition of Scott R. Hewitt taken by Defendants and in which I defended Mark E. Hutton on May 8, 2007, in Wichita, Kansas. It accurately reproduces the questions asked and the answers given.

4. The attached Exhibit 4 is a complete copy of the Notice of Final Partnership Administrative Adjustment issued by the Internal Revenue Service's St. Louis Office on August 24, 2005.

5. The attached Exhibit 5 is a complete copy of the Cantley and Sedacca opinion letter issued on January 23, 2002 to Mark E. Hutton regarding the MLD Transaction.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 24, 2007.

/s/ Thomas C. Pliske
Thomas C. Pliske

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T

(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

Plaintiff,

V.

THE UNITED STATES,

Defendant.

D E P O S I T I O N

The deposition of MARK HUTTON, taken on behalf of the Defendant pursuant to the Federal Code of Civil Procedure and Notice before:

DONNA M. LYTLE, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

a Certified Shorthand Reporter of Kansas, at the Epic Center, 301 N. Main Street, Suite 1200, Wichita, Kansas, on the 8th day of May, 2007, starting at the hour of 2:00 P.M.

PLAINTIFF'S EXHIBIT
1

APPEARANCES

The plaintiff appeared by its counsel, Mr. Tom Pliske, of the firm Gasaway & Stientjes, LLC, 1120 Olivette Executive Parkway, Suite 220, St. Louis, Missouri 63132.

The defendant appeared by its counsel, Mr. Robert Stoddart, of the U.S. Department of Justice, Tax Division, P.O. Box 26, Washington, DC 20044.



INDEX


| WITNESS | PAGE |
|---|---|
| MARK HUTTON | |
| Direct Examination By Mr. Stoddart | 4 |
| Cross Examination By Mr. Pliske | 60 |
| Redirect Examination By Mr. Stoddart | 100 |
| Recross Examination By Mr. Pliske | 109 |
| Redirect Examination By Mr. Stoddart | 111 |

| DEPOSITION EXHIBITS - Marked for Identification | |
|---|---|
| Deposition Exhibit No. 1 | 22 |
| Deposition Exhibit No. 2 | 30 |
| Deposition Exhibit No. 3 | 31 |
| Deposition Exhibit No. 4 | 54 |

| | |
|---|---|
| SIGNATURE OF WITNESS | 116 |
| CORRECTION PAGES | 117-119 |
| CERTIFICATE OF SHORTHAND REPORTER | 120 |




MARK HUTTON,

of lawful age, having been first duly sworn on his oath to state the truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. STODDART:

Q. Could you please give us your name?

A. Mark Edward Hutton.

Q. Could you please give us your address?

A. Home address, 7118 Clearmeadow Court, Wichita, Kansas.

Q. My name is Bob Stoddart, I represent the United States which you are suing. Have you ever been deposed before?

A. Yes.

Q. In what connection?

A. On a number of construction project litigations for a company that I worked for prior to starting my company.

Q. What company is that?

A. Martin K. Eby Construction.

Q. Then you know how it works.

A. A little bit.

Q. Everything has to be oral and there can't be any sign language, and it's best if only one



person talks at a time.

Is there any reason you can't give completely full and truthful testimony today?

A. No, sir.

Q. Okay. Let's start right in by asking you about the new suit that you filed in the U.S. District of Kansas against Deutsche Banc. You did file a suit?

A. Yes, I did.

Q. Did you have a chance to look at the complaint before it was filed?

A. No, I did not.

Q. Did you engage in an attorney to file this for you?

A. I engaged Rob Stientjes, with the Gasaway, Stientjes law firm, to investigate this issue and then he took it from there.

Q. By "he", you mean Stephen M. Gorny, G-O-R-N-Y?

A. I believe that Rob Stientjes worked with him. I do not and have never met with Mr. Gorny. My contact has been Rob Stientjes with my law firm, Gasaway, Stientjes?

Q. Do you know if Mr. Stientjes ever got a copy of the complaint before it was filed?

A. I don't know that he did. I assume that he did, I mean, that he actually prepared it.
Q. Did he prepare it from the information you'd given him?
A. Yes.
Q. Is there any representation made in this complaint -- have you looked at it since?
A. I've attempted to read it. I'm not big on legal stuff legalese. I've attempted to read through it and try to follow it.
Q. To the best of your knowledge, were there any representations made in this complaint that were false?
A. I don't recall any that I read.
Q. Let's just go through some of the ones that might concern me. I only have one copy I'm afraid so I may have to push it across the table for you to look at.
Looking at Paragraph 15 which says, and I'm breaking to the middle of the sentence here, quote, Deutsche Banc continued marketing, promoting and participating in this sham, Son of Boss tax shelters, including ML tax investments and others devised by them as part of the defendant's arrangement, closed quote.



Is this MLD transaction a sham Son of Boss tax shelter?
A. That's not for -- I don't have the background knowledge in law and tax to really understand what defines a sham tax shelter or what a shelter is, so I couldn't tell you. That was written by Rob Stientjes and those are his words, so you'd have to ask him on that.
Q. Okay. He is your attorney, and he represents you?
A. He does. Actually, Tom is my direct representation.
Q. And have you ever directed any of your attorneys to file an amended complaint removing that language?
A. No, no.
Q. Do you stand by it?
A. Do I stand by it?
Q. Yes. To the extent that you don't want to correct it?
A. Well, I don't -- I guess so. I'm not qualified to decide whether that's a relevant issue or not --
Q. Okay.
A. -- in the whole scheme of things. I'm a



contractor, I'm not a tax CPA or an attorney, so when you start talking about, is this -- do I agree that this is a sham or not, I couldn't tell you.
Q. Okay.
A. I've never heard that word in that context until, you know, this whole thing came up.
Q. As long as the attorney, who is representing you, says it and you don't disavow it, that would be fine by me.
I will look at Paragraph 22, quote, you say that the ML deposit transactions were structured in a way that Deutsche Banc decided whether to control -- whether a profit was earned and how much that profit would be, and B, Deutsche Banc would exercise its discretion to ensure no profit would be earned, closed quote. Is that true?
A. I did not give that information to Rob Stientjes. I think he obtained that information from other avenues, but he did not get that from me. I learned -- that's the first time I learned of that, when I read this complaint.
Q. Did you tell him it was wrong?
A. I don't know that it's right or wrong.



