Page 62

with good people?
A. Oh, definitely, yes.
Q. With regard to the 2001 transaction we've been talking about all day, did you rely on other people in the analysis of that transaction?
A. Most definitely did.
Q. I heard, I think more from the other people this morning, their testimony, not so much with you, describe your relationship with Bryan Hanning.
A. Well, Bryan, I've known Bryan since clear back in the 70's, but primarily, not as a good friend, we shared friends in high school days and knew him primarily from dating my wife. Really didn't get to know Bryan until about 1992, '93, when he called on me and I'd started Hutton Construction Corporation, and didn't really -- probably last time I saw him was in about 1975 and then again didn't really see him again until 19... about '93 when he called me as a business prospect.
Q. Do you have a business relationship with him today?
A. Yes.
Q. Did you have a business relationship with

Page 63

him prior to 2001?
A. Yes.
Q. Did you approach him or did he approach you with respect to this 2001 transaction?
A. He approached me.
Q. Was your 2001 taxable year as it was developing in 2001, was it unusual in any way?
A. No. I mean, it was showing kind of the same systematic growth in profit that we'd had over prior years. It was a profitable year.
Q. It was --
A. Not significantly so.
Q. Not a spike in income?
A. No, not what I would consider a spike. There was an increase, but not a spike.
Q. Did you find it unusual that Bryan Hanning would approach you with an investment opportunity?
A. No. I mean, over the times that we got together on a fairly regular basis going to lunch and visit, I mean, we threw all sorts of ideas around from investment opportunities and structuring various deferred compensation plans and continuity, what I called continuity insurance, which is kind of life insurance, stuff

Page 64

like that.
Q. Did you question him about some of the investment opportunities he brought you?
A. Sure, yeah. We explored some.
Q. Were you aware that he had a securities license?
A. Yes.
Q. And you recall any other type investments other than insurance type products that he may have recommended to you?
A. I don't recall any specific. And Bryan, maybe you should have asked him this, but he could go over my head really quickly. He had to be really careful when he explained things to me, that he didn't get ahead of me, where I'd be able to really even talk to him coherently about them. Because of that, I felt like Bryan had a really good grasp on things and trusted him for that.
Q. Were you comfortable with his advice --
A. Oh, always.
Q. -- in 2001?
A. Yeah.
Q. Do you still use him today as an investment advisor?
A. Yeah, sure do.

Page 65

Q. Are you upset with him with respect to this 2001 transaction?
A. Upset, no, no. Somewhat disappointed, but not mad.
Q. Did you ever ask Bryan in 2001 before or subsequent to provide you tax shelter type investments?
A. Absolutely not, no.
Q. Was this ever presented to you as a tax shelter?
A. No.
Q. What was your understanding of this investment?
A. That it was a high risk investment that had tax advantages to it. Not unlike we talked about this morning, oil wells and stuff like that.
Q. Are you adverse to high risk investments?
A. No. I probably am now a little bit more because I'm older, but five years ago, the stock market, I was making some pretty decent money on investments in the stock market, and when that went down, I was looking for something to try to kinda pick up the slack, if you will.
Q. Do you consider yourself in a high risk business?

A. Definitely.
Q. Just in a few minutes explain what you mean by that.
A. Well, there are a lot of variables related to the profitability of a particular construction project that are totally outside our control. We could have a vendor that goes down that doesn't deliver the structural steel that then prevents me from completing a project on time that puts me in contract default.
I could have a subcontractor that fails to install something properly and as long as eight or nine years later, I have to come back and fix a problem that's expensive. I've got an issue right now on a parking lot that's showing signs of deterioration because the concrete vendor changed the aggregate and didn't tell anybody, and now the concrete vendor is gone and I've got to stand the cost of fixing this parking lot that's about $350,000.
If that ain't high risk, that's more money than I made on the job, and that's high risk.
Q. How many construction projects do you have going on right now?



