Page 94

advice?
A. Sure.
Q. You pay a commission to your broker?
A. Usually in the form of some type of a commission.
Q. You know Bryan Hanning, when he sells you life insurance, gets a commission?
A. Oh, definitely, I know he does.
Q. You know what the commission is?
A. No.
Q. Did you know Bryan Hanning got a commission for getting you involved in the MLD transaction?
A. Yes.
Q. Did you know it at the time that you invested?
A. Yes.
Q. And did that surprise you?
A. It's how he makes his living, no.
Q. Did you ever know how much he got paid?
A. No.
Q. Do you know today?
A. No.
Q. Does Bryan Hanning still give you investment advice today?

Page 95

A. Yes.
Q. Something other than insurance advice?
A. Well, it's through -- I mean, it always ends up in insurance, but it's very sophisticated insurance things. Like we just recently purchased additional insurance through a high earning process that he can explain a lot better than I can, again, that involves significant amounts of cash being invested in a mutual fund that was managed by Massachusetts Mutual.
Q. So when we talk about insurance products with Bryan Hanning, they do have -- I'm asking you now, do they have an investment component?
A. Oh, yeah, definitely.
Q. An investment component meaning something that's in the stock market?
A. That's right, yes.
Q. Mr. Hutton, is there somebody you work with on a day-to-day basis, an attorney, an accountant, CPA, back in 2001, like Scott Hewitt that you never approached and asked their advice with respect to this transaction?
A. Say that again, sorry.
Q. Is there another professional you rely on for legal, tax, accounting type advice that you

Page 96

did not present this MLD transaction to back in 2001?
A. Well, there's all sorts of people that I rely upon in various segments of my business that are legal and, primarily legal, that I didn't bounce this off of. Bryan Hazen at Prudential was handling some money manager stuff for me at the time, I didn't bounce this off of him. I didn't bounce it off of Dan Peare at Hinkle Elkouri who handles my wills and trust stuff, so I guess to answer that, yes. There were some people that I used in the past that I didn't run this by.
Q. And why'd you run it by Scott Hewitt?
A. That's who I deemed was -- I could reasonably rely upon. I mean, he understood my tax and business position on everything better than anybody else. The others that I dealt with did not have that base of knowledge.
Q. Okay. Did you know prior to today that Scott Hewitt had followed up with Cantley & Sedacca at some other date?
A. I didn't realize that he had actually called them and ran things by them, preparing the return. I didn't know that until today.
Q. Would you have expected him to if he

Page 97

didn't understand?
A. It doesn't surprise me that he did it. I mean, Scott's always been very thorough for me, and reliable, so the fact that he did it didn't surprise me or cause me any concern or anything, especially the young woman that works for him, Amy, is very detailed. I'm sure they wanted to make sure that they were representing me the best they could.
Q. So again, the fact that he didn't tell you he was going to do it, that's in the normal course of business?
A. Oh, yeah.
Q. You never directed him to call or not call?
A. No, no.
Q. You wouldn't expect him to let you know that he did this?
A. No, not necessary.
Q. Again, Mr. Hewitt typically will give you his thoughts and opinions orally?
A. Yes, always.
Q. And --
A. I can't remember a time he's written me a memo or anything.

MR. STODDART: May I make a remark, we're getting very deep into asked and answered territory here.
Please continue.
Q. Have you ever read an IRS notice 2000-44?
A. No.
Q. Do you believe Mr. Hewitt's read it?
A. I'm sure he has.
Q. Had he read it, Notice 2000-44, prior to the preparation of your 2001 tax return, in your opinion?
A. In my opinion, no.
Q. Tough question, in your opinion, have you been cooperative in this process concerning the 2001 MLD transaction?
A. You know, I certainly have tried to be. As soon as we heard that this -- that the IRS had an issue with this, we started moving towards correcting it. It was not something that we hid behind or tried to screen in any way. We were very open and forthright, at least I believe. I did seek legal counsel to make sure everything was handled properly. We paid the taxes, we paid the penalties, we paid the interest.
Q. How do you think we're here in



litigation, why do you think we're here in litigation with respect to this matter if you've been cooperative?
A. Well, I think there's kind of the underlying issue is --
MR. STODDART: And objection, go right ahead.
You're going to be speculating about what the IRS is thinking. Go right ahead.
A. No, I wasn't going to do that. I was going to say that in our opinion, the issue of the legality and the viability of this transaction is yet to be decided, and that right now as it stands, it's been a unilateral declaration by the IRS that this is illegal and, I forget all the fancy terms they've referred to it, transaction, and I don't know that I agree with that, and that's one of the reasons that we're sitting here. And under the advice of Tony Gasaway, we believe that we have at least some reasonable reliance issue that is still before us.
MR. STODDART: You're telling me what Tony Gasaway told you?
A. Yes.
MR. STODDART: You waive the



attorney-client privilege? Go right away.
A. Big deal. I've never hidden behind that yet.
Q. If you know this, Mr. Hutton, do you recall filing a Form 8886 Reportable Transaction Disclosure Statement with the Internal Revenue Service?
A. I don't recall filing that, but I believe it was part of the 2000 -- in looking through this 2003 amended return, I see where we filed it. I remember discussing that with Scott, that that was an issue that had come up where you were required to disclose any transactions you had participated.
Q. You don't recall filing it or not filing it with respect --
A. No, I see here that it was part of this amended return, so I'd have to say, yes, it was filed.
MR. PLISKE: I have no further questions.

REDIRECT EXAMINATION

BY MR. STODDART:
Q. Mr. Hutton, you say you rely on people and you surround yourself with advisors like that IT specialist in your building. Before you do, do



you make any efforts to know that they can do the job that you're going to ask them to do?
A. Sure.
Q. Do you make any effort to be sure that Mr. Hewitt would be able to verify that there was a 1.3 percent statistical probability based on Black/Scholes of realizing a 14,446 percent return?
A. Not that specifically, but I had 15 years of relationship or almost 15 years of relationship with Scott Hewitt that was based on a respect and trust of his abilities as my accountant.
Q. In that 15 years, did you ever ask his opinion about an investment opportunity that had a statistical probability of realizing a 14,446 percent return on your investment?
A. Did not, not using those specific terms, sir, no.
Q. What is the largest return on your investment that was mentioned in any earlier transaction on which you requested Mr. Hewitt's opinion?
A. We didn't ever discuss statistical or dollar values of returns, we just really talked more in generalities whether it would have a

reasonable return, a significant return, things like that.
Q. Did you ever discuss with Mr. Hewitt leaving aside exact percentages --
A. No.
Q. I'm not done, in investments that could have a stratospheric return on investment?
A. Stratospheric.
Q. Larger, say, than 10,000 percent, shockingly large.
A. You know, if you're referring to the 2001 transaction, I don't believe I was ever led to believe that it was that huge.
Q. 14,446?
A. Yeah.
Q. You didn't think that was huge?
A. In my conversations with Cantley & Sedacca, we did not discuss these numbers specifically. We just talked about significant opportunity to make money. I believe that Cantley & Sedacca probably overstated those opportunities and implications to me, and that I did not read carefully what I consider to be boiler plate in that letter.
Q. Did you look -- we're talking here about



the thing that's captioned Investor Representation.
A. Um-hum.
Q. Paragraph 5. Did you glance at it at least before you signed it?
A. I probably glanced at it, yeah, sure.
Q. Did the number 14,446 percent catch your eye?
A. You know, I don't recall that I -- that I lost my breath over it or anything like that. Again, you know, it's kinda like, I get investment stuff all the time that purports to be these great deals and they're all full of lies and inflation and everything else. I didn't trust that aspect that closely, quite frankly. I trusted Scott Hewitt.
Q. So you didn't trust the 14,446 percent number?
A. I don't think I put any value to it.
Q. Did you make any personal effort to look into the numbers?
A. I already said I didn't.
Q. Okay. I suppose you answered, that you never specifically asked Mr. Hewitt about it, correct, and you never specifically asked him if



