IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T

(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC

CLEARMEADOW CAPITAL CORP.,

Tax Matters Partner,

Plaintiff,

V.

THE UNITED STATES,

Defendant.

D E P O S I T I O N

The deposition of BRYAN HANNING, taken on behalf of the Defendant pursuant to the Federal Code of Civil Procedure and Notice before:

DONNA M. LYTLE, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

a Certified Shorthand Reporter of Kansas, at the Epic Center, 301 N. Main Street, Suite 1200, Wichita, Kansas, on the 8th day of May, 2007, starting at the hour of 11:35 a.m.

PLAINTIFF'S EXHIBIT 2
PENGAD-Bayonne, N. J.

APPEARANCES

The plaintiff appeared by Mr. Mark Hutton and by its counsel, Mr. Tom Pliske, of the firm Gasaway & Stientjes, LLC, 1120 Olivette Executive Parkway, Suite 220, St. Louis, Missouri 63132.

The defendant appeared by its counsel, Mr. Robert Stoddart, of the U.S. Department of Justice, Tax Division, P.O. Box 26, Washington, DC 20044.

The witness appeared by his counsel, Mr. Terry L. Malone, of the firm Martin, Pringle, Oliver, Wallace & Bauer, LLP, 100 North Broadway, Suite 500, Wichita, Kansas 67202.

Also appearing, Mr. Don Glenn.



INDEX


| WITNESS | PAGE |
|---|---|
| BRYAN HANNING | |
| Direct Examination By Mr. Stoddart | 4 |
| Cross Examination By Mr. Pliske | 22 |
| Redirect Examination By Mr. Stoddart | 30 |
| Recross Examination By Mr. Pliske | 34 |

| DEPOSITION EXHIBITS - Marked for Identification | |
|---|---|
| Deposition Exhibit No. 1 | 5 |
| Deposition Exhibit No. 2 | 13 |
| Deposition Exhibit No. 3 | 15 |
| Deposition Exhibit No. 4 | 18 |

| | |
|---|---|
| SIGNATURE OF WITNESS | 36 |
| CORRECTION PAGES | 37-39 |
| CERTIFICATE OF SHORTHAND REPORTER | 40 |




BRYAN HANNING,

of lawful age, having been first duly sworn on his oath to state the truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. STODDART:

Q. My name is Bob Stoddart, I represent the United States and I'm with the Department of Justice.
Could you please give us your full name and address?
A. My name is Bryan Scott Hanning. I live at 1 Sandpiper, Wichita, Kansas.
Q. Are you employed?
A. I am employed.
Q. How are you employed?
A. I am employed with Mass Mutual, Massachusetts Mutual Life.
Q. Do you have any other employment?
A. Actually, I do work with AGH Wealth Advisors, here in Wichita.
Q. In what capacity?
A. I'm as a representative member and agent for selling life insurance products and investments.



Q. What sort of investments?
A. Primarily mutual funds, variable annuities, variable life insurance products.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 1.)
Q. Do you know what Exhibit 1 is?
A. I do.
Q. What is it?
A. It's an affidavit.
Q. And you gave it in this case; correct?
A. Correct.
Q. I'd like to look at Paragraph 2. You say you approached Mark Hutton and informed him of an investment strategy offered through the law firm of Cantley & Sedacca.
How did you find out about the strategy offered through the law firm of Cantley & Sedacca?
A. I was a part of an association called National Association For Family Wealth Counselors and they had resource material that was offered, and I found Cantley & Sedacca listed under resources for investment opportunities and tax planning strategies and that's how I became aware of them.

Q. What sort of research or resource material?
A. Well, the only thing that was offered was the name of the firm and a contact name and phone number.
Q. I mean, where did you find this? Was there a flier or what?
A. As I recall, there was a binder that was provided that had information in it.
Q. Along with other information?
A. Yes, lots of other information about the association and the services it provided.
Q. And were there other investment opportunities listed?
A. I'm sure there were, and I don't recall what they were.
Q. What did you do when you found the name of Cantley & Sedacca in that book?
A. The question was what did I do when I found the name?
Q. Yeah, what'd you do next?
A. Basically, I just held it in reference, you know, for any opportunities that I would run across with certain clients and held the name, that it was available to me on recall.



