IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1223 T

(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC

CLEARMEADOW CAPITAL CORP.,

Tax Matters Partner,

Plaintiff,

V.

THE UNITED STATES,

Defendant.

D E P O S I T I O N

The deposition of SCOTT R. HEWITT, taken on behalf of the Defendant pursuant to the Federal Code of Civil Procedure and Notice before:

DONNA M. LYTLE, CSR, RPR, CRR

OWENS, BRAKE & ASSOCIATES

234 North 7th Street, Suite E

Salina, Kansas 67401

a Certified Shorthand Reporter of Kansas, at the Epic Center, 301 N. Main Street, Suite 1200, Wichita, Kansas, on the 8th day of May, 2007, starting at the hour of 9:30 a.m.

PENGAD-Bayonne, N. J.
PLAINTIFF'S EXHIBIT
3

APPEARANCES

The plaintiff appeared by Mr. Mark Hutton and by its counsel, Mr. Tom Pliske, of the firm Gasaway & Stientjes, LLC, 1120 Olivette Executive Parkway, Suite 220, St. Louis, Missouri 63132.

The defendant appeared by its counsel, Mr. Robert Stoddart, of the U.S. Department of Justice, Tax Division, P.O. Box 26, Washington, DC 20044.



INDEX


| WITNESS | PAGE |
|---|---|
| SCOTT R. HEWITT | |
| Direct Examination By Mr. Stoddart | 4 |
| Cross Examination By Mr. Pliske | 44 |
| Redirect Examination By Mr. Stoddart | 65 |
| Recross Examination By Mr. Pliske | 68 |
| Redirect Examination By Mr. Stoddart | 71 |

| DEPOSITION EXHIBITS - Marked for Identification | |
|---|---|
| Deposition Exhibit No. 1 | 5 |
| Deposition Exhibit No. 2 | 13 |
| Deposition Exhibit No. 3 | 14 |
| Deposition Exhibit No. 4 | 17 |
| Deposition Exhibit No. 5 | 20 |
| Deposition Exhibit No. 6 | 22 |
| Deposition Exhibit No. 7 | 23 |
| Deposition Exhibit No. 8 | 33 |
| Deposition Exhibit No. 9 | 39 |
| Deposition Exhibit No. 10 | 42 |

| | |
|---|---|
| SIGNATURE OF WITNESS | 72 |
| CORRECTION PAGES | 73-75 |
| CERTIFICATE OF SHORTHAND REPORTER | 76 |




SCOTT R. HEWITT,
of lawful age, having been first duly sworn on his oath to state the truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. STODDART:

Q. Good morning. My name is Bob Stoddart, I represent the United States in this case, with the Justice Department.
Could you please give us your full name and your address?
A. Scott R. Hewitt, home address or business address?
Q. Either.
A. 205 West Second, Wichita, Kansas, 67202.
Q. May we have your phone number?
A. 316-269-4500.
Q. And have you ever been deposed before?
A. Yes.
Q. Oh, good. Then I don't have to stress that the transcript is only from our oral indications and that you can't nod your head or make gestures and expect to be understood.
Are you able to give full and complete answers today; is there any reason why you can't?



A. To my knowledge, no.
Q. So you're not on any debilitating drug or anything of that sort?
A. No.
Q. I may be, I'm on antihistamines. We might as well begin.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 1.)
Q. Do you know what Exhibit 1 is?
A. Yes.
Q. What is it?
A. It was an affidavit that I signed regarding this case.
Q. Paragraph 3, you say you've been Mark Hutton's personal accountant from 1993. In that capacity, what have you done for him?
A. I've done all his personal tax returns, his corporate tax returns, consulted on various business items with Mark.
Q. What sort of business items?
A. Tax matters regarding asset purchases, building purchases, any of the things that Mark does, business or personally wise, that would have a tax impact.

Page 6

Q. Has your advice and your consultation been exclusively about the tax affect of these purchases?
A. I would say, yes, for the most part.
Q. Have you become familiar basically with Mr. Hutton's holdings and his assets?
A. Through preparation of the tax returns, I'm aware of his holdings and assets.
Q. Now, to get to what this case is about, in 2001, Mr. Hewitt (sic) entered a transaction or investment or tax shelter that is supposed to have generated certain tax losses that was claimed on the 2001 and 2003 amended return as a loss.
Do you know or are you familiar with that transaction which involved Deutsche Banc, among others?
A. Yes, I am.
Q. So to avoid a lot of difficulty prefaces, I'll just called it the market link deposit transaction, or the MLD transaction.
A. Okay.
Q. When did you first become familiar, first hear about the MLD transaction?
A. During Mark's discussions with, I believe it was the Cantley & Sedacca law firm. Mark gave

Page 7

me a call and we had a meeting and a telephone conference with Mark and Bryan Hanning and myself on the phone with Ed Sedacca, I believe.
Q. When was that?
A. I don't remember the date. Prior to the time Mark invested in the transaction.
Q. So before October of 2001?
A. I would guess that'd be right.
Q. Did you have any other calls with Cantley & Sedacca, other than your first one?
A. We had a second brief call to clarify a few things after the first one, and then when we're preparing the 2001 return, we had a brief phone call with Mr. Sedacca to get a clarification on reporting.
Q. What was the clarification you got on reporting?
A. It's been a long time. Just assurance of the way I prepared the return, that it was reasonable. There wasn't anything real specific, just general questions. I don't, frankly, remember all the conversation.
Q. Had you given a copy of the return to Mr. Sedacca to look at?
A. No.

Page 8

Q. Back to the first meeting, do you remember what the conversation was about?
A. It was mainly Mr. Sedacca explaining the investment opportunity and the risks, the reward scenario of what the transaction could produce. Then question and answers. Mark had questions, I had questions, Bryan Hanning asked questions, and then we left the -- got off the phone call with Mr. Sedacca and basically adjourned the meeting.
Q. What were your questions?
A. My questions involved the tax aspects, what happens if the MLD has profit, how is that going to be taxed, what happens if it has a loss and the tax aspects of that. That's pretty much my involvement in that.
Q. Do you remember what profit items you were considering?
A. The currency transactions?
Q. Um-hum.
A. I believe they were Euros, but those transactions, if they had profit, my questions were, were they long-term capital gains, were they ordinary income, those kind of things.
Q. Do you remember the second meeting you had?

