# CANTLEY & SEDACCA, LLP

ATTORNEYS AT LAW
5220 SPRING VALLEY ROAD, SUITE 610
DALLAS, TEXAS 75254
TEL. (972) 361-0090
FAX. (972) 361-0644

EDWARD SEDACCA
PARTNER

MIAMI, FL
DALLAS, TX
SAN FRANCISCO, CA


January 23, 2002

VIA FEDEX

Mr. Mark Hutton
7118 West Clearmeadow Court
Wichita, Kansas 67205

Dear Mr. Hutton:

Enclosed please find our opinion letter pertaining to your market-linked deposit investment, as well as, two copies of the representations ("Investor Representations") that we will need from you, Clearmeadow Investments, LLC (the "LLC") and Clearmeadow Capital Corp. (the "Corp.") in connection with our issuance of the opinion letter. While we are furnishing you with the opinion letter, please be advised that the opinion letter may not be relied upon (and is not otherwise released) unless and until we have received the following items: (a) the Investor Representations fully executed by you, the LLC and the Corp.; (b) the fully executed additional representations that we require from Dan Brooks (and his entity, CF Advisors XXXVII, LLC); and (c) any remaining agreements and documents that we have not yet received but which are relevant to the opinion letter.

Please review the Investor Representations for accuracy and completeness and, if acceptable to you, kindly sign, date and have witnessed your signature in two places where indicated by the "Sign Here" tabs and return the signed Investor Representations (original signatures only) to my attention at the following address: Cantley & Sedacca, LLP, 5220 Spring Valley Road, Suite 610, Dallas, Texas 75254.

Sincerely,

Edward Sedacca

Enc.

PLAINTIFF'S EXHIBIT 5

PENGAD-Bayonne, N. J.

**CANTLEY & SEDACCA, LLP**
ATTORNEYS AT LAW
5220 SPRING VALLEY ROAD, SUITE 610
DALLAS, TEXAS 75254
TEL. (972) 361-0090
FAX. (972) 361-0644

EDWARD SEDACCA
PARTNER

MIAMI, FL
DALLAS, TX
SAN FRANCISCO, CA

January 22, 2002

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

Mr. Mark Hutton
7118 West Clearmeadow Court
Wichita, Kansas 67205

Re: **Investment Transactions**

Dear Mr. Hutton:

You (the "Investor") have requested our opinions regarding certain federal income tax consequences of the investment transactions ("Transactions") described below.

In rendering our opinions, we have reviewed and relied upon representations and advice, including financial information, from you and various other parties to the Transactions and made certain assumptions, which representations, advice and assumptions are referred to herein. We have also examined such documents, and we have made such other inquiries of officers, owners and other persons involved in the Transactions, as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, assumptions, documents, and responses to such inquiries. If any such item is inaccurate in any material respect, or any such documents prove not to be authentic, the opinions contained herein may not be relied upon. We have reviewed the applicable provisions of the Internal Revenue Code of 1986, as amended ("Code"), and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg.," "Treasury Regulations," or "Regulations") promulgated thereunder; relevant decisions of the federal courts; published Revenue Rulings ("Rev. Rul.") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue Service ("Service" or "IRS"); and such other materials as we have considered relevant. In certain instances, we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed. We must caution you, however, that our opinions are not binding upon the IRS or the courts and there can



C&SLLP004873

be no assurance that the IRS or a court considering these matters would agree with our opinions set forth herein.

Based upon our understanding of the facts and assumptions as described herein, we believe that it is more likely than not that our opinions set forth herein would be upheld by a court if they were challenged by the IRS and fully litigated on the merits. Any conclusion set forth in this letter that an issue "should," "would," "will" or "likely" be resolved in a particular manner means only that it is our opinion it is more likely than not that a court would sustain that conclusion.

## I. THE TRANSACTIONS

We understand that the Investor is a United States citizen. We also understand that the Investor was introduced to Dan Brooks of Clarion Capital. Clarion Capital is in the business of structuring foreign currency based derivative products. We understand that Mr. Brooks has nearly 20 years of investment and trading experience. Most recently, Mr. Brooks was employed by Deutsche Bank in its Institutional Trading/Derivative Structuring group from 1996 until 2001. Prior to joining Deutsche Bank, Mr. Brooks was employed: (1) as a management trainee in Chemical Bank's Institutional Currency Trading group from 1982 through 1984, (2) then, as Chief Currency Trader for Bank of America's Institutional Currency Trading group from 1984 through 1989, (3) then, as Chief Currency Trader for Lehman Brothers from 1989 through 1991, and (4) then, as Head of Proprietary Currency Trading for Banque Nationale de Paris from 1991 through 1996. Mr. Brooks is currently principal owner of and is employed by Clarion Capital. Mr. Brooks has a B.A., and a Masters of Business Administration in finance/investment from Duke University.

We understand that the Investor had communicated his concerns to Mr. Brooks regarding the current status of the United States equities markets, as well as the lack of perceived opportunity for investment type yields in the bond markets. We further understand that the Investor communicated to Mr. Brooks that he believed interest rates were also well below his comfort level. With this in mind, Mr. Brooks introduced the Investor to a foreign currency based investment strategy comprised of certain foreign currency market linked deposit ("MLD") type investments and other structured foreign currency based derivative products. Mr. Brooks, with his vast experience, felt there was still tremendous opportunity in the foreign currency derivative products area and that he has represented to us that, if the Investor were to continue his investment in the Transactions and with Mr. Brooks (and his entity) for at least five (5) years, his investment strategy could yield the Investor an annual return of somewhere between 15% and 17% net of all of the Investor's fees and expenses from the Transactions. The Investor decided to invest with Mr. Brooks.

Mr. Brooks initially introduced the Investor to certain foreign currency market linked deposit type investments or MLDs. It was with the initial intent of investing in foreign currency type derivative products that on October 10, 2001 the Investor formed Clearmeadow Investments, LLC (the "LLC"), a Delaware limited liability company, and

contributed $287,500 in cash to the LLC. At this time, the Investor was the sole member and beneficial owner of the LLC. Then, the Investor, through the LLC, opened an account with Deutsche Bank on October 12, 2001 and deposited into the account the $287,500 that the Investor had contributed to it in order to purchase long and short MLD positions amongst other investments. The long and short MLDs are separate instruments that can be bought or sold separately. The maturity date on an MLD is usually less than one year (typically 10, 15, 30, 45 or 90 days). An MLD, like a money market or certificate of deposit, is a cash deposit. In addition, an MLD contains two interest components, a fixed rate of return component which is paid in all events at the maturity of the cash deposit and a variable rate of return component which is tied to the performance of a market item (such as a foreign currency). The obligation of the counterparty to pay the variable interest component of an MLD at maturity is determined by reference to a specific financial market measure, such as the value or price of an equity index or a commodity, or to a change in foreign exchange rates. Further, the determination of whether a depositor would be entitled to receive the variable interest component of his/her deposit would not be determined (or determinable) until the maturity date set for the deposit. The cost of purchasing an MLD position is generally determined by the overall rate of return that a depositor is seeking.

