has represented to us that if the Investor were to continue his investment in the Transactions and with CC and Mr. Brooks for at least five years, the Investor would have a reasonable opportunity to achieve an annual return of somewhere between 15% and 17%, net of all of the Investor's fees and expenses from the Transactions. Whether and when the Investor collapses the Transactions and terminates his investment in the LLC is determined solely by the Investor. *See also* Section 8.1 of the Operating Agreement (CC, as a Class B Member, may not Transfer any of its Class B Units, in whole or in part, at any time without the consent of the Class A Members). However, Investor has represented to us that it is his current intention to continue his investment in the Transactions and with CC and Mr. Brooks for such period of time so as to be able to achieve a reasonable economic return on his investment, without regard to tax benefits and net of all of his fees and expenses from the Transactions.

Any purported profit motive of a taxpayer must be bona fide. Whether a taxpayer has a bona fide profit motive depends upon the taxpayer's subjective and good faith intent to earn a profit. *Finoli v. Commissioner*, 86 T.C. 697, 722 (1986). So long as the taxpayer is reasonable in its assessment of the economic benefits of a transaction, the fact that the assessment does not bear out does not render the transaction devoid of economic substance. *King v. U.S.*, 545 F.2d 700, 708 (10th Cir. 1976). The profit potential must be real, however. For example, in *ACM Partnership*, the Tax Court found that at the time the taxpayer entered into the partnership, its only real opportunity to earn a profit was through an increase in the credit quality of the issuers of certain notes, or a 400-500 basis point increase in 3-month LIBOR interest rates. In holding against the taxpayer, the Tax Court found such an increase not possible given the lenders already extremely high credit rating at the time of the transaction and based on its own 6-year review of 3-month LIBOR rates (which failed to show an increase of even 300 basis points in the necessary time frame). The Tax Court did, however, note that it was not suggesting

> that a taxpayer refrain from using the tax laws to the taxpayer's advantage. In this case, however, the taxpayer desired to take advantage of a loss that was not economically inherent in the object of the sale, but which the taxpayer created artificially through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance.

73 T.C.M. (CCH) at 2215.

In upholding this portion of the Tax Court's decision, the Third Circuit noted that the partnership's transactions had offset one another and had no net effect on the partnership's financial position, *ACM Partnership*, 157 F.3d at 249-50, and further noted that "[t]ax losses such as these, which are purely an artifact of tax accounting methods and which do not correspond to any actual economic losses, do not constitute the type of "bona fide" losses that are deductible under the Internal Revenue Code and regulations." *Id* at 252.



C&SLLP004892

The amount of potential profit from a transaction must also be more than a *de minimis* amount.[11] For example, in *Sheldon v. Commissioner*, 94 T.C. 738 (1990), the Tax Court denied the tax benefits of the transactions at issue because the real economic impact of the transactions was "infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions." *Id.* at 769.[12] The taxpayer, in *Sheldon*, had potential gain of $18,000 as compared to the taxpayer's claimed deductions of $15 million, assuming a 50% tax bracket (although the highest marginal individual income tax rate for 1981, the tax year at issue, was 70%), or a ratio of approximately .24% (or .17% using a 70% marginal individual income tax rate). By comparison, if the contingencies for both the long and short MLD positions are satisfied (which it has been represented to us has an approximate 28% statistical probability, based on Black-Scholes, of occurring), the Investor's potential economic profit from the MLD positions would be approximately EUR 19,232[13] as compared to his potential tax benefits from said positions of approximately EUR 1,074,176.[14] Thus, the ratio of potential economic profit to potential tax benefits for the Investor was, at a minimum, approximately 1.7% (or approximately 7 times greater than the ratio in *Sheldon* assuming a 50% marginal income tax rate or approximately 10 times greater than the ratio in *Sheldon* assuming a 70% marginal income tax rate).[15] Moreover, where only the contingency for the long MLD

[11] In Notice 98-5, the Service announced that it will issue regulations, effective on the date of the Notice, dealing with foreign taxes paid or accrued in connection with transactions, described as those in which the anticipated economic benefits are "insubstantial" in relationship to the anticipated tax benefits. It is uncertain when or whether these regulations will be issued, their criteria for the insubstantiality of anticipated economic benefits, or whether they will apply beyond the area of foreign taxes.

[12] In *Sheldon*, the Tax Court denied the purported tax benefits of a series of Treasury bill sale-repurchase transactions because they lacked economic substance. In those transactions, the taxpayer bought Treasury bills that matured shortly after the end of the tax year and funded the purchase by borrowing against the Treasury bills. The taxpayer accrued the majority of its interest deduction on the borrowings in the first year while deferring the inclusion of its economically offsetting interest income from the Treasury bills until the second year. The transactions lacked economic substance because the economic consequences of holding the Treasury bills were largely offset by the economic cost of the borrowings.

[13] This amount is equal to the difference between the Short Bonus Rate and the Long Bonus Rate, or .18%, multiplied by the Long Deposit Amount, or EUR 27,472,520 less the net premium paid for the MLD positions, or EUR 30,219.

[14] This amount is equal to the premium paid for the long MLD position, or EUR 2,747,252, multiplied by the highest marginal federal ordinary income tax rate for individuals—i.e., 39.1%.

[15] Also, as the highest marginal non-corporate income tax rate is scheduled to be reduced to 38.6% for calendar years 2002 and 2003, 37.6% for calendar years 2004 and 2005 and 35% for calendar year 2006 and all subsequent calendar years, *see* Section 101 of the Economic Growth and Tax Relief Reconciliation Act of 2001, depending on when the Investor realizes potential tax benefits from the Transactions, said potential tax benefits could be as low as EUR 961,538 – i.e., 35% of EUR 2,747,252— and the Investor's ratio of economic benefits to potential tax benefits could be as high as approximately 2.0% -- i.e., EUR 19,232/EUR 961,538. Moreover, to the extent that the Investor's potential tax benefit from the Transactions is a capital loss, then the Investor's potential tax benefits from the Transactions would be EUR 549,450 – i.e., 20% of EUR 2,747,252—and the Investor's ratio of potential economic benefits to potential tax benefits would be approximately 3.5% -- i.e., EUR 19,232/EUR 549,450.

Of course, the additional Investments of the LLC are also expected to generate additional profits for the Investor.


C&SLLP004893

position is satisfied, the Investor's ratio of potential economic profit to potential tax benefits would equal approximately 400% (or 800%, in the case where the Investor's potential tax benefit from the Transactions is a capital, rather than an ordinary, loss).

