the economic effects of the two notes would offset, with the expected tax loss on the note that decreased in value significantly exceeding any reasonably expected economic loss on the two notes. Upon the occurrence of the reset event, the corporation would sell the note ("Loss Note") which declined in value.

The ruling noted that the Commissioner had the authority, under Treasury Regulations Section 1.1275-6(c)(2), to integrate the two notes and treat them as a single synthetic debt instrument. In general, Treasury Regulations Section 1.1275-6(c)(2) permits the Commissioner to integrate a qualifying debt instrument[29] (e.g., a contingent payment debt instrument that is issued for money) with a "section 1.1275-6 hedge"[30] if the combined cash flows are substantially the same as either of the cash flows necessary to satisfy the fixed or floating requirement of Treasury Regulations Section 1.1275-6(b)(2)(i). Where there is such an integration, the combined cash flows of the qualifying debt instrument and the section 1.1275-6 hedge generally are treated as a synthetic debt instrument (i.e., an integrated transaction) for *all* federal income tax purposes. *See* Treas. Reg. §§ 1.1275-6(b)(3) and (f).

Treasury Regulations Section 1.1275-6(b)(ii)(A) provides that a debt instrument issued by a taxpayer and a debt instrument held by the taxpayer cannot be part of the same integrated transaction. As the short MLD position entered into by the LLC (and, thus, the Investor for federal income tax purposes) is more likely than not, for federal income tax purposes, a debt instrument issued by the LLC and the long MLD position entered into by the LLC is more likely than not, for federal income tax purposes, a debt instrument held by the LLC, these MLD positions cannot be part of the same integrated transaction.

As noted above, we believe that it is more likely than not that the Investor's contribution of his LLC membership interest to the Corporation constituted, for federal income tax purposes, a direct contribution by the Investor of the MLD positions and other assets then held by the LLC to the Corporation in a Section 351 transaction (i.e., a

[29] A "qualifying debt instrument" is any debt instrument (including an integrated transaction as defined in Treasury Regulations Section 1.1275-6(c)) (certain contingent payment debt instruments issued for nonpublicly traded property). Thus, a contingent debt instrument that is issued for cash can constitute a qualifying debt instrument.

[30] A "section 1.1275-6 hedge" is any financial instrument (which is defined to include, among other things, a debt instrument, but which does not include stock) if the combined cash flows of the financial instrument and the qualifying debt instrument permit the calculation of a yield to maturity (under the principles of Section 1272), or the right to the combined cash flows would qualify under Treasury Regulations Section 1.1275-5 as a variable rate debt instrument that pays interest at a qualified floating rate or rates (except for the requirement that the interest payments be stated as interest). Treas. Reg. § 1.1275-6(b)(2)(i). A financial instrument is not a section 1.1275-6 hedge, however, if the resulting synthetic debt instrument does not have the same term as the remaining term of the qualifying debt instrument. *Id.* Also, a financial instrument that hedges currency risk is not a section 1.1275-6 hedge.

However, a debt instrument can be a section 1.1275-6 hedge only if it is issued substantially contemporaneously with, and has the same maturity (including rights to accelerate or delay payments) as, the qualifying debt instrument. Treas. Reg. § 1.1275-6(b)(2)(ii).

nonrecognition transaction). Also, as noted above, we further believe that it is more likely than not that upon CC's admission as a member of the LLC and its contribution of $2,500 to the LLC, the Corporation would be treated as having contributed the MLD positions and other assets then held by the LLC (as a disregarded entity) to the LLC (as a partnership) in a Section 721 transaction (i.e., a nonrecognition transaction). Accordingly, we believe that it is more likely than not that these MLD positions in the hands of the LLC (as a disregarded entity for federal income tax purposes) and then in the hands of the Corporation and the LLC (as a partnership for federal income tax purposes), as successors to the Investor,[31] cannot be part of the same integrated transaction under Treasury Regulations Section 1.1275-6(b)(ii)(A).

## G. Partnership Anti-Abuse Regulations.

Another means by which the Service may seek to attack the formation and operation of the LLC is through the application of the partnership anti-abuse regulations of Treasury Regulations Section 1.701-2 (the "Partnership Anti-Abuse Regulations").

### 1. Abuse of subchapter K

The Partnership Anti-Abuse Regulations grants the Service broad authority to recast a transaction if a partnership is formed or availed of in connection with such transaction and a principal purpose of such transaction is to reduce substantially the present value of the partners' aggregate federal income tax liability in a manner that is inconsistent with the intent of subchapter K of the Code. According to Treasury Regulations Section 1.701-2(a), the intent of subchapter K is "to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax." According to the Partnership Anti-Abuse Regulations, implicit in this intent are the following three requirements: (i) the partnership must be *bona fide* and the transaction under scrutiny must be entered into for a substantial business purpose[32]; (ii) the form of the transaction must be respected under the substance-over-form principles; and (iii) the tax consequences of the transaction must properly reflect the partners' economic agreement and clearly reflect the partners' income unless any deviation from this standard is clearly contemplated by the applicable provision of the Code or Regulations. According to Treasury Regulations Section 1.701-2(a)(3),

---

[31] Treasury Regulations Section 1.1275-6(g) provides that

> [f]or purposes of this section, any reference to a taxpayer, holder, issuer, or person includes, where appropriate, a reference to a predecessor or successor. For purposes of the preceding sentence, a predecessor is a transferor of an asset or liability (including an integrated transaction) to a transferee (the successor) in a nonrecognition transaction. Appropriate adjustments, if necessary, are made in the application of this section to predecessors and successors.

[32] *See* Statement of John Rooney, attorney advisor in the Treasury's Office of Tax Legislative Counsel to the ABA Tax Section on January 29, 1995, reprinted in Sheppard, 66 Tax Notes 776, 778 (1995), that "[s]ubstantial business purpose and principal purpose of tax avoidance cannot co-exist."


C&SLLP004914

> certain provisions of subchapter K and the regulations thereunder were adopted to promote administrative convenience and other policy objectives, with the recognition that the application of those provisions to a transaction could, in some circumstances, produce tax results that do not properly reflect income. Thus, the proper reflection of income requirement of this paragraph (a)(3) is treated as satisfied with respect to a transaction that satisfies paragraphs (a)(1) and (2) of this section to the extent that the application of such a provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision.

