nonetheless held that the short sale of Treasury bills constituted a liability within the meaning of Section 752, noting that

> . . . Salina's obligation to close its short sale by replacing the Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN.

*Id.* In that case, the Service had maintained that the taxpayer had substantially overstated the amount of its short-term capital gain (and the amount of such gain that was allocated to FPL, its 98% corporate limited partner that had a large capital loss carryover available to offset such gain) by failing to treat its obligation to return the Treasury bills that it sold short as a "liability" under Section 752(a). The court rejected the taxpayer's argument that the difference between FPL's outside basis and taxpayer's basis in its assets was attributable to the "open transaction" treatment accorded to short sales under Section 1233, and that Rev. Rul. 95-26 conflicted with Rev. Rul. 73-301 and *Helmer v. Commissioner*.

In its discussion of *Helmer*, the *Salina Partnership* court noted that the *Helmer* court had agreed with the Commissioner that no liability within the meaning of Section 752 arose upon the partnership's receipt of the option payments, emphasizing that income attributable to the option payments was subject to deferral at the partnership level "due only to the inability of the partnership to determine the character of the gain,[41] *not because the partnership was subject to a liability to repay the funds paid or to perform any services in the future.*" The court further noted that it was suggested in *Helmer* that a partnership liability under Section 752 may arise where a partnership receives payments in a transaction that qualifies as an open transaction for tax purposes *if the partnership is subject to a liability to repay the funds or to perform any services in the future.*

In rejecting the taxpayer's attempts to draw an analogy between the option payments in *Helmer* and the cash proceeds received on the sale of the borrowed Treasury bills, the Tax Court, in *Salina Partnership*, noted that

> [a]lthough the two transactions are both considered open transactions for purposes of application of the income tax, the transactions are materially different for purposes of analysis under section 752. The option payments that the partnership received in Helmer v. Commissioner, supra, represented fixed payments on the sale of a partnership

[41] In *Helmer*, the court made reference to how the Commissioner had "conceded that the income from the option payments was deferrable by the partnership until characterized as ordinary income (because of a default by the optionee) or capital gains (because of an exercise of the option by the optionee)." TC Memo 1975-160 (May 27, 1975).

> asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills.

The Tax Court expressly acknowledged that while a short sale obligation and an option were both open transactions for federal income tax purposes, only the short sale obligation constituted a "liability" for Section 752 purposes. *See also* Rev. Rul. 95-26, 1995-1 C.B. 131 (service concluded that the short sale created a partnership liability within the meaning of Section 752, (relying upon Rev. Rul. 88-77 for the proposition that a liability under section 752 includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets)).

Here, the premium received by the LLC in respect of the short MLD position was and continues to remain "free and clear of any claim for repayment or demand for further services" and did not, and does not, constitute a financial or pecuniary obligation of the holder of said position.

Moreover, even assuming, *arguendo*, that the Short Bonus Yield was required to be treated as a liability for Section 752 purposes, we believe that it is more likely than not that the Corporation's basis in its Class A LLC Units would not be affected by such treatment because the amount of this "liability" would be considered zero. In Rev. Rul. 95-45, 1995-1 C.B. 53, the taxpayer sold securities short and contributed the $1,000x proceeds and the short sale obligation to a corporation in exchange for stock in a Section 351 exchange. At the time of the transfer, the value of the securities was $800x. The Service concluded that the short sale obligation was a liability, and that the amount of the liability was $1,000x.

If the Service is correct that the amount of the liability is determined by the original value of the securities to be delivered, the short MLD position (and the Short Bonus Yield) is nevertheless distinguishable because, at the time of the Corporation's deemed contribution of the short MLD position to the LLC, whether the LLC would have any payment obligation in respect of the Short Bonus Yield and, if so, the amount of such payment obligation, was unknown, unascertainable and could not be determined with reasonable accuracy. By contrast, the short seller, in Rev. Rul. 95-45, had to transfer securities albeit which at the time of such contribution was worth only $800x. The Service might assert that the amount of the liability is not the actual amount of the liability but the amount included in basis. This argument produces an incorrect result in other contexts, and should be rejected here. For example, assume a taxpayer purchases an asset with $1,000x of borrowed funds, repays a portion of such loan with other assets, and then contributes the property and the liability to a corporation. Under the Service's approach, the taxpayer's basis under Section 358 in the stock received would be reduced by $1,000x, the original amount of the loan included in basis. This is clearly the incorrect result: basis would more likely than not be reduced only by the actual amount of the liability. In the case of a short MLD position, we believe that it is more likely than not that the amount of the liability in respect of the Short Bonus Yield would be zero at

the time of the Corporation's deemed contribution of the short MLD position to the LLC.[42]

Also, for the same reason that we believe that Section 358(h) would not apply to the Investor's contribution of his LLC membership interest to the Corporation, *see* II.L.2 *supra*, we also believe that it is more likely than not that Section 358(h) would not apply to the Corporation's deemed contribution to the LLC (as a partnership).

