the taxpayer is made as of the close of the taxable year of the entity unless otherwise stated. The LLC, Corporation and the Investor are all calendar year taxpayers.

**1. Activities Subject to the "At Risk" Rules**

The "at risk" rules apply to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.[48]

In applying the "at risk" rules, a two-step analysis is required. The scope of an activity must first be defined and then it must be determined whether separate activities should be aggregated or segregated for purposes of applying these rules. The proposed Section 465 Regulations provide only limited guidance in this regard. If two activities are interrelated, it is not clear whether there are two activities or only one.

Section 465(c)(3) applies to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income. Although a partnership or S corporation is not itself subject to the "at risk" rules, the nature of any activity involving a partner or shareholder is determined at the partnership or S corporation level. As a result, for purposes of the "at risk" rules, the Investor would be considered engaged in the activity of the LLC – that is, the making of the Investments for the production of income. If the Investor also invests directly (or indirectly through the Corporation) in marketable securities and other financial instruments for his own direct or indirect account, these investments would also constitute one or more "at risk" activities of the Investor. Arguably, the Investor's direct investments, his indirect interest in the Corporation's investments and his indirect interest in the LLC's Investments each constitutes a separate activity for purposes of Section 465. With respect to carrying on a trade or business under the rules of Section 465(c)(3) (although no similar rule exists for the production of income), if a taxpayer actively participates in the management of such trade or business, then all activities comprising such trade or business are aggregated for purposes of these rules. IRC § 465(c)(3)(B). Section 465(c)(3)(C) provides that activities are aggregated or treated as separate activities as the Treasury prescribes by Regulations. To date, no such Regulations have been proposed or adopted.

The legislative history of the amendment to Section 465 indicates that Regulations, when adopted, may provide for the aggregation of related activities for the production of income that do not have tax shelter characteristics or for segregation of such activities, as may be appropriate. H.R. Rpt. No. 95-1445, 95th Cong. 2d Sess., 68-70 (8/4/78). At least one commentator, however, has stated that such legislative history "no

48 Generally, a person engaged in the carrying on a trade or business is one who buys and sells in frequent and continuous operations for its own account, with the aim of achieving short-term appreciation in values therefrom, whereas a person engaged in the production of income is one whose buying and selling activities are limited to occasional transactions, and who generally intends to profit from long-term appreciation. *See generally Whipple v. Commissioner*, 373 U.S. 193 (1963); *Levin v. U.S.*, 597 F.2d 760, 765 (Ct. Cl. 1979); *Moller v. U.S.*, 721 F.2d 810 (Fed. Cir. 1983); *Ball v. Commissioner*, T.C. Memo 2000-245. Under these principles, we believe that it is more likely than not that the LLC, and thus the Investor with respect to the LLC's activities (*see* discussion below), would be considered a person engaged in the production of income. *See* FSA 200025020.


C&SLLP004943

longer makes much sense" in view of subsequent developments, in particular the enactment of the passive activity loss rules, discussed below. Harllee, At-Risk Rules, 550 Tax Management Portfolio A-10. Under these rules, all "portfolio income" is treated as not subject to the limitations of Section 469, thus falling into a single activity. Furthermore, these rules adopt a "facts and circumstances" test to determine what activities covered by the rules should be aggregated. Treas. Reg. § 1.469-4(c)(1).

In *Elliston v. Commissioner*, 82 T.C. 747 (1984), *aff'd without published opinion*, 765 F.2d 1119 (5th Cir. 1985), the court addressed an analogous issue. *Elliston* involved a two-tier partnership situation with Dallas Associates, a partnership, owning interests in a number of lower tier partnerships, each engaged in the leasing business. Dallas aggregated the income and losses of the lower tier partnerships in determining its own taxable income. The Service challenged this aggregation, claiming that each lower tier partnership had to be treated as a separate activity for purposes of Section 465. The Tax Court concluded that Dallas Associates could aggregate the income and losses from these separate lower tier partnerships. Part of the Tax Court's rationale was that had Dallas Associates carried on the activities of each of the lower tier partnerships directly, they would have been aggregated. Judge Dawson, in his concurring opinion, also noted that Section 465 focused on the activities of a "taxpayer" and that although a partnership may be a separate person for federal income tax purposes, it is not a taxpayer; thus, for purposes of Section 465, a partnership must be treated as an aggregate of its partners and that each of the partners should be viewed as directly engaging in the activities of the partnership.

Although *Elliston* was decided prior to amendments to Section 465, the rationale of *Elliston* should continue to be relevant to situations such as the aggregation of activities for the production of income described in Section 465(c)(3)(a)(ii) where statutory and regulatory guidance is absent. Moreover, the rationale of *Elliston* would also appear to be applicable, here, in the case of the aggregation of the activities of a lower-tier partnership (i.e., the LLC) that is owned by an S corporation (i.e., the Corporation).

Consequently, until Regulations are released defining parameters for aggregation and segregation of activities relating to the production of income, we believe that it is more likely than not that the Investor would be permitted to combine his directly-held investment activities with his activities through the LLC into a single activity.

**2. Amount "At Risk"**

A taxpayer is considered "at risk" for an activity in the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, IRC § 465(b)(1)(A), although a taxpayer is not considered "at risk" for amounts protected against loss through non recourse financing, guarantees, stop loss agreements, or "other similar arrangements". IRC § 465(b)(4). No such arrangements exist with respect to the Transactions. The Service might argue that the potentially offsetting nature of the short and long MLD positions could constitute such type of loss protection arrangement. In



C&SLLP004944

*Laureys v. Commissioner*, 92 T.C. 101 (1989), the Tax Court held that when a commodities market maker hedged itself through offsetting straddle positions, such offsetting positions were not covered by Section 465(b)(4). Instead, the Tax Court concluded that Section 465(b)(4) was intended to address "new and creative" methods of protecting a taxpayer against loss. *See Thurner v. Commissioner*, T.C. Memo. 1990-529 (court affirmed the *Laureys* conclusion that an offsetting option is not such an "arrangement", but denied the taxpayer "at risk" treatment because, in addition to the offsetting options, an actual stop loss arrangement was in place). Accordingly, we believe that it is more likely than not that the Service would be unsuccessful if it were to take the position that the potentially offsetting nature of the long and short MLD positions constitutes a loss protection arrangement or similar arrangement referred to in Section 465(b)(4).

