IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC,
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED
ADDITIONAL FINDINGS OF UNCONTROVERTED FACT
AND PLAINTIFF'S PROPOSED FINDINGS OF
UNCONTROVERTED FACT

_____

Pursuant to RCFC 56(h)(2), the defendant, the United States, responds to the plaintiff's

proposed additional findings of uncontroverted fact (PPAFUF) and proposed findings of

uncontroverted fact (PPFUF). The defendant relies upon the Declaration of Robert Stoddart

(Stoddart Decl.) and its exhibits,[1] and the Declaration of Martha TenEyck (TenEyck Decl.) and

its exhibits. The Stoddart and TenEyck Declarations were filed in appendix B of the brief in

support of the defendant's motion for summary judgment (Def. App. B). The defendant also

relies upon the declaration of Thomas C. Pliske and its exhibits (Pliske Decl.), filed in appendix

B to the brief in support of plaintiff's cross-motion for summary judgment (Pl. App. B).

_____

[1] Attached to this document is another Declaration of Robert Stoddart, with two exhibits.
It supports the defendant's response to PPAFUF No. 40.

- 1 -

**PLAINTIFF'S PROPOSED ADDITIONAL FINDINGS OF UNCONTROVERTED FACTS NOT RAISED IN DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS:**

1. In response to DPFUF No. 3, Plaintiff proposes the following:

PPAFUF No. 1:  During 2001, Hutton noticed that his income showed kind of the same systematic growth in profit that he had experienced over prior years. (Pliske Decl. Ex. 1 at 63, App. B. at 19)

Defendant's Response:  During 2001, Hutton noticed that "[t]here was an increase, but not a spike" in his income.  (Pliske Decl. Ex. 1 at 63, line 15, Pl. App. B at 19.)


2. In response to DPFUF No. 5, Plaintiff proposes the following:

PPAFUF No. 2:  In 2001, Bryan Hanning approached Mark E. Hutton and informed Mark E. Hutton of an investment strategy offered through the law firm of Cantley & Sedacca, LLP that Bryan Hanning thought would be a potential investment opportunity for Mark E. Hutton. (Pliske Decl. Ex. 2, Hanning Deposition Exhibit 1, App. B. at 65)

Defendant's Response: The defendant does not object to the proposed finding as far as it goes, but the defendant adds the following:  "The investment strategy was comprised of certain foreign currency transactions."  (Stoddart Decl. Ex. 32A, Def. App. B at 217.)


3. In response to DPFUF No. 13, Plaintiff proposes the following:

PPAFUF No. 3: While the MLD transaction may have been functionally different from the prior investment transactions proposed by Hanning, the same analysis regarding investment potential and tax benefit potential are present in the MLD transaction, just as they were present in

the prior investment opportunities Hanning presented to Hutton. (Pliske Decl. Ex. 2 at 25-26, App. B at 60-61.)

 <u>Defendant's Response</u>:  Nothing in the cited testimony supports the proposed finding.  In fact, at pages 25-26 of the cited deposition, Hutton's lawyer asked Hanning, "Is this 2001 transaction, the MLD transaction, is it similar or quite a bit different than other opportunities you may have approached him with?"  Hanning answered, "Well, it's very different from the things I work with Mark [Hutton] on."  The MLD transaction was so different that no one could reasonably have expected Hanning to offer a useful "analysis regarding investment potential and tax benefit potential."  Hanning is an employee of the Massachusetts Mutual Life Insurance Company.  (Stoddart Decl. Ex. 32 at 4, Def. App. B at 194.)  Before 2001, Hanning had sold Hutton and his entities only insurance-related products, and all but one of them were products of Massachusetts Mutual.  (*Id*. at 12-13, Def. App. B at 201-02.)  Hanning admits that he lacked the knowledge and experience needed to evaluate Hutton's MLD transaction (*id*. at 16, Def. App. B at 205), and he never gave Hutton any reason to think otherwise (*id*. at 16-17, App. B at 205-06). The analysis of an insurance policy is not the same as the analysis of a foreign-currency options trade–and Hanning was not involved in Hutton's analysis of the MLD transaction.  (Pliske Dec. Ex. 1 at 89, Pl. App. B at 25.)


 4. In response to DPFUF No. 18, Plaintiff proposes the following:

 PPAFUF No. 4: In the October 4, 2001 letter Cantley and Sedacca stated that they were to provide legal services regarding tax planning and were engaged to "review the tax ramifications of a market link deposit investment strategy…and to research and review the law supporting the

issuance of a legal opinion for" the MLD transaction. (Pliske Decl. Ex. 2, Hanning Deposition

Exhibit 3, App. B at 69.)  Cantley & Sedacca also stated that it is a law firm, that it is not an

investment advisor and does not express an opinion on the investment itself.

(Pliske Decl. Ex. 2, Hanning Deposition Exhibit 3, App. B at 69, 71-72.)

 Defendant's Response: The defendant agrees with the proposed finding.


 5. In response to DPFUF No. 20, Plaintiff proposes the following:

 PPAFUF No. 5:  Hanning participated in the first conference call with Cantley &

Sedacca, LLP, so that he could assist Hutton in understanding the MLD transaction.  (Pliske

Decl. Ex. 2 at 27-29, App. B. at 61; Pliske Decl. Ex. 2, Hanning Deposition Exhibit 1, App. B. at

65)  If Hanning did not have the knowledge and experience to properly evaluate the merits of the

transaction then it was unknown to Hutton. (Pliske Decl. Ex. 2, Hanning Deposition

Exhibit 1, App. B. at 65)

 Defendant's Response:  The defendant agrees with the first sentence of the proposed

finding, but the second sentence makes an unsupported assertion about Hutton's knowledge .

The cited document fails to state or even to imply what "was unknown to Hutton," and its author

(Hanning) could have had no first-hand knowledge of what was unknown to Hutton.  The second

sentence was therefore improperly proposed as a finding under RCFC 56(e) & (h)(1).


 6. In response to DPFUF No. 21, Plaintiff proposes the following:

 PPAFUF No. 6: By participating in the conference call so he could assist Hutton in

understanding the MLD transaction, Hanning implicitly represented to Hutton that he had the

knowledge and experience to properly evaluate the MLD transaction. (Pliske Decl. Ex. 2, Hanning Deposition Exhibit 1, App. B. at 65)

Defendant's Response: Nothing in the cited document supports the assertion that Hanning made an implicit representation of "knowledge and experience [needed] to properly evaluate the MLD transaction." If he had made such an implicit representation, he would have implied a falsehood. The defendant's attorney asked Hanning if he had the knowledge and experience needed to evaluate the MLD transaction. Hanning answered under oath, "I did not." (Stoddart Decl. Ex. 32 at 16, App. B at 205.) The defendant's attorney also asked him, "Did you *represent* to Mr. Hutton that you had the knowledge and experience to evaluate the merits and risks of the transaction?" Hanning again answered, "I did not." *Id*. at 16-17, Def. App. B at 205-06 (emphasis added).

If Hutton had wished to assert that Hanning's conduct somehow impressed him as an implicit representation of Hanning's unclaimed and nonexistent knowledge and experience in evaluating foreign-currency option trades, Hutton should have supported his assertion with a declaration of fact made under penalty of perjury. *See* RCFC 56(e) & (h)(1). Instead, he offers inferences from silence and arguments by his attorney, which cannot support a proposed finding.


7. In response to DPFUF No. 22, Plaintiff proposes the following:

PPAFUF No. 7: Although Hutton, alone, may not have the knowledge and experience in financial and business matters that would permit him to evaluate the merits and risks of trading options on foreign currency, he relies on others like Scott Hewitt , his CPA and tax advisor. (Pliske Decl. Ex. 1 at 15, App. B. 7.)

<u>Defendant's Response</u>:  The proposed finding is misleading.  It implies that Hutton reasonably relied upon "others like Scott Hewitt" to evaluate the merits and risks of trading options on foreign currency–even though Scott Hewitt never evaluated the financial side of the transaction, never told Hutton that he had a reasonable opportunity of making a profit, and admitted, "I have no expertise in that area."  (Stoddart Decl Ex. 33 at 9, App. B at 232.)  As Hutton himself admitted, "I guess I took his *silence* as an acquiescence, if you will, that yeah, it's an okay deal, but I did not ask him specifically as it relates to that."  (Stoddart Decl. Ex. 31 at 17-18, Def. App. B at 162-63 (emphasis added); *see also id.* at 23-24, App. B at 168-69.)  Hutton, however, can remember no occasion on which Hewitt–his *tax* advisor–gave him an implicit opinion that a transaction would be profitable by failing to state that it would not be profitable. (Stoddart Decl. Ex. 31 at 20, App. B at 165.)

Under these circumstances, it is a genuine issue of fact whether Hutton could reasonably have relied upon Hewitt's evaluation of the merits and risks of trading options on foreign currency.  Hewitt never made such an evaluation, could not have made one, and never claimed to have made one.

8. In response to DPFUF No. 24, Plaintiff proposes the following:

PPAFUF No. 8:  Hewitt was Hutton's CPA and tax advisor and assisted Hutton in making his business successful through the years.  (Pliske Decl. Ex. 3 at 5, App. B. at 74)  Hewitt never gave Hutton any reason not to think that he had the financial and business knowledge needed to evaluate the merits of trading options on foreign currencies. (See Pliske Decl. Ex. 1 at 15-16, App. B at 7) In fact, Hewitt participated in phone calls with Cantley & Sedacca, LLP (*See*

Pliske Decl. Ex. 3 at 6-9, App. B at 75); and following the telephone call, Hewitt went back to his office doing research before advising Hutton that the investment looked good. (*See* Pliske Decl. Ex. 1 at 92, App. B at 26; Pliske Decl. Ex. 3, App. B at 81)

     <u>Defendant's Response</u>:  The defendant agrees with the first sentence of the proposed finding.  The rest of the proposed finding, however, suggests Hutton properly inferred that Hewitt–his *tax* advisor–could evaluate the merits of a foreign-currency option trade simply because Hewitt never said he could not.  The facts do not support the suggestion.  In the phone calls with Cantley & Sedacca, Hewitt asked no questions about the financial aspects of the MLD transaction; he asked only about the tax aspects.  That was "pretty much [his] involvement in that."  (Stoddart Decl. Ex. 33 at 8, Def. App. B at 231.)  Hewitt may have done some research at some time about tax questions, but he took the possibility of profit "on faith."  (*Id*. at 9-10, Def. App. B at 232-33.)  Hewitt never gave Hutton any assurance that he had a reasonable opportunity to make a non-tax profit from the MLD transaction.  (*See id*. at 9, Def. App. B at 232.)

     Under these circumstances, there is a genuine issue of fact whether Hutton could reasonably have taken an assurance that Hewitt never gave and could not have given.