Q. Do you disavow it?
A. I guess not because I don't know whether it's right or wrong.
Q. That's fine.
A. Again, I didn't -- that information I did not give Mr. Stientjes as it related to Deutsche Banc, he found that out through other investigations and you'd have to ask him whether that was something that he -- how he found that out, because that was new information for me.
Q. But he is your representative; correct?
A. Um-hum, yes.
Q. And you don't disavow it?
A. No, I guess not, no.
Q. Going to read from Paragraph 56, quote, There was not a reasonable chance of earning a profit on the ML deposit transaction and other Son of Boss like transactions, closed quote. Is that true?
A. Well, I think that's a question that we have today. It appears to me that there was some misrepresentations made to me back when this transaction and investment opportunity was put forward, and that's what this -- that's really the root of this lawsuit is how I was mislead by

taking their advice and their personal representations.
Q. Do you disavow that statement?
A. I guess not, no.
Q. Going to read from Paragraph 28. Quote, Defendants knew that the various law firms that they worked with were using, quote, canned, closed quote, opinion letters concerning the ML deposit transactions and other Son of Boss like transactions and needed only to fill in several blanks for each of the many clients to which they rendered such, quote, opinion letters, closed quote. The fact that the, quote, opinion letters, closed quote, were, quote, canned, closed quote, was not disclosed to plaintiffs or class, closed quote. Is that true?
A. I believe that to be true, yeah. We didn't know at the time it was a canned opinion.
Q. If you would have known it was a canned opinion, would you have continued with the transaction?
A. I can't say whether I would have or not. I think it would have -- we would have maybe investigated, but the word canned is somewhat erroneous because, I mean, there's all sorts of



legal documents that are used on a repetitious basis and put forward for various other -- all sorts of entities to use, that are consistent.
For instance, an LLC. If I want to form an LLC, I call up my attorney and he doesn't start from scratch in generating the document that creates that LLC, he pulls it from other things that he's done, and so the fact that it's canned, quote, quote, is -- I don't know that that's, in itself, a reason that I would have rejected it.
Q. If you'd known it was canned, would you have investigated further?
A. I think I would have -- I would have expected Scott Hewitt, that's who I relied upon to take a look at the opinion letter. That is so far above me as it relates to understanding or even attempting to understand the sophistication of the tax code and those transactions and everything, that was well above anything that I understood from a legality standpoint, and that's why I relied on Scott Hewitt for it.
Q. If you'd known this was a canned opinion letter, would you have asked Mr. Hewitt to investigate?
A. I suspect I would have. I mean, I would



have asked him to make sure that it was really no different than anything else, though. I handed it to him and I said, I need your opinion on this.
Q. Going to read from Paragraph 83, Defendants breached their duties to plaintiffs by promoting the ML deposit transaction, and other Son of Boss like transactions, by making false representations by failing to disclose material or significant facts of the effects of those facts and misrepresentations; by advising plaintiffs to engage in and complete the ML deposit transactions; by advising plaintiffs that the cost of the currency long option purchased by them in the ML deposit transaction could properly be included in their tax basis for computing capital loss for 2001; that the amounts received for selling the currency short option could be ignored, closed quote. Is all of that true?
A. There's a lot there.
Q. Is anything in it false?
A. That's easier. As we see it today, I think that's a correct statement. I think we were mislead by Deutsche Banc.
Q. As a factual matter, that's true, what I just read?



A. I'm sorry, I didn't catch the question.
Q. Is what I just --
A. I thought you were talking to yourself.
Q. Is what I just read true from this paragraph?
A. Our assertion is true, we believe our assertion is true, that Deutsche Banc mislead us in what the tax ramifications and what the opportunities were in the whole investment, we were mislead.
Q. Do you wish to disavow this representation made to the U.S. District Court?
A. I don't know any reason why I would.
Q. I'm going to read from Paragraph 105, closed quote, The defendants acted with full knowledge and awareness that the transaction was disclosed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint when, in fact, they lacked those features, paren, which was necessary for successful tax strategy, close paren, close quote. Is that true?
A. We believe that's an accurate representation of what -- yeah.

Q. And you don't disavow that?
A. No.
Q. I have something that was an exhibit in previous depositions but I don't have anymore copies, so it won't be an exhibit here. I will just give you a copy to look at.
A. Okay.
Q. And if Mr. Pliske wants to look at it, it is a letter captioned agreement for your legal services from Cantley & Sedacca. Showing that to Mr. Hutton now. I'd like to look at Paragraph 3. Do you have that?
MR. PLISKE: I have the October 4th letter.
Q. Paragraph 3, third sentence of Paragraph 3, quote, In making the investment that will be required as part of the investment, you have relied solely upon your, paren, and your financial advisor's, paren, independent investigation of all matters or concerns regarding the investment and the investment. You, paren, or your financial advisor, close paren, possess the knowledge and experience in financial and business matters that ensures your, paren, and your financial advisor's, paren, capability to evaluate



the merits and risks of the investment, and you are, therefore, making an informed decision as to the investment, closed quote.
Do you have knowledge and experience in financial and business matters that would ensure your capability to evaluate the merits and risks of option trading in foreign currencies?
A. Absolutely not, that's why I hire guys like Scott Hewitt.
Q. And whom did you hire -- who was your financial advisor who did possess knowledge and experience in financial and business matters?
A. I would look at that as Scott Hewitt.
Q. But he says he didn't have that knowledge.
A. Well, he may have said that, but I looked to him. I felt like he did when I -- when we analyzed this particular opportunity, that's who my primary person that I looked to, was Scott Hewitt, in discussion of this.
Q. Did Mr. Hewitt ever give you any reason to think that he had financial and business knowledge so as to evaluate the merits of trading options in foreign currencies?
A. Well, I'd answer that by saying he sure



didn't tell me he didn't, and I've had a lot of faith and trust in Scott over the years. He's helped our company, he's been instrumental in helping our company grow and with his expertise in other areas and the like, he's proven to be a valuable consultant for me, and so I didn't really question in depth whether he was specifically comfortable with this, but he never indicated to me that he wasn't.
Q. Did you ever ask Mr. Hewitt for an opinion on whether the option trading transaction would, apart from tax contributions, provide a reasonable opportunity for profit, apart from tax considerations?
A. You know, I don't specifically recall asking him that, but in the course of our conversations, I had a comfort level that he was okay with it, but I really don't recall that I specifically phrased a question to him like that.
Q. In his affidavit he said that he gave you the opinion that if it was not profitable, there would be down side protection because of tax attributes.
MR. PLISKE: Objection.
A. That wasn't really what the question was.