A. We're up to anywhere from about 16 to 20, depending on the size of them.
Q. 2001, what about that?
A. We'd been smaller than that, 10 to 12 range.
Q. Do you run some type of statistical analysis as to the probability of it being -- each job being profitable?
A. No, I'd probably kill myself if we looked at that.
Q. How do you make that determination when you bid on a job?
A. You get used to it. You almost get -- you get a little numb to the risk that you're taking and, you know, I don't know that it's healthy, but when you're sitting down, I mean, there are some projects in various construction sectors, if you will, that we've chosen not to participate in, because the risk is even higher. Like utility installations and heavy highway stuff and things like that. So we try to mitigate our risk through various management techniques and evaluation of our clients and stuff like that, but as far as running any statistical or actuarial kind of analysis, I don't know of anybody that



does that in our business.
Q. Could you lose your business based on one job?
A. Definitely. I'd not only lose my business, but I could lose everything I own personally, and will ever own for quite some time because I'm personally guaranteed on a surety, and the surety says whatever they pay out on my behalf, if there's a claim, I have the privilege of paying them back, plus their fees, and that means not just what I have, but what I could have in the future.
Q. Just so I understand, are you saying that you go from day-to-day living with the thought that you could lose everything based on one bad job?
A. I suppose that's in the back of my head. I don't dwell on it, you know, and I have faith and confidence in the people that I've hired around me that they'll make good solid business decisions, but that probability is out there, and happens in this country every day.
You talk to attorneys that are in the business of defending contractors in various lawsuits and they'll tell you that it's a very



lucrative business and there are contractors that are taken out of business every day because of the liability they have of being a general contractor.
Q. It came out this morning that you invested in oil and gas wells.
A. Um-hum.
Q. Is that a high risk investment?
A. Yeah, it has been so far. It hasn't returned anything to speak of.
Q. You invest a large amount of money in oil wells?
A. I've got a couple other thousand dollars invested in a number of drill programs.
Q. Have you ever made a profit?
A. Absolutely none. Right now, the total, the total that that 200,000 is returning is about a hundred dollars a month on one well royalty.
Q. Do you get tax benefits on that?
A. Definitely, yeah. I don't understand them totally, I depend on Scott for that.
Q. I looked at your 2001 tax return, I believe you have a building for rent, that you rent out a building?
A. Right, uh-huh.
Q. Whose building, what building is that?

Page 70

A. It's in the 2002, it was an office building that I owned personally that I leased to Hutton Construction Corporation.
Q. Do you get tax benefits for that arrangement?
A. Yeah, I suspect I do. Again, I leave that up to Scott. I rely on Scott for that, yeah.
Q. Does that building depreciate every year?
A. No, not always.
Q. Does it appreciate?
A. Well, you hope it does, but it depends on the economy, and the neighborhood and a lot of other variables that I have no control over.
Q. You think it's worth more today than when you bought it?
A. I sold that building.
Q. For more than you paid for it?
A. No, I think I about broke even on that, and then built a second one.
Q. Your building that Hutton Construction is in?
A. The building I'm in now is actually owned by the Hutton -- Mark E. Hutton Irrevocable Trust.
Q. Is that appreciating?
A. Again, I hope so, but I don't know. We

Page 71

haven't had it appraised.
Q. I looked again at your 2001 tax return. It appears you have numerous investments in stock options. Are you aware of that?
A. No, those were through money managers that I hired to take care of various funds.
Q. Do you know whether you had an income or a loss for all those option investments?
A. No, I don't know. Again, I expect Scott to kinda look at that.
Q. Would it surprise you if I told you you had losses on all your --
A. In 2001, no. Everything -- it seemed like it lost in 2001.
Q. One of your investments is something called telephonica espan, probably for espa±ol.
Do you recall what that investment was?
A. No.
Q. Could it be some type of foreign investment?
A. I'm sure, now. It was probably a money managed fund that specialized in overseas, what do they call that, sector of stocks. I can't remember now.
Q. Who's Scott Hewitt?

Page 72

A. Scott is my personal and corporate accountant.
Q. And when did he become your personal and corporate accountant?
A. I think we started in, would be tax year of 1993.
Q. So he has been your accountant throughout the last 14 years?
A. Uh-huh.
Q. Do you ask him for tax advice?
A. All the time.
Q. How many times a year on an average?
A. On an average, probably once a month, on issues.
Q. Does he give you written advice, typically?
A. Never.
Q. Does he give you oral advice?
A. Oh, yeah. I go in his office, sit down, and kinda say, here's where our company's going, here's some thoughts I've had as it relates to what I want to invest some things in, and he pounds on his calculator a while and says, yeah, I think that'd probably be something that would be worthwhile, or no, I think you could do better if