he had --
A. (Nods head up and down).
Q. -- understood the Black/Scholes formula?
A. No.
Q. You said in your cross examination that Mr. Hewitt had given you business advice in other transactions, and I remember particularly that he said the cost of an airplane you wanted to buy seemed to be large, considering other transactions he had known from other companies; correct?
A. I don't recall that.
Q. You remember that he gave you information about a plane?
A. He didn't give me any information about a plane, I'm the one that took everything to him.
Q. He gave you his opinion.
A. He did, yeah, he gave the opinion of what I brought him as it related to what I call the pro forma, the operating costs and the expenditures, and we discussed briefly the tax implications of plane ownership.
Q. And he mentioned that he had experience with this from other companies?
A. He had some -- I don't know that it related so much to other companies, he implied



that he understood the situation.
Q. Did he imply that he had any experience at all with options trading when he discussed the MLD transaction with you?
A. He indicated to me that he was comfortable enough with saying that the deal was okay.
Q. All right. When the settlement initiative was rejected, did you ask Mr. Gasaway to explain why the initiative was rejected?
A. What do you mean by the initiative, you're talking about the settlement?
Q. Your application, yes.
A. You know, I don't recall whether I asked him that question or not.
Q. Were you curious?
A. I'm sure I was. Tony was not the most easiest guy in the world to get ahold of though, I'll tell you that. That's one of the reasons that I'm sitting here with Tom, I think.
Q. Did you try to get ahold of him to ask why your application was rejected?
A. I'm sure I did, but I don't specifically remember doing it.
Q. Why are you sure you did?

Page 106

A. Well, because it would have been in the course of getting a letter from the IRS that said I was rejected. I'm sure I would have sent that letter on to Tony Gasaway and said, what, you know, what's going on here.
Q. Do you remember sending it away to Mr. Gasaway?
A. Not specifically, sir, no.
Q. Do you remember getting any answer?
A. No, not specifically.
Q. What became of your copy of the complete opinion letter from Cantley & Sedacca?
A. I believe I still have it.
Q. You didn't produce it when we requested --
A. I believe I gave it to Mr. Gasaway. I don't know what happened to it after that.
Q. Okay. When you bought your oil wells, did you pay for your oil wells?
A. Yes, sir.
Q. When you had this building that you were leasing, did you pay for the building or at least sign a lease or a mortgage?
A. Um-hum.
Q. You bought stock options, did you pay the option premium for the stock options?

Page 107

A. Yes, sir.
Q. You mentioned that you're familiar a bit with margins but you don't use that.
A. I know what they are.
Q. Do you know what a margin call is?
A. I do.
Q. Did you receive the equivalent of a margin call from the MLD transaction?
A. No, not that I recall.
Q. Were you ever told that you might receive a margin call?
A. I don't remember receiving that or being told that, no.
Q. Do you have any disclosure at all that you might be called upon to actually pay the 27 and a half million dollars that you purported to have transferred?
A. I don't recall any.
Q. Would you please look for any document you might have that would reflect at all on this?
A. I believe -- I've given absolutely everything that's related to this has been transferred to my law firm so if they have it, I mean, if it's in there, that's what I have.
Q. If you'd had it -- is there a possibility

Page 108

you would have lost it?
A. I suppose there's always that possibility. I've seen my office at home.
Q. You think it's likely you would have lost it?
A. Probably not.
Q. You say that Cantley & Sedacca led you to believe that there was a reasonable opportunity to make a profit; true?
A. I believe that's true, yes.
Q. And you said primarily Cantley & Sedacca led you to believe there was a reasonable opportunity for profit; true?
A. True.
Q. Did anybody else lead you to believe there was a reasonable opportunity to make a profit?
A. Not when I made the decision to pursue the transaction, no.
Q. So there was no one else?
A. No one else.
Q. You say that Mr. Hewitt told you that he wanted to check some things out about the Cantley & Sedacca opinion letter?
A. Um-hum.

Page 109

Q. What did he do to check it out?
A. I don't know.
Q. So when you said that you assumed he did some research, were you only speculating that he did research?
A. I think that's what assume means, yeah, I assumed he did research.
Q. You don't know that he did?
A. I don't know that he did.
Q. Did he tell you that he did?
A. Don't recall that he specifically said that I researched this or that.
Q. Okay.
MR. STODDART: That's enough for redirect.

RECROSS EXAMINATION

BY MR. PLISKE:
Q. Just a follow-up question. You just testified that you reasonably believed you could make a profit based on Cantley & Sedacca's representation; is that correct?
A. Um-hum, yes, sir.
Q. And you were asked the question did anyone else tell you you could reasonably make a profit?

MR. STODDART: Objection, that wasn't the question I asked, did anyone else lead you to believe that you could make a profit.

Q. The fact that Bryan Hanning was involved and was a trusted professional and did not tell you to stay away from this investment, did that reasonably give you some assurance as to making a profit in this?

MR. STODDART: In your opinion, may I ask.

MR. PLISKE: Yeah.

A. In my opinion, I can tell you -- if it hadn't been Bryan Hanning that brought me this opportunity, I probably would not have considered it because of its sophistication and the like, but I trusted Bryan that he would bring me a viable and profitable opportunity, and so the answer to that is, yes, I did trust Bryan.

Q. So are you saying because of the negative implication --

A. No, positive implication. I trusted Bryan very much, still do, in what he brings me, and his advice on various matters.

Q. You're not relying on me with respect that this was a reasonable opportunity to make an



investment, are you?

A. No.

Q. Are you relying on Mr. Stoddart?

A. No, I think it's pretty clear, he doesn't think it's a very good deal.

Q. But you're relying on Mr. Hanning, even though he didn't say, use any words to tell you that this was a reasonable opportunity to make a profit; is that correct?

A. I think that's correct. I mean, I relied, like I did with Scott Hewitt, on, at that time, 12 years of relationship, of business relationships, and multiple monetary transactions that we had done together, so it was -- I was relying upon that trust and faith that we had developed over that 12 years, and continue to have today.

MR. PLISKE: I don't have any further questions.

MR. STODDART: Just one.

REDIRECT EXAMINATION

BY MR. STODDART:

Q. Did you have any reason to believe that Mr. Hanning had experience in evaluating options trades?



A. You know, I really believed that Bryan was sophisticated enough and knowledgeable enough that he understood this transaction.

Q. What did he do, if anything, to let you think that he had experience in valuing options?

A. Well, not specific to options, but in past deals, Bryan always appeared to have a good handle on the tax code and investment opportunities and the complexities of, like, split dollar life insurance issues and things like that, and proved to be good at guiding me, if not personally through that, but recommending people in various things, like Dan Peare at Hinkle Elkouri, as related, developing a trust and everything like that. He was a trusted advisor on that kind of stuff, and I believed because of his level of communication to me on other sophisticated issues, that he brought this to me, and understood it, and was, therefore, by its nature, kind of put his stamp of approval on it. I would have expected Bryan not to bring me something that he didn't feel was out of my best interest to do.

Q. If he'd brought you any investment of any sort promising heaven knows what, you would have



signed it?

A. Absolutely not. I mean, he has brought me some insurance policies that we've regrouped on, and I said, that isn't really what I want to do and we've backed up, but I've stayed with Bryan Hanning on them. It's no different than any other financial -- I don't throw Bryan out because I don't like the deal he brought me. We work together to put a deal together that meets my needs.

Q. And what were your personal efforts to see whether your reliance on Mr. Hanning in an options trading deal promising 14,000 percent return, what were your personal efforts to see if he had the capacity to evaluate it?

A. Again, I felt like the 12 plus years of direct business relationship with him gave me an opportunity that I was reasonable in relying on him, that that was not outside our normal business relationship, and that we have, you know, that we had done numerous deals together that I had not drilled down into the very minute details on. They were based on him bringing it to me and my trust in him and that we moved forward on them.

Q. You said that there were some that you

looked into and you decided not to do as he proposed?
A. As we discussed it, we made changes to it.
Q. Why didn't you look into this one?
A. I was comfortable with it.
Q. Why?
A. Because he brought it to me.
Q. Only because he brought it to you?
A. Primarily, yeah, and Scott Hewitt said it was okay, too. It wasn't just Bryan Hanning, it was a combination of Bryan Hanning and Scott Hewitt that brought me this deal, and by Bryan bringing it to me, and by Scott saying I think it's okay, gave me the impression and the comfort that I would be able -- that this was an okay deal to do.
Q. Even though you paid $225,000 down for more than a million dollars in tax loss, didn't that strike you as different from the sort of transaction that you'd relied on those two gentlemen for in the past?
A. Certainly was different, yes.
MR. STODDART: All right, I have no more questions.