Q. When did you find out what the investment strategy was?
A. I don't remember exactly.
Q. Did you ever contact Cantley & Sedacca?
A. Only -- I only contacted Cantley & Sedacca after I had a potential prospect or somebody interested in something of that nature.
Q. Of what nature? I'm trying to get to how you knew what the strategy was before you contacted Cantley & Sedacca.
A. I understand the question. As I recall, this was an alternative investment, so this is something outside of the traditional investment opportunity, and at the time, I had clients that were interested in those types of investment opportunities that would be beyond a mutual fund or something along those lines. I have clients that ask me what are opportunities out there that would be beyond traditional investments, and that's how you became aware of that.
Q. What do you mean beyond traditional investments?
A. Beyond mutual funds, stocks and bonds, variable products of any sort like that.
Q. Do you understand by that term, beyond



usual investments, investments that have tax advantages?
A. Well, I understand a lot of investments, even traditional, have tax advantages.
Q. When did you approach Mr. Hutton?
A. When did I approach him?
Q. Um-hum.
A. I don't recall exactly. I've talked to him frequently as a client and I don't remember the date of when I contacted him.
Q. Was it before or after you contacted Cantley & Sedacca?
A. I believe it was after.
Q. And why did you contact Cantley & Sedacca?
A. To -- well, at the time to find out about their investment choices and what they were doing.
Q. Before you contacted Cantley & Sedacca did you have anybody in mind, someone who might be interested in this?
A. Yes.
Q. And who was that -- who were those?
MR. MALONE: Counsel, before we get any further, certainly, we've had an issue with the protective order that we haven't talked about



on the record and the client identities and their information we consider to be confidential, so we can certainly talk about the other opportunities. I'm reluctant to talk about the names since we don't know about the protective order we weren't able to reach.
Certainly, I understand Mark Hutton and his companies are the subject of this lawsuit so I think based on prior discussion, we are certainly going to let Mr. Hanning talk about those, and certainly reference that there were other clients, but we're uncomfortable and object to providing other names.
Q. Did you have Mr. Hutton in mind as a potential buyer?
A. Well, no -- not originally, I didn't.
Q. Did you have others in mind as potential investors, other than Mr. Hutton?
A. No, not originally.
Q. Did you have anybody in mind as a potential investor when you contacted Cantley & Sedacca?
A. Yes, I did. I had one at that time.
Q. Was it Mr. Hutton?
A. It was not.

Q. Why did you approach Mr. Hutton, that is, why did you think it would be a potential investment opportunity for him?
A. As I stated earlier, Mr. Hutton was interested in opportunities and ideas that would help him increase his wealth opportunities as well as which would include investments of different sort.
At the time, the market environment for traditional investments was not exceptionally good, and this was an investment option that I thought and we discussed as being a possible opportunity for him to pursue.
Q. When did you arrange conference calls for Mr. Hutton and the law firm of Cantley & Sedacca?
A. I don't recall exactly when, but for the initial meeting, to understand what the concept might involve, I arranged for that conference call to occur.
Q. Who was in the conference call?
A. Well, I'm not sure on the Cantley & Sedacca end of things, I want to say it was Beckett Cantley, but it could have been Mr. Sedacca at that time. And that's who was on that end.



Q. Who was on your end?
A. Myself, Mr. Hutton, I believe Scott Hewitt was there, and Marc Kaplan.
Q. Who is Marc Kaplan?
A. Marc Kaplan is a CPA with the firm of AGH, and he was there to comment on the partnership rules and help with the understanding of that.
Q. Would you consider yourself Mr. Hutton's investment advisor?
A. I would not.
Q. Had you ever sold investments to Mr. Hutton before this transaction?
A. I've sold him -- actually, Mr. Hutton directly? We had one variable life contract that was actually split between himself and the company. That would be the only investment.
Q. Is that a kind of life insurance with self directed investments in it?
A. Yes, it is a life insurance policy with mutual funds, self directing funds in it.
Q. Do you remember what sort of investments were in this variable annuity contract?
A. There was a large cap stock, there was mid cap stock, small cap stock, and international,



as well as guaranteed.
Q. Are these mutual funds?
A. They are mutual funds.
Q. So it's a small cap mutual fund?
A. Yes.
Q. And large cap, et cetera?
A. Correct, separate investment accounts.
Q. And before and up until you contacted Mr. Hutton about this particular transaction, what sort of things had you sold to him?
A. As I mentioned, the variable life contract. As far as Mr. Hutton directly, that would be exactly -- that'd be the only thing that I'd sold him.
Q. You sold things to him for his entities or to his entities?
A. I did.
Q. And what were they?
A. Variable life contracts on key people, and we had a 401(k) plan before then. Those would be the only two things.
Q. Was the 401(k) through Massachusetts Mutual?
A. It was.
Q. Were all these other mutual funds, et



cetera, in variable annuities, were they through Massachusetts Mutual?
A. They were.
Q. Before introducing Mr. Hutton to this particular transaction, had you ever sold him anything that was not a product of Massachusetts Mutual?
A. To him personally or to his entity?
Q. To either?
A. To his entity, there was, I believe, a Jackson National Life Policy that was sold on one of his key people for the company.
Q. A life insurance policy?
A. Correct.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 2.)
Q. Do you know what Exhibit 2 is?
A. I do.
Q. What is it?
A. It is an intake summary.
Q. What's an intake summary?
A. I believe it's for general information of the client.
Q. Where did you get this?