Page 9

A. It was just a more brief meeting, just to clarify -- I was asked to be there, it mainly didn't involve tax, it was Mark and Bryan Hanning and another gentleman named Marc Kaplan who worked for AGH, Allen, Gibbs & Houlik. It was more just clarifying -- a few clarifying questions that Mark had on the transaction.
Q. What were those few final questions?
A. I don't remember now.
Q. Did you ever do an independent examination of the financial aspect of this transaction?
A. Of the financial side, no. That's Mark and Bryan.
Q. So you never gave Mr. Hutton any assurance that he had a reasonable opportunity to make a profit independent of the tax benefits that he would get?
A. I did not. I have no expertise in that area.
Q. If you look at Paragraph 9 of Exhibit 1, you say you discussed the investment with Mr. Hutton and noted its possibility of a high return. Also the risk of a large loss.
When you noted the possibility of a high

Page 10

return, did you yourself think that it had a possibility of a high return?
A. It's like any investment, I was -- my thinking was there was potential for a return.
Q. Why was there potential?
A. Just from the discussions that I was -- I mean, I was in the room during the discussions of the investment and I felt like there'd be a potential for -- even though risky, it had a possibility of having a return.
Q. Did you yourself independently from your knowledge of finance believe that it had a return or you believed that it had a potential of a return, or were you taking the possibility of return on faith, so to speak, from what Cantley & Sedacca was saying?
A. No real knowledge of that. Probably more on faith, I would say.
Q. In Paragraph 11, you say that you were unaware at the time of providing any advice to Mark Hutton regarding the MLD investment, that it had been determined to be a listed transaction.
Do you remember when it was determined to be a listed transaction?
A. I believe that was in 2004. I may be

Page 11

wrong on that but that's when I -- I think it happened.
Q. Okay. And you say in Paragraph 13 that you reviewed the extensive legal opinion from the law firm of Cantley & Sedacca; is that true?
A. That's true.
Q. Did you get a copy of the legal opinion from Cantley & Sedacca?
A. I had acquired a copy of Mark's, yes, but I did not keep a copy of it. I gave it back to Mark.
Q. When did you give a copy back?
A. After I reviewed it.
Q. Did you review it before you did the tax return?
A. Yes.
Q. And did you return it before you produced the tax return?
A. Yes.
Q. I'll tell you that the return that I got from Mr. Hutton was printed on only the odd numbered pages, like one, three, five.
MR. PLISKE: Objection, you said the return.
MR. STODDART: I'm sorry, you're

Page 12

right.
Q. The opinion letter from Cantley & Sedacca, do you remember if the opinion letter from Cantley & Sedacca that you got had the even numbered pages?
A. I have no idea. I would assume it would have but I don't know. Not anything I really looked at.
Q. You didn't look to see if it had all the pages?
A. It was bound, I assumed it would have had them. I just made an assumption.
Q. You reviewed the opinion, didn't you?
A. Um-hum.
Q. Did you notice anything missing?
A. Not to my knowledge.
Q. Okay.
A. No, I didn't notice anything missing.
Q. You remember if it had the even numbered pages?
A. I can't remember that. It didn't appear to be -- anything out of order in the document.
Q. Okay. You then eventually prepared tax returns for Mr. Hutton. For the year 2001, what tax returns did you prepare?

Page 13

A. There would have been a Clearmeadow Capital Corp, which was an LLC, Clearmeadow Capital Company, I believe, is the name of it, an S corp, and then Mark Hutton's personal return and also Mark Hutton's business return.
Q. I'm going to get out another exhibit here.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 2.)
Q. Do you know what Exhibit 2 is?
A. Yeah.
Q. What is it?
A. It was a request to Mr. Sedacca to get an example return during the time we're preparing the return to make sure we knew how to report the -- report everything.
Q. Did you request a sample return from Mr. Sedacca?
A. No, my associate did.
Q. Did you ask this associate to?
A. Yeah.
Q. Who is the associate?
A. Amy Clupny.
Q. And her name is on the --

Page 14

A. Her name is misspelled, C-L-U-P-N-Y.
Q. Thank you.
Did you ever receive this sample return?
A. Yes.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 3.)
Q. Do you know what Exhibit 3 is?
A. It appears to be the sample return.
Q. Is it?
A. Yes, it is.
Q. Do you remember -- oh, the sample return for which entity?
A. It'd been the Clearmeadow Investments, LLC return.
Q. The partnership?
A. Um-hum.
Q. Did you follow this sample return when you did your own return?
A. Actually, we had already prepared the return before we requested this and we were pretty much right on. We didn't agree with one number, I believe.
Q. So all of your return is basically the same as Cantley & Sedacca except for the change of

Page 15

one number?
A. I believe that's correct.
Q. And is the one number on Page 3 of this exhibit?
A. Yeah, I believe so.
Q. And just to be sure, what line is that number on?
A. 14b(1).
Q. And the handwritten number, is that the number that you put in?
A. I believe it is. I'd have to look at the Clearmeadow return.
Q. I note on the front of this sample exhibit in Line H(1) that there's an X by cash, so the cash accounting method was chosen; is that correct?
A. That's what they suggested. I'm not sure how we reported it on Clearmeadow, I frankly don't remember.
Q. Would it refresh your memory if I were to show you a copy of the return --
A. Sure.
Q. -- you prepared.
A. Yeah, we looked at cash basis, also.
Q. Why did you elect cash basis?

Page 16

A. Normally on an LLC investment, I almost always select cash, unless there's a reason to go accrual.
Q. Do you know the Internal Revenue Code prohibits the use of the cash method for tax shelters?
A. At this point in time, we didn't think this was a tax shelter.
Q. Do you know the definition of tax shelter that applies to the choice of accounting method provision?
A. Frankly, no.
Q. I believe it's a partnership, one of the many definitions, a partnership, a significant purpose of which is the avoidance of federal income tax.
Did you consider whether Clearmeadow was a partnership, a significant purpose of which was the avoidance of federal income tax?
A. Absolutely not, it was an investment partnership.
Q. And it's significant purpose was not --
A. Not in my mind, no.
MR. STODDART: Let's go off the record for a moment.

Page 17

(WHEREUPON, an off the record discussion was had, after which the following:)
Q. I would like these exhibits back, because they're not exhibits to your deposition, but I'll tell you it is an exhibit that's captioned at the top Investor Representations.
Have you ever seen this document before?
A. I don't recall ever seeing this before.
Q. May I have those back, please?
A. (Complies with request).
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 4.)
Q. Have you ever seen Exhibit 4?
A. Yes, I have.
Q. And what is Exhibit 4?
A. Agreement for legal services from Mr. Hutton.
Q. If you'd look at Page 2, and look at the first sentence of the second paragraph of Page 2, states, I quote, as you are aware, investment in the investment in the manner contemplated by Bank is anticipated to provide you with substantial tax benefits; correct?

A. That's what it says.
Q. Wouldn't you think that an investment that provides substantial tax benefits has a significant purpose in the avoidance of federal income tax?
A. I didn't view it that way, I viewed it as an investment strategy.
Q. An investment -- about how much out of pocket did Mr. Hutton pay?
A. 150,000, I believe.
Q. It's a bit more than that, but how much in losses did you claim altogether?
A. I don't recall off the top of my head.
Q. Was it in excess of $2 million?
A. Don't know without looking.
Q. Let's look. Would it refresh your memory if you were to take a look at your 2001 partnership return?
A. Sure.
Q. You might try looking at Line 23. Line 23 is distributions of property other than money? What was that property?
A. Basis and open securities.
Q. And what were the securities?
A. Exact securities, I'm not sure.