The long MLD position that the LLC entered into constituted a deposit of EUR[1] 27,472,520 (the "Long Deposit Amount") made by the LLC on October 15, 2001 ("Long Deposit Date") with Societe General ("SB"). Under the terms of this long MLD position, on December 14, 2001 (the "Long Maturity Date"), SG would be required to pay to the LLC an amount equal to the sum of: (i) the Long Deposit Amount, plus (ii) the "Long Fixed Yield" (as defined below), plus (iii) the "Long Bonus Yield" (as defined below), except that the Long Bonus Yield is only payable if at 10 a.m. New York time on the Long Maturity Date, the JPY/USD spot market exchange rate is at least 124.65. For purposes of the foregoing, the "Long Fixed Yield" means interest on the Long Deposit Amount determined from the Long Deposit Date to the Long Maturity Date calculated at an annual rate of 3.67% on the basis of a 30 day month/360 day year. The "Long Bonus Yield" means an amount equal to the product of: (a) 16%, and (b) the Long Deposit Amount. On the Long Deposit Date, the spot market JPY/USD exchange rate was 121.05. The premium paid by the LLC for the long MLD position was EUR 2,747,252.

The short MLD position entered into by the LLC constituted a deposit of EUR 27,472,520 (the "Short Deposit Date") made by SG with the LLC on October 15, 2001 (the "Short Deposit Date"). Under the terms of this short MLD position, on December 14, 2001 (the "Short Maturity Date"), the LLC would be required to pay to SG, an amount equal to the sum of: (i) the Short Deposit Amount, plus (ii) the "Short Fixed Yield" (as defined below), plus (iii) the "Short Bonus Yield" (as defined below), except that the Short Bonus Yield is only payable if at 10 a.m. New York time on the Short Maturity Date, the spot market JPY/USD exchange rate is at least equal to 124.67. For purposes of the foregoing, the "Short Fixed Yield" means interest on the Short Deposit Amount determined from the Short Deposit Date to the Short Maturity Date calculated at

[1] For purposes of this opinion, "EUR" refers to Eurodollars, "JPY" refers to Japanese Yen and "USD" or "$" refers to United States dollars.







C&SLLP004875

an annual rate of 3.67% on the basis of a 30 day month/360 day year. The "Short Bonus Yield", means an amount equal to the product of: (a) 15.82%, and (b) the Short Deposit Amount. On the Short Deposit Date, the JPY/USD spot market exchange rate was 121.05. The premium received by the LLC from SG was EUR 2,717,033. We understand, and have assumed for purposes of our opinions herein, that the LLC's receipt of this premium did not constitute an income recognition event for federal income tax purposes for either the LLC or the Investor at the time of receipt and that no income recognition event in respect of this premium will arise until the Short Maturity Date.

All amounts payable under a long MLD position or short MLD position are payable in U.S. dollars at the then spot JPY/USD exchange rate. It has also been represented to us that, as of the Short Deposit Date or Long Deposit Date, there was an approximate 28% statistical probability (based on Black/Scholes) of the contingencies of both the short and long MLD positions being satisfied and of the LLC (and, thus, the Investor) thus realizing a 60% return (net of direct transaction costs associated with the MLD positions) on its net investment in its MLD investments and an approximate 1.3% statistical probability (based on Black/Scholes) of the contingency of the long MLD position (but not the short MLD position) being satisfied and of the LLC thus realizing an approximate 14,446% return (net of direct transaction costs associated with the MLD positions) on its MLD investment. It has been further represented to us that the LLC (and, thus, the Investor) has a statistical probability (based on Black/Scholes) of approximately 70% of neither contingency being satisfied and of, thus, losing its entire MLD investment.

We have been advised that the MLD positions entered into by the LLC were private contractual arrangements with SG and for which there was (i) no market on a national securities exchange that is registered under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); (ii) no market on an interdealer quotation system sponsored by a national securities association registered under section 15A of the Securities Exchange Act of 1934; (iii) no market on a domestic board of trade designated as a contract market by the Commodities Futures Trading Commission; (iv) no market on a foreign securities exchange or board of trade that satisfies analogous regulatory requirements under the law of the jurisdiction in which it is organized (such as the London International Financial Futures Exchange, the Marche a Terme International de France, the International Stock Exchange of the United Kingdom and the Republic of Ireland, Limited, the Frankfurt Stock Exchange, and the Tokyo Stock Exchange); (v) no interdealer market[2]; and (vi) solely with respect to a debt instrument, no debt market for such instrument.[3] We understand from Mr. Brooks, however, that while an MLD position

[2] For this purpose, an interdealer market refers to a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields, or other pricing information) of one or more identified brokers, dealers, or traders or actual prices (including rates, yields, or other pricing information) of recent transactions; except that it does not refer to a directory or listing of brokers, dealers, or traders for specific contracts (such as yellow sheets) that provides neither price quotations nor actual prices of recent transactions.

[3] For this purpose, a debt market exists with respect to a debt instrument if price quotations for the instrument are readily available from brokers, dealers, or traders, although no debt market exists with







C&SLLP004876

is an exotic derivative structure, any number of sophisticated options desks could and would make a price on said position.

In general, the long and short MLD positions could be transferred independently of each other, although under the International Swap Dealers Association Master Agreement ("ISDA Agreement") entered into by the LLC, together with the Confirmation For Currency Linked Deposit Swap for the LLC's long MLD position (the "Confirmation"), other than transfers of the long MLD position to majority-owned and controlled entities, any transfer by the LLC of its MLD position requires SG's prior written consent. It is our understanding that this consent requirement is intended merely to serve as a protection to SG against the situation of SG having an obligation to pay on the long MLD position without the ability to offset its obligation with any amount that it would be entitled to receive under the short MLD position (*e.g.*, because the short MLD position is owned by a different person). It is also our understanding that SG would not be adverse to granting its consent to the assignment by the LLC of its short MLD position (without the long MLD position) if SG was satisfied with the creditworthiness of the assignee. Moreover, we understand that SG does, in fact, enter into only MLD positions where it is the depositor (without entering into any offsetting positions) where it is satisfied as to the creditworthiness of the counterparty.