In the recent case of *IES Industries, Inc. v. United States*, 87 AFTR 2d 2001-2492 (8th Cir. filed June 14, 2001), the Eighth Circuit held that "[t]he fact that [a taxpayer] took advantage of duly enacted tax laws in conducting [certain transactions] does not convert the transactions into shams for tax purposes." 87 AFTR 2d at 2001-2497 (footnote omitted). In *IES Industries*, the taxpayer, an investor owned electric utility company, entered into ADR trading opportunities identified by a securities broker. The taxpayer purchased select ADRs of companies which had announced dividends with a settlement date before the record date for such dividends, causing the taxpayer to be the actual owner of the dividends on the record date. Once the right to the dividends accrued to the taxpayer, the taxpayer immediately sold the ADRs back to the counterparty with a settlement date of the transaction occurring after the record date for the dividends. The cost of the ADRs purchased by the taxpayer (with dividend rights attached) was more than the price at which the taxpayer resold the ADRs back to the counterparty, resulting in capital losses to the taxpayer. These losses were intended by the taxpayer to be carried back to previous tax years in order to offset capital gains it had incurred from sales of stock and thus to obtain a federal income tax refund from those years. The taxpayer also claimed foreign tax credits and certain deductions for interest, commissions, and foreign income tax withheld as a result of the transactions.

The District Court granted the Service's motion for summary judgment and completely disregarded the transactions for tax purposes, finding that the transactions "were shaped solely by tax avoidance considerations" and lacked practical economic effect. *Id.* at 6 (citing the District Court's Order of Summary Judgment of Sept. 22, 1999, at 3). The court had given only a cursory review of the law and facts, stating that the taxpayer's only change in "economic position" as a result of the transactions was "the transfer of the claim to the foreign tax credit to IES." *Id.* at 7 (citing the District Court's Order, at 3). The District Court did not consider whether the trades had a valid business purpose.

The Eighth Circuit reversed the District Court and found that the taxpayer's ADR trades had both economic substance and business purpose and allowed the foreign tax credits and loss deductions claimed by the taxpayer. The Eighth Circuit noted that "[t]he fact that IES took advantage of duly enacted tax laws in conducting the ADR trades d[id] not convert the transactions into shams for tax purposes." *Id.* at 10. The Eighth Circuit held that the transactions at issue did, in fact, have economic substance because the economic benefit to the taxpayer was the amount of the gross dividend received by the taxpayer, before foreign taxes were withheld, rather than the net dividend received, as argued by the Service. Despite the fact that the taxpayer actually only received 85% of the dividend in cash once the foreign tax was withheld, the taxpayer for U.S. federal income tax purposes was treated as having received 100% of the dividend and the taxpayer would be liable for U.S. income taxes on 100% of the dividend. According to the Eighth Circuit, "[b]ecause the entire amount of the ADR dividends was income to



C&SLLP004894

[the taxpayer], the ADR transactions resulted in a profit, an economic benefit to [the taxpayer]." *Id.* at 8. In disagreeing with the Service's argument that the taxpayer's trades were shams due to lack of risk of loss, the Eighth Circuit noted that

> [t]he risk may have been minimal, but that was in part because [the taxpayer] did its homework before engaging in the transactions. Company officials met twice with [the securities broker's] representatives and studied the materials provided. After that, [the taxpayer] consulted its outside accountants and its securities counsel for reassurances about the legality of the transactions and their tax consequences.

*Id.* at 9. The Eighth Circuit was "not prepared to say that a transaction should be tagged a sham for tax purposes merely because it does not involve excessive risk. IES's disinclination to accept any more risk than necessary in these circumstances strikes us as an exercise of good business judgment consistent with a subjective intent to treat the ADR trades as money-making transactions." *Id.*

In its just issued ruling involving a transaction similar to the one in *IES Industries*, the Fifth Circuit, in *Compaq Computer Corp. v. Commissioner*, 00-60648 (December 28, 2001), reversed the Tax Court's holding, *see* 113 T.C. 214 (1999), that the ADR transaction had neither economic substance nor a non-tax business purpose, relying in large part on the Eighth Circuit's analysis in *IES Industries, Inc. v. United States*, 87 AFTR 2d 2001-2492 (8th Cir. filed June 14, 2001). As to issue of business purpose, the Fifth Circuit, in *Compaq Computer Corp.* noted that

> even assuming that Compaq sought primarily to get otherwise unavailable tax benefits in order to offset unrelated tax liabilities and unrelated capital gains, this need not invalidate the transaction. See Frank Lyon Co., 435 U.S. at 580, 98 S. Ct. at 1302 ("The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.") (footnote omitted); Holladay, 649 F.2d at 1179; ACM Partnership, 157 F.3d at 248 n.31 ("[W]here a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations."); Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J. Learned) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase

> one's taxes."), aff'd, 293 U.S. 465, 55 S. Ct. 266 (1935). Yet the evidence in the record does not show that Compaq's choice to engage in the ADR transaction was solely motivated by the tax consequences of the transaction. Instead, the evidence shows that Compaq actually and legitimately also sought the (pre-tax) $1.9 million profit it would get from the Royal Dutch dividend of approximately $22.5 million less the $20.7 million or so in capital losses that Compaq would incur from the sale of the ADRs ex dividend.
>
> Although, as the Tax Court found, the parties attempted to minimize the risks incident to the transaction, those risks did exist and were not by any means insignificant. The transaction occurred on a public market, not in an environment controlled by Compaq or its agents. The market prices of the ADRs could have changed during the course of the transaction (they in fact did change, 113 T.C. at 218); any of the individual trades could have been broken up or, for that matter, could have been executed incorrectly; and the dividend might not have been paid or might have been paid in an amount different from that anticipated by Compaq. See IES, 253 F.3d at 355. The absence of risk that can legitimately be eliminated does not make a transaction a sham, see id.; but in this case risk was present. In light of what we have said about the nature of Compaq's profit, both pre tax and post-tax, we conclude that the transaction had a sufficient business purpose independent of tax considerations.

Also, in *United Parcel Service of America, Inc. v. Commissioner*, 87 AFTR 2d 2001-2565 (11th Cir. June 20, 2001), *rev'g* 78 T.C.M. (CCH) 262 (1999), a case where the taxpayer had restructured its package insurance program, the Eleventh Circuit reversed the Tax Court's finding that such restructuring constituted a sham in substance. According to the Tax Court, the taxpayer had

> failed to prove that the restructuring of its [insurance program] was motivated by nontax business reasons or that the restructuring had economic substance. Rather, we find that the restructuring was done for the purpose of avoiding taxes and that the arrangement between [the parties] had no economic substance or business purpose.

78 T.C.M. (CCH) at 293 (footnote omitted).

On appeal, the Eleventh Circuit found that "[t]here were . . . real economic effects from this transaction on all of its parties," and that because the transaction had real economic effect and a business purpose, it "had sufficient economic substance to merit respect in taxation." *United Parcel Service of America,* 87 AFTR 2d 2001 at 2568. According to the Eleventh Circuit,

> [i]t may be true that there was little change over time in how the [restructured] program appeared to customers. But the tax court's narrow notion of "business purpose" - which is admittedly implied by the phrase's plain language - stretches the economic-substance doctrine farther than it has been stretched. A "business purpose" does not mean a reason for a transaction that is free of tax considerations. Rather, a transaction has a "business purpose," when we are talking about a going concern like [the taxpayer], as long as it figures in a bona fide, profit-seeking business. This concept of "business purpose" is a necessary corollary to the venerable axiom that tax-planning is permissible. The Code treats lots of categories of economically similar behavior differently. For instance, two ways to infuse capital into a corporation, borrowing and sale of equity, have different tax consequences; interest is usually deductible and distributions to equityholders are not. There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business, but it does not mean that the taxpayer lacks a "business purpose." To conclude otherwise would prohibit tax-planning.