Under the Partnership Anti-Abuse Regulations, the Service is granted authority to (1) disregard the partnership in whole or in part; (2) treat one or more partners as not partners; (3) adjust the method of accounting used by the partnership or a partner to clearly reflect the partnership's or the partner's income; (4) reallocate the partnership's income, gain, loss, credit, or deduction; or (5) otherwise adjust or modify the claimed tax treatment. Treas. Reg. § 1.701-2(b).

Whether the Partnership Anti-Abuse Regulations is applicable requires a facts and circumstances analysis of the transaction at issue, including a comparison of the purported business purpose of the transaction with the claimed tax benefits resulting from the transaction. *See* Treas. Reg. § 1.701-2(c). Treasury Regulations Section 1.701-2(c) contains a non-exclusive list of factors that indicate, but do not necessarily establish, that a partnership was formed or availed of with a principal purpose of tax reduction in a manner inconsistent with the intent of subchapter K. These factors are:

> 1. The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's business directly.
>
> 2. The present value of the partners' aggregate federal tax liability is substantially less than if purportedly separate transactions that are designed to achieve a particular end result are treated as steps in a single transaction.
>
> 3. One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities, or have little or no participation in the profits from the







C&SLLP004915

partnership's activities other than a preferred return in the nature of a payment for the use of capital.

4. Substantially all of the partners are related to one another.

5. Partnership items are allocated in accordance with the literal language of Treasury Regulations Sections 1.704-1 and 1.704-2 but the results are inconsistent with the purpose of Section 704(b).

6. The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained by the contributing partner.

7. The benefits and burdens of ownership of partnership property are in substantial part shifted to the distributee partner before or after the property is actually distributed to the distributee partner.

As discussed below, we believe that at least five (5) out of the seven (7) factors are not implicated and the application of at least one (1) of the factors is unclear.

As for the first factor, whether the present value of the aggregate federal tax liability of the Investor and CC would be substantially less than had the Investor and CC owned the assets, and conducted the business, of the LLC directly is not clear. For example, were the Investor to hold the MLD positions directly and sell the positions prior to the Short or Long Maturity Date, the Investor would more likely than not recognize a loss—albeit a short-term capital loss-- equal to the gross premium paid for the long MLD position. Moreover, even assuming, *arguendo,* that the present value of the aggregate federal tax liability of the Investor and CC may be substantially less than had the Investor and CC owned the assets, and conducted the business, of the LLC directly, the use of a limited liability vehicle having at least two members would be necessary to the extent that one of the goals of the Transactions was to create a limited liability pooled investment vehicle for the Investor and CC (and possibly others) that would not be subject to an entity-level tax. A limited liability company or limited partnership that qualify as partnerships for federal income tax purposes are suitable entities for this purpose.

As for the second factor, this factor appears to be a restatement of the "end-result" formulation of the step transaction doctrine. None of the transactions comprising the Transactions are linked to any other transaction and are not predetermined by any other event or transaction, no step in the Transactions is dependent on any other step, and the Investor is at risk, and stands to profit significantly, with respect to each transaction. It has been represented to us that there does not exist, nor will there exist, any understanding, agreement, obligation, or arrangement pursuant to which the Investor, the Corporation, CC, Mr. Brooks, the LLC, SG or any other party involved in the Transactions was, is or will be committed to undertake all or any transaction comprising


C&SLLP004916

the Transactions upon the happening of any other transaction (other than the contractual obligations of any of the parties in respect of the MLD positions).

As for the third factor, CC owns 1% of the total outstanding units of the LLC and is allocated 1% of the LLC's net profits (after the Corporation has been allocated an amount of net profits equal to 10% of the fair market value of the Investor's capital contributions to the LLC). *See* Treas. Reg. § 1.701-2(d), Example 1 (1% interest in a partnership not disregarded). CC is also entitled to receive additional consideration, the amount of which is based on the performance of the Investments of the LLC. In addition, CC is not protected against loss of its investment (although CC is only allocated losses after the Corporation's capital account balance has been reduced to zero).

As for the fourth factor, the Investor is not related to either CC or Mr. Brooks.

As for the fifth factor, the capital accounts of the Corporation and CC are maintained as set forth in Treasury Regulations Section 1.704-1(b)(2)(iv). *See* Section 4.1 of the Operating Agreement. As noted above, after the Corporation has been allocated an amount of LLC net profits equal to 10% of the fair market value of the Investor's capital contributions to the LLC, the remaining net profits are allocated to the Corporation and CC in proportion to their respective LLC Units. In general, distributions follow allocations except that on liquidation of the LLC, distributions are made to the members in accordance with their respective positive capital account balances.

As for the sixth factor, while the Corporation would retain, albeit indirectly, substantially all of the benefits and burdens of ownership of the MLD positions and other investments of the LLC by virtue of the Corporation's ownership of 99% of the LLC's outstanding Units, the LLC is nonetheless the real owner of said positions and investments. *See* Treas. Reg. § 1.701-2(d), *Example (1)*.

Finally, as for the seventh factor, the shifting of the benefits and burdens of ownership of any LLC property to the Corporation or CC would coincide with the actual distribution of any such property to the Corporation or CC, and no earlier or later. Thus, this seventh factor should not be implicated.

Accordingly, we believe that it is more likely than not that the Service would be unsuccessful if it argued for recharacterization of the Transactions as an abuse of subchapter K under the Partnership Anti-Abuse Regulations.

**2. Abuse of entity**

The Partnership Anti-Abuse Regulations also grants the Service the authority to treat a partnership as an aggregate of its partners "as appropriate to carry out the purpose of any provision" of the Code or Regulations. Treas. Reg. § 1.701-2(e). This rule will not apply to the extent that (a) a provision of the Code or Regulations prescribes the treatment of a partnership as an entity, and (b) entity treatment and the ultimate tax







C&SLLP004917

results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision. Treas. Reg. § 1.701-2(e)(2).