**M. Nonapplication of Notice 2000-44.**

In Notice 2000-44, 2000-36 I.R.B. 255 (the "Notice"), the Service addressed several fact patterns, including the following:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any

[42] Furthermore, the amount of the liability is not the amount that the obligor might have to pay the obligee currently to free himself of the obligation. *Accord*, Rev. Rul. 95-45, *supra*, the Service ruled that the assumed obligation was a "liability" in the amount of $1000x even though the obligee would have had to pay only $800 to free himself from the obligation. Similarly, except in the case of the original issue discount rules (which are an overlay on the common tax law of debt obligations and in any event apply only after a *de minimis* threshold), the amount of a debt obligation for tax purposes is set when the obligation is issued: it does not change with fluctuations in interest rates or the issuer's credit rating, even though these changes would affect the value of the debt obligation and therefore the amount that an economically rational issuer would pay the holder to discharge the debt. Also, while discharge of indebtedness income is measured by the original issue price and not by the face amount, for numerous other tax purposes the amount of a debt obligation is its face amount, i.e., the amount that the holder would receive at maturity. *See, e.g.*, IRC §§ 144(a)(1), 148(f)(4)(D), 453A(c)(4), 691(a)(5)(B). We believe that it is more likely than not that the Short Bonus Yield has no "face amount" *per se*, but particularly when there is no payment obligation in respect thereof and, otherwise, the amount of such payment obligation, if any, is unascertainable and cannot be determined with reasonable accuracy.







C&SLLP004935

> income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.
>
> The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of Section 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). *See Fox v. Commissioner*, 82 T.C. 1001 (1984). *Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.*
>
> Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

(Emphasis added).

Even assuming, *arguendo*, that (i) the Service and Treasury had the requisite statutory authority to issue the Notice, and (ii) the Notice is somehow binding on taxpayers, *see discussion infra*, we believe that it is more likely than not that the Notice was intended by the Service to address the purchase and sale of options and, therefore,







C&SLLP004936

would not apply to the MLD positions which more likely than not constitute debt instruments for federal income tax purposes.

As for the Investor's contribution of his LLC membership interest to the Corporation in what is more likely than not a Section 351 exchange, the Notice noted that "tax losses *from similar transactions* designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes." The Notice addressed a transaction involving a Section 721 exchange of options for a partnership interest. A Section 351 exchange would, *arguably*, be viewed as similar to a Section 721 exchange. However, we believe that it is more likely than not that the Investor's Section 351 exchange would not be "similar" to the Section 721 options transaction addressed in the Notice. For one thing, unlike the options transaction in the Notice, the Investor's net economic outlay to acquire the Corporation stock — i.e., approximately $674,187.50 in MLD positions, cash and other foreign currency investments— would more likely than not not be considered "nominal or zero".

As for the Corporation's deemed contribution of the MLD positions to the LLC, the Notice provides little, if any, technical analysis regarding the possible application of Section 752 or other provisions of the Code or Regulations to even the fact pattern set forth therein and, that, it is impossible to determine how Section 752 should (if at all) apply to said MLD positions.

In Rev. Rul. 95-26, 1995-1 C.B. 131, the Service addressed whether a partnership's short sale of securities created a liability within the meaning of Section 752. In that ruling, a partnership entered into a short sale of securities on a national securities exchange and the partnership's broker-dealer took securities on hand and sold them on behalf of the partnership. The partnership left the cash proceeds from the sale with the broker-dealer as collateral and deposited additional cash with the broker dealer as further collateral. The partnership was obligated to deliver identical securities to the broker-dealer to close out the short sale. On these facts, the Service concluded that the short sale created a partnership liability within the meaning of Section 752, and relied upon Rev. Rul. 88-77, *supra*, for the proposition that a liability under Section 752 includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets. The Service concluded that a short sale creates such a liability because (a) a short sale created an obligation to return the borrowed securities, and (b) the partnership basis in its assets was increased by the amount of the cash received on the sale of borrowed securities. *See also Salina Partnership, supra.*