A taxpayer's amount "at risk" is, in general, increased by the taxpayer's share of taxable and tax-exempt income generated from the activity and decreased by the amount of the taxpayer's loss from the activity allowed as a deduction under Section 465(a). IRC § 465(b)(5); Prop. Reg. §§ 1.465-22, -23[49]; *see also Lansburgh v. Commissioner*, 92 T.C. 448 (1989)(taxpayer's "at risk" amount increased to extent the taxpayer recognizes income with respect to the activity), *Allen v. Commissioner*, 55 T.C.M. (CCH) at 688 (1988) (gain recognized on the disposition of the activity or an interest in the activity increases the taxpayer's amount "at risk").[50]

The legislative history of Section 465 states that a partner's "at risk" amount is computed with reference to the partner's basis in his partnership interest.[51] The link between the partnership rules and Section 465 is corroborated in PLR 9036013 (June 8, 1990) where the Service stated that the economic risk of loss analysis of Section 752 applied to determine a partner's amount "at risk". However, the Section 465 at risk rules and the Section 704(d) partnership loss allowance rules diverge in two areas. First, a partner can acquire basis through non-recourse financing for Section 704(d) purposes, although such financing generally would not constitute an amount at risk for the taxpayer. Second, if a partnership interest is sold and the selling partner has suspended Section 704(d) losses. subsequent gain on the sale of the partnership interest may not be used to free-up the losses. The partnership's taxable year closes with respect to the selling partner under Section 706(c)(2)(A) and the basis for the partner's partnership interest at that date is zero.[52] By contrast, losses suspended under Section 465 may be used to offset against income from the sale of a partnership interest, which income is treated as income from the activity. Prop. Regs. §1.465-66(a). In effect, the Section 465 limitation applies

[49] The proposed regulations under Section 465 are to apply to losses attributable to amounts paid or incurred in taxable years beginning after December 31, 1975.

[50] These adjustments reflect the fact that the "at risk" amount is determined in a manner consistent with the determination of the taxpayer's adjusted basis, except that certain non-recourse debt amounts and amounts protected against loss are not included. *See* Senate Report at 50. Senate Explanation to 1976 Tax Reform Act.

[51] S. Rep. No. 938. 94th Cong., 2d Sess. 50 n.8 (1976)

[52] *See Sennett v. Commissioner*, 80 T.C. 825, *aff'd per curiam*, 752 F2d 428 (9th Cir. 1985).


C&SLLP004945

at the partner level, whereas the Section 704(d) limitation isolates the disallowed loss at the partnership level.[53]

In the case of an S corporation, the Section 465 "at risk" rules apply at both the corporate level and the shareholder level. Prop. Reg. § 1.465-10(a). Therefore, losses from an activity can be deducted by the corporation only to the extent that the corporation is at risk in the activity. *Id.* In addition, a shareholder is allowed a loss in the activity only to the extent that the shareholder is at risk in the activity. *Id.* An S corporation's amount at risk in an activity is determined in the same manner as that of any other taxpayer, except that an amount borrowed by the S corporation from one or more of its shareholders may increase the corporation's amount at risk, notwithstanding the fact that the shareholders have in interest in an activity other than that of a creditor. Prop. Reg. § 1.465-10(b). An S corporation shareholder's amount at risk with respect to an activity of his S Corporation generally includes both the amount invested by the shareholder in the S corporation's stock and any funds loaned by the shareholder to the corporation. *See* Eustice and Kuntz, Federal Income Taxation of S Corporations, ¶ 7.08; *see also* Prop. Reg. § 1.465-10(c).

In the case, such as here, where a taxpayer's interest in an activity is by reason of the taxpayer owning stock in an S corporation which owns a membership interest in a limited liability company which is engaged in the activity, the taxpayer must first establish that the S corporation has a sufficient amount at risk in its interest in the limited liability company and, then, that the taxpayer has a sufficient amount at risk in his stock interest in the S corporation. *See* Edward H. Allen, P-H TC Memo ¶ 88,166 (1988). In such a situation, the taxpayer's basis (and at risk amount) with respect to his interest in the S corporation and the S corporation's basis (and at risk amount) with respect to its interest in the limited liability company could differ in the case where there are liabilities involved. Whereas the S corporation might be considered at risk for its allocable share of certain of the limited liability company's liabilities, the S corporation shareholder would generally not be considered at risk for any liability of either the limited liability company or the S corporation, other than a liability which the S corporation owes to the shareholder.

Here, in that the Short Bonus Yield would more likely than not not be a "liability" for purposes of Sections 358 and 752, *see* discussion above, the Investor's "at risk" amount with respect to the LLC's activity(ies) would more likely than not equal his basis in the Corporation's stock.

**S. Section 1092 (Straddle rules)**

Section 1092(a)(1) provides that any loss on one or more "positions" is taken into account for any taxable year only to the extent that the loss exceeds the unrecognized gain (if any) on "offsetting positions" held by the taxpayer or a related party. IRC §

[53] The underlying logic is that at the point that an investor terminates its entire interest in an investment, Section 465 should not preclude deduction of any suspended losses.







C&SLLP004946

1092(a)(1). The term "position" means an interest (including a futures or forward contract or option) in personal property. IRC § 1092(d)(2). For this purpose, an obligor's interest in a nonfunctional currency denominated debt obligation is treated as a position in the nonfunctional currency. IRC § 1092(d)(7)(A). The term "personal property" means any personal property that is of a type that is actively traded. IRC §1092(d)(1). Actively traded personal property includes any personal property for which there is an established financial market. Treas. Reg. § 1.1092(d)-1(a). For this purpose, an "established financial market" includes: (i) a national securities exchange that is registered under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); (ii) an interdealer quotation system sponsored by a national securities association registered under section 15A of the Securities Exchange Act of 1934; (iii) a domestic board of trade designated as a contract market by the Commodities Futures Trading Commission; (iv) a foreign securities exchange or board of trade that satisfies analogous regulatory requirements under the law of the jurisdiction in which it is organized (such as the London International Financial Futures Exchange, the Marche a Terme International de France, the International Stock Exchange of the United Kingdom and the Republic of Ireland, Limited, the Frankfurt Stock Exchange, and the Tokyo Stock Exchange); (v) an interbank market; (vi) an interdealer market[54]; and (vii) solely with respect to a debt instrument, a debt market[55]. Treas. Reg. § 1.1092(d)-1(b)(1).[56]

Moreover, foreign currency for which there is an active interbank market is presumed to be actively traded. IRC § 1092(d)(7)(B).