     9. In response to DPFUF No. 25, Plaintiff proposes the following:

     PPAFUF No. 9: The relationship between Hutton and his business advisor, Hewitt, is such that if Hewitt, after research and investigation, did not believe that the MLD investment, or any other investment, was a viable investment, he would have relayed this to Hutton. Hewitt never told Hutton that based on his research and understanding of the MLD transaction, the MLD transaction was not a viable investment. (*See* Pliske Decl. Ex. 1 at 15-17, 23-24, App. B at 7, 9)

<u>Defendant's Response</u>:  The cited pages are from Hutton's deposition; nothing in them supports the proposed finding about what Hewitt would have done, and Hutton offers no testimony on the subject from Hewitt.  At most, the testimony shows that Hutton considered Hewitt to be honest, and that Hutton "felt" Hewitt would have raised a concern if he had one. Whether that feeling was reasonable under the circumstances is a genuine issue of fact:  As Hutton knew, Hewitt had asked Cantley & Sedacca only about the tax aspects of the transaction. (*See, e.g.,* Stoddart Decl. Ex. 33 at 8, Def. App. B at 231.)  Hewitt lacked the expertise to determine if the MLD was a viable investment.  (*See id*. at 9, App. B at 232.)

10. In response to DPFUF No. 26, Plaintiff proposes the following:

PPAFUF No. 10:  Because Hewitt found no problems in the profitability or the tax benefits of other investment transactions, Hutton can remember no occasion which Hewitt expressed an opposing opinion that the profitability or tax benefits of other investment transactions would not be profitable or would not produce the tax benefits claimed. (Pliske Decl. Ex. 1 at 20-21, App. B at 8.)

<u>Defendant's Response</u>:  Nothing in the cited document supports the following language in the proposed finding:  "Because Hewitt found no problems in the profitability or the tax benefits of other investment transactions."

11. In response to DPFUF No. 28, Plaintiff proposes the following:

PPAFUF No. 11: After reviewing the investment potential with Hutton, Hanning, and Cantley and Sedacca, Hewitt believed there was a potential for a return, even though risky, the

MLD transaction had a possibility of having a return. (Pliske Decl. Ex. 3 at 10, App. B. at 76)

Defendant's Response:  The proposed finding is misleading.  Although the cited

testimony does support a finding that Hewitt "believed" there was a potential for return, Hewitt's

belief was grounded in faith alone, not independent thought.  On the cited page, the defendant's

attorney asked Hewitt, "Did you yourself independently from your knowledge of finance believe

. . . that it had a potential of a return or were you taking the possibility of return on faith, so to

speak, from what Cantley & Sedacca was saying?"  Hewitt answered, "No real knowledge of

that.  Probably more on faith, I would say."  (Pliske Decl. Ex. 3 at 9-10, Pl. App. B at 75-76.)


12. In response to DPFUF No. 28, Plaintiff proposes the following:

PPAFUF No. 12: Hewitt was on the initial conference call not to provide financial

analysis of the MLD transaction; but to provide advice regarding the tax aspects of the

transaction. (Pliske Decl. Ex. 3 at 6-9, App. B. at 75) Hewitt's expertise in dispensing advice

regarding the MLD transaction was limited to dispensing advice regarding tax benefits of the

MLD transaction. (Pliske Decl. Ex. 3 at 5-6, App. B. at 74-75)

Defendant's Response:  The defendant agrees with the proposed finding.


13. In response to DPFUF No. 29, Plaintiff proposes the following:

PPAFUF No. 13: Hewitt's understanding of the MLD transaction was that "there was a

potential for a return" and even acknowledged that "even though risky, it had a possibility of

having a return". (*See* Pliske Decl. Ex. 3 at 10, App. B at 76)

Defendant's Response:  Hewitt had no independent understanding of the MLD transaction's profit potential.  He took his "understanding" on faith–that is, he assumed the transaction had a profit potential because he believed Cantley & Sedacca had said so.  (*See* Pliske Decl. Ex. 3 at 10, Pl. App. B at 76.)  He relied upon Edward Sedacca's assertions even though he knew that Cantley & Sedacca were promoters of the scheme.  (*Id*. at 66, Pl. App. B at 90.)  Cantley & Sedacca, however, had refused to offer an opinion about the MLD transaction's profit potential.  *See* PPAFUF No. 4, *supra*.


14. In response to DPFUF No. 30, Plaintiff proposes the following:

PPAFUF No. 14: Hutton did not believe that he asked anyone the specific question as to whether "the [MLD] transaction had a reasonable probability of producing an economic profit in excess of taxes and out-of-pockets costs." Hutton also had discussions and asked the general question whether the MLD investment was a high risk/high reward type of investment.  Hutton also relied on his advisors with respect to such conclusions. (*See* Pliske Decl. Ex. 1 at 26, App. B at 10.)

Defendant's Response:  The defendant agrees with the first two sentences of the proposed finding; but the third sentence suggests that Hutton reasonably relied on his advisors, and it is a genuine issue of fact whether such reliance was reasonable for the reasons set out in the defendant's responses to PPAFUF nos. 3, 6, 7, 8, and 9, *supra*, which are incorporated by this reference.

15. In response to DPFUF Nos. 31 and 32, Plaintiff proposes the following:

PPAFUF No. 15: Hutton relied on the attorneys, Cantley and Sedacca, and upon his own advisors, Hewitt, his CPA and business advisor, and Hanning, his investment advisor. (*See* Pliske Decl. Ex. 1 at 108, App. B at 30; and Pliske Decl. Ex. 1 at 26, App. B at 10.)

Defendant's Response:  The proposed finding is misleading because it suggests that Hutton's reliance was reasonable.  If Hutton relied upon Cantley & Sedacca to give him advice about the profit potential of the MLD transaction, even Cantley & Sedacca would call his reliance unreasonable.  As Hutton himself admits in PPAFUF No. 4, *supra*, "Cantley & Sedacca . . . stated that it is a law firm, that it is not an investment advisor and does not express an opinion on the investment itself."  As to Hutton's reliance upon Hewitt and Hanning, it is a genuine issue of fact whether such reliance was reasonable for the reasons set out in the defendant's responses to PPAFUF nos. 3, 6, 7, 8, and 9, *supra*, which are incorporated by this reference.

16. In response to DPFUF No. 43, Plaintiff proposes the following:

PPAFUF No. 16: Because the transaction was a non-taxable transaction which did [*sic*] Hutton was not required to report on his 2001 tax return, Hutton did not report the $2,472,500 "premium received" on his personal federal income tax return for 2001. (*See* Stoddard Decl. Ex. 29, App. B at 126-34.)

Defendant's Response:  (1) Objection.  The proposed finding makes a legal assertion ("the transaction [the sale of a written option] was a non-taxable transaction"), and the legal assertion is incorrect.  The transaction was a taxable transaction, but the transaction remained open until the option closed.  *See* Rev. Rul. 58-234, 1958-2 C.B. 279; *see also* Cantley &

Sedacca's opinion letter, Pliske Decl. Ex. 5 at 47 (emphasis added) ("[W]e understand, and assume for purposes of our opinions herein, that receipt of the short MLD premium from SG did not constitute an income recognition event *at the time of receipt* and that no income recognition event in respect of this premium would arise *until the Short Maturity Date*").  Hutton's accountant, Scott Hewitt, also agrees that income from the sale of an option is recognized when the option closes.  (*See* Pliske Decl. Ex. 3 at 21-22, Pl. App. B at 78-79.)

(2)  Response:  The defendant agrees that Hutton did not report the $2,472,500 "premium received" on his personal federal income tax return for 2001.


17. In response to DPFUF No. 74, Plaintiff proposes the following:

PPAFUF No. 17: Although Hewitt didn't assure Hutton that he independently tested the conclusion in the Cantley and Sedacca letter, Hewitt did perform independent tests to confirm the legal conclusions and may have informed Hutton of the results. (Pliske Decl. Ex. 3 at 33; App. B at 81)  Furthermore, Hewitt performed independent research regarding the conclusions stated in the Cantley and Sedacca October 4, 2001 letter. (*See* Pliske Decl. Ex. 1 at 92, App. B. at 26; Pliske Decl. Ex. 3 at 31; App. B at 81)

<u>Defendant's Response</u>:  Hewitt never told Hutton that he had independently tested the conclusions in Cantley & Sedacca's legal opinion (their letter of January 22, 2002).  (Pliske Decl. Ex. 3 at 33, line 12, Pl. App. B at 81.)  Hewitt never gave Hutton his opinion of the advice in Cantley & Sedacca's opinion letter.  (*Id*. at 70, Pl. App. B at 91.)  The Cantley & Sedacca legal opinion is the first legal opinion Hewitt had ever read.  (*Id*. at 65, Pl. App. B at 89.)  Hewitt cannot recall looking independently or "very deep[ly]" at any of the authorities cited in the

Cantley & Sedacca letter.  (*Id*. at 30, Pl. App. B at 81.)  When Hewitt looked through the Cantley

& Sedacca letter at his deposition, he could not recall having read any of the cited authorities in

order to prepare the tax return that reported Hutton's MLD transaction.  (*Id*. at 31, Pl. App. B at

81.)  Hewitt cannot say that he agreed with the entire Cantley & Sedacca letter, but he also

cannot say which parts he disagreed with.  (*Id*. at 32, Pl. App. B at 81.)  Hewitt cannot recall

what efforts he made to test the letter's conclusions; he made no notes of his efforts; and he told

no one about his efforts.  (*Ibid*.)  At first Hewitt thought that his assistant, Amy Clupny, may

have done some research (though not at his request), but he was merely speculating that she did

the research.  (*Id*. at 25-26, Pl. App. B at 79-80.)

18. In response to DPFUF No. 75, Plaintiff proposes the following:

PPAFUF No. 18: While the MLD transaction way [*sic*] have been functionally different

from the prior investment transactions reviewed by Hanning and Hewitt, the same analysis

regarding investment potential and tax benefit potential are present in the MLD transaction, just

as they were present in the prior investment opportunities Hanning and Hewitt presented to

Hutton. (*See* Pliske Decl. Ex. 2 at 25-26, App. B at 61.)

Defendant's Response:  This proposed finding substantially repeats PPAFUF No. 3,

*supra*.  Therefore the defendant incorporates its response to that proposed finding by this

reference.  The only difference between the two proposed findings is the assertion here that

Hewitt (as well as Hanning) reviewed "[unspecified] prior investment transactions," and that

Hewitt presented "[unspecified] prior investment opportunities" to Hutton.  The cited pages

never mention Hewitt, and they cannot support the assertion that Hewitt played the role the proposed finding attributes to him.

19. In response to DPFUF No. 96, Plaintiff proposes the following:

PPAFUF No. 19: Hewitt and his assistant Amy Clupny prepared an independent return for Clearmeadow Investments LLC prior to requesting the sample return, and the sample return matched the independent figures determined by Hewitt, except for one figure. (Pliske Decl. Ex. 3 at 14-15, App. B at 77; Pliske Decl. Ex. 3, Hewitt Deposition Exhibit 2, App. B at 95.)

Defendant's Response:  The proposed finding is misleading.  It suggests that Hewitt's firm reported the MLD transaction on various tax returns with no guidance from Cantley & Sedacca, using only their independent understanding of tax law.  The suggestion is false. Hewitt's assistant Amy Clupny drafted the 2001 tax returns for Hutton and his entities; she also made notes of her communications with Cantley & Sedacca about those returns.  (Pliske Decl. Ex. 3 at 20, Pl. App. B at 78; *id*. Depo. Ex. 5, Pl. App. B at 114-16.)  See, in particular, Pl. App. B 116 (Clupny's typewritten memo stating, in part, "Discussed treatment of attorney fees with Ed Sedacca.  He suggested two possible ways to report the fees. . . .  1.  On the S-corporation. . . . 2.  On the 1040. . . .").  Hewitt himself admits that he called Edward Sedacca while his firm was preparing the 2001 returns for "clarification on reporting."  (Pliske Decl. Ex. 3 at 7, Pl. App. B at 75.)