MR. PLISKE: I don't think he said that in his affidavit.
MR. STODDART: Let's get his affidavit.
Q. And while we continue, I'd like to ask you, when exactly did Mr. Hewitt tell you that this transaction had a reasonable possibility of producing a profit?
A. I don't believe that I said that he said that.
Q. So he didn't say that?
A. No, what I said was that in the course of our discussions, that I had a comfort level that he believed that, but I don't believe that he ever specifically said what you're asking me the question is.
Q. What exactly gave you the comfort level?
A. Scott and I've worked together on a number of things, and Scott's always been very open and honest with me as to issues that I've brought to him, and I felt like if he would have had a concern about that or a comment, he was always very open in making those, and he didn't.
So I guess I took his silence as a acquiescence, if you will, that yeah, it's an okay

deal, but I did not ask him specifically as it relates to that. That would have been out of character for me, quite frankly, for me to have drilled in that deep to a transaction like this.
Q. Did Mr. Hewitt ever before then given you his opinion that any transaction you entered had a reasonable possibility of making an economic profit regardless of the tax consequences?
A. No, no. Only thing I would qualify again is I suppose there's been times I've thrown out an idea of maybe a direction I was going to take my company, and we'd talk about the profitability aspect of that, and the investment in a piece of real estate.
Kind of good example would be building an office building for my company and how that was -- the ownership structure was going to be set up so that it had its -- it was profitable and benefitted me the best for tax purposes.
Q. Would he give an opinion on the business merits of your transaction?
A. If I asked him specifically to do that, he would be more than open to do that.
Q. Did he ever?
A. On this transaction or on others?



Q. On others before this, let's say.
A. Yeah, yeah.
Q. Such as?
A. Well, he brought me the idea of starting the company EquipLease, as an equipment rental company that's outside of Hutton Construction, and we discussed the benefits of that.
Q. Did he tell you that it was reasonably likely or did he give you the impression, or did he say, did he say this was likely to give you a profit?
A. Well, I think -- in that particular case, we knew it would be a profitable deal, how the profits were handled, and its impact on me long-term financially is really what the discussion of that particular deal was.
Q. I'm interested in the occasions before you entered this MLD transaction on which -- in which you specifically went to Mr. Hewitt for business advice, apart from tax advice.
A. Gosh, I mean, it was all so intermixed. I can't say that I ever went to him for business advice that we didn't discuss in context with that the tax ramifications of it, that I recall anything specific to that, but we've had a lot of



conversations about various business things that we do and how that affects things.
Q. And when you have conversations about business things, does he actually implicitly talk about the business things?
A. I don't really understand what you're...
Q. You're saying you got a comfort level because Mr. Hewitt didn't speak up and say, this is unlikely to produce a profit --
A. Yeah.
Q. -- apart from tax?
Were there other occasions in which he gave you this kind of implicit business advice that something is going to be profitable just because he failed to say it would not be profitable?
A. Well, I think I know what you're getting at. I'm not sure that I could say explicitly that there's any one thing like that, that you're asking me.
Q. If there's not any one thing, does that mean there is no thing?
A. No.
Q. What does it mean?
A. Well, I think it means that in the



context of literally thousands of conversations that I've had with Scott as my accounting partner and that I can't say yes or no that he's ever sat down and that we've had that context, just to talk about the profitability of something and not have tax implications intermixed. It's just not generic to our conversations.
Q. So your testimony is that he gave you the advice -- that you had a reasonable opportunity to earn a significant profit from the transactions in excess of all fees and transaction costs and without regard to tax benefits because he never told you that you did not have a reasonable opportunity?
A. Yeah, I mean, he never brought it up and said, Mark, this doesn't feel right, doesn't smell right. I mean, he never said anything like that, and that would be something that would be in his character to do.
Q. And when you went to him and asked for his opinion, what opinion did you ask for?
A. I asked him what he thought of the deal, and that would be a direct quote, what do you think of this, and he -- go ahead.
Q. Did you give him the Black/Scholes

analysis that you were supposed to have discussed with Mr. Brooks?

A. I would not have a clue as to what the Black/Scholes analysis was if you put it in front of me today.

Q. Did you ask Mr. Hewitt to look into Daniel Brooks' Black/Scholes analysis?

A. No. I wouldn't have known what that is or anything to be able to ask him. Why I would have asked him?

Q. Do you have any reason to think that Mr. Hewitt would know about the Black/Scholes analysis?

A. I couldn't answer that.

Q. Had he ever mentioned it to you before?

A. No.

Q. Had he ever talked to you about valuing option trades?

A. None.

Q. Did you know from other transactions that he, in fact, did value option trades?

A. No.

(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 1.)



Q. Do you know what this Exhibit 1 is. It's captioned at the Top Investor Representations?

A. Yeah, um-hum.

Q. And you signed this?

A. Yes, I did, looks like on the back.

Q. On March 11th, 2002?

A. Um-hum.

Q. In Paragraph 5 that, quote, Based on the advice of CC and Brooks as to the probability of the investments reaching certain price levels at which they would be profitable, and on the advice of my own investment advisors, I believe and continue to believe that I have and continue to have a reasonable opportunity to earn a significant economic profit from the transactions in excess of all fees and transaction costs, and without regard for tax benefits, closed quote.

Ask you again, what was the, quote, advice of my own investment advisors, closed quote, on which you believed that you had a reasonable opportunity to earn a significant economic profit from the transactions?

A. I based my opinion of that on the fact that Scott Hewitt had no objections to it.

Q. And his lack of objections was his



advice?