Page 73

you did this.
Q. Does he give you tax advice, too?
A. Um-hum.
Q. Is that a yes?
A. Yes, I'm sorry.
Q. Do you challenge his tax advice at times?
A. I have. I've asked more questions, how come we did something that I would think would have been kind of a similar circumstance that had a different outcome, so I'd ask him how come.
Q. Is that for your understanding?
A. Uh-huh, yeah, and kind of an example is, we just recently purchased an interest in an airplane and Scott gave me some opinions as it related to what that transaction -- how that would impact us. Not just tax wise, but also, I kinda bounced the whole pro forma, if you will, off of him, kind of what the ownership would be, and how that would relate to flight hours and stuff like that. And he used some numbers that in talking to the attorney that helped me kinda evaluate the partnership agreement for that airplane, had given me some different numbers as related to flight hours, so I challenged Scott on that, and we talked about it, came up with a solution.

Q. If that wasn't a viable investment, would he have told you that?
A. Oh, yeah, yeah.
Q. Do you rely on him to tell you that?
A. Of course, yes. I expect it.
Q. Do you expressly ask him if this is not a viable investment, would you tell me it's not a viable investment?
A. I really feel like our relationship is beyond me having to tell him that. We've been working together for so many years, why would I not want him to do that, is kinda how I look at it. So, no, I don't expressly say everytime, you'd tell me if this is a loser, wouldn't you? I don't ask him that question.
Q. Would he tell you if it was a loser?
A. Oh, sure, and he has.
Q. He has told you with respect to other investments?
A. Yeah. He warned me about the cost of the airplane and the impact that it has on companies that he's seen in the past and how -- said you need to weigh that against the value of the airplane, but yeah, I mean, we've talked about that kind of stuff.



Q. Just to clarify, you said "we" bought an interest in an airplane. Was that you and Scott?
A. No, it was Hutton Construction.
Q. Are you aware of Scott's background?
A. Other than I knew he worked with Dale Hanneman, and was a partner in Hanneman & Hewitt, and he had a degree and was a CPA. Other than that, no.
Q. Why is it Scott Hewitt got involved in a conference call with you, Bryan Hanning, and Cantley & Sedacca?
A. I asked him to sit in on it.
Q. Did Cantley & Sedacca tell you not to have him sit in on it?
A. No, no. As a matter of fact, I recall that they encouraged it.
Q. Why did he sit in on it?
A. Because I wanted his independent opinion as to what he thought of this deal.
Q. Was he allowed to sit in and not ask questions?
A. No, he was free to ask any question he wanted to, and, in fact, did.
Q. Did that give you a comfort level with him involved in this transaction?



A. It's probably the main reason that I went ahead and went through with the transaction.
Q. Mr. Hutton, I believe you know at this time that this has been classified as a listed transaction by the IRS; is that correct?
A. Yeah, I know that now.
Q. Did you know at the time you made this investment that it was a listed transaction?
A. Absolutely not, no.
Q. Did Mr. Hewitt ever tell you it was a listed transaction at the time you invested or at the time you prepared your return?
A. No.
Q. Would you have expected Mr. Hewitt to have told you it was a listed transaction if he knew it was a listed transaction?
A. I have no doubt that he would have told me that.
Q. Are you surprised that he did not know it was a listed transaction at the time you invested in it?
A. I don't know if surprised is the word, I'm disappointed that he didn't catch that.
Q. If he had told you that it was a listed transaction, would you have invested in it?



A. After learning at the time -- at that time, I wouldn't have known what a listed transaction is, but I certainly would have said, what does that mean, and he would have explained it, then I -- the answer to that would be, no, I would not have pursued the deal.
Q. Have you been involved in any other transactions, investment-type transactions, that have been determined to be listed by the Internal Revenue Service?
A. Did another one in 2002.
Q. And describe that transaction a little bit.
A. It's fundamentally the same, it's also tied -- my understanding, it's tied to market linked deposit, had the same possibilities of return. And that occurred, we did that one, and then it wasn't too long after we did the 2002 transaction that everything kind of came out on all this and started this process of unraveling it.
Q. Were you aware that the 2002 transaction was a listed transaction at the time you invested or at the time the return was filed?
A. No, again, I didn't, we did not know what