MR. PLISKE: No more questions. Other than I'd like to give Mark the opportunity to say anything with respect to this deposition that you don't think we covered, and you would like to put on the record, Mark.
A. Other than to say that this is something that we've tried to comply with the request of the IRS, we feel like we have been very reactive to what their response was to this.
It was maybe, in hindsight sitting here today, there were some mistakes made, but at the time this transaction was done, I was relying, and I believe fairly so, on trusted people that have been business advisors to me for well over 10 years, and that's why I'm sitting here today to tell that story.
MR. STODDART: Thank you very much for your testimony.



________________________
MARK HUTTON

STATE OF KANSAS )
) ss:
COUNTY OF )

Subscribed and sworn to before me, the undersigned authority, this, the ____ day of ____________________, 2007.

________________________
NOTARY PUBLIC

My appointment
Expires:________________________



IN RE: Clearmeadow Investments V USA
Case No. 05-1223 T
CORRECTION SHEET FOR DEPOSITION OF
MARK HUTTON
Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:____________________________
Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:____________________________
Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:____________________________
Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:____________________________
____________________________________________

Page____Line____reads as follows:________________

Should read:_________________________________

Reason for change:____________________________

Page____Line____reads as follows:________________

Should read:_________________________________

Reason for change:____________________________

Page____Line____reads as follows:________________

Should read:_________________________________

Reason for change:____________________________

Page____Line____reads as follows:________________

Should read:_________________________________

Reason for change:____________________________

Page____Line____reads as follows:________________

Should read:_________________________________

Reason for change:____________________________



Page____Line____reads as follows:________________

Should read:_________________________________

Reason for change:____________________________

Page____Line____reads as follows:________________

Should read:_________________________________

Reason for change:____________________________

I certify that I have read my deposition in the above case and request that the above changes be made.

________________ ______________________

(date) Signature of Witness



CERTIFICATE

STATE OF KANSAS )
) ss:
SALINE COUNTY )

I, Donna M. Lytle, Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition by him given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office, this _____ day of ______________, 2007.

____________________________

Donna M. Lytle, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

**Investor Representations**

In connection with the opinion to be delivered by Cantley & Sedacca LLP ("Cantley & Sedacca") to me regarding certain investment transactions (the "Transactions"), and recognizing that (1) Cantley & Sedacca will rely upon the following representations in issuing its tax opinion letter (the "Tax Opinion") to me, and (2) the tax opinions set forth therein may not be accurate if any of the following representations are not accurate in all respects, I hereby certify that the following representations are true, correct and complete:

1. I am a United States citizen.

2. I, through my wholly owned corporation, Clearmeadow Capital Corp., a Delaware corporation (the "Corporation") have joined together with CF Advisors XXXVII, LLC ("CC") in the formation of Clearmeadow Investments, LLC, a Delaware limited liability company ("LLC"), in good faith with a common investment purpose. In connection therewith, I had contributed $287,500 in cash to the LLC in order that the LLC acquire investments in long and short market linked deposit ("MLD") positions and other foreign currency investments and, thereafter, contributed my membership interest in the LLC to the Corporation and caused the LLC to admit CC as a member of the LLC for such business reasons including, among other things, diversification of our portfolio and the professional management to be provided by CC and its sole member, Dan Brooks ("Brooks").

3. Prior to entering into the Transactions, I was aware of Brooks' extensive background and experience in MLD and other foreign currency transactions, including his nearly 20 years of experience trading in, managing and advising clients with respect to MLD investments, foreign currency contracts and similar types of investments. Prior to entering into the Transactions, I discussed with Brooks the Transactions and his investment strategy.

4. No portion of my investment in the Transaction was, is or will be guaranteed (directly or indirectly) by any person, nor am I otherwise protected (either directly or indirectly) against loss through a stop loss agreement or other arrangement.

5. I entered into the Transactions for business reasons, with the intent to produce a significant economic profit from price movements of foreign currency contracts, MLD positions and other similar investments (collectively, the "Investments"). Based on advice of CC and Brooks as to the probability of the Investments reaching certain price levels at which they would be profitable, and on the advice of my own investment advisors, I believed, and continue to believe, that I have, and continue to have, a reasonable opportunity to earn a significant economic profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits. In fact, my decision to invest in the Transactions and with CC and Brooks was based, in large part, on CC's and Brooks' representations that (a) there was an approximate 28% statistical probability (based on Black/Scholes) of realizing a 60% return on my net investment in the MLD positions, net of all of my direct transaction costs associated with the positions, and an approximate 1.3% statistical probability (based on

DEPOSITION EXHIBIT

1- Hutton



C&SLLP004994

Black/Scholes) of realizing a 14,446% return on my net investment in the MLD positions, net of all of my direct transaction costs associated with the positions, and (b) if I were to continue my investment in the Transactions and with CC and him for at least five (5) years, I could reasonably expect that his investment strategy would yield for me an annual return on my total investment in the Transactions of somewhere between 15% and 17%, net of all of my fees and expenses from the Transactions and without regard to tax benefits. It is my current intention to continue the Corporation's (and, thus, my) investment in the Transactions and with CC and Brooks for such period of time so as to be able to achieve a reasonable economic return on my investment, without regard to tax benefits and net of all of my fees and expenses from the Transactions.

6. I am not entering into the Transactions in reliance upon the Tax Opinion and would have entered into the Transactions even without the Tax Opinion being issued to me.

7. LLC was and is a validly formed and validly existing limited liability company under Delaware law.

8. The Corporation was and is a validly formed and validly existing corporation under Delaware law. A Department of the Treasury/Internal Revenue Service Form 2553 (Election by a Small Business Corporation under section 1362 of the Internal Revenue Code) was timely filed to be effective beginning with the Corporation's first taxable year. Such election remains, and will remain, effective and has not been and will not be terminated (either voluntarily or involuntarily) at any time during the Corporation's existence.

9. My purpose in holding my investment in the Transactons through the Corporation was to have a vehicle for holding my investment in the Transactions while retaining the flexibility to be able to make other investments in which Brooks or CC would not participate.

10. Cantley & Sedacca has been furnished with the current version of the operating agreement of the LLC (the "Operating Agreement") and the certificate of incorporation, bylaws and other organizational documents of the Corporation.

11. At the time that I contributed my Class A LLC Units to the Corporation, and immediately following such contribution, neither the LLC nor the Corporation had any liabilities or obligations (other than the LLC's contractual obligations to Societe General ("Bank") in respect of the short MLD position) and none of the assets then held by the LLC or the Corporation were subject to any liability or obligation. At no time did I receive, nor am I entitled to receive, any money or other property in connection with my investment in the Transactions from CC, Brooks or any other person.

12. The short and long MLD positions (deposit amount: 27,472,520 Eurodollars) that the LLC invested in was an investment made by the LLC on its own behalf and independently of, and not as agent for, any other person.



C&SLLP004995

13. I have not (either directly or indirectly) hedged, nor will I hedge, my exposure from my net investment in the Transactions, nor have or will I identify any aspect of the Transactions as being part of a hedging transaction under Treasury Regulations Section 1.446-4.

14. The U.S. dollar has been, and will remain, the functional currency for myself, the Corporation and the LLC.

15. At any time after the expiration of the period ending fifteen (15) days prior to end of the first calendar quarter after the effective date of the Operating Agreement, I have the option to require that CC either purchase all of my Class A LLC Units or sell to me all of its Class B LLC Units, in either case, for a purchase price equal to the book value of the units being sold as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Whether, when and how I exercise either of these options is within my sole discretion and control. It is my understanding that "book value" for these purposes means the fair market value of the units being sold, after booking up or down the LLC members' capital accounts to reflect any and all realized gain and loss from the Investments and other assets of the LLC based upon their then fair market values.

16. The LLC has not elected, and will not elect, under Treasury Regulations Section 301.7701-3 to be classified as a corporation for federal tax purposes.