A. This came from the Cantley & Sedacca firm.
Q. And why did they send you this?
A. They sent this to me to forward to Mr. Hutton for general information.
Q. So Mr. Hutton filled it out?
A. I believe I assisted Mr. Hutton in filling it out.
Q. And did you send it back to Cantley & Sedacca?
A. As I recall, I believe I did.
Q. And what is Line 6?
A. I don't think I know.
Q. Oh, okay. Did Cantley & Sedacca pay you or AGH a referral fee for referring Mr. Hutton to them?
A. I'm sorry, ask the question again.
Q. Did Cantley & Sedacca pay either you or AGH a referral fee for referring Mr. Hutton to them?
A. Cantley & Sedacca paid a referral fee to AGH Wealth Managements Solutions.
Q. Are you a partner of AGH Wealth Management Solutions?
A. I was a, yes, an officer and owner of AGH



Wealth Management Solutions.
Q. I expect an objection, but I have to ask anyway, how much was the referral fee?
MR. MALONE: Counsel, as you anticipate, we object to the amount of the referral fee. Again, as we talked about earlier, this is an issue we believe ought to be properly covered by a protective order and we've been unable to get one reached thus far. We're certainly willing to let Mr. Hanning say that we got a referral fee, but the amount at this point we object to, and I'm instructing him not to answer without the protective order.
Q. Was the referral fee de minimis?
A. Define de minimis.
Q. Very small?
A. I don't recall.
Q. Did you disclose to Mr. Hutton that Cantley & Sedacca had paid AGH a referral fee because you referred him to them?
A. Yes.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 3.)
Q. This is Exhibit 3. Do you know what



Exhibit 3 is?
A. Yes, I do.
Q. What is it?
A. It is an agreement for legal services.
Q. Have you seen it before?
A. I have.
Q. When did you see it?
A. I remember seeing it back in October 4th of 2001.
Q. Did you give this to Mr. Hutton?
A. I believe I did.
Q. I'd like to look at the first paragraph on the first page which lists representations that Mr. Hutton is making. He represents that he or his financial advisor possesses the knowledge and experience in financial and business matters that ensures his or his advisors capability to evaluate the merits and risks of the investment.
Did you possess the knowledge and experience in financial business matters to evaluate the merits and risks of the MLD transaction?
A. I did not.
Q. Did you represent to Mr. Hutton that you had the knowledge and experience to evaluate the



merits and risks of the investment?
A. I did not.
Q. Did he ever ask you to evaluate the merits and risks of the investment?
A. I don't recall.
Q. Did you ever give him an opinion about the merits and risks of the investment?
A. I don't recall.
Q. To your knowledge, did Mr. Hutton have reason to believe that you had knowledge and experience in financial and business matters so as to evaluate the merits and risks of the MLD investment?
MR. MALONE: Object to the form of the question as calling for speculation, but you can answer it, if you can.
A. Could you ask the question again?
Q. Well, I don't think it's speculation.
Have you ever given Mr. Hutton reason to believe, had you given him reason to believe that you had the knowledge and experience in financial and business matters to evaluate the merits and risks of a market linked deposit transaction?
A. No, I don't believe I did.
Q. Did you ever give Mr. Hutton an opinion

about whether the tax benefits generated by the transaction would be upheld if the IRS challenged them?
A. I did not.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 4.)
Q. Do you know what this Exhibit is, Exhibit 4?
A. I know it's an e-mail.
Q. Was it an e-mail that you received?
A. It indicates that I did receive it.
Q. First of all, do you know what the subject is, re: Leman's strategy. Do you know what Leman's strategy is?
A. I don't know what it is. I know it's a term that is used for a strategy that Cantley & Sedacca was producing.
Q. What, to your knowledge, was that strategy?
A. I really don't know what it was.
Q. Do you know if it had anything to do with the year 2001?
A. I suppose it would, because of the date.
Q. Do you know?



A. I don't recall.
Q. At the bottom of the Exhibit there's communication that someone, I assume it's Mark Hutton, because it's from him, would like to take down a million five thousand dollars of loss for the year 2001. Do you know what loss that is?
A. Well, I think it's tax loss.
Q. Do you know?
A. I don't know.
Q. Do you know anything about the details of the MLD transaction?
A. I don't.
Q. Were you ever given any bank statements, for example?
A. I was not.
Q. Back again to an earlier Exhibit, Exhibit 4, which is the letter?
MR. MALONE: I think we identified 4 as the e-mail. You're looking at Exhibit 3, I believe.
MR. STODDART: Oh, you're right, goodness me, 3.
Q. It's the exhibit that has the Cantley & Sedacca letterhead dated October 5th, 2001?
A. Um-hum.