Q. Were they Canadian dollars?
A. Whatever CAD currency stands for. I assume that's Canadian, yeah.
Q. And those dollars were later sold; correct?
A. I believe they were, yes.
Q. And they were sold for pretty much their face value, weren't they?
A. Don't know the answer to that, off the top of my head.
Q. You prepared the individual return, didn't you?
A. Yes.
Q. I can tell you as a fact that they were sold for pretty much their face value.
A. Okay.
Q. How much would the loss have been?
A. Depends on what the face value was.
Q. It was about a thousand dollars and the loss would have been over two million; correct?
A. Yep.
Q. Pretty good investment if you put in 150,000, 300,000, and you get a tax loss of over two million; correct?
A. That's your opinion.



Q. I understand it's not your opinion, so it's your opinion if you make an investment of 300,000 and get a tax loss of over two million, a significant purpose of that investment is not the avoidance of federal income tax?
A. In my opinion, that was not the reason we went into this investment.
Q. Your opinion is your opinion.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 5.)
Q. Do you know what Exhibit 5 is?
A. It was work papers used in preparation of tax returns.
Q. They're handwritten. Whose handwriting is it?
A. Amy Clupny.
Q. Did she actually prepare the return?
A. Yes.
Q. Did she prepare it under your supervision?
A. Yes.
Q. What does she mean, if you know, the bottom of the first page of this Exhibit, establish deduction in both year?



A. I'm not sure.
Q. As I understand this transaction, Mr. Hutton's supposed to have paid a premium for a long position equaled to two and a half million U.S. dollars and on the same day, he's supposed to have received a premium for a short position equaled to slightly less. Do you recall about the same way?
A. Frankly, I don't, I don't remember that.
Q. To save time, I will just assure you that that is the case and you can just assume it's hypothetical, if you like.
A. Okay.
Q. But here we have a transaction buying basically operations; correct, buying and selling?
A. Correct.
Q. So Mr. Hutton purchased an option, let's say for two and a half million, and he wrote an option for slightly less. He did all of this in October of 2001, the transaction closed on December 14th of 2001, and what are the tax effects of doing that?
A. Off the top of my head, I don't know the answer to your question.
Q. Well, he paid money, he received money.

Is the money he received taxable income?
A. Potentially.
Q. And when options close, do you recognize taxable income?
A. I would say normally you would.
Q. Did he recognize taxable income in this case for the short premium he received in the amount of nearly two and a half million dollars?
A. I don't know that he ever received two and a half million dollars.
Q. True, he did not. Did he pay two and a half million dollars?
A. Not that I'm aware of.
Q. Okay.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 6.)
Q. Do you know what Exhibit 6 is?
A. It's a money transfer request.
Q. This was produced from your files?
A. I remember seeing it, I'm not sure of the significance of it, honestly.
Q. Well, let's look at what it says on its face. Mr. Hutton is asking a bank to transfer 25 million U.S. dollars and to pay premiums of two



and a half million dollars. You said before you were more or less familiar with Mr. Hutton's assets. To your knowledge, did he have 27 and a half million dollars to invest in this transaction?
A. Not aware that he did.
Q. Here's another Exhibit from your files that you produced.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 7.)
Q. Do you know what this Exhibit is?
A. It's a Deutsche Banc account statement.
Q. Did you look at this exhibit before you prepared the 2001 return?
A. I assume I did, yes.
Q. Exhibit 6 -- we know that on October 15th, 2001, Mr. Hutton told the bank to transfer out 27 and a half million dollars from his account, and I can tell you that he's also supposed to have received about the same amount at the same time. Do you notice any such transfers on the bank statement?
A. Not on this statement, no.
Q. It is the same bank; correct?



A. Same bank?
Q. Mentioned in Exhibit 6, and this is the account from which Mr. Hutton asked to have the 27 and a half million dollars transferred, isn't it?
A. Well, from the account number -- I don't know what the extra one three is on this one so I don't know for sure that that's the same account.
Q. Let's assume that it is.
A. Okay.
Q. We'll find out from Mr. Hutton if he had more than one account with Deutsche Banc. Do you see any transfer of 27 and a half million dollars?
A. No.
Q. Do you see any receipt of any amount that's approximately that large?
A. No.
Q. Before you prepared the 2001 return, did these documents raise any question in your mind?
A. I really didn't use this document, to my knowledge, in the return. There are other documents, I assume.
Q. Did you look at it?
A. Look at what?
Q. That document, Exhibit 7?
A. I assume I did, yes.



Q. Did you look at document Exhibit 6?
A. If it was in my file, I assume I looked at it.
Q. When you saw an instruction to pay 27 and a half million, is that something that you considered?
A. I honestly don't, it's been too long, I don't remember.
Q. When you were talking to Mr. Sedacca, did you ever ask him why there should be tax consequences for payment of money that was never paid?
A. Don't believe I ever asked that question.
Q. Why not?
A. Don't know. Never came to mind.
Q. Do you recall any explanation of why there should be a tax effect for money that was never paid?
A. Not really.
Q. Do you know if Miss Clupny did any research to decide if there should be a tax effect for money that was never paid?
A. I believe she did.
Q. Did she do so at your request?
A. Not that I recall. She probably did it

Page 26

on her own.
Q. You don't recall asking her to, but you recall that she did?
A. I believe so, yeah.
Q. Why do you believe so?
A. Because she had -- something in my mind says she did, I don't know.
Q. Please, we need to know what in your mind says she did.
A. It's been a long time.
Q. Are you just speculating that she did?
A. I'm probably speculating she did, yeah.
Q. Do you know that Mr. Hutton filed a suit against Deutsche Banc?
A. I'd heard about it, I didn't know the details of it.
Q. So Mr. Hutton did not consult with you before he filed the lawsuit?
A. No.
Q. Did not ask your advice?
A. Not that I'm aware of, that I recall.
Q. I can tell you that the lawsuit involves the tax effect of the MLD transaction, basically.
I only have one copy of this, this is the complaint that Mr. Hutton filed in that lawsuit,

Page 27

and I'd like to read a bit of Paragraph 8.
If anybody would like to be sure that I'm not changing the words, you may please come and stand over my shoulder here. I'm quoting from the middle of the paragraph, quote, and we're talking about the Cantley & Sedacca tax opinion letter, quote, the opinion letters were issued after and failed to seriously address a 1999 IRS notice paren 1999 notice, close paren, that rejected transactions substantially the same as that the defendants were foisting on Mark Hutton, as well as a 1998 tax decision by the Third Circuit, ACM Partnership V Commissioner, that rejected the reasoning of the defendants in their canned opinion letters, closed quote.
Later on in that complaint, Paragraph 15, specifies that the 1999 notice is 1999-59.
You read the Cantley & Sedacca opinion letters; yes?
A. Yes.
Q. Did you think that the opinion letters failed to address that 1999 IRS notice?
A. I wasn't aware of the 1999 notice at the time I read the opinion letter, that I recall anyway.

Page 28

Q. I'm going to show you a copy of the Cantley & Sedacca opinion.
MR. STODDART: Do you have one, Mr. Pliske?
MR. PLISKE: I do not.
MR. STODDART: I've given Mr. Pliske a copy.
(WHEREUPON, an off the record discussion was had, after which the following:)
Q. Did you ever, before you prepared the tax return, take a look at IRS notice 2000-44?
A. I don't recall.
Q. There was a section in the Cantley & Sedacca opinion letter saying that that notice did not apply.
Did you agree with the Cantley & Sedacca opinion letter when it stated that that notice did not apply?
A. I assume I did because I agreed with the Cantley & Sedacca opinion letter.
Q. The opinion letter I can assure you mentions -- well, I can assure you anyway that notice 2000-44 mentions notice 99-59, I've handed it to you, in the second paragraph.