On October 17, 2001, the Investor transferred his entire membership interest in the LLC to Clearmeadow Capital Corp., a Delaware corporation (the "Corporation") and, pursuant to that Assignment of Membership Units and Joinder Agreement, dated October 17, 2001, by and among the Investor and the Corporation (the "Assignment Agreement"), the Investor withdrew from the LLC and the Corporation was admitted as a member of the LLC. Simultaneously with the Investor's transfer, CF Advisors XXXVII, LLC, a domestic limited liability company that is wholly-owned and controlled by Mr. Brooks ("CC"), was admitted as a member of the LLC, and CC and the Corporation entered into the Amended & Restated Operating Agreement of Clearmeadow Investments, LLC, dated October 19, 2001 (the "Operating Agreement"). CC is also the investment advisor to the LLC. In exchange for 1,000 Class B Units in the LLC, CC contributed $2,500 in cash to the LLC out of its Additional Consideration (as defined below). At this time, the Corporation had 99,000 Class A Units in the LLC.

It was represented to us that the Corporation was and remains a validly formed and validly existing corporation under Delaware law. It was further represented to us that a Department of the Treasury/Internal Revenue Service Form 2553 (Election by a Small Business Corporation under section 1362 of the Internal Revenue Code) for the

---

respect to a debt instrument if (A) no other outstanding debt instrument of the issuer (or of any person who guarantees the debt instrument) is traded on an established financial market described in clauses (i), (ii), (iii), (iv), (v), or (vi) above; (B) the original stated principal amount of the issue that includes the debt instrument does not exceed $25 million; (C) the conditions and covenants relating to the issuer's performance with respect to the debt instrument are materially less restrictive than the conditions and covenants included in all of the issuer's other traded debt (e.g., the debt instrument is subject to an economically significant subordination provision whereas the issuer's other traded debt is senior); or (D) the maturity date of the debt instrument is more than 3 years after the latest maturity date of the issuer's other traded debt.


C&SLLP004877

Corporation was timely filed to be effective beginning with the Corporation's first taxable year, and that such election remains effective. It has been further represented to us that such election will not be terminated (either voluntarily or involuntarily) at any time during the Corporation's existence.

It was represented to us that the Investor's purpose in investing in the MLD investments through the LLC was to utilize an entity that would enable the Investor to minimize personal liability on his MLD investment (and, in particular, the short MLD position) and which was a flow-through (or disregarded) entity for tax purposes. Moreover, the use of the LLC to acquire and hold the MLD positions and other Investments allowed for the direct participation of, and direct loss exposure for, CC (and Mr. Brooks) in the Transactions. It was further represented to us that the Investor's purpose for contributing his LLC membership interest to the Corporation was to isolate his investment with CC and Mr. Brooks in a separate investment vehicle through which the Investor could make other investments without the participation or involvement of Mr. Brooks.

In general, the Operating Agreement provides that LLC net profits are first allocated to the members to offset previous allocations of LLC net losses, and then to the Corporation (and, thus, the Investor), until the Corporation has been allocated an amount of net profits equal to 10% of the fair market value of its contributed assets[4] (unreduced by any liabilities assumed by the LLC), and then to the Corporation and CC in proportion to their respective Units. *See* Section 4.2(b) of the Operating Agreement. In general, LLC net losses are first allocated to the members to offset previous allocations of LLC net profits, and then to the Corporation (and, thus, the Investor) until the Corporation's capital account[5] has been reduced to zero, and then to CC. *See* Section 4.2(a) of the Operating Agreement. The Corporation (and, thus, the Investor) is also specially allocated all deductions, losses and other items related to the Additional Consideration payable to CC for its investment advisory services to the LLC. *See* Section 4.3(f) of the Operating Agreement.

The sole member of CC is Mr. Brooks who, as better described above, has nearly 20 years of experience trading, managing and advising clients with respect to foreign currency contracts, MLD positions and other similar investments.

In general, management and control of the LLC is reserved exclusively to the members of the LLC, although those members acting pursuant to a "Required Vote" have the power and authority to manage, and direct the management of, the business and affairs of the LLC. *See* Sections 5.1 and 6.2(c) of the Operating Agreement. As the owner of 99% of the total Units in the LLC, the Corporation (and, thus, the Investor) is essentially vested with management and control of the business and affairs of the LLC.

[4] For purposes of our opinions, we have assumed that this is intended to mean and refer to the Investor's capital contribution to the LLC.

[5] The Corporation's capital account balance would be deemed to equal the amount of cash and the fair market value of the assets held by the LLC at the time of CC's admission as a member of the LLC and CC's contribution of $2,500 to the LLC. *See* Rev. Rul. 99-5, 1999-1 CB 434.

However, CC is vested with the power and authority to direct the LLC's investment activity, and to manage the LLC's portfolio in the manner deemed best by CC to grow its value and provide the greatest investment return to all of the members. *See* Section 5.2 of the Operating Agreement. As compensation for its investment advisory services, CC receives quarterly services fees, payable no later than the last day of each quarter, of an amount that, when annualized, equals (a) 2% of the net asset value of the LLC as of the last day of the fiscal year (unreduced by LLC distributions for such fiscal year), and (b) 20% of the LLC's income and gains during such fiscal year, except that for the first quarter of the first fiscal year, a front-end loaded service fee of $10,000 for such quarter is due and payable as of the effective date of the Operating Agreement (the "Additional Consideration"). *See* Section 5.5 of the Operating Agreement.

The purposes of the LLC are to: (i) engage in the acquisition, maintenance, and disposition of foreign currency investments and foreign currency derivatives; (ii) acquire, invest in, and sell other investments for the mutual benefit of the members; (iii) enable CC to consolidate and manage various foreign currency and foreign currency derivative investments of the members within the ownership and management structure of the LLC consistent with the investment strategy which CC deems in its sole discretion to provide the greatest yield for the members in light of the risks of such investments; and (iv) conduct any other business or joint enterprise which shall be legal for a limited liability company to conduct under the Limited Liability Company Act of the State of Delaware. *See* Section 1.5 of the Operating Agreement. Representations consistent therewith were also made to us by the LLC. For purposes herein, the investments made and held by the LLC shall be referred to, individually, as an "Investment" and, collectively, as the "Investments".