*Id* at 2569 (citations omitted). While noting that the restructuring transaction at issue was "sophisticated and complex," the Eleventh Circuit nevertheless emphasized that "its sophistication does not change the fact that there was a real business that served the genuine need for customers to enjoy loss coverage and for [the taxpayer] to lower its liability exposure." *Id.* According to the Eleventh Circuit, the restructuring transaction had sufficient "economic effects" to warrant respect for tax purposes resulting in (i) the creation of genuine obligations of the taxpayer enforceable by an unrelated party, and (ii) the loss by the taxpayer of a stream of income from customer fees.

Finally, in the just decided case of *Boca Investerings Partnership v. United States,* 88 AFTR 2d 2001-6252 (D.Ct. Dist. Col. October 5, 2001), the court found, among other things, that Boca Investerings Partnership ("Boca") was a partnership for federal income tax purposes, that the transactions entered into by Boca had economic substance because, from a subjective point of view, the partners — and particularly the AHP partners (as defined below)— had a non-tax business purpose for entering those transactions, namely to make a profit on their investment and that the transactions had economic substance because, from an objective ex ante perspective, they have a reasonable prospect of







C&SLLP004897

turning a profit. The District Court also re-affirms the proposition that for a transaction to be recognized and not be treated as a sham for federal income tax purposes under the economic substance doctrine, the taxpayer must satisfy

> *either* part of the test for economic substance — if either (1) using a subjective analysis, the transaction has a nontax business purpose, OR (2) using an objective analysis, the transaction has a reasonable possibility of generating a profit, ex ante. Horn v. Commissioner, 968 F.2d at 1237-38. The D.C. Circuit expressly recognized that "a transaction undertaken for a nontax business purpose will not be considered an economic sham *even if* there was no objectively reasonable possibility that the transaction would produce profits. " [Citation omitted]. By the same token, a transaction that has economic consequences other than tax benefits will not be disregarded even if it was motivated by tax considerations. See Gregory v. Helvering, 293 U.S. at 469; Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978); Estate of Strangi, 115 T.C. at 478; Johnson v. United States, 11 Cl. Ct. 17 (1986). Both factors are considered in applying the traditional sham transaction test, but the transaction will be recognized if either is satisfied. Horn v. Commissioner, 968 F.2d at 1237 ("a transaction will not be considered a sham if it is undertaken for profit or for other legitimate nontax business purposes"). In this case, plaintiffs have established by a preponderance of the evidence that the transactions financing the purchase and sale of the PPNs had economic substance because those transaction had a non-tax business purpose. Since satisfaction of either prong of the test is sufficient to demonstrate that a transaction has economic substance, the Court need not draw any conclusions regarding the second prong — whether, using an objective analysis, the transactions had a reasonable prospect of making a profit. That said, the Court does find that the great weight of the evidence, including the expert testimony presented at trial — particularly that of Ms. Rahl and Mr. Fong — support plaintiffs' position that the transactions in this case also satisfy the second prong of the sham transaction/economic substance test. . . .

*Id* at 2001-6322. (Emphasis supplied).

In *Boca Investerings Partnership*, Boca was formed by four partners, two of which were United States corporations (i.e., American Home Products Corporation ("AHP") and AHP 10 (together, the "AHP partners")) and the other two of which were

registered Netherland Antilles limited liability companies (i.e., Syringa and Addiscombe (together, the "Foreign Partners")). In approving the transaction, AHP was of the understanding that: (i) its investment would be in the form of a partnership; (ii) Boca would initially invest in certain privately-placed, floating rate notes ("PPNs") that would offer a higher return to AHP than it was experiencing on its other investments and would be satisfactory to AHP if held until the put date; and (iii) if other transactions were subsequently approved, there was a potential for AHP to experience a capital loss and other tax benefits. The AHP partners contributed $150,000,000 to Boca in exchange for a 10% partnership interest in Boca and the Foreign Partners contributed $1,350,000,000 in exchange for a 90% partnership interest in Boca. Boca then used this $1,500,000,000 of capital contributions to purchase $300,000,000 face value PPNs from Norinchukin and Sanwa on May 1, 1990, $500,000,000 face value PPNs from Pepsico on May 2, 1990 and $400,000,000 in certain other short-term obligations that were within Boca's investment guidelines. On May 24, 2000, Boca sold $200,000,000 in principal amount of PPNs for $160,000,000 plus certain Installment Purchase Agreements providing for contingent payments ("LIBOR Notes"). On May 29, 1990, Boca sold $400,000,000 in principal amount of the PPNs for $320,000,000 in cash plus LIBOR Notes. On May 30, 1990, Boca sold $500,000,000 in principal amount of the PPNs for $400,000,000 in cash plus LIBOR Notes. Thus, in total, Boca sold its PPNs for $880,000,000 plus LIBOR Notes. Under the LIBOR Notes, the issuer was obligated to make 20 quarterly payments based upon the three-month LIBOR interest rate and a notional amount.[16] The LIBOR Notes were neither registered, payable on demand nor had interest coupons attached.

On July 20, 1990, the AHP partners purchased a portion of the Foreign Partners' interest in Boca such that, following this purchase, the AHP partners had a 54.832830% interest in Boca and the Foreign Partners had a 45.167170% interest in Boca. Then, on August 3, 1990, Boca distributed the LIBOR Notes (which, at that time, had a market value of $217,082,000) plus $2,264,432 to the AHP partners and $174,878,148 to the Foreign Partners.[17] In this distribution, the AHP partners' took a tax basis in the distributed LIBOR Notes of $907,485,424 (i.e., its basis in its interest in Boca). Boca also undertook a series of redemptions to redeem one of the Foreign Partners of its interest in Boca, and then the other Foreign Partner of its interest in Boca.[18] The AHP partners then sold all of their LIBOR Notes between November 6, 1990 and November 8,

---

[16] Although the term and notional amounts of the LIBOR Notes were fixed, because of the variable and unknown future three-month LIBOR rate, the total contract price for the sold PPNs could not be readily ascertained as of the end of the tax period in which the sale occurred. Thus, the sales of the PPNs were treated as contingent payment installment sales because the payments to be received stretched over 7 years, and the amount of each quarterly payment depended on future interest rates and, therefore, were ascertainable.

[17] According to the case, when the LIBOR Notes were acquired in May, 1990, the AHP partners did not know that they would be distributed to them in August, 1990 and that at the time of such distribution the AHP partners had no plan to sell the LIBOR Notes.

[18] One of the reasons given by AHP for this purchase was that it wanted to use funds held in Boca to acquire a majority interest in Genetics Institute and that the remaining Foreign Partner would not consent to using the funds for such purpose and, moreover, AHP did not want to have another partner having an interest in Genetics Institute.