Although there is no authority on point, as discussed above, the partnership provisions themselves (including Treasury Regulations Section 1.701-2(a)) contemplate the use of a partnership as a vehicle to permit taxpayers to conduct joint activities. Also, Section 722 by its terms provides that a partner's tax basis in the partner's partnership interest is determined with reference to the tax basis of property contributed by the partner. Moreover, under the partnership scheme, there are often disparities between a partner's tax basis in its partnership interest and the partnership's tax basis in its assets (*see, e.g.*, Section 754). In addition, both the Code and Regulations clearly anticipate disparities in the allocations of gains and losses and require that the Section 704(b) rules are followed. Furthermore, the examples contained in Treasury Regulations Section 1.701-2(f) relate to the use of a partnership to gain advantage of its entity status outside of subchapter K of the Code. Accordingly, we believe that it would be more likely than not that the Service would not be successful were it to attempt to disregard the LLC as an entity under Treasury Regulations Section 1.701-2(e).

### 3. Validity of Partnership Anti-Abuse Regulations

Finally, notwithstanding the foregoing, the validity of the Partnership Anti-Abuse Regulations is not entirely certain. Some commentators have argued that the Partnership Anti-Abuse Regulations could be held to be invalid because they are vague and lack clear and workable standards.[33] To begin with, the language of these regulations is exceedingly broad, and even the examples do not help to elucidate the meaning of the broad terms. Further, arguably, these regulations were adopted in violation of Executive Order 12866. This Executive Order applied to any significant regulatory action, which included a Regulation, that was likely to result in a rule that may (i) have an annual effect on the economy of $100 million or more; (ii) adversely affect in a material way the economy or a sector; or (iii) raise novel legal or policy issues. Commentators have argued that the Partnership Anti-Abuse Regulations satisfy each of these requirements.

Commentators have also asserted that these Regulations are invalid because they are an unconstitutional usurpation of legislative and judicial powers. The Partnership Anti-Abuse Regulations empower the Service to disregard the language of the statute when literal compliance with specific provisions is not consistent with the "intent" of subchapter K, and then create that intent without relying on anything of Congressional origin. In adopting subchapter K as part of the Internal Revenue Code of 1954, Congress specifically considered and rejected the type of tax avoidance test that appears in the Partnership Anti-Abuse Regulations. *See* S. Rep. No.938, 94th Cong., 2d Sess 100 (1976). The courts have held that the Service does not have the authority to disregard statutory provisions merely to reach the result that the Service desires. *See, e.g., Crooks*

[33] See, e.g., McKee, Nelson and Whitmire, Federal Taxation of Partnerships and Partners ¶1.05 (3rd ed., 2000 Cum. Supp. No. 3); Banoff, Anatomy of an Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2, 66 Tax Notes 1859 (March 20, 1995); Gouwar, The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority, 11 J. Partnership Tax'n 287 (1995).







C&SLLP004918

*v. Harrelson*, 282 U.S. 55 (1930); *Commissioner v. Brown*, 380 U.S. 563 (1965); *Busse v. Commissioner*, 479 F2d 1147 (7th Cir. 1973), acq., 1978-2 C.B. 1; *Woods Investment Co. v. Commissioner*, 85 T.C. 274 (1985), acq., 1986-2 C.B. 1. *See also RLC Industries Co. v. Commissioner*, 98 T.C. 457 (1992), aff'd, 58 F.3d 413 (9th Cir. 1995). Arguably, the Partnership Anti-Abuse Regulations attempt to supersede the statute and add restrictions not found in subchapter K of the Code.

Moreover, the Partnership Anti-Abuse Regulations are not based on any specific legislative grant of authority, and consequently may be invalid under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and *Rowan Cos., Inc. v. U.S.*, 452 U.S. 247 (1981). In essence, the Partnership Anti-Abuse Regulations usurp judicial power by granting the Service the power to apply the substantive law on a case by case basis, which is a judicial function. The courts are thus relegated to the rôle of determining whether the Service has abused its discretion, rather than hearing the case de novo where the Service and the taxpayer are on an equal footing.

**H. <u>No Assignment of Income</u>.**

First, we understand, and assume for purposes of our opinions herein, that the LLC's receipt of the short MLD premium from SG did not constitute an income recognition event at the time of receipt and that no income recognition event in respect of this premium would arise until the Short Maturity Date. Under the assignment of income doctrine, income earned from property generally must be included in gross income of the person who beneficially owns the property. *See Blair v. Commissioner*, 300 U.S. 5, 12 (1937) ("[t]he one who is to receive the income as the owner of the beneficial interest is to pay the tax."). We believe that it is more likely than not that this doctrine would not apply to either the Investor's contribution of his LLC membership interest (which, for federal income tax purposes, would be treated as a direct contribution by the Investor of the MLD positions and other assets then held by the LLC) to the Corporation or to the Corporation's deemed contribution of the MLD positions and other LLC assets to the LLC (as a partnership) because the Investor and Corporation would be viewed as having a valid business/investment purpose for such contribution and deemed contribution. *Cf.* Rev. Rul. 80-198, 1980-2 C.B. 113 (holding that where there is a valid business purpose for the transfer of accounts receivable and all assets of a proprietorship, the assignment of income doctrine will not override the non-recognition provisions of Section 351). As for the Investor's contribution, as noted above, it has been represented to us that the Investor's purpose for his contribution was to isolate his investment with CC and Mr. Brooks in a separate investment vehicle through which he could make other investments without the participation of CC or Mr. Brooks.

Furthermore, at the time of the contributions, there was no payment obligation in respect of the Long Bonus Yield or Short Bonus Yield, nor was it ascertainable at that time whether there would ever be a payment obligation in respect thereof. Thus, we believe that it is more likely than not that the Service would not be successful if it sought to treat the Investor's contribution as an anticipatory assignment of income and any income that may arise on settlement of the MLD position as income of the Investor or the Corporation (rather than of the LLC). *Cf. Cold Metal Process Co. v. Commissioner*, 247

F.2d 864 (6th Cir. 1957), rev'd, 25 T.C. 1333 (1956) (assignment of income doctrine was not applied to certain transfer of contract claims for money damages). While the short MLD position may not be viewed as "property" for purposes of Section 721, we believe that it is more likely than not that the above rationale would equally apply to such position and any income recognized in respect thereof (e.g., the income resulting from the short MLD premium) would constitute income of the LLC.

I. **Tax Basis.**

As noted above, we believe that it is more likely than not that the Investor's contribution of his LLC membership interest to the Corporation would be treated, for federal income tax purposes, as a direct contribution by the Investor of the MLD positions and the other assets then held by the LLC to the Corporation. In general, transfers of property to a wholly-owned corporation are tax-free under Section 351(a), except that transfers of property to a corporation that is an investment company are not tax-free under this Section. IRC § 351(e).