As quoted above, the Notice provides that the "transactions may be subject to challenge under § 752," but it does not provide any critical analysis on how Section 752 should apply. The Notice concludes that the taxpayer would be incorrect in increasing its basis in its partnership interest by the cost of the call option while not reducing the basis as a result of the partnership's assumption of the taxpayer's obligation with respect to the offsetting call option. Yet, the Notice fails to articulate how Section 752 would reduce


C&SLLP004937

the basis since any decrease in a partner's individual liabilities by reason of assumption by the partnership of such liabilities (under Section 752(b)) would be offset by an increase in its basis provided under Section 752(a). *See* Treas. Reg. § 1.752-1(f).

Moreover, when it issued the Notice, the Service did not revoke its long-standing position regarding the definition of liability espoused in Rev. Rul. 88-77. The Notice is also inconsistent with the Tax Court's view that granting an option does not create a liability under Section 752, as expressed in the *Helmer* case discussed above. Accordingly, we believe that it is more likely than not that the Short Bonus Yield does not rise to the level of a liability for either Section 358 or 752 purposes and, thus, no reduction in basis in respect thereof would be warranted.

Even assuming, *arguendo*, that the Notice was intended to apply to transactions involving MLD positions, we believe that it would be more likely than not that the Transactions would be sufficiently distinguishable from the option transaction described in the Notice. For one thing, as noted above, the Corporation's (and, thus, the Investor's) "net economic outlay" for its interest in the LLC (i.e., EUR 27,472,520 in MLD positions, cash and other foreign currency investments) would more likely than not not be considered "nominal or zero".

N. **Negative basis adjustments under Section 705(a)(2)(B) or 752(b) upon maturity of short MLD position where no Short Payment Amount required to be made.**

Other than the basis adjustment for any net income, gain or loss in respect of the MLDs at maturity, we believe that it is more likely than not that if, upon the Short Maturity Date, no payment is required to be made in respect of the Short Bonus Yield, the Corporation would have no negative basis adjustment in its Class A LLC Units under either Section 705(a)(2)(B) or 752(b). Section 705(a)(2)(B) provides, in part, that the adjusted basis of a partner's interest in a partnership is decreased by "expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account." This language should be viewed as applying to expenditures which deplete partnership assets but which do not give rise to a deduction or basis. *See* McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners*, ¶ 6.02[3][c] (3d ed. 1997). Although the Regulations do not elaborate on the kinds of expenditures included in this category, typical examples of such expenditures are disallowed losses under Sections 267(a)(1) or 707(b), life insurance premiums not deductible under Section 264, and interest on debts incurred or continued in order to purchase tax-exempt notes not deductible under Section 265. *See id*; Willis, Pennell and Postlewaite, *Partnership Taxation*, ¶ 5.02[4] (6th ed. 1999).

If, on the Short Maturity Date, the contingency that triggers the obligation to pay the Short Bonus Yield (i.e., if the spot market JPY/USD rate reaches 124.67) is not satisfied, then no obligation or liability would arise in respect of the Short Bonus Yield, and the Short Bonus Yield component of the short MLD position would be worthless. In such event, we believe that it is more likely than not that the Corporation would not be



C&SLLP004938

required to decrease its tax basis in its Class A LLC Units under Section 705(a)(2)(B) on the Short Maturity Date.

For the same reasons, in such event, we also believe that it is more likely than not that the Corporation would not be required to decrease its tax basis in its Class A LLC Units under Section 752(b).[43]

### O. Corporation's sale of LLC interest to CC.

Section 741 provides that on the sale or exchange of an interest in a partnership, gain or loss will be recognized by the selling partner and that such gain or loss will generally be considered as gain or loss from the sale or exchange of a capital asset (except as otherwise provided in Section 751 relating to unrealized receivables and substantially appreciated inventory items).

Under the Operating Agreement, the Corporation has the option to require that CC purchase all of the Corporation's Class A LLC Units. In such event, we believe that it is more likely than not that the Corporation would recognize gain or loss equal to the Corporation's amount realized for its Class A LLC Units over the Corporation's adjusted basis in said units. We further believe that it is more likely than not that such gain or loss would be capital gain or loss (except to the extent required to be treated as ordinary income under Section 751), and a long-term or short-term capital gain or loss depending on the Corporation's holding period at such time.