Section 1092(c)(2)(A) provides that a taxpayer holds offsetting positions with respect to personal property if there is a substantial diminution of the taxpayer's risk of loss from holding any position with respect to personal property by reason of his holding 1 or more other positions with respect to personal property (whether or not of the same

---

An interdealer market is characterized by a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields, or other pricing information) of one or more identified brokers, dealers, or traders or actual prices (including rates, yields, or other pricing information) of recent transactions. Treas. Reg. § 1.1092(d)-1(b)(2)(i). An interdealer market does not include a directory or listing of brokers, dealers, or traders for specific contracts (such as yellow sheets) that provides neither price quotations nor actual prices of recent transactions. Id.

[55] A debt market exists with respect to a debt instrument if price quotations for the instrument are readily available from brokers, dealers, or traders. Treas. Reg. § 1.1092(d)-1(b)(2)(ii). A debt market does not exist with respect to a debt instrument if (A) No other outstanding debt instrument of the issuer (or of any person who guarantees the debt instrument) is traded on an established financial market described in Treasury Regulations Section 1.1092(d)-1(b)(1)(i), (ii), (iii), (iv), (v), or (vi) (other traded debt); (B) The original stated principal amount of the issue that includes the debt instrument does not exceed $25 million; (C) The conditions and covenants relating to the issuer's performance with respect to the debt instrument are materially less restrictive than the conditions and covenants included in all of the issuer's other traded debt (e.g., the debt instrument is subject to an economically significant subordination provision whereas the issuer's other traded debt is senior); or (D) The maturity date of the debt instrument is more than 3 years after the latest maturity date of the issuer's other traded debt. *Id.*

[56] For purposes of section 1092(d), *(1)* a notional principal contract (as defined in Treasury Regulations Section 1.446-3(c)(1)) constitutes personal property of a type that is actively traded if contracts based on the same or substantially similar specified indices are purchased, sold, or entered into on an established financial market within the meaning of Treasury Regulations Section 1.1092(d)-1(b); and (2) the rights and obligations of a party to a notional principal contract are rights and obligations with respect to personal property and constitute an interest in personal property. Treas. Reg. § 1.1092(d)-1(c).







C&SLLP004947

kind). If 1 or more positions offset only a portion of 1 or more other positions, the Secretary shall by regulations prescribe the method for determining the portion of such other positions which is to be taken into account for purposes of this section . IRC § 1092(c)(2)(B).[57] Two or more positions are presumed to be offsetting if, as applicable, (i) the positions are in the same personal property (whether established in such property or a contract for such property), (ii) the positions are in the same personal property, even though such property may be in a substantially altered form, (iii) the positions are in debt instruments of a similar maturity or other debt instruments described in regulations prescribed by the Secretary, or (iv) there are such other factors (or satisfaction of subjective or objective tests) as the Secretary may by regulations prescribe as indicating that such positions are offsetting. IRC § 1092(c)(3)(A). For these purposes, 2 or more positions shall be treated as described in clauses (i) through (iv) above only if the value of 1 or more of such positions ordinarily varies inversely with the value of 1 or more other such positions. *Id.* However, any such presumption may rebutted. IRC § 1092(c)(3)(B)

If part or all of the gain or loss with respect to a position held by a partnership or other entity would properly be taken into account for purposes of chapter 1 of the Code by a taxpayer, then, except to the extent otherwise provided in regulations, such position is treated as held by the taxpayer. IRC §1092(d)(4)(C). Thus, under this provision, the Investor would more likely than not be treated as the holder of the MLD positions.

The term "unrecognized gain" means (i) in the case of any position held by the taxpayer as of the close of the taxable year, the amount of gain which would be taken into account with respect to such position if such position were sold on the last business day of such taxable year at its fair market value, and (ii) in the case of any position with respect to which, as of the close of the taxable year, gain has been realized but not recognized, the amount of gain so realized. IRC § 1092(a)(3).

Here, even assuming, *arguendo*, that the short MLD position constitutes a "position" of the Investor for purposes of Section 1092(d)(2) by reason of Sections 1092(d)(7)(A)(i.e., as the Investor is the obligor of an interest in the short MLD position -- arguably a non-functional currency denominated debt obligation-- such interest might arguably be treated as a position in the non-functional currency – Eurodollars or Japanese Yen) and 1092(d)(7)(B)(i.e, Eurodollars and Japanese Yen constitute foreign currencies for which there are active interbank markets and, thus, these currencies would be presumed to be actively traded for purposes of Section 1092), we nonetheless believe that it is more likely than not that any loss that the Investor might incur in respect of the Transactions would not be limited by Section 1092.

First, Section 1092(d)(7)(A) only applies with respect to an *obligor's* interest in a non-functional currency denominated debt instrument, although not to any other type of interest in such an instrument –e.g., the Investor's interest as the obligee in the long MLD position. Thus, we believe that it is more likely than not that Section 1092(d)(7)(A)

---
[57] To date, no such regulations have been issued.







C&SLLP004948

would not apply with respect to the Investor's interest in the long MLD position and, thus, such interest could not be treated as a position in Eurodollars under Section 1092(d)(7)(B). Thus, the issue becomes whether the long MLD position, itself, constitutes an "offsetting position" to the short MLD position. To qualify as an offsetting position, the long MLD position must, in the first instance, constitute a "position", which, for purposes of Section 1092, means an interest (including a futures or forward contract or option) in personal property. As noted above, "personal property" means any personal property of a type which is "actively traded." We understand that while the MLD positions are exotic derivative structures, any number of sophisticated options desks could and would make a price on either of said positions. Thus, there *arguably* is an interbank market for said positions and said positions, *arguably*, would constitute personal property of a type which is "actively traded" (within the meaning of Treasury Regulations Sections 1.1092(d)-1(a) and (b)(1).

Even assuming, *arguendo,* that the short and long MLD positions constitute "offsetting positions" for purposes of Section 1092, we believe that it is more likely than not that the Investor's loss would nonetheless not be limited by Section 1092 because in no event would there be "unrecognized gain", within the meaning of Section 1092(a)(3), at December 31, 2001 (i.e., the close of the LLC's, Corporation's and Investor's 2001 taxable year) in respect of either of the MLD positions or, alternatively, because the amount of the loss would exceed the amount of any such "unrecognized gain" at December 31, 2001. Since both the long and short MLD positions would have already matured and been closed out on December 14, 2001 (i.e., the Long Maturity Date and Short Maturity Date) there would be no unrecognized gain in respect of either of such positions at December 31, 2001.[58] Section 1092 was enacted to

> prevent deferral of income and to prevent conversion of ordinary income and short- term capital gain into long-term capital gain on straddle transactions. Generally, the deduction of losses on straddle positions involving property not on the mark-to-market system (described below) is limited to the amount by which such losses exceed unrealized gains on any offsetting straddle positions.