20. PPAFUF No. 20: Hanning was always compensated for the sale of any products that were sold by him. (Pliske Decl. Exh. No. 1 at 94, App. B. at 27)

Defendant's Response:  The defendant agrees with the proposed finding.


21. PPAFUF No. 21: Hutton had known Hanning for 8+ years prior to the MLD

investment in and trusted him to bring him only reputable investment products. (Pliske Decl.

Exh. No. 1 at 62, App. B. at 19)

Defendant's Response:  The proposed finding improperly suggests that Hutton's trust in

Hanning was reasonable under the circumstances; it was not.  Before the transaction at issue,

Hanning had sold Hewitt only the products of insurance companies.  The MLD transaction was

much different from any of the other investments Hanning had earlier proposed.  With this

reference, the defendant incorporates its response to PPAFUF No. 3, *supra*.


22. PPAFUF No. 22: Hutton believed that Hanning would never bring him an

investment opportunity that did not make sense, or would not otherwise be a valid investment

despite the risks involved. (Pliske Decl. Exh. No. 1 at 63-64, App. B. at 19)

Defendant's Rersponse: (1) Objection:  The phrase "invalid investment" conveys no clear

meaning.  (2) Response:  The cited pages do not support the proposed finding.  At most, they

show that Hutton was "comfortable" with Hanning's advice even though Hanning "could go over

[his] head really quickly."  (Pliske Decl. Ex. 2 at 64, Pl. App. B at 19.)


23. PPAFUF No. 23: The law firm of Cantley & Sedacca presented the MLD investment

to Hanning and later to Hutton. (Pliske Decl. Exh. No. 2 at 8, 10, App. B. at 56, 57)

Defendant's Response:  The defendant agrees with the proposed finding, with the addition that Hanning found Cantley & Sedacca listed in binder under the heading "resources for investment opportunities and tax planning strategies."  (Pliske Decl. Ex. 2 at 5-6, Pl. App. B at 55-56.)

24. PPAFUF No. 24: This law firm provided Hutton a legal opinion with respect to the MLD transaction and assisted Hutton with the transactions necessary to implement the transaction. (Pliske Decl. Exh. No. 1 at 88, App. B. at 25)

Defendant's Response:  The defendant agrees with the proposed finding.

25. PPAFUF No. 25: Hutton was not aware, nor was it necessary that he be aware, of any role other parties may have taken with respect to the MLD transactions or perhaps their relationship with Cantley & Sedacca. (Pliske Decl. Exh. No. 1 at 88, App. B. at 25)

Defendant's Response:  The cited testimony provides no support for the proposed finding, which is in any event more a legal conclusion than a factual statement.

26. PPAFUF No. 26: Hutton simply recognized that the MLD investment was a high risk investment for which he was receiving expert assistance from a law firm with expertise in foreign-currency transactions. (Pliske Decl. Exh. No. 1 at 26, App. B. at 10)

Defendant's Response:  Nothing in the cited testimony states or implies that Hutton received "expert assistance from a law firm with expertise in foreign-currency transactions." Nothing in the cited testimony states or implies that Hutton "realized" anything about the MLD

- 16 -

transaction.  At most, the document would support a finding that Hutton "discussed" the risk and possible return of the transaction.

27. PPAFUF No. 27: Hutton recognized that if certain conditions ultimately existed that there could be tax benefits, (i.e. a tax loss), or tax detriments (i.e. a taxable gain). (Pliske Decl. Exh. No. 1 at 26, App. B. at 10)

Defendant's Response:  Nothing in the cited testimony supports the proposed finding that Hutton realized that there could be tax benefits or tax detriments.  All of the questions and answers on the cited page concern economic profit.

28. PPAFUF No. 28: Hutton had invested in oil wells and other high risks [*sic*] investments and had obtained tax benefits from such investments as intangible drilling costs. (Pliske Decl. Exh. No. 1 at 69, App. B. at 20)

Defendant's Response:  The cited testimony mentions only oil wells and a rental building and describes only the oil wells as "a high risk investment."  It provides no support for the assertions that Hutton invested in "other high risk investments" and that the oil wells had generated "intangible drilling expenses."  Even if the proposed finding were supported, however, it does not follow that Hutton could reasonably have expected tax benefits from the MLD transaction simply because he was able to report intangible drilling costs from oil wells.  Hutton actually paid for his oil-well investments and for the rental building.  (Pliske Decl. Ex. 1 at 106, Pl. App. B at 30.)  He did not pay the amounts recited in the MLD-transaction documents.  (*Id*. at 36-37, Pl. App. B at 12.)  Even Hutton is now willing to admit–in the abstract–that a potential $2

million tax loss in return for a $250,000 out-of-pocket expense is too good to be true. (Pliske Decl. Ex. 1 at 59, Pl. App. B at 18.) He also admits that the MLD transaction was different from the transactions concerning which he had earlier consulted Hewitt and Hanning. (*Id*. at 114, Pl. App. B at 32.)

29. PPAFUF No. 29: His trusted advisors, Brian Hanning, an investment advisor, presented Hutton with investment opportunities in the past; and Hutton's personal and business certified public accountant (CPA) Scott Hewitt were involved in the review and analysis of those transactions, as well as the MLD investment. (Pliske Decl. Exh. No. 1 at 63-64, App. B. at 19; Pliske Decl. Exh. No. 1 at 15, App. B. at 7)

Defendant's Response: The cited testimony does not support a finding that Hewitt was "involved in the review and analysis of *those* transactions," *i.e.*, the "investment opportunities" presented by Hanning. In fact, with the exception of some advice about Hutton's construction company, Hewitt had never expressed an opinion that any transaction Hutton entered had a reasonable possibility of profit apart from its tax consequences. (Pliske Decl. Ex. 1 at 18, Pl. App. B at 8.)

30. PPAFUF No. 30: Neither of these trusted advisors advised Hutton that the MLD transaction was not a good investment or that the represented tax consequences, good or bad, were being improperly represented. (Pliske Decl. Exh. No. 1 at 26, App. B. at 10; Pliske Decl. Ex. 1 at 16-17, 23-24, App. B at 7, 9.)

<u>Defendant's Response</u>:  The defendant admits that neither Hewitt nor Hanning told Hutton that the MLD transaction was not a good investment.  The defendant repeats, however, that both of these "trusted advisors" have denied they had the expertise necessary to render an opinion about the financial aspects of the investment.  (Pliske Decl. Ex. 2 at 16, Pl. App. B at 58 (Hanning); Pliske Decl. Ex. 3 at 9, Pl. App. B at 75 (Hewitt)).  Neither man had ever given Hutton any reason to believe he had such expertise.   (Pliske Decl. Ex. 2 at 16-17, Pl. App. B at 58 (Hanning); Pliske Decl. Ex. 1 at 15-16, Pl. App. B at 7 (Hewitt)).  And Hutton admits that the MLD transaction was different from any other transaction concerning which he had earlier consulted Hanning and Hewitt.  (Pliske Decl. Ex. 1 at 114, Pl. App. B at 32.)  Hutton never asked his tax advisor whether the MLD transaction stood a reasonable chance of producing an economic profit independent of tax benefits.  (Pliske Decl. Ex. 1 at 16-17, Pl. App. B at 7.)

Under the circumstances, it is a genuine issue of fact whether Hutton could reasonably have relied upon Hanning and Hewitt's failure to object to the MLD transaction as an endorsement of the transaction.


31. PPAFUF No. 31: Both of these individuals are experienced financial advisors and have worked with Hutton many years prior to 2001 and are still working with him through today. (Pliske Decl. Ex. 2 at 4, App. B at 55; Pliske Decl. Ex. 3 at 5, App. B at 74; Pliske Decl. Ex. 1 at 15, App. B at 7)

<u>Defendant's Response</u>:  Hewitt is not a financial advisor:  he has no expertise in that area. (Pliske Decl. Ex. 3 at 9, Pl. App. B at 75.)  And before Hanning suggested the MLD transaction, he had brought Hutton only the products of insurance companies.  (Pliske Decl. Ex. 2 at 12-13,

Pl. App. B at 57.)  Hanning does not consider himself to be Hutton's investment advisor.  (*Id*. at 11, Pl. App. B at 57.)

32. PPAFUF No. 32: They continue to provide him with both financial and tax advice as might be applicable with respect to certain investments. (Pliske Decl. Ex. 2 at 24, App. B at 60; Pliske Decl. Ex. 3 at 46-47, App. B at 85)

Defendant's Response:  By this reference, the defendant incorporates its response to PPAFUF No. 31.

33. PPAFUF No. 33: They participated in the initial conferences with the law firm, Cantley and Sedacca, which originally introduced the MLD transaction to Hanning; they participated in subsequent follow up conferences with Cantley and Sedacca and they did their own independent research. (Pliske Decl. Ex. 3 at 6-8, App. B at 75; Pliske Decl. Ex. 1 at 92, App. B at 26; Pliske Decl. Ex. 3 at 31, App. B at 81)

Defendant's Response:  The defendant agrees that Hewitt and Hanning participated in conference calls with Cantley & Sedacca, though Hewitt did not participate in the first call (*see* Pliske Decl. Ex. 1 at 50, Pl. App. B at 16), but nothing in the cited testimony supports the assertion that Hanning did independent research of any sort about the MLD transaction; and the documents prove that Hewitt did no research into the financial aspects of the transaction.  (*See* Pliske Decl. Ex. 3 at 9, Pl. App. B at 75.)  To illustrate the thoroughness and independence of Hewitt's tax research, the defendant incorporates its responses to PPAFUF Nos.  17 and 19, *supra*.

34. PPAFUF No. 34: Hutton had every reason to believe, based on the facts, that his financial advisors properly evaluated the merits and risks of the MLD transactions. (Pliske Decl. Ex. 2 at 17-18, App. B at 58-59; Pliske Decl. Ex. 1 at 16-17, App. B at 7)

Defendant's Response:  (1) Objections: The proposed finding repeats the substance of several earlier proposed findings; the phrase "every reason" is vague; and the proposed finding suggests no specific reason why Hutton should have believed that his advisors exercised expertise that they lacked and performed an evaluation he never requested.  (2) Response:  With this reference the defendant incorporates its responses to PPFAUF Nos. 3, 6, 7, 8, 9, 11, and 15. Furthermore, Hutton himself has admitted he merely "speculated" that Hewitt had done research. (Pliske Decl. Ex. 1 at 108-09, Pl. App. B at 30.)  Hutton's speculations do not constitute reason to believe that Hewitt had properly evaluated the merits and risks of the transaction.  Hutton has also admitted that Cantley & Sedacca are the only parties who led him to believe there was a reasonable opportunity to make a profit in the MLD transaction.  (*Ibid*.)  Hutton's reliance on Cantley & Sedacca was unreasonable, because he knew that Cantley & Sedacca were expressing no opinion on the profitability of the investment.  *See* PPAFUF No. 4, *supra*.