A. That's how I saw it, yeah, I was comfortable with that. I asked him to look at it and he came back and said he thought it was okay.

Q. Let's look at another sentence from this paragraph, quote, in fact, my decision to invest in the transactions with CC and Brooks was based in large part on CC's and Brooks' representations that A, there was an approximately 28 percent statistical probability, paren, based on Black/Scholes, paren, of realizing a 60 percent return on my net investment in the MLD positions, net of all my direct transactions costs associated with the positions, and an approximate 1.3 percent statistical probability, paren, based on Black/Scholes, paren, of realizing a 14,446 percent return on my net investment in the MLD positions net of all my direct transaction costs associated with the positions, closed quote.

It is your testimony that Mr. Hewitt -- that Mr. Hewitt advised you that there was a 28 percent statistical probability based on Black/Scholes, et cetera, because he did not tell you the opposite?

A. We didn't discuss that segment of it, so



you can draw the conclusion how you want to. I go back to my -- what I said originally, I had him look at the whole deal, I asked him what he thought of it, he said he thought it'd be okay.

Q. Did you give him the information from Mr. Brooks that determined that there was a 28 percent statistical probability of realizing a 60 percent return, et cetera, et cetera? I can tell you he didn't provide any documents like that to me.

A. I don't believe I received all that information directly. I was kinda depending upon Scott to get information that he needed to be comfortable with this from Bryan Hanning and, in fact, I think they had some conversation about that, as well as Cantley & Sedacca.

Q. Did you believe that Bryan Hanning had the ability to determine that there was a 28 percent statistical probability based on Black/Scholes?

A. I don't believe that he had that ability to actually determine that statistically. I did believe Bryan to understand the basics of this transaction and the viability of it as it related to its ability to yield a profit.

Q. Did you ask him whether in his opinion

the transaction had a reasonable probability of producing an economic profit in excess of taxes and out-of-pocket costs?

A. No, I didn't ask him that specifically.

Q. Did you ask anybody that?

A. No, I don't believe I asked that specific question.

Q. Did you ask the general question of anyone whether this would produce an economic profit net of taxes?

A. We certainly discussed that as the reason of this investment was the fact that it had a probability, although it be a high risk, of yielding a significant return on the investment, yeah, we discussed that.

Q. And what did you do to determine that such a probability existed?

A. Well, I guess, again, I relied on Scott Hewitt and his understanding of financial things and somewhat Bryan Hanning as well, believing that Bryan Hanning would not have brought this to me if it didn't have at least some reasonable opportunity to make some money.

Q. Did you rely on anything other than that?

A. I don't recall that I did, no.



Q. We noticed before that this said representations was signed on the 11th of March 2002. And Cantley & Sedacca sent an opinion letter to you dated January 22nd, 2002, two months before you made your representations.

Did that raise any questions in your mind that they gave you their advice before they had representations?

A. No. Frankly, I looked at that opinion letter as a -- something that I expected Scott Hewitt to digest, not me. Again, it's not something that I had any background knowledge in, and I could have read it and not understood a word of it, because it's all written around legalese and code stuff. That's not what I do.

Q. On the first page of this January 22nd, 2002, investment opinion letter, which I think Mr. Pliske has, the second paragraph contains the sentence -- well, they relied upon representations and advice from you and other parties, and, quote, If any such item is inaccurate in any material respect or any such documents prove not to be authentic, the opinions contained therein may not be relied upon, closed quote.

Did you see that?



A. I'm sure I did read that, yeah.

Q. And you represented that your financial advisor had given you advice about the probability of a profit based on 28 percent statistical probability based on Black/Scholes. Was that accurate?

A. I believe, again, I believe that Scott Hewitt -- I relied upon Scott Hewitt who indicated to me that he was comfortable with the deal. We did not drill into the specifics of Black/Scholes or the probabilities or anything like that because that's what I depend on Scott to do.

Q. I'll ask this again, but I think it's been answered, did you ever ask Mr. Hewitt to look into the probabilities of profit?

A. I never asked Scott Hewitt to look into the probabilities of the profit of this investment.

I assumed if Scott had a question about that, he would have done it. Scott has always been very thorough for me and so when I asked him to look at the deal, that was in my mind asking him to investigate that to the point that he was comfortable that it was what it was represented to be.



Q. Did you think that that assumption was reasonable, given that you were asking for an opinion about probability of profit based on statistical probabilities computed under the Black/Scholes method?

A. I think knowing what I know today, it probably was outside of what would be -- I would ask Scott again.

Q. I'd like to go back for just a second to an earlier exhibit -- no, not an exhibit, to the thing I earlier asked you about, that Cantley & Sedacca...

A. The October 4th letter?

Q. Right, right, and it says in the third paragraph there, quote, To assist us in explaining the investment to you, we have engaged one or more financial advisors whom we will pay for their assistance to us, closed quote.

Who was the financial advisor they paid?

A. In my mind, that would have been Bryan Hanning.

Q. Did anybody else tell you that they were paid by Cantley & Sedacca?

A. No.

Q. I have another Exhibit.

(WHEREUPON, the reporter marked
for identification Deposition
Exhibit No. 2.)
Q. This is Exhibit 2. Do you know what Exhibit 2 is?
A. Looks like a letter.
Q. Have you signed it?
A. I did.
Q. And the letter authorizes somebody at Deutsche Banc to pay out an amount that adds up to 27 and a half million dollars from a certain account.
Did you have 27 and a half million dollars in that account when you authorized the transfer of funds?
A. Well, this was a part of a --
Q. First the answer, then the explanation. Did you have 27 and a half million dollars?
A. Not that I'm aware of.
Q. Did you?
A. Not that I'm aware of.
Q. Had you put 27 and a half million dollars into that account?
A. No, but my understanding of the transaction was that Deutsche Banc was actually



going to be loaning that.
Q. Did you ever sign a promissory note for 27 and a half million dollars?
A. Not that I recall.
Q. If you do find such documents referencing a loan from Deutsche Banc, will you please make sure that I get a copy?
A. Of course, of course.
(WHEREUPON, the reporter marked
for identification Deposition
Exhibit No. 3.)
Q. Do you know what Exhibit 3 is?
A. This is a statement of account from Deutsche Banc.
Q. And for what period is it?
A. Oh, gosh, let me find it here. Net value as of December 31st of 2000, October -- statement of account, October 1st to October 31st, 2001. Confusing.
Q. Go to the second page, under activity, do you see anything that would indicate that there was 27 and a half million dollars in this account --
A. No, sir.
Q. -- in October?