a listed transaction was; I didn't.
Q. Was Scott Hewitt involved with you with respect to the 2002 transaction?
A. Yes.
Q. Was Bryan Hanning involved with you?
A. Yes, Bryan brought me the 2002 transaction as well.
Q. He brought you the 2002 transaction as well?
A. Yes.
Q. Did you investigate the 2002 transaction?
A. You know, I can't say that we didn't spend the time on it, when I say "we", Scott or I didn't spend the time on it that we did on the previous one, because it was represented by Bryan Hanning and Cantley & Sedacca that it was effectively the same transaction. And so we thought we'd take another shot at it and see if we could make some money.
Q. Do you gamble, Mr. Hutton?
A. Yeah, not heavily, but when I go to Vegas, I'll gamble.
Q. What gambling, type of gambling?
A. Black jack, primarily.
Q. What are the odds of winning?



A. I don't know. Evidently not very good because I usually don't.
Q. Do you still gamble though?
A. Yeah, sure, yeah.
Q. You recently filed a suit against Deutsche Banc; is that correct?
A. That's correct.
Q. Did you file that suit because you were advised with respect to the statute of limitations in filing a suit against Deutsche Banc?
A. You know, I honestly don't recall speaking to Rob about the statute of limitations. Our conversation centered around the fact that we just really felt that Deutsche Banc, that we had relied upon them and that they had intentionally mislead us with bad information.
Q. You were asked a number of questions with respect to the paragraphs in the complaint. Do you recall that?
A. Yes.
Q. And you stated that you would not change those allegations or that you did not believe they were false; is that correct?
A. That's what I recall, um-hum.
Q. Has a court determined whether those



allegations are true or false?
A. My understanding is Deutsche Banc hasn't even filed an answer yet so it's a long way from any resolution.
Q. If you're successful in your litigation with respect to the United States in this matter, would you dismiss your lawsuit against Deutsche Banc?
A. That's something I have not discussed with counsel, so I couldn't say.
Q. You've invested in stocks and you've invested in options in the past; is that correct?
A. That's correct.
Q. Have you ever done any margin trading with your broker?
A. No, no, I've never really utilized a margin account.
Q. Do you know what a margin account is?
A. Yeah, uh-huh, vaguely. Basically, where they loan you money to buy stock.
Q. So you could buy stock without having money in your account?
A. Sure, yeah.
Q. So was it unusual when you looked at the transaction, the October financial statements from



Deutsche Banc, that you could have bought something without having the money in your account?
A. Yeah, again, based on my understanding of the transaction, that was not -- and kinda how this was all set up by Deutsche Banc, it didn't strike me as odd.
Q. Do you say you're a business man, Mr. Hutton?
A. I try to be, yes.
Q. When you work with attorneys, have you ever heard of the term a CYA letter?
A. Yeah.
Q. And what is a CYA letter?
A. It's boiler plate, cover themselves, cover their ass kinda deal, and it's -- yeah.
Q. We went over a number of exhibits this morning, letters to you from Cantley & Sedacca.
A. Um-hum.
Q. Would you view those as CYA letters?
A. Good part of them, yeah, yeah.
Q. What do you do in business when you see a CYA letter?
A. Well, it's kind -- you get numb to them, because you get them all the time from various

Page 82

people, and so, you know, you try to -- you just kinda look at those as part of doing business, putting up with them.
Q. You don't read every sentence and question it?
A. No, I'd never get anything done.
Q. Do you ever call an attorney when you get a letter from them that basically dismisses everything they told you?
A. You know, very seldom will I run something like that by an attorney. I like to consider myself, you know, that I'm able to judge whether it's a CYA or really of any significance, so go on gut feel there.
Q. I may have asked this, and if so, I apologize, did your income spike in 2001 and 2002?
A. No. It's actually went down in 2002, I believe, if I remember right.
Q. We've looked at a 2003 amended return. Do you recall that?
A. Uh-huh, yes, right here.
Q. Do you recall whether that was the 2001 or the 2002 transaction that generated that loss?
A. I don't recall.
Q. It could have been the 2002?