17. The Operating Agreement, and no other agreement (whether oral or written), covers the rights and obligations of the members of the LLC. The LLC has filed (and will file) its own income tax returns and has maintained (and will maintain) its own separate books and records. The Corporation has filed (and will file) its own income tax returns and has maintained (and will maintain) its own separate books and records.

18. Prior to my entering into the Transactions, I was not related to CC, Brooks, Bank or any other person having any involvement with the Transactions.

19. There does not exist, nor will there exist, any understanding, agreement, obligation, or arrangement pursuant to which either I am, or the Corporation, LLC, CC, Brooks, Bank or any other party involved in the Transactions is, committed to undertake all or any of the transactions comprising the Transactions upon the happening of any other transaction, except to the extent that any person is contractually obligated to perform under the MLD positions in accordance with their stated terms.

20. LLC has not elected, and will not elect, under Treasury Regulations Section 1.988-3(b), to treat exchange gain or loss on any forward contracts, future contract or option contracts as capital gain or loss.

21. I, along with the LLC and the Corporation, are all calendar year taxpayers.

22. I have reviewed the description of the Transactions as set forth in the Tax Opinion and such description is accurate and materially complete, and there are no pertinent facts relating to any aspect of the Transactions that have not been disclosed to Cantley & Sedacca.



C&SLLP004996

IN WITNESS WHEREOF, I have signed this Representation Certificate this 11th day of March, 2002.

Witness

Witness

MARK HUTTON

SIGN HERE

IN WITNESS WHEREOF, the Corporation and LLC have each reviewed this Representation Certificate and, by its signature below, acknowledges and verifies the accuracy of each of the representations hereinabove made.

CLEARMEADOW INVESTMENTS, LLC

By: Clearmeadow Capital Corp.,
its member

Witness

Witness

By:
Name: MARK HUTTON
Title:
Date: 11-MARCH-2002

SIGN HERE

By: CF ADVISORS XXXVII, LLC
its member

Witness

Witness

By:
Name: Dan Brooks, sole member
Date:

CLEARMEADOW CAPITAL CORP.

Witness

Witness

By:
Name: MARK HUTTON
Title:
Date: 11-MARCH-2002

SIGN HERE

**CLEARMEADOW INVESTMENTS, LLC**
2233 S. West Street
Wichita, Kansas 67213

10/15, 2001

**VIA TELECOPY (214) 740-7780**

Mr. Craig Brubaker
Deutsche Banc Alex Brown
200 Crescent Court
Suite 500
Dallas, Texas 75201

Re: CLEARMEADOW INVESTMENTS, LLC
Acct # 223-788813

Dear Mr. Brubaker:

This letter constitutes your authorization to transfer the necessary funds to complete the purchase of the market linked deposits in the notional amount of US $25,000,000 and to also pay the premiums totaling US $2,500,000 associated therewith from the above-referenced account to Societe Generale, New York ABA.

Please contact me if you have any questions regarding this matter.

Very truly yours,

DEPOSITION EXHIBIT
2- Hutton

Mark E. Hutton, Manager

SH 00116

CASE # 05-1223

# Deutsche Banc Alex. Brown
# Client Statement

DEUTSCHE BANC ALEX. BROWN INC.
P. O. BOX 1776
BALTIMORE MD 21203

CLENDENING/BRUBAKER
INVESTMENT REP #182
200 CRESCENT COURT SUITE 500
DALLAS TX 75201-6959
(214) 740-7700 (800) 527-3903

CLEARMEADOW INVESTMENTS LLC
ATTN MARK E HUTTON
2233 S WEST STREET
WITCHITA KS 67213

SH 00151

DEPOSITION EXHIBIT
3 Hutton

CASE # 05-1223

## Portfolio Overview

### Assets

| | Value as of October 31, 2001 | % of total assets |
|---|---|---|
| Cash | $0.00 | 0.0% |
| ıoney funds | 250,065.92 | 100.0 |
| Common stocks | 0.00 | 0.0 |
| Preferred stocks | 0.00 | 0.0 |
| Mutual funds | 0.00 | 0.0 |
| Government debt issues | 0.00 | 0.0 |
| Corporate debt issues | 0.00 | 0.0 |
| Municipal debt issues | 0.00 | 0.0 |
| Certificates of deposit | 0.00 | 0.0 |
| Options | 0.00 | 0.0 |
| Limited partnerships | 0.00 | 0.0 |
| Annuities | 0.00 | 0.0 |
| Other | 0.00 | 0.0 |
| **Total assets** | **$250,065.92** | **100.0%** |

### Liabilities

| | Value as of October 31, 2001 | % of total assets |
|---|---|---|
| ᴗash debit | $0.00 | 0.0% |
| Margin debit | 0.00 | 0.0 |
| Short options | 0.00 | 0.0 |
| Other short securities | 0.00 | 0.0 |
| **Total liabilities** | **$0.00** | **0.0%** |

| | |
|---|---|
| Net Value of Your Account | $250,065.92 |
| Net Value as of December 31, 2000 | $0.00 |

## Activity

| | This period |
|---|---|
| Net value of your account as of September 30 | $0.00 |
| Net cash activity | 249,942.29 |
| Net securities into/out of account | 0.00 |
| Net return on your portfolio | 123.63 |
| **Net value of your account as of October 31** | **$250,065.92** |

## Income

| | This period | Year to date |
|---|---|---|
| Net income received | $123.63 | $123.63 |
| Current estimated annual income | $5,801.52 | |
| Current estimated annual yield | 2.32% | |

Statement of Account
October 1 to October 31, 2001
Account 223-78884

2237888400-021-00181198 R N

Deutsche Bank

**Deutsche Banc Alex. Brown**

Statement of Account
October 1 to October 31, 2001
Account 223-78884



# Cash Summary

## Opening Cash Balance $0.00

## Income Summary

| | This period | Year to date |
|---|---|---|
| Taxable dividends | $123.63 | $123.63 |
| Taxable interest | 0.00 | 0.00 |
| Capital gains distributions received | 0.00 | 0.00 |
| Non-taxable dividends | 0.00 | 0.00 |
| ɔn-taxable interest | 0.00 | 0.00 |
| **Net income received** | **$123.63** | **$123.63** |

## Cash Activity

| | This period | Year to date |
|---|---|---|
| Deposits | $287,500.00 | $287,500.00 |
| Withdrawals | 37,520.00 - | 37,520.00 - |
| U.S. tax withheld | 37.71 - | 37.71 - |
| Non-resident tax withheld | 0.00 | 0.00 |
| Foreign taxes withheld | 0.00 | 0.00 |
| Interest charges on cash debit | 0.00 | 0.00 |
| Interest charges on margin debit | 0.00 | 0.00 |
| **Net cash activity** | **$249,942.29** | **$249,942.29** |

## Purchases and Sales

| | This period | Year to date |
|---|---|---|
| Total purchases | $287,585.92 - | $287,585.92 - |
| Total sales | 37,520.00 | 37,520.00 |
| ∩ther money fund sales | 0.00 | 0.00 |
| **et purchases/sales(incl. money funds)** | **$250,065.92 -** | **$250,065.92 -** |

## Other Activity

| | This period | Year to date |
|---|---|---|
| Bond redemptions | $0.00 | $0.00 |
| Other activity | 0.00 | 0.00 |
| **Net other activity** | **$0.00** | **$0.00** |

## Closing Cash Balance $0.00

# Portfolio Summary

## Activity

| | This period | Year to date |
|---|---|---|
| Previous net account value | $0.00 | $0.00 |
| Net cash activity | 249,942.29 | 249,942.29 |
| Net securities into/out of account | 0.00 | 0.00 |
| **Adjusted previous account value** | **$249,942.29** | **$249,942.29** |
| Net change in market value | 0.00 | 0.00 |
| Net income received | 123.63 | 123.63 |
| **Net account value as of October 31, 2001** | **$250,065.92** | **$250,065.92** |
| Net return on portfolio | 123.63 | 123.63 |

SH 00152

CASE # 05-1223

SH 00153

CASE # 05-1223

# Portfolio Holdings

Prices are provided by an independent pricing service. For current market price quotations, call your Investment Representative.