Q. Back again to Exhibit 3, Paragraph 3 --
A. You have a different date on that than this one. You have October 5th, this is October 4th.
Q. I will use the one that you have. I think they're the same. There's a sentence in the middle of the Paragraph 3, quote, to assist us in explaining the investment to you, we have engaged one or more financial advisors whom we will pay a fee for their assistance to us, closed quote.
Do you know who that financial advisor was?
A. I don't, I don't know.
Q. Do you know an entity called CF Advisors?
A. I'm sorry, CF...
Q. Advisors?
A. I don't recall CF Advisors.
Q. Were there any persons or entities in 2001 that you understood as being the promotors of this investment?
A. The question is -- I'm sorry, ask the question again.
Q. Did you understand that any persons or entities in 2001 were the promotors of the MLD transaction?



A. Other than Cantley & Sedacca?
Q. Um-hum.
A. As I recall, Deutsche Banc was involved.
Q. Would you call them a promoter of the arrangement?
A. I suppose so.
Q. Would you call Cantley & Sedacca a promoter of the arrangement?
A. I would.
Q. Can you recall if anyone else was involved?
A. By name, Dan Brooks is a name that I recall.
Q. Who is Dan Brooks, if you know?
A. I believe he's with Deutsche Banc.
Q. Do you know what his role in the transaction was?
A. I believe he was an investment individual, but I couldn't tell you exactly.
Q. Okay.
MR. STODDART: Well, I told you this would be a short deposition, and this is about all I have for now.
Mr. Pliske?
MR. PLISKE: Thank you.

CROSS EXAMINATION
BY MR. PLISKE:
Q. Mr. Hanning, my name's Tom Pliske, I represent the plaintiff in this case, and I'll follow-up with a few questions, too. If you don't understand them, let me know, and I'll repeat them or clarify them.
I'd like to start off with who you are, your education background, please.
A. I graduated with a bachelor in business administration from WSU in 1980. I left college as a contractor for 10 years and then got into this business in 1991.
Q. Are you licensed or certified in any fields?
A. I'm licensed for insurance, life, health and annuities, as well as mutual funds and variable products.
Q. And by mutual funds, does that require a separate brokerage license of some type?
A. Series 6 and Series 7.
Q. When did you obtain your Series 6 and Series 7 license?
A. I believe it was around 1993.
Q. Work background, can you tell me, after



college, where you started working?
A. I started, I was self employed with my own contracting business and that's what I did before this business.
Q. A contracting business, being a construction business?
A. Construction and painting, yes.
Q. You're no longer in that business?
A. I'm no longer in that business.
Q. Is it a high risk field to be in?
A. With employees it is.
Q. What about just for financial reasons?
A. I wouldn't consider it high risk.
Q. Did you make money in that business?
A. I did.
Q. Did you lose money?
A. I lost money on jobs, yes.
Q. How long have you known Mr. Hutton?
A. I've known Mark since 19 -- can't even think back that far, 1975.
Q. 1975, so before this relationship was established?
A. Yes.
Q. How long have you worked with Mr. Hutton and his companies in a position of advisor of some



type?
A. I believe it was 1992 or three that we first began, had a relationship.
Q. And you are still working with him today?
A. I am.
Q. So around 15 years working with Mr. Hutton and his companies?
A. Right.
Q. Do you provide him investment opportunities throughout the year or at different times?
A. Yes, I do.
Q. Something other than life insurance?
A. Occasionally.
Q. Something other than the MLD transaction in 2001?
A. Yes.
Q. Can you give us an example of other investment opportunities you've presented to him?
A. It's been few, but we talk occasionally about money management, more traditional investments.
Q. Does he follow-up with you or just dismiss any suggestions you have?
A. He actually has a personal advisor for



investments that he's remained with.
Q. Did you present him an opportunity or were you involved in an investment opportunity in 2002 similar to the 2001 transaction?
A. Ask the question again.
Q. Did you present him with an investment opportunity in 2002 similar to the 2001 transaction?
A. I don't recall.
Q. Did you approach Mr. Hutton with respect to the 2001 transaction or did he approach you?
A. Well, Mark and I talked frequently and so I suppose I would have approached him in conversation.
Q. Does he ever approach you and ask for investment opportunities?
A. Occasionally.
Q. Is the transaction he engaged in in 2001 any different than any other opportunities throughout the years that you may have approached him with?
A. Well -- ask the question again, I'm sorry.
Q. Is this 2001 transaction, the MLD transaction, is it similar or quite a bit

different than other opportunities you may have approached him with?
A. Well, it's very different from the things I work with Mark on.
Q. Is he a conservative investor, typically, versus a high risk investor?
A. I don't know. I believe Mark -- I think Mark takes calculated risks.
Q. Do you consider the MLD transaction a calculated risk?
A. I don't know if I have enough knowledge to say that it was, but I think so.
Q. Is it a high risk investment?
A. Yes.
Q. Could he make a lot of return if it was successful?
A. It was my understanding he could.
Q. Does Mark Hutton always go with what you advise him to invest in?
A. No, he doesn't.
Q. Has he asked you questions about the investment?
A. He does.
Q. Is it typical for Mark to get other professionals involved if he doesn't understand?