Page 29

Did you decide that that notice did not apply to this partnership on this transaction?
A. I don't ever recall reading this.
Q. So you don't recall reading notice, 2000-44?
A. No.
Q. It'd be fair to assume from that that you have no opinion about whether the Cantley & Sedacca opinion letter adequately addresses this notice and notice 99-59?
A. That'd be correct.
Q. Did you have an opinion at the time?
A. At the time, I thought the Cantley & Sedacca opinion letter was relevant.
Q. Well, certainly relevant. Did you think that it adequately addressed the authorities that it was based upon?
A. Yes.
Q. Did you look at the authorities it was based upon?
A. Well, I thought I did.
Q. Did you?
A. What we could find, we looked at. I don't recall reading this notice, though.
Q. Is your testimony that you did look at

the authorities on which Cantley & Sedacca based their opinion?
A. I believe we did, yeah.
Q. Which ones did you look at?
A. I'd have to go through the opinion letter again and look. It's been a long time since I read it.
Q. I have the opinion letter right here.
Did you make notes of your reactions to Cantley & Sedacca's analysis of the authorities on which they relied?
MR. STODDART: Note for the reporter here that Mr. Hewitt is looking at the Cantley & Sedacca opinion letter.
A. Could you repeat your question?
Q. Which of these authorities on which Cantley & Sedacca relied did you look at independently?
I'd like you to list all of them, please, all of them you looked at independently?
A. I don't recall. I may not have looked very deep into any of them.
Q. Before you submitted the 2001 tax returns, did you disclose to Mr. Hutton that you hadn't looked deeply into any of the authorities



on which Cantley & Sedacca relied?
A. Most of their authorities are listed in their agreement here.
Q. No doubt. Did you look independently into any of them?
A. Not that I can remember specific ones, no. I just don't remember.
Q. Can you remember doing any independent research into the authorities that Cantley & Sedacca list for purposes --
A. I remember reading cases, but I can't tell you which ones off the top of my head.
Q. And you read these cases for this particular return?
A. Yes.
Q. Okay.
Read through the opinion letter that will refresh your recollection?
A. Nothing rings a bell yet.
Q. Let me know as soon as a bell is rung.
A. I read a lot of these things.
Q. You read them when? In order to prepare this return or just in your general education as a CPA?
A. Mostly in general education.



Q. And from your memory, did you do any independent reasoning about the conclusions of the Cantley & Sedacca opinion letter?
A. From my knowledge at the time, my conclusion of the Cantley & Sedacca opinion letter was that it was -- I agreed with it.
Q. You agreed with the entire thing?
A. I can't say I agreed with the entire thing but I agreed -- I don't know what part that I didn't agree with but I wouldn't have advised Mark that it was all right to do if I didn't agree with it.
Q. I'd like to know what efforts you made to test the conclusions?
A. I don't recall at this point.
Q. Did you make any efforts to test the conclusions?
A. Yes, at the time.
Q. Did you make any notes about your efforts to test the conclusions?
A. Not that I'm aware of, no.
Q. Did you tell anybody else that you were testing the conclusions?
A. Probably not, to my knowledge.
Q. You never told Mr. --



A. I may have told Mr. Hutton, yes, but no one else.
Q. You may have. Did you?
A. I don't remember.
Q. What did you tell Mr. Hutton about your efforts to make sure that the Cantley & Sedacca opinion letter was correct?
Did you ever assure him that you had independently tested those conclusions?
A. Probably not.
Q. Yes or no, please.
A. No.
Q. Did you ever expressly assure Mr. Hutton that if the IRS challenged any of the opinions taken on that return, there was a greater than 50 percent chance that the positions would be upheld?
A. Greater than 50 percent chance it'd be upheld?
Q. Um-hum, expressly say that.
A. No, not to my knowledge.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 8.)
Q. You'll see from the SH number at the

bottom right of Exhibit 8 that these are documents you produced, or this is a document you produced?
A. Um-hum.
Q. Do you know what it is?
A. Just some brief notes I took during a conversation once these cases started going.
Q. Conversation with whom?
A. I assume it'd be Mark and Tony Gasaway.
Q. What does it mean, the last line of Exhibit 8, legal opinion, dash, 2001, not defensible?
A. That was after -- I'm not sure what that meant. Something I wrote down during the conversation with Mr. Gasaway. I don't know.
Q. What legal opinion?
A. Not for sure.
Q. What were you talking about with Mr. Gasaway?
A. About the litigation on the Son of Boss transaction.
Q. The MLD transaction that Mr. Hutton entered?
A. Yes.
Q. Was the legal opinion the one given to Mr. Hutton about the 2001 MLD transaction?



A. I can't say that for sure, I don't know.
Q. Were you talking about any other legal opinion with Mr. Gasaway?
A. No.
Q. So was the legal opinion the one given to Mr. Hutton?
A. I don't know why I wrote that. I'm not sure what that means for sure. It probably was but I'm not sure.
Q. Let's start at the top of the Exhibit. What does the first line mean, national office dash, litigate Son of Boss, dash?
A. Mr. Gasaway was talking about whether or not we needed to litigate this case.
Q. What does the second line mean, notice 2003-81 transaction dash?
A. Something that Mr. Gasaway said that came out after these transactions had been done.
Q. And I can't read what's next in that line, in your handwriting. Could you please read it to me?
A. Looks like it says look at this, Clay Littlefield. I don't know. At this point, it doesn't ring a bell.
Q. The bells have grown strangely silent.



There is an arrow pointing to 2003-81; is that so?
A. Looks like it.
Q. And look at this. Were you making note to yourself to look at the 2003-81?
A. I assume that's what that means, yes.
Q. And Clay Littlefield underneath that, who is Clay Littlefield?
A. I have no idea. I don't remember.
Q. What is Q and A on June 6th? That's the third line of this Exhibit.
A. There was -- seems like there was a Q and A document that the IRS released on June 6th, I don't remember what year, that I was going to look at.
Q. You can remember that.
A. This is a lot more recent than the other stuff.
Q. Just wondering why you could remember that and not which legal opinion was not defensible?
A. 'Cuz you're asking me if this is a specific legal opinion and I'm not sure if that's what it is.
Q. What did you mean by not defensible?
A. I have no idea.



Q. Is this something somebody said?
A. Again, I don't know.
Q. During this conversation, what were you talking about that occurred in 2001?
A. That occurred in 2001?
Q. Yes, why did you put down the year 2001 when you were talking to Mr. Gasaway?
A. I assume it was because we were talking about Mr. Hutton's MLD transaction after he started receiving notices that IRS is challenging. That's when Mr. Gasaway got involved.
Q. Were you talking about anything else that took place in 2001 besides the MLD transaction?
A. With Mr. Gasaway, no, I don't think so.
Q. So was the legal opinion there on the same line before the dash and the 2001, was that the legal opinion about the MLD transaction that took place in 2001?
A. It could be.
Q. Was it?
A. I don't remember what we were talking about.
Q. What else --
A. I don't know.
Q. You honestly don't know?