It has been represented to us that based on the investment information provided by CC as to the probability of the Investments reaching certain price levels at which they would be profitable, and on the advice of the Investor's own investment advisors, the Investor believed, and continues to believe, that he has, and will continue to have, a reasonable opportunity to earn a significant economic profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits. It has been further represented to us that Investor intends to continue his Investment for a period of time to enable Investor to earn a reasonable profit from the Transactions, in excess of all fees and transactions and without regard to tax benefits.

Subject to certain conditions, the Operating Agreement also permits the holders of the Class A Units (here, the Corporation) to transfer any or all of their Class A Units in the LLC at any time and without the need for any advance written notice to any other member. *See* Section 8.1 of the Operating Agreement. Also, to entice the Investor to enter into the LLC, CC agreed to incorporate a provision into the Operating Agreement which provides, *inter alia,* that, at any time after the expiration of the period ending fifteen (15) days prior to the end of the first complete quarter after the effective date of the Operating Agreement, a Class A Member may, at its option, either require that CC purchase all of its Class A LLC Units for a purchase price equal to the "book value" for such units as determined in accordance with Treasury Regulations Section 1.704-


C&SLLP004879

1(b)(2)(iv) or the Class A Members, by a Required Vote, may require that CC sell all of its Class B LLC Units to the Class A Members for a purchase price equal to the "book value" for such units as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). *See* Section 8.4 of the Operating Agreement. Whether, when and how a Class A Member exercises this option is within its sole discretion and control. It has been represented to us that the Operating Agreement's reference to "book value" in connection with this option was intended by the parties to mean the "fair market value" of said units, after booking up or down the members' capital accounts to reflect any and all unrealized gain and loss from the Investments and the other assets then held by the LLC, and that the Operating Agreement shall be interpreted and applied consistently with such interpretation. The purpose of the option is to provide the Investor with an incentive to invest with CC and to allow for either CC's removal or a liquidation of the Class A LLC Units in the event CC's investment strategies do not meet the Investor's expectations. This option provides the Investor with an evaluation period of CC's investment activities to ascertain whether he believes CC's investment strategy will be able to produce the intended or expected returns set forth at the beginning of the investment period.

It has been represented to us that the U.S. dollar has been, and will continue to be, the functional currency of the Investor, the Corporation and the LLC and, also, that each of them are calendar year taxpayers.

## II. ANALYSIS

### A. Status of LLC prior to admission of CC as member

Prior to the admission of CC as a member of the LLC, we believe that it is more likely than not that the LLC, at the time that the Investor was its sole member and beneficial owner, was a disregarded entity for federal income tax purposes. *See* Treas. Reg. § 301.7701-3(b)(1)(ii). We further believe that it is more likely than not that, for federal income tax purposes, the Investor himself would be treated as the person having entered into the MLD positions and that, for federal income tax purposes (including, without limitation, for purposes of Sections 351, 358, 721, 722 and 752), the Investor's contribution of his LLC membership interest to the Corporation constituted a direct contribution by the Investor of the short and long MLD positions, cash and other assets then held by the LLC.

### B. Admission of CC as member of LLC – Formation of LLC as partnership for federal income tax purposes

A single member entity disregarded as an entity separate from its owner is classified as a partnership when the entity has more than one member. Treas. Reg. § 301.7701-3(f)(2). Guidance on the federal tax consequences of such changes is provided in Rev. Rul. 99-5, 1999-1 C.B. 434, and Rev. Rul. 99-6, 1999-1 C.B. 432. *See* TD 8844 (November 29, 1999).

In Rev. Rul. 99-5, a limited liability company had a single owner, A, and was disregarded as an entity separate from its owner for federal tax purposes under Treasury Regulations Section 301.7701-3. In Situation 2 of Rev. Rul. 99-5, B, who was not related to A, contributed $10,000 to the limited liability company in exchange for a 50% ownership interest in the limited liability company.[6] According to the Service,

> the [limited liability company] was converted from an entity that is disregarded as an entity separate from its owner to a partnership when a new member, B, contributes cash to the [limited liability company]. B's contribution is treated as a contribution to a partnership in exchange for an ownership interest in the partnership. A is treated as contributing all of the assets of the [limited liability company] to the partnership in exchange for a partnership interest.

In that ruling, the Service ruled that: (1) no gain or loss was recognized by A or B as a result of the conversion of the disregarded entity to a partnership, citing Section 721(a); (2) B's basis in the partnership interest was equal to $10,000, the amount of cash contributed to the partnership, while A's basis in the partnership interest was equal to A's basis in the assets of the limited liability company which A was treated as contributing to the newly-created partnership, citing Section 722; (3) the basis of the property contributed to the partnership by A was the adjusted basis of that property in A's hands and the basis of the property contributed to the partnership by B was $10,000, the amount of cash contributed to the partnership, citing Section 723; (4) A's holding period for the partnership interest received included A's holding period in the capital and section 1231 assets deemed contributed when the disregarded entity converted to a partnership, and B's holding period for the partnership interest began on the day following the date of B's contribution of money to the LLC, citing Section 1223(1); and (5) the partnership's holding period for the assets transferred to it included A's holding period, citing Section 1223(2).

Accordingly, we believe that it is more likely than not that CC's admission as a member of the LLC and its contribution of $2,500 in cash to the LLC resulted in the conversion of the LLC from a disregarded entity to a partnership for federal income tax purposes, with CC being treated as contributing this cash to a partnership in exchange for a partnership interest (i.e., 1,000 Class B LLC Units) and the Corporation being treated as contributing the MLD positions and the other assets then held by the LLC to a partnership in exchange for a partnership interest (i.e., 99,000 Class A LLC Units).

---

[6] Rev. Rul. 99-5 further noted that the limited liability company used all of the contributed cash in its business and that A and B continued to operate the business of the limited liability company as co-owners of the LLC.



C&SLLP004881

C. **Partnership Status.**

Under Sections 701 and 702 of the Code, a partnership is treated as a flow-through entity for federal income tax purposes. Treasury Regulations Section 301.7701-3(b)(1)(i) provides that a domestic eligible entity that has two or more members and that does not elect to be classified as a corporation will be classified as a partnership for federal tax purposes.

It has been represented to us that the LLC is a validly formed limited liability company under Delaware law. It has been further represented to us that the LLC has not elected, and will not elect, under Treasury Regulations Section 301.7701-3 to be taxed as a corporation for federal income tax purposes. Thus, at least under Section 7701(a)(2) and the Treasury Regulations thereunder, we believe that it is more likely than not that, upon CC's admission as a member of the LLC and its contribution of $2,500 to the LLC, the LLC would qualify as a partnership for federal income tax purposes.