C&SLLP004899

1990, recognizing an aggregate short-term capital loss of $710,669,136 on such sale. AHP used this loss to offset $ 693,594,801 of capital and Section 1031 gains, including a $ 605,104,183 gain from its June 29, 1990 sale of the stock of one of its subsidiaries, Boyle-Midway Household Products, Inc. Following this purchase, Boca continued operating as a partnership with a principal place of business in the Netherlands Antilles, the AHP Partners continued to share in Boca's operating income and Boca continued to file partnership income tax returns.

According to the District Court,

> [t]he Court should respect the partnership for tax purposes if, but only if: considering all the facts-- the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing true light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Boca Investerings Partnership*, 88 AFTR 2d 2001-6252 (D.Ct. Dist. Col. October 5, 2001). The District Court identified the four basic attributes that it viewed as being indicative of a partnership including: (i) the express or implied intent of the parties to form a partnership; (ii) the contribution of money, property and/or services; (iii) an agreement for joint proprietorship and control; and (iv) an agreement to share profits. *Id* (citing *S&M Plumbing Co. v. Commissioner*, 55 T.C 702, 707 (1971)). The District Court found all four of these attributes to be present with respect to Boca, noting that: (a) all four of the partners of the partnership intended to, and did, organize Boca as an investment partnership; (b) all four of the partners contributed substantial capital to Boca; (c) all four of the partners participated on the Partnership Committee and jointly controlled Boca, since the agreement of owners of 95% of Boca was required in order to take action; and (d) all four partners jointly shared in the income, gain, losses, and expenses from Boca's investments pursuant to the Partnership Agreement. The District Court also found there to be a legitimate purpose for the creation of Boca, Boca's purchase and sale of the PPNs and its purchase of the LIBOR Notes, and for the AHP partners' subsequent purchases of the interests of the Foreign Partners. According to the District Court,

> [s]ince there was a legitimate partnership and legitimate business purposes for its creation, organization and investments, and since there were legitimate business reasons for the [AHP Partners] to buy out the interests of the [Foreign Partners] at the prices they did, *it is irrelevant if AHP was motivated in part to organize Boca as a partnership by a desire to reduce taxes.* See Gregory v.

> Helvering, 293 U.S. 465, 468-69 (1935). . . AHP's motive to obtain a tax benefit is not inconsistent with its intent to make a profit. So long as it was not motivated *solely* by the former, it should be recognized as a partnership for tax purposes. In Chisolm v. Commissioner [citation omitted], Judge Learned Hand expressly rejected the argument that a partnership "formed confessedly to escape taxation" was for that reason "not 'bona fide'" [Citation omitted]. . . .

*Id* (Emphasis added).[19]

The *Salina Partnership, IES Industries, United Parcel Service, Boca Investerings Partnership* and *Compaq Computer Corp.* cases all relied, at least in part, upon *Gregory v. Helvering* for the proposition that a taxpayer is free to structure its business transaction as the taxpayer sees fit, unless the transaction is ". . . shaped solely by tax-avoidance features that have meaningless labels attached." In *Gregory v. Helvering*, the taxpayer formed a corporation for the single purpose of liquidating it to avoid paying tax on a dividend distribution. In that case, the Supreme Court found that the reorganization was "an operation having no business or corporate purpose – a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan." 293 U.S. at 469 (emphasis added). The Supreme Court concluded that "the facts speak for themselves and are susceptible of but one interpretation," that "[t]he whole undertaking . . . was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." *Id.* at 470.

Here, it has been represented to us that the Investor entered into the Transactions for business reasons with the intent to produce a significant economic profit from price movements of the Investments. For one thing, as noted above, the Investor invested in the MLD positions through the LLC in order to minimize his exposure to personal liability risk in respect of such positions (and, in particular, the short MLD position).[20] It was further represented to us that the Investor joined together with CC in good faith with a common investment purpose and for such business reasons including, among other things, diversification of his portfolio as well as the professional management to be provided by CC the sole member of which is Mr. Brooks, a person who has 20 years of experience trading in, managing, and advising clients with respect to investments similar to the Investments. Moreover, prior to entering into the Transactions, the Investor had met with the promoters of the Transactions and Mr. Brooks, conferred with his own investment advisors, studied the materials provided to his by the promoters and CC as to the economic risks and rewards of the Transactions and consulted with his outside

[19] According to the District Court, the issue is whether there was a legitimate business purpose for what the parties did, not whether they may also have had a tax motive for doing it.

[20] Although the short and long MLD positions mostly, although not completely, hedge each other, it is nonetheless possible that the Investor, if he were to own the MLD positions directly, could find herself in a position of having to pay SG under the short MLD position but being unable to collect from SG on the long MLD position, whether due to SG's bankruptcy or otherwise.



C&SLLP004901

accountants regarding the legality of the Transactions. Finally, the Investor had a reasonable opportunity – i.e., 28% statistical probability (based on Black-Scholes) -- of realizing a pre-tax return of at least 60% (net of direct transaction costs associated with the MLD positions) on his investment in the MLD positions. *Compare Boca Investerings Partnership v. United States,* 88 AFTR 2d 2001-6252 (D.Ct. Dist. Col. October 5, 2001) (financial model calculating a range of possible outcomes from investment in LIBOR Notes showed that after two years, there was a 10% chance of the holder of the LIBOR Notes receiving something greater than $308 million in profit and a 50% chance of receiving something greater than $248 million in profit).[21] Moreover, even though the court, in *Boca Investerings Partnership,* found that only costs directly associated with an investment be taken into account in determining "profit", Mr. Brooks has represented to us that the Investor would have a reasonable opportunity to achieve an annual return of somewhere between 15% and 17% from his investment in the Transactions, net of <u>all</u> of the Investor's fees and expenses from the Transactions, if the Investor were to continue his investment with CC and Mr. Brooks for at least five years. As a general matter, while the Investor would likely realize an overall economic loss from the Transactions if the Investor were to terminate his investment in the Transactions and with CC and Mr. Brooks after only a relatively short period of time, the longer the period of time that the Investor continues his investment in the Transactions and with CC and Mr. Brooks, the greater the likelihood that the Investor would realize an overall economic profit from the Transactions, net of all of the Investor's fees and expenses from the Transactions. Whether, when and how the Investor terminates his investment in the Transactions and with CC and Mr. Brooks is within his sole discretion and control. *See also* Section 8.1 of the Operating Agreement (A Class B Member – i.e., CC-- may not Transfer any of its Class B Units, in whole or in part, at any time without the consent of the Class A Members). Investor has represented to us that it is his current intention to continue his investment in the Transactions and with CC and Mr. Brooks for such period of time so as to be able to achieve a reasonable economic return on his investment, without regard to tax benefits and net of all of his fees and expenses from the Transactions.

Accordingly, based on the foregoing, we believe that it is more likely than not that the Transactions, and the Investor's involvement therewith, would not be disregarded for lack of economic substance or business purpose.