In general, a transfer is considered made to an investment company if (a) the transfer directly or indirectly results in the diversification of the transferors' interests, and (b) as relevant, the transferee is a corporation more than 80% of the value of whose assets are held for investment and are "stocks and securities" or interests in regulated investment companies or real estate investment companies. Treas. Reg § 1.351-1(c). For this purpose, all "stocks and securities" held by the corporation would be taken into account. IRC § 351(e)(1)(A). As relevant, "stocks and securities" include money, stocks and other equity interests in a corporation, evidences of indebtedness, options, forward or futures contracts, notional principal contracts and derivatives and any foreign currency. IRC §§ 351(e)(1)(B)(i), (ii) and (iii). The determination of whether a corporation is an investment company is ordinarily made by reference to the circumstances in existence immediately after the transfer in question. Treas. Reg. § 1.351-1(c)(2).[34]

Accordingly, in the case of the Investor's contribution of his LLC membership interest to the Corporation, for the Corporation to be treated as an investment company, such contribution must have resulted directly or indirectly, in diversification of the Investor's interest. Treas. Reg. § 1.351-1(c)(1). According to Treasury Regulations Section 1.351-1(c)(5),

> [a] transfer ordinarily results in the diversification of the transferors' interests if two or more persons transfer nonidentical assets to a corporation in the exchange. For this purpose, if any transaction involves one or more transfers of nonidentical assets which, taken in the aggregate, constitute an insignificant portion of the total value of assets transferred, such transfers shall be disregarded in determining whether diversification has occurred. *If there is only one transferor (or two or more transferors of*

[34] However, where circumstances change thereafter pursuant to a plan in existence at the time of the transfer, this determination shall be made by reference to the later circumstances. *Id.*







C&SLLP004920

> *identical assets) to a newly organized corporation, the transfer will generally be treated as not resulting in diversification....*

(Emphasis added).

Since the Investor's contribution of his LLC membership interest to the Corporation constituted a transfer by one transferor to a newly organized corporation, we believe that it is more likely than not that such contribution did not result in diversification of the Investor's interest and, thus, did not constitute a transfer to an investment company.

Section 721(a) provides that no gain or loss is recognized to a partnership or any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership. Section 721(b), however, provides that this general rule will not apply to any gain realized on a transfer of property to a partnership which would be treated as an investment company (within the meaning of Section 351(e)) if the partnership were incorporated. Thus, we believe that it is more likely than not that the Corporation's deemed transfer of assets of the LLC (as a disregarded entity) to the LLC (as a partnership) resulting from CC's admission as a member of the LLC and its contribution of $2,500 to the LLC would not result in diversification of the Corporation's interest and, therefore, would not constitute a transfer to an investment company. The Corporation's deemed contribution coincided with CC's actual contribution to the LLC of $2,500, which amount constituted no more than 1% (by value) of the total assets contributed (and deemed contributed) by both the Corporation and CC to the LLC. *Compare* Treas. Reg. § 1.351-1(c)(7), *Example (1)* (two transferors each contributed $10,000 worth of the same class of stock to new corporation in exchange for 50 shares of the new corporation's stock and a third transferor contributed $200 worth of readily marketable securities, or just slightly less than 1% -- i.e., .9901%-- to the new corporation in exchange for 1 share of the new corporation's stock. The third transferor's participation is disregarded and no diversification resulted) *with* Rev. Rul. 87-9, 1987-1 C.B. 133 (transfers by two transferors to new corporation in exchange for 89% and 11% of the stock of the new corporation found to result in diversification).

Moreover, even assuming, *arguendo*, that either the Investor's contribution and the Corporation's deemed contribution resulted in diversification, given the timing of the contribution and deemed contribution, we believe that it is more likely than not that the Investor did not recognize any gain or loss as a result of such contribution or deemed contribution.

Section 722 provides, in general, that "[t]he basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership is the amount of money and the contributing partner's adjusted basis of such property at the time of the contribution . . . ." Here, upon the admission of CC as a member of the LLC and its contribution of $2,500 to the LLC, the LLC would be deemed converted from a disregarded entity to a partnership for federal income tax purposes. As such, the Corporation would be treated as having contributed the MLD positions and the other







C&SLLP004921

assets of the LLC (as a disregarded entity) to the LLC (as a partnership) in exchange for 99,000 Class A LLC Units, or 99% of the total outstanding units in the LLC. We believe that it is more likely than not that the Corporation's basis in its Class A LLC Units at such time was equal to the gross premium paid by the LLC for its long MLD position, without reduction for the Short Bonus Yield, plus the amount of the LLC's cash and the LLC's basis in its other assets.[35]

It is possible that the Service could argue that the long and short MLD positions acquired by the LLC should be treated as a single property interest (because, for example, the long and short MLD positions were purchased or sold on the same date with the same counterparty). However, we believe that it is more likely than not that the long and short MLD positions would be treated as separate property interests for federal income tax purposes (with there being no reduction in basis from the Short Bonus Yield).

By analogy, there is also additional support for treating the long and short MLD positions as separate investments in the federal income tax treatment of options. Section 1234 provides, in general, that gain or loss attributable to the failure to exercise an option to buy or sell property will be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates. If an option is exercised, the option cost, or premium, is included in determining the total cost basis of the property. *See* Rev. Rul. 78-182, 1978-1 C.B. 265. From Rev. Rul. 78-182, it can be inferred that the holder of an option obtains a basis in the option (until exercise or lapse) equal to the cost of the premium. The Service also found in that ruling that where both a put and call are sold at the same time for separate identifiable premiums, the writer determines its gain or loss for each position by reference to the separate premium received for each position. Consequently, and as Rev. Rul. 78-182 illustrates, it appears to be the long-standing view of the Service not to merge two offsetting positions for determining a taxpayer's basis in each position.