As the Corporation is an S corporation for federal income tax purposes, any loss recognized by the Corporation would flow through and be taken into account by the Investor. IRC § 1366(a)(1). Moreover, in that, as discussed above, we believe that the Investor did not have to reduce his basis in his Corporation stock under Section 358 on his contribution of the LLC membership interest to the Corporation, we further believe that it is more likely than not that the Investor would have sufficient basis in his Corporation stock so that any such loss allocable to his would not be limited by Section 1366(d). Also, the character of any such loss to the Corporation – e.g., as capital or ordinary — would more likely than not carry over to the Investor. IRC § 1366(b); Treas. Reg. § 1.1366-1(b)(1).

### P. Corporation's purchase of CC's Class B LLC Units

Under the Operating Agreement, the Corporation has the option to require that CC sell all of CC's Class B LLC Units to the Corporation. In such event, we believe that it is more likely than not that such sale would result in the conversion of the LLC from a partnership to a disregarded entity for federal income tax purposes. *See* Treas. Reg. § 301.7701-3(f)(2).

[43] Section 752(b) provides that "[a]ny decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership."







C&SLLP004939

Rev. Rul. 99-6, 1999-1 C.B. 432, sets forth the United States federal tax consequences if one person acquires all of the interests in a limited liability company that was classified as a partnership under Treasury Regulations Section 301.7701-3. According to that revenue ruling, the limited liability company's status as a partnership terminates under Section 708(b)(1)(A). *See also McCauslen v. Commissioner*, 45 T.C. 588 (1966) (partner's purchase of the other partner's interest in a two-partner partnership treated as a liquidation of the partnership).

In the case of a partnership's distribution to a partner, Section 731(a)(1) provides that gain is not recognized to the partner except to the extent that any money and "marketable securities" distributed exceeds the adjusted basis of the partner's interest in the partnership immediately before the distribution. Section 732(b) provides that the basis of property (other than money and "marketable securities") distributed by a partnership to a partner in liquidation of the partner's interest will be an amount equal to the adjusted basis of the partner's interest in the partnership, reduced by any money and "marketable securities" distributed in the same transaction. Section 735(b) provides that, in determining the period for which a partner has held property received in a distribution from the partnership, there shall be included the holding period of the partnership, as determined under Section 1223, with respect to the property.

Consequently, we believe that it is more likely than not that as a result of the Corporation becoming the LLC's sole member by reason of its purchase of all of CC's Class B LLC Units, the LLC would be treated as having liquidated under Section 708(b)(1)(A) for federal income tax purposes. In such event, we further believe that it is more likely than not that the Corporation would take an adjusted tax basis in the LLC's then remaining assets (other than its cash and "marketable securities"[44]) equal to the Corporation's adjusted tax basis in its LLC interest immediately before such liquidation (reduced by the amount of any cash and fair market value of any "marketable securities", held by the LLC at such time).[45]

**Q. <u>Sale of Investments by LLC (as Single Member Entity)</u>**

**1. Sale of Foreign Currency Contracts**

Section 985(a) generally requires that all income tax determinations with respect to a taxpayer (including with respect to a disposition of a foreign currency contract) be made in the taxpayer's functional currency. Section 985(b)(1) generally provides that a taxpayer's functional currency is the U.S. dollar, although a qualified business unit, or QBU, of a taxpayer may use another currency as its functional currency if certain

[44] In general, subject to the exceptions of Section 731(c)(3), the term "marketable securities" means financial instruments and foreign currencies which are, as of the date of the distribution, actively traded (within the meaning of Section 1092(d)(1)), IRC § 731(c)(2)(A), as well as those additional items identified in Section 731(c)(2)(B).

[45] The basis of marketable securities with respect to which gain is recognized under Section 731(c) is their basis determined under Section 732 increased by the amount of such gain. IRC § 731(c)(4).


C&SLLP004940

conditions are met. Treasury Regulations Section 1.988-1(c) provides that any currency of a taxpayer or a QBU other than its functional currency is "nonfunctional currency."

Section 988 contains a complex set of rules prescribing the tax treatment of transactions in foreign currency. The general rule of Section 988(a)(1)(A) is that any foreign currency gain or loss on a "section 988 transaction" is ordinary income or loss. This rule applies notwithstanding any contrary provision providing for capital gain or loss. *See* IRC § 988(a)(1)(A); Treas. Reg. § 1.988-3(a).

A "section 988 transaction" includes, *inter alia,* (a) the disposition of nonfunctional currency, or (b) entering into or acquiring a forward contract, futures contract, option, warrant or similar financial instrument, if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency. *See* IRC § 988(c)(1); Treas. Reg. § 1.988-1(a). It has been represented to us that the U.S. dollar is the functional currency of the Investor, the Corporation and the LLC. Therefore, any currency other than the U.S. dollar would constitute a non-functional currency.