1981 Economic Recovery Tax Act, PL 97-34, (August 13, 1981).

As there would be no deferral of income in respect of the MLD positions, we believe that it is more likely than not that any loss claimed in respect thereof would not be limited by Section 1092.

**T. Section 1256 (Marked-to-market treatment)**

Section 1256(a) requires mark-to-market treatment for a "section 1256 contract" held by a taxpayer at the close of the taxpayer's taxable year and upon the termination or

[58] We would also point out that there would, arguably, be no "unrecognized gain" in respect of either of the MLD positions because the Investor's income from the MLD positions would more likely than not constitute "interest" income (rather than short or long-term capital gain).







C&SLLP004949

transfer of a taxpayer's rights or obligations with respect to such a contract during the year by assignment, lapse, or otherwise. This is achieved by treating each such contract held by the taxpayer as sold on such date for the fair market value of the contract. IRC § 1256(a)(1). "Proper adjustment" is made to any gain or loss subsequently realized in respect of any section 1256 contract by any gain or loss taken into account by reason of Section 1256(a)(1). IRC § 1256(a)(2). The term "section 1256 contract" means any (1) regulated futures contract, (2) foreign currency contract, (3) nonequity option, (4) dealer equity option.

A "regulated futures contract" is defined in Section 1256(g)(1) to mean a contract (A) with respect to which the amount required to be deposited and the amount which may be withdrawn depends on a system of marking to market, and (B) which is traded on or subject to the rules of a qualified board or exchange.[59] While the term "futures contract" is not defined in Section 1256, such term is defined by the Commodities Future Trading Commission ("CFTC") as:

> an agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at the initiation of the contract; (2) which obligates each party to the contract to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied by delivery or offset.

CFTC Glossary: A :Layman's Guide to the Language of the Futures Industry; *see* FSA 200025020 (June 23, 2000). Accordingly, based on this definition, we believe that it is more likely than not that the MLD positions would not be treated as a futures contract for purposes of Section 1256. Moreover, even assuming, *arguendo,* that the MLD positions were to constitute futures contracts, we believe that it is more likely than not that the MLD positions, as contractual arrangements between two private parties, would not constitute "regulated futures contracts" within the meaning of Section 1256(g)(1).

As we believe that it is more likely than not that the MLD positions would constitute debt instruments for federal income tax purposes, we further believe that it is more likely than not that a MLD position would not constitute either a "nonequity option" (as defined in Section 1256(g)(3)) or "dealer equity option" (as defined in Section 1256(g)(4)).

The term "foreign currency contract" means a contract which (i) requires delivery of, or the settlement of which depends on the value of, a foreign currency which is a currency in which positions are also traded through regulated futures contracts, (ii) is traded in the interbank market, and (iii) is entered into at an arm's length at a price

[59] The term "qualified board or exchange" means (A) a national securities exchange which is registered with the Securities and Exchange Commission, (B) a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission, or (C) any other exchange, board of trade, or other market which the Secretary determines has rules adequate to carry out the purposes of Section 1256. IRC § 1256(g)(7).

determined by reference to the price in the interbank market. Although the legislative history of Section 1256 assumed that the Service would provide guidance through revenue rulings, notices, etc. as to the types of contracts that would fall within this definition, *see* H.R. Conf. Rpt. No. 986, 97th Cong., 2d Sess., 25 (1982), no such guidance has yet been published.

According to the legislative history,

> [t]rading in foreign currency for future delivery is conducted through regulated futures contracts, and is also conducted through contracts negotiated with any one of a number of commercial banks which comprise an informal market for such trading (bank forward contracts). Bank forward contracts differ from regulated futures contracts [("RFCs")] in that they are private contracts in which the parties remain entitled to performance from each other. They further differ from regulated futures contracts in that they do not call for daily variation margin to reflect market changes, and in that the interbank market has no mechanism for settlement terminating a taxpayer's position prior to the delivery date. Prior to ERTA, taxpayers who used both the futures exchanges and the interbank market to conduct short-term trading in foreign currency were subject to substantially comparable tax treatment for both types of contract. Although bank forward contracts differ from regulated futures contracts, the volume of trading through forward contracts in foreign currency in the interbank market is substantially greater than foreign currency trading on futures exchanges, and prices are readily available. Such contracts are economically comparable to regulated futures contracts in the same currencies and are used interchangeably with regulated futures contracts by traders.

H. Rept. 97-794, 97th Cong., 2d Sess.. 23 (Committee Report 1982).

In FSA 200025020 (June 23, 2000), the Service noted that Congress intended to include within the definition of a foreign currency contract bank forward contracts in currencies that are traded through RFCs because bank forward contracts are economically comparable to and used interchangeably with RFCs. FSA 200025020 further noted that

> [t]he Internal Revenue Code offers no definition of the interbank market. The interbank market refers to the OTC market maintained by banks to purchase and sell foreign currency and financial products. The interbank market is not a formal market, but rather a group of banks holding themselves out to the general public as being willing to purchase, sell or otherwise enter into certain transactions. The Service broadly interprets the interbank market to

> include all banks and investment banks (as the terms are generally used in the marketplace). . . .

An MLD position is, *arguably,* a contract "the settlement of which depends on the value of" a foreign currency (i.e., the Eurodollar). We also understand from Mr. Brooks that the MLD position is a contract which was entered into at arm's length at a price determined by reference to the price in the interbank market and that any number of sophisticated options desks could and would make a price on said position.

Even assuming, *arguendo,* that the MLD positions were section 1256 contracts, the Investor's contribution of his LLC membership interest (and, thus, the MLD positions held by the LLC) to the Corporation would require the Investor to recognize any gain or loss that arose with respect to said positions from the time the positions were entered into by the LLC to the date of such contribution. 1982 Technical Corrections Act, P.L. 97-448 (January 12, 1983)(". . .section 1256(a) will apply when transfers of regulated futures contracts are made to and from partnerships and other flow-through entities . . ."). As such period was very short, any such gain or loss would more likely than not not have been material. For the same reason, any gain or loss that the Corporation would be required to recognize on its deemed contribution of the MLD positions to the LLC would also more likely than not not have been material.