35. PPAFUF No. 35: The mere fact that Hanning brought the MLD investment to Hutton, led Hutton to believe it had merit. (Pliske Decl. Ex. 1 at 26, App. B at 10)

Defendant's Response:  The proposed finding is misleading because it suggests that Hutton could reasonably have believed the MLD transaction had merit merely because Hanning brought it to him.  The facts suggest otherwise.  The MLD transaction offered a chance of a staggering 14,446% profit based on a Black/Scholes analysis, but Hutton did not believe that

Hanning had the ability to verify that analysis.  (Pliske Decl. Ex. 1 at 24-25, Pl. App. B at 9.)

And Hutton himself doubted the possibility of 14,446% return despite what the MLD's

promotional documents stated.  In his words, "I get investment stuff all the time that purports to

be these great deals, and they're all full of lies and inflation and everything else.  I didn't trust

that aspect that closely, quite frankly."  (Pliske Decl. Ex. 1 at 103, Pl. App. B at 29.)  Despite his

personal doubts about the promoters' promises, he never troubled to ask Hanning (or anyone

else) if there was a reasonable probability the MLD transaction would produce an economic

profit in excess of tax benefits and economic costs.  (*Id*. at 26, Pl. App. B at 10.)  Even if Hutton

had asked the question, Hanning could not have answered it because he lacked the knowledge

and experience needed to evaluate the MLD transaction.  (Pliske Decl. Ex. 2 at 16, Pl. App. B at

58.)  Hanning never gave Hutton any reason to think otherwise.  (*Id*. at 16-17, Pl. App. B at 58.)

Under the circumstances, there is a genuine issue of fact whether Hutton could reasonably

have relied on Hanning's mere suggestion of the MLD investment as evidence of its merit.


36. PPAFUF No. 36: Hanning never brought an investment to Hutton that did not have

merit. (Pliske Decl. Ex. 1 at 26, App. B at 10)

Defendant's Response:  The cited testimony does not support the proposed finding.

Furthermore, before suggesting the MLD transaction, Hanning had brought Hutton only the

products of insurance companies–and all but one of them were products of Massachusetts Mutual

Life Insurance Company.  (Pliske Decl. Ex. 2 at 12-13, Pl. App. B at 57.)  The MLD transaction

was very different from all of the other–perhaps meritorious–investments Hanning had proposed

to Hutton.  (*Id*. at 25-26, Pl. App. B at 60-61.)

37. PPAFUF No. 37: Hewitt was involved in all conferences with Hutton and did his own

independent research. (Pliske Decl. Ex. 3 at 6-8, App. B at 75; Pliske Decl. Ex. 1 at 92, App. B at

26; Pliske Decl. Ex. 3 at 31, App. B at 81)

<u>Defendant's Response</u>: The proposed finding repeats the substance of PPAFUF No. 33,

*supra*. Accordingly, by this reference the defendant incorporates its response to PPAFUF No.

33.

38. PPAFUF No. 38: Hewitt never told Hutton that the investment did not have merit and

their working relationship was such that if the investment did not have merit, or if he was unable

to properly analyze the investment, he would have told Hutton such. (Pliske Decl. Ex. 1 at 16-17,

App. B at 7)

<u>Defendant's Response</u>:  The proposed finding repeats the substance of PPAFUF No. 9,

*supra*.  Accordingly, by this reference the defendant incorporates its response to PPAFUF No. 9.

39. PPAFUF No. 39: It wasn't until Hutton received the letter dated May 20, 2004 that he

and his advisors became aware that the IRS was taking the position that the MLD investment was

a tax shelter being challenged by the IRS. (Pliske Decl. Ex. 1 at 98, App. B at 28)

<u>Defendant's Response</u>:  The proposed finding seems to refer to a letter from the IRS to

Mark E. and Mary S. Hutton that appears as Exhibit 1 of the TenEyck Declaration, Def. App. B

at 374.  But Hutton states that he filed a reportable transaction disclosure statement with his 2003

return and that the disclosure statement was his first notice that the MLD transaction was a listed

transaction.[2] (Pliske Decl. Ex. 1 at 83-84, Pl. App. B at 24.)  When Hutton first learned of the

IRS's position about the MLD transaction is therefore a genuine issue of fact.

Furthermore, if Hutton's advisors did learn of the IRS's position on the Son of Boss tax

shelter for the first time on May 20, 2004, then his advisors were ignorant of Notice 2000-44,

2000-2 C.B. 255 (published on August 13, 2000), and of Temp. Treas. Reg. § 1.752-6T

(published on June 24, 2003 as T.D. 9062, 68 FR 37414-01).  There is a genuine issue of fact

whether Hutton, who purchased a Son of Boss tax shelter, could justifiably have relied upon

advisors who were so uninformed about the IRS's published positions and about tax law.

40. PPAFUF No. 40: Hutton immediately paid the tax that was associated with any

benefits he received from the MLD transactions. (Pliske Decl. Ex. 1 at 84-87, App. B at 24-

25)

Defendant's Response:  Hutton claims to have made a $175,870 deposit "associated with

any benefits he received from the MLD transactions" (Compl. ¶ 10), but he did not make the

deposit immediately after May 20, 2004.  A "designated payment" (Code 670) of $175,870.63

was credited to Hutton's 2001 account on October 25, 2004–more than five months after May 24,

2004.  *See* Exhibits 1 and 2 of the Declaration of Robert Stoddart, attached to this document at

pages 52-55, *infra*.

---

[2]  *See also* Compl. ¶ 10 (On September 11, *2003*, Hutton deposited $175,870, which he believes to be the increase in his tax liability that would result from the adjustments made in the FPAA.)  The defendant believes the complaint is simply wrong.

41. PPAFUF No. 41: Hutton, upon the advice of his new attorney, signed a Notice of Election to participate in the settlement initiative that was being offered by the IRS. (Pliske Decl. Ex. 1 at 38-39, App. B at 13)

Defendant's Response: The defendant agrees with the proposed finding.


42. PPAFUF No. 42: Later the IRS sought additional information and Hutton provided such information to his attorney to forward to the IRS. (Pliske Decl. Ex. 1 at 39, App. B at 13)

Defendant's Response:  The cited page shows only that Hutton handed the IRS's requests for information to his attorney and "relied upon him to . . . work all that out . . . ."  (Pliske Decl. Ex. 1 at 39, Pl. App. B at 13.)  The IRS sought additional information in a summons that it served upon Hutton *personally*.  (*See* TenEyck Decl. ¶ 13, Def. App. B at 372.)  Hutton neither provided the information nor appeared as the summons required.  The information he had earlier provided was insufficient.  (*Id.* ¶ 14, Def. App. B at 372.)


43. PPAFUF No. 43: The IRS claims that they never received a response to their request for additional information. (Pliske Decl. Ex. 1 at 39, App. B at 13)

Defendant's Response:  The cited testimony fails to support the proposed finding.  The IRS did receive a response to its request for information:  It received a FAX from Hutton's attorney refusing to produce the information.  (TenEyck Decl. Ex. 15, Def. App. B at 399-401.)  But the IRS never received the information.  (TenEyck Decl. ¶¶ 14-15, Def. App. B at 372-73.)

44. PPAFUF No. 44: In his capacity as both an investor and partner, he immediately sought the advice and counsel of his CPA, Scott Hewitt. (Pliske Decl. Ex. 1 at 15, App. B. at 7)

Defendant's Response:  The proposed finding is unclear:  the word "immediately" refers to no particular time, and the cited testimony does not refer to Hutton's dealings with the IRS–the subject of the previous proposed findings.  The defendant assumes the proposed finding means to assert that Hutton consulted Hewitt "immediately" after he heard of the MLD investment, which is the time discussed in and around the cited page.

Furthermore, nothing in the cited testimony supports the assertion that Hutton consulted Hewitt "[i]n his capacity as both an investor and partner."  On the cited page, Hutton states that he consulted Hewitt "when we analyzed this particular opportunity"–*i.e.*, the MLD transaction. (Pliske Decl. Ex. 1 at 15, Pl. App. B at 7.)  Hutton entered the MLD deal on October 5, 2001. (*See* Defendant's Proposed Finding of Uncontroverted Fact (DPF) 31.)  He must have analyzed the opportunity before he accepted it.  But Hutton's S-corporation, Clearmeadow Capital Corp., did not enter its partnership with CF Advisors and Daniel J. Brooks until October 19, 2001. (DPF 55.)  Hutton could hardly have consulted Hewitt in his capacity as a partner two weeks before the partnership existed.

45. PPAFUF No. 45: Hewitt testified that he did his own independent research and saw nothing adverse with the MLD investment to advise his client, Hutton, not to invest in the MLD transaction. (Pliske Decl. Ex. 1 at 92, App. B at 26; Pliske Decl. Ex. 3 at 31, App. B at 81)

Defendant's Response:  The cited testimony does not support the proposed finding.  It concerns Hewitt's preparation of the tax returns, not his advice about whether "to invest in the

MLD transaction." Hewitt has admitted his lack of expertise in that area. (*See* Pliske Decl. Ex. 3 at 9, Pl. App. B at 75.) And there is little support even for the assertion that Hewitt did "independent research" about the tax aspects of the transaction. At Pliske Decl. Ex. 1 at 92, Pl. App. B at 26, Hutton answers a question from his attorney:

> Q.     And you believe he [Hewitt] went back home and did some research?
>
> A.     I had no reason to believe he didn't. I mean, again, I trusted him that he did.

But at Pliske Decl. Ex. 1 at 108-09, Pl. App. B at 30, Hutton clarified what he knew about Hewitt's "independent research":

> Q.     You say that Mr. Hewitt told you that he wanted to check some things out about the Cantley & Sedacca opinion letter?
>
> A.     Um-hum.
>
> Q.     What did he do to check it out?
>
> A.     I don't know.
>
> Q.     So when you said that you assumed he did some research, were you only speculating that he did research?
>
> A.     I think that's what assume means, yeah, I assumed he did research.
>
> Q.     You don't know that he did?
>
> A.     I don't know that he did.

And Hewitt himself claimed little credit for "independent research." At Pliske Decl. Ex. 3 at 31, Pl. App. B at 81, Hewitt answered questions from the defendant's attorney:

> Q.     Did you look independently into any of [the authorities cited by Cantley & Sedacca]?
>
> A.     Not that I can remember specific ones, no. I just don't remember.

- 27 -

On the same page Hewitt nevertheless asserted that he did do some research at some time before working on Hutton's return, stating: "I remember reading cases, but I can't tell you which ones off the top of my head." The defendant's attorney then asked the following question:

> Q.     You read them when? In order to prepare this return or just in your general education as a CPA?
>
> A.     Mostly in general education.

The defendant also incorporates its response to PPAFUF No. 17, *supra*.

It is a genuine issue of fact whether (and when) Hewitt "did his own independent research."


46. PPAFUF No. 46: Hewitt independently completed the tax return, making only one small adjustment when confirming with Cantley and Sedacca, how such tax consequences were to be reflected on the tax return. (Pliske Decl. Ex. 3 at 14, App. B at 77)

Defendant's Response:  By this reference the defendant incorporates its response to PPAFUF No. 19, *supra*.