A. No.
Q. Exhibit 2 was your instructions to Deutsche Banc to transfer 27 and a half million dollars that is dated October 15th.
A. This letter was actually generated by Deutsche Banc, so I was following their instructions.
Q. Do you -- in the last few pages of Exhibit 3, has listed withdrawals, this is on Page 4?
A. Okay, I'm there now.
Q. Do you see any withdrawal of 27 and a half million dollars?
A. No, sir.
Q. Did you get a copy of this bank statement?
A. Yeah, I believe this is probably the statement that I gave Scott Hewitt.
Q. Did you wonder why the bank statement doesn't show 27 and a half million dollars when you had instructed Deutsche Banc to transfer 27 and a half million dollars?
A. I guess I don't know that I wondered. I assumed that it was part of a transaction that took place. Instead of passing through this



account, that it would have just gone straight to where it was supposed to go.
Q. So the money would go where it was supposed to go?
A. Yeah, based on Deutsche Banc's instructions.
Q. Again, what is your understanding of where this money came from?
A. Well, this is kinda like, in my business, we'll do a project for somebody and we send them a monthly pay application. That pay application is approved and then their bank wires us money to pay for that. It doesn't pass through that person's bank account, it comes straight to us from the bank that set up the construction loan, and so I guess if I had to -- I mean, that's what I relate this to, is that there was some transaction that occurred that this money was not going to actually flow through my account, but would be part of that transaction because it's -- again, I was following and trusting Deutsche Banc, be it misguided, perhaps.
Q. Did you make any effort of your own to see where this 27 and a half million dollars came from or where it went?

A. No, sir.
Q. Did you instruct anybody else to see where the 27 and a half million dollars came from or where it went?
A. No, sir.
Q. There was another part of the deal I believe in which another party SociTtT GTnerale, I think, made a deposit into your account, or supposed to have, of 25 million and bought from you a written option for slightly less than 2 and a half million.
Am I understanding that correctly?
A. I'm not familiar with the details of that at all.
Q. Did you read the Cantley & Sedacca legal opinion?
A. Like I said earlier, I tried, but that stuff doesn't register with me. Again, it's way outside of my expertise and understanding of things.
Q. Tell me what your understanding of the deal was.
A. Well, in summary, it looked to me like it was a transaction of using foreign currency and leveraging the value of the foreign currency for



profit, and I related it somewhat, I had a sister who lived in New York that had done some currency transactions in the past that she said were very profitable for her, so when this was brought to me, I related it to that.
Q. Didn't anyone ever tell you that SociTtT GTnerale was going to be depositing with you the equivalent of $25 million and was going to be buying from you an option that cost slightly less than that?
A. No. Again, I depended on Deutsche Banc to execute this and trusted them, figured, size of Deutsche Banc, you ought to be able to trust them, and they were, with this Dan Brooks I believe was the guy with Deutsche Banc that took care of all this for me, just like I would not execute a trade personally for stock, you know. If I decided I wanted to buy stock for something, I would tell an investment advisor. I didn't buy life insurance directly, I go through Bryan Hanning, because I depend on people like that to execute it in the proper manner, because I don't have the background and knowledge to do that.
Q. When you buy stock and you ask somebody to buy it for you, do you give them actual money?



A. Do I give them actual money?
Q. Yes.
A. Not them. I would pay whoever, who I bought the stock from, but I might pay them a broker's fee for it.
Q. So you actually pay the -- pay for the investment?
A. I pay for the investment execution, yes, uh-huh.
Q. And if you want the stock, you would expect to buy the stock for what it's worth; correct?
A. Sure, or hopefully for a little less, you know.
Q. Did it strike you as odd that you were buying options out of your account when there was no money to buy them in the account?
A. Well, again, it was -- I didn't drill into the details of the transaction. The transaction was designed and orchestrated by Deutsche Banc and I depended upon them, and that's why I didn't get -- I figured if Deutsche Banc wanted -- needed to have 27 and a half million dollars in my account to do whatever they needed, then they would have either asked me for it or



applied it some way, loaned it to me or whatever. I didn't get into the details of this thing because again, it isn't what I do.
Q. What efforts did you make to determine that this had happened?
A. That the transaction had actually occurred?
Q. Yes.
A. I guess I didn't make any. Again, I trusted, again, that an institution the size and capacities of Deutsche Banc was trustworthy enough to execute it.
Q. Did you know Deutsche Banc was a promoter of this --
A. I did not, no.
Q. -- transaction?
A. No, I didn't. Learned that later.
Q. Did you know you were paying a fee to Deutsche Banc?
A. No, I did not.
I guess I would clarify that, I didn't realize that Dan Brooks was aligned with Deutsche Banc, as I understand him to be now, and that I knew I was paying some fees to Dan Brooks, just like I've paid fees to other investment people,

whether they be lump sum fees or percentages or whatever for other investments.
Q. You did get the Cantley & Sedacca opinion letter of January 22nd, 2002, and on Page 2, the second paragraph, it says, closed quote, Most recently, Mr. Brooks was employed by Deutsche Banc in its institutional training derivative structuring group from 1996 to 2001.
Didn't you know that that Daniel Brooks and Deutsche Banc had worked together?
A. I would read that, I mean, I can't remember specifically reading this, but in reading it today, that would imply to me that he was no longer there.
Q. 2001, did you think to ask?
A. Why wouldn't it say up until present if he was still working there?
Q. That's not my question.
A. Yeah.
Q. Did you think to ask about Mr. Brooks's affiliation with Deutsche Banc?
A. No, no, it didn't raise a flag for me.
Q. Some time after you filed the 2001 returns, you elected to participate in the IRS's settlement initiative for the Son of Boss