Page 83

A. It could have been.
Q. This is an amended return -- you need more time to look at it?
A. Just reading here. No, I'm okay.
Q. Do you recall when you amended this 2003 tax return, despite the one point close to $5 million loss you claimed, whether you received one penny of tax benefit from this amended return?
A. I don't believe that I did, no. That's all still up in the air and part of why we're sitting here today, the way I understand it.
Q. If you had a question on this tax return, would you go back to your books and records and try to --
A. I'd go back to Scott Hewitt.
Q. And whatever he told you, would you accept it?
A. Yeah accept it, yeah. I have for 15 years.
Q. When did Scott Hewitt, or did he tell you this was a listed transaction?
A. It's actually -- I don't recall, it would have been -- I think it came up in an IRS bulletin, is that what they do, that said that they're adding a deal here, and I see it here

Page 84

where you had to disclose certain transactions, that if you'd participated in certain transactions, and that came out in 2003, and here's the reportable transaction disclosure statement that was filed with the 2003 return.
Q. Now, you wouldn't have read that revenue ruling, would you?
A. Absolutely not.
Q. Who would have informed you about that?
A. Scott Hewitt.
Q. Do you recall, was that the first time he learned that this was a listed transaction?
A. I believe so.
Q. And did you do anything once that was announced by the Internal Revenue Service?
A. Well, first thing we did was we got in touch with Tony Gasaway, and we then, under Tony's advice, we revised the 2001 tax year and paid the taxes.
Q. So as soon as you learned it was challenged by the IRS, you amended the return?
A. Yes, sir.
Q. And you paid the tax?
A. Yes, sir, and interest.
Q. And interest?

Page 85

A. Um-hum.
Q. And did you do anything after that?
A. Paid penalties after the IRS sent me a deal for the penalties.
Q. Did you --
A. And interest on those penalties.
Q. Do you recall paying penalty and interest in 2001?
A. Yes.
Q. What about 2002, did you do anything to correct that return?
A. We amended that return as well.
Q. Did you wait until you were examined by the IRS --
A. No.
Q. -- or did you do it immediately?
A. We did it immediately. We were ahead of them.
Q. Why did you not enter into this settlement initiative with the IRS?
A. I was leaving that up to Tony Gasaway to handle.
Q. Did that come before or after you amended the return, the settlement initiative, do you recall?

A. I believe the settlement initiative, I believe it came after we amended the return, but I don't know that for certain.
Q. Did you want to enter into the settlement initiative?
A. You know, we talked about it. Again, I think we had discussions to that. I wasn't sure whether I wanted to or not, and again, I was relying upon the professional opinion of Tony Gasaway at that time, as well as Scott Hewitt.
Scott was still involved with those decisions and was assisting me in the analysis of -- as a matter of fact, he's the one who actually filed the amended returns and came up with how much penalty and interest I had to pay and all that stuff.
Q. Were you advised that you did not have to enter this settlement initiative since you'd already amended your return?
A. I don't remember that conversation.
Q. Was it your intention to enter the settlement initiative?
A. You know, I always felt like it was something that warranted attention and, in fact, I think we did apply to get into the -- we sent the



form in or Mr. Gasaway did for us, to apply to get -- to take advantage of the settlement. I remember getting a letter that said we were rejected, without understanding why.
Q. Did you ever advise Mr. Gasaway not to enter into this settlement initiative?
A. No, no.
Q. Earlier Mr. Stoddart, for the Department of Justice, asked you which business and entities for which you participated and held an officer type position, and you listed a number of them; do you recall that?
A. Yeah.
Q. Did you -- were you ever involved with something called Clearmeadow? You didn't list that.
A. Yes, I was, I'm sorry.
Q. Are there any other entities that you may have been involved in?
A. There was Clearmeadow Capital and there was Clearmeadow Investments.
Q. Were those part of the MLD transaction?
A. They initially were. I ran a few other things through Clearmeadow Investments.
Q. What kind of other things did you run



through Clearmeadow?
A. I'll have to look and get out the checkbook, but there was some other investment things that I did, and I'll be happy to kinda get those records out and look at them, it's a while back, but I remember using it because it was already formed and was a viable LLC.
Q. Did you attempt to read and understand the legal opinion that was presented to you by Cantley & Sedacca?
A. You know, I would say I started glancing through it and found out very quickly that it was going to be beyond me, so I didn't go very deep into it at all.
Q. Did you rely on anybody else to go into this opinion?
A. I relied on Scott Hewitt.
Q. Did you give him a copy of the opinion?
A. Yes.
Q. Did you give him a complete copy of the opinion?
A. Yes.
Q. Were there any documents that you received from Cantley & Sedacca with respect to the 2001 or 2002 transaction that you did not give