## Cash and Equivalents

| | Amount | Estimated annual income | Current annual yield |
|---|---|---|---|
| DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $250,065.92 | $5,801.52 | 2 32% |
| **Total cash and equivalents** | **$250,065.92** | **$5,801.52** | |

# Portfolio Activity

## Dividends and Interest

| Date | Activity | Description | Amount |
|---|---|---|---|
| 10/23/2001 | Dividend | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES TEFRA TAX WITHHELD | $123.63<br>37.71 - |
| **Total dividends and interest** | | | **$123.63** |

## Purchases and Sales

| Settlement date | Activity | Type | Quantity | Description | Unit price | Amount |
|---|---|---|---|---|---|---|
| 10/15/2001 | Purchased | Sweep | 287,500 | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $1 | $287,500.00 - |
| 10/16/2001 | Sold | Cash | 27,510 - | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | 1 | 27,510.00 |
| 10/23/2001 | Fund reinvested | Cash | 85.92 | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES MONTHLY DIVIDEND REINVESTED | 1 | 85.92 - |
| 10/23/2001 | Sold | Cash | 7,500 - | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | 1 | 7,500.00 |
| 10/24/2001 | Sold | Cash | 2,500 - | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | 1 | 2,500.00 |

Deutsche Bank

Statement of Account
October 1 to October 31, 2001
Account 223-78884

22378884400-021-00181199 RN

SH 00154

# Portfolio Activity continued

## Purchases and Sales

| Settlement date | Activity | Type | Quantity | Description | Unit price | Amount |
|---|---|---|---|---|---|---|
| 10/25/2001 | Sold | Sweep | 10 - | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC. PRIME SERIES | 1 | 10.00 |
| **Net purchases and sales** | | | | | | **$250,065.92 -** |

## Deposits

### Other Deposits

| Date posted | Description | Amount |
|---|---|---|
| 10/12/2001 | FUNDS RECEIVED COMM WICHITA | $287,500.00 |
| **Total other deposits** | | **$287,500.00** |

## Withdrawals

### Other Withdrawals

| Date posted | Description | Amount |
|---|---|---|
| 10/16/2001 | FUNDS WIRED TO SOCIETE GENERALE NA INC. NEW Y IRD OPERATIONS | $27,500.00 - |
| 10/16/2001 | WIRE FEE | 10.00 - |
| 10/23/2001 | TRF TO CF ADV XXXVII A/O 10/23/01 AS INV ADV PYMT | 7,500.00 - |
| 10/24/2001 | FUNDS WIRED TO BANKERS TRUST COMPANY DEUTSCHE BK LONDON/F | 2,500.00 - |
| 10/24/2001 | WIRE FEE | 10.00 - |
| **Total other withdrawals** | | **$37,520.00 -** |

CASE # 05-1223

CASE # 05-1223

SH 00155

# Market Indices

## Equities

| Equities | Current | December 31, 2000 | Change year to date |
|---|---|---|---|
| Dow Jones Industrial Average | 9,075.14 | 10,786.85 | 15.9%- |
| NASDAQ Composite | 1,690.20 | 2,470.52 | 31.6%- |
| S & P 500 | 1,059.78 | 1,320.28 | 19.7%- |
| MSCI EAFE | 1,108.34 | 1,492.41 | 25.7%- |

## Fixed Income Securities

| Fixed Income Securities | Current | December 31, 2000 |
|---|---|---|
| Long term treasury bond yield | 4.81% | 5.46% |
| Lehman Brothers Intermediate US Credit Index | 11.33% | 9.46% |

Deutsche Bank

Statement of Account
October 1 to October 31, 2001
Account 223-78884

2237888400-021-00181200 R N

**Deutsche Banc Alex. Brown**

Statement of Account
October 1 to October 31, 2001
Account 223-78884



SH 00156

# Disclosure

Please advise us promptly of any material change in your investment or financial situation.
Your account is with Deutsche Banc Alex. Brown Inc., a registered broker-dealer, referred to herein as Deutsche Banc Alex. Brown. The reporting period for your statement ends on the last day of the month. The dates indicated on purchases and sales are settlement dates. Margin interest charges incurred after the period indicated on this statement will be shown on the next statement. In order to review margin interest charges, you should retain this statement for use in conjunction with the next statement.
Any free credit balances represents funds payable on demand which, although properly accounted for on our books and records, are not segregated and may be used in the conduct of this Firm's business, without payment to you subject to the limitations of 17 CFR Section 240.15c3-3 under the Securities Exchange Act of 1934.
Positions and activity shown on your margin account comprise a combined statement of your margin account and your special memorandum account. The special memorandum account is maintained for you in accordance with Regulation T of the Board of Governors of the Federal Reserve System and is comprised of funds generated by your margin activity and segregated for your future use. A permanent detailed record of the activity in this account is available for inspection at your request. We reserve the right to establish or modify requirements pertaining to the operation of a margin account which may exceed requirements established by the Federal Reserve Board and/or the New York Stock Exchange.
Aggregate commissions which you have paid are not reported separately on this statement of account.
Commissions and charges incurred in connection with the execution of option and other transactions have been included in confirmations of those transactions previously furnished you. A summary of this information will be made available to you upon request.
Orders for your account may be aggregated with other customer orders. In so doing, you may receive an average price for your orders which may be different from the price(s) you may have received had your orders not been aggregated. This practice may also result in your orders being only partially completed
A financial statement on this Firm is available for your personal inspection at our offices, or a copy will be mailed upon your written request.
Information regarding market price, market value, estimated income, dividends and annual yields is based on data obtained from sources we consider to be reliable but is not guaranteed as to accuracy. This information is provided as a convenience to aid in your financial recordkeeping.
Deutsche Banc Alex. Brown money fund yield figures are based on the seven-day period preceding the statement date. Deutsche Asset Management Funds and Deutsche Asset Management Flag Investors Funds estimated yield and income figures are computed based on either dividends for the preceding twelve-month period or the annualized rate of distribution.
Direct participation program securities (e.g. partnerships, limited liability companies, and real estate investment trusts ("REITS") which are not listed on a national securities exchange or on The Nasdaq Stock Market, Inc. are generally illiquid. No formal trading market exists for these securities and their values will be different than the purchase price. Unless otherwise indicated, the values shown herein for such securities have been provided by the management of each program and are updated quarterly. These values represent management's estimate of the investor's interest in the net assets of the program. Therefore, the estimated values shown herein may not necessarily be realized upon sale of the securities
We receive payment for routing for execution some orders in certain listed securities. The determination as to where to route orders is based on several factors, subject to the overriding consideration that customers receive best execution. All orders for which we receive payment are exposed to the possibility of price improvement, so that all such orders potentially can be executed at prices superior to the best bid or best offer. Payment is received in the form of rebates, or credits against exchange fees and specialist fees. Details will be furnished upon written request.

Deutsche Banc Alex. Brown Inc. debits $50 from each account transferring to another broker-dealer or financial institution to cover the administrative costs of such transfer.
NASD Regulation, Inc. makes available to investors a brochure regarding its Public Disclosure Program. The Public Disclosure hotline number is (800) 289-9999. The NASD Regulation website can be located at www.nasdr.com.
Deutsche Banc Alex. Brown Inc., Member SIPC.

* The current portfolio value excludes unpriced securities.
** Denotes a mutual fund.
*** Denotes a foreign security.

# Money Market Fund 7 Day Average Yields:

| | |
|---|---|
| DB ALEX. BROWN CASH RESERVE PRIME | 2.32% |
| DB ALEX. BROWN CASH RESERVE TREASURY | 2.15% |
| DB ALEX. BROWN CASH RESERVE TAX FREE | 1.59% |

# Your Standing Instructions are:

Purchases: Hold securities in street name
Sales: Credit proceeds to account
Income: Hold in account

**End of Statement**

CASE # 05-1223

AMENDED RETURN - SECOND AMENDMENT

Form **1040X** (Rev November 2003)

Department of the Treasury — Internal Revenue Service

# Amended U.S. Individual Income Tax Return

► See separate instructions.