A. Yes, it is.
Q. And did he get other professionals involved in the MLD transaction?
A. Yes, he did.
Q. And who was that other professional that you're aware of?
A. Scott Hewitt.
Q. And did Scott participate in a phone conference with you and Mark and Cantley & Sedacca?
A. He did.
Q. Did you ask questions of Cantley & Sedacca on that phone conference, do you recall?
A. I don't recall.
Q. Do you recall if Scott asked questions during that phone conference?
A. Yes, he did.
Q. Did Mark ask questions?
A. Yes, he did.
Q. Why do you think Mark asked questions with respect -- prior to investing?
A. I'm sorry?
Q. Why do you think Mark may have asked questions?
A. To understand the nature of the product



and transaction.
Q. Have you worked with Mark on deferred compensation arrangements?
A. Yes.
Q. And you testified you work with him on split dollar policies?
A. Yes.
Q. Are there tax benefits on either of those arrangements with respect to the company?
A. Yes.
Q. Are you involved in a lot of transactions involving deferred compensation or split dollars with other companies?
A. I am.
Q. Are your other clients concerned with the tax benefits that they may get --
A. Yes.
Q. -- with respect to those investment strategies?
A. Absolutely.
Q. Is it unusual for a client not to be concerned with tax consequences when they invest?
A. Yes, it is.
Q. Can you explain to Mark Hutton the advantages or disadvantages of investing in a



split dollar policy?
A. Yes, I can.
Q. And can you explain the tax consequences -- you don't have to, but could you explain the tax consequences to Mr. Hutton?
A. I could.
Q. Can you explain the tax consequences to Mr. Hutton of investing in a deferred compensation?
A. I can, and I might add that I refer to his tax advisor for clarification as well.
Q. In general?
A. In general.
Q. Okay. You did not advise him as to tax advice with respect to the MLD transaction; is that correct?
A. That's correct.
Q. You testified there was another individual on the phone conference. Who was that; a CPA?
A. Marc Kaplan.
Q. And did Marc Kaplan provide clarification as to partnership rules?
A. He did.
Q. And was that for Mark's benefit and

Scott's benefit?
A. Yes.
Q. You're not qualified to provide that type of partnership law or partnership transaction?
A. Not at all.
Q. You've known Mark for approximately 32 years; is that correct?
A. Yes.
Q. Have you ever been aware or has Mark ever approached you with respect to an investment for purposes of obtaining nothing but tax benefits?
A. No, I don't recall.
MR. PLISKE: I have no further questions.
MR. STODDART: I have just a few more.

REDIRECT EXAMINATION

BY MR. STODDART:
Q. You said to Mr. Pliske that occasionally you've approached Mr. Hutton with other investment opportunities than life insurance products. Before 2001, what were all of the other investment opportunities you approached Mr. Hutton with that were not life insurance products?
A. It would be money management programs or



mutual fund type of opportunities.
Q. What's a money management program?
A. Where we would hire or match him with a money manager like a bank, or SEI, I believe, was the firm even back then, that might have been offered at that time.
Q. Are these investment opportunities comparable to the MLD transaction?
A. No, they are not.
Q. You mentioned that Mr. Hutton had another investment advisor. Who is that?
A. I'm not familiar with the gentleman.
Q. Was he Mr. Hutton's investment advisor in 2001?
A. I believe so, but I'm not sure.
Q. Good heavens. To your knowledge, was this other investment advisor involved in the 2001 transaction?
A. I don't know.
Q. Was he ever on your conference calls with Cantley & Sedacca?
A. No.
Q. You said it was your understanding that Mr. Hutton could make a lot if he was successful in the MLD transaction. On what did you base that



understanding?
A. On whatever the investment component was to the transaction.
Q. Did you run any calculations under the Black/Scholes formula?
A. I don't even know what the Black/Scholes formula is.
Q. As I understand it, there's options involved in the MLD transaction?
A. And that very well could be, I don't know.
Q. On what did you base your understanding that the option trade could be profitable?
A. From Cantley & Sedacca.
Q. From anything else?
A. None.
Q. You said that you were able to explain the tax consequences of deferred compensation arrangements and split dollar insurance. Are those both basically insurance products?
A. Split dollar is an insurance technique. Deferred compensation is not necessarily a life insurance product.
Q. What company did you use for the deferred compensation agreements -- arrangements that you