A. I don't know.
Q. And not defensible, that's a kind of dramatic statement. What was it said about?
A. If I knew the legal opinion, I would know that. I'm not sure.
Q. But you do know what the 2001 refers to?
A. I assume it was the 2001 transaction.
Q. Was it? What else were you talking about that took place in 2001?
A. If this conversation with Mr. Gasaway, that's what it would have been.
Q. Something's not defensible, was it about 2001, or was that a stray mark on the paper?
A. Don't know. I honestly don't know why -- in what context I wrote that.
Q. Okay. Could it have been what you were thinking about saying about some unrelated issue?
A. Don't know.
Q. Is it your practice to write notes about different subjects on the same line?
A. I have before, yes.
Q. So this could have been about --
A. This could have been another call and I just had the piece of paper in front of me. That's why I don't know exactly what context this



is in.
Q. Would anything else on this page have been from some other conversation?
A. The top part is definitely the Tony Gasaway conversation. The reason this is down here, I'm not sure (indicating).
Q. Okay. We have question of fact. The 2001 returns you did weren't the only returns you did to report this transaction, are they?
A. No.
Q. You did a amended return on October 21st, 2004.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 9.)
Q. Do you know what Exhibit 9 is?
A. It's an amended return for Clearmeadow Investments, LLC.
Q. With your signature at the bottom?
A. Yes.
Q. And this is just two pages; correct?
A. I can't imagine --
Q. I produced only two pages.
A. Oh, yeah, there's only two pages, correct.



Q. The second page says that the taxpayer's amending tax return to eliminate income and loss related to a market link deposit transaction. That's the MLD we're talking about, isn't it?
A. That's correct, yes.
Q. Why did you or Mr. Hutton file this return to eliminate the MLD transaction items?
A. We were directed through Mark's legal counsel, I think Tony Gasaway, to prepare amended returns, so that's what we did. I don't know his reasoning for sure.
Q. Did you have any opinion about this, the amended return?
A. No. I was out of the picture at that point, I was just doing the amended returns as requested.
Q. Were you aware that in June of 2003, the IRS issued a retroactive temporary regulation that would have or that did reduce the basis of the partnership interest in Mr. Hutton's hands by the amount of the contingent liability on his short position?
A. I was made aware of that by Mr. Gasaway, yes.
Q. Did he give that as the reason for --



A. I did not ask for reason. Mr. Hutton and Mr. Gasaway requested amended returns eliminating the transaction, that's what I did.
Q. And then there was a later amended return to reclaim the income and loss items related to the MLD transaction for this year, wasn't there?
A. Um-hum, again, at the same request.
Q. So Mr. Gasaway asked you this?
A. Um-hum, and Mr. Hutton.
Q. Did you have any questions about why they were asking?
A. No. I knew it was in the ongoing scope of what was happening with the IRS.
Q. Did they tell you why they were asking you to do it?
A. No.
Q. For the year 2001, to your knowledge, did Mr. Hutton have any unusual or nonrecurring items of income?
A. Off top of my head, I don't believe so, but I'd have to look at his return.
Q. Have I given you a copy of his individual return?
A. His individual, I don't believe so. No, I just have Clearmeadow's.

Q. Oh, well, I don't have a copy, so we'll just pass on.
You'll be happy to know I don't have many more questions.
A. Good.
(WHEREUPON, the reporter marked for identification Deposition Exhibit No. 10.)
Q. I know you did not produce Exhibit 10, and I won't ask you to tell me what it is but I'll tell you what it is. It's something that Mr. Hanning produced, and it purports to be, anyway, a transcript of e-mails, and at the bottom appears to be an e-mail from Mr. Hutton. You see on the "from" line towards the bottom?
A. Um-hum.
Q. The message is, quote, Scott and I met today and figured this out. We would like to take down $1,005,000 of loss for the year 2001. I would think the balance for next year, but if possible, I would like to wait until later in 2002 to decide on this. Is that possible, closed quote.
Is this a reference to the MLD transaction?



A. I've never seen this before, I don't know.
Q. I know you haven't, but it says Scott and I met today. Was this "Scott" you that he was meeting with?
A. I don't recall at all. November 30th, 2001.
Q. The subject line says Leman's strategy. Do you know what the Leman's strategy is?
A. No.
Q. Well, if you don't remember, you don't remember.
MR. PLISKE: Was this Exhibit marked?
MR. STODDART: Yes, it is.
MR. PLISKE: Eight.
COURT REPORTER: Ten.
Q. I'm going to ask you a question just out of my own curiosity -- I take it back, you will not know the answer.
Now, thinking back over the answers you've given during the deposition, is there any answer that you would like to supplement?
A. Not that I can think of, no.
Q. Is there any clarification at all that you would like to make?



A. Not that I'm aware of, no.
Q. Then I guess since we're here and now, there aren't any, because you're not aware of them.
Anything you would like to say on the record?
A. No.
MR. STODDART: Then I will hand you over to the tender mercies of Mr. Pliske.
CROSS EXAMINATION
BY MR. PLISKE:
Q. Mr. Hewitt, my name is Tom Pliske, I represent the plaintiff in this matter. I, too, will be asking you a number of questions. If you're not sure what the question is, please ask me to clarify it --
A. Sure.
Q. -- I'd be happy to.
I'd like to start off going through your background. Could you, for the record, please, tell us what your educational background is?
A. I have a bachelor of administration degree from Wichita State University and certified with a permit to practice in the State of Kansas.
Q. Is that a certificate as a certified



public accountant?
A. Yes.
Q. Approximately when did you receive your CPA license?
A. 1984.
Q. And have you been practicing in public accounting since 1984?
A. Yes.
Q. Do you practice primarily in the tax area?
A. Yes.
Q. Do you conduct audits?
A. A few, yes.
Q. What percent of your work is done in the tax area?
A. Approximately 70 percent.
Q. And in the tax area, does that consist of tax planning?
A. Occasionally, yes.
Q. Do you do tax compliance work on a regular basis, the preparation of tax returns?
A. Yes, um-hum.
Q. Work experience, history, since graduating and getting your CPA license, where have you worked?

Page 46

A. I worked for -- from '77 to 1984, I worked for Haney, Riffel and Company, local firm. In '85, I started a firm called Hewitt -- Hanneman & Hewitt.
Q. That was 1985?
A. Uh-huh.
Q. Were you a partner?
A. I was a partner with Dale Hanneman, and then in 2004, I split off from him and opened Hewitt and Company.
Q. And you're a partner in Hewitt and Company?
A. Yes, I'm the only partner, only owner.
Q. How many employees do you have?
A. Three full time and two part time.
Q. And earlier when I asked about the type of work that you do, is that the type of work the firm does, also?
A. Yes.
Q. Your background with Mr. Hutton, earlier you stated you've been working with Mr. Hutton since 1993; is that correct?
A. '93 or '94, in that time frame.
Q. And do you prepare audits on his business?