In general, courts have respected partnerships for tax purposes if the parties have been able to demonstrate that the partnership constituted a joining together of the parties for the joint conduct of a business and the sharing of the profits or losses (or both) therefrom. *See, e.g., Commissioner v. Culbertson*, 337 U.S. 733, 741 (1949). According to the United States Supreme Court in *Culbertson*, in determining whether there was a true partnership for income tax purposes, "[t]he question [wa]s . . . whether, considering all the facts — the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent — the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Id* at 742 (footnote omitted); *see 70 Acre Recognition Equipment*, 72 T.C.M. (CCH) 1508; *Sirrine Building No. 1 v. Commissioner*, 69 T.C.M. (CCH) 2476 (1995), *aff'd*, 117 F3d 1417 (5th Cir. 1997); *Smith's Estate v. Commissioner*, 313 F.2d 724 (8th Cir. 1963); *Luna v. Commissioner*, 42 T.C. 1067 (1964); *see also Brannen v. Commissioner*, 78 T.C. 471, 512 n. 16 (1982), *aff'd* 722 F2d 695 (11th Cir. 1984) (in a case in which neither party raised the issue of whether a valid partnership existed where there was a lack of profit motive, the Tax Court, in a footnote, noted that "[the entity] was formed by a formal partnership agreement covering the rights and liabilities of the partners, the partnership filed returns of income, and books and records were maintained on behalf of the partnership . . . [and that o]n the basis of this record, it appears that [the entity] was a partnership) (citing *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 558-63 (1979), *aff'd* 633 F2d 512 (7th Cir. 1980); and *Luna v. Commissioner*, 42 T.C. at 1077-78).

Here, the LLC has a formal operating agreement (i.e. the Operating Agreement) that covers the rights and obligations of the members of the LLC. It has also been represented to us that the LLC has filed (and will file) its own income tax returns and has maintained (and will maintain) its own separate books and records.

The fact that a partnership is formed for one or more tax reasons is not, in and of itself, reason to disregard the partnership for federal income tax purposes. *See generally Estate of Albert Strangi v. Commissioner*, 115 T.C. 478, 484 (2000) (taxpayers are generally free to structure transactions as they please, even if motivated by tax-avoidance considerations)(citing *Gregory v. Helvering*, 293 U.S. 465, 469 (1935)); *Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986)). For example, in *Estate of Albert Strangi*, the Tax Court found that

> [the Partnership] was validly formed under State law. The formalities were followed, and the proverbial 'i's were dotted' and 't's were crossed.' The partnership, as a legal matter, changed the relationships between decedent and his heirs and decedent and actual and potential creditors. Regardless of subjective intentions, the partnership had sufficient substance to be recognized for tax purposes. Its existence would not be disregarded by potential purchasers of decedent's assets, and we do not disregard it in this case.

*Id.* at 486; *see also Knight v. Commissioner*, 115 T.C. 506 (2000); *70 Acre Recognition Equipment Partnership v. Commissioner*, 72 T.C.M. (CCH) 1508 (1996); *Boca Investerings Partnership v. United States*, 88 AFTR 2d 2001-6252 (D.Ct. Dist. Col. October 5, 2001) (discussed below). *Compare ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000), *aff'g* T.C. Memo 1998-305 (discussed below).

In *ASA Investerings Partnership*, the Tax Court held that a partnership formed by Allied Signal and ABN, a foreign partner, was not a valid partnership for tax purposes, in part, based on what it viewed as the two "partners'" different investment objectives. According to the court, Allied Signal only wanted capital losses, whereas ABN wanted only a specified rate of return on its investment and was not willing to share in any losses. Allied Signal paid all expenses, guaranteed ABN a minimum profit and made all critical management decisions. The court concluded that ABN's role in the transaction was not as a partner in a partnership, but rather as a lender. In support thereof, the court noted that Allied Signal agreed to enter into the transaction before it even knew the identity of its partner.

The Transactions are clearly distinguishable from the situation in *ASA Investerings Partnership*. For one thing, whereas neither of the partners in *ASA Investerings Partnership* formed their partnership to produce an economic profit (let alone a significant economic profit), CC and the Investor (through the Corporation) have represented to us that they joined together as members of the LLC in good faith with a common investment purpose and with the intent to produce a significant economic profit from price movements of the Investments. Moreover, whereas one of the partners in *ASA Investerings Partnership* (i.e., ABN) wanted only a specific rate of return on its


C&SLLP004883

investment, the Investor and CC entered into the Transactions with the intent of sharing in the bottom-line gains and profits of the LLC and the Operating Agreement so reflects this intent. The Operating Agreement provides that after the Corporation (and, thus, the Investor) has been allocated an amount of LLC net profits equal to 10% of the fair market value of the Investor's capital contributions, the remaining net profits are shared by the Corporation and CC in proportion to their Units. CC is also entitled to receive, as additional consideration for its investment advisory services to the LLC, the Additional Consideration, the amount of which is based on the income and gains of the LLC's Investments. Moreover, while LLC net losses are first allocated to the Corporation (and, thus, to the Investor) until the Corporation's capital account balance has been reduced to zero, CC would thereafter be allocated any additional net losses. Thus, CC is not protected against loss of its investment or the Additional Consideration. It has also been represented to us that CC's investment in the LLC is not guaranteed by the Investor or any other person. Although the Corporation (and, thus, the Investor) has the option to require that CC either sell its Class B LLC Units to the Corporation or purchase the Corporation's Class A LLC Units, the purchase price required to be paid by the purchasing member for the units of the selling member would equal the "book value" for said units as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). It has been represented to us that the parties understand "book value" in this context to mean the fair market value of said units, after a booking up or down of the members' capital accounts to reflect any and all unrealized gain and loss from the Investments and other assets of the LLC based upon their then fair market values. Thus, the Corporation's exercise of this option would not result in either a bargain purchase or guaranteed profit for any party.