### E. <u>Investor's contribution of his LLC membership interest to the Corporation</u>

Section 351(a) provides that no gain or loss is recognized by a transferor of property to a corporation in exchange for the corporation stock if that transferor, together with any other persons transferring property to the corporation as part of the same

[21] Assuming that Boca's cost for acquiring the LIBOR Notes was $220,000,000 – i.e., $ 1,500,000,000 less the $880,000,000 in cash received from Boca's sale of the PPNs less the $400,000,000 in the other short-term investments held by Boca— such profit amounts would have resulted in a return of approximately 140% (with a profit of $308,000,000) and a return of approximately 113% (with a profit of $248,000,000). The case also noted that there were many situations in which the Boca partners would make a profit and some situations where their profit would be substantial.

transaction, "controls" the transferee corporation immediately after the exchange. For this purpose, "control" means the ownership of stock possessing at least 80% of the total combined voting power of all classes of stock entitled to vote and 80% of the total number of shares of each other class of stock. IRC § 368(c). Here, the Investor transferred his LLC membership interest to the Corporation in exchange for 100% of the Corporation's stock. Thus, we believe that it is more likely than not that the Section 351 "control" requirement was satisfied.

The term "property" is not defined for purposes of Section 351, although it has been broadly construed to include both tangible and intangible assets, including partnership interests. *See* Rev. Rul. 81-38, 1981-1 C.B. 386 (discussing transfer of partnership interest to an S corporation as qualifying under section 351). As noted above, we believe that it is more likely than not that the Investor's contribution of his LLC membership interest to the Corporation would be treated as a direct contribution by the Investor to the Corporation of the MLD deposits and other assets then owned by the LLC. We further believe that it is more likely than not that the MLD deposits and any foreign currency contracts or cash then held by the LLC would constitute "property" for purposes of Section 351. *See* Section II.W.1.b(i). Accordingly, we believe that it is more likely than not that the Investor satisfied Section 351's "property" requirement. *See, e.g.*, Rev. Rul. 94-45, 1994-2 C.B. 39 (transfer by life insurance company of investment assets together with right to future income and obligations under its insurance and annuity contracts to wholly owned subsidiary in exchange for stock in the subsidiary was Section 351 exchange).

Although neither Section 351 nor the Regulations thereunder contain an express "business purpose" requirement, such a requirement has been imposed under case law. *See*, *e.g.*, Rev. Rul. 55-36, 1955-1 C.B. 340; *Caruth Corp. v. United States*, 688 F. Supp. 1129 (N.D. Tex. 1987), *aff'd without discussion of this point*, 865 F.2d 644 (5th Cir. 1989); *West Coast Marketing Corp. v. Comm'r*, 46 T.C. 32 (1966). See also *Estate of Kluener v. Comm'r*, 154 F.3d 630 (6th Cir. 1998), *aff'g in part and rev'g in part* T.C. Memo 1996-519 (Where a shareholder contributed horses to a controlled corporation which sold the horses and distributed the proceeds to the shareholder, the Tax Court found no business purpose for the contribution and held Section 351 to be inapplicable). In *Caruth Corp. v. United States*, the taxpayers had transferred their shares of common stock in one closely held corporation to their other wholly-owned corporation four days before a dividend on such stock was declared. Although the transfer met the explicit requirements of Section 351, the Service nonetheless argued for a business purpose requirement to also be imposed. According to the District Court,

> [t]he long history of Section 351 . . . reveals that the various corporate "organization" provisions (which preceded section 351) were closely bound to the corporate "reorganization" provisions (like section 368). In promulgating these sections, Congress recognized the economic reality that corporate readjustments do not meaningfully change the identity of the person controlling







C&SLLP004903

> the transferred property. Indeed, corporate "organization" and "reorganization" transactions were always considered simultaneously by Congress; and for 33 years they occupied the same sections in the code. This legislative history indicates that the principles governing corporate reorganizations under section 368 should also be relevant to transactions involving controlled corporations under section 351 . . .
>
> Both the organization transactions pursued under section 351 and those involving a plan of reorganization under section 368 rely upon the same basis provisions for the transferor and for the corporation. . . . This scheme of interdependence clearly identifies the nearly uniform economic natures of the organization or transfer provisions of section 351 and the reorganization provisions of section 368 . . .
>
> For these reasons, it seems clear that section 351 and the reorganization provisions (of section 368) are cumulative, and not mutually exclusive. Therefore, the business purpose requirement should be applied to section 351, just as it has been applied to section 368.

*Id.* at 1139-40 (citations omitted). The District Court ultimately found that the transaction at issue did, in fact, have a business purpose and therefore should be respected for tax purposes.[22]

[22] According to the District Court, whether or not the taxpayer had a business purpose in transferring his North Park stock to his wholly-owned corporation, the Caruth Corporation, was a question of fact (citing *United States v. Cumberland Public Service Co.*, 338 U.S. at 456). As the District Court had found, the Caruth Corporation had been in business for over 40 years and had owned various assets and businesses, whereas the activities of North Park (i.e., the corporation the stock of which was being transferred in the Section 351 exchange) were being "wound down." Thus, one of the purposes of the contribution was to provide Caruth Corporation with additional capital for its operations since North Park did not need capital reserves and since the Caruth Corporation was having "more and more operations in Florida". Twelve days following the contribution (i.e., May 17, 1978), the Caruth Corporation received $506,250 as a dividend distribution from North Park. This dividend was declared on May 7, 1978 to be payable on May 17, 1978 for shareholders of record on May 15, 1978. According to the taxpayer, this dividend provided the Caruth Corporation with additional funds for its business operations and also increased its assets and its ability to borrow money should the need arise. The District Court further noted that the Caruth Corporation continued in business, and continued to own the North Park stock, until it was liquidated in 1984 and that there was no evidence that the Caruth Corporation was a meaningless, shell corporation which was merely being used for tax avoidance purposes. According to the District Court:

> [i]t is true, as the IRS contends, that the evidence *did not* show that the Caruth Corporation was on the brink of financial disaster or that a significant capital contribution was essential to the corporation's survival. However, Caruth did not need to prove either of these circumstances in order to establish that there was a business purpose for the transfer of the North Park stock to the Caruth Corporation. Indeed,



C&SLLP004904

Even assuming, *arguendo*, that Section 351 imposes a business purpose requirement, we believe that it is more likely than not that the Investor's contribution of his LLC membership interest (and, thus, for federal income tax purposes the MLD positions and other assets then held by the LLC) to the Corporation in exchange for all of the Corporation's stock did have sufficient business purpose. It was represented to us that the Investor's purpose for such contribution was to isolate his investment with CC and Mr. Brooks in a separate investment vehicle through which the Investor could make other investments without the participation or involvement of Mr. Brooks. Moreover, given the timing of this contribution, we believe that it is more likely than not that there was little or no gain to be recognized on the contribution and, therefore, no tax advantage to be gained by the Investor from this contribution.[23]

## F. Section 165

### 1. In general

Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. Treasury Regulations Section 1.165-1(b) further provides that for a loss to be allowable under Section 165(a), it must be evidenced by closed and completed transactions, fixed by identifiable events, and be actually sustained during the taxable year; that the loss be *bona fide*; and that substance rather than form should govern. The loss arising from the Transactions would be evidenced by a closed and completed event and fixed by an

---

> if this were the test, then the only shareholders who would be able to demonstrate a business purpose under section 351 for capital contributions to controlled corporations would be those whose corporations were unsuccessful or were near bankruptcy.
>
> Therefore, Caruth did establish—as required by section 351—that there was a business purpose for the transfer of the North Park stock to the wholly-owned company, the Caruth Corporation.