In addition, the short and long MLD positions may be transferred or assigned independently of each other (subject to any credit requirements of the counterparty). For example, Congress needed to add Section 269B to the Code to provide special rules for the treatment of a stapled entity. A stapled entity is one where the stock of one entity cannot be traded without trading the stock of the other entity. The legislative history of this provision indicates that the law in this regard was unclear. Staff of the Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Tax Reform Act of 1984, 98th Cong., 2d Sess., 454 (1984). We are not aware of any efforts by Congress to treat non-stapled entities as a single entity. Moreover, the obligations under the short and long MLD positions are separate obligations. For example, it is possible that the LLC could find itself in a position of having to pay SG under the short

[35] Alternatively, the Corporation's basis in its Class A LLC Units could be viewed as being equal to the sum of (i) the Long Deposit Amount, (ii) the amount of the LLC's cash, (iii) the LLC's basis in its other assets, and (iv) the gross premium paid by the LLC for its long MLD position, reduced by the Short Deposit Amount and any other liabilities of the LLC (although, as discussed below, the Short Bonus Yield more likely than not would not constitute a liability for Section 752 or 357 purposes).

MLD position but being unable to collect from SG under the long MLD position, whether due to SG's bankruptcy or otherwise.[36]

In addition, Congress has recognized that separate instruments are generally given separate effect, even when one transaction may significantly offset the risk of the other. *See, e.g.*, IRC §§ 1092 (loss on one position of a straddle is deferred until gain is recognized on the offsetting position; the offsetting positions are not netted), IRC §§1258 (recharacterizing certain gain attributable to the time value of a taxpayer's investment as ordinary income, not purporting to recharacterize the transaction as a borrowing) and 1259 (constructive sale provision).

Finally, case law recognizes that a taxpayer can hold long and short positions in property at the same time, and that each position constitutes a separate property interest. In *Smith v. Commissioner*, 78 T.C. 350 (1982), the court held that each leg of a straddle should be treated as separate property, whether the legs were acquired at different times or at the same time. *See also Stoller v. Commissioner*, 994 F.2d 855 (DC Cir. 1993) *aff'g in part and rev'g in part*, 60 TCM (CCH) 1554 (1990) (separate contracts were respected); *Richardson v. Commissioner*, 121 F.2d 1 (2d Cir. 1941) (can hold long and short positions at the same time). *See also* Rev. Proc. 65-29, 1965-2 CB 1023; Rev. Rul. 78-182, 1978-1 CB 265; *Arnall v. U.S.*, a District Court case unofficially reported at 4 AFTR 2d 5975 (N.D. Ga. 1959).

Here, the long and short MLD positions: (i) were bought and sold separately and for separate identifiable purchase prices; and (ii) could be transferred or assigned independently of each other. Accordingly, we believe that it is more likely than not that the long and short MLD positions would be treated as separate property interests for federal income tax purposes and that the effect of each MLD position on tax basis would be determined separately.

### J. Treatment of MLD positions as debt instruments.

In general, an MLD position constitutes a deposit made by the depositor with the deposit recipient, whereby the deposit recipient is obligated to pay, in addition to the deposit amount (here, the Short or Long Deposit Amount) and the fixed interest component (here, the Short or Long Fixed Yield), a contingent payment (here, the Short or Long Bonus Yield) based on a certain rate if the applicable financial market measure has been reached on the maturity date (here, the Short or Long Maturity Date). Accordingly, we believe that it is more likely than not that an MLD position would constitute a debt instrument for federal income tax purposes. *See, e.g.*, Treas. Reg. § 1.1232-1(d) (for purposes of Section 1232—i.e., the predecessor statute to Sections 1271 through 1275—the term "other evidence of indebtedness" included certificates of deposit, time deposits, bonus plans and other deposit arrangements with banks, domestic building and loan associations, and similar financial institutions); Rev. Rul. 85-119, 1985-2 C.B. 60 (analyzing whether certain equity-flavored bank holding company securities should

[36] Of course, the LLC would presumably also have the opportunity to file for bankruptcy if it had insufficient assets to pay on the short MLD position.







C&SLLP004923

constitute debt rather than equity for federal income tax purposes); Notice 94-47, 1994-1 C.B. 357 (setting forth relevant factors to be considered in debt v. equity characterization). *See also* David P. Hariton, "Distinguishing Between Equity and Debt in the New Financial Environment," 49 *Tax L. Rev.* 499, 500 (1994) (analyzing the distinction between equity and debt, and noting that such distinction "turns on relative participation in the burdens and benefits of ownership").

We further believe that it is more likely than not that an MLD deposit constitutes a "short-term nongovernment obligation" or "short-term obligation" (within the meanings of Sections 1271(a)(4) and 1272(a)(2)(C), respectively) and that, in addition to the payment of the Long Fixed Yield and Short Fixed Yield, any payment of the Long Bonus Yield and Short Bonus Yield would be treated as interest, whether under the rules of Treasury Regulations Section 1.1275-4 applicable to contingent payment debt instruments, *see, e.g.*, Treas. Reg. 1.1275-4(b)(8)(i) (any gain recognized by a holder on the sale, exchange, or retirement of a debt instrument subject to Treasury Regulations Section 1.1275-4(b) is interest income), the rules applicable to variable rate debt instruments under Treasury Regulations Section 1.1275-5, or under general principles of tax law in the event that the rules of Treasury Regulations Section 1.1275-4 or 1.1275-5 would not apply by reason of, for example, Treasury Regulations Section 1.1275-4(a)(2)(vi). *See, e.g.*, Rev. Rul. 83-51, 1983-1 C.B. 48 (contingent interest under a shared appreciation mortgage is interest for purposes of Section 163).

## K. Impact of Sections 357, 358 and Related Authorities

### 1. In General

As discussed above, we believe the Investor's contribution of his LLC membership interest to the Corporation in exchange for all of the Corporation's stock would constitute a tax-free exchange under Section 351(a). As such, the Investor's basis in the Corporation stock received in the exchange was equal to the basis of the property contributed by the Investor to the Corporation (i.e., for federal income tax purposes, the short and long MLD positions and other assets then held by the LLC), decreased by: (i) the fair market value of any other property (except money) received by the Investor, (ii) the amount of any money received by the Investor, and (iii) the amount of loss recognized by the Investor on the exchange, and increased by the amount of gain recognized by the Investor on the exchange. IRC § 358(a)(1). For this purpose, any liability assumed by the Corporation in the exchange, other than a liability excluded under Section 357(c)(3),[37] would be treated as money received by the Investor (and, thus, would reduce the Investor's basis in his Corporation stock). IRC § 358(d).

[37] Such a liability would include a liability the payment of which would give rise to a deduction (although not a deduction that results in the creation of, or increase in, the basis of any property) or would be described in Section 736(a) (in general, certain payments made in liquidation of a partner's interest in a partnership).