In the case of a "section 988 transaction" described in Section 988(b)(3) (including, among other things, a forward contract, futures contract, option or similar financial instrument where the underlying property to which the instrument or contract ultimately relates is a non-functional currency, *see* Treas. Reg. § 1.988-1(a)), any gain or loss from such a transaction will be treated as a foreign currency gain or loss (as the case may be).

Treasury Regulations Section 1.988-2 provides rules for determining the amount of gain or loss that arises from a section 988 transaction and that is characterized as ordinary gain or loss under Treasury Regulations Section 1.988-3. Treasury Regulations Section 1.988-2(a)(2)(i) provides that on a disposition of nonfunctional currency, the exchange gain is the excess of the amount realized over the taxpayer's adjusted basis in the currency and the amount of exchange loss is the excess of the taxpayer's adjusted basis in the currency over the amount realized on its disposition. Treasury Regulations Section 1.988-2(a)(2)(i) provides that the amount realized on the disposition of nonfunctional currency is determined under Section 1001, and Treasury Regulations Section 1.988-2(a)(2)(iii)(A) provides that the adjusted basis of nonfunctional currency is determined under the applicable provisions (*i.e.*, Sections 1011 through 1023). Thus, nonfunctional currency is generally treated in the same manner as non-cash property (except for the ordinary gain or loss characterization).

Accordingly, we believe that it is more likely than not that the sale of the foreign currency contracts by the LLC, as a disregarded entity for federal income tax purposes, would result in the Corporation's recognition of ordinary gain or loss, measured by the difference between the amount realized from such sale and the LLC's adjusted tax basis in the sold contracts.

As the Corporation is an S corporation for federal income tax purposes, any ordinary gain or loss recognized by the Corporation on such sale would flow through and


C&SLLP004941

be taken into account by the Investor. IRC § 1366(a)(1). Moreover, in that, as discussed above, we believe that the Investor did not have to reduce his basis in his Corporation stock under Section 358 on the contribution of his LLC membership interest to the Corporation, the Investor would more likely than not have sufficient basis in his Corporation stock such that any such Corporation loss allocable to his would not be limited by Section 1366(d). Also, the character of such loss as an ordinary loss would more likely than not carry over to the Investor. IRC § 1366(b); Treas. Reg. § 1.1366-1(b)(1).

**2. Sale of Investments or other assets of the LLC (other than foreign currency contracts)**

Upon the sale of any Investment or other asset (other than any asset, the characterization of any gain or loss from the disposition of which is determined under Section 988) by the LLC (as a disregarded entity for federal income tax purposes) the Corporation would recognize capital gain or loss, measured by the difference between the amount realized from such sale and the adjusted tax basis in the sold asset.[46]

As the Corporation is an S corporation for federal income tax purposes, any such gain or loss recognized by the Corporation would be flowed through and taken into account by the Investor. IRC § 1366(a)(1). Moreover, in that, as discussed above, the Investor did not have to reduce his basis in his Corporation stock under Section 358 on the contribution of his LLC membership interest to the Corporation, the Investor would more likely than not have sufficient basis in his Corporation stock such that any capital loss allocable to him would not be limited by Section 1366(d). Also, the character of such loss as a capital loss would more likely than not carry over to the Investor. IRC § 1366(b); Treas. Reg. § 1.1366-1(b)(1).

**R. <u>Section 465 (At risk rules)</u>**

Generally, the "at risk" provisions limit the current deduction of losses attributable to certain activities to the extent those losses exceed the taxpayer's "amount at risk" in the activity. IRC § 465(a). The "at risk" rule applies to individuals directly and in their capacity as partners of a partnership and shareholders of S corporations (and such rule does not apply to partnerships or S corporations[47]). Accordingly, the "at risk" rule would apply to the Investor with respect to his indirect interest in the LLC and its activities.

Whether the taxpayer is "at risk" is determined on the basis of facts as of the close of the taxable year. Prop. Regs. § 1.465-1(a). The determination of the amount that a taxpayer is "at risk" in cases where the activity is engaged in by an entity separate from

---

[46] We are assuming, for purposes of our opinions herein, that any of these other Investments or other assets would constitute capital assets for federal income tax purposes.

[47] Committee Reports on P.L. 98-369 (Deficit Reduction Act of 1984).





C&SLLP004942