Similarly, if, prior to the Long or Short Maturity Date, the Corporation were to exercise its option to require that CC either purchase all of the Corporation's Class A LLC Units or sell all of its Class B LLC Units to the Corporation then, as discussed above, the LLC would more likely than not be treated as having terminated under Section 708(b)(1)(A) (by reason of becoming a single member limited liability company) and as having distributed all of its assets (including the MLD positions) to the Corporation or CC, as relevant. Thus, the LLC would also be required to recognize gain or loss that arose during the period that it owned the MLD positions while it was a partnership for federal income tax purposes (taking into account any gain or loss previously recognized under Section 1256(a)(1) in respect of the MLD positions). In such event, the amount of gain or loss that would be allocated to the Corporation would more likely than not not be material.[60]

Also, assuming, *arguendo,* that the MLD positions were section 1256 contracts that were subject to the mark-to-market rules upon their contribution by the Investor to the Corporation and their deemed contribution by the Corporation to the LLC, the Service

---

[60] For one thing, any gain that the LLC would be required to recognize in respect of an MLD position would be largely offset by a loss that the LLC would be required to recognize in respect of the other MLD position. 1981 Economic Recovery Tax Act, PL 97-34 (August 13, 1981)("Any gain or loss on the contract is taken into account for the taxable year, together with the gain or loss on other contracts which were held during the year but closed out before the last business day. Thus, taxpayers' net gain or loss is approximately equal to the aggregate net amount which is credited to their margin accounts, or which they had to pay into their account, during the year").

Also, and as discussed above, the income that the LLC would recognize would more likely than not constitute interest income or expense, and not "gain" or "loss."







C&SLLP004952

could argue that such contribution or deemed contribution should be treated either (i) as if the MLD positions were sold first to the Corporation and then to the LLC or (ii) as if the MLD positions were closed out and new MLD positions with the same terms were entered into first by the Corporation and then the LLC. Were the Service successful with such an argument, the LLC's contribution of the MLD positions to the Corporation and the Corporation's deemed contribution of the MLD positions to the LLC would not be subject to the rules regarding contributions to partnerships and other flow-through entities as discussed above. We believe that it is more likely than not that such an argument would not be upheld.

The purpose of enacting Code Section 1256 as part of the Economic Recovery Act of 1981 ("1981 Act") was to conform the tax treatment of regulated futures contracts to the daily cash settlement, mark-to-market system employed by U.S. commodity futures exchanges for purposes of determining margin requirements. Under this system, even though a trader does not close out a position, but continues to hold it, the trader receives any gain in the position in cash as a matter of right each trading day and the trader has the right to withdraw such amount. Correspondingly, if the position declines in value, the trader is required to deposit additional funds. Thus, Congress intended Section 1256 to apply the doctrine of "constructive receipt" to the economic gains or losses realized by the taxpayer at year end even though the taxpayer continued to hold such positions. *See* General Explanation of the Economic Recovery Act of 1981 (H.R. 4242, 97th Cong., P.L. 97-34) prepared by the Staff of the Joint Committee on Taxation (12/31/81) ("1981 General Explanation") at 296. In *Murphy v. U.S.*, 992 F.2d 929 (9th Cir. 1991), aff'g an unreported District Court decision, the court concluded that Section 1256 was constitutional because Congress premised recognition of gain or loss under Section 1256 on the existing doctrine of constructive receipt.

The 1981 General Explanation also provides that

> [i]f a taxpayer holds futures contracts at the beginning of a taxable year, any gain or loss subsequently realized on these contracts must be adjusted to reflect any gain or loss taken into account with respect to these contracts in a prior year.

Although Congress could just as easily provide that the mark-to-market rules created a constructive sale and repurchase of the contracts to adjust the basis of the contracts to reflect the gains and losses triggered under Section 1256(a)(1), it did not do so. Rather it chose to apply constructive receipt principles to merely trigger mark-to-market gain or loss with respect to a contract at a particular point in time and to adjust the amount of subsequent gain or loss with respect to such contract by reference to such previously recognized gain or loss.

Section 1256(a), as enacted pursuant to the 1981 Act, only applied to contracts held by a taxpayer at year-end and did not address events occurring within the year, such

as a termination or transfer of a contract. Congress added Section 1256(c) as part of the Technical Corrections Act of 1982 ('1982 Act"), which provides, as relevant, that

> [t]he rules of paragraphs (1) [income and loss recognition], (2) [proper adjustment], and (3) [character] of subsection (a) shall also apply to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract by offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, by lapse, or otherwise.

In enacting Section 1256(c)(1) Congress clearly intended the rules of Section 1256(a)(1), (2), and (3) to apply to transfers to by a partner to a partnership. *See* JCS-20-82, Description of H.R. 6056, Technical Corrections Act of 1982, prepared for Use by the Committee for Ways and Means for a Hearing on April 27, 1982 by the Staff of the Joint Committee on Taxation ("Description"). At page 3, the Description provides:

> [t]he bill would require expressly that gains and losses be taken into account when a taxpayer's rights in a regulated futures contract are transferred. Thus, section 1256(a) would apply when transfers of regulated futures contracts are made to and from partnerships and other flow through entities.

Although the legislation could have provided that a transfer to a partnership (or other flow through entity) would be deemed to be a sale by the partner to the partnership or the termination of the contract by the partner and the entering into of a "new" contract by the partnership, it did not do so. Rather, it merely required that such a transfer trigger the mark-to-market gain recognition and other rules of Section 1256(a).

Based on the foregoing, we believe that it is more likely than not that the application of Section 1256(a)(1) upon the Investor's contribution of the MLD positions to the Corporation and the Corporation's deemed contribution of the MLD positions to the LLC would not cause the Investor or Corporation to be treated as either (i) selling the MLD positions to the Corporation or LLC, respectively, or (ii) closing out the MLD positions and entering into "new" MLD positions by the Corporation or LLC with the same terms, and that such contribution and deemed contribution would be subject to the rules regarding contributions to partnerships and other flow-through entities, as discussed above and a Section 1256(a)(2) "proper adjustment" would be made with respect to any subsequent gain or loss recognized by the LLC with respect to the contributed MLD positions.