47. PPAFUF No. 47: Hutton provided all the advice provided to him from Cantley & Sedacca to Scott Hewitt. (Pliske Decl. Ex. 1 at 89, App. B at 25; Pliske Decl. Ex. 3 at 11, App. B at 76)

Defendant's Response: The defendant agrees with the proposed finding.

48. PPAFUF No. 48: Hutton completed the Cantley & Sedacca client intake form with the help of his business advisor, Bryan Hanning. (Pliske Decl. Ex. 2 at 14, App B at 58; Pliske Decl. Ex. 2, Hanning Deposition Exhibit 2, App. B at 66-68.)

Defendant's Response:  Nothing in the cited testimony supports the assertion that Bryan Hanning was Hutton's "business advisor."  With that exception, the defendant agrees with the proposed finding.


49. PPAFUF No. 49:  The written opinion by Cantley & Sedacca that was ultimately issued on January 23, 2002 and was issued after the fact, but reflected the facts as they existed at or near the time that plaintiff entered into the transaction. (Pliske Decl. Ex. 1 at 27-28, App. B at 10)

Defendant's Response:  Nothing in the cited testimony supports the proposed finding. Furthermore, the Cantley & Sedacca opinion expressly relies upon Hutton's representation that he "intends to continue his Investment for a period of time to enable [him] to earn a reasonable profit from the Transactions, in excess of all fees and transactions [*sic*] and without regard to tax benefits." Pliske Decl. Ex. 5 at 7.  Hutton has offered no evidence that he made this representation "at or near the time that plaintiff entered into the transaction."  In fact, the record shows that Hutton made this representation for the first time on March 11, 2002, three months after the Clearmeadow partnership liquidated.  (*See* DPF 68-69.)  Hutton cannot pretend that Cantley & Sedacca were relying on the representation in October of 2001–five months before he made it.

- 29 -

50. PPAFUF No. 50: Hewitt was involved in telephone conversations, examined promotional materials, asked questions, and sought the advice of the law firm Cantley and Sedacca at the time of the preparation of the firm [*sic*]. (Pliske Decl. Ex. 3 at 6-9, App. B at 75)

Defendant's Response:  The defendant agrees with the proposed finding if it is meant to assert that Hewitt sought Cantley & Sedacca's advice concerning how to report items generated by the MLD tax shelter when Hewitt prepared the 2001 federal tax *forms* for Hutton and his entities.


**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERED FACTS IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT:**

PPFUF No. 1. Mark E. Hutton (hereinafter "Hutton"), a resident of Wichita, Kansas (Pliske Decl. Ex. 1 at 4, App. B at 4), has been a licensed general contractor since 1992; he received his license while doing business through Hutton Construction Corporation. (*Id.* at 44, App. B at 14) For the last 15 years he has been president of the Hutton Construction Corporation. (*Id*. at 45, App. B at 14)

Defendant's Response: The defendant agrees with the proposed finding.


PPFUF No. 2. Hutton has invested in oil wells and other high risk investments and has obtained tax benefits from such investments as intangible drilling costs. (Pliske Decl. Ex. 1 at 69, App. B at 20)

Defendant's Response:  By this reference, the defendant incorporates its response to PPAFUF No. 28, *supra*.

PPFUF No. 3. Bryan Scott Hanning (hereinafter "Hanning") has known Hutton since 1975, and has been an advisor of some sort to Hutton and his related entities since 1992. Hanning is a representative member and agent of AGH Wealth Advisors and employed with Massachusetts Mutual Life. (Pliske Decl. Ex. 2 at 4, App. B at 55; Pliske Decl. Ex. 1 at 62, App. B at 19)

Defendant's Response: The defendant agrees with the second sentence of the proposed finding, but the cited testimony offers little support for the first sentence. Hutton "[r]eally didn't get to know Bryan [Hanning] until about 1992, '93." (Pliske Dec. Ex. 1 at 62, Pl. App. B at 19.) And nothing in the cited testimony[3] supports the assertion that Hanning was ever an "advisor" of any sort to Hutton or to his entities. At most, the testimony suggests that Hutton had a "business relationship" with Hanning. *Ibid.* Hanning himself denies that he was ever Hutton's investment advisor. (Pliske Decl. Ex. 2 at 11, Pl. App. B at 57.)

PPFUF No. 4. Hanning has brought to Hutton's attention different investments that he believes will be beneficial to Hutton. (Pliske Decl. Ex. 2 at 23-24, App. B at 60; Pliske Decl. Ex. 1 at 62-63, App. B at 19) Hanning, in the past and currently, advises Hutton regarding investment opportunities including tax planning (split dollar life insurance, 401K investment plans, deferred compensation arrangements, etc.), equity investments, and insurance investment

---

[3] At Pliske Decl. Ex. 2 at 23-24, Pl. App. B at 60 (emphasis added), Hutton's attorney asks Hanning, "How long have you worked with Mr. Hutton and his companies *in a position of advisor of some type?*" The words are the attorney's–not Hanning's–and nothing in the previous answers justifies the attempt to insert them into Hanning's testimony. Hanning's response is more careful: "I believe it was 1992 or three that we first began, had a *relationship.*"

products. (Pliske Decl. Ex. 2 at 23-24, App. B at 60.) Hanning never brought an investment to Hutton that did not have merit. (Pliske Decl. Ex. 1 at 63-64, App. B at 19.)

Defendant's Response:  The defendant agrees with the first sentence of the proposed finding, but nothing in the cited testimony supports assertion in the second sentence that Hanning "advises Hutton regarding investment opportunities including tax planning."  In fact, Hanning denies that he is Hutton's investment advisor.  (Pliske Decl. Ex. 2 at 11, Pl. App. B at 57.)  As to the third sentence, the defendant incorporates its response to PPAFUF No. 36; furthermore, the cited testimony shows only that Hutton was "comfortable" with Hanning's advice, not that Hanning's suggestions had "merit."

PPFUF No. 5.  Hutton trusts Hanning because his background and because of their long term relationship. (Pliske Decl. Ex. 1 at 64, 110, App. B at 19, 31)

Defendant's Response:  The cited testimony shows that Hutton can recall no investment Hanning ever brought to him that was not an insurance product.  (Pliske Decl. Ex. 1 at 64, Pl. App. B at 19.)  Hutton does insist that he would not have considered investing in the MLD transaction if Hanning had not brought it to him (Pliske Decl. Ex. 1 at 110, App. B at 31); but the MLD transaction was "very different from the things [Hanning] work[s] with Mark [Hutton] on" (Pliske Decl. Ex. 2 at 25-26, Pl. App. B at 60-61).  And Hanning admits that he lacked the knowledge and experience needed to evaluate the MLD transaction.  (*Id*. at 16, Pl. App. B at 58.) Hanning never gave Hutton any reason to believe that he had the knowledge and experience needed to evaluate the transaction.  (*Id*. at 17, Pl. App. B at 58.)

Under the circumstances, it is a genuine issue of fact whether Hutton could reasonably have relied upon Hanning to evaluate the MLD transaction.

PPFUF No. 6. Hanning is employed with Massachusetts Mutual Life Insurance Company and is a member of AGH Wealth Advisors in Wichita, Kansas. (Pliske Decl. Ex. 2 at 4, App. B at 194.) Hanning receives compensation if Hutton takes advantages of the investment opportunity being offered. (Pliske Decl. Ex. 1 at 94, App. B at 27)

Defendant's Response: The defendant agrees with the proposed finding.

PPFUF No. 7. In 2001, Hanning approached Hutton and informed Hutton of an investment strategy offered through the law firm of Cantley & Sedacca, LLP that Hanning thought would be a potential investment opportunity for Hutton. (Pliske Decl. Ex. 2, Hanning Deposition Exhibit 1, App. B at 65.)  Hanning approached Hutton in 2001 with respect to the MLD investment opportunity because Hutton was interested in different investment opportunities. (Pliske Decl. Ex. 2 at 10, App. B at 57)

Defendant's Response:  The defendant agrees with the proposed finding.

PPFUF No. 8. Hanning found Cantley & Sedacca listed under the caption "resources for investment opportunities and tax strategies" in a binder of information issued by the National Association for Family Wealth Counselors, an organization to which Hanning belongs. (Pliske Decl. Ex. 2 at 5-6, App. B at 55-56) Hanning called Cantley & Sedacca to learn about their investment choices and operations. (Pliske Decl. Ex. 2 at 8, App. B at 56)

- 33 -

<u>Defendant's Response</u>:  The defendant agrees with the proposed finding.


PPFUF No. 9. During this initial call, Mr. Sedacca (hereinafter referred to as "Sedacca"),

from Cantley & Sedacca, explained the mechanics of the MLD investment opportunity, the risks

involved, and the reward scenarios. (Pliske Decl. Ex. 3 at 6-8, App. B at 75) Following Mr.

Sedacca's presentation, Hutton posed questions requested the transaction, followed by Hanning's

and Hutton's questions. (Pliske Decl. Ex. 3 at 8-9, App. B at 75)

<u>Defendant's Response</u>:  The proposed finding suggests that Hanning and Hutton both

participated in Hanning's "initial call" to Cantley & Sedacca; but the evidence shows that

Hanning approached Hutton only after speaking to Cantley & Sedacca.  (*See* Pliske Decl. Ex. 2 at

8, Pl. App. B at 56.)  Otherwise the defendant agrees with the proposed finding.


PPFUF No. 10. A subsequent teleconference was held with Hutton, Hanning, Scott

Hewitt (hereinafter "Hewitt"), Sedacca, and Mark Kaplan (hereinafter referred to as "Kaplan").

(Pliske Decl. Ex. 3 at 7, App. B at 75)  Because of the complications of this sophisticated

investment (i.e. MLD investment) Hanning also had another CPA that he works with, Marc

Kaplan, accompany him to explain the MLD investment transaction to Hutton. (Pliske Decl. Ex.

2 at 29,33, App. B at 61-62) The second call was to clarify the information Hutton, Hanning and

Hewitt received from Sedacca. (Pliske Decl. Ex. 3 at 7, App. B at 75)

<u>Defendant's Response</u>:  The cited testimony shows that Mark Kaplan provided

"clarification as to partnership rules" (Pliske Decl. Ex. 2 at 29, Pl. App. B at 61)–not that he

"explain[ed] the MLD transaction to Hutton." The cited testimony never refers to the MLD transaction as "sophisticated."

PPFUF No. 11. Prior to investing in the MLD transaction, Hutton insisted on a conference call with his CPA, Hewitt, who participated and asked questions to satisfy himself as to the representations being made by Cantley and Sedacca. (Pliske Decl. Ex. 1 at 50, App. B. at 16 )

Defendant's Response: Nothing in the cited testimony supports the assertion that Hewitt asked questions "to satisfy himself as to the representations being made by Cantley and Sedacca." At most the testimony shows that Hewitt asked questions about the tax consequences of the deal. In fact, the cited testimony shows that neither Hewitt nor Hanning challenged the most startling of Cantley & Sedacca's representations even though Hutton recognized at the time how startling it was: "I remember really more about the mechanics of the process, and I remember specifically joking around about the money it could make. Wow, that'd be a great return." (Pliske Decl. Ex. 1 at 50, Pl. App. B at 16.) Despite Hutton's doubts about the represented potential return (*see id*. at 103, Pl. App. B at 29), neither he nor Hewitt asked Cantley & Sedacca about the probability of such a return during the telephone conference (*id*. at 51, Pl. App. B at 16).