transactions, didn't you?
A. Tried. You guys didn't like it.
Q. Why exactly didn't we like it?
A. I don't know. By that time, I was -- I'd retained Tony Gasaway as my counsel on this issue and he's the one, and I don't recall why it got rejected, but we did get a letter back from the IRS rejecting us.
Q. Did you know that the IRS was asking for information that they say they did not get?
A. Well, I handed all that stuff, all those requests for information and everything were handed over to Tony Gasaway, my counsel, and I relied upon him to determine and work all that out with, I believe it was Marty Tinic (sp), that was the gal's name, but I gave a power of attorney to Tony Gasaway and all those conversations took place directly between Tony and Miss Tinic.
Q. Were you ever present for any of those conversations?
A. No.
Q. Did you ever tell the IRS that you thought you had a reasonable defense to penalties because you relied upon Scott Hewitt?
A. We did not -- I did not ever speak at



that level about this case with the IRS, it was always through my counsel, Tony Gasaway.
Q. Did you instruct your counsel to tell the IRS that you had a defense against the penalties on the ground that you relied on Mr. Hewitt?
A. I don't recall that I instructed him to do that, no.
Q. Well, if you had gone in for an interview with the IRS about the Son of Boss settlement initiative, they would have asked you for certain information?
A. We got a big ol' -- I mean, I saw a big long list of stuff that they had sent Tony, and I remember seeing some correspondence that Tony answered back, said, this is what we'll do. After that, I think it got passed off, Miss Tinic was no longer involved, I think it got pushed someplace else. Don't know.
Q. Hold on for just a second.
MR. STODDART: Can we go off the record?
(WHEREUPON, an off the record discussion was had, after which the following:)
Q. As you were saying, there's a long list



of questions that the IRS had asked you if you'd gone through the settlement initiative and I'm going to ask you some of them.
First one, identify all attorneys whom you or any publically traded entities in which you hold an interest have retained since 1989 for business investments, estate planning, tax and personal matters.
A. Attorneys?
Q. Um-hum.
A. Well, let's see. There would be Dan Peare, with Hinkle Elkouri who handles my wills and trust stuff. I received in 1992 some legal opinions from a firm in Wichita here called Bever, Dye, and Mustard, and let's see, I had an attorney, Jolynn Oakman that drew up a will for my wife and I back in the late 80's, about '88 that subsequently was amended by Dan Peare. And then, of course, Tony Gasaway, who was retained pursuant to this transaction.
Q. Did you retain him?
A. Yes.
Q. How did you find him?
A. Scott Hewitt is the one who recommended that I, when this whole issue kinda came around,

Page 42

Scott Hewitt suggested that I talk to Tony.
Q. What did he say you should talk to Mr. Gasaway about?
A. When I got the notification from the IRS that they were looking at this transaction, I called up Scott, Scott called up a friend of his at Stinson, Morrison and Hecker, guy named John Better, I believe is his name, I think it's John, and John knew of Tony Gasaway who was employed by the St. Louis office of Stinson, Morrison and Hecker at the time, and that's kinda how it all came to be. That's when I started talking to Tony.
Q. Going to leap ahead because this gets very tedious after a while.
Did you complete high school?
A. Yes, sir.
Q. Do you have an undergraduate degree from a college or university?
A. Yes, sir.
Q. What's the name of the school?
A. Kansas State University.
Q. What were your years of enrollment?
A. I was at Kansas State from 1974 through 1977.

Page 43

Q. What type of degree do you hold?
A. Engineering.
Q. What was your major or principal field of study?
A. Construction science.
Q. What was your minor or secondary course of study?
A. Girls.
Q. Let's leap to the third, shall we.
A. I really didn't have a minor.
Q. Did you attend college or university classes other than those that resulted in your degree?
A. I spent a year and a half at Wichita State University in industrial arts education before I went up to K-State in engineering.
Q. Do you have a graduate degree?
A. No, sir.
Q. Have you had any postgraduate education that did not lead to a graduate degree?
A. Other than some seminars, and I think I took a real estate class out at Wichita State for one semester.
Q. Did you attend a business or a trade school?

Page 44

A. No.
Q. Did you receive any training or education in the areas of accounting, finance and income taxes?
A. Absolutely not. That would have been cruel and unusual punishment.
Q. Have you attended any investment related classes or investment seminars?
A. No, not seminars, no.
Q. Any investment related classes?
A. No. I've gone to deals that a bank puts on on kinda economic outlooks and stuff like that, and generally you don't get out of one of those that they don't pitch something to you, so, that's it.
Q. Do you have any professional or business certifications or licenses?
A. I'm a licensed general contractor.
Q. What was the date you received your license?
A. As Hutton Construction, 1992. Would have been about March of 1992.
Q. Was the certification or license ever involuntarily revoked or suspended?
A. No, sir.

Page 45

Q. What was your work history for the last 15 years?
A. All 15 years, as the president of Hutton Construction Corporation.
Q. Would you identify all business entities in which -- in the last 15 years you had an ownership interest and also served as an employee?
A. Yeah, you want me to go through those?
Q. Yes.
A. I'll try to hit them all. There's EquipLease, LLC, which is a limited liability corporation that the sole purpose is to rent equipment to Hutton Construction. I'm partners in an LLC called Insight Medical Partners. We build and lease real estate to medical tenants such as medical office buildings and surgery centers. There's another entity, Cyprus Medical Partners that did one building in the same context, just a different group -- one extra investor, so we created a separate LLC. I think that's pretty well it, that I can remember.
Q. Do any of those entities or does any of those entities have an in-house accountant?
A. EquipLease and Hutton Construction, of course, uses Scott Hewitt but not in-house. When

you say in-house, on my payroll?
Q. Yes.
A. No, no.
Q. Are you a current stockholder in any nonpublically held company?
A. Yes.
Q. And which ones?
A. Hutton Construction Corporation, a sub S corp.
Q. I think you've answered this, but it's here, so I'll ask it. Did you ever hold a position involving any of the following business areas: Accounting?
A. No.
Q. Finance?
A. No, sir.
Q. Federal, state or local taxes?
A. No, sir.
Q. Securities?
A. No, sir.
Q. Currency transactions?
A. No, sir.
Q. Options transactions?
A. No, sir.
Q. Would you please tell me the names of all