to Scott Hewitt to review?
A. I don't recall anything. I passed everything through Scott.
Q. He had all the information that you had to analyze this transaction; is that true testimony?
A. Yes, sir.
Q. What about Bryan Hanning, was he involved in the analysis of this transaction?
A. He was not. I assumed that Bryan understood it, in that he, Bryan, in the past had understood other sophisticated transactions that he brought me, many of them well above my ability to really determine how viable they were, and so when Bryan brought it to me, I made the assumption that he was kinda putting his good name and our trust behind that, and that's where we went.
Q. Still use Bryan Hanning today?
A. Yes, sir.
Q. And you still use Scott Hewitt?
A. Yes, sir.
Q. Did you believe you could make a profit, economical profit from the MLD transaction?
A. I believed there was a reasonable opportunity to do that. That's what I was led to

believe.
Q. Who led you to believe that?
A. Primarily Cantley & Sedacca.
Q. Were you upset in any way differently by the loss of the money invested in this transaction than any other transaction you would be involved in?
A. No.
Q. You did lose money on it?
A. I believe I did.
Q. As far as your knowledge, are you the only one who invested in this MLD transaction?
A. I understand there's thousands of people.
Q. At the time you invested, did you ask whether there were other investors?
A. I don't know that I asked the question, but I remember it being discussed that there were -- that this was a very popular investment strategy at the time.
Q. And who discussed that with you?
A. Would have been Bryan Hanning and Cantley & Sedacca.
Q. Did Scott Hewitt give you an opinion with respect to the 2001 and the 2002 transactions?
A. Yes, I believe he did.



Q. And what type of opinion did he give you?
A. Verbal, again. I said, what do you think -- I want you to tell me what you think of this deal, and he came back and says, I think it's okay.
Q. Is that enough for you?
A. That's enough for me.
Q. Has he done that to you on other deals?
A. Almost exactly the same way.
Q. Is this transaction any different between you and Scott Hewitt as any other transaction you've entered into with Scott, with Scott Hewitt as your advisor?
A. No, it's not.
Q. And when I say this transaction, I am now talking about the 2001 and the 2002, and it's the same?
A. It's the same.
Q. Did Scott Hewitt bill you for his opinion?
A. His hourly rate, I'm sure. It all gets lumped together. Scott never gave me much of a detailed billing, it always just said, you know, accounting fees, accounting services, and hourly rate times x number of hours.



Q. Did Scott Hewitt ever indicate to you that he did any type of tax or legal research with respect to this investment?
A. He did, after the phone call that I invited Scott Hewitt to with the Cantley & Sedacca group, Scott said, I want to go back to the office and check some things out, and it was a day or two later that we spoke on the phone where he said, I think it's an okay deal.
Q. And you believe he went back and did some research?
A. I had no reason to believe he didn't. I mean, again, I trusted him that he did.
Q. He could have told you it was an okay deal right after the phone conference if he wasn't going to do research?
A. I think if Scott would have been comfortable with it at that time and he would have made that statement, I would have accepted it.
Q. Mr. Hutton, have you ever instructed Scott Hewitt or any tax preparer that you've engaged in the past on how to prepare your tax return?
A. No.
Q. What would happen if you instructed Scott



Hewitt on how to prepare your tax return?
A. Scott would have said, no.
Q. Do you believe when you signed your 2001 and 2002 tax return, they were correct?
A. Definitely, yes.
Q. Do you believe Scott Hewitt would prepare a tax return on your behalf for which there was not substantial authority?
A. No.
Q. Based on your relationship with your CPA and tax return preparer, do you believe your 2001 and 2002 tax returns were more likely correct than not correct at the time you signed the returns?
A. Yes, I do.
Q. Would you sign these returns if you believed they were incorrect?
A. No.
Q. Do you, in your business, often go out and seek second opinions from other accountants?
A. No.
Q. If you're getting legal advice, do you go out and seek an opinion from a second or third attorney?
A. No.
Q. Do you pay other investment advisors for