OMB No. 1545-0091

This return is for calendar year ► 2003, or fiscal year ended ►

Please print or type

| | |
|---|---|
| Your first name MI Last name: MARK E. HUTTON | Your social security number: 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 |
| If a joint return, spouse's first name MI Last name: MARY S. HUTTON | Spouse's social security number: 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 |
| Home address (no. and street) or P.O. box if mail is not delivered to your home: 7118 CLEARMEADOW CT — Apt no. | Phone number: (316) 942-8855 |
| City, town or post office. If you have a foreign address, see instructions. State ZIP code: WICHITA, KS 67205 | For Paperwork Reduction Act Notice, see instructions. |

A If the name or address shown above is different from that shown on the original return, check here ► ☐

B Has the original return been changed or audited by the IRS or have you been notified that it will be? ☐ Yes ☒ No

C Filing status. Be sure to complete this line. **Note.** You cannot change from joint to separate returns after the due date.

On original return ► ☐ Single ☒ Married filing jointly ☐ Married filing separately ☐ Head of household ☐ Qualifying widow(er)

On this return ► ☐ Single ☒ Married filing jointly ☐ Married filing separately ☐ Head of household* ☐ Qualifying widow(er)

* If the qualifying person is a child but not your dependent, see instructions.

| Use Part II on page 2 to explain any changes | Line | A Original amount or as previously adjusted (see instructions) | B Net change — amount of increase or (decrease) — explain in Part II | C Correct amount |
|---|---|---|---|---|
| **Income and Deductions (see instructions)** | | | | |
| 1 Adjusted gross income (see instructions) | 1 | -547,297. | -1,475,112. | -2,022,409. |
| 2 Itemized deductions or standard deduction (see instructions) | 2 | 86,534. | | 86,534. |
| 3 Subtract line 2 from line 1 | 3 | -633,831. | -1,475,112. | -2,108,943. |
| 4 Exemptions. If changing, fill in Parts I and II on page 2 | 4 | 6,100. | | 6,100. |
| 5 Taxable income. Subtract line 4 from line 3 | 5 | -639,931. | -1,475,112. | -2,115,043. |
| **Tax Liability** 6 Tax (see instructions). Method used in column C. TABLES | 6 | | | |
| 7 Credits (see instructions) | 7 | | | |
| 8 Subtract line 7 from line 6. Enter the result but not less than zero | 8 | | | |
| 9 Other taxes (see instructions) | 9 | | | |
| 10 Total tax. Add lines 8 and 9 | 10 | | | |
| **Payments** 11 Federal income tax withheld and excess social security and tier 1 RRTA tax withheld. If changing, see instructions | 11 | 24,384. | | 24,384. |
| 12 Estimated tax payments, including amount applied from prior year's return | 12 | | | |
| 13 Earned income credit (EIC) | 13 | | | |
| 14 Additional child tax credit from Form 8812 | 14 | | | |
| 15 Credits from Form 2439, Form 4136, or Form 8885 | 15 | | | |
| 16 Amount paid with request for extension of time to file (see instructions) | 16 | | | |
| 17 Amount of tax paid with original return plus additional tax paid after it was filed | 17 | | | |
| 18 Total payments. Add lines 11 through 17 in column C | 18 | | | 24,384. |

DEPOSITION EXHIBIT 4-Hutton

**Refund or Amount You Owe**

| | | |
|---|---|---|
| 19 Overpayment, if any, as shown on original return or as previously adjusted by the IRS | 19 | 24,384. |
| 20 Subtract line 19 from line 18 (see instructions) | 20 | |
| 21 **Amount you owe.** If line 10, column C, is more than line 20, enter the difference and see instructions | 21 | |
| 22 If line 10, column C, is less than line 20, enter the difference | 22 | |
| 23 Amount of line 22 you want **refunded to you** | 23 | |
| 24 Amount of line 22 you want **applied to your** estimated tax — 24 | | |

44-P

**Sign Here** — Joint return? See instrs. Keep a copy for your records.

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which the preparer has any knowledge.

► [signature] 9/5/05 — Your signature, Date

► [signature] 9/5/05 — Spouse's signature. If a joint return, both must sign. Date

**Paid Preparer's Use Only**

| | |
|---|---|
| Preparer's signature ► Scott R. Hewitt | Date 8/25/05 — Check if self-employed ☐ — Preparer's SSN or PTIN P00024411 |
| Firm's name (or yours if self-employed), address, and ZIP code ► HEWITT & COMPANY, PA, 229 E. WILLIAM, STE. 310, WICHITA, KS 67202 | EIN 20-1528452; Phone no. (316) 269-4500 |

FDIA1812L 12/02/03

Form 1040X (Rev 11-2003)

170

AMENDED RETURN - SECOND AMENDMENT

Form 1040X (Rev 11-2003) MARK E. AND MARY S. HUTTON 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 Page 2

**Part I** **Exemptions.** See Form 1040 or 1040A instructions.

If you are **not changing your exemptions**, do not complete this part.
If claiming **more exemptions**, complete lines 25 - 31.
If claiming **fewer exemptions**, complete lines 25 - 30.

| | | A Original number of exemptions reported or as previously adjusted | B Net change | C Correct number of exemptions |
|---|---|---|---|---|
| 25 Yourself and spouse | 25 | 2 | | 2 |
| **Caution.** If your parents (or someone else) can claim you as a dependent (even if they chose not to), you cannot claim an exemption for yourself. | | | | |
| 26 Your dependent children who lived with you | 26 | 1 | -1 | |
| 27 Your dependent children who did not live with you due to divorce or separation | 27 | | | |
| 28 Other dependents | 28 | | | |
| 29 Total number of exemptions. Add lines 25 through 28 | 29 | 3 | -1 | 2 |
| 30 Multiply the number of exemptions claimed on line 29 by the amount listed below for the tax year you are amending. Enter the result here and on line 4. | 30 | 6,100. | | 6,100. |

| Tax year | Exemption amount | But see the instructions for line 4 if the amount on line 1 is over: |
|---|---|---|
| 2003 | $3,050 | $104,625 |
| 2002 | 3,000 | 103,000 |
| 2001 | 2,900 | 99,725 |
| 2000 | 2,800 | 96,700 |

31 Dependents (children and other) not claimed on original (or adjusted) return:

| (a) First name | Last name | (b) Dependent's social security number | (c) Dependent's relationship to you | (d) ✓ if qualifying child for child tax credit |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Number of your children on line 31 who:
- lived with you ► ☐
- **did not** live with you due to divorce or separation (see instructions) ► ☐

Dependents on line 31 not entered above ► ☐

**Part II** **Explanation of Changes to Income, Deductions, and Credits**

**Enter the line number from page 1 of the form for each item you are changing and give the reason for each change. Attach only the supporting forms and schedules for the items changed. If you do not attach the required information, your Form 1040X may be returned. Be sure to include your name and social security number on any attachments.**

If the change relates to a net operating loss carryback or a general business credit carryback, attach the schedule or form that shows the year in which the loss or credit occurred. See the instructions. Also, check here ► ☐

TAXPAYER IS AMENDING TAX RETURN TO REPORT A $20,000 REDUCTION IN THE ORDINARY LOSS AND A IRC SECTION 988 LOSS OF $(1,495,112) REPORTED ON AN AMENDED K-1 FROM CLEARMEADOW CAPITAL CORPORATION (#48-1251040). THE 2003 TAX RETURN HAS ALSO BEEN ADJUSTED TO REPORT CHANGES IN CAPITAL LOSS, CHARITABLE CONTRIBUTION AND FOREIGN TAX CREDIT CARRYFORWARDS FROM THE TAXPAYER'S 2002 TAX RETURN, WHICH WAS ALSO AMENDED. SEE ATTACHED FORMS AND SCHEDULES.

**Part III** **Presidential Election Campaign Fund.** Checking below will not increase your tax or reduce your refund.

If you did not previously want $3 to go to the fund but now want to, check here ► ☐

If a joint return and your spouse did not previously want $3 to go to the fund but now wants to, check here ► ☐

Form 1040X (Rev 11-2003)

FDIA1812L 12/02/03

171

ATTACHMENT TO AMENDED 1040X - COPY ONLY - DO NOT PROCESS

**Schedule K-1 (Form 1120S)**

Department of the Treasury
Internal Revenue Service

# Shareholder's Share of Income, Credits, Deductions, etc

► See separate instructions.