did for Mr. Hutton?
A. Well, two different things. Deferred compensation agreements are written by attorneys, and products themselves, if there is an informal funding, would have been Massachusetts Mutual Life for the variable life component.
Q. To Massachusetts Mutual for the deferred comp arrangements you did with Mr. Hutton; correct?
A. Correct.
Q. Could you explain the consequences of the MLD transaction?
A. I could not.
Q. Was Marc Kaplan a member of AGH?
A. The question was, was he or is he?
Q. Was he in 2001?
A. He was.
Q. Was he a partner?
A. No.
Q. What was he?
A. He was a CPA, that's all I know.
Q. An employee?
A. Correct.
MR. STODDART: That's about all I have.

MR. PLISKE: I have a few follow-up, if I may.

RECROSS EXAMINATION

BY MR. PLISKE:

Q. Mr. Hanning, just so I can understand, money manager, you work with other clients and put them with money managers?
A. I do.
Q. Are money managers investors of the client's money?
A. Yes, they are.
Q. Can they invest in stocks?
A. They can.
Q. Bonds?
A. Yes.
Q. Treasury bonds?
A. Yes.
Q. Municipal bonds?
A. Yes.
Q. Options?
A. Yes.
Q. Calls and puts?
A. Yes.
Q. You testified that you did not -- that you believed this was a high risk, high profit



type investment for Mark Hutton, but when followed up, you said, if I'm incorrect, stop me, as represented to you by Cantley & Sedacca; is that correct?
A. That's correct.
Q. You did not do an independent analysis?
A. I did not.
Q. But Cantley & Sedacca represented to you it was a high risk high reward type investment?
A. Yes.
Q. And did they represent that to Mr. Hutton?
A. Yes, I believe they did.
MR. PLISKE: No further questions.
MR. STODDART: We can go off the record. Oh, no, on the record.
I want to thank you very much for your testimony, on the record.



____________________________

BRYAN HANNING

STATE OF KANSAS )
) ss:
COUNTY OF )

Subscribed and sworn to before me, the undersigned authority, this, the ____ day of ____________________, 2007.

____________________________

NOTARY PUBLIC

My appointment
Expires:__________________________



IN RE: Clearmeadow Investments V USA
Case No. 05-1223 T

CORRECTION SHEET FOR DEPOSITION OF
BRYAN HANNING

Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:_____________________________
Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:_____________________________
Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:_____________________________
Page____Line____reads as follows:________________
____________________________________________
Should read:__________________________________
____________________________________________
Reason for change:_____________________________
____________________________________________

Page____Line____reads as follows:________________

Should read:________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

Should read:________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

Should read:________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

Should read:________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

Should read:________________________________

Reason for change:__________________________



Page____Line____reads as follows:________________

Should read:________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

Should read:________________________________

Reason for change:__________________________

I certify that I have read my deposition in the above case and request that the above changes be made.

________________ ____________________

(date) Signature of Witness



CERTIFICATE

STATE OF KANSAS )
) ss:
SALINE COUNTY )

I, Donna M. Lytle, Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition by him given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office, this _____ day of _____________, 2007.

________________________
Donna M. Lytle, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401

AFFIDAVIT

I, Bryan Hanning, being first dully sworn, hereby state the following under penalty of perjury:

1. I have been a personal friend and investment and insurance advisor to Mark E. Hutton for a number of years. I am also a registered representative of MML Investor Services, Inc. and officer/owner of AGH Trusted Advisors, LLC (formerly known as AGH Wealth Management Solutions, LLC).

2. In 2001, I approached Mark E. Hutton and informed him of an investment strategy offered through the law firm of Cantley & Sedacca, LLP that I thought would be a potential investment opportunity for him.

3. I arranged for conference calls with Mark E. Hutton and the law firm of Cantley & Sedacca, LLP, so that Mark could obtain additional information regarding the investment strategy.

4. The investment strategy was comprised of certain foreign currency transactions.

5. I participated in the first conference call with Cantley & Sedacca, LLP, so that I could assist Mark in understanding the investment.

6. It is my understanding that Mark E. Hutton also sought out the advice of his personal accountant, Scott Hewitt, CPA, with respect to the investment strategy proposed by Cantley & Sedacca, LLP.

7. I continue to be Mark E. Hutton's personal investment and insurance advisor through today.

Further the affiant saith not.

[signature]
Bryan Hanning

Subscribed and sworn to before me, this 19th day of September, 2006.

[Notary Seal:]

JACQUELINE A. FARMER
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 3/25/09

Jacqueline A. Farmer
Notary Signature

NOTARY PUBLIC
My commission expires: 3/25/09.