Page 47

A. I have prepared an audit on his records. Normally, we do reviews for his bonding requirements.
Q. And you prepare the tax returns?
A. Correct.
Q. Earlier you stated corporate tax returns, individual tax returns, Clearmeadow Capital?
A. We prepared that, yes.
Q. Do you prepare any other tax returns on behalf of Mr. Hutton or his business?
A. There's another partnership return.
Q. Which is that?
A. EquipLease.
Q. Do you prepare payroll tax returns?
A. No.
Q. Do you prepare all these returns or are they prepared under your supervision?
A. Prepared under my supervision.
Q. Does Mark ever direct you how to prepare a return?
A. No.
Q. Has he -- would you ever prepare a return as directed by any client?
A. No. We have arguments about which way to report it, but if push comes to shove, I win.

Page 48

Q. And you're talking with respect to Mr. Hutton?
A. Correct.
Q. Do you take continuing education classes?
A. Yes.
Q. Are they mandatory in this state?
A. Yes, 80 hours every two years.
Q. And do you take continuing education classes in tax matters?
A. Yes.
Q. And periodically or recently or always?
A. Well, I mix it probably 60, 70 percent tax and the rest financial or that kind of thing.
Q. You know Mr. Hutton on a business level. Do you know him on a social level?
A. Very occasionally.
Q. Would you be in here testifying on his behalf for any reason other than it being a true statement?
A. No.
Q. You stated you were involved in the early discussions with respect to the MLD transaction for 2001; is that correct?
A. That's correct.
Q. And you were on a phone conference with

Page 49

Cantley & Sedacca?
A. Yes.
Q. Who was on that phone conference with you?
A. I believe Ed Sedacca at the other end, and Mark and Bryan Hanning and myself.
Q. Why were you on the conference?
A. Mark just asked me to come and listen and give him an opinion on my thoughts about this transaction.
Q. Did you just listen?
A. Mostly.
Q. Did you ask questions?
A. I think we all asked questions as I recall but mine were -- I don't recall what questions I would have asked but I'm fairly sure I did.
Q. You were not prohibited from asking questions?
A. No, no, no, huh-uh.
Q. After that phone conference, do you recall -- I don't know what you did, but did you follow-up in any way after that phone conference?
A. Once Mr. Hutton received the opinion letter, I read through it and evidently didn't do a good job of analyzing it, and then we had another meeting later.

Page 50

Q. I'll go back to what your comment was, evidently not doing a good job of independently analyzing it. Is that based on the direct testimony you just gave to Mr. Stoddart?
A. Yes.
Q. At the time, did you feel like you did a good job analyzing it?
A. I felt comfortable with my opinion or my conclusions on the opinion letter.
Q. I just looked at you looking at the opinion letter, flipping through every page. Would it be correct to say that there are hundreds of references to code sections, regulations, case law, revenue ruling, notices?
A. Yes.
Q. Would it be unusual that you cannot remember five and a half years later which particular case you may have read five and a half years ago?
A. That would not be unusual. I don't remember what I did yesterday sometimes.
Q. Mr. Hewitt, you assisted Mark in this discussion that has gone forward with respect to what has been referred to as a MLD transaction for 2001; is that correct?

Page 51

A. That's correct.
Q. Were you involved in any other transactions similar to the 2001 MLD transaction with respect to Mr. Hutton?
A. I had some involvement in a transaction on the 2002 year.
Q. Mr. Hutton came to you for your advice in 2002?
A. Yes.
Q. Does Mr. Hutton still come to you for advice on tax transactions?
A. Yes.
Q. You still do work for Mr. Hutton preparing tax returns?
A. Yes.
Q. And you prepared tax returns before the 2001 transaction?
A. Yes.
Q. And was there a 2002 transaction also involving currency transactions?
A. I didn't review any of that. I can't remember if it was a currency transaction or what it was. It was another transaction.
Q. And you prepared his 2002 tax return?
A. Yes.

Page 52

Q. Did you feel comfortable with the 2002 tax return when you prepared it?
A. Yes.
Q. When I say comfortable, did you believe it was more likely than not correct?
A. Yes.
Q. Is that how you prepare all tax returns, more likely than not correct?
A. Yes.
Q. And by saying that, and this might be words of art, but substantial authority for any position taken on the tax returns?
A. Yes.
Q. Did you communicate to Mr. Hutton that you believed these tax returns were true and correct when you filed them?
A. Yes.
Q. Did you believe there was substantial authority when you prepared the returns for Mr. Hutton's signature?
A. Yes, or I wouldn't have prepared them.
Q. And Mr. Hutton never directed you how to prepare them?
A. No.
Q. You questioned some advice given to you

Page 53

by Cantley & Sedacca on how to prepare the tax returns; is that correct?
A. Yes.
Q. And you followed up with phone calls?
A. Um-hum.
Q. Did you follow their advice specifically as to how to prepare his return?
A. No, not a hundred percent.
Q. You made your own independent judgment what should be reflected on the return as opposed to what you were told by Cantley & Sedacca?
A. Yes.
Q. Did you discuss that change with Mr. Hutton?
A. Yes.
Q. And did he agree with you?
A. Um-hum.
Q. Was it less tax benefits or more tax benefits?
A. It was less tax benefits.
Q. And was Mr. Hutton upset with you for not giving him more tax benefits?
A. No, not that I recall.
Q. Does Mr. Hutton rely on you for tax advice?

Page 54

A. I believe so, yes.
Q. Does he question sometimes when you give him advice?
A. If he doesn't understand my reasoning, yes, he does.
Q. Do you think he counted on you to accurately prepare the 2001 tax return?
A. Yes.
Q. At the time the 2001 tax return was prepared, were you aware that the IRS had classified this MLD transaction as a listed transaction?
A. No.
Q. Later did you learn it was determined by the IRS to be a listed transaction?
A. Yes, I learned that in a conversation with Tony Gasaway that it was a listed transaction because some law changed retroactively after the returns were filed.
Q. And did Mr. Hutton attempt to do anything once he realized the IRS was challenging the transaction?
A. He hired Tony Gasaway to help him resolve the issues.
Q. Did you prepare an amended return to be

Page 55

filed with respect to the MLD?
A. Yes.
Q. Did you prepare an amended return for 2002?
A. Yes.
Q. Do you believe it was Mr. Hutton's desire to properly file the tax return based on the IRS's position?
A. Oh, absolutely.
Q. And the amended return?
A. In the amended returns, yes.
Q. Did Mr. Hutton attempt to disclose the MLD transaction to the IRS that you're aware of?
A. In the amended returns, I believe we did, yes, the IRS was aware of it at that point.
Q. Are you aware whether Mr. Hutton attempted to enter into the settlement initiative as offered by the Internal Revenue Service with respect to the 2001 year?
A. We originally -- I saw some paperwork that gave us the option to go in. I'm not sure if he actually -- there was some paperwork, I can't remember, but yeah.
Q. You didn't assist him with that?
A. I did not assist on that.