We believe that it is more likely than not that the fact that, for federal income tax purposes, CC has only 1% of the total units in the LLC would not result in CC being disregarded as a "partner" of the LLC, or the LLC being disqualified as a partnership by reason of having only one member or beneficial owner. Under the prior entity classification regulations, Section 4.01 of Rev. Proc. 89-12, 1989-1 C.B. 798, required the collective interests of all general partners of a limited partnership in each material item of income, gain, loss, deduction or credit of the partnership to equal at least 1%. Thus, a two-partner limited partnership would not have been classified as other than a partnership merely because the general partner had only a 1% interest in the income, gain, loss, deduction or credits of the partnership. Here, CC owns 1,000 Class B LLC Units, which amounts to 1% of the total units in the LLC and in respect of which CC is allocated 1% of the LLC's net profits, income and gain (after the Corporation has been allocated an amount of net profits, income and gain equal to 10% of the fair market value of the Investor's capital contributions, unreduced by any liabilities assumed by the LLC from the Corporation). CC is also entitled to receive the Additional Consideration, the amount of which is directly linked to the performance of the Investments. While the LLC's net losses are first allocated to the Corporation until the Corporation's capital account balance has been reduced to zero, any remaining losses would be allocated to CC. Thus, CC is not protected against loss. Moreover, it has been represented to us that CC's investment in the LLC is not being guaranteed by any person. Thus, while CC receives its allocations of net income and net loss after the Corporation receives its


C&SLLP004884

allocations, the transactions contemplated for the LLC are such that CC is likely to receive its allocations of net income or net loss. CC had also made a significant capital contribution to the LLC (i.e., $2,500 in cash). The existence of these traditional factors is evidence that CC's status in the LLC is meaningful and has meaningful effect. Accordingly, we believe that it is more likely than not that, for federal income tax purposes, CC would not be disregarded as a "partner" of the LLC, and that the LLC would not be disqualified as a partnership by reason of having only one member or beneficial owner.

**D. <u>Sham transaction/business purpose/economic substance doctrines.</u>**

The Service has attempted to disallow the tax consequences which result from the formation and operation of a partnership by asserting that the partnership was not formed with the requisite business purposes, or where separate and apart from the tax benefits, economic substance to the transaction was lacking. In general, a transaction will be respected for tax purposes if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached." *James v. Commissioner*, 899 F.2d 905, 908 (10th Cir. 1990) (quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978)). A key factor in assessing the economic substance of a transaction is whether the transaction has any practical economic effect other than the creation of tax losses. Courts have generally refused to recognize the tax consequences of a transaction that does not appreciably affect the taxpayer's beneficial interest except to reduce tax. The fact that a transaction could yield only an insignificant profit does not imbue the transaction with sufficient economic substance to be respected for tax purposes. *See Knetsch v. United States*, 364 U.S. 361, 366 (1960); *ACM Partnership v. Commissioner*, 157 F.3d 231, 248 (3d Cir. 1998); *Sheldon v. Commissioner*, 94 T.C. 738, 768-69 (1990). In *Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir. 1988), the Seventh Circuit noted that

> [a] transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the prospect of such advantages—may indeed have had no other interest in the transaction."

The Tax Court recently summarized the economic substance doctrine – sometimes known as the economic substance sham transaction doctrine—in *Salina Partnership LP v. Commissioner*, 80 T.C.M. (CCH) 686 (2000), as follows:

> It is well settled that taxpayers generally are free to structure their business transactions as they please, even if motivated by tax avoidance considerations. *See Gregory v.*







C&SLLP004885

*Helvering*, 293 U.S. 465, 469 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 196 (1983), *aff'd in part, rev'd in part, and remanded* 752 F.2d 89 (4th Cir. 1985). However, to be accorded recognition for tax purposes, a transaction generally is expected to have "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-584 (1978); *see Winn-Dixie Stores, Inc. v. Commissioner*, 113 T.C. 254, 278 (1999) *aff'd*87 AFTR 2d 2001-2626 (June 28, 2001). This principle, which finds its origin in *Gregory v. Helvering, supra*, is better known as the "economic substance doctrine.

A sham transaction is one which, though it may be proper in form, lacks economic substance beyond the creation of tax benefits. *Karr v. Commissioner*, 924 F.2d 1018, 1022-1023 (11th Cir. 1991), *aff'g Smith v. Commissioner*, 93 T.C. 378 (1989). An evaluation whether a transaction is a substantive sham generally requires: (1) A subjective inquiry whether the transaction was carried out for a valid business purpose independent of tax benefits, and (2) a review of the objective economic effect of the transaction. *See Karr v. Commissioner, supra* at 1023; *Kirchman v. Commissioner*, 862 F.2d 1486, 1490-1491 (11th Cir. 1989), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986); *see also ACM Partnership v. Commissioner*, 157 F.3d 231, 247-248 (3d Cir. 1998), *aff'g in part and rev'g in part on another ground* T.C. Memo. 1997-115; *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990), *aff'g in part, rev'g and remanding in part on another ground Larsen v. Commissioner*, 89 T.C. 1229 (1987), *aff'g* T.C. Memo. 1987-628, *aff'g Sturm v. Commissioner*, T.C. Memo. 1987-625, *and aff'g Moore v. Commissioner*, T.C. Memo. 1987-626; *Rose v. Commissioner*, 868 F.2d 851, 853-854 (6th Cir. 1989), *aff'g* 88 T.C. 386 (1987). Only after we conclude that a transaction is not an economic sham do we review the tax consequences of the transaction under the Code. *See ACM Partnership v. Commissioner*, T.C. Memo. 1997-115, *affd. in part and rev'd in part on another ground* 157 F.3d 231 (3d Cir. 1998).

A taxpayer may establish that a transaction was entered into for a valid business purpose if the transaction is


C&SLLP004886

> "rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and * * * economic situation." *Compaq Computer Corp. & Subs. v. Commissioner*, 113 T.C. 214, 224 (1999) (citing *ACM Partnership v. Commissioner, supra*) [Note that this case was just reversed by the Fifth Circuit on December 28, 2001]; *see Kirchman v. Commissioner, supra* at 1490-1491. A taxpayer may establish that a transaction has objective economic consequences where the transaction appreciably affects the taxpayer's beneficial interest. *See Knetsch v. United States*, 364 U.S. 361, 366 (1960) (quoting *Gilbert v. Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (Hand, J., dissenting)); *see also ACM Partnership v. Commissioner*, 157 F.3d at 248; *Northern Ind. Pub. Serv. Co. v. Commissioner*, 115 F.3d 506, 512 (7th Cir. 1997), *aff'g* 105 T.C. 341 (1995). Stated differently, a transaction has economic substance if it offers a reasonable opportunity for profit exclusive of tax benefits. *See Gefen v. Commissioner*, 87 T.C. 1471, 1490 (1986), and cases cited therein. Generally, there must be a reasonable expectation that nontax benefits will meet or exceed transaction costs. *See Yosha v. Commissioner*, 861 F.2d 494, 498 (7th Cir. 1988), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986). Modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance. *See Sheldon v. Commissioner*, 94 T.C. 738, 767-768 (1990); *Saba Partnership v. Commissioner*, T.C. Memo. 1999-359.