(Emphasis added). *Compare Estate of Robert G. Kluener, et al. v. Commissioner*, T.C. Memo 1996-519 (taxpayer transferred horses to his wholly-owned corporation, which then sold the horses. The gain resulting from such sales was sheltered by the corporation's net operating losses thus reducing the amount of total taxes required to be paid in respect of such gain. The court held that the taxpayer, and not the corporation, will be treated as the seller of the horses and the person required to recognize the gain. The court noted that: the corporation's records did not reflect titling of horses, sale, or receipt and possession of sales proceeds until proceeds were distributed to the taxpayer; the taxpayer continued to control horses and accounts containing the sale proceeds; the taxpayer did not reveal the existence of the funds to corporate personnel; and the corporation made distributions to the taxpayer equal to the proceeds from the sale and the taxpayer used loans, and not the sale proceeds, to finance the corporation. Moreover, the timing of the distribution was set with the assistance of the taxpayer's tax advisers and that the distribution was made at a time when the corporation had no current or accumulated earnings and profits and was treated as a nontaxable return of capital).

[23] Any tax advantage to the Investor from the basis resulting from his payment of the long MLD position premium would have occurred in any case upon the admission of CC as an additional member of the LLC and regardless of whether the Investor had contributed his LLC membership interest to the Corporation.


C&SLLP004905

identifiable event—i.e., either (i) the Corporation's disposition of its Class A LLC Units, (ii) the Corporation's disposition of the Investments that are distributed to it upon the LLC's liquidation, or (iii) the Investor's sale of his stock in the Corporation.

In Rev. Rul. 2000-12, 2000-11 I.R.B. 1, Situation 1, a corporation purchased two privately-placed debt instruments from unrelated issuers for $1,000,000 each. The debt instruments bore interest at a fixed rate adjusted for a contingency as of a reset date. In the case of one of the debt instruments, the interest rate would double if the particular contingency occurred, whereas the interest rate would be zero if the contingency did not occur. With respect to the other debt instrument, the interest rate would be zero if the contingency occurred, whereas the interest rate would double if the contingency did not occur. Thus, the increase in value of one of the debt instruments would be offset by a decrease in value of the other debt instrument, resulting in no economic gain or loss to the corporation. The corporation then sold the note that declined in value. The ruling noted that the amount of the tax loss suffered with respect to such note exceeded the amount of the economic loss suffered by the taxpayer on the two notes. The ruling concluded that the loss on the note that declined in value was not allowable because it was not "bona fide" and did not reflect actual economic consequences. In support of its position, the ruling cited *ACM Partnership v. Commissioner,* 157 F.3d 231, 252 (3d Cir. 1998), *Scully, supra* and *Shoenberg, supra. See also* Notice 99-59, 1999-52 IRB 761 (addressing a transaction wholly unlike the Transactions) and Notice 2000-44, 2000-36 IRB 255, discussed in detail below, in which the Service took the same position in reliance on the same authorities. The ruling also cited to cases where tax losses from option straddle transactions were found to be devoid of economic substance and prearranged to generate a tax loss and defer the offsetting gain and were disallowed as not being true losses. *See Lerman v. Commissioner*, 939 F.2d 44 (3rd Cir. 1991), cert. denied, 502 U.S. 984 (1991), and *Keane v. Commissioner*, 865 F.2d 1088 (9th Cir. 1989).

In *ACM Partnership,* the Third Circuit adopted the concept of a *bona fide* loss. The taxpayer in that case, however, acknowledged that the transaction was structured so that the securities in issue were purchased and sold at the exact *same* price. According to the Third Circuit

> [a]s the Supreme Court emphasized in Cottage Savings, deductions are allowable only where the taxpayer has sustained a "bona fide" loss as determined by its "[s]ubstance and not mere form." According to ACM's own synopsis of the transactions, the contingent installment exchange would not generate actual economic losses. Rather, ACM would sell the Citicorp notes for the same price at which they were acquired, generating only tax losses which offset precisely the tax gains reported earlier in the transaction with no net loss or gain from the disposition. Tax losses such as these, which are purely an artifact of tax accounting methods and which do not

> correspond to any actual economic losses, do not constitute the type of "bona fide" losses that are deductible under the Internal Revenue Code and regulations.

*ACM Partnership*, 157 F.3d 252 at (citations omitted). The court further noted that

> [w]hile it is clear that a transaction such as ACM's that has neither objective non-tax economic effects nor subjective non-tax purposes constitutes an economic sham whose tax consequences must be disregarded, and equally clear that a transaction that has both objective non-tax economic significance and subjective non-tax purposes constitutes an economically substantive transaction whose tax consequences must be respected, it is also well established that where a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations. See, e.g., Gregory, 293 U.S. at 468-69, 55 S. Ct. at 267 ("if a reorganization in reality was effected... the ulterior purpose will be disregarded"), Northern Indiana Pub. Serv. Co., 115 F.3d at 512 (emphasizing that Gregory and its progeny "do not allow the Commissioner to disregard economic transactions...which result in actual, non-tax-related changes in economic position" regardless of "tax avoidance motive" and refusing to disregard role of taxpayer's foreign subsidiary which performed a "recognizable business activity" of securing loans and processing payments for parent in foreign markets in exchange for legitimate profit); Kraft Foods Co. v. Commissioner, 232 F.2d 118, 127-28 & n.19 (2d Cir. 1956) (refusing to disregard tax effects of debenture issue which "affected ... legal relations" between taxpayer and its corporate parent by financing subsidiary's acquisition of venture used to further its non-tax business interests). In analyzing both the objective and subjective aspects of ACM's transaction in this case where the objective attributes of an economically substantive transaction were lacking, we do not intend to suggest that a transaction which has actual, objective effects on a taxpayer's non-tax affairs must be disregarded merely because it was motivated by tax considerations.

157 F.3d at 248 n.31.



C&SLLP004907

In *Scully v. United States*, 840 F.2d 478 (1988), the Seventh Circuit disallowed loss from the sale of real estate by trustees of the family trust to other family trusts with the same fiduciaries, beneficiaries and remaindermen. According to the Seventh Circuit:

> [l]osses will not be allowed which are claimed in connection with transactions which do not vary control or change the flow of economic benefits....[A taxpayer] will not be permitted to transfer assets from one pocket to another and take a loss thereby where he remains at the conclusion of the transfer the real owner of the property, either because of retention of title, command over the property, either directly or through the person who appears as the nominal vendee or transferee.

840 F.2d at 485. In *Shoenberg v. Commissioner*, 77 F.2d 446 (1935), the Eighth Circuit denied a loss deduction to an investor who sold stock at a loss and on the same day bought the same number of identical shares through his investment company. A little more than thirty days later, the investor purchased the shares from his investment company at a lower price than that for which he had originally sold them. The Eighth Circuit denied the investor's loss deduction, stating that "where such sale is made as part of a plan whereby substantially identical property is to be reacquired and that plan is carried out, the realization of loss is not genuine and substantial; it is not real." *Id* at 449.