Both Congress and the Service have indicated that the term "liability" as used in Sections 357, 358 and 752 are synonymous. H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess, 1984-3 (vol. 2) CB 110-11 (Congress amended Section 704(c) to, *inter alia*, require that accounts payable contributed to a partnership be allocated to the contributing partner and not be treated as a liability of the partnership under Section 752. According to the conference committee report, this treatment was intended to be "parallel to the [1978] amendment to section 357(c)", which also excluded deductible liabilities from the definition of "liability"); Rev. Rul. 88-77, 1988-2 C.B. 129 (noting that the legislative history accompanying the amendment to section 704(c) made by the Tax Reform Act of 1984 explicitly rejected the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of Section 752 that is consistent with section 357(c)); Rev. Rul. 95-74, 1995-2 C.B. 36 (In support of its ruling that contingent environmental liabilities were not "liabilities" for purposes Sections 357 and 358, the IRS cited Rev. Rul. 88-77, which addressed the treatment of liabilities under Section 752).

Accordingly, as discussed in II.L. below, we believe that it is more likely than not that the Short Bonus Yield did not constitute a "liability" for purposes of Section 358(d) and that the Investor was not required to reduce his basis in his Corporation stock in respect of the Short Bonus Yield. *See also* discussion on Section 358(h) in paragraph 2 below.

**2. Nonapplication of Section 358(h)**

Section 358(h) provides, in relevant part, that if the basis of property transferred to a corporation in a Section 351 exchange exceeds its fair market value, then the transferor's basis in the stock received must be reduced (but not below fair market value) by the amount (determined as of the date of the exchange) of any "liability" assumed in exchange for the property.

Section 309(c)(1) of H.R. 5662, contained in The Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763, directed the Service to prescribe "rules which provide appropriate adjustments under subchapter K of chapter 1 of the Code to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities as defined in Section 358(h) in transactions involving partnerships." For this purpose, the term "liability" includes "any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." IRC § 358(h)(3). However, this general rule does not apply to any liability if –

> (A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or
>
> (B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.







C&SLLP004925

IRC § 358(h)(2).

Accordingly, even assuming, *arguendo*, that the Short Bonus Yield constituted a "liability" for purposes of Section 358(h), as the Investor had transferred his entire LLC membership interest and, thus, for federal income tax purposes, all of the LLC's assets (and, thus, all of the assets which were associated[38] with the short MLD position -- i.e., the long MLD position), we believe that it is more likely than not that the exception of Section 358(h)(2) would apply.[39]

### L. <u>Impact of Section 752 and Related Authorities.</u>

Section 752, relating to the treatment of certain liabilities, provides that an increase in a partner's share of liabilities, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, will be considered as a contribution of money by such partner to the partnership. Any decrease in a partner's share of liabilities, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, will be considered as a distribution of money to the partner by the partnership. The term "liability" is not defined in either the Code or Regulations.

The courts have consistently held that obligations which are contingent or speculative are not liabilities for purposes of Section 752, a principle which the Service has consistently followed. *See, e.g., Long v. Commissioner*, 660 F.2d 416 (10th Cir. 1981), *aff'g* 71 T.C. 1 (1979); *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982). This line of authority is based on the theory that contingent or speculative obligations cannot give rise to basis. *See, e.g., Denver & Rio Grande Western Railroad Co. v. United States*, 505 F.2d 1266 (Ct. Cl. 1974); *Lemery v. Commissioner*, 52 T.C. 367 (1969), *aff'd* 451 F.2d 173 (9th Cir. 1971).

In *Long*, the Tenth Circuit addressed whether certain contested claims against a partnership were liabilities under Section 752. In holding that the obligations were not liabilities, the court stated that the Tax Court

> held that because the lawsuit claims against the partnership were indefinite and contingent liabilities, they should not be recognized for basis adjustment purposes

[38] We believe that the fact that the short MLD position was "associated" with the long MLD position for purposes of this exception is not the same as saying that the short MLD position and long MLD position are subject to integration.

[39] Although Section 358(h) would, if it were to apply at all, require that the Investor reduce his basis in his Corporation stock (although not the Corporation's basis in the LLC assets or, otherwise, its LLC membership interest), this would nonetheless have the effect of limiting the amount of any loss of the Corporation that could be taken into account by the Investor. *See* IRC § 1366(d)(generally, amount of S corporation's losses and deductions that the S corporation shareholder is permitted to take into account may not exceed the shareholder's adjusted basis in his S corporation stock and any S corporation debt owed to the shareholder).

> *until the exact amounts of the liabilities were established.* After the parties settled those suits, the Tax Court treated the settlement totals plus attorneys' fees incurred as partnership liabilities and permitted adjustment of the estate's basis in the partnership interest to the extent of its 25% interest. *See* 1 W. McKee, W. Nelson & R. Whitmire, *Federal Taxation of Partnerships and Partners* ¶ 7.01[2] (1997). We agree with this approach and holding.

*Long*, 660 F.2d at 419 (emphasis added).

The *Brountas* case involved an oil and gas drilling partnership investment partially paid with non-recourse obligations that were to be satisfied only out of oil production payments. The First Circuit, in *Brountas*, characterized the obligation as highly contingent and speculative and seeming "less like the repayment obligation that typically accompanies a recourse loan than like a device for sharing business risks — the risks that accompany oil explorations." 692 F.2d at 158. As a result, the court similarly held that the obligations were not partnership liabilities for purposes of Section 752.

In determining whether an obligation is contingent, the analysis generally stops if the terms of the obligation objectively impose a contingency. *See, e.g., Denver & Rio Grande Western Railroad Co. v. United States*, 505 F.2d 1266 (Ct. Cl. 1974); *Lemery v. Commissioner, supra*. In *Denver & Rio Grande Western Railroad Co.*, the Court of Claims refused to allow the railroad taxpayer to include in its basis advances by a customer (used to build a "spur line") which were repayable only out of proceeds from shipping above a certain annual tonnage for ten years. The taxpayer argued that the repayment obligation was not contingent because in light of the underlying facts and circumstances, it could be predicted with "reasonable certainty" that the advances would be repaid in full. The court rejected the argument, stating that it did not matter what the parties' subjective intentions were. Absent a binding obligation to repay all of the advances at the time the subject deductions were taken, the court considered it "impossible" to value the obligation assumed. *See* 505 F.2d at 1269-70.