C&SLLP004954

**U. Section 469 (Passive activity loss rules)**

The passive activity loss rules of Section 469 limit losses from certain activities in which a taxpayer does not materially participate. The aggregate amount of deductions disallowed for the taxable year under Section 469 is generally equal to a net amount designated as the "passive activity loss." These rules apply to a taxpayer's activities, include those activites that the taxpayer conducts through S corporations and partnerships. Treas. Reg § 1.469-4(a).

Section 469(c)(1) states that a "passive activity" is any activity that involves the conduct of any "trade or business" in which the taxpayer does not materially participate. Section 469(c)(6) further provides that, to the extent provided in regulations, the term "trade or business" includes any activity in connection with a trade or business or any activity for which expenses are allowable as a deduction under Section 212. Treasury Regulations Sections 1.469-1(e)(2) and 1.469-4(b)(1)(i) provide that the term "trade or business activity" includes any activity that involves the conduct of a trade or business within the meaning of Section 162.

Treasury Regulations Section 1.469-1T(e)(6) provides that the activity of trading personal property for the account of owners of interests in the activity is not a passive activity, regardless of whether the activity is a trade or business and regardless of a partner's level of participation. Treasury Regulations Section 1.469-1T(e)(6) provides an example of "trading personal property for the account of owners of interests in the activity." This example indicates that a partnership's trading activities consists of "trading personal property for the account of its partners" where the capital employed by the partnership in the trading activity consists of amounts contributed by the partners in exchange for their partnership interests.

The term "personal property" is defined in the Regulations to have the same meaning as under Section 1092(d), but without regard to Section 1092(d)(3) which generally excludes stock from the definition. For purposes of this analysis we have assumed, *arguendo*, that the Investments of the LLC are personal property under this definition.

If the LLC were deemed to be a mere "investor", rather than a "trader", then the Investor would more likely than not not be deemed to be engaged in a trade or business and Section 469 would more likely than not not apply. Assuming *arguendo* that the LLC were deemed to be carrying on a trade or business as a trader, then Investor's participation in the LLC more likely than not would constitute an activity that is not a passive activity based upon the exception under Temporary Regulations Section 1.469-1T(e)(6) for the "activity of trading personal property for the account of owners of interests in the activity". Accordingly, we believe that it is more likely than not that any loss of the Investor resulting from the Transactions would not be subject to limitation under Section 469.


C&SLLP004955

## V. Nonapplication of Section 6662 Substantial Understatement Penalties

### 1. Substantial Understatement of Taxable Income

Section 6662(b)(2) provides for a 20% underpayment penalty for taxpayers if there is a substantial understatement of income tax on a return. For non-corporate taxpayers, an understatement is considered substantial for this purpose if it exceeds the greater of 10% of the correct tax or $5,000. *See* IRC § 6662(d)(1). An understatement generally does not include deficiency amounts attributable to a position that is supported by "substantial authority" or for which there is adequate disclosure. *See* IRC § 6662(d)(2)(B).

Substantial authority for a position exists if the weight of authorities supporting the position is substantial in relation to the weight of authorities against the position. *See* Treas. Reg. § 1.6662-4(d)(3)(i). Authorities for this purpose include (but are not limited to) applicable provisions of the Code; proposed, temporary and final Regulations; revenue rulings and revenue procedures; court cases; congressional intent as reflected in committee reports; private letter rulings and technical advice memoranda issued after October 31, 1976; and actions on decision and general counsel memoranda issued after March 12, 1981. *See* Treas. Reg. § 1.6662-4(d)(3)(iii). The weight of an authority depends upon its relevance and persuasiveness, and the type of document providing the authority. *See* Treas. Reg. § 1.6662-4(d)(3)(ii).

The "substantial authority" standard is higher than the "reasonable basis" standard but generally below the "more likely than not" standard. *See* Treas. Reg. § 1.6662-4(d)(2). The "reasonable basis" standard is defined in Treasury Regulations Section 1.6662-3(b)(3) as a position that is significantly higher than not frivolous or not patently improper. The Internal Revenue Manual ("IRM") states that the standard is one where a position is arguable but fairly unlikely to prevail in court. The "more likely than not" standard is one in which a position has a greater than 50 percent likelihood of being upheld if challenged by the Service. *See* Treas. Reg. § 1.6662-4(d)(2). The IRM therefore states that "the substantial authority exception can be met when the taxpayer has less than a 50 percent, but more than a one-in-three likelihood, of being sustained on the issue." IRM 120.1.5.8.4.1 (1998).

If the position involves a tax shelter,[61] there must be both "substantial authority" for the position and the taxpayer must have "reasonably believed . . . that the tax treatment . . . was more likely than not the proper treatment." Treas. Reg. § 1.6662-

[61] A "tax shelter" is generally defined as any plan or arrangement a significant principal purpose of which is the avoidance or evasion of federal income tax. *See* IRC § 6662(d)(2)(C)(iii).







C&SLLP004956

4(g)(1). For purposes of our analysis, we have assumed, *arguendo,* that the Transactions would constitute a "tax shelter." The "reasonable belief' requirement can be satisfied if the taxpayer reasonably relies in good faith (*i.e.*, the taxpayer discloses all the facts it knows or should know) on the opinion of a qualified tax professional that unambiguously states that there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the Service. *See* Treas. Reg. § 1.6662-4(g)(4).

### 2. Substantial Valuation Misstatement

Section 6662(b)(3) provides for a 20 percent underpayment penalty for taxpayers if there is a substantial valuation misstatement under chapter 1 of the Code. Section 6662(e)(1)(A) provides that there is a substantial valuation misstatement under chapter 1 if, among other things, the value or adjusted basis of any property claimed on any income tax return is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Section 6662(h)(1) increases the penalty to 40 percent in the case of any gross valuation misstatement. Section 6662(h)(2) provides that there is a gross valuation misstatement if, among other things, the valuation or adjusted basis of any property claimed on any income tax return is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. The penalty does not apply, however, if the reasonable cause exception of Section 6664(c) and Treasury Regulations Section 1.6664-4, discussed below, applies.

Because, arguably the tax basis of the long MLD position might be more than 400 percent of the net basis of the MLD positions, the terms of Section 6662(h)(2) might appear to apply, absent the Section 6664(c) reasonable cause exception. However, the legislative history of Section 6662(e) implies that the provision is intended to apply only where excessive basis arises as a result of an excessive valuation, *i.e.*, an issue of fact, as opposed to an issue of law.