PPFUF No. 12. Mr. Hutton did not invest in the transaction until his independent CPA gave him the approval several days after the phone conference with Cantley and Sedacca. (Pliske Decl. Ex. 1 at 92, App. B. at 26)

Defendant's Response:  The defendant agrees that Hutton bought into the MLD

transaction after seeking Hewitt's opinion, but the proposed finding suggests that Hutton bought

into the deal in reasonable reliance on that opinion.  Such reliance would not have been

reasonable under the circumstances.  *See* Defendant's response to PPAFAF No. 7, *supra*, which

is incorporated by this reference.


PPFUF No. 13. Cantley & Sedacca sent Hanning a form captioned "Intake Summary,"

which Hanning helped Hutton to complete. Hanning then returned the form to Cantley &

Sedacca. (Pliske Decl. Ex. 2 at 14, App B at 58; Pliske Decl. Ex. 2, Hanning Deposition Ex. 2,

App. B at 66-68.)

Defendant's Response:  The defendant agrees with the proposed finding.


PPFUF No. 14. Before 2001, Hanning had sold only one investment product to Hutton as

an individual: a split-dollar variable life contract that contained mutual funds. (Pliske

Decl. Ex. 2 at 11, App. B at 57) Hanning had also sold Hutton's business entities key-person life

insurance policies and a 401(k) plan. (Id. at 12, App. B at 57) Except for one life insurance

policy, all of the products Hanning had sold to Hutton and his entities were products of

Massachusetts Mutual Life Insurance Company. (*Id*. at 12-13, App. B at 57)

Defendant's Response: The defendant agrees with the proposed finding.


PPFUF No. 15. So that Hutton could understand the nature of the MLD transaction,

Hanning arranged conference calls among himself, Hutton, Cantley & Sedacca, Marc Kaplan,

and Scott Hewitt. (Pliske Decl. Ex. 2 at 27-29, App. B at 61) Edward Sedacca represented

Cantley & Sedacca. (Pliske Decl. Ex. 3 at 49, App. B at 85) Marc Kaplan was a CPA employed

by AGH Wealth Management Solutions. (Pliske Decl. Ex. 2 at 33, App. B at 62)  Scott Hewitt is

a CPA (Pliske Decl. Ex. 3 at 45, App. B at 84) who performs accounting and tax services for

Hutton and his entities (Pliske Decl. Ex. 3 at 46-47, App. B at 85).

　　　　Defendant's Response: The defendant agrees with the proposed finding.


　　　　PPFUF No. 16. Because Hanning recommended Hutton as a purchaser of the MLD

transaction, Cantley & Sedacca paid a referral fee to AGH Wealth Management Solutions, an

entity in which Hanning had an ownership interest. (Pliske Decl. Ex. 2 at 14-15, App. B at 58)

　　　　Defendant's Response: The defendant agrees with the proposed finding.


　　　　PPFUF No. 17. Hanning disclosed to Hutton that Cantley & Sedacca had paid him

a referral fee for recommending Hutton as a purchaser of the MLD transaction. (Pliske Decl. Ex.

2 at 15, App. B at 58)

　　　　Defendant's Response: The defendant agrees with the proposed finding.


　　　　PPFUF No. 18. On October 4, 2001, Cantley & Sedacca sent Hutton (through Hanning) a

document captioned "Agreement for Your Legal Services." Hanning gave the document to

Hutton. (Pliske Decl. Ex. 2 at 15-16, App. B at 58; Pliske Decl. Ex. 2, Hanning Deposition

Exhibit 3, App. B at 69, 71-72)

　　　　Defendant's Response: The defendant agrees with the proposed finding.

PPFUF No. 19. The October 4, 2001, Agreement required Hutton to represent: (1) that he had relied solely upon his (and his financial advisor's) independent investigation of all matters or concerns regarding the MLD transaction; and (2) that he (or his financial advisor) possessed knowledge and experience in financial and business matters sufficient to ensure his (or his financial advisor's) capability to evaluate the merits and risks of the MLD transaction. Cantley & Sedacca is a law firm and simply stated that it is not an investment advisor and does not express an opinion on the investment itself. (Pliske Decl. Ex.2, Hanning Deposition Exhibit 3, App. B at 69, 71-72)

Defendant's Response: The defendant agrees with the proposed finding.


PPFUF No. 20. Hanning does not consider himself to be Hutton's investment advisor, yet Hanning approached Hutton regarding the MLD transaction and suggested that the MLD transaction would be a potential investment opportunity for Hutton. (Pliske Decl. Ex. 2 at 11, App. B at 57; Pliske Decl. Ex. 2, Hanning Deposition Exhibit 1, App. B at 65)

Defendant's Response:  The defendant agrees with the proposed finding, except that the word "yet" implies that a salesman who sells an investment must necessarily be an "investment advisor" despite his sworn statement to the contrary.  The cited testimony does not support the implication.


PPFUFNo. 21. Hanning participated in the first conference call with Cantley & Sedacca, LLP, so that he could assist Hutton in understanding the MLD transaction. If Hanning did not have the knowledge and experience to properly evaluate the merits of the transaction then

it was unknown to Hutton. (Pliske Decl. Ex. 2 at 27-29, App. B. 61; Pliske Decl. Ex. 2, Hanning

Deposition Ex. 1, App. B. at 65)

    <u>Defendant's Response</u>:  By this reference the defendant incorporates its response to

PPAFUF No. 5, *supra*.


    PPFUF No. 22. By participating in the conference call so he could assist Hutton in

understanding the MLD transaction, Hanning implicitly represented to Hutton that he had the

knowledge and experience to properly evaluate the MLD transaction. (Pliske Decl. Ex. 2, Haning

Deposition Exhibit 1, App. B. at 65)

    <u>Defendant's Response</u>:  By this reference the defendant incorporates its response to

PPAFUF No. 6, *supra*.


    PPFUF No. 23. Hutton, alone, may not have the knowledge and experience in financial

and business matters that would permit him to evaluate the merits and risks of trading options on

foreign currency, however he relies on others like Scott Hewitt, his CPA and tax advisor. (Pliske

Decl. Ex. 1 at 15, App. B. at 7) Hutton understood that the MLD investment was a *high* risk

investment that had a high possible reward. (Pliske Decl. Ex. 1 at 26, App. B. at 10.)

    <u>Defendant's Response</u>:  For its response to the first sentence of the proposed finding, the

defendant incorporates its response to PPAFUF No. 7, *supra*.  As to the second sentence:

Nothing in the cited testimony states what Hutton "understood" about the MLD transaction.  At

most, the document would support a finding that Hutton "discussed" the risk and possible return

of the transaction with unnamed persons.  In fact, the MLD transaction was not a high-risk

investment;  it was a digital option transaction designed to minimize risk.  An investor could lose

no more than the (relatively small) difference between the premiums paid and received for the

short and long positions.  (*See* Stoddart Decl Ex. 34 at 36-37, Def. App. B at 281-82.)

Furthermore, Hutton did not trust the representations of a "high possible reward" (Pliske Decl.

Ex. 1 at 103, Pl. App. B at 29) and even joked about it (*id*. at 50, Pl. App. B at 16).


        PPFUF No. 24. Hewitt has been Hutton's accountant since 1993. (Pliske Decl. Ex. 3 at 5,

App. B at 74) Hutton considers Hewitt to be the financial advisor who had sufficient knowledge

and experience in financial and business matters to evaluate the MLD transaction. (Pliske Decl.

Ex. 1 at 15, App. B at 7)

        Defendant's Response:  The defendant agrees that Hewitt has been Hutton's accountant

since 1993.  If the finding is meant to imply that Hutton reasonably believed Hewitt "had

sufficient knowledge and experience in financial and business matters to evaluate the MLD

transaction," the defendant incorporates its response to PPAFUF No. 7, *supra*.


        PPFUF No. 25. Hewitt prepared and continues to prepare Hutton's personal and business

tax returns from 1994 though 2006. Hewitt is an independent and trusted advisor. (Pliske Decl

Ex 3 at 5-6, App. B at 74-75)

        Defendant's Response:  The defendant agrees that Hewitt prepared Hutton's personal and

business tax returns from 1994 though 2006, but nothing in the cited testimony supports the

second sentence of the proposed finding.

PPFUF No. 26. Hewitt was Hutton's CPA and tax advisor and assisted Hutton in making his business successful through the years. Hewitt never gave Hutton any reason to think that he did not have the financial and business knowledge needed to evaluate the merits of trading options on foreign currencies. (*See* Pliske Decl. Ex. 1 at 15-16, App. B at 7) In fact, Hewitt participated in phone calls with Cantley & Sedacca, LLP (*See* Pliske Decl. Ex. 3 at 6-9, App. B at 75); and following the telephone call, Hewitt went back to his office doing research before advising Hutton that the investment looked good. (*See* Pliske Decl. Ex. 1 at 15-18, App. B at 7-8).

Defendant's Response:  By this reference the defendant incorporates its response to PPAFUF No. 8, *supra*.


PPFUF No. 27. Typically, Hutton sought Hewitt's advice regarding various business transactions, but Hutton never directly asked Hewitt whether the MLD transaction provided a reasonable opportunity of profit apart from tax considerations. (Pliske Decl. Ex. 1 at 16-17, App. B at 7) Hutton provided Hewitt with the MLD investment materials. (Pliske Decl. Ex. 1 at 89, App. B at 25; Pliske Decl. Ex. 3 at 11, App. B at 76)

Defendant's Response:  Nothing in the cited testimony shows that Hutton "typically" sought Hewitt's advice regarding business transactions.  The defendant agrees that Hutton never directly asked Hewitt whether the MLD transaction provided a reasonable opportunity of profit apart from tax considerations, and that Hutton provided Hewitt with the MLD investment materials.

PPFUF No. 28.  Because of the nature of Hutton and Hewitt's relationship, if Hewitt had a concern or a comment about the MLD transaction, Hewitt would have expressed his concerns or comments. (Pliske Decl. Ex. 1 at 16-17, App. B at 7) Hewitt never made any comment or expressed his concerns regarding the MLD transaction. (Pliske Decl. Ex. 1 at 16-17, App. B at 7) Because of Hewitt's silence, Hutton took Hewitt's silence on the subject as a statement that the MLD transaction actually did provide a reasonable opportunity for profit. (*Id.* at 17-18, App. B at 7-8; *see also id* at 23-24, App. B at 9)

Defendant's Response:  As to the first sentence of the proposed finding, the defendant incorporates its response to PPAFUF No. 9, *supra*.  As to the second and third sentences, the defendant incorporates its response to PPAFUF No. 7, *supra*.

PPFUF No. 29. Hutton never asked Hewitt to check the Black/Scholes calculations that purported to show the MLD transaction's possibility of profit; and Hewitt had never mentioned to Hutton the Black/Scholes calculation or the valuation of options. (Pliske Decl. Ex. 1 at 22, App. B at 9)

Defendant's Response:  The defendant agrees with the proposed finding.