the investment advisors whom you or any nonpublically held entities in which you hold an interest have engaged since 1989?
A. Well, there would be Bryan Haysen, who would be with Prudential, turned into Wachovia. He did some money management stuff for me. There would be guy named Jake Jernigan, who I have done some personal stuff with related primarily to my IRA. At Eby Construction I had a rollover IRA that I took out of that. Of course, there's been Bryan Hanning that I've used. Those are the primary people. There's been some money managers, but I worked through Bryan Haysen at Prudential. He really is the one who managed the money managers for me, so I can't say as I had any direct contact with them.
Q. Of those investment advisors, which are the ones you contacted about the MLD transaction?
A. Actually, Scott Hewitt would have been the only one that I contacted.
Q. Is he one of your investment advisors?
A. I would consider him that, yes.
Q. Okay. Before 2001, did you ever trade, invest in or otherwise purchase or sell foreign currency?



A. No.
Q. Have you entered into investments in foreign currency since 2001?
A. I have not directly, but some of the portfolio managers of some money may have, I couldn't answer that, other than through that method, but I have not directly or directed anybody to do it.
Q. Do you know if those investment managers, in fact, did enter into investments in foreign currency?
A. I don't know specifically that they did, sir, no.
Q. Before 2001, did you ever trade or otherwise purchase or sell foreign currency options?
A. Not foreign currency options, I did some stock options once.
Q. Have you entered into investments in foreign currency options since 2001?
A. Not directly. Kind of the same answer, unless a money manager did it for me.
Q. Before 2001, did you ever purchase or sell investments through or otherwise used the services of a broker?



A. Before 2001?
Q. Yes.
A. Sure, yeah.
Q. Do you maintain an account with a broker today?
A. Yes, sir.
(WHEREUPON, an off the record discussion was had, after which the following:)
Q. Who introduced you to Cantley & Sedacca?
A. That'd be Bryan Hanning.
Q. Did you ever meet in person or by telephone with Cantley & Sedacca?
A. By telephone only.
Q. Where did the meetings take place?
A. At my office.
Q. When did they take place?
A. I don't recall specifically, other than it would have been kinda mid to late summer, based on my recollection, but I don't recall the specific dates.
Q. Was there another meeting with Cantley & Sedacca?
A. We had, I recall, two telephone conferences with Cantley & Sedacca.

Page 50

Q. And who was in on them under your recollection?
A. I recall that the first one was myself and Bryan Hanning only, and then with Cantley & Sedacca on the other end where they attempted to explain the investment opportunity to me. It's at that time that I said, whoa, way over my head, I need the advice of Scott Hewitt, so that's when Bryan Hanning set up a second conference call and Bryan and Scott and the other guy from Allen, Gibbs & Houlik, I can't remember his name.
Q. Kaplan?
A. Kaplan was there, and then myself, and then we had a second conference call. That's where Scott asked the bulk of those questions.
Q. Were any of the questions on things other than the tax consequences of the deal?
A. I remember really not that much about the tax consequences. I remember really more discussion about more of the mechanics of the process, and I remember specifically joking around about the money it could make. Wow, that'd be a great return.
Q. You mean the 14,000 --
A. I don't remember the exact percentage,

Page 51

but it was certainly part of our discussion was that that would be a significant amount of income.
Q. Did they mention the statistical probabilities of such a return?
A. I don't recall any discussion about drilling into statistics or anything like that.
Q. So you don't remember if Mr. Hewitt asked about the probabilities of such a return?
A. I don't recall that he did. I don't believe we got into probabilities.
Q. What are all the fees and costs you incurred in connection with the MLD transaction?
A. Well, from what I remember, there was a -- I paid some commissions to Deutsche Banc, I paid some fees to Cantley & Sedacca, and then, of course, put money up to deposit at Deutsche Banc.
Q. How much money did you put up to deposit?
A. You know, I'd have to look at my records, I don't recall exactly how much that we did for that.
Q. Would it refresh your recollection if I were to show you again Exhibit 3, or if you would look at Exhibit 3.
A. Looks like about $250,000.
Q. That's the amount that you deposited with

Page 52

Deutsche Banc?
A. I'm assuming it is because that's what they say it is on their statement. They usually aren't in the habit of increasing that.
Q. So all in all, about how much would you say you paid out of pocket?
A. I think it was around $225,000, that I recall.
Q. I'm going to show you something I'm not going to make an exhibit, because I don't have any more copies, but it's been an exhibit in other depositions. It is that e-mail from Bryan Hanning at the top, I will wait for Mr. Pliske to get his copy out.
MR. PLISKE: Okay, go ahead.
Q. You'll see here at the top of the e-mail that has Bryan S. Hanning at the top of the printout, the subject is Leman's strategy. Do you happen to know what Leman's strategy is?
A. No, sir.
Q. Now, look at the bottom here. This is an e-mail apparently from you because your name is on the "from" line. Is that your e-mail address, which is Mhutton@huttonconstruction.com?
A. That's changed now, but that was it at

Page 53

that time, uh-huh.
Q. Did you send that e-mail that's at the bottom there?
A. I would say yes, yeah. It sounds like me and certainly looks like it's from me, um-hum.
Q. I'll read this into the record then. It says Bryan slash Jeremy. Scott and I met today and figured this out. We would like to take down $1,005,000 of loss for year 2001. I would think the balance for next year, but if possible, I would like to wait until later in 2002 to decide on this. Is that possible?
First, could you identify Bryan and Jeremy?
A. Well, I don't know Jeremy, I'm assuming that he was Jeremy Nerenberg, but Bryan Hanning would be who I was referring to there.
Q. And what loss were you talking about taking down?
A. Well, it was my understanding that in the failure of this opportunity to yield a profit, that there was some tax benefits, and that would have been that loss.
Q. So this is from the MLD transaction?
A. I believe so, yes, sir.