For calendar year 2003 or tax year beginning , 2003, and ending ,

OMB No. 1545-0130

**2003**

Shareholder's identifying number ► 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

Shareholder's name, address, and ZIP code

MARK E HUTTON
7118 CLEARMEADOW CT
WICHITA, KS 67205

Corporation's identifying number ► 48-1251040

Corporation's name, address, and ZIP code

CLEARMEADOW CAPITAL CORP
2233 S. WEST STREET COURT
WICHITA, KS 67213

A Shareholder's percentage of stock ownership for tax year (see instructions for Schedule K-1) ► 100 %
B Internal Revenue Service Center where corporation filed its return ► OGDEN, UT
C Tax shelter registration number (see instructions for Schedule K-1) ►
D Check applicable boxes: (1) ☐ Final K-1 (2) ☒ Amended K-1

| | (a) Pro rata share items | | (b) Amount | (c) Form 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 1 | -345. | See the Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | 2 Net income (loss) from rental real estate activities | 2 | | |
| | 3 Net income (loss) from other rental activities | 3 | | |
| | 4 Portfolio income (loss): | | | |
| | a Interest income | 4a | 141. | Form 1040, line 8a |
| | b (1) Qualified dividends | 4b(1) | 1,674. | Form 1040, line 9b |
| | (2) Total ordinary dividends | 4b(2) | 1,783. | Form 1040, line 9a |
| | c Royalty income | 4c | | Schedule E, Part I, line 4 |
| | d (1) Net short-term capital gain (loss) (post-May 5, 2003) | 4d(1) | 2,703. | Schedule D, line 5, col (g) |
| | (2) Net short-term capital gain (loss) (entire year) | 4d(2) | 1,416. | Schedule D, line 5, col (f) |
| | e (1) Net long-term capital gain (loss) (post-May 5, 2003) | 4e(1) | 980. | Schedule D, line 12, col (g) |
| | (2) Net long-term capital gain (loss) (entire year) | 4e(2) | 724. | Schedule D, line 12, col (f) |
| | f Other portfolio income (loss) (attach schedule) SEE LINE 23 | 4f | -1,495,112. | (Enter on applicable line of return.) |
| | 5a Net section 1231 gain (loss)(post-May 5, 2003) | 5a | | See Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | b Net section 1231 gain (loss)(entire year) | 5b | | |
| | 6 Other income (loss) (attach schedule) | 6 | | (Enter on applicable line of return.) |
| Deductions | 7 Charitable contributions (attach schedule) | 7 | | Schedule A, line 15 or 16 |
| | 8 Section 179 expense deduction | 8 | | See Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | 9 Deductions related to portfolio income (loss) (attach schedule) SEE LINE 23 | 9 | 3,946. | |
| | 10 Other deductions (attach schedule) | 10 | | |
| Investment Interest | 11a Interest expense on investment debts | 11a | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b(2), 4c, and 4f above | 11b(1) | 1,924. | See Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | (2) Investment expenses included on line 9 above | 11b(2) | 3,946. | |
| Credits | 12a Credit for alcohol used as fuel | 12a | | Form 6478, line 10 |
| | b Low-income housing credit: | | | |
| | (1) From section 42(j)(5) partnerships | 12b(1) | | Form 8586, line 5 |
| | (2) Other than on line 12b(1) | 12b(2) | | |
| | c Qualified rehabilitation expenditures related to rental real estate activities | 12c | | See the Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | d Credits (other than credits shown on lines 12b and 12c) related to rental real estate activities | 12d | | |
| | e Credits related to other rental activities | 12e | | |
| | 13 Other credits | 13 | | |

BAA For Paperwork Reduction Act Notice, see the Instructions for Form 1120S.

Schedule K-1 (Form 1120S) 2003

SHAREHOLDER 1

SPSA0412L 11/20/03

172

ATTACHMENT TO AMENDED 1040X - COPY ONLY - DO NOT PROCESS

Schedule K-1 (Form 1120S) (2003) CLEARMEADOW CAPITAL CORP 48-1251040 Page 2

| | (a) Pro rata share items | | (b) Amount | (c) Form 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Adjustments and Tax Preference Items | 14a Depreciation adjustment on property placed in service after 1986 | 14a | | See Shareholder's Instructions for Schedule K-1 (Form 1120S) and Instructions for Form 6251 |
| | b Adjusted gain or loss | 14b | | |
| | c Depletion (other than oil and gas) | 14c | | |
| | d (1) Gross income from oil, gas, or geothermal properties | 14d(1) | | |
| | (2) Deductions allocable to oil, gas, or geothermal properties | 14d(2) | | |
| | e Other adjustments and tax preference items (attach sch) | 14e | | |
| Foreign Taxes | 15a Name of foreign country or U.S. possession ► CANADA | | | Form 1116, Part I |
| | b Gross income from all sources | 15b | | |
| | c Gross income sourced at shareholder level | 15c | | |
| | d Foreign gross income sourced at corporate level: | | | |
| | (1) Passive | 15d(1) | | |
| | (2) Listed categories (attach schedule) | 15d(2) | | |
| | (3) General limitation | 15d(3) | | |
| | e Deductions allocated and apportioned at shareholder level: | | | |
| | (1) Interest expense | 15e(1) | | |
| | (2) Other | 15e(2) | | |
| | f Deductions allocated and apportioned at corporate level to foreign source income: | | | |
| | (1) Passive | 15f(1) | | |
| | (2) Listed categories (attach schedule) | 15f(2) | | |
| | (3) General limitation | 15f(3) | | |
| | g Total foreign taxes (check one): ► [X] Paid [ ] Accrued | 15g | 7. | Form 1116, Part II |
| | h Reduction in taxes available for credit (attach schedule) | 15h | | See Instructions for Form 1116 |
| Other | 16 Section 59(e)(2) expenditures: a Type ► | | | See Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | b Amount | 16b | | |
| | 17 Tax-exempt interest income | 17 | | Form 1040, line 8b |
| | 18 Other tax-exempt income | 18 | | See the Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | 19 Nondeductible expenses | 19 | | |
| | 20 Property distributions (including cash) other than dividend distributions reported to you on Form 1099-DIV | 20 | | |
| | 21 Amount of loan repayments for 'Loans from Shareholders' | 21 | | |
| | 22 Recapture of low-income housing credit: | | | |
| | a From section 42(j)(5) partnerships | 22a | | Form 8611, line 8 |
| | b Other than on line 22a | 22b | | |

**Supplemental Information**

23 Supplemental information required to be reported separately to each shareholder (attach additional schedules if more space is needed):

**LINE 4F**
**OTHER PORTFOLIO INCOME (LOSS)**

SEE SCHEDULE 1(A) .......... $ -1,495,112.
TOTAL $ -1,495,112.

**LINE 9**
**DEDUCTIONS RELATED TO PORTFOLIO INCOME (LOSS)**

| | |
|---|---|
| INVESTMENT MANAGEMENT FEES | $ 1,808. |
| WACHOVIA MANAGEMENT FEES | 2,138. |
| TOTAL | $ 3,946. |

SPSA0412L 11/20/03

Schedule K-1 (Form 1120S) 2003

SHAREHOLDER 1 : MARK E HUTTON 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

173

# AMENDED RETURN - SECOND AMENDMENT

PROTECTIVE DISCLOSURE

Form **8886** (March 2003)

Department of the Treasury Internal Revenue Service

## Reportable Transaction Disclosure Statement

► Attach to your tax return.
► See separate instructions.