DEPOSITION EXHIBIT
1 - Hanning

# INTAKE SUMMARY

**Please Email Back to bgcantley@msn.com**

**Questions 1 – 13 for Deal Documents**
**Questions 14 – 20 for Deutsche Banc Documents**

| | |
|---|---|
| Cantley & Sedacca Primary Contact | **BGC** |

| | |
|---|---|
| 1. Referred by: | Bryan Hanning |
| 2. Name of Client (s) | Mark E. Hutton<br>7118 W. Clearmeadow Ct.<br>Wichita, KS 67205<br>316-721-1571<br>316-942-8881 |
| 3. Client's Residential Address, Phone, Fax | See above. |
| 4. Client Social Security # or Fed I.D. # | 509-58-~~1564~~ 1624 |

DEPOSITION EXHIBIT
2-Hanning

| | |
|---|---|
| 5. Individual's Breakdown of Shares / Percentages of Company (if more than One participant) | n/a |
| 6. Amount to be Invested Into Investment Strategy | $250 (10% x 1m) + $37,500 (DB 1.5%) = 287.5k total |
| 7. Name of Client LLC to be used with Dan Brooks. (Entity #1) | New |
| 8. LLC Entity #1 Business Address (if same as # 3 write "SAME") | Same |
| 9. State of Organization of Newly Formed LLC (Entity #1) | De |
| 10. If forming a Corp. or LLC in cases where loss is in S Corp. or Partnership, or if we have more than one client – What is the Name and Type of this Entity? (Entity #2) | n/a |
| 11. If the answer to #10 is "yes" – What is the Business Address for this New Corp. or LLC (Entity #2) | n/a |
| 12. If the answer to #10 is "yes" – What is the State of Organization of Corp. or LLC (Entity #2) | n/a |

| | |
|---|---|
| 13. What is the County of the Client's Principle Business (Entity #1 & #2) | Sedgwick |
| 14. Bank Reference (Bank Name, Branch, Address, Contact Name) | Commerce Bank<br>150 N. Main<br>Wichita, KS 67202<br>John Frazee |
| 15. Who is the Client's Employer | Self |
| 16. Employer Address | Self |
| 17. Job Title | Self |
| 18. Occupation | Self |
| 19. Dependents | 2 (age 17, 20) |
| 20. Birth Date | 8-5-1954 |

**CANTLEY & SEDACCA, LLP**
ATTORNEYS AT LAW
3414 PEACHTREE ROAD, NE, SUITE 105
ATLANTA, GEORGIA 30326
TEL. (404) 442-2108
FAX (770) 234-6686

BECKETT G. CANTLEY
PARTNER

ATLANTA, GA
DALLAS, TX
SAN FRANCISCO, CA

October 4, 2001

Mr. Mark E. Hutton
2233 S. West Street
Wichita, KS 67213

DEPOSITION EXHIBIT
3 - Hanning

**Re: Agreement for Your Legal Services**

Dear Mark:

Our law firm appreciates having the opportunity to provide legal services to you regarding your tax planning. As part of our service to you, it is important that we both understand the scope of our representation and our agreement regarding fees. You have engaged us to review the tax ramifications of a **market link deposit** investment strategy (the "Investment") and to research and review the law supporting the issuance of a legal opinion letter for this Investment (the "Opinion") and to issue an Opinion. Also, we have not been engaged to provide any type of advice regarding investment matters. The Opinion will be based on the relevant facts provided to us by you and by **Deutsche Bank** ("Bank"), certain representations made to us by you and by Bank, and on the state of the law at the time it is rendered. It will express our best professional judgment, applying a "more likely than not" standard, and will not be a guarantee.

The total flat fee for this service is **$150,000** (the "Flat Fee"). We request that you now forward the Flat Fee to our client escrow account. The Flat Fee will be considered earned as of **October 4, 2001** and you agree that we may bill you for the service immediately and place the Flat Fee into our general funds. However, we agree to continue our review of the Investment until the Opinion is issued. If you have paid us the Flat Fee and we have not issued an Opinion by April 15, 2002, we will refund the Flat Fee. Your execution of this Agreement indicates your approval of this arrangement.

The Investment involves a substantial investment of your assets. You have agreed that you shall bear all the economic risk of the Investment. In making the Investment that will be required as a part of the Investment, you have relied solely upon your (and your financial advisor's) independent investigation of all matters or concerns regarding the Investment and the Investment. You (or your financial advisor) possess the knowledge and experience in financial and business matters that ensures your (and your financial advisor's) capability to evaluate the merits and risks of the Investment and you are therefore making an informed decision as to the Investment. To assist us in explaining the Investment to you, we have engaged one or more financial advisors whom we will pay a fee for their assistance to us. We are not financial advisors and have expressed no opinion as to the investment suitability of the Investment. Likewise, any financial advisor engaged by us has not expressed an opinion on the Investment on our behalf. You acknowledge that we have made no guarantee regarding the successful determination of this matter and that all expressions relative thereto are matters of our preliminary opinion based upon our current knowledge of the subject matter.