Page 56

Q. You've known Mr. Hutton now for approximately 11, 12 years; is that correct?
A. Fourteen, probably.
Q. Is he what might be described as a high risk investor?
A. I would say just by the nature of the business he's in that he's high risk.
Q. Describe that, please.
A. He's a commercial construction contractor. To me -- and oil and gas driller, or oil and gas operators, are about the highest risk you can be.
Q. Is he an oil and gas investor?
A. He does do oil and gas investing.
Q. Why is that a high risk investment?
A. Dry holes are dry holes. No return, but there's the expense.
Q. Are there tax benefits?
A. Yes, the intangible growing costs are on the wells, depletion on the production.
Q. Does Mr. Hutton invest in oil wells to lose money?
A. No.
Q. Do you believe that he invested in the MLD transaction for purposes other than investment

Page 57

purposes?
A. No, I don't.
Q. Are tax benefits from your experience only applicable if somebody has taxable income?
A. I'd say, yes.
Q. Has Mark Hutton ever had a situation where he had no taxable income?
A. In one of the years the company had a big loss which flowed through to his individual return, so he ended up with no taxable income.
Q. So you can only have tax benefits if you've got taxable income?
A. Right.
Q. Mr. Hutton invested in the MLD transaction prior to December 31st?
A. Correct.
Q. Do you recall approximately when he first got involved with the MLD transaction?
A. Some time -- not exactly, it was before the 2001 year ended, in the summer, I believe.
Q. Do you recall Mark Hutton, Mr. Hutton, having any spike in his 2001 tax year as to income or taxable income?
A. No, it was a normal, seemed to be a normal year.

Q. What about 2002?
A. Normal year.
Q. Does Mr. Hutton go out and seek what might be classified as tax shelters --
A. No.
Q. -- for purposes of having his tax return prepared?
A. No.
Q. You've said that based on your history of preparing his return --
A. Right.
Q. -- for 12 years?
A. That's correct.
Q. You were asked several questions about a legal opinion that was provided to you and you were asked whether or not the opinion you reviewed was every other page on direct testimony. Do you recall that?
A. I recall that, yes.
Q. You stated the opinion you reviewed was given to you by Mr. Hutton; is that correct?
A. That's correct.
Q. You stated that you understood the opinion at the time you received it?
A. Yes.



Q. You read it?
A. Yes.
Q. You would know whether every other page was missing then?
A. Yes.
Q. You stated that it was a bound version that you received?
A. It wasn't bound, it was stapled as I recall.
Q. Has Mr. Hutton ever invested in oil wells that haven't been profitable?
A. Yes.
Q. Did he get tax benefits?
A. Yes. We're in a drilling partnership that we both invested in that hit dry holes.
Q. Still got tax benefits?
A. Still got tax benefits.
Q. Does Mr. Hutton gamble, do you know?
A. Not that I'm aware of.
Q. Do you have any idea today how many construction jobs he performs at any one time, his company performs?
A. On any one time, he probably has seven to twelve projects going.
Q. Can he lose money?



A. Oh, absolutely.
Q. Can any one of those jobs wipe out his business?
A. Wipe out his business, probably not, but wipe out profit for the year, absolutely.
Q. Is it fair to say that it would only be at the end of the year before Mr. Hutton or perhaps you as his accountant would know whether or not he had a profitable year?
A. We do periodic -- he has monthly financials and we talk periodically about the profitability of the company, so you might know a little bit before year end. It just depends on what percentage you're complete on the project.
Q. Any factors you're aware of with respect to Mr. Hutton's business that would determine whether or not a particular construction job is profitable or not?
A. Oh, vendor problems, there's weather problems, there's -- bidding it wrong. You bid a project wrong and you basically eat it if you don't -- if you can't renegotiate it.
Q. Let me go back to that legal opinion. You did some -- or did you do some research with respect to the legal opinion when you got it?



A. Yes, I did.
Q. And did you give Mark Hutton your opinion, having read the legal opinion and having done some research?
A. Yes.
Q. And what was your opinion?
A. My opinion was that the document would do what it said it would. In was an investment in securities.
Q. Would you invest in this particular investment?
A. No, I would not.
Q. Why?
A. I don't have the financial backing that Mark does. I'm not the risk taker that Mark is.
Q. Thank you. Did Mark Hutton --
(WHEREUPON, an off the record discussion was had, after which the following:)
Q. You stated that you gave an opinion as to what you thought of the legal opinion to Mr. Hutton; is that correct?
A. That's correct.
Q. Was that opinion in writing?
A. No.

Page 62

Q. Do you usually give Mr. Hutton opinions in writing?
A. No.
Q. How do you express your opinion to him?
A. Usually we just have a discussion.
Q. And you had a discussion with respect to the MLD transaction?
A. Yes, um-hum.
Q. Did you have a discussion with Mr. Hutton with respect to the 2002 transaction?
A. I wasn't as deeply involved in the 2002 transaction but -- I don't know.
Q. Did you prepare the 2002 return?
A. Yes, I did prepare the return.
Q. Was it more likely than not correct when you prepared it?
A. Yes.
Q. Was there substantial authority when you -- substantial legal authority when you prepared the 2002 return, in your opinion?
A. In my opinion, yes.
Q. Are you paid by Mr. Hutton for giving him the opinion he wants to hear?
A. Yes -- no, no. I'm paid by Mr. Hutton to do my job.

Page 63

Q. And how are you paid by Mr. Hutton?
A. On an hourly basis.
Q. And is that for all matters?
A. Yes.
Q. You keep track of every minute of time and bill Mr. Hutton?
A. Not every minute but majority of it, yes.
Q. Were you compensated by anyone with respect to the 2001 or the 2002 transaction?
A. No, other than Mr. Hutton, he paid me my hourly rate.
Q. Tough question for you, Mr. Hewitt. Does Mr. Hutton trust you?
A. He wouldn't keep using my services if he didn't, so I'd say, yes.
Q. Are you aware, if ever, that Mr. Hutton sought the advice of another CPA because he did not like your advice?
A. Not that I'm aware of, no.
Q. Would you recommend any client to go seek a second or third or fourth opinion?
A. You don't normally do that. But, no, I wouldn't.
Q. Would it be unusual if you found out your clients were going around asking other CPA's and

Page 64

lawyers if you're corrupt?
A. Oh, that'd be very unusual, yes.
Q. Is it usually not done in the practice?
A. I don't know of any clients that's ever done that.
Q. I want to be sure I have this correct, did you ever tell Mark Hutton that this 2001 or 2002 transactions were listed transactions?
A. No.
Q. Did you later learn they were listed transactions?
A. I later learned through Tony Gasaway.
Q. But you were not aware that these particular transactions were listed transactions as determined by the IRS at the time Mark invested or at the time you prepared the return?
A. That is correct.
Q. Why do you think Mark Hutton invested in the MLD transaction?
A. I think he invested in it to make a profit.
Q. How many of your other clients have been involved in the MLD transaction?
A. None.
Q. When you read the legal opinion as

Page 65

provided by Cantley & Sedacca, did you believe this transaction complied with the black letter of the law?
A. Yes, I did.
Q. I guess one last question to make sure I understand, did you believe when you prepared the 2001 and 2002 tax return that there was substantial authority for the positions taken on those returns?
A. Yes.
MR. PLISKE: I don't have any other questions.
MR. STODDART: Just a couple questions on redirect.