*Salina*, 80 T.C.M. (CCH) at 694 (emphasis added).

In the Appendix II To JCX-82-99: Description and Analysis of Present-Law Rules and Recent Proposals Relating to Corporate Tax Shelters", Prepared by the Staff of the Joint Committee On Taxation, JCX-84-99, November 10, 1999 ("JCT Appendix"), two types of "sham" transactions were described -- "shams in fact" and "shams in substance". The JCT Appendix described a "sham in fact" as a transaction in which the steps purported to have occurred never, in fact, occurred, citing *Goodstein v. Commissioner*, 267 F.2d 127 (1st Cir. 1959) (a case which involved assets that were never purchased, and a loan that was never incurred, by the taxpayer). We believe that it is more likely than not that the Transactions would not constitute a "sham in fact" in that each transaction comprising the Transactions did, and will, in fact, occur.

The JCT Appendix described a "sham in substance" as a transaction in which all of the steps to the transaction have, in fact, occurred but the taxpayer nonetheless had no economic risk with respect to the transaction (e.g., the taxpayer is protected from loss and/or is precluded from realizing profit), citing *Yosha v. Commissioner*, 861 F.2d 494

(7th Cir. 1988) (Taxpayers entered into a series of transactions on the London Metals Exchange, or "LME", which were structured to fully protect the taxpayers against loss through arrangements by the promoter with the LME brokers and to prevent the taxpayers from realizing a profit therefrom).[7]

In determining whether a transaction has sufficient economic substance for tax purposes, courts have recognized that offsetting legal obligations, or circular cash flows, may effectively eliminate any real economic significance of the transaction. For example, in *Knetsch v. United States*, 364 U.S. at 361, the taxpayer purchased an annuity bond using non-recourse financing. However, the taxpayer repeatedly borrowed against increases in the cash value of the bond. Thus, the bond and the taxpayer's borrowings constituted offsetting obligations. As a result, the taxpayer could never derive any significant benefit from the bond. The Supreme Court found the transaction to be a sham, as it produced no significant economic effect and had been structured only to provide the taxpayer with interest deductions. *Id.* at 366.

Here, the Investor has real risk of loss with respect to his substantial investment in the Transactions – i.e., his $287,500 cash contribution to the LLC. It has been represented to us that this investment has not been, nor will be, guaranteed by any person. Under the Operating Agreement, the Corporation (and, thus, the Investor) is allocated the first net losses of the LLC until the Corporation's capital account balance has been reduced to zero, as well as all deductions, losses and other items related to the Additional Consideration payable to CC. The Corporation (and, thus, the Investor) also has the upside potential of its investment in the Transactions. Under the Operating Agreement, the Corporation is first allocated an amount of LLC net profits equal to 10% of the fair market value of the Investor's capital contributions to the LLC (unreduced by any liabilities assumed by the LLC), with any remaining net profits allocated to the Corporation and CC in proportion to their respective Units in the LLC. While the Corporation has the option to require that CC either purchase the Corporation's 99,000 Class A LLC Units or sell its 1,000 Class B LLC Units to the Corporation, the purchase price for any of said units is the "book value" for said units as determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv), which the Investor and CC have represented to us they understand to mean the fair market value of said units, after booking up or down the members' capital accounts to reflect any and all unrealized gain and loss from the Investments and other assets of the LLC. Thus, this option creates neither a bargain purchase nor a guaranteed profit for any of the parties. While the long and short MLD positions entered into by the LLC mostly, although not completely, hedge each other, it has been represented to us that the Investor has not (either directly or

---

[7] Because the arrangements to protect against loss were made by the promoter, the court did not address the effect of bona fide hedging transactions with unrelated parties. Hedges provided by a party involved in the transactions was also viewed as a negative factor in *ACM Partnership v. Commissioner*, T.C. Memo. 1997-115, *aff'd in part and rev'd in part*, 157 F.3d 231 (3rd Cir. 1998), cert. denied, 526 U.S. 1017 (1999). While the long and short MLD position acquired by the LLC mostly, although not completely, hedges each other, it has been represented to us that the Investor has not (either directly or indirectly) hedged his exposure from his net investment in the Transactions (i.e., his $287,500 capital contribution to the LLC), nor identified or will identify any aspect of the Transactions as being part of a hedging transaction under Treasury Regulations Section 1.446-4.


C&SLLP004888

indirectly) hedged, nor will hedge, his exposure from his net investment in the Transactions (i.e., $287,500 cash contribution to the LLC), nor have or will he identify any aspect of the Transactions as being part of a hedging transaction under Treasury Regulations Section 1.446-4. Accordingly, we believe that it is more likely than not that the Transactions would not constitute a "sham in substance".

For a transaction to have a business purpose, the taxpayer must have a business or commercial reason to engage in the transaction without regard to tax benefits. *Friedman v. Commissioner*, 869 F.2d 785, 792 (4th Cir. 1989); *Rice's Toyota World, Inc. v. Commissioner, supra*. In *Winn-Dixie Stores Inc. v. Commissioner*, 113 T.C. 254 (1999) *aff'd* 87 AFTR 2d 2001-2626 (June 28, 2001), for example, the Tax Court disallowed interest deductions on policy loans in a corporate-owned life insurance (COLI) program that insured the lives of approximately 30,000 workers. The program resulted in a pre-tax loss for the taxpayer. The taxpayer made two arguments in support of its position: (i) first, that the program enabled it to fund costs of one of its benefit programs, and (ii) second, that the program enabled it to increase the benefits it could offer to its employees. As to the first argument, the court found no contemporaneous evidence that the taxpayer had purchased the COLI policies to provide such funding noting, in particular, that the COLI policies were not designed to fund such benefits, the taxpayer's chief financial officer never told the entity that was planning the COLI transactions that the purpose was to fund the benefit program, and the projections showed that the cash flow from the program was needed to pay future interest and premiums as opposed to being available to fund the benefits plan. As for the taxpayer's second argument, the court found that the described additional benefits were not related to the COLI program.