Here, it has been represented to us that the Investor has a reasonable expectation of realizing a significant economic profit from the Transactions. Moreover, the Investor is at risk for real economic loss of his $287,500 that he contributed to the LLC. Under the Operating Agreement, the LLC's net losses are first allocated to the Corporation (and, thus, to the Investor) until the Corporation's capital account balance has been reduced to zero. It has been further represented to us that the Investor's investment has not been, nor will be, guaranteed by any person. Thus, we believe that it is more likely than not that the Transactions are distinguishable in this regard from the transaction in *ACM Partnership* in that the Investor is not protected from economic loss.

In addition, we believe that it more likely than not that the Transactions do not involve a situation like that in *Scully* and *Shoenberg*, where the taxpayers therein sought to recognize a tax loss from the sale of property of which the taxpayers had retained beneficial ownership. Here, any loss that the Investor would recognize from the Transactions would arise either from: (a) the Corporation's sale of its Class A LLC Units, (b) the Corporation's sale of the Investments that would be distributed to it upon the LLC's liquidation, or (c) the Investor's sale of his stock in the Corporation. In any of these situations, neither the Investor, the Corporation nor any person related to either of them would continue to retain title or command over, or otherwise any beneficial or other ownership interest in, the sold units, Investments or stock, as applicable. Accordingly, we believe that it is more likely than not that the Transactions would be distinguishable from the transactions in *Scully* and *Shoenberg*.

Moreover, although the LLC entered into a long and short MLD position that mostly, although not completely, hedge each other, there is no support for the implication in Rev. Rul. 2000-12 that the mere existence of a position that mostly, but not completely, offsets each other means that a loss is not "bona fide." Section 1256 was added to the Internal Revenue Code by the Economic Recovery Tax Act of 1981. Among other reasons stated in the General Explanation of the Economic Recovery Tax Act of 1981 (the "General Explanation"), Congress enacted Section 1256 "to prevent taxpayers from claiming the tax benefits which were allegedly obtained by using a futures straddle as a tax shelter." Thus, Section 1256 was enacted to address the abuse that the courts sought to address in the London Metals Exchange cases, see II.B. above. It did so not through an outright disallowance of any losses inherent in such positions, but instead by accelerating the tax consequences of holding such positions by requiring that such positions be marked–to-market at the close of the taxable year or upon certain other events. Thus, when the offsetting positions are entered into with the requisite economic substance and business purpose, losses arising from the offsetting positions should be allowed unless they are restricted by Section 1256. Section 1092 was also adopted by the Economic Recovery Tax Act of 1981 to deal with offsetting positions. The Tax Court, in *Smith v. Commissioner*, had refused to find a non-statutory wash sale rule that would deny the losses and looked to the enactment of Section 1092 as evidence that the mere existence of offsetting positions was not enough to deny a loss. Accordingly, we believe that it is more likely than not that the mere existence of offsetting positions would not be enough to allow the Service to successfully contend that a loss arising therefrom is not "bona fide".

Moreover, notwithstanding the Service's contentions or dictum in some cases, tax losses are, frequently, wholly independent from actual economic losses. This follows from the existence of specific, Code-mandated tax accounting methods and the annual accounting period. This principle is at the heart of the rule that a corporation's earnings and profits account, which is designed to mirror (at least in some sense) its economic income, is computed differently from its taxable income, less taxes and dividends paid.

Based upon the foregoing, we believe that it is more likely than not that the Investor's loss from the Transactions should be allowable under Section 165(a).

**2. Sections 165(c)(2) and 183**

Sections 165(c) and 183 impose additional limitations on the ability of individuals[24] to claim losses. Section 165(c)(2) limits deduction of losses to those "incurred in any transaction entered into for profit"[25] and Section 183(a) generally bars deductions attributable to an activity "not engaged in for profit".

[24] In the case of a partnership (or entity treated as a partnership for federal income tax purposes), Section 165(c)(2) is applied at the partnership level. *Cf.* PLR 8313003 (May 18, 1982).

[25] Section 165(c)(1) also permits deduction of losses "incurred in a trade or business".



C&SLLP004909

Treasury Regulations Section 1.183-2(a) provides that "[a]lthough a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity... with the objective of making a profit." A taxpayer need only have a good faith expectation of earning a profit from the activities undertaken. *See, e.g., Burger v. Commissioner*, 809 F.2d 355 (7th Cir. 1987); *Johnson v. U.S.*, 11 Cl. Ct. 17 (1986).

Notwithstanding the similar language of Sections 183(a) and 165(c)(2), some courts have required under Section 165(c)(2) that the taxpayer's profit motive be the "primary" motive for entering into the transaction. *See Fox v. Commissioner*, 82 T.C. 1001 (1984) (primary profit motive test derived from a footnote in *Helvering v. National Grocery Co.*, 304 U.S. 282, 289 n.5, *reh'g denied*, 305 U.S. 669 (1938)). In addition, the Tax Court relied on an earlier case involving the deductibility of a loss under Section 165(c)(2), *Smith v. Commissioner*, 93 T.C. 378 (1989). However, in *Smith*, the Tax Court did not impose the "primary" test articulated in *Fox*, noting instead that:

> [t]he mere fact that petitioners may have had a strong tax avoidance purpose in entering into their commodity tax straddles does not in itself result in the disallowance of petitioners' losses under section 165(c)(2), *provided petitioners also had a nontax profit motive for their investments at the time*. See Knetsch v. United States, 172 Ct. Cl. 378, 348, F. 2d 932, 936-937 (1965). Such hope of deriving an economic profit aside from the tax benefits need not be reasonable so long as it is bona fide. See, Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd. 379 F.2d 252 (2nd Cir. 1967).

*Id* at 391 (Emphasis added).

Both *Fox* and *Smith*, as well as the bulk of later cases involving the application of the "primary" standard, arose in connection with commodities straddle transactions with respect to which the taxpayer had little or no opportunity to earn any meaningful profit.[26] In addition, neither the *Knetsch* nor the *Bessenyey* case (cited in *Smith*) required that a profit motive be the taxpayer's primary motive for the subject transaction, although the *Knetsch* case did refer to the *National Grocery Co.* decision discussed above.

[26] The Tax Court in *Sheldon v. Commissioner*, applied these principles where in certain of the transactions before the court the taxpayer demonstrated that it could have made a profit. The Tax Court denied the claimed deductions stating that: "[i]n instances where intermediate repos would have or did generate some form of [positive] carry, these amounts were nominal, either fixed or short term and stable and, in any event, merely reduced the fixed losses by relatively insignificant amounts." The Tax Court ultimately found that even what nominal profit there was in *Sheldon* was absorbed by losses on related and, arguably, integrated transactions. 94 T.C. 738, 768 and 769.