In *Lemery*, the Tax Court held that an obligation to pay part of the purchase price of a business out of "net profit" was too contingent to be included in the purchaser's basis. The petitioners were unsuccessful in arguing that, although the amount was contingent, the liability itself was absolute. *See* 52 T.C. at 377-78.

Further, in *La Rue v. Commissioner*, 90 T.C. 465 (1988), the Tax Court held that liabilities attributable to an accrual basis partnership's deductible expenses must meet the "all events" test of Section 461 (described below) before they would be considered "liabilities" for inclusion in the basis of a partner's partnership interest. In that case, La Rue was a general partner of GooSGody and Co. ("GooSGody") a large stock brokerage firm. Due to the inability of record-keeping technology at the time to keep up with trading volume, GooSGody incurred large, unanticipated "back office" liabilities. These back office liabilities were created by the following types of transactions:

(1) Fails to Receive — Securities which the broker should have purchased at a stated price were not purchased. Gain or loss would be incurred on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities. These transactions were the functional equivalent of short sale transactions.

(2) Fails to Deliver — Securities which the broker thought were sold to another broker but for which no "comparison" for proof could be provided. These securities then had to be sold and the gain or loss incurred was measured by the difference between the original sales price and the actual proceeds received.

(3) Securities Differences — These represented differences between the securities the broker's records stated it should be holding for its own or other's accounts and the securities actually "in the box." These resulted mainly from incorrect deliveries, receipts, or thefts. Gain or loss was measured by the value of excess securities or their replacement cost.

(4) Dividend Errors — The broker was responsible to its customers for dividends and interest on securities which it held as nominee for its customers, that is, securities held in "street name." If the broker failed to receive a dividend or interest payment when due, it was still liable to its customer for such amount.

Due to the large losses generated by these back office problems and the withdrawal of capital by subordinated lenders, GooSGody was in violation of the New York Stock Exchange minimum capital requirements. At the same time, another brokerage firm, Merrill Lynch, agreed to acquire GooSGody. The acquisition transaction raised the issue as to whether La Rue, and the other GooSGody partners, could include the back office liabilities in the bases of their partnership interests.

The Tax Court held that the GooSGody partners could not include these back office liabilities in their bases because the "all events" test had not been met. The court reasoned that:

> [b]ecause an accrual basis partnership uses the "all-events" test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis.

*La Rue*, 90 T.C. at 478 (citations omitted). The all-events test is met with respect to any item if all events have occurred which determine the fact of the liability and the amount of the liability can be determined with reasonable accuracy. *See* Treas. Reg. § 1.461-1(a). The court found that while GooSGody had a liability to its customers for their back







C&SLLP004928

office failures, the amount of these liabilities were not determinable with reasonable accuracy until any missing securities were purchased or excess securities were sold at the market price. *See La Rue* at 479.

Here, at the time of the Corporation's deemed contribution of the MLD positions of the LLC (as a disregarded entity) to the LLC (as a partnership), the LLC's obligation in respect of the Short Bonus Yield was analogous to the contingent obligations discussed in the above cases. *See also* Treas. Reg. §§ 1.1275-4 and 1.1275-5. By its terms, the Short Bonus Yield was, and will remain until the Short Maturity Date, both contingent and speculative. Whether the LLC had, or will have, any payment obligation in respect of the Short Bonus Yield and, if so, the amount of such payment obligation was, and will remain, unknown, unascertainable and otherwise not determinable with reasonable accuracy until the Short Maturity Date. Thus, we believe that it is more likely than not that the Corporation was not required to reduce its tax basis in its Class A LLC Units by reason of the Short Bonus Yield deemed contributed by the Corporation to the LLC (as a partnership).

The conclusion that the Short Bonus Yield is not a liability for tax purposes is also supported by former Temporary Regulations Section 1.752-1T(g) (T.D. 8237, 1989-1 C.B. 180 (1988)). That temporary Regulation, which was effective from December 29, 1988, through December 29, 1991, defined partnership liabilities and, through examples, provided that a partnership obligation governed by Temporary Regulations Section 1.752-1T must first be debt for United States federal income tax purposes in order to qualify as a partnership liability under Section 752. *See, e.g., Chevron Corporation v. Commissioner*, 104 T.C. 719, 771-74 (1995) (regarding effect of examples under a Regulation). *See also* Examples (2) and (3)(ii) of paragraph (k) of former Temporary Regulations Section 1.752-1T. The final Regulations under Section 752 do not contain a definition of the term "liability,".[40] However, the Service's position on what in fact is a liability was articulated in Rev. Rul. 88-77, 1988-2 C.B. 128, which is generally identical to the Temporary Regulations. In the Ruling, the Service held that for purposes of computing the adjusted basis of a partner's interest in a cash basis

[40] On July 31, 1991, Treasury issued proposed regulations (the "Proposed Regulations") designed to "simplify the Temporary Regulations." (Preamble to PS-49-91 (Federal Register, July 31, 1991)). The Proposed Regulations, which are generally effective after December 28, 1991, delete entirely the definition of "liability" for purposes of section 752. The preamble to the Proposed Regulations does not reveal any substantive reason for this deletion, other than the streamlining of the Temporary Regulations. The definition was likewise excluded from the final Regulations without explanation. One commentator has noted that "[w]hile the final Regulations inexplicably fail to include that definition, it would appear an appropriate definition for purposes of the final Regulations as it was the distillation of numerous judicial and administrative pronouncements." Willis, Pennell and Postlewaite, *Partnership Taxation*, ¶ 6.01[2] (6th ed. 1999) (footnote omitted). This appears to be confirmed by the Service's failure to revoke Rev. Rul. 88-77 which contains a "liability" definition identical to that contained in the Temporary Regulations. Moreover, as one commentator noted, there appears "to be no exceptions under which an obligation that satisfies any of the enumerated criteria is not a liability, or under which an obligation that does not satisfy any of the criteria is a liability." McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners*, ¶ 7.01[1] at n.3 (2d ed. 1990) (emphasis added).