The gross valuation misstatement penalty is an extension of the 20% penalty under Section 6662(e) for a "substantial valuation misstatement," which exists if the value or adjusted basis claimed on the return is 200% or more of the correct amount. A dispute with the Service regarding the basis of an asset can arise either from an issue of fact or from an issue of law. The Joint Committee on Taxation, *General Explanation of the Economic Recovery Tax Act of 1981* (JCS-71-81), December 29, 1981 (hereinafter "1981 Tax Act Explanation") discussion of the reasons for the new penalty made clear that Congress was concerned only with basis overstatement resulting from excessive valuations, not incorrect application or interpretation of law. It stated that

> [t]he Congress believed that a specific penalty was needed to deal with various problems related to the valuation of property. This particular need is illustrated by the fact that there are about 500,000 tax disputes outstanding which involve property valuation questions of more than routine significance. These cases alone involve approximately $2.5 billion in tax attributable to the valuation issues.

> The Congress recognizes that valuation issues frequently involve difficult questions of fact. Often these issues seem to be resolved simply by "dividing the difference" in the values asserted by the Internal Revenue Service and those claimed by the taxpayer. Because of this approach to valuation questions, the Congress believes that taxpayers were encouraged to overvalue certain types of property and to delay resolution of the valuation issues. . . .
>
> In recognition of the fact that valuation issues often are difficult, especially where unique property is concerned, the Congress decided to adopt a test for the application of a new penalty under which only significant overvaluations will be penalized.

1981 Tax Act Explanation.

The Joint Committee provided two examples of the situations that the provision was intended to address. Neither example involved a disputed tax-free reorganization, Section 351 exchange, or like-kind exchanges, common situations resulting in legal disputes over the adjusted basis of property. Instead, one example involved an excessive valuation in the context of a charitable deduction and the other involved a basis adjustment arising from an excessive estate tax valuation. At no point did the 1981 Tax Act Explanation by the Joint Committee refer to basis adjustments arising from disputes over matters of law.

Furthermore, the amendments made in 1989 would indicate that no change in this view was intended. Thus, a separate penalty provision, Section 6662(e)(1)(B), was enacted to deal with valuation and basis adjustments arising from adjustments under Section 482, which involves both issues of fact and issues of law.

Accordingly, we believe that it is more likely than not that based upon the foregoing, a fair reading of the statute and its legislative history strongly suggests that a basis overstatement arising from issues of law, such as would be the case with respect to the Transactions, should not be the type of overstatement intended to be reached by Section 6662(e)(1)(A).

### 3. Reasonable Cause

Section 6664(c) provides a general exception to Section 6662 penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts and circumstances determination made on a case-by-case basis. The most important factor is the extent of the taxpayer's effort to determine proper tax liability. *See* Treas. Reg. § 1.6664-4(b)(1). Reliance on the opinion of a professional tax advisor constitutes "reasonable cause" and "good faith" if the advice is based on all pertinent facts and







C&SLLP004958

circumstances and the law as it relates to those facts and circumstances. For example, relevant facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a particular manner. All facts that are relevant to the tax treatment of a transaction must be disclosed. *See* Treas. Reg. § 1.6664-4(c)(1)(i).

The Regulations also set forth the following requirements ("General Opinion Requirements"), all of which must be satisfied for reliance on tax advice, including opinion letters, to be considered reasonable and in good faith:

> (i) The opinion was based on all pertinent facts and circumstances, including the taxpayer's purposes (and the relative weight of such purposes) for entering into the transaction and for structuring the transaction in a particular manner. In addition, reliance on an opinion will not be considered reasonable if the taxpayer fails to disclose a fact that it knows or should know to be relevant to the proper tax treatment of an item.
>
> (ii) The opinion was based on the law as it relates to those facts and circumstances.
>
> (iii) The opinion was not based on any unreasonable factual or legal assumptions (including assumptions as to future events).
>
> (iv) The opinion did not unreasonably rely upon the representations, statements, findings or agreements of the taxpayer or any other person. For example, the opinion must not be based upon a representation or assumption that the taxpayer knows or has reason to know is unlikely to be true.

*See* Treas. Reg. § 1.6664-4(c)(1).

Although we have found no court case that has construed the General Opinion Requirements (which were issued in August of 1995; T.D. 8617), numerous judicial decisions have relied upon similar principles in holding that a taxpayer's reliance upon the advice of a tax professional qualified for the reasonable cause and good faith exception to the substantial understatement penalty. *See, e.g., Mauerman v. Commissioner*, 22 F.3d 1001 (10th Cir. 1994); *Vorsheck v. Commissioner*, 933 F.2d 757 (9th Cir. 1991); *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990); *Daoust v. Commissioner*, 67 T.C.M. (CCH) 2914 (1994); and *English v. Commissioner*, 65 T.C.M. (CCH) 2160 (1993).

The Supreme Court also reaffirmed the right of a taxpayer to rely upon the substantive advice of an accountant or attorney to avoid penalties in *United States v. Boyle*, 469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid filing deadlines, which did not constitute "reasonable cause," and



C&SLLP004959

reasonable reliance on professionals as to questions of substantive law, which would). According to *Boyle*,

> [w]hen an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.

*Id.* at 251.

In a number of cases, courts have not permitted a tax shelter investor to rely on an opinion of counsel — even one stating that it was "more likely than not" that the tax benefits would be respected — as a shield from penalties. *See, e.g., Robertson v. Commissioner*, 77 T.C.M. (CCH) 1849 (1999); *McCrary v. Commissioner*, 92 T.C. 827 (1989). The opinions in these cases generally were not directed to the specific investor, but were a part of, or attached as an exhibit to, the offering materials, and based on factual assumptions, such as appraisals, which were at the very least open to question. *See, e.g., Charlton v. Commissioner*, 60 T.C.M. (CCH) 324 (1990) (the opinion was "replete with cautions and waivers"). Further, in *Barber v. Commissioner*, T.C. Memo. 2000-372, where the investor secured, and claimed to have relied on, the "more likely than not" opinion of independent counsel, the advisor himself had no knowledge of the industry on which the tax shelter was based, relied on an obviously unreasonable appraisal, and applied so many caveats to the opinion that the taxpayer should have realized it was worthless. By contrast, our opinions expressed herein are not part of any offering materials, is rendered directly to the investor, and does not rely on any controversial factual assumptions.