PPFUF No. 30. Following the phone conversations, and before notifying Hutton that he approved the MLD transaction, Hewitt performed independent research regarding the MLD transaction. (Pliske Decl. Ex. 1 at 92, App. B at 26; Pliske Decl. Ex. 3 at 31, App. B at 81)

Defendant's Response:  Hewitt did no independent research concerning the financial aspects of the MLD transaction.  (Pliske Decl. Ex. 3 at 9, Pl. App. B at 75.)  As to the

thoroughness and independence of his research concerning the tax aspects, the defendant

incorporates its responses to PPAFUF Nos. 17 and 19, *supra*.  There is no evidence that Hewitt

performed tax research before Hutton bought into the MLD transaction.

PPFUF No. 31. Based on Hewitt's understanding of the MLD transaction, "there was a

potential for a return" and Hewitt acknowledged that "even though risky, it had a possibility of

having a return". (*See* Pliske Decl. Ex. 3 at 10, App. B at 76)

Defendant's Response:  Hewitt did not base his opinion of the MLD's profit potential

upon an "understanding" of the MLD transaction.   He took the possibility of profit "on faith."

(Pliske Decl. Ex. 3 at 9-10, Pl. App. B at 75-76.)

PPFUF No. 32. Hutton stated that he did not believe that he asked anyone the specific

question as to whether "the [MLD] transaction had a reasonable probability of producing an

economic profit in excess of taxes and out-of-pockets costs." Hutton further stated that he had

discussions and asked the general question whether the MLD investment was a high risk/high

reward type of investment and his reliance on his advisors with respect to such conclusions. (*See*

Pliske Decl. Ex. 1 at 26, App. B at 10)

Defendant's Response:  The defendant agrees that Hutton stated what the first sentence of

the proposed finding says he stated.  And the defendant agrees that, on the cited page of his

deposition, Hutton stated he had relied upon Hewitt and Hanning.  The defendant denies that the

reliance was reasonable under the circumstances for the reasons given in its responses to

PPAFUF Nos. 3, 6, 7, and many others, *supra*.

PPFUF No. 33.  Hutton relied on the attorneys, Cantley and Sedacca, and upon his own advisors, Hewitt, his CPA and business advisor, and Hanning, his investment advisor to determine whether to enter into the MLD transaction. (*See* Pliske Decl. Ex. 1 at 108, App. B at 30 and Pliske Decl. Ex. 1 at 26, App. B at 10)

Defendant's Response:  By this reference the defendant incorporates its response to PPAFUF No. 15, *supra*.

PPFUF No. 34. Hanning gave Hutton no negative opinion on whether the tax benefits claimed for the MLD transaction would be upheld if the IRS challenged them. (Pliske Decl. Ex. 2 at 17-18, App. B at 59)

Defendant's Response:  The defendant agrees that Hanning, an insurance agent, never told Hutton the MLD's asserted tax advantages would *not* survive a challenge.  It does not follow that Hutton could reasonably have understood that lack of a warning as confirmation that the tax advantages would survive a challenge.  Hanning never gave Hutton reason to believe that he could evaluate the merits and risks of the MLD transaction.  (Pliske Decl. Ex. 2 at 17, Pl. App. B at 58.)

PPFUF No. 35. Hewitt, by preparing the tax returns for Hutton claiming any tax benefits that may have flowed from the MLD transaction, implicitly assured Hutton that the tax benefits were proper. (Pliske Decl. Ex. 3 at 47, App. B at 85)

Defendant's Response:  Nothing on the cited page supports the proposed finding.

- 44 -

PPFUF No. 36. While the MLD transaction way [*sic*] have been functionally different from the prior investment transactions reviewed by Hanning and Hewitt, the same analysis regarding investment potential and tax benefit potential are present in the MLD transaction, just as they were present in the prior investment opportunities Hanning and Hewitt presented to Hutton. (Pliske Decl. Ex. 2 at 25-26, App. B at 60-61)

Defendant's Response: With this reference the defendant incorporates its response to PPAFUF No. 18, *supra*.

PPFUF No. 37. Scott Hewitt's firm, Hewitt & Co., as Hutton's accountant prepared the 2001 federal income-tax returns for Clearmeadow Investments, LLC, Clearmeadow Capital Corporation, and Hutton. (Pliske Decl. Ex. 3 at 12-13, App. B at 76)

Defendant's Response:  The defendant agrees with the proposed finding.

PPFUF No. 38. Hewitt independently completed the tax return, making only one small adjustment when confirming with Cantley and Sedacca, how such tax consequences were to be reflected on the return. Hewitt contacted Cantley and Sedacca to question them on their position prior to finalizing Plaintiff's 2001 tax return, and completed the tax return in a manner for which he believed was proper and correct and not the way he was advised by Cantley and Sedacca. (Pliske Decl. Ex. 3 at 14, App. B at 77)

Defendant's Response:  The cited page fails to support the assertion that Hewitt completed the return in a way that was "not the way he was *advised* by Cantley and Sedacca."  At most it shows that Hewitt had completed a draft return before receiving a draft from Cantley &

Sedacca. But Hewitt called Edward Sedacca while the Hewitt firm was working on its draft for "clarification on reporting." (Pliske Decl. Ex. 3 at 7, App. B at 75.) Naturally, Hewitt's draft would have reflected Sedacca's clarifications, and it is not necessarily a sign of independence that Hewitt's draft was nearly identical to Cantley & Sedacca's. Furthermore, Amy Clupny drafted the return for Hewitt's firm, and she also consulted Cantley & Sedacca. *See* the defendant's response to PPAFUF No. 19, *supra*.

PPFUF No. 39. Hutton ultimately obtained the signed written opinion from a law firm, Cantley and Sedacca, stating the legal basis for all representations that had been made to him and his advisors since their initial contact. (Pliske Decl. Ex. 1 at 27-28, App. B at 10)

<u>Defendant's Response</u>: The defendant agrees that Hutton ultimately obtained a signed written opinion from Cantley & Sedacca, but the cited testimony provides no support for the assertion that the opinion states "the legal basis for all representations that had been made to him and his advisors since their initial contact."

PPFUF No. 40. Hutton, in 2005, after being contacted by the IRS and learning that this transaction was being challenged, hired an attorney, Anthony S. Gasaway, and filed amended tax returns. (Pliske Decl. Ex. 1 at 42, App. B at 14)

<u>Defendant's Response</u>: The defendant agrees with the proposed finding.

PPFUF No. 41. Prior to being contacted by the IRS, neither Hutton nor Hewitt, were ever aware that the MLD investment, was what might be considered a listed transaction by the IRS, or

that such investment might be included in Notice 2000-44 that was issued by the IRS.

(Pliske Decl. Ex. 1 at 84, App. B at 24)

    Defendant's Response:  With this reference the defendant incorporates its response to

PPAFUF No. 39, *supra*.


    PPFUF No. 42. In addition to amending the 2001 tax returns and adjusting for any tax

benefits that might have flowed from the MLD investment, Hutton paid any additional tax

liability that was due. In addition, he took advantage of the Settlement initiative being offered by

the IRS with respect to investors in the MLD type investments. (Pliske Decl. Ex. 1 at 84-87,

App. B at 24-25)

    Defendant's Response:  Hutton did not "pay any additional tax liability that was due."  He

made a jurisdictional *deposit*, which did not include penalties or interest.  With this reference the

defendant incorporates its response to PPAFUF No. 40, *supra*.  The defendant also agrees that

Hutton applied to participate in the IRS's settlement initiative, but the cited testimony does not

show that Hutton "took advantage of it" by complying with its requirements.  *See* defendant's

responses to PPAFUF Nos. 42 and 43, *supra*.


    PPFUF No. 43. He completed Form 13582, Notice of Election to Participate in

Announcement 2004-46 Settlement Initiative, for his attorney, Gasaway, which was subsequently

filed with the Service. (Pliske Decl. Ex. 1 at 38-39, App. B at 13)

    Defendant's Response:  The defendant agrees with the proposed finding.

PPFUF No. 44. Upon the IRS seeking follow up information, Hutton provided such information to his attorney. (Pliske Decl. Ex. 1 at 39, App. B at 13)

Defendant's Response:  With this reference the defendant incorporates its response to PPAFUF No. 42, *supra*.

PPFUF No. 45. Today, the Service states that it never received a response for Hutton with respect to their follow up questions and that is the reason any settlement was not entered into with Hutton. (Pliske Decl. Ex. 1 at 39, App. B at 13)

Defendant's Response:  With this reference the defendant incorporates its response to PPAFUF No. 43, *supra*.  The defendant also admits that the IRS did not enter a settlement with Hutton (and that the IRS states, both today and earlier, that it did not enter a settlement with Hutton) because Hutton failed to provide the required information.

PPFUF No. 46. Notice of Final Partnership Administrative Adjustment for Clearmeadow LLC was issued by the IRS on August 24, 2005. See Pliske Decl. Ex. 4, App. B at 128-140.

Defendant's Response:  The defendant agrees with the proposed finding.

PPFUF No. 47. On January 23, 2002, Hutton received Cantley and Sedacca's signed tax opinion letter. See Pliske Decl., Ex. 5, App. B. at 141-242.

Defendant's Response:  The defendant admits that the date "January 23, 2002" appears on a cover letter sent with Cantley & Sedacca's opinion letter, but the cited document does not show when Hutton received the opinion letter.

Respectfully submitted,

s/Robert Stoddart
ROBERT STODDART
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
TEL:  (202) 307-6445
FAX: (202) 514-9440
Robert.C.Stoddart@usdoj.gov

RICHARD T. MORRISON
  Acting Assistant Attorney General
DAVID GUSTAFSON
  Chief, Court of Federal Claims Section

s/ David Gustafson

December 10, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

————————————

No. 05-1223 T
(Judge Allegra)

CLEARMEADOW INVESTMENTS, LLC,
CLEARMEADOW CAPITAL CORP.,
Tax Matters Partner,

                                       Plaintiff,

v.

THE UNITED STATES,

                                       Defendant.

————————————

DECLARATION OF ROBERT STODDART

————————————

I, Robert Stoddart, am an attorney employed by the Tax Division of the U.S. Department of Justice, and was assigned to defend this case on February 7, 2007. I am now the custodian of the files compiled by the attorneys who were assigned to defend this case before me. I make this declaration of my personal knowledge.

1.      The attached Exhibit 1 is a true copy of a transcript for the 2001 income-tax account of Mark E. and Mary S. Hutton that the Internal Revenue Service sent to the Tax Division after this case was filed. As required by General Order 42A, ¶ 25, I redacted all Social Security numbers from the exhibit.