Q. And there was more of a loss that you were going to take in some other period?
A. Yes. I mean, it's...
Q. How much was the remaining loss that you were going to take?
A. I don't recall.
Q. You remember what period you took the loss in?
A. Well, this would have been in 2001.
Q. I mean, the remaining loss?
A. Never took it. I believe it was shortly after this that we determined that this was a red flag, you know, that the IRS had ruled that this was not a viable deal, and so we commenced to unravel it.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 4.)
Q. Do you know what Exhibit 4 is?
A. It's an amended tax return for 2003.
Q. Did you sign it?
A. Yes, sir.
Q. Did you file it?
A. Yes, sir.
Q. It says in the second page under part 2



that: Taxpayer's amending tax return to report a $20,000 reduction in the ordinary loss and an IRC Section 988 loss of one million four hundred ninety-five thousand and one hundred twelve, closed paren, dollars, reported on an amended K-1 from Clearmeadow Capital Corporation, closed quote.
A. Um-hum.
Q. What loss did Clearmeadow Capital Corporation have that you're amending your 2003 return to take?
A. Well, this amended tax return was prepared under the direction of Tony Gasaway as it related to how we were going to pursue the issue of the viability of this market linked transaction, and it was part -- it was a strategy that he came up with and I followed and he's the one who pretty well directed Scott Hewitt how to approach this.
Q. Are you pursuing even now the overpayment claimed on Line 19 of this amended return?
A. Got to find Line 19. Which page?
Q. It's on the first page.
A. First page, Line 19, okay. No. I don't know what the status of that is, to be honest with



you.
Q. Do you know if you are still pursuing --
A. I think the IRS sent me a letter, said take a hike, and that's where we left it.
Q. Okay. Then is it fair to assume that you're not pursuing the IRC Section 988 loss of $1,495,112?
A. I have to defer that to counsel.
Q. He's not under oath. If you don't know, you don't know?
A. I don't know. I don't know, I've left this whole deal up to them.
MR. PLISKE: Bob, can I clarify something, the dollar amount you referred to, the 24 thousand and asked if he was pursuing that as an overpayment, that line actually says overpayment as shown on the original return. I don't think there's any adjustment with respect to this amended return, no tax coming back.
MR. STODDART: Good, good, okay. Let us correct that.
A. I was going to say, I didn't get $24,000.
Q. I stand corrected, and I thank Mr. Pliske for that.
Would it be fair to assume that this loss



mentioned at least in part 2 from Clearmeadow Capital Corporation is the remainder of the loss that you were wanting to defer to another year in this e-mail captioned Bryan S. Hanning?
A. It could be. I don't know specifically that that's where that came from, but again, because I relied upon Scott Hewitt and Tony Gasaway.
Q. Did Clearmeadow Capital Corporation have any other loss besides the loss in the MLD transaction?
A. No, sir, they did not.
Q. So I'll ask you again, would it be reasonable to assume?
A. Yeah, I think reasonable, yeah. I guess I didn't hear that part.
Q. So by my reckoning, if you add one million five thousand that you were going to take on the 2001 return and the one million four hundred thousand and change loss mentioned on the amended return, the deal generated in excess of two million dollars in tax loss; do you recall that being the case?
A. I remember discussing the tax losses with Scott, yes.

Q. And is two million dollars in the ballpark?
A. I don't remember talking about an aggregate amount, in all honesty. I remember talking about the one million, I don't remember talking about the 1.4 deal at all.
Q. Okay, let's take the one million then.
A. Okay.
Q. You paid 225,000 out of pocket?
A. Um-hum.
Q. You got one million and perhaps two million of loss from the deal; yes?
A. I took one million there, uh-huh.
Q. And another one million that may or may not, let's say, from Clearmeadow. Apart from all of the advice you may have gotten, or the assumptions you may have made or the law that you might have heard about, didn't it ever strike you that that was just too good to be true?
A. You know, I was so used to Scott drilling into me the letter of the code and the fact that the code had its steps that you had to go through and the like, did I think it was a good deal? You bet. Did I think it was something that I was outside, reasonably relying upon Scott Hewitt, no.
Q. Apart from relying on Scott Hewitt, let's



pretend there's no Scott Hewitt.
A. Okay.
Q. You hear from somewhere you can pay $225,000 to me, I will give you two million with tax loss. Wouldn't you think that's too good to be true?
A. I would say in that pure context, yes, but I think it has to be weighed against the other opportunities that that transaction has.
Q. Such as?
A. The possibility of return, and the tax dollars that that would have generated.
Q. And again, you're relying on whom to know that there was a 28 percent possibility of a return of --
A. I don't have the specific numbers but the Cantley & Sedacca people represented to me, I believe, probably unfairly now, that the opportunity to profit from this was significantly better than what it turned out to be.
Q. And you believed them?
A. I did at the time, yes, sir. And the reason I believed them is I asked Scott Hewitt to pursue it and check it out, and he came back and said, again, I think the deal's okay.



Q. You asked Scott Hewitt to check it out, did you ask him to check out the statistical --
A. No, I asked him to check the deal out. Tell me what you think of the deal, and he came back and said, I think it's okay.
Q. You never really asked about the statistical probabilities?
A. I really don't deal in statistics. It's just kinda not my world.
Q. We may go into that, I suppose.
MR. STODDART: Let's go off the record.
(WHEREUPON, a recess was had, after which the following:)
MR. STODDART: I've finished with direct.
Go right ahead.
MR. PLISKE: Thank you.
CROSS EXAMINATION
BY MR. PLISKE:
Q. Mr. Hutton, I'm Tom Pliske, I represent you in this matter, and I have some questions for you.
We pretty well covered your education experiences, your work experiences, your accounting and tax background, or lack thereof.



The other day I was at your office and you pointed out the IT person's office.
A. Um-hum.
Q. Why do you even have an IT person at the office?
A. Because I don't have a clue to make our network and software and everything work. That's his specialty.
Q. So do you rely on other people in your own business --
A. Oh, yeah.
Q. -- in your business, which is general contracting?
A. Um-hum.
Q. Do you rely on others today to become a profitable business?
A. Very much so, yeah. As I said, my job is to hire the right people to put around me that actually generate the profit. My job is to hire the right people and to keep them happy and to organize the flow of this company so that they can do their work that makes us profitable.
Q. Is your company profitable today?
A. It is today, um-hum.
Q. Do you believe you've surrounded yourself