OMB No. 1545-1800

137

Name(s) shown on return: MARK E. AND MARY S. HUTTON

Identifying number: 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

Number, street, and room or suite no.: 7118 CLEARMEADOW CT

City or town / State / ZIP code: WICHITA, KS 67205

1a Name of reportable transaction: MARKET LINK DEPOSIT

1b Tax shelter registration number (11-digits)(if any)

2 Identify the type of reportable transaction. Check the box(es) that apply. (see instructions)

- a [X] Listed transaction
- b [ ] Confidential transaction
- c [ ] Transaction with contractual protection
- d [ ] Loss transaction
- e [ ] Transaction with significant book-tax difference
- f [ ] Transaction with brief asset holding period

3 If the transaction is a 'listed transaction' or substantially similar to a listed transaction, identify the listed transaction (see instructions)
► NOTICE 2002-65, 2002-41 I.R.B. 690

4 Enter the number of transactions reported on this form ► 1

5 If you invested in the transaction through another entity, such as a partnership, an S corporation, or a foreign corporation, identify the name and employer identification number (EIN) (if any) of that entity
CLEARMEADOW CAPITAL CORP 48-1251040

6 Enter in **columns (a) and (b)** below, the name and address of each person to whom you paid a fee with regard to the transaction if that person promoted, solicited, or recommended your participation in the transaction, or provided tax advice related to the transaction.

| (a) Name | (b) Address |
|---|---|
| CANTLEY AND SEDACCA, LLP | C/O TODD WELTY 901 MAIN STREET DALLAS, TX 75202 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

BAA For Paperwork Reduction Act Notice, see separate instructions. Form 8886 (3-2003)

CPCA8612L 08/07/03

200

## AMENDED RETURN - SECOND AMENDMENT

MARK E. AND MARY S. HUTTON 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

Form 8886 (3-2003) Page 2

7 **Facts.** Describe the facts of the transaction that relate to the expected tax benefits, including your participation in the transaction.

SEE ATTACHMENT 1

8 **Expected tax benefits.** Describe the expected tax benefits, including deductions, exclusions from gross income, nonrecognition of gain, tax credits, adjustments (or the absence of adjustments) to the basis of property, etc. See instructions for more details.

SEE ATTACHMENT 2

9 **Estimated tax benefits.** Provide a separate estimate of the amount of each of the expected tax benefits described above for each affected tax year (including prior and future years).

REDUCTION IN 2001 INCOME TAX LIABILITY - $373,419

REDUCTION IN 2002 INCOME TAX LIABILITY - $0

REDUCTION IN 2003 INCOME TAX LIABILITY - $0

AMENDED RETURN - SECOND AMENDMENT



ATTACHMENT 1
FORM 8886, LINE 7, FACTS

THE TRANSACTIONS REPORTED ON THE TAXPAYER'S 2001 AND 2003 INDIVIDUAL INCOME TAX RETURNS WERE PASS THROUGH ENTITY FOREIGN CURRENCY TRANSACTIONS THAT THE IRS WOULD CONSIDER SIMILAR TO THOSE DESCRIBED IN IRS NOTICE 2002-65. THE GAIN PORTION OF THE TRANSACTION TOOK PLACE IN THE LIMITED LIABILITY COMPANY, CLEARMEADOW INVESTMENTS (FEIN 48-1251013) THEREBY CREATING BASIS IN THE LLC. THE LLC INTEREST, WHICH WAS OWNED BY THE TAXPAYER, WAS THEN CONTRIBUTED TO AN S CORPORATION, CLEARMEADOW CAPITAL CORP (FEIN 48-1251040) IN EXCHANGE FOR STOCK OF THE CORPORATION. THE TRANSACTION RESULTED IN A LOSS IN THE S CORPORATION THAT WAS PASSED THROUGH TO THE SHAREHOLDER AS A PORTFOLIO LOSS. TAXPAYER POSITS THAT THE TRANSACTION REPORTED HEREIN FALLS WITHOUT NOTICE 2002-65. REGARDLESS, THIS PROTECTIVE DISCLOSURE IS FILED UNDER THE PROVISIONS OF TREASURY REGULATION 1.6011-4.

ATTACHMENT 2
FORM 8886, LINE 8, EXPECTED TAX BENEFITS

TAX EFFECTS ON TAXPAYER'S 2001 TAX RETURN - THE LOSS OF $1,004,040 GENERATED IN CLEARMEADOW CAPITAL CORP WAS PASSED THROUGH TO THE SHAREHOLDER AND REPORTED ON HIS SCHEDULE E AS NONPASSIVE S CORPORATION LOSS. THERE WAS ALSO INTEREST INCOME OF $450,163 WHICH WAS OFFSET BY INVESTMENT INTEREST EXPENSE OF $446,863 AND INVESTMENT FEES AND EXPENSES OF $10,040. THE TAXPAYER ALSO DEDUCTED LEGAL FEES OF $150,000 RELATED TO THE TRANSACTION.

TAX EFFECTS ON TAXPAYER'S 2002 TAX RETURN - NONE

TAX EFFECTS ON TAXPAYER'S 2003 TAX RETURN - LOSS OF $1,495,112 GENERATED IN CLEARMEADOW CAPITAL CORP WAS PASSED THROUGH TO THE SHAREHOLDER AND REPORTED ON HIS SCHECULE E AS NONPASSIVE S CORPORATION LOSS.

# AMENDED RETURN - SECOND AMENDMENT

PROTECTIVE DISCLOSURE

Form 8886 (March 2003)

Department of the Treasury Internal Revenue Service

## Reportable Transaction Disclosure Statement

► Attach to your tax return.
► See separate instructions.

OMB No. 1545-1800

137

Name(s) shown on return: MARK E. AND MARY S. HUTTON

Identifying number: 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

Number, street, and room or suite no.: 7118 CLEARMEADOW CT

City or town / State / ZIP code: WICHITA, KS 67205

1a Name of reportable transaction: OFFSETTING FOREIGN CURRENCY OPTION CONTRCTS

1b Tax shelter registration number (11-digits)(if any)

2 Identify the type of reportable transaction. Check the box(es) that apply. (see instructions)

a [X] Listed transaction
b [ ] Confidential transaction
c [ ] Transaction with contractual protection
d [ ] Loss transaction
e [ ] Transaction with significant book-tax difference
f [ ] Transaction with brief asset holding period

3 If the transaction is a 'listed transaction' or substantially similar to a listed transaction, identify the listed transaction (see instructions)
► NOTICE 2003-81

4 Enter the number of transactions reported on this form ► 1

5 If you invested in the transaction through another entity, such as a partnership, an S corporation, or a foreign corporation, identify the name and employer identification number (EIN) (if any) of that entity

6 Enter in columns (a) and (b) below, the name and address of each person to whom you paid a fee with regard to the transaction if that person promoted, solicited, or recommended your participation in the transaction, or provided tax advice related to the transaction.

| (a) Name | (b) Address |
|---|---|
| CANTLEY AND SEDACCA, LLP | C/O TODD WELTY 901 MAIN STREET DALLAS, TX 75202 |
| MULTI NATIONAL STRATEGIES, LLC | 243 W 30TH STREET, SUITE 501 NEW YORK, NY 10001 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

BAA For Paperwork Reduction Act Notice, see separate instructions. Form 8886 (3-2003)

CPCA8612L 08/07/03

**AMENDED RETURN - SECOND AMENDMENT**

MARK E. AND MARY S. HUTTON 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

Form 8886 (3-2003) Page 2

**7 Facts.** Describe the facts of the transaction that relate to the expected tax benefits, including your participation in the transaction.

THE OFFSETTING FOREIGN CURRENCY TRANSACTION INVOLVES REPORTING A LOSS FROM THE ASSIGNMENT OF A 1256 CONTRACT TO A CHARITY. THE TAXPAYER IS ALSO DEDUCTING FEES OF $50,000 RELATED TO THIS TRANSACTION. IT IS A LISTED TRANSACTION AS DESCRIBED IN NOTICE 2003-81.

**8 Expected tax benefits.** Describe the expected tax benefits, including deductions, exclusions from gross income, nonrecognition of gain, tax credits, adjustments (or the absence of adjustments) to the basis of property, etc. See instructions for more details.

THE TAX RESULTS OF THIS TRANSACTION ON THE TAXPAYER'S 2002 TAX RETURN WAS A NET LOSS OF $855,134 REPORTED ON FORM 4797 AND A $50,000 DEDUCTION ON SCHEDULE A AS A MISCELLANEOUS ITEMIZED DEDUCTION.

**9 Estimated tax benefits.** Provide a separate estimate of the amount of each of the expected tax benefits described above for each affected tax year (including prior and future years).

REDUCTION IN 2002 INCOME TAX LIABILITY WAS $338,867.