**Bryan S. Hanning**

**From:** Jeremy Nerenberg [jnerenberg@att.net]
**Sent:** Thursday, December 06, 2001 9:14 AM
**To:** Mark Hutton
**Cc:** Bryan S. Hanning
**Subject:** Re: Lemans strategy

Gentlemen:

I spoke too soon in my prior email. Apparently, the entire remaining balance would have to be triggered next year (e.g., no amount can be carried over into 2003). Please contact Ed Sedacca at 972-361-0090 should you have any questions regarding this matter. I will assume that you would still like to take down $1,005,000 of the loss for year 2001, and thus take down the entire remaining balance for year 2002 -- is this correct?

Best Regards:

Jeremy Nerenberg
Cantley & Sedacca, LLP
Attorneys At Law
5220 Spring Valley Rd., Suite 610
Dallas, TX 75254
214-264-1825 (cell)
972-233-6175 (office)
972-361-0644 (fax)
jnerenberg@att.net

Other Offices:
Atlanta, GA
San Francisco, CA

Unless otherwise stated herein, the information contained within this message is not intended to be legal advice and is not to be relied upon as such. Furthermore, the information is confidential and privileged, intended only for the named addressee. If the recipient is other than the intended addressee, any dissemination, distribution or copying of this material is strictly prohibited; please destroy this email and contact the sender at the above address. Your cooperation would be greatly appreciated.

----- Original Message -----
From: "Mark Hutton" <Mhutton@huttonconstruction.com>
To: <BSHanning@aghlc.com>; <jnerenberg@att.net>
Sent: Friday, November 30, 2001 5:07 PM
Subject: RE: Lemans strategy

Brian / Jeremy

Scott and I met today and figured this out. We would like to take down $1,005,000 of loss for year 2001. I would think the balance for next year but if possible I would like to wait until later in 2002 to decide on this. Is that possible?

DEPOSITION EXHIBIT
4-Hanning

We emphasize that any information that you provide us during this representation must be complete and accurate to the best of your knowledge as we will be relying on such information in providing your legal services. We also emphasize that all advice and/or planning is based on the current status of the Internal Revenue Code of 1986, as amended, and related tax laws (the "Tax Law"). We cannot predict with any accuracy any future change in the Tax Law and do not represent that the Tax Law will not result in a need for a change to your planning. This agreement when signed represents the entire agreement of the parties and all of the prior discussions concerning the entire subject matter hereof are merged herein and shall be considered to be a part of this agreement and shall not survive the execution hereof. This agreement cannot be changed verbally and can only be changed by another written agreement that must be signed by an authorized representative of this firm. Please indicate your approval of each of the terms of this engagement and fee agreement by signing below. A copy of this agreement is also enclosed for your files.

As you are aware, investment in the Investment in the manner contemplated by Bank is anticipated to provide you with substantial tax benefits. Because of these benefits, there is a possibility that if your return is reviewed, the IRS will audit your tax return, and that your tax return will be scrutinized. Except as provided in the next paragraph, issuance of the Opinion to you ends our responsibility with regard to your investment and our engagement in this matter. We will have no obligation or responsibility thereafter for advising you of tax law developments. You should understand that your reliance on the Opinion will not absolve you of the need to demonstrate that, in addition to potential tax benefits, you invested in the Investment because you believed, based on your own independent evaluation, that you had a realistic possibility of realizing a reasonable economic profit from your investment without regard to any tax benefits.

We also agree to provide you an audit defense in the event that you alert us that your require our representation in connection with an examination by the Internal Revenue Service of the Investment as reported on your federal income tax return. Such audit defense shall be provided to you at both the audit stage and at the IRS Appeals Office stage (if necessary). Such audit defense shall not include representation at the U.S. Tax Court, U.S. District Court or Court of Claims, although we would be happy to discuss such a defense with you should the need arise. A second nonrefundable flat fee of **$25,000** ("Second Fee") will be due upon your alerting us that you require our representation. The Second Fee is limited to representation in connection with the Investment and does not apply to any other items or transactions on your return that may be questioned by the Internal Revenue Service.

Our engagement is to represent you and only you. Our representation does not extend to any affiliate of yours, and you should be aware that we will not be considered to have established an attorney-client relationship with any such affiliate for any purpose.

Sincerely,

CANTLEY & SEDACCA, LLP

Beckett G. Cantley

APPROVED, AGREED TO AND ACCEPTED:

By: ______________________________ Date: ____________
**Mark E. Hutton**