REDIRECT EXAMINATION

BY MR. STODDART:
Q. You say that you aren't aware that the MLD transaction was a listed transaction at the time you prepared the returns. What steps did you take to make sure they were not listed transactions?
A. To be honest with you, I didn't know what a listed transaction was at the time. This is the first legal opinion I'd ever read.
Q. So this was a kind of novel experience

for you?
A. I'd say, yes.
Q. Did you make any special effort because of its novelty?
A. Well, I read the opinion letter, I did some research.
Q. What research?
A. We've been through that.
Q. Yes, I know, I want to know if you've gotten any better memory?
A. No, and I also relied on the attorney, Mr. Sedacca and I relied on Marc Kaplan from AGH, who said they had clients involved in it and that it was a good transaction.
Q. Did you know that Cantley & Sedacca was promoting the transaction?
A. Promoting the transaction?
Q. Selling it?
A. Yes.
Q. Did you know that AGH was promoting the transaction?
A. I assume they were because of their representative, Mr. Hanning.
Q. Are they the only ones you consulted about the MLD transaction to see if they were --



A. Yes.
Q. -- good? Didn't it raise a question in your mind that you were consulting people that you knew to be selling the transaction?
A. I didn't realize at the time that Marc Kaplan was selling the transaction. Bryan Hanning's in a different organization, I believe, with AGH.
Q. Okay.
A. Marc Kaplan's in their tax division.
Q. I may have asked this before, but it did strike me as you were giving your cross-examination, did you ever expressly assure Mr. Hutton that you had made an independent examination of the conclusions of the legal opinion of Cantley & Sedacca?
A. Expressly assure, no.
Q. Now, you were talking about oil wells and other risky investments, and you invested in the oil wells yourself you say; right?
A. Yes, it's a publically traded partnership.
Q. When you made the investment, did you actually pay for the investment out of money that was actually in your account?
A. Oh, yeah. Actually, I borrowed it.



Q. So, did you make any -- did you tell a bank, say, to transfer any money that wasn't in your account?
A. No.
Q. When Mr. Hutton bought his other risky investments, do you know if he asked a bank to transfer money that wasn't in his account?
A. Other than that one document you showed me, no.
Q. You say that Mr. Hutton participated in the settlement initiative. Do you know why he did not complete the steps necessary to formalize and complete his participation in the settlement initiative?
A. That was between Mr. Gasaway and Mr. Hutton, I don't know.
MR. STODDART: You'll be happy to hear that I have no more questions.
MR. PLISKE: I'd like to follow-up with a few questions.

RECROSS EXAMINATION

BY MR. PLISKE:
Q. Mr. Hewitt, do you know what a listed transaction is today, in general?
A. In general, yes.



Q. Who creates, determines that a transaction is a listed transaction?
A. Who determines?
Q. Congress?
A. IRS.
Q. Pursuant -- the Internal Revenue Service makes that determination?
A. I can't honestly answer that, I don't know where that -- if it came from the treasury or came from -- I don't believe it came from Congress.
Q. So do you know, is it part of the Internal Revenue Code?
A. Not that I'm aware of. It's more of a revenue ruling.
MR. STODDART: A bit of an objection here, in fact, listed transactions are in the Internal Revenue Code, but we're discussing law and I just want to object to the asking of legal conclusions from a witness who has already testified that he doesn't know, but go right ahead.
Q. You testified in 2001 you did not know what a listed transaction was; is that correct?
A. That's correct.

Q. Have you discussed listed transactions with your peers since this time, 2001, other CPA's?
A. Just Miss Clupny, in my office.
Q. Any of the CPE meetings you go to?
A. Oh, there's usually blurbs about it, but they rarely cover them in the CPE stuff.
Q. Are you aware or not aware of whether other CPA's knew what listed transactions were back in 2001?
A. I would assume --
Q. Don't assume.
A. I have no idea.
Q. Okay. You stated you did not expressly provide an opinion to Mr. Hutton with respect to your opinion of the Cantley & Sedacca letter; is that true?
A. That's true.
Q. By preparing the return, is there an implied statement to Mr. Hutton that the returns are correct?
A. Yeah.
Q. If you deduct a capital loss on his tax return for another investment, do you expressly tell him what your opinion is or do you just



prepare the return?
A. I just prepare the return.
Q. Is it unusual that you did not expressly tell him your opinion as to the Cantley & Sedacca --
A. No.
MR. PLISKE: I don't have any further questions.
MR. STODDART: Just one.

REDIRECT EXAMINATION

BY MR. STODDART:
Q. When you prepare an opinion and give your implicit -- when you prepare a return and give your implicit opinion that the return is correct, is that a case in which the taxpayer has come to you with a legal opinion from a lawyer and has expressly asked you to look at it, do you get a legal opinion from a lawyer every time you make this implicit assurance that the tax return is correct?
A. No.
MR. STODDART: No more questions, and I think you are free to go and we can go off the record.
(WHEREUPON, an off the record discussion was had.)



__________________________
SCOTT R. HEWITT

STATE OF KANSAS )
) ss:
COUNTY OF )

Subscribed and sworn to before me, the undersigned authority, this, the ____ day of __________________, 2007.

__________________________
NOTARY PUBLIC

My appointment
Expires:________________________



IN RE: Clearmeadow Investments V USA
Case No. 05-1223T

CORRECTION SHEET FOR DEPOSITION OF
SCOTT R. HEWITT

Page____Line____reads as follows:________________
__________________________________________
Should read:_______________________________
__________________________________________
Reason for change:__________________________
Page____Line____reads as follows:________________
__________________________________________
Should read:_______________________________
__________________________________________
Reason for change:__________________________
Page____Line____reads as follows:________________
__________________________________________
Should read:_______________________________
__________________________________________
Reason for change:__________________________
Page____Line____reads as follows:________________
__________________________________________
Should read:_______________________________
__________________________________________
Reason for change:__________________________
__________________________________________

Page____Line____reads as follows:________________

______________________________________

Should read:______________________________

______________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

______________________________________

Should read:______________________________

______________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

______________________________________

Should read:______________________________

______________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

______________________________________

Should read:______________________________

______________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

______________________________________

Should read:______________________________

______________________________________

Reason for change:__________________________



Page____Line____reads as follows:________________

______________________________________

Should read:______________________________

______________________________________

Reason for change:__________________________

Page____Line____reads as follows:________________

______________________________________

Should read:______________________________

______________________________________

Reason for change:__________________________

I certify that I have read my deposition in the above case and request that the above changes be made.

________________ ____________________

(date) Signature of Witness



CERTIFICATE

STATE OF KANSAS )

) ss:

SALINE COUNTY )

I, Donna M. Lytle, Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition by him given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office, this _____ day of ______________, 2007.

____________________________

Donna M. Lytle, CSR, RPR, CRR
OWENS, BRAKE & ASSOCIATES
234 North 7th Street, Suite E
Salina, Kansas 67401