The Tax Court further considered a taxpayer's business motives in *Levy v. Commissioner*, 91 T.C. 838 (1988), wherein the taxpayers entered into a sale-leaseback of computer equipment for the asserted reason of diversifying their business and investments. In upholding the tax benefits, the court noted that the taxpayers

> entered into the transaction in issue for sound business reasons (namely to diversify their business investments by entering into a legitimate long-term investment involving the purchase and leaseback of computer equipment). Petitioners approached the decision to enter into this transaction in a businesslike manner. Petitioner's financial advisor thoroughly and in good faith investigated the proposed purchase-leaseback transaction. He prepared cash flow analyses which included the components of the transaction that were critical to earning a profit on the investment. Those components included the current fair market value and projected residual value of the equipment, the fair rental value of the lease, and the rent participation agreement. He explained to petitioners the significance of and risks associated with the projected residual value of the equipment and the rent participation agreement. In


C&SLLP004889

> addition, he explained to petitioners the tax consequences of the transaction. Petitioners also retained a law firm with expertise in leasing transactions to investigate the financial status and creditworthiness of each participant involved in the transaction, to investigate each participant's business reputation, and to handle the legal aspects of this complex transaction.
>
> We are satisfied that petitioners had a good faith and substantial business purpose for entering into the transaction. Petitioners participated in the purchase leaseback transaction only after they were convinced that the investment had a reasonable possibility of producing a profit.

91 T.C. at 855-856. *See IES Industries, Inc. v. U.S.*, 87 AFTR 2d 2001-2492 (8th Cir. 2001) (in transaction involving the claiming of foreign tax credits associated with dividends on certain American Depository Receipts ("ADR")[8], the court allowed the foreign tax credits and distinguished the Tax Court's decision in *Compaq Computer Corp. v. Commissioner*, 113 T.C. 214 (1999) by noting that while the taxpayer's risk of loss may have been minimal, it was in part because the taxpayer did its homework before engaging in the transactions citing the two meetings that the taxpayer's officials had with the promoter's representatives, their studying of the materials provided, and the taxpayer's consultation with its outside accountants and securities counsel for reassurances about the legality of the transactions and their tax consequences); *see also Compaq Computer Corp. v. Commissioner*, No. 00-60648 (5th Cir. December 28, 2001)(Court agreed with the Eighth Circuit's decision in *IES Industries, Inc.*), rev'g 113 T.C. 214 (1999)(the fact that the taxpayer made no independent inquiry into the commercial aspects of the transactions was taken into account by the court in the disallowance of foreign tax credits associated with dividends on certain ADR).

In *ACM Partnership v. Commissioner*, 73 T.C.M. (CCH) 2189 (1997), the taxpayer entered into a near-simultaneous purchase and sale of debt instruments. The Tax Court had agreed with the Service's argument that these transactions were entered into without any realistic expectation of profit and solely for tax motivated purposes. According to the Tax Court, the taxpayer's exchange of debt instruments generated only "a phantom loss" that was not economically inherent in the object of the sale and that the transaction did not have "economic substance separate and distinct from economic benefit achieved solely by tax reduction." 73 T.C.M. (CCH) at 2215. On appeal, the Third Circuit affirmed the Tax Court's decision holding that the transaction was lacking of any significant economic consequences other than the creation of tax benefits and, taken together, the transaction "had only nominal, incidental effects on [the taxpayer's] net economic position." *ACM Partnership*, 157 F.3d at 250.

---

8/ An ADR is a publicly traded security or receipt which represents a share of a foreign corporation held in trust by a U.S. bank, and which is fully negotiable in U.S. dollars.



C&SLLP004890

In *ASA Investerings Partnership v. Commissioner*, 76 T.C.M. (CCH) 325 (1998), *aff'd* 201 F.3d 505 (D.C. Cir. 2000), *cert. denied*, 121 S. Ct. 171 (2000), the Tax Court determined that a valid partnership was not actually formed at the outset. In that case, the transactions were entered into to take advantage of the contingent installment sales rules and were found to be structured to minimize the partnership's exposure to risk and for the sole purpose of generating tax losses. On appeal, the D.C. Circuit affirmed the Tax Court's decision finding that none of the purported partners had the intent to form a real partnership and noting that "[a] partner whose risks are all insured at the expense of another partner hardly fits within the traditional notion of partnership." *ASA Investerings Partnership*, 201 F.3d at 515. Consequently, the D.C. Circuit did not even reach the economic substance issue.

Although the expectation of a profit is an important factor, the fact that a particular transaction fails to generate a profit does not automatically render the transaction devoid of economic substance (or as lacking business purpose). For example, in *Chisholm v. Commissioner*, 79 F.2d 14 (2nd Cir. 1935), *cert. denied*, 296 U.S. 641 (1935), the Second Circuit held that the desire to pool and jointly manage assets was adequate business purpose for owning and managing assets through a partnership.

In determining the amount of "profit" from a transaction involving LIBOR notes, the District Court for the District of Columbia recently concluded that only "out-of-pocket costs, i.e., those out-of-pocket or transaction costs DIRECTLY associated with the LIBOR Notes", and not lost opportunity costs[9] or other transaction costs[10] were to be taken into account. *Boca Investerings Partnership, et. al. v. United States*, 88 AFTR 2d 2001-6252 (October 5, 2001). Applying this standard here, only those out-of-pocket or transaction costs directly associated with the MLD investment and the other Investments made by the LLC (which, presumably, would include the fees of CC and Mr. Brooks) would be taken into account in determining the amount of the Investor's profit from the Transactions. Under this standard, any non-directly associated costs including, presumably, the fee that the Investor pays to the sponsor of the Transactions, which fee is a one-time fee payable by the Investor at the outset of the Transactions, would presumably not be taken into account in determining the amount of the Investor's profit from the MLD investment and the LLC Investments. If all of the Investor's fees and expenses from the Transactions were required to be taken into account, the Investor might realize an economic loss if the Investor were to terminate his investment in the Transactions and with CC after only a short period of time. However, the longer the period of time that the Investor continues his investment in the Transactions and with CC and Mr. Brooks, the greater the likelihood that the Investor would realize an economic profit net of all of his expenses from the Transactions (including those expenses not directly associated with the MLD investment or LLC Investments). In fact, Mr. Brooks

[9] "Lost opportunity costs" was defined by the District Court as representing the next best alternative in which one could otherwise have invested, as compared to the investment that was actually made.

[10] These other transaction costs included: (a) the $7 million fee paid to Merrill Lynch, (b) transaction costs of about $12.24 million in connection with the private placement notes ("PPNs")/LIBOR Note sale and purchase, (c) the $2.5 million and $2.2 million premiums paid for the purchase of partnership interests of the other partners, (d) and a $500,000 advisory fee paid to the New York branch of ABN Bank.