Moreover, even some courts purporting to apply the "primary" standard have appeared not to do so literally. For example, in *Nickeson v. Commissioner*, 962 F.2d 973, 976 (10th Cir. 1992), a case involving Section 174, the court first appeared to apply the primary standard by requiring that the taxpayer engage in the transaction with the "dominant hope and intent to realizing a profit", but then went on to provide that "the determination crucial to the instant case [is] whether the taxpayers had an actual and honest profit objective." Also, in *Leema Enterprises Inc. v. Commissioner,* TC Memo 1999-18, the court held that the taxpayers' primary motive could not have been profit because they would not have invested in "new and untried ventures . . . unless they would benefit from prompt and sizable tax deductions". In affirming the application of this standard, however, the Tenth Circuit instead looked to the taxpayers' conduct that made a net profit "all but impossible". *Keeler v. Commissioner, supra,* 243 F.3d 1212, at 1220. *See also Nickerson v. Commissioner*, 700 F.2d 402, 404 (7th Cir. 1973) (applying a "primary purpose" requirement under Section 183).

The limited scope that some courts accord the "primary" standard may be due in part to how it arose. In *Fox v. Commissioner,* which first applied this standard in the context of Section 165(c)(2), the taxpayers had little or no opportunity to make more than a relatively small fixed economic profit from the commodity straddle transactions that they entered into.

Here, by contrast, the Investor has a reasonable opportunity to make a significant (and, perhaps, a very substantial) economic profit from his MLD investment. It has been represented to us that the Investor has a 28% statistical probability (based on Black-Scholes) of realizing an economic profit of approximately 60% (net of the direct transaction costs associated with the MLD positions) on said investment and a 1.3% statistical probability (based on Black-Scholes) of realizing an economic profit of approximately 14,446% (net of the direct transaction costs associated with the MLD positions) on said investment. Moreover, Mr. Brooks and CC have represented to us that the Investor would have a reasonable opportunity to achieve an annual return of somewhere between 15% and 17% on his investment in the Transactions, net of <u>all</u> of the Investor's fees and expenses from the Transactions, if the Investor were to continue his investment in the Transactions and with CC and Mr. Brooks for at least five years. Moreover, the Investor has represented to us that it is his current intention to continue his investment in the Transactions and with CC and Mr. Brooks for such period of time so as to be able to achieve a reasonable economic return on his investment, without regard to tax benefits and net of all of his fees and expenses from the Transactions.

Accordingly, we believe that it is more likely than not that the Investor had the requisite profit motive to support his deduction of loss in respect of the Transactions under Sections 165(c)(2) and 183.

**3. Notice 2000-44**

Notice 2000-44, *see infra,* describes two arrangements that the Service and the Treasury believe "have been designed to produce noneconomic tax losses on the







C&SLLP004911

disposition of partnership interests." Among other things, the Notice states that "[t]he purported losses resulting from the transaction described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of section 165." Even assuming, *arguendo,* that (i) the Service and Treasury had the requisite statutory authority to issue the Notice[27] and (ii) the Notice is somehow binding on taxpayers,[28] as discussed below, the Transactions are not of the type that Notice 2000-44 seems to be addressing. Also, as support for its position that the losses described therein were not "bona fide" and did not reflect "actual economic consequences", the Notice cites the *ACM, Scully* and *Shoenberg* cases, all of which, as discussed above, involved circumstances more likely than not distinguishable from the Transactions. As a result, we believe that it is more likely than not that the authorities cited in Notice 2000-44 would not provide a basis for denying the Investor's deduction of a loss sustained from the Transactions.

**4. Treasury Regulations Section 1.1275-6 (Debt integration rules)**

In Situation 2 of Rev. Rul. 2000-12, a corporation purchased two $1,000,000 10-year notes from unrelated issuers. One of the notes provided for quarterly interest payments, a 5.7% interest rate for the first quarter, compounded quarterly, and a contingent payment based on an event not dependent on actively traded personal property that would occur (or not occur) with a probability of 50% on December 1, 1998 (the reset event). If the reset event occurred, the interest rate would double to 11.4%, compounded quarterly, whereas if the reset event would not occur, the interest rate would be reset to zero. The other note had the same terms as the first note except that the consequences of the contingency were reversed. The ruling further provided that it could be expected that

[27] Section 7805(b)(1)(C) limits the express statutory authority for Notices to those "substantially describing the expected contents of any temporary, proposed, or final regulation." The Notice contains no such an intent since it neither describes in any detail the contents to be included in a future regulation nor references any specific intent to issue future regulations. *Compare* Notice 97-21, 1997-1 C.B. 407. Consequently, it is at least questionable whether Notice 2000-44 is properly issued under Section 7805.

[28] The binding authority of an IRS notice is no greater than that of a Revenue Ruling. *See* Rev. Rul. 90-91, 1990-2 C.B. 262; *Constantino v. TRW, Inc.*, 13 F.3d 969, 980-981 (6th Cir. 1994). While the circuits have split in the deference granted to a Revenue Ruling (and sometimes take inconsistent approaches even within a circuit). *compare McLendon v. Commissioner*, 135 F.3d 1017 (5th Cir. 1998); *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1145 (3rd Cir. 1993), *cert. denied*, 511 U.S. 1004 (1994); *Wood v. Commissioner*, 955 F.2d 908, 913 (4th Cir. 1992), *cert. dismissed*, 505 U.S. 1231 (1992); *Gillespie v. U.S.*, 23 F.3d 36, 39 (2d Cir. 1994); *Canisius College v. U.S.*, 799 F.2d 18 n. 8 (2d Cir. 1986) *cert. denied*,481 U.S. 1014 (1987); *Temple University v. United States*, 769 F.2d 126, 137 ( 3d Cir. 1985), *cert. denied*, 476 U.S. 1182 (1986) *Walt Disney Inc. v. Comm'r.*, 4 F.3d 735 (9th Cir. 1993); the Tax Court has generally treated a Revenue Ruling merely as the view of one of the parties to the litigation. *See, e.g., Trinova Corp. and Subsidiaries v. Commissioner*, 108 T.C. 68 (1997); *Pasqualini v. Commissioner*, 103 T.C. 1, 8 n. 8 (1994)(citing *Tandy Corp v. Commissioner*, 92 T.C. 1165, 1170 (1989)); or, at most, as "advisory only" and a mere "useful guide, outlining some of the factors to be considered" in interpreting the Code. *Burck v. Commissioner*, 63 T.C. 556 (1975), aff'd, 533 F.2d 768 (2d Cir 1976). Moreover, courts "have not looked favorably upon bootstrapping revenue rulings issued shortly prior to or after the initiation of litigation." *Ludwig v. Commissioner*, 68 T.C. 979 n. 4 (1977) (citing *Fribourg Navigation Co. v. Commissioner*, 383 U.S. 272, 279 (1966), *rev'g*, 335 F.2d 15 (2d Cir. 1964); *Busse v. Commissioner*, 479 F.2d 1147, 1152 n. 12 (7th Cir. 1973)). *See also Silco, Inc. v. U.S.*, 779 F.2d 282 (5th Cir. 1986).



C&SLLP004912