C&SLLP004929

partnership, accrued but unpaid expenses and accounts payable are not liabilities of the partnership or "partnership liabilities" within the meaning of Section 752. Consequently, a partner's tax basis in its partnership interest would not be increased by such expenses or account payable. Accordingly, under this Service-sanctioned definition of liability, we believe that it is more likely than not that, at the time that the short MLD position was deemed contributed by the Corporation to the LLC, the Short Bonus Yield would not constitute a liability for Section 752 purposes. *Cf. Deputy v. du Pont*, 308 U.S. 488 (1940); Rev. Rul. 95-8, 1995-4 I.R.B. 29.

The Supreme Court, in *Deputy v. du Pont*, stated that, in terms of a short sale of stock, "although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness.'" In that case, the taxpayer, Pierre du Pont, borrowed stock of E. I. du Pont de Nemours and Company ("du Pont") under an agreement whereby he agreed to return the stock loaned in kind within ten years and in the interim to pay to the lender all dividends declared and paid on the shares so loaned. The taxpayer then sold the borrowed shares to certain executives of du Pont for cash, which such executives borrowed from du Pont. It was thought desirable that these executives have a financial interest in du Pont, but there were alleged legal prohibitions on the corporation itself selling the stock to them. When the ten-year term of the loan was about to expire, the taxpayer arranged for a new loan of securities from a different lender in order to satisfy his obligation to the first lender. The second loan of du Pont stock was similar to the first, in that it had a ten-year term, the obligation was to return the stock loaned in kind, and in the interim pay an amount equivalent to all dividends declared and paid on the borrowed shares, plus an amount equal to the lender's tax liability arising by reason of the agreement. The Service disallowed the deduction of the amounts paid to the second lender on the grounds that the payment was not an ordinary and necessary business expense of the taxpayer, nor was it deductible interest.

The disallowance was reversed on appeal, but upheld by the Supreme Court. On the first point, the Supreme Court held against the taxpayer, finding that while the expenditures related to offering incentives to du Pont's management may have been ordinary and necessary to du Pont's business, they were not ordinary and necessary business expenditures of the taxpayer. On the second point, the Supreme Court also held against the taxpayer, finding that the payments relating to the security loan did not constitute interest, because the obligation to return the du Pont shares was not an "indebtedness," and the amounts paid did not constitute "interest," which was defined as "compensation for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. at 498.

Similarly, in Rev. Rul. 88-77, *supra*, as noted heretofore, the Service held that:

> [f]or purposes of section 752 of the Code, the terms "liabilities of a partnership" and "partnership liabilities" include an obligation *only if and to the extent that* incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to

> borrowings), gives rise to an immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest. The preceding sentence uses the term "assets" to include capitalized items that are properly allocable to future periods, such as organizational expenses and construction period expenses. (emphasis added).

Thus, for purposes of Section 752, a liability does not exist, and therefore no Section 752 adjustment should be appropriate in connection with a partnership obligation that neither increases the basis of partnership assets, generates a partnership deduction or constitutes a nondeductible, noncapital expenditure of the partnership. Prior to the Short Maturity Date, the Short Bonus Yield would neither increase the basis of any LLC asset, generate any LLC deduction or constitute a nondeductible, noncapital expenditure of the LLC.

Further support for not treating the Short Bonus Yield as a liability for Section 752 purposes is found in Rev. Rul. 73-301, 1973-2 C.B. 215. In that ruling, a partnership received cash progress payments on a construction contract reported under the completed contract method. The partnership distributed the cash to its partners. The issue was whether the partnership's obligation under the contract caused the advance payments to constitute Section 752 liabilities. If so, the cash distributions to the partners would not have exceeded the basis of the partners' interests. The Service refused to accord Section 752 liability treatment to the construction contract, stating that

> [t]he progress payments . . . received by the partnership and reflected as "deferred income" on the books of the partnership . . . represent amounts received on account of services performed on the contract not yet reported as gross income. This amount together with the right of the partnership to an additional payment . . . for work performed constitute "unrealized receivables" within the meaning of section 751(c) of the Code, and the progress payments are not a "liability" as referred to in section 752 which increases the adjusted basis of the partnership interests of the partners. The income or loss from performance of the contract will affect the basis of the partnership interests of the partners, as provided in section 705(a), when such income or loss is recognized for Federal income tax purposes.
>
> Accordingly, no increase in the adjusted basis of the partnership interests . . . is made as a result of the receipt by the partnership of the advance payments within the meaning of section 752(a) of the Code.



C&SLLP004931

Rev. Rul. 73-301, 1973-2 C.B. 216. Therefore, the Service disallowed a Section 752 basis step-up, despite the resulting disparity between the inside basis of the partnership's assets and the outside basis of the partnership interests.

Similarly, in *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), the Tax Court held that a partnership's receipt of money pursuant to an option agreement did not create a partnership liability under Section 752. In *Helmer*, a partnership owned certain real property on which it granted a corporation a purchase option. In consideration for the option, the corporation paid cash to the partnership. The partnership distributed the cash to its partners. The Service argued that the option agreement did not create a partnership liability under Section 752 and, therefore, the distribution of the option money caused the partners to recognize gain under Section 731 (*i.e.*, the distribution of the option money exceeded the partners' tax bases in their partnership interests). The partners argued that the receipt of the option money created a short option partnership liability under Section 752, which increased the adjusted basis of their respective partnership interests.

The Tax Court held for the Service, even though a disparity between partnership inside and outside basis resulted. In so holding, the Tax Court noted that it was

> . . . faced with a unique situation. Helmer Brothers received payments pursuant to the option agreement when there was no forfeiture of any of the option payments, the option had not been terminated, nor had any portion of the option been exercised by the optionee. Respondent, in his brief, conceded that the income from the option payments was deferrable by the partnership until characterized as ordinary income (because of a default by the optionee) or capital gains (because of an exercise of the option by the optionee). . . .
>
> . . . The moneys received under the option agreement were received without any restrictions except that upon exercise of the option such amounts would be applied against the purchase price. Thus, the restriction only affected the character of the gain in the partnership's hands. It is this lack of ability to determine character of income (not any liability to repay or to perform) that causes the deferral of the recognition of the income by the partnership until the option is either exercised or lapsed.

*Helmer*, 34 T.C.M. (CCH) at 731 (citations omitted).

In *Salina Partnership*, *supra*, although finding that the taxpayer had entered into the transaction for a valid business purpose independent of tax purposes, the Tax Court