Furthermore, as discussed above, the substantial understatement penalty should not apply merely because the tax reasons for a transaction are found to outweigh the business reasons. In enacting the substantial understatement penalty, Congress acknowledged that "no reasonably informed business decision is made without regard to its tax effects." A "tax shelter" is defined as an arrangement in which "the" principal purpose is to avoid or evade tax. Such a strict reading of the penalty would therefore eliminate the reasonable cause and good faith exception to the penalty for all corporate and non-corporate taxpayers participating in such transactions. It is clear from the legislative history that Congress intended to preserve, not eliminate, this exception for all taxpayers. Unlike the cases where a penalty was sustained despite advice of counsel, the Transactions do not rely on unreasonable financial assumptions. Based on the Investors' signed representations, we believe, and it has been represented to us that the Investors had a profit motive for entering into the Transactions, and there existed an objective and reasonable ability to make a substantial economic profit. Moreover, it was represented to



C&SLLP004960

us that if the Investor were to continue his investment with CC and Mr. Brooks for at least five years, his investment strategy could yield the Investor an annual return of somewhere between 15% and 17%, net of all of the Investor's fees and expenses from the Transactions and without regard to tax benefits. Accordingly, we believe that it is more likely than not that the substantial understatement penalty would not apply to Investors.[62]

#### 4. Conclusion

Overall, based on the foregoing, we believe that there is a greater than 50% likelihood than not that the tax treatment claimed by the Investor in respect of the Transactions would be upheld if challenged by the Service and would not subject the Investor to penalties under Section 6662(b)(2) or (3).

### W. Tax Shelter Registration Not Required

#### 1. Tax shelter under Section 6111(c)(1)

Section 6111(a)(1) requires a tax shelter organizer to register a "tax shelter" with the Service. A "tax shelter," for this purpose, is defined as any investment (A) with respect to which any person could reasonably infer from the representations made, or to be made, in connection with the offering for sale of interests in the investment that the tax shelter ratio for any investor as of the close of any of the first 5 years ending after the date on which such investment is offered for sale may be greater than 2 to 1, and (B) which is, as relevant, a "substantial investment." IRC § 6111(c)(1).

An investment is a "substantial investment" if (A) the aggregate amount which may be offered for sale exceeds $250,000, and (B) there are expected to be 5 or more investors. IRC § 6111(c)(4); *see also* Temp. Reg. § 301.6111-1T, A-21. For purposes of our analysis, we have assumed that the Transactions would constitute a "substantial investment" within the meaning of Section 6111(c)(4) and Temporary Regulations Section 301.6111-1T, A-21

However, we believe that it is more likely than not that no person could reasonably infer from the representations made, or to be made, in connection with the Transactions that the Investor's tax shelter ratio would be greater than 2 to 1. The term "tax shelter ratio" means, with respect to any year,[63] the ratio which (A) the aggregate amount of the deductions and 350 percent of the credits which are represented to be potentially allowable to any investor under Subtitle A of the Code for all periods up to (and including) the close of such year, bears to (B) the "investment base" as of the close of such year. IRC § 6111(c)(2). The term "investment base" means, with respect to any year, the amount of money and the adjusted basis of other property (reduced by any

[62] In recent tax shelter cases in which courts sustained substantial understatement penalties, the taxpayers had not secured a "more likely than not" opinion from counsel. *See Compaq Computer Corp. v. Commissioner*, 113 T.C. 214 (1999); *I.R.S. v. CM Holdings. Inc.*, 86 AFTR 2d 2000-6470 (D. Del.).

[63] The term "year" means (A) the taxable year of the tax shelter, or (B) if the tax shelter has no taxable year, the calendar year. IRC § 6111(e)(2).



C&SLLP004961

liability to which such other property is subject) contributed by the investor as of the close of such year.[64]

a. <u>Determining the aggregate amount of the deductions and 350 percent of the credits represented to be potentially allowable to the Investor (i.e., the numerator of the "tax shelter ratio")</u>

A deduction or credit is considered to be represented as being potentially allowable to an investor if any statement is made (or will be made) in connection with the offering for sale of an interest in an investment indicating that a tax deduction or credit is available or may be used to reduce federal income tax or federal taxable income. Temp. Reg. § 301.6111-1T, A-8. Representations of tax benefits may be oral or written and include those made at the time of the initial offering for sale of interests in the investment, such as advertisements, written offering materials, prospectuses, or tax opinions, and those that are expected to be made subsequent to the initial offering. *Id.* The Regulations further provide that representations are not confined solely to statements regarding actual dollar amounts of tax benefits, but also include general representations that tax benefits are available with respect to an investment. *Id.*[65]

Although some explicit representation concerning tax benefits is necessary before an investment may be considered a tax shelter, once an explicit representation is made (or will be made) regarding *any* tax benefit, *all* deductions or credits *typically associated* with the investment will be inferred to have been represented as potentially allowable. Temp. Reg. § 301.6111-1T, A-9 (Emphasis added). Thus, the tax shelter ratio will be determined with reference to those tax benefits that are explicitly represented as being potentially allowable, as well as all other tax benefits that are "typically associated" with the investment. *Id.* According to the example in the Regulations, in the case of an investment in a building eligible for the rehabilitation tax credit, tax benefits considered to be typically associated with such investment include cost recovery deductions, amortization deductions for construction period interest and taxes, real estate taxes after

[64] For this purpose, there shall not be taken into account any amount borrowed from or attributable to a borrowing arranged by (in simplified terms), tax shelter promoters, managers and related persons; amounts borrowed from foreign lenders known to such persons; amounts held in cash, cash equivalents or marketable securities; and distributions to be made without regard to the tax shelter's income. IRC §§ 6111(c)(3)(B), (C); Temp. Reg. § 301.6111-1T, A-14. It has been represented to us that no portion of the Investor's investment in the Transactions is derived from any borrowing.

Also, for this purpose, the term "marketable securities" is defined in Temporary Regulations Section 301.6111-1T, A-14(4) as any securities that are part of an issue any portion of which is traded on an established market and any securities that are regularly quoted by brokers or dealers making a market. The MLD positions (or at least the Long Bonus Yield and Short Bonus Yield which may be payable thereunder), which are custom investments, would appear to fall into neither category. Because these positions are so volatile, the Investor is not guaranteed any return in respect of the Long Bonus Yield, so no amount will be distributed in respect thereof without regard to income. Accordingly, we believe that it is more likely than not that none of the exclusions from investment base will apply.

[65] Thus, for example, an advertisement stating that "purchase of restaurant includes trade fixtures (5-year write-off and investment tax credit)" constitutes an explicit representation of tax benefits. *Id.*







C&SLLP004962