2.      The attached Exhibit 2 is a true copy of an extract from the Internal Revenue Manual, IRM 3(27)(68)(12)(4), Master File Codes.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 10, 2007.

s/ Robert Stoddart
_____
ROBERT STODDART

```
Station Name:                                                              Time:

AMDISA ████████████
                       ST-        SER/RPT                              JULIAN-DT>2005230    PRJ FR
MFT  TX-PRD   CD    PBC NUMBER      EGC    NC/CD  SRC PICF      ASED         CRTN-DT    -CD -C
30   200112   12    209 298311204  1557    HUTT   17   0   08/28/2005    20040311    0268
30   200212   12    214 298311409  1631    HUTT   17   0   04/15/2006    20040311    0269 F
NM-LN-YR>1999                            PRIMARY-NAME>HUTTON,MARK E & MARY S
                       CONTINUATION-OF-PRIMARY-NAME>
                                    STREET>7118 CLEAR MEADOW CT
                       CITY>WICHITA                      STATE>KS ZIP>67205105
```

---

Station Name: WIC004MA2569279 Date: 8/18/2005 Time: 11:09:22 AM

```
████████████          MFT>30  TX-PRD>200112                    NM-CTRL>HUTT
PRIMARY-NAME>HUTTON,MARK E & MARY S                           JULIAN-DT>200523
ASED>08/28/2005                           OPNG-CRTN/TRANSFR-DT>03/11/200
SOURCE-CD>17   TAX SHELTER PROGRAM                     EXAM-START-CYC>200406

DIF-REASON-CODE>R   DIF-CAT-SCORE>00420
ACTY-CD>534 MF-TC>670                                              DIS-IND>
                                            SPOUSES-SSN>████████████
STATUTE-XTRCTN-IND>1   PARTIAL-AGRMT-IND>1   TC-300-IND>0
PBC>209 SBC>41500 POD>397   SC TRANSFERRED FROM>298 AMSOC-TRANSFER-DT>05/24/200
EGC/DT>1557  12/16/2004         PRIOR-EGC/DT>1314 06/02/2004   PRIOR-SBC>4050
 CURRENT-STATUS-CD/DATE              PRIOR-STATUS-CD/DATE
 12 STARTED          06/07/2004 10 ASSIGNED-NO TIME APPLIED   06/02/200
PROJ-CD>0268 TRACKING-CD>9767                       PICF-CD>0
                            XREF-DLN>17247164100005
RET-RECVD-DT>08/28/2002          RET-PSTNG-YR>2002 UPDT-CD>Q PR-UPDT-CD>
CAF-IND>1              AIMS-OPN-CTRL-NUM>298311204            TC-424-CD>

NM-LN-YR>1999        MASTER-FILE-NAME-LINE>MARK E & MARY S HUTTON
                     CONT-OF-PRIMARY-NAME>
                            STREET>7118 CLEAR MEADOW CT
                       CITY>WICHITA                STATE>KS ZIP>67205105
                                                            SC>17 CSC
Employee #2939624045 Page 001 of 002  PAGE   002
```



EXHIBIT

IMFOLT ███████ 30200112P01   IMF TAX MODULE          NM CTRL:HUTT
09221-243-16044-2                          SPSSN ██████████ UP-CYC:33
MARK E & MARY S HUTTON                          TOT EXEMPTIONS:02    FMS:
MARY S HUTTON                    FSC:2 STATUS:12 STATUS DATE:09302002 AIMS :1
NEXT  CSED:09-30-2012 ASSESSED BAL:   24,939.29-SETTLMNT DATE:09302002 LIEN :
LAST  CSED:07-04-2015 TOT INTEREST:   13,437.34 INTEREST DATE:07112005 BWI  :
FIRST CSED:09-30-2012 INT ASSESSED:   13,437.34 DISASTER RDD :       BWNC :0
      ASED:08-28-2005 INT PAID:       13,437.34-DISASTERSTART:       CC81 :0
      RSED:10-15-2005 FTP TOTAL:            .00 GOVRN SC:09 HIST LC:48 CC85 :0
   FREEZE:      -LK   FTP ASSESSED:         .00 MATH IN: TDA COPY:   TC914:0
INDICATORS:                                                         CAF  :1
EFT-IND: 0                                                          ARDI :0
TC   DATE      AMOUNT       CYCLE      DLN          VARIABLE DATA    DDRC :0
150 09302002        .00   20023808 09221-243-16044-2 RECEIVED-DATE: 08282002
806 04152002   31,269.00- 20023808 09221-243-16044-2
460 04152002        .00   20021808 39219-111-02221-2 EXT-DT:08152002
670 04152002    2,000.00- 20021808 39219-111-02221-2
460 04152002        .00   20023808 09277-248-22545-2 EXT-DT:10152002
846 09302002   33,269.00  20023808 09221-243-16044-2 RFND-INT:        .00   DD:
922 09072003 .₈? .00   20032008 28277-126-10210-3 PROCESS-CD:03-21
425 03022004        .00   20041008 29277-062-20000-4 SOURCE-CD:20 SPC:0268
         EGC:5314                               PBC:298 SBC:00000

         PAGE 001 OF 002              IMFPG 002

IMFOLT ██████    30200112P02   IMF TAX MODULE       NM CTRL:HUTT

                                                            UP-CYC:33
TC   DATE      AMOUNT       CYCLE      DLN          VARIABLE DATA
420 03112004        .00   20041108 17277-071-00000-4 SOURCE-CD:20 PBC:209
                                                    SBC:00000 EGC:5314
670 10252004   175,870.63- 20044408 09217-299-28500-4 DESG-PYMT-CD:24
971 10252004        .00   20044408 09277-702-00229-4 ACT-CD: 010
977 10252004        .00   20044408 09277-702-00229-4
570 11152004        .00   20044408 09217-299-28500-4
971 10252004        .00   20044708 09277-722-00333-4 ACT-CD: 013
977 10252004        .00   20044708 09277-722-00333-4
960 12082004        .00   20045008 84277-743-00502-4
971 09132004        .00   20050708 38277-439-00490-5 MEMO:   137,494.00
                                                    ACT-CD: 064
971 10252004        .00   20052208 18277-545-02572-5 ACT-CD: 013
977 10252004        .00   20052208 18277-545-02572-5
300 07042005   137,494.00  20052508 17247-566-10000-5 CSED:07042015
336 07042005    13,437.34  20052508 09221-243-16044-2

         PAGE 002 OF 002              IMFPG 001

# Section 8.    Master File Codes

## .01  *Transaction Codes* IRM 3(27)(68)(12).4

Transaction Codes (TC) consist of three digits. They are used to identify a transaction being processed and to maintain a history of actions posted to a taxpayer's account on the Master File. Every transaction processed by ADP must contain a Transaction Code to maintain Accounting Controls of debits and credits, to cause the computer at NCC to post the transaction on the Master File, to permit compilation of reports, and to identify the transaction when a transcript is extracted from the Master File. Transaction codes that are unique to IDRS are also included.

Many BMF and IMF Transaction Codes will *not* be used for IRAF. Also, the definitions of several transaction codes are necessarily changed since there will be no resequencing, offsetting, or computer generated interest. In addition, all refunds will be scheduled manually with the refunds posted to the IRAF using TC 840.

### Reversal Codes

An "R" following the transaction code indicates the transaction has been reversed.

Payment or penalty transaction codes with reversal code "3" which are NOT LISTED in this section are actually reversal code "0" transactions. For programming purposes, the "0" has been converted to "3" to indicate the original payment or penalty transactions (or portion of it) which have been reversed. However, for account analysis purposes, the "3" reversal code should be considered as "0".

All transaction codes currently in use are listed on the following pages. Abbreviations used under the heading FILE are as follows: IMF "I", BMF "B", EPMF "E" and IRAF "A". EPMF may be shown twice for certain entity TC. For doc. code 63, they are applied to the entity module; for doc. code 64, applied to the plan data module.

| TRANS CODE | DR/CR | FILE | TITLE | VALID DOCUMENT CODE | REMARKS |
|---|---|---|---|---|---|
| 000 | | I/B/E | Establish an Account | BMF: 04 or 63 80, 81 IMF: 63 EPMF: 04, 30, 33 36, 37, 38, 39, 63 IRAF: 63 | Adds a new taxpayer entity to the applicable Master File. BMF—Generates TCMP Code IMF— Establishes Power of Attorney and Scrambled SSN Indicator. |
| | | E | Establish Plan | 64 | Establish a Plan Data module |
| 001 | | B/E | Resequence an Account due to a TIN Change | Generated Transaction | Requences an account to a different TIN. Generated when TC 011, 040, or 041 posts. Carries old TIN as reference. |
| 001 | | E | Resequence due to Plan Number change | Generated Transaction | Resequences a plan data module due to a plan number change. Carries old plan number as reference. Generated by Doc code 64 transaction. |
| 001 | | I/A | Resequence an Account | Generated Transaction | Resequences an account because of an SSN change or a change in SSN validity. |
| 002 | | B/A/E | TIN Change Failed to Resequence | Generated Transaction | Account did not meet merge criteria. Restores entity and tax modules to the MF that were processed as TC 001. |

8-29

from the spouse's module (may be zero if none available or spouse's account is not found) and freeze is released.

| 667 | Debit (NPJ) | I | Estimated Tax Debit Transfer Out | Generated Transaction | Debit transaction representing amount of ES Credits transferred to a spouse's account. Release Excess ES Credit Freeze. |
| 670 | Credit (PJ) | I,B,A | Subsequent Payment | 17,18,24,58 I/B: 34 | If return has posted, credits the Tax Module with payment on account. If return has not posted, credits the Tax Module with prepayment on account. IMF only: If a TC 416 is posted, generates TC 417 when module balance is zero, or the 670 amount varies less than one dollar from the TC 416 amount, or 670 has Doc Code 58. May carry secondary TC 460 generating Automatic extension of two months. |
| 671 | Debit (PJ) | I,B A | Subsequent Payment Check Dishonored | 24,58,87 | Records a dishonored check issued as a subsequent payment. IMF/BMF/IRAF: if not accompanied by secondary TC 280, TC 286 is generated. |
| 672 | Debit (PJ) | I,B,A | Correction of 670 Processed In Error | 24 I,B: 34 | Reverses a 670 in whole or in part by debiting the module. |
| 678 | Credit (PJ) | B | Credit for Treasury Bonds | 17,24,58 | Credits Tax Module for amount of estimated tax paid by Treasury Bonds. Applies only to Estate Tax. |
| 679 | Debit (PJ) | B | Reverse credit for Treasury Bonds | 24, 58 | Reverses TC 678 in whole or in part by debiting the module. |
| 680 | Credit | I,B,A | Designated Payment of Interest | 17,18,24 | IMF/BMF/IRAF: Input to Pay assessed and/or unassessed interest due without tolerance application. Updates interest paid field by the TC 680 amount. If the interest paid field exceeds the interest assessed field, generates TC 196 to the extent of paid unassessed interest due. Any portion that exceeds TOTAL interest due is applied to tax and penalty. The TC 680 amount which pays assessed interest is excluded when recomputing interest. |
| 681 | Debit (PJ) | I,B,A | Designated Payment Check Dishonored | 24,58,87 | Records a dishonored check issued as a designated payment of interest and reverses the 680 transaction in whole or in part IMF/BMF/IRAF: if not accompanied by secondary TC 280, TC 286 is generated. |
| 682 | Debit (PJ) | I,B,A | Correction of 680 Processed In Error | 24,58,87 I,B: 34 | Reverses 680 credit in whole or in part by debiting the Tax Module IMF/IRAF: When posted, computer automatically generates a TC 197 interest reversal generated from the posting of TC 680 if